Stephen M. Pezanosky
State Bar No. 15881850
Eli O. Columbus
State Bar No. 24028062
David L. Staab
State Bar No. 24093194
Martha Wyrick
State Bar No. 24101606
HAYNES AND BOONE, LLP
301 Commerce Street, Suite 2600
Fort Worth, TX 76102
Telephone: 817.347.6600
Facsimile: 817.347.6650
Email: stephen.pezanosky@haynesboone.com
Email: eli.columbus@haynesboone.com
Email: david.staab@haynesboone.com
Email: martha.wyrick@haynesboone.com

**PROPOSED ATTORNEYS FOR DEBTORS**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Corsicana Bedding, LLC, *et al.*,[1] | § | Case No. 22-90016-elm11 |
| | § | |
| Debtors. | § | Joint Administration Requested |

**DEBTORS' EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS
PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503 AND 507 (I) AUTHORIZING
THE DEBTORS TO OBTAIN SENIOR SECURED SUPERPRIORITY POSTPETITION
FINANCING; (II) GRANTING (A) LIENS AND SUPERPRIORITY ADMINISTRATIVE
EXPENSE CLAIMS AND (B) ADEQUATE PROTECTION TO CERTAIN
PREPETITION LENDERS; (III) AUTHORIZING USE OF CASH COLLATERAL; (IV)
SCHEDULING A FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Corsicana Bedding, LLC (3019) ("Corsicana"); Thetford Leasing LLC (7227) ("Thetford"); Olive Branch Building, LLC (7227) ("Olive Branch"); Eastern Sleep Products Company (1185) ("Eastern Sleep"); Englander-Symbol Mattress of Mississippi, LLC (5490) ("Englander Symbol"); Hylton House Furniture, Inc. (5992) ("Hylton House"); Luuf, LLC (3450) ("Luuf"); Symbol Mattress of Florida, Inc. (4172) ("Symbol Florida"); Symbol Mattress of Pennsylvania, Inc. (3160) ("Symbol Pennsylvania"); Symbol Mattress of Wisconsin, Inc. (0871) ("Symbol Wisconsin"); Symbol Mattress Transportation, Inc. (1185) ("Symbol Transportation"); and Master Craft Sleep Products, Inc. (4961) ("Master Craft"). The location of the Debtors' service address is P.O. Box 3233, Fort Worth, Texas 76113.

Corsicana Bedding, LLC and its debtor affiliates, as debtors and debtors-in-possession in the above-referenced chapter 11 cases (collectively, the "Debtors") hereby file this *Debtors' Emergency Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503 and 507 (I) Authorizing the Debtors to Obtain Senior Secured Superpriority Postpetition Financing; (II) Granting (A) Liens and Superpriority Administrative Expense Claims and (B) Adequate Protection to Certain Prepetition Lenders; (III) Authorizing Use Of Cash Collateral; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (the "Motion"). In support of the Motion, the Debtors respectfully state as follows:

### Preliminary Statement[2]

1.      As described in greater detail in the First Day Declaration, the Debtors commenced these chapter 11 cases to effectuate a transaction with Blue Torch, or such other party that may emerge through the section 363 sale process, to implement an overall operational and financial restructuring. In furtherance of these goals, the Debtors propose to enter into two, separate DIP Facilities: (i) the DIP Revolver Facility pursuant to the terms of the Revolver DIP Agreement and (ii) the DIP Term Loan Facility pursuant to the terms of the Term DIP Term Loan Note.

2.      The agreements with the DIP Secured Parties reflect the only terms under which the Debtors have been able to obtain the financing necessary to fund critical expenses, to provide the Debtors with an orderly transition into the Chapter 11 Cases, and to preserve the going-concern value of the Debtors.

3.      The DIP Facilities provide the Debtors with the necessary liquidity to continue operating their business and fund the expenses of these Chapter 11 Cases by providing the Debtors

---

[2] Terms not defined in this Preliminary Statement are defined elsewhere in this Motion.

with access to Cash Collateral and: (i) up to **$40 million** in DIP Revolving Commitments and (ii) term loans in an aggregate principal amount not to exceed **$18 million** under the DIP Term Loan.

4. The Debtors are at a critical juncture, and the DIP Facilities provide the necessary financing to allow the Debtors to preserve value for all stakeholders and pursue value maximizing transactions in these Chapter 11 Cases that will benefit the Debtors' estates and creditors.

## Jurisdiction and Venue

5. The United States District Court for the Northern District of Texas (the "District Court") has jurisdiction over the subject matter of this Motion pursuant to 28 U.S.C. § 1334. The District Court's jurisdiction has been referred to this Court pursuant to 28 U.S.C. § 157 and the District Court's Miscellaneous Order No. 33, *Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc* dated August 3, 1984. This is a core matter pursuant to 28 U.S.C. § 157(b), which may be heard and finally determined by this Court. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

6. The statutory bases for the relief requested herein include sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d), 364(e), 503 and 507 of Title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of the United States Bankruptcy Court for the Northern District of Texas (together, the "Local Rules").

## Background

7. On June 25, 2022 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code commencing the above captioned cases (the "Chapter 11 Cases"). The Debtors continue to manage and operate their businesses as debtors-in-possession pursuant to section 1107 and 1108 of the Bankruptcy Code.

8. An official committee of unsecured creditors has yet to be appointed in these Chapter 11 Cases. No trustee or examiner has been requested or appointed in these Chapter 11 Cases.

9. A detailed description of the Debtors and their businesses, and the facts and circumstances supporting the Motion and the Debtors' Chapter 11 Cases are set forth in the *Declaration of Michael Juniper in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"),[3] which was filed on the Petition Date and is incorporated by reference in this Motion, and the *Declaration of Michael Juniper in Support of Debtors' Emergency Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503 and 507 (I) Authorizing the Debtors to Obtain Senior Secured Superpriority Postpetition Financing; (II) Granting (A) Liens and Superpriority Administrative Expense Claims and (B) Adequate Protection to Certain Prepetition Lenders; (III) Authorizing Use Of Cash Collateral; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (the "Juniper DIP Declaration"), which is attached hereto as **Exhibit 1**.

## Relief Requested

10. The Debtors request the entry of an interim order, substantially in the form attached hereto as **Exhibit 2** (the "Interim Order") and a final order (the "Final Order"), authorizing and approving the Debtors to obtain postpetition financing pursuant to section 363 and 364 of the Bankruptcy Code by entering into (a) a senior secured postpetition debtor-in-possession asset-based revolving credit facility in the aggregate principal amount (subject to availability) of up to $40 million provided by Wingspire Capital LLC ("Wingspire"), as administrative agent, and the lenders from time to time party to the Revolver DIP Agreement (as defined herein) and (b) a senior

---

[3] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Juniper Declaration.

secured postpetition debtor-in-possession term loan facility in the aggregate principal amount of up to $18 million[4] provided by the lenders from time to time party to the DIP Term Loan Note (as defined herein); (c) granting adequate protection to the Prepetition Secured Parties (as defined herein); (d) granting liens and providing super-priority claims with respect to such postpetition financing; (e) authorizing the Debtors to use cash collateral of the Preptition Secured Parties (the "Cash Collateral") on an interim basis in accordance with the budget attached to the Interim Order as **Exhibit C** (the "Initial Budget") which reflects the Debtors' anticipated cash receipts and anticipated disbursements for each calendar week during the period from the Petition Date through and including the end of the thirteenth (13th) calendar week following the Petition Date (the Initial Budget and each subsequent budget approved by the DIP Agents and then in effect, the "Approved Budget"); (f) modifying the automatic stay to the extent necessary to effectuate the terms and conditions of the Interim Order and the Final Order; (g) scheduling a final hearing (the "Final Hearing") on the Motion no later than thirty (30) days after the Petition Date; and (h) granting related relief.

### Concise Statement of the Material Terms of the Interim Order

11.     In accordance with Bankruptcy Rule 4001, below is a summary of the material proposed terms of the DIP Facility and the Debtors' use of Cash Collateral.[5]

| Summary of Material Terms | | Location |
|---|---|---|
| **Borrowers** | **DIP Revolver Facility:**<br><br>Corsicana Bedding, LLC<br>Eastern Sleep Products Company | Interim Order, ¶¶ (1)(a)–(b)<br><br>Revolver DIP Agreement, preamble |

---

[4] Inclusive of $3 million of Protective Advances (as defined in the Prepetition Term Loan Agreement) made by the Prepetition Term Loan Lenders on June 7, 2022 to provide the Debtors with necessary working capital to avoid immediate and irreparable harm pending the preparation for and commencement of these Chapter 11 Cases.

[5] To the extent the terms and conditions listed herein conflict or are inconsistent with those in the Interim Order, the terms and conditions of the Interim Order shall control. All terms not otherwise defined below shall have the meanings ascribed to them in the Interim Order.

| Summary of Material Terms | | Location |
|---|---|---|
| | **DIP Term Loan Facility:**<br><br>Corsicana Bedding, LLC | DIP Term Loan Note, preamble |
| **Guarantors** | **DIP Revolver Facility:**<br><br>Corsicana Parent Co., LLC<br>Chesterfield Landco, L.L.C.<br>Eastern Sleep-Fort Wayne, LLC<br>Eastern Sleep-Poinciana, LLC<br>Englander-Symbol Mattress of Mississippi, LLC<br>Hylton House Furniture, Inc.<br>Master Craft Sleep Products, Inc.<br>Olive Branch Building, LLC<br>Symbol Mattress – Las Vegas, LLC<br>Symbol Mattress of Florida, Inc.<br>Symbol Mattress of Pennsylvania, Inc.<br>Symbol Mattress of Wisconsin, Inc.<br>Symbol Mattress Transportation, Inc.<br>Thetford Leasing, LLC<br><br>**DIP Term Loan Facility:**<br><br>Each of the Debtors other than Corsicana Bedding, LLC. | Revolver DIP Agreement, preamble, § 1.1<br><br>DIP Term Loan Note, preamble |
| **Purpose** | **Both DIP Facilities**<br><br>The proceeds of the DIP Facilities shall be used to: (A) pay costs, premiums, fees, and expenses related to the Chapter 11 Cases and in connection with the DIP Facilities; (B) immediately use borrowings under the DIP Revolver Facility to fully repay the Prepetition ABL Obligations and borrowings under the DIP Term Loan Facility to repay the Protective Advances (as each are defined in the Interim Order); (C) make permitted adequate protection payments in respect of the Prepetition Obligations (as defined Interim Order) as provided for in the Interim Order and the Approved Budget; and (D) provide financing for working capital and for other general corporate purposes of the Debtors in accordance with the Approved Budget. | Interim Order, ¶ (4)<br><br>Revolver DIP Agreement, § 6.8<br><br>DIP Term Loan Note, § 1(d) |
| **Amount** | **DIP Revolver Facility:**<br><br>The DIP Revolver Facility consists of a senior secured super-priority asset-based revolving credit facility (the "DIP Revolver Facility") in an aggregate principal amount (subject to availability) of up to $40 million in revolving commitments available for borrowing by the Borrowers subject to the applicable Borrowing Base (as defined in the Revolver DIP Agreement) (such commitments, the "DIP Revolving Commitments," and the loans outstanding under any of the DIP Revolving Commitments from time to time, collectively, the "DIP Revolving Loans"). | Interim Order, ¶¶ (1)(a)–(b)<br><br>Revolver DIP Agreement, Recitals ¶ E<br><br>DIP Term Loan Note, § 1(a) |

| Summary of Material Terms | | Location |
|---|---|---|
| | **DIP Term Loan Facility:**<br><br>The DIP Term Loan Facility consists of a senior secured super-priority term loan facility (the "DIP Term Loan Facility," and, together with the DIP Revolver Facility, collectively, the "DIP Facilities") in an aggregate principal amount of up to $18 million[6] which shall be available as term loans (the "DIP Term Loans," and, together with the DIP Revolving Loans, the "DIP Loans") to the Borrowers (as defined in the DIP Term Loan Note) upon entry of the Interim Order and satisfaction of the other conditions set forth in the DIP Term Loan Note in an interim amount not to exceed $9,750,000, which amount is inclusive of the $3,000,000 Protective Advances (as defined in the Interim Order) (the "Interim DIP Term Loan"), prior to entry of the Final Order, and the remainder of the DIP Term Loans available upon entry of the Final Order and satisfaction of the other conditions set forth in the DIP Term Loan Note. | |
| **DIP Agents and Lenders** | **Agent to the DIP Revolver Facility:**<br><br>Wingspire Capital LLC ("Wingspire"), as administrative agent (in such capacity, the "DIP Revolver Administrative Agent)."<br><br>**DIP Revolver Lenders:**<br><br>Wingspire and the lenders from time to time party to the Revolver DIP Agreement (in such capacity, the "DIP Revolver Lenders," and together with the DIP Revolver Administrative Agent, the "DIP Revolver Secured Parties").<br><br>**Agent to the DIP Term Loan Facility:**<br><br>Blue Torch Finance, LLC ("Blue Torch"), as administrative agent and collateral agent (in such capacities, the "DIP Term Administrative Agent," and together with the DIP Revolver Administrative Agent, the "DIP Agents")).<br><br>**DIP Term Lenders:**<br><br>The lenders from time to time party to the DIP Term Loan Note (the "DIP Term Lenders," and, together with the DIP Term Administrative Agent, the "DIP Term Secured Parties," and the DIP Term Lenders, together with the DIP Revolver Lenders, the "DIP Lenders," and the DIP Lenders, together with the DIP Agents, collectively, the "DIP Secured Parties"), including:<br><br>Lenders:<br>     BTC Holdings Fund II LLC<br>     BTC Holdings SBAF Fund LLC<br>     BTC Holdings KRS Fund LLC<br>     BTC Offshore Holdings Fund II-B LLC<br>     BTC Holdings SC Fund LLC | Interim Order, ¶¶ (1)(a)–(b)<br><br>Revolver DIP Agreement, preamble<br><br>DIP Term Loan Note, preamble |

---

[6] *See supra* note 4.

| Summary of Material Terms | | Location |
|---|---|---|
| | Swiss Capital BTC OL Private Debt Offshore SP, a Segregated Portfolio of Swiss Capital Private Debt (Offshore) Funds SPC<br>Swiss Capital BTC OL Private Debt Fund L.P.<br><br>Protective Advance Holders<br>    Blue Torch Credit Opportunities SBAF Fund LP<br>    Blue Torch Credit Opportunities SC Master Fund LP<br>    Blue Torch Offshore Credit Opportunities Master Fund II LP<br>    Blue Torch Credit Opportunities KRS Fund LP<br>    Swiss Capital BTC OL Private Debt Offshore SP, a Segregated Portfolio of Swiss Capital Private Debt (Offshore) Funds SPC<br>    Swiss Capital BTC OL Private Debt Fund L.P. | |
| **Interest Rate** | **DIP Revolver Facility:**<br><br>Alternate Base Rate[7] + 3.75%<br><br>**DIP Term Loan Facility:**<br><br>Adjusted Term SOFR[8] + 9.00% | Revolver DIP Agreement, § 3.1(a)<br><br>DIP Term Loan Note, § 4(a) |
| **Maturity** | **DIP Revolver Facility:**<br><br>The DIP Revolver Facility and the Debtors' authorization to use the proceeds of the DIP Revolving Loans will terminate upon the earliest to occur of:<br><br>(a) October 23, 2022, or if such date is not a Business Day, the immediately following Business Day,<br><br>(b) July 30, 2022, if the Final Order has not been entered by the Court on or prior to such date, or if such date is not a Business Day, the immediately following Business Day,<br><br>(c) the maturity date of the DIP Term Loan Facility,<br><br>(d) the date of the substantial consummation (as defined in section 1101(2) of the Bankruptcy Code) of a plan of reorganization that has been confirmed by an order of the Bankruptcy Court, | Interim Order, § 3.1<br><br>Revolver DIP Agreement, § 1.1 (defining "Maturity Date")<br><br>DIP Term Loan Note, § 18 (defining "Maturity Date") |

---

[7] Under the Revolver DIP Agreement, "Alternate Base Rate means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, and (b) the Federal Funds Effective Rate in effect on such day plus 0.50% per annum, provided that the Alternate Base Rate shall at no time be less than 1.00% per annum. Any change in the Alternate Base Rate due to a change in the Prime Rate or the Federal Funds Effective Rate shall be effective from and including the effective date of such change in the Prime Rate or the Federal Funds Effective Rate." Revolver DIP Agreement, § 1.1.

[8] Under the DIP Term Loan Note, "Adjusted Term SOFR means, for purposes of any calculation, the rate per annum equal to (a) Term SOFR for such calculation plus (b) the Term SOFR Adjustment." DIP Term Loan Note, § 18(a).

| Summary of Material Terms | Location |
|---|---|
| (e) the date of termination of all of the Revolving Commitments pursuant to Section 2.3 of the Revolver DIP Agreement, | |
| (f) the date on which the Obligations become due and payable pursuant to this Agreement, whether by acceleration or otherwise, | |
| (g) the date of consummation of a sale of all or substantially all of the Debtors' assets under section 363 of the Bankruptcy Code, | |
| (h) the date of consummation of a sale of all or substantially all of the Collateral under section 363 of the Bankruptcy Code, | |
| (i) the date the Loan Parties' file a motion seeking to convert any or all of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, | |
| (j) (i) the date of conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or (ii) the appointment or election of a trustee under Chapter 11 of the Bankruptcy Code or a responsible officer or examiner with enlarged powers relating to the operation of the Loan Parties' business (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106 of the Bankruptcy Code, | |
| (k) the date the Loan Parties' file a motion seeking a dismissal of any or all of the Chapter 11 Cases, or | |
| (l) the date of dismissal of any of the Chapter 11 Cases. | |
| **DIP Term Loan Facility:** | |
| The DIP Term Loan Facility and the Debtors' authorization to use the proceeds of the DIP Term Loans will terminate upon the earliest to occur of | |
| (i) October 23, 2022, or if such date is not a Business Day the immediately following Business Day, | |
| (ii) July 30, 2022, if the Final Order has not been entered by the Bankruptcy Court on or prior to such date, or if such date is not a Business Day the immediately following Business Day, | |
| (iii) the consummation of a sale of all or substantially of the Debtors' assets pursuant to the Sale Motion or otherwise; | |
| (iv) the substantial consummation of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order of the Bankruptcy Court, or | |
| (v) the date on which the Term Loans are accelerated pursuant to Section **Error! Reference source not found.** of the DIP Term Loan Note. | |

| Summary of Material Terms | | Location |
|---|---|---|
| **Events of Default** | **Both DIP Facilities:**<br><br>Each of the following shall constitute a "<u>DIP Termination Event</u>" unless waived in writing by the applicable DIP Secured Parties and in accordance with the applicable DIP Loan Documents:<br><br>(i) the occurrence of any "<u>Event of Default</u>" as that term is defined in each of the DIP Loan Agreements;<br><br>(ii) any failure to meet or satisfy any Milestone in accordance with the applicable DIP Loan Documents;<br><br>(iii) the occurrence of the "<u>Maturity Date</u>" as defined in each of the DIP Term Loan Note and the Revolver DIP Agreement;<br><br>(iv) any material violation, breach, or default by any Debtor with respect to any of its obligations under the Interim Order or the DIP Loan Documents,<br><br>(v) the termination of the DIP Loan Documents, or the modification of the DIP Loan Documents or the Interim Order in a manner adverse to any of the DIP Secured Parties or the Prepetition Secured Parties without the prior written consent of such party,<br><br>(vi) entry of any order authorizing any party in interest to reclaim any of the DIP Collateral, granting any party in interest relief from the automatic stay with respect to the DIP Collateral, or requiring that Debtors turnover any of the DIP Collateral, in each case prior to full, final and indefeasible repayment of all DIP Obligations and Prepetition Obligations and with respect to DIP Collateral having value in excess of $50,000;<br><br>(vii) conversion of any Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code;<br><br>(viii) a trustee is appointed or elected in any Chapter 11 Case, or an examiner with the power to operate the Debtors' businesses is appointed in any Chapter 11 Case;<br><br>(ix) (A) with respect to the Debtors, commencement of an adversary proceeding or contested matter objecting to the extent, validity or priority of any Prepetition Obligations and/or the Prepetition Liens and (B) with respect to any party in interest with standing (other than the Debtors), commencement of such proceeding or matter to the extent such proceeding or matter is not overruled by the Court or dismissed within thirty (30) days;<br><br>(x) the date that is thirty-five (35) calendar days following the entry of the Interim Order if a Final Order is not entered in form and substance acceptable to the DIP Secured Parties and the Prepetition Secured Parties by such date; | Interim Order, §§ 3.1, 3.2(a)–(b)<br><br>Revolver DIP Agreement, § 8.1<br><br>DIP Term Loan Note, § 16 |

| Summary of Material Terms | Location |
|---|---|
| (xi) the date of the Final Hearing, if the Interim Order is modified at the Final Hearing in a manner unacceptable to the DIP Secured Parties or the Prepetition Secured Parties; <br><br> (xii) the Debtors shall withdraw the Sale Motion and/or propose an alternative restructuring transaction, chapter 11 plan or course of these Cases other than a sale of substantially all assets pursuant to the Sale Motion (as defined in the Interim Order) (in any event, the "New Approach") that, in any case, does not provide for the repayment in full, in cash, of the DIP Obligations substantially contemporaneously with such withdrawal of the Sale Motion or proposal of such New Approach; and <br><br> (xiii) any modification, amendment, vacatur or stay of the Interim Order in any manner not consented to in writing by the DIP Agents and the Prepetition Agents. <br><br> Prior to the payment in full of all Prepetition Obligations and all DIP Obligations, any request by the Debtors with respect to the following shall also constitute a DIP Termination Event: <br><br> (i) to obtain postpetition loans or other financial accommodations pursuant to sections 364(c) or 364(d) of the Bankruptcy Code that does not provide for the repayment in full of the DIP Obligations and the Prepetition Obligations, other than as provided in the Interim Order or as may be otherwise permitted pursuant to the DIP Loan Documents; <br><br> (ii) to challenge the application of any payments authorized by the Interim Order pursuant to section 506(b) of the Bankruptcy Code; and <br><br> (iii) to propose or support any challenge pursuant to Section 4.1 of the Interim Order, or any challenge by any party in interest seeking to limit or prevent the DIP Secured Parties or the Prepetition Secured Parties from exercising their credit bid rights in connection with the sale of any assets of the Debtors; provided, that the Debtors' response to any information request by a party in interest shall not constitute "support" of a challenge; or <br><br> (iv) to seek relief under the Bankruptcy Code, including, without limitation, under section 105 of the Bankruptcy Code, to the extent any such relief would restrict or impair (A) the rights and remedies of any of the DIP Secured Parties or the Prepetition Secured Parties against the Debtors as provided in the Interim Order, any of the DIP Loan Documents, or any of the Prepetition Documents (B) the exercise of such rights or remedies by any of the DIP Secured Parties or the Prepetition Secured Parties against the Debtors in accordance with the DIP Loan Documents, the Interim Order or the Prepetition Documents; provided, however, that the DIP Agents and the Prepetition Agents may otherwise consent in writing, but no such consent shall be implied from any other action, inaction, or | |

| Summary of Material Terms | Location |
|---|---|
| acquiescence by the DIP Secured Parties and the Prepetition Secured Parties.<br><br>It shall also be a DIP Termination Event if the Debtors propose or support any chapter 11 plan or the sale of all or substantially all of the Debtors' assets (other than pursuant to the Sale Motion (as defined in the Interim Order)), or seek entry of an order confirming a chapter 11 plan or approving such non-conforming sale, that is not conditioned upon the payment of the DIP Obligations, the Prepetition Obligations and the Debtors' obligations with respect to the Adequate Protection granted hereunder, in full in cash, within a commercially reasonable period of time, and in any event no later than the effective date of such chapter 11 plan or sale, without the written consent of the DIP Agents and the Prepetition Agents, as applicable. | |
| **Payment of DIP Fees**<br><br>**DIP Revolver Facility:**<br>Unused Line Fee: 0.5% per annum on the average daily unused amount of the Revolving Commitment (as defined in the Revolver DIP Agreement).<br><br>Exit Fee: Upon the Maturity Date, Borrowers shall pay an exit fee of $800,000, which fee represents (i) two percent (2.0%) multiplied by (ii) the aggregate amount of the Revolving Commitments on the Second Amendment Date.<br><br>Collection Day Fees: Additional interest that the Borrowers would have paid in respect of the Revolving Loans, at the Alternate Base Rate plus the Applicable Margin, as if each payment received (whether in the form of cash, check or otherwise) which has been presented for application to the Revolving Loans had not been received in the Collections Account and credited to the Borrowers until three Business Days after the Business Day that such payment was actually received in the Collections Account.<br><br>**DIP Term Loan Facility:**<br>Facility Fee: 2.0% of the aggregate principal amount of the Commitment, payable on the Closing Date (as such terms are defined in the DIP Term Loan Note).<br><br>Agent Fee: $100,000 payable on the Closing Date (as defined in the DIP Term Loan Note) and on the anniversary of the Closing Date.<br><br>Exit Fee: 2.0% of the aggregate principal amount of the Commitments (as defined in the DIP Term Loan Note), payable on the Maturity Date or such earlier date on which the DIP Term Loan Obligations are paid in full. | Interim Order, § 1.3(c)<br><br>Revolver DIP Agreement,§§ 2.5(e), 3.2<br><br>DIP Term Loan Note, § 8 |
| **Payment of Expenses**<br><br>**Both DIP Facilities:**<br><br>The Debtors shall pay (i) the reasonable and documented fees and expenses reimbursable under the DIP Facilities, the DIP Loan Agreements, or the other DIP Loan Documents, as applicable, whether incurred before or after the Petition Date and (ii) all reasonable and documented out-of-pocket costs and expenses of the | Interim Order, §§ 2.4(c), 2.4(d), 5.15<br><br>Revolver DIP Agreement, § 10.3(a) |

| Summary of Material Terms | Location |
|---|---|
| DIP Agents and the DIP Revolver Lenders including, without limitation, reasonable and documented fees and disbursements of counsel in connection with the enforcement or preservation of any rights under the DIP Facilities, the DIP Loan Agreements, or the other DIP Loan Documents. With respect to payment of fees and expenses incurred from and after the Petition Date, the DIP Agents and the DIP Revolver Lenders shall comply with the procedures set forth in Section 2.4(d) of the Interim Order. | DIP Term Loan Note, § 1(d) |

| | Summary of Material Terms | Location |
|---|---|---|
| **Indemnity Obligations** | **Both DIP Facilities:**<br><br>The Debtors shall indemnify and hold harmless the Prepetition Secured Parties, the DIP Agents and the DIP Lenders in respect of any claim or liability incurred in respect thereof or in any way related thereto, provided that no such parties will be indemnified for any cost, expense, or liability to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from such parties' gross negligence or willful misconduct. No exception or defense exists in contract, law, or equity as to any obligation set forth, in paragraph E(viii) of the Interim Order, in the Prepetition Documents, or in the DIP Loan Documents, to the Debtors' obligation to indemnify and/or hold harmless the Prepetition Secured Parties, the DIP Agents or the DIP Lenders, as the case may be. | Interim Order, ¶ (E)(viii)<br><br>Revolver DIP Agreement, § 10.3(b)<br><br>DIP Term Loan Note, § 9 |
| **DIP Superpriority Claims** | **Both DIP Facilities**<br><br>Subject to the priorities set forth on **Exhibit E** of the Interim Order and the Carve Out, on account of all DIP Obligations now existing or hereafter arising pursuant to the Interim Order, the DIP Loan Documents, or otherwise, the DIP Agents, for the benefit of themselves and the DIP Lenders, will be granted allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code, having priority in right of payment over any and all other obligations, liabilities, and indebtedness of the Debtors, whether now in existence or hereafter incurred by the Debtors, and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, inter alia, sections 105, 326, 328, 330, 331, 364(c)(1), 365, 503(b), 507(a), 507(b), 546(c), 1113, or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, which allowed superpriority administrative claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (including, subject to entry of the Final Order, proceeds of Avoidance Actions) (such superpriority administrative expense claim as to the DIP Revolver Facility, the "Revolver Superpriority Claim" and, as to such superpriority administrative expense claim as to the DIP Term Loan Facility, the "DIP Term Loan Superpriority Claim" and, collectively, the "DIP Superpriority Claims"). | Interim Order, § 2.2(a)<br><br>Revolver DIP Agreement, § 1.1 (definition of "Adequate Protection Superpriority Claim")<br><br>DIP Term Loan Note, § 11 |
| **DIP Priming Liens** | To secure performance and payment when due (whether at the stated maturity, by acceleration or otherwise) of any and all DIP Obligations of the Debtors to the DIP Secured Parties of whatever | Interim Order, § 2.1 |

| Summary of Material Terms | Location |
|---|---|
| kind, nature, or description, whether absolute or contingent, now existing or hereafter arising, the DIP Agents, for the benefit of themselves and the DIP Lenders, are granted, effective as of the Petition Date, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected security interests in and liens (such security interests and liens as to the DIP Revolver Facility, the "Revolver DIP Liens" and, such security interests and liens as to the DIP Term Loan Facility, the "DIP Term Loan Liens," and, collectively, the "DIP Liens") in and upon all DIP Collateral, subject to Permitted Liens and the rankings and priority set forth in Section 2.1(b) of the Interim Order and as set forth on **Exhibit E** of the Interim Order.<br><br>**Revolver DIP Liens Rankings and Priority:** The Revolver DIP Liens on the DIP Collateral securing the DIP Revolver Obligations shall be first and senior in priority to all other interests and liens of every kind, nature, and description, whether created consensually, by an order of the Court or otherwise, including, without limitation, liens or security interests granted in favor of third parties in conjunction with sections 363, 364, or any other section of the Bankruptcy Code or other applicable law; provided, however, that the Revolver DIP Liens on (A) the Prepetition ABL Priority Collateral (whether in existence on the Petition Date or hereafter arising) shall be subject to the Carve Out and Permitted Liens; (B) the Prepetition Term Priority Collateral (whether in existence on the Petition Date or hereafter arising) shall be subject to the Carve Out, Permitted Liens, the DIP Term Loan Liens, the Prepetition Term Loan Liens and the Prepetition Term Loan Adequate Protection Liens; (C) assets of the Debtors (the "Non-Lender Encumbered Assets") that were subject to validly perfected liens or security interests as of the Petition Date other than the Prepetition Liens (if any, the "Non-Lender Existing Liens") shall be subject (notwithstanding anything in the Prepetition Intercreditor Agreement to the contrary) to such Non-Lender Existing Liens, the Carve Out and pari passu with the DIP Term Loan Liens; and (D) any other assets of the Debtors ("Unencumbered Assets") that were not subject to any validly perfected liens or security interest as of the Petition Date (including, subject to the entry of a Final Order, Avoidance Proceeds) shall be subject (notwithstanding anything in the Prepetition Intercreditor Agreement to the contrary) to the Carve Out and *pari passu* with the DIP Term Loan Liens, in each case as such priorities are set forth in **Exhibit E** of the Interim Order.<br><br>**DIP Term Loan Liens Rankings and Priority:** The DIP Term Loan Liens on the DIP Collateral securing the DIP Term Loan Obligations shall be first and senior in priority to all other interests and liens of every kind, nature, and description, whether created consensually, by an order of the Court or otherwise, including, without limitation, liens or interests granted in favor of third parties in conjunction with sections 363, 364, or any other section of the Bankruptcy Code or other applicable law; provided, however, that the DIP Term Loan Liens on (A) the Prepetition ABL Priority Collateral (whether in existence on the Petition Date or hereafter arising) shall be subject to the Carve Out, Permitted Liens, the Revolver DIP Liens, the Prepetition ABL Liens and the Prepetition | Revolver DIP Agreement, § 2.10<br><br>DIP Term Loan Note, § 11 |

| Summary of Material Terms | | Location |
|---|---|---|
| | ABL Adequate Protection Liens (as defined in the Interim Order); (B) the Prepetition Term Priority Collateral (whether in existence on the Petition Date or hereafter arising) shall be subject to the Carve Out and Permitted Liens; (C) the Non-Lender Encumbered Assets shall be subject (notwithstanding anything in the Prepetition Intercreditor Agreement to the contrary) to the Non-Lender Existing Liens, the Carve Out and pari passu with the Revolver DIP Liens; and (D) the Unencumbered Assets shall be subject (notwithstanding anything in the Prepetition Intercreditor Agreement to the contrary) to the Carve Out and *pari passu* with the Revolver DIP Liens, in each case as such priorities are set forth in **Exhibit E** of the Interim Order. | |
| **Automatic Stay Waiver** | After expiration of the Remedies Notice Period, the automatic stay provisions of section 362 of the Bankruptcy Code and any other restriction imposed by an order of the Court or applicable law are hereby modified without further notice, application, or order of the Court to the extent necessary to (i) permit the DIP Agents and Prepetition Agents to perform any act authorized or permitted under or by virtue of the Interim Order, the DIP Loan Agreements, or the other DIP Loan Documents, as applicable, including, without limitation, (ii) to implement the postpetition financing arrangements authorized by the Interim Order, (iii) to take any act to create, validate, evidence, attach or perfect any lien, security interest, right or claim in the DIP Collateral, (iv) to assess, charge, collect, advance, deduct and receive payments with respect to the Prepetition Obligations and DIP Obligations (or any portion thereof), including, without limitation, all interests, fees, costs, and expenses permitted under any of the DIP Loan Documents and apply such payments to the Prepetition Obligations, and (v) subject to the Remedies Notice Period, to take any action and exercise all rights and remedies provided to it by the Interim Order, the DIP Loan Documents, or applicable law. | Interim Order, § 3.4 |
| **Adequate Protection** | **DIP Revolver Facility:** **Prepetition ABL Adequate Protection Liens.** Prepetition ABL Adequate Protection Liens. The Prepetition ABL Secured Parties are granted (effective and perfected upon the date of the Interim Order and without the necessity of any Perfection Act (as defined therein)) valid and perfected postpetition replacement security interests in and liens upon the DIP Collateral (the "Prepetition ABL Adequate Protection Liens"), which liens shall be, with respect to: (A) the Prepetition ABL Priority Collateral (whether in existence on the Petition Date or hereafter arising), subject and subordinate solely to the Carve Out (as defined in the Interim Order), Permitted Liens (as defined in the Interim Order), the Revolver DIP Liens and the Prepetition ABL Liens; (B) the Prepetition Term Priority Collateral (whether in existence on the Petition Date or hereafter arising), subject and subordinate solely to the Carve Out, Permitted Liens, the DIP Liens, the Prepetition Liens and the Prepetition Term Loan Adequate Protection Liens; (C) the Non-Lender Encumbered Assets, subject to the Non-Lender Existing Liens, the Carve Out and the DIP Liens, and pari passu with the Term Loan Adequate Protection Liens; and (D) Unencumbered Assets, | Interim Order, § 2.4(a) |

| Summary of Material Terms | Location |
|---|---|
| subject to the Carve Out and the DIP Liens, and *pari passu* with the Prepetition Term Loan Adequate Protection Liens, in each case as such priorities are set forth in **Exhibit E** to the Interim Order.<br><br>Adequate Protection Payments. Subject to the Approved Budget, the Debtors are authorized to pay to the Prepetition ABL Lenders on the first business day of each calendar month after the entry of the Interim Order, an amount equal to all accrued and unpaid prepetition or postpetition interest (at the non-default rate), fees, and costs under the Prepetition ABL Documents. For the avoidance of doubt, (a) no payment of interest pursuant to section 2.4(a) of the Interim Order shall be required so long as interest is being timely paid in respect of the Revolver DIP Obligations, and (b) the payment of interest pursuant to section 2.4(a) of the Interim Order shall be without prejudice to the rights of the Prepetition ABL Secured Parties to assert claims for payment of interest at the default rate in accordance with the Prepetition Documents in the event of a successful Challenge (as defined in the Interim Order) to the ABL Refinancing (as defined herein).<br><br>**DIP Term Loan Facility:**<br><br>Prepetition Term Loan Adequate Protection Liens. The Prepetition Term Loan Secured Parties are hereby granted (effective and perfected upon the date of the Interim Order and without the necessity of any Perfection Act (as defined therein)) valid and perfected postpetition replacement security interests in and liens upon the DIP Collateral (the "<u>Prepetition Term Loan Adequate Protection Liens</u>" and, together with the Prepetition ABL Adequate Protection Liens, the "<u>Prepetition Secured Parties Adequate Protection Liens</u>"), which liens shall be, with respect to: (A) the Prepetition ABL Priority Collateral (whether in existence on the Petition Date or hereafter arising), subject and subordinate solely to the Carve Out, Permitted Liens, the DIP Liens, the Prepetition Liens and the Prepetition ABL Adequate Protection Liens; (B) the Prepetition Term Priority Collateral (whether in existence on the Petition Date or hereafter arising), subject and subordinate solely to the Carve Out, Permitted Liens, the DIP Term Loan Liens and the Prepetition Term Loan Liens; (C) the Non-Lender Encumbered Assets, subject to the Non-Lender Existing Liens, the Carve Out and the DIP Liens, and *pari passu* with the Prepetition ABL Adequate Protection Liens; and (D) the Unencumbered Assets, subject to the Carve Out and the DIP Liens, and *pari passu* with the Prepetition ABL Adequate Protection Liens, in each case as such priorities are set forth in **Exhibit E** to the Interim Order.<br><br>**Both DIP Facilities:**<br><br>Adequate Protection Superpriority Claims. The Prepetition Secured Parties are granted allowed superpriority administrative expense claims pursuant to sections 503(b), 507(a), and 507(b) of the Bankruptcy Code (the "<u>Prepetition Secured Parties Adequate Protection Claims</u>"), which shall be allowed claims against each of the Debtors (jointly and severally), with priority (except as otherwise provided in the Interim Order) over any and all administrative | |

| Summary of Material Terms | Location |
|---|---|
| expenses and all other claims against the Debtors now existing or hereafter arising, of any kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and all other administrative expenses or other claims arising under any other provision of the Bankruptcy Code, including, without limitation, sections 105, 326, 327, 328, 330, 331, 365, 503(b), 507(a), 507(b), or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy, or attachment. The Prepetition Secured Parties Adequate Protection Claims shall be payable from and have recourse to all pre- and post-petition property of the Debtors, subject to the Carve Out, Permitted Liens and the rankings and priorities set forth in **Exhibit E** to the Interim Order.<br><br>_Financial Reporting._ The Debtors shall timely provide the Prepetition Secured Parties with (x) reasonable access to the Debtors' facilities, management, books, and records required under the Prepetition Documents and (y) copies of all financial reporting provided to the DIP Agent and DIP Lenders pursuant to the DIP Loan Documents substantially simultaneously with such delivery to the DIP Lenders. The Debtors are also directed to allow the Prepetition Secured Parties (and their representatives and advisors), reasonable access to all of the Debtors' premises, information systems, facilities, management, books, and records for the purpose of enabling Prepetition Secured Parties to inspect, appraise and audit the DIP Collateral. | |
| **Roll Up Provisions**      **DIP Revolver Facility:**<br><br>Upon the entry of the Interim Order and the satisfaction or waiver of all other closing conditions in the Revolver DIP Agreement, without any further action by the Debtors, the Court or any other party, the Debtors shall be (i) authorized to immediately borrow under the Revolver DIP Agreement the full amount necessary to fully and immediately pay off in full all Prepetition ABL Obligations and (ii) subject to Section 4.1 hereof, deemed to have contemporaneously fully repaid all Prepetition ABL Obligations (clauses (i) and (ii) together, the "ABL Refinancing").<br><br>Moreover, as set forth in the Juniper DIP Declaration, in consideration of the entry of the Interim Order authorizing the payment of all Prepetition ABL Obligations with the proceeds of the DIP Revolver Facility (x) the Prepetition ABL Lenders agreed to waive any claims for interest at the Default Rate (as such term is defined in the Prepetition ABL Credit Agreement), (y) the DIP Revolver Lenders have agreed to reduce the Availability Block from $8 million to $4 million so as to provide the Debtors with access to significant additional working capital; and (z) the DIP Revolver Lenders have agreed to defer payment of the Exit Fee required to be paid under the Prepetition ABL Credit Agreement until the Maturity Date of the DIP Revolver Facility.<br><br>**DIP Term Loan Facility:**<br><br>Upon the entry of the Interim Order and the satisfaction or waiver of all other closing conditions in the DIP Term Loan Note, without any | Interim Order, §§ 1.4(a), (b)<br><br>Revolver DIP Agreement, § 1.1 (definition of "Refinancing Indebtedness")<br><br>DIP Term Loan Note, § 1(b) |

| Summary of Material Terms | | Location |
|---|---|---|
| | further action by the Debtors, the Court or any other party, the Debtors shall be (i) authorized to immediately borrow under the DIP Term Loan Note the full amount necessary to fully and immediately pay off in full the Protective Advances and (ii) subject to Section 4.1 hereof, deemed to have contemporaneously fully repaid all Protective Advances (clauses (i) and (ii) together, the "<u>Protective Advance Refinancing</u>," together with the ABL Refinancing, the "<u>Roll-Up Provisions</u>"). | |
| | Moreover, as set forth in the Juniper DIP Declaration, in consideration of the entry of the Interim Order authorizing the repayment of the Protective Advances with the proceeds of the DIP Term Loan Facility, the Prepetition Term Loan Secured Parties agreed to waive any claims for interest at the Default Rate (as such term is defined in the Prepetition Term Loan Agreement) on $3 million of Prepetition Term Loan Obligations. | |
| **506(c) Surcharge Waiver** | **Both DIP Facilities:**<br><br>Except as otherwise set forth therein, upon entry of the Interim Order, no costs or expenses of administration which have been or may be incurred in these Chapter 11 Cases at any time (including, without limitation, any costs and expenses incurred in connection with the preservation, protection, or enhancement of value by the DIP Agents or the DIP Lenders upon the DIP Collateral, or by the Prepetition Secured Parties upon the Prepetition Collateral, as applicable) shall be charged against any of the DIP Agents, DIP Lenders, or (subject to entry of the Final Order) the Prepetition Secured Parties, or any of the DIP Obligations or Prepetition Obligations or the DIP Collateral or the Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise without the prior express written consent of the affected DIP Secured Parties and/or affected Prepetition Secured Parties, in their sole discretion, and no such consent shall be implied, directly or indirectly, from any other action, inaction, or acquiescence by any such agents or creditors (including, without limitation, consent to the Carve Out or the approval of any budget hereunder). | Interim Order, § 5.11 |
| **Release of Claims** | Subject to Section 4.1 of the Interim Order, each of the Debtors, their Estates and the Prepetition Obligors, on their own behalf and on behalf of each of their past, present and future predecessors, successors, heirs, subsidiaries, and assigns, hereby forever, unconditionally, permanently, and irrevocably release, discharge, and acquit each of the DIP Secured Parties and the Prepetition Secured Parties, and (in such capacity) each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns (collectively, the "<u>Released Parties</u>") of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including, without limitation, attorneys' fees), debts, liens, actions, and causes of action of any and every nature whatsoever, whether arising in law or otherwise, and whether known | Interim Order, § 5.17 |

| Summary of Material Terms | Location |
|---|---|
| or unknown, matured or contingent, arising under, in connection with, or relating to (i) the Prepetition Obligations and the DIP Facilities or (ii) the DIP Loan Documents and the Prepetition Documents, as applicable, including, without limitation, (a) any so-called "lender liability" or equitable subordination claims or defenses, (b) any and all "claims" (as defined in the Bankruptcy Code) and causes of action arising under the Bankruptcy Code, and (c) any and all offsets, defenses, claims, counterclaims, set off rights, objections, challenges, causes of action, and/or choses in action of any kind or nature whatsoever, whether arising at law or in equity, including any recharacterization, recoupment, subordination, avoidance, or other claim or cause of action arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state, federal, or foreign law, including, without limitation, any right to assert any disgorgement or recovery, in each case, with respect to the extent, amount, validity, enforceability, priority, security, and perfection of any of the Prepetition Obligations and the DIP Obligations, the Prepetition Documents and the DIP Loan Documents, or the Prepetition Liens and the DIP Liens, and further waive and release any defense, right of counterclaim, right of setoff, or deduction to the payment of the Prepetition Obligations and the DIP Obligations that the Debtors now have or may claim to have against the Released Parties, arising under, in connection with, based upon, or related to any and all acts, omissions, conduct undertaken, or events occurring prior to entry of the Interim Order. The Debtors are authorized in any payoff letter or similar agreement into which they enter upon payment in full of any DIP Obligations to provide a waiver and release substantially similar to the waiver and release set forth in section 5.17 of the Interim Order of the applicable DIP Agent(s) and the applicable DIP Lenders and their respective related parties. | |
| **Remedies** **Both DIP Facilities:**<br><br>Upon the expiration of five (5) Business Days following the delivery of a written notice by any DIP Agent or Prepetition Agent, as applicable, of the occurrence of and during the continuance of a DIP Termination Event (the "Remedies Notice Period"), (a) the DIP Agents shall each be entitled to independently take any act or exercise any right or remedy as provided in the Interim Order or any DIP Loan Document, as applicable, including, without limitation, (i) declare all DIP Obligations owing under their respective DIP Loan Documents to be immediately due and payable; (ii) terminate, reduce, or restrict any commitment to extend additional credit to the Debtors to the extent any such commitment remains; (iii) terminate the DIP Facilities and any DIP Loan Document as to any future liability or obligation of the DIP Secured Parties, but without affecting any of the DIP Obligations or the DIP Liens securing the DIP Obligations; (iv) invoke the right to charge interest at the default rate under the DIP Loan Documents; and/or (v) stop lending; and (b) the Prepetition Agents shall (i) be entitled to terminate and/or revoke the Debtors' right, if any, under the Interim Order and the other DIP Loan Documents to use any Cash Collateral and all such authority to use Cash Collateral shall cease and (ii) each have automatic and immediate relief from the automatic stay with respect to the | Interim Order, § 3.3 |

| Summary of Material Terms | | Location |
|---|---|---|
| | Prepetition Collateral (without regard to the passage of time provided for in Fed. R. Bankr. P. 4001(a)(3)), and shall be entitled to exercise all rights and remedies available under the Prepetition Documents and applicable non-bankruptcy law (subject to the Prepetition Intercreditor Agreement). For the avoidance of doubt, notwithstanding the foregoing, during the Remedies Notice Period, the Debtors (x) may not borrow under the DIP Revolver Facility or make any Withdrawal from the Escrow Account (as those terms are defined in the Interim Order), and (y) may use Cash Collateral solely in amounts necessary to avoid immediate and irreparable harm to the Debtors' Estates (including funding payroll and paying other administrative expenses) all in accordance with the Interim Order and the Approved Budget, or that have otherwise been approved in advance in writing by the DIP Secured Parties. | |
| **Credit Bid Rights** | **Both DIP Facilities:**<br><br>The Debtors acknowledge and agree that, pursuant to Section 363(k) of the Bankruptcy Code and subject to the Prepetition Intercreditor Agreement, each of the DIP Revolver Secured Parties, Prepetition ABL Secured Parties, the DIP Term Secured Parties and the Prepetition Term Loan Secured Parties shall have the right to credit bid the full amount of the DIP Revolver Obligations, the Prepetition ABL Obligations, the DIP Term Loan Obligations and the Prepetition Term Loan Obligations, respectively, in connection with any sale of the Debtors' assets pursuant to the Sale Motion or otherwise. | Interim Order, § 5.14 |
| **Milestones** | **Both DIP Facilities:**<br><br>The Milestones are set forth in **Exhibit D** to the Interim Order, as follows:<br><br>(i) No later than three (3) Business Days after the Petition Date, the Interim Order approving the DIP Facilities and the adequate protection of the Prepetition Liens shall be entered by the Court;<br><br>(ii) No later than three (3) Business Days following the Petition Date, the Debtors shall file the Sale Motion (as defined in the Interim Order), which motion shall be in form and substance reasonably acceptable to the DIP Agents;<br><br>(iii) No later than thirty-five (35) days after the Petition Date, the Final Order approving the DIP Facilities and the adequate protection of the Prepetition Liens shall be entered by the Court;<br><br>(iv) No later than thirty-five (35) days after the Petition Date the Court shall have entered an order approving bid and auction procedures, in form and substance reasonably acceptable to the DIP Secured Parties;<br><br>(v) If the asset purchase agreement provided by the stalking horse bidder in connection with the Sale Motion does not provide for the payment in full in cash of the DIP Revolver Facility (and the Prepetition ABL Facility to the extent any amounts remain due and | Interim Order, Ex. D<br><br>Revolver DIP Agreement, § 6.18, Schedule 6.18<br><br>DIP Term Loan Note, § 14(h) |

| Summary of Material Terms | Location |
|---|---|
| owing thereunder), than the later of 50 days after the Petition Date or 3 Business Days prior to the deadline for objecting to the approval of the sale of all or substantially all of the Debtors' assets, the stalking horse bidder shall have provided a commitment letter for replacement/refinancing of the DIP Revolver Facility (and the Prepetition ABL Facility to the extent any amounts remain due and owing thereunder), in form and substance reasonably acceptable to the DIP Revolver Administrative Agent and DIP Revolver Lenders. For the avoidance of doubt, Wingspire may provide such commitment letter;<br><br>(vi) No later than sixty (60) days after the Petition Date the Court shall have entered one or more orders authorizing and approving the sale of all or substantially all of the Debtors' assets pursuant to one or a series of related or unrelated transactions, and such order(s) shall be in a form and substance reasonably acceptable to the DIP Secured Parties; and<br><br>(vii) No later than seventy-five (75) days after the Petition Date, the approved sale(s) of all or substantially all of the Debtors' assets shall have been consummated. | |
| **Cash Collateral** | **Entities with an Interest in Cash Collateral:**<br><br>The Prepetition ABL Secured Parties have a first lien on the Cash Collateral.<br><br>The Prepetition Term Loan Secured Parties have a second lien on the Cash Collateral.<br><br>**Purposes for the Use of Cash Collateral:**<br><br>The Debtors have an immediate need to obtain the postpetition financing and to use Cash Collateral as set forth in the Interim Order to, among other things, permit the orderly continuation of the operation and maintenance of their businesses, minimize the disruption of their business operations and other efforts and activities and preserve and maximize the value of the assets of the Debtors' Estates to maximize the recovery to all creditors of the Estates. | Interim Order, ¶ (E)<br><br><br><br><br><br>Interim Order, ¶ (F) |

## Basis for Relief Requested

### I.    The Debtors' Prepetition Indebtedness

#### A.    ABL Facility

12.    Corsicana Bedding, LLC ("Corsicana"), and certain of its affiliates designated therein, as borrowers, Corsicana Parent Co., LLC, designated as "Holdings" thereunder, certain other parties (including, without limitation, Holdings) designated as "Guarantors" thereto (such

parties, collectively, the "<u>Prepetition ABL Obligors</u>"), the financial institutions from time to time party thereto (collectively, the "<u>Prepetition ABL Lenders</u>"), and Wingspire, as administrative agent (in such capacity, the "<u>Prepetition ABL Agent</u>"), are parties to that certain Credit Agreement, dated as of April 28, 2021 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "<u>Prepetition ABL Credit Agreement</u>" and, together with all other agreements, documents, and instruments executed and/or delivered with, to or in favor of the Prepetition ABL Agent and the Prepetition ABL Lenders, including, without limitation, all security agreements, deposit account control agreements (including, without limitation, the Control Agreements (as defined below)), control agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements, documents, and instruments, including any fee letters, executed and/or delivered in connection therewith or related thereto, the "<u>Prepetition ABL Loan Documents</u>"). The Prepetition ABL Credit Agreement provided the Prepetition ABL Obligors with an asset-based revolving credit facility (the "<u>Prepetition ABL Facility</u>") with $40 million of maximum aggregate availability to the borrowers thereunder, subject to a borrowing base (as reduced by reserves), as set forth in the Prepetition ABL Credit Agreement.

13. As of the Petition Date, approximately **$18,545,929.18** in principal was outstanding under the Prepetition ABL Facility in the form of "<u>Loans</u>" (as defined under the Prepetition ABL Credit Agreement), plus interest accrued and accruing at the rates set forth in the Prepetition ABL Credit Agreement (together with any other amounts outstanding under the Prepetition ABL Loan Documents, including, without limitation, obligations in respect of fees, expenses, and indemnity the "<u>Prepetition ABL Obligations</u>").[9] The Prepetition ABL Agent and the Prepetition ABL Lenders are referred to collectively herein as the "<u>Prepetition ABL Secured Parties</u>."

---

[9] The defined term "Obligations" in the Prepetition ABL Credit Agreement means "the due and punctual payment and performance of all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party [i.e., the

14. As more specifically described in the various loan documents entered into in connection with the Prepetition ABL Facility, the Prepetition ABL Facility is secured by (a) first priority security interests in and liens (subject only to certain of the liens permitted under the Prepetition ABL Loan Documents) on certain of the Debtors' property, including (i) all Accounts[10] (other than Accounts which constitute identifiable proceeds of Term Priority Collateral), (ii) all cash, money and cash equivalents (other than, in each instances, as set forth in the Prepetition Intercreditor Agreement), (iii) all Deposit Accounts, Securities Accounts and Commodity Accounts (other than, in each instance as set forth in the Prepetition Intercreditor Agreement), (iv) all Inventory, (v) to the extent evidencing or governing any of the items referred to in clauses (i) through (iv) above, all Documents, General Intangibles, Instruments, Chattel Paper, Commercial Tort Claims, Investment Property and Letter-of-Credit Rights (other than, in each instance as set forth in the Prepetition Intercreditor Agreement), (vi) ABL Intercompany Debt, certain payments constituting certain proceeds of ABL Priority Collateral and the ABL Secured Parties' Business Interruption Insurance Percentage, (vii) all supporting obligations with respect to the ABL Priority Collateral (other than as set forth in the Prepetition Intercreditor Agreement), (viii) all books and records constituting ABL Priority Collateral, (ix) all collateral security and guarantees with respect to any of the items referred to in the preceding clauses (i) through (viii), and (x) all proceeds of

---

Prepetition ABL Obligors] under or pursuant to each of the [Prepetition ABL] Loan Documents or otherwise with respect to any Loan [as defined under the Prepetition ABL Credit Agreement], including, without limitation all principal, interest, fees and other amounts payable under the [Prepetition ABL] Loan Documents, and all costs and expenses incurred in connection with enforcement and collection of the foregoing, including the fees, charges and disbursements of counsel, in each case whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising, and including interest, expenses and fees that accrue after the commencement by or against any Loan Party or any [affiliate] thereof of any proceeding under any [applicable bankruptcy and insolvency laws] naming such [person] as the debtor in such proceeding, regardless of whether such interest, expenses and fees are allowed in such proceeding."

[10] Capitalized terms used but not defined in this paragraph shall have the meanings ascribed to them in the Interim Order.

any of the items referred to in the preceding clauses (i) through (ix) (such property, whether now existing or hereafter arising or acquired, in clauses (i) through (ix), collectively, the "Prepetition ABL Priority Collateral"); and (b) second priority security interests in and liens on certain of the Debtors' property, including (i) all Property of the Borrowers and Guarantors, whenever arising and wherever located, on which a Lien is granted as security for any Term Obligations and that does not constitute Prepetition ABL Priority Collateral, and (ii) goodwill (such property, whether now existing or hereafter arising or acquired, in clauses (i) and (ii) collectively, the "Prepetition Term Priority Collateral" and, together with the Prepetition ABL Priority Collateral, the "Prepetition Collateral" and, such liens and security interests in clauses (a) and (b), the "Prepetition ABL Liens") provided further, that the Prepetition Collateral does not include, and the Prepetition ABL Obligations are not secured by, any Excluded Assets (as defined in the Prepetition Documents (as defined below)).

### B.      Term Obligations

15.      Corsicana Bedding, as borrower, and certain of its affiliates designated therein as "Guarantors" (such parties, collectively, the "Prepetition Term Loan Obligors" and, together with the Prepetition ABL Obligors, the "Prepetition Obligors"), each "Lender" from time to time party thereto (collectively, the "Prepetition Term Loan Lenders" and, together with the Prepetition ABL Lenders, the "Prepetition Lenders"), and Blue Torch, as administrative agent and collateral agent (in such capacities, the "Prepetition Term Loan Agent" and, together with the Prepetition ABL Agent, the "Prepetition Agents", and, the Prepetition Term Loan Agent together with the Prepetition Term Loan Lenders, the "Prepetition Term Loan Secured Parties" and, together with the Prepetition ABL Secured Parties, the "Prepetition Secured Parties"), are parties to that certain Financing Agreement, dated as of April 28, 2021 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Prepetition Term Loan Agreement"

and, together with all other agreements, documents, and instruments executed and/or delivered with, to or in favor of the Prepetition Term Loan Secured Parties, including, without limitation, all security agreements, deposit account control agreements (including, without limitation, the Control Agreements (as defined in the Interim order)), control agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements, documents, and instruments, including any fee letters, executed and/or delivered in connection therewith or related thereto, the "Prepetition Term Loan Documents" and, together with the Prepetition ABL Loan Documents, the "Prepetition Documents"). Pursuant to the Prepetition Term Loan Agreement, the Prepetition Term Loan Lenders made term loans in the aggregate principal amount of $128,500,000, exclusive of the Protective Advance (the "Prepetition Term Loans").

16.     As of the Petition Date, approximately **$129,407,386.16** of indebtedness under the Prepetition Term Loan Agreement was outstanding, which amount includes the Applicable Premium (as such term is defined in the Prepetition Term Loan Agreement) in the amount of $2,512,717.34, capitalized interest in the amount of $161,419.83, and accrued and unpaid interest through the Petition Date in the amount of $1,097,382.22 (and, together with any other amounts outstanding under the Prepetition Term Loan Documents, including interest, fees, and expenses, the "Prepetition Term Loan Obligations" and, together with the Prepetition ABL Obligations, the "Prepetition Obligations").

17.     As more specifically described in the various loan documents entered into in connection with the Prepetition Term Loan Obligations, the Prepetition Term Loans are secured by (a) first priority security interests in and liens (subject only to certain of the liens permitted under the Prepetition Senior Note Documents) on the Prepetition Term Priority Collateral; and (b) second priority security interests in and liens on the Prepetition ABL Priority Collateral (such liens

and security interests in clauses (a) and (b), the "Prepetition Term Loan Liens" and, together with the Prepetition ABL Liens, the "Prepetition Liens"); *provided, that* the Prepetition Term Obligations are not secured by any Excluded Assets (as defined in the Prepetition Term Loan Documents).

### C. Intercreditor Agreement

18. Wingspire, in its capacity as Prepetition ABL Agent, and Blue Torch, in its capacity as Prepetition Term Loan Agent, *inter alia*, are parties to that certain Intercreditor Agreement, dated as of April 28, 2021 (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Intercreditor Agreement"). As more specifically set forth and defined in the Prepetition Intercreditor Agreement, (i) the Prepetition ABL Liens have (a) first priority with respect to the ABL Priority Collateral, which includes all Accounts, cash, money, and cash equivalents, and Inventory, among others and (b) second priority with respect to Term Priority Collateral, and (ii) the Prepetition Term Loan Liens have (a) first priority with respect to Term Priority Collateral, which includes the Equity Interests, Equipment, Real Estate, Fixtures, and Intellectual Property, among others and (b) second priority with respect to the ABL Priority Collateral.

### D. Prepetition Collateral

19. To secure the Prepetition Obligations, the Debtors entered into certain guaranty and collateral agreements and certain other security documents governing the Prepetition Secured Parties' respective security interests in the Prepetition Collateral (such agreements, as amended, restated, amended and restated, supplemented or otherwise modified from time to time, and together with any ancillary collateral documents, including, without limitation, any related mortgages and deeds of trust, the "Prepetition Collateral Documents"). Pursuant to the Prepetition Collateral Documents, and on the terms set forth therein and subject to the Prepetition Intercreditor

Agreement, the Debtors granted to the Prepetition Secured Parties the Prepetition Liens on the Prepetition Collateral.

## II.     The Debtors' Immediate Need for Cash

20.     The Debtors do not have sufficient liquidity, including Cash Collateral, to operate and maintain their businesses in the ordinary course of business without the financing requested in this Motion.  The Debtors' ability to maintain business relationships with their vendors, suppliers, and customers, to pay their employees, pay certain fees and expenses as set forth herein, and to otherwise fund their operations and other efforts and activities is essential to the Debtors' continued viability as the Debtors seek to maximize the value of the assets of the Estates (as defined in the Interim Order) for the benefit of all creditors of the Debtors.  The ability of the Debtors to obtain sufficient working capital and liquidity through the proposed postpetition financing arrangements with the DIP Secured Parties and the use of Cash Collateral as set forth in the Interim Order, the DIP Loan Agreements and the other DIP Loan Documents, as applicable, is vital to the preservation and maintenance of the going concern value of each Debtor.  Accordingly, the Debtors have an immediate need to obtain the postpetition financing and to use Cash Collateral as set forth in the Interim Order to, among other things, permit the orderly continuation of the operation and maintenance of their businesses, minimize the disruption of their business operations and other efforts and activities and preserve and maximize the value of the assets of the Debtors' Estates to maximize the recovery to all creditors of the Estates.

## III.     Events Leading to the Debtors' Entry into the DIP Loan Agreements

21.     As set forth in further detail in the First Day Declaration, the Debtors' financial performance has been negatively impacted by an ongoing slump in the mattress industry, reduced consumer spending, and increased production costs.  The Debtors have also faced internal obstacles and company-specific business challenges.  Internal logistics obstacles and the Debtors'

overall capital structure have resulted in decreased productivity and revenues. The Debtors continue to experience sales levels below historical levels, resulting in further liquidity pressures. The Debtors' revenue and profitability remain insufficient to support its debt service, working capital, and capital expenditures requirements.

22.     Given the short amount of time between when the Debtors decided to pursue the filing of the Chapter 11 Cases and the Petition Date, the Debtors needed to act quickly to agree upon the terms of the DIP Facilities with their lenders. The DIP Lenders promptly responded to the Debtors' request for term sheets regarding the terms of potential DIP financing during June 2022. After extensive arm's length negotiations, the Debtors chose to accept the DIP financing proposals from the DIP Lenders.

## IV.     The Proposed DIP Facilities

23.     The Debtors are proposing two (2) debtor-in-possession financing facilities, which are summarized herein. After extended good faith, arm's length negotiations, the DIP Lenders agreed to provide the DIP Facilities on the terms provided in the DIP Loan Documents and the Interim Order, which are summarized herein. The proceeds of the DIP Facilities, which the Debtors estimate will be sufficient to finance these Chapter 11 Cases, will be used to (a) pay costs, premiums, fees, and expenses related to Chapter 11 Cases and in connection with the DIP Facilities; (b) immediately use borrowings under the DIP Revolver Facility to fully repay the Prepetition ABL Obligations; (c) make permitted adequate protection payments in respect of the Prepetition Obligations as provided for in the Interim Order and the Approved Budget; and (d) provide financing for working capital and for other general corporate purposes of the Debtors.

24.     The Debtors are unable to procure financing in the form of unsecured credit allowable as an administrative expense under sections 364(a), 364(b), or 503(b)(1) of the Bankruptcy Code or in exchange for the grant of a superpriority administrative expense, or liens

on property of the Estates not subject to a lien pursuant to sections 364(c)(1), 364(c)(2), or 364(c)(3) of the Bankruptcy Code. As set forth herein, in the First Day Declaration, and in the Juniper DIP Declaration, it would be futile under the circumstances for the Debtors to undertake any further efforts to seek, and they would not obtain, the necessary postpetition financing, let alone on terms more favorable, taken as a whole, than the financing offered by each of the DIP Secured Parties pursuant to the DIP Loan Documents. The Debtors' Prepetition Lenders would not consent to any priming liens being granted to third parties, and the Debtors do not have any significant unencumbered assets to which a non-priming lien could attached. In light of the foregoing, and considering the futility of all other alternatives, the Debtors have reasonably and properly concluded, in the exercise of their sound business judgment, that the DIP Facilities represent the best financing available to the Debtors at this time, and are in the best interests of the Debtors, their Estates, and all of their stakeholders.

25. The Debtors also considered that the DIP Agents, each of whom serves as the administrative agent under the Debtors' prepetition secured credit agreements, have intimate knowledge of the Debtors' business and capital structure, allowing the Debtors to efficiently negotiate and document the DIP Loan Agreements prior to the commencement of the Chapter 11 Cases.

26. Additional information about the Debtors' DIP Financing process can be found in the First Day Declaration and the Juniper DIP Declaration, which are incorporated herein by reference.

**A.** **DIP Revolver Facility**

27. The Prepetition ABL Secured Parties have committed to providing the DIP Revolver Facility, on the terms and conditions substantially in the form annexed to the Interim Order as **Exhibit A** (as the same may be amended, restated, amended and restated, supplemented,

waived, extended or otherwise modified from time to time, the "Revolver DIP Agreement," and, together with any other related agreements, documents, security agreements, or pledge agreements, including the Interim Order and the Final Order (each as defined below), collectively, the "Revolver DIP Documents"), by and among the Borrowers (as defined in the Revolver DIP Documents), the Guarantors (as defined in the Revolver DIP Documents), the DIP Revolver Administrative Agent, and the DIP Revolver Lenders, in an aggregate principal amount (subject to availability) of up to $40 million in revolving commitments available for borrowing by the Borrowers.

### B. DIP Term Loan Facility

28. The Prepetition Term Loan Secured Parties have committed to the DIP Term Loan Facility, on the terms and conditions substantially in the form annexed to the Interim Order as **Exhibit B** (as the same may be amended, restated, amended and restated, supplemented, waived, extended, or otherwise modified from time to time, the "DIP Term Loan Note," and, together with the Revolver DIP Agreement, collectively, the "DIP Loan Agreements" and the DIP Term Loan Note, together with any other related agreements, documents, security agreements, or pledge agreements, including the Interim Order and the Final Order, collectively, the "DIP Term Documents," and the DIP Term Documents, together with the Revolver DIP Documents, the "DIP Loan Documents"), by and among the Borrowers (as defined in the DIP Term Loan Note), the Guarantors (as defined in the DIP Term Loan Note), the DIP Term Administrative Agent, and the DIP Term Lenders, in an aggregate principal amount of up to $18 million[11] in term loan commitments which shall be available as term loans to the Borrowers (as defined in the DIP Term

---

[11] Inclusive of $3,000,000 of Protective Advances (as defined in the Prepetition Term Loan Agreement) made by the Prepetition Term Loan Lenders on June 7, 2022 to provide the Debtors with necessary working capital to avoid immediate and irreparable harm pending the preparation for and commencement of these Chapter 11 Cases.

Loan Note) upon entry of the Interim Order and satisfaction of the other conditions set forth therein in an interim amount not to exceed $9,750,000, which amount is inclusive of the $3,000,000 Protective Advances, prior to entry of the Final Order, and the remainder of the DIP Term Loan Facility available upon entry of the Final Order to the extent set forth therein.

### C. Roll-Up Provisions

29. The Debtors also seek authorization, immediately upon entry of the Interim Order, to be (i) authorized to immediately borrow under the Revolver DIP Agreement the full amount necessary to fully and immediately pay off in full all Prepetition ABL Obligations and (ii) subject to Section 4.1 of the Interim Order, deemed to have contemporaneously fully repaid all Prepetition ABL Obligations (clauses (i) and (ii) together, the "ABL Refinancing"). The full and immediate payoff of the Prepetition ABL Obligations with the proceeds of borrowings under the DIP Revolver Facility in accordance with the Interim Order (but subject to the provisions of Section 4.1 thereof) is necessary as the DIP Revolver Facility would not have been made available to the Debtors by the DIP Revolver Lenders and the Prepetition ABL Secured Parties have not otherwise consented to the use of their Cash Collateral, the subordination of their liens to the Carve Out, the Revolver DIP Liens, the DIP Term Loan Liens and the Prepetition Term Loan Adequate Protection Liens (as defined in the Interim Order), in each case as provided in the Interim Order, or the extension of credit to fund the Debtors' critical working capital needs in the form of the DIP Revolver Facility. Moreover, as set forth in the Juniper DIP Declaration, in consideration of the ABL Refinancing, (x) the Prepetition ABL Lenders have agreed to waive any claims for interest at the Default Rate (as such term is defined in the Prepetition ABL Credit Agreement), (y) the DIP Revolver Lenders have agreed to reduce the Availability Block (as such term is defined in the Revolver DIP Agreement) from $8 million to $4 million so as to provide the Debtors with access to significant additional working capital during the Chapter 11 Cases; and (z) the DIP Revolver

Lenders have agreed to defer payment of the Exit Fee required to be paid under the Prepetition ABL Credit Agreement until the Maturity Date of the DIP Revolver Facility. Thus, the ABL Refinancing will confer material benefits on the Debtors.

30. The Debtors also seek authorization, immediately upon entry of the Interim Order, to be (i) authorized to immediately borrow under the DIP Term Loan Note the full amount necessary to fully and immediately pay off in full the Protective Advances and (ii) subject to Section 4.1 of the Interim Order, deemed to have contemporaneously fully repaid all Protective Advances (clauses (i) and (ii) together, the "Protective Advance Refinancing," and together with the ABL Refinancing, the "Roll-Up Provisions"). As set forth in the Juniper DIP Declaration, the Protective Advances in the amount of $3 million were made by the Prepetition Term Loan Lenders shortly before the commencement of these Chapter 11 Cases so as to provide working capital to avoid immediate and irreparable harm to the Debtors' businesses, their estates and their creditors as the Debtors prepared for filing the Chapter 11 Cases. The full and immediate payoff of the Protective Advances with the proceeds of borrowings under the DIP Term Loan Facility in accordance with the Interim Order (but subject to the provisions of Section 4.1 thereof) is necessary as the Prepetition Term Loan Secured Parties have not otherwise consented to the use of their Cash Collateral, the subordination of their liens to the Carve Out, the Revolver DIP Liens, the DIP Term Loan Liens and the Prepetition Revolver Adequate Protection Liens (as defined below), in each case as provided in this Interim Order, or the extension of credit to fund the Debtors' critical working capital needs in the form of the DIP Term Loan Facility. Moreover, as set forth in the Juniper DIP Declaration, in consideration of the entry of the Interim Order authorizing the repayment of the Protective Advances with the proceeds of the DIP Term Loan Facility, the Prepetition Term Loan Secured Parties have agreed to waive any claims for interest at the Default

Rate (as such term is defined in the Prepetition Term Loan Agreement) on $3 million of Prepetition Term Loan Obligations.

**D.** **DIP Loan Lien Rankings and Priority**

31. The Revolver DIP Liens on the DIP Collateral securing the DIP Revolver Obligations shall be first and senior in priority to all other interests and liens of every kind, nature, and description, whether created consensually, by an order of the Court or otherwise, including, without limitation, liens or security interests granted in favor of third parties in conjunction with sections 363, 364, or any other section of the Bankruptcy Code or other applicable law; provided, however, that the Revolver DIP Liens on (A) the Prepetition ABL Priority Collateral (whether in existence on the Petition Date or thereafter arising) shall be subject to the Carve Out and Permitted Liens (as defined in the Interim Order); (B) the Prepetition Term Priority Collateral (whether in existence on the Petition Date or thereafter arising) shall be subject to the Carve Out, Permitted Liens, the DIP Term Loan Liens, the Prepetition Term Loan Liens and the Prepetition Term Loan Adequate Protection Liens; (C) assets of the Debtors (the "Non-Lender Encumbered Assets") that were subject to validly perfected liens or security interests as of the Petition Date other than the Prepetition Liens (if any, the "Non-Lender Existing Liens") shall be subject (notwithstanding anything in the Prepetition Intercreditor Agreement to the contrary) to such Non-Lender Existing Liens, the Carve Out and *pari passu* with the DIP Term Loan Liens; and (D) any other assets of the Debtors ("Unencumbered Assets") that were not subject to any validly perfected liens or security interest as of the Petition Date (including, subject to the entry of a Final Order, Avoidance Proceeds) shall be subject (notwithstanding anything in the Prepetition Intercreditor Agreement to the contrary) to the Carve Out and *pari passu* with the DIP Term Loan Liens, in each case as such priorities are set forth in **Exhibit E** to the Interim Order.

32. The DIP Term Loan Liens on the DIP Collateral securing the DIP Term Loan Obligations shall be first and senior in priority to all other interests and liens of every kind, nature, and description, whether created consensually, by an order of the Court or otherwise, including, without limitation, liens or interests granted in favor of third parties in conjunction with sections 363, 364, or any other section of the Bankruptcy Code or other applicable law; provided, however, that the DIP Term Loan Liens on (A) the Prepetition ABL Priority Collateral (whether in existence on the Petition Date or hereafter arising) shall be subject to the Carve Out, Permitted Liens, the Revolver DIP Liens, the Prepetition ABL Liens and the Prepetition ABL Adequate Protection Liens (as defined below); (B) the Prepetition Term Priority Collateral (whether in existence on the Petition Date or hereafter arising) shall be subject to the Carve Out and Permitted Liens; (C) the Non-Lender Encumbered Assets shall be subject (notwithstanding anything in the Prepetition Intercreditor Agreement to the contrary) to the Non-Lender Existing Liens, the Carve Out and *pari passu* with the Revolver DIP Liens; and (D) the Unencumbered Assets shall be subject (notwithstanding anything in the Prepetition Intercreditor Agreement to the contrary) to the Carve Out and *pari passu* with the Revolver DIP Liens, in each case as such priorities are set forth in **Exhibit E** attached to the Interim Order.

33. Subject to the priorities set forth on **Exhibit E** to the Interim Order and the Carve Out, on account of all DIP Obligations now existing or hereafter arising pursuant to the Interim Order, the DIP Loan Documents, or otherwise, the DIP Agents, for the benefit of themselves and the DIP Lenders, will be granted allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code, having priority in right of payment over any and all other obligations, liabilities, and indebtedness of the Debtors, whether now in existence or hereafter incurred by the Debtors, and over any and all administrative expenses or priority claims

of the kind specified in, or ordered pursuant to, inter alia, sections 105, 326, 328, 330, 331, 364(c)(1), 365, 503(b), 507(a), 507(b), 546(c), 1113, or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, which allowed superpriority administrative claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (including, subject to entry of the Final Order, proceeds of Avoidance Actions) (such superpriority administrative expense claim as to the DIP Revolver Facility, the "Revolver Superpriority Claim" and, as to such superpriority administrative expense claim as to the DIP Term Loan Facility, the "DIP Term Loan Superpriority Claim" and, collectively, the "DIP Superpriority Claims"). The Prepetition Secured Parties have consented to the DIP Superpriority Claims.

### E. Use of Cash Collateral

34. In addition to the DIP Facilities, the Debtors require the continued use of their existing Cash Collateral. The DIP Lenders have agreed to the terms of the proposed use of Cash Collateral reflected in the Interim Order and the DIP Loan Agreements. Therefore, the Debtors have the requisite consent to use Cash Collateral.

### Supporting Authority

35. For the following reasons, the Debtors respectfully submit that they have satisfied the standards applicable for the Court's approval of the DIP Facilities and entry of the Interim Order.

### I. The Debtors Should be Authorized to Obtain Postpetition Financing

### A. Entering into the DIP Facilities is an Exercise of the Debtors' Sound Business Judgment

36. The Court should authorize the Debtors, as an exercise of the Debtors' sound business judgment, to enter into the DIP Loan Agreements, obtain access to the DIP Facilities, and

continue using the Cash Collateral as an exercise of the Debtors' sound business judgment.

37.     Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or super-priority financing under certain circumstances discussed in detail below.  Provided that an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant debtors considerable deference in acting in accordance with their sound business judgment in obtaining such credit.  *See, e.g., In re ERG Intermediate Holdings, L.L.C.,* Case No. 15-31858 (HDH) (Bankr. N.D. Tex. June 15, 2015) (order approving postpetition financing as an exercise of the debtors' business judgment); *In re Barbara K. Enters., Inc.*, Case No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest.") (citations omitted); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) ("[T]he applicable factors can be synthesized as follows: (1) That the proposed financing is an exercise of sound and reasonable business judgment . . . .").  Moreover, the Court may appropriately take into consideration non-economic benefits to the debtors offered by a proposed postpetition facility.  For example, in *In re ION Media Networks. Inc.,* the bankruptcy court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to

obtain credit from a particular lender is almost never based purely on economic terms. Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization. This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps to foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

38.    The Debtors' execution of the DIP Loan Documents is an exercise of their sound business judgment that warrants approval by the Court. Prior to the Petition Date, the Debtors and their advisors undertook a detailed investigation as to the Debtors' projected financing needs during the pendency of any chapter 11 case and determined that the Debtors would require substantial postpetition financing to support their operational and restructuring activities. Accordingly, after significant negotiations by the Debtors and their advisors, the Debtors negotiated the DIP Facilities with the DIP Lenders in good faith, at arm's-length, and with the assistance of outside counsel, to obtain the required postpetition financing on terms favorable to the Debtors.

39.    The Debtors believe that the Court's consideration of non-economic factors, as permitted by *ION Media*, is especially appropriate here. Absent the DIP Lenders' willingness and ability to fund the DIP Facilities, and interim approval by the Court of the DIP Facilities, the Debtors will run out of cash in the near term. Moreover, as set forth in the Juniper DIP Declaration, it is unlikely any third-party lenders would be in a position to provide as certain a financing arrangement as currently available under the DIP Facilities. The Debtors submit that the certainty afforded by the DIP Facilities—with respect to both the consensual nature as well as the likelihood of closing and the DIP Lenders' support of the Debtors' efforts with these Chapter 11 Cases— provides additional and ample reason to authorize it.

40. The DIP Facilities will provide the Debtors with access to the necessary liquidity, which the Debtors and their advisors have independently determined should be sufficient to support the Debtors' operations and activities through the pendency of the Chapter 11 Cases, and will send a strong signal to employees, customers, suppliers, and other parties of the Debtors' long-term prospects. Thus, the Debtors submit that entering into the DIP Agreements constitutes an exercise of the Debtors' sound business judgment that should be approved by the Court.

**B.**     **The Debtors Should be Authorized to Obtain Postpetition Financing on a Senior Secured, Priming and Superpriority Basis, and the Roll-Up Provisions Should be Approved**

41. The Debtors should be authorized to obtain postpetition financing on a senior secured, priming, and superpriority basis. Section 364 of the Bankruptcy Code authorizes a debtor to obtain, in certain circumstances, postpetition financing on a secured or superpriority basis, or both. Specifically, section 364(c) of the Bankruptcy Code provides, in pertinent part, that the Court, after notice and a hearing, may authorize a debtor that is unable to obtain credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code to obtain credit or incur debt:

> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b);
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

42. Pursuant to the terms of the DIP Loan Documents and in accordance with Bankruptcy Code section 364(c)(1), the Debtors request that the DIP Obligations be allowed as DIP Superpriority Claims against each of the Debtors with priority in payment over any and all administrative expenses, adequate protection claims, diminution claims, prepetition unsecured

claims, and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, any prepetition claims and adequate protection claims of the Prepetition Lenders, and any and all administrative expenses or other claims of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, sections 105, 326, 328, 330, 331, 503(b), 506(c) (with respect to the Prepetition Secured Parties, subject to entry of the Final Order), 507(a), 507(b), 546, 726, 1113, and 1114 of the Bankruptcy Code or otherwise, including those resulting from the conversion of any of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment; provided, however, that the DIP Superpriority Claims shall be subject to (i) the priority set forth on **Exhibit E** to the Interim Order and (ii) the Carve Out (as set forth in the Interim Order).

43.     In addition to authorizing financing under section 364(c) of the Bankruptcy Code, courts may authorize a debtor to obtain postpetition credit secured by a lien that is senior or equal in priority to existing liens on property already subject to a lien if the debtor cannot otherwise obtain such credit and the interests of existing lienholders are adequately protected. *See* 11 U.S.C. § 364(d)(1). When determining whether to authorize a debtor to obtain credit secured by a "priming" lien as authorized by section 364(d) of the Bankruptcy Code, courts focus on whether the transaction will enhance the value of the debtors' assets. Courts consider a number of factors, including, without limitation:

- whether alternative financing is available on any other basis (*i.e.*, whether any better offers, bids or timely proposals are before the court);

- whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtors' business;

- whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtors and proposed lender(s);

- whether the proposed financing agreement was negotiated in good faith and at arm's length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors; and whether the proposed financing agreement adequately protects prepetition secured creditors.

*See, e.g.*, *Ames Dep't Stores*, 115 B.R. at 37–39; *Bland v. Farmworker Creditors*, 308 B.R. 109, 113–14 (S.D. Ga. 2003); *see also* 3 Collier on Bankruptcy ¶ 364.04[1] (16th ed. rev. 2022).

44. Here, the Debtors seek authority to enter into the DIP Loan Agreements, which will grant the DIP Lenders the DIP Liens in the DIP Collateral, as described above. The Debtors believe the DIP Liens should be authorized for the following reasons.

45. First, the Debtors conducted arm's-length negotiations with the DIP Agents regarding the terms of the respective DIP Facilities, and those agreements reflect the most favorable terms on which the DIP Lenders were willing to offer financing. No alternative financing at the favorable terms offered in the DIP Facilities is available to the Debtors, and the Debtors are not able to obtain financing from the DIP Lenders other than financing secured by first priority priming liens. In light of the unavailability of other financing with which to fund their ongoing operations and preserve the value of their assets, the Debtors determined that entering into the DIP Loan Agreements would best maximize value of their estates.

46. Second, the Debtors need the funds to be provided under the DIP Facilities to preserve the value of their estates for the benefit of all creditors and other parties in interest. Absent the DIP Facilities and use of the Cash Collateral, the Debtors will be unable to prosecute these Chapter 11 Cases and preserve the Debtors' significant going concern value. Providing the Debtors with the liquidity necessary to preserve their going concern value through the pendency of these Chapter 11 Cases is in the best interest of all stakeholders.

47. Third, the terms of the DIP Loan Agreements are reasonable and adequate to ensure the Debtors' ongoing ability to satisfy obligations in connection with the Chapter 11 Cases.

Indeed, the DIP Facilities will provide the Debtors with access to: (i) $40 million in DIP Revolving Commitments and (ii) an aggregate principal amount not to exceed $18 million under the DIP Term Loan. The Debtors and their advisors have independently determined that these amounts are sufficient and necessary to allow the Debtors to administer these Chapter 11 Cases.

48. Fourth, the Debtors and the DIP Agents negotiated the DIP Facilities in good faith and at arm's-length, and the Debtors' entry into the DIP Loan Agreements are an exercise of their sound business judgment and is in the best interests of their estates, creditors, and other parties in interest.

49. Fifth, as described below, the Debtors will provide adequate protection for the Prepetition Liens on and security interests in the Prepetition Collateral as well as any decline in, or diminution of, the value of the Prepetition Liens or security interests.

50. Additionally, as a condition of the DIP Facilities, the Debtors agree to the terms of the Roll-Up Provisions, including the ABL Refinancing and the Protective Advance Refinancing, as explained above. The DIP Lenders' requirement of the Roll-Up Provisions should be approved, since as a practical matter in the context of the Chapter 11 Cases, the roll-up does not run afoul of the provisions of, or the policies underlying, the Bankruptcy Code. *See In re Barbara K. Enters., Inc.*, 2008 WL 2439649, at *14 (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest.") (internal citation omitted). The Roll-Up Provisions are justified under the circumstances because, among other things: (i) the Prepetition Secured Parties are consenting to the use of Cash Collateral; (ii) the Prepetition Lenders, in their capacity as DIP Lenders, are agreeing to provide postpetition liquidity through the DIP Facilities; and (iii) the Roll-Up Provisions will result in a decrease of the prepetition debt.

51.     Moreover, many courts, including courts in this District, have approved the refinancing or repayment of revolving and term loan prepetition obligations pursuant to debtor-in-possession loan facilities on an interim basis. *See, e.g., In re Rockall Energy Holdings, LLC*, Case No. 22-90000-MXM-11 (Bankr. N.D. Tex. Mar. 11, 2022) (authorizing, on an interim basis, a roll-up of prepetition secured claims, including term loan claims and hedge claims, in an aggregate amount of $10,000,000); *In re Studio Movie Grill Holdings, LLC*, Case No. 20-32633-SGJ-11 (Bankr. N.D. Tex. Oct. 27, 2022) (authorizing the refinancing of certain term loan debt in an aggregate amount of $16,200,000); *In re Tuesday Morning Corp.*, Case No. 20-31476-HDH-11 (Bankr. N.D. Tex. June 26, 2020) (authorizing refinancing of all but a small portion of prepetition secured claims under the postpetition revolving credit facility); *In re Erickson Inc.*, Case No. 16-34393-hdh (Bankr. N.D. Tex. Sept. 10, 2016) (authorizing, on an interim basis, repayment of $14,890,364 under the existing first lien credit facility).[12]

52.     The Court should therefore (a) approve the DIP Superpriority Claims as provided for in section 364(c)(1) of the Bankruptcy Code, (b) authorize the Debtors to provide the DIP Lenders with DIP Liens on the DIP Collateral as provided in section 364(d)(1) of the Bankruptcy

---

[12] *See also In re ATP Oil & Gas Corp.*, Case No. 12-36187 (Bankr. S.D. Tex. Sept. 21, 2012) (authorizing refinancing of $367,600,000 plus accrued and unpaid interest under the post-petition facility); *In re United Retail*, Case No. 12-10405 (Bankr. S.D.N.Y. Feb. 1, 2012) (authorizing the refinancing of $11,500,000 of existing letter of credit obligations); *In re Velo Holdings, Inc*., et al., Case No. 12-11384 (Bankr. S.D.N.Y. April 2, 2012) (authorizing a dollar-for-dollar refinancing of prepetition obligations up to $20,000,000); *In re Blockbuster, Inc.*, Case No. 10-14997 (Bankr. S.D.N.Y. Sept. 23, 2010) (authorizing the roll up of secured notes of up to $125 million); *In re Chemtura Corp*., Case No. 09-11233 (Bankr. S.D.N.Y. Mar. 18, 2009) (authorizing a $86.5 million refinancing revolving credit facility under a $400 million debtor-in-possession financing facility); *In re Lyondell Chemical Co.*, Case No. 09-10023 (Bankr. S.D.N.Y. Mar. 1, 2009) (approving a dollar-for-dollar roll up of $3.25 billion of a prepetition secured debt facility); *In re Tronox Inc.*, Case No. 09-10156 (Bankr. S.D.N.Y. Feb. 6, 2009) (approving the payment of $79.5 million of prepetition secured indebtedness); *In re Lenox Sales, Inc.*, No. 08-14679 (Bankr. S.D.N.Y. Dec. 16, 2008) (approving payment of $72.1 million in prepetition secured indebtedness); *In re deCODE genetics, Inc.*, Case No. 09-14063 (JPW) (Bankr. D. Del. Nov. 16, 2009) (authorizing the refinancing of over $3,000,000 outstanding under certain prepetition obligations).

Code; and (c) authorize the Debtors to consummate the ABL Refinancing and the Protective Advance Refinancing.

### C. The Interests of Prepetition Secured Parties are Adequately Protected

53. A debtor may obtain postpetition credit "secured by a senior or equal lien on property of the estate that is subject to a lien only if" the debtor, among other things, provides "adequate protection" to those parties whose liens are primed. *See* 11 U.S.C. § 364(d)(1)(B). By requiring debtors to provide adequate protection to those creditors whose liens are being primed, the Bankruptcy Code seeks to protect a secured creditor from diminution in the value of its interest in the particular collateral. *See Suntrust Bank v. Den-Mark Const., Inc.*, 406 B.R. 683, 702 (E.D.N.C. 2009) ("Adequate protection is designed to preserve the pre-petition position of the existing lender."); *In re Cont'l Airlines, Inc.*, 146 B.R. 536, 539–40 (Bankr. D. Del. 1992) (secured creditor only entitled to adequate protection to the extent the collateral declined in value); *In re Pursuit Athletic Footwear, Inc.*, 193 B.R. 713, 716 (Bankr. D. Del. 1996) ("[I]f there is no actual diminution in the value of [the secured creditor's] collateral" and the debtor "can operate profitably post-petition," the secured creditor "is adequately protected against the use of cash [collateral].").

54. What constitutes sufficient adequate protection is decided on a case-by-case basis. *See In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986) ("[W]e conclude that a judicial determination of…adequate protection is a question of fact rooted in measurements of value and the credibility of the witnesses."); *see also Resolution Trust Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Grp., Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Martin*, 761 F.2d 472, 474 (8th Cir. 1985); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); *In re Realty S.W. Assocs.*, 140 B.R. 360, 366 (Bankr. S.D.N.Y. 1992).

55. Here, the Prepetition Secured Parties have consented to the priming of the Prepetition Liens in favor of the DIP Facilities. Given the Prepetition Secured Parties' consent,

the Debtors do not need to show that those parties are adequately protected. *See Anchor Sav. Bank FSB v. Sky Valley, Inc.,* 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the super-priority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected."); *see also In re Sun Healthcare Grp., Inc.,* 245 B.R. 779, 781 n.5 (Bankr. D. Del. 2000) ("Their consent (to the use of their cash collateral and priming of their liens) was given in exchange for certain payments . . . as adequate protection[.]"); *In re El Paso Refinery, L P,* 171 F.3d 249, 252 (5th Cir. 1999) (stating that priming lien given to a postpetition lender by "agreement was given a priority over the preexisting first lien of a group of Term Lenders"); *In re Outboard Marine Corp.,* No. 00-37405, 2002 WL 571661, at *1 (Bankr. N.D. Ill. Jan. 9, 2002) ("[T]he DIP Lenders committed to provide certain financing to the Debtors . . . pursuant to which the Prepetition Lenders consented to the imposition of priming liens upon the Prepetition Collateral and in favor of the DIP Lenders[.]"), *aff'd, Bank of Am., N.A. v. Moglia,* 330 F.3d 942 (7th Cir. 2003). Nonetheless, the Debtors granted the Adequate Protection Liens and a superpriority administrative expense claim, junior and subordinate only to the Carve Out and the priorities set forth on **Exhibit E** to the Interim Order, as adequate protection to the Prepetition Secured Parties.

56. The DIP Lenders were unwilling to provide the Debtors the DIP Facilities without the DIP Liens. While the Debtors attempted to find other alternatives, the proposed DIP Facilities are the only postpetition financing they were able to secure under the circumstances. Accordingly, pursuant to section 364(d) of the Bankruptcy Code and consistent with the purposes underlying the provision of adequate protection, the Court should authorize the Debtors to grant the DIP Liens to the DIP Lenders to secure the Debtors' obligations under the DIP Facilities.

## II. The Debtors Should be Authorized to Use the Cash Collateral

57.     The requisite Prepetition Lenders have consented to the Debtors' use of Cash Collateral under the terms of the DIP Loan Documents.  The Debtors submit that their request to use Cash Collateral complies with applicable Bankruptcy Code requirements.

58.     The Debtors' use of property of their estates is governed by section 363 of the Bankruptcy Code, which provides in pertinent part, as follows:

> If the business of the debtor is authorized to be operated under section... 1108... of this title and unless the court orders otherwise, the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

59.     Section 363(c)(2)(A) of the Bankruptcy Code permits a debtor in possession to use cash collateral with the consent of the secured party.  Alternatively, section 363(c)(2)(B) of the Bankruptcy Code permits the Bankruptcy Court, after notice and a hearing, to authorize a debtor in possession's use of cash collateral without the consent of the secured party so long as the use is consistent with the provisions of section 363 of the Bankruptcy Code.

60.     The Debtors have the Prepetition Secured Parties' consent to use Cash Collateral subject to the terms and conditions set forth in the Interim Order.  Accordingly, the Debtors' use of Cash Collateral should be approved under section 363(c)(2)(A) of the Bankruptcy Code.

61.     Second, the Debtors' proposed adequate protection is consistent with the requirements of section 363 of the Bankruptcy Code and, therefore, the Debtors' use of Cash Collateral—in addition to the requisite Prepetition Secured Parties having consented to it—meets the standard for approval under section 363(c)(2)(B) of the Bankruptcy Code.  As described above, the Adequate Protection (as defined in the Interim Order) adequately protects the Prepetition

Secured Parties' interests in the Prepetition Collateral from diminution during the Chapter 11 Cases, including by the Debtors' use of the Cash Collateral.

62. In addition to the adequate protection relief itself, the Debtors' preservation of estate assets through the use of Cash Collateral serves as its own form of "adequate protection." Indeed, the Debtors' secured creditors will inherently benefit from the Debtors' proposed use of the Cash Collateral, which will prevent avoidable diminution of the value of the Collateral and enhance the likelihood of increasing or preserving the Debtors' overall going concern value. *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (noting that, in determining whether protection is "adequate," courts consider "whether the value of the debtor's property will increase as a result of the" use of collateral or provision of financing); *In re Sky Valley, Inc.*, 100 B.R. 107, 114 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989) ("an increase in the value of the collateral . . . resulting from superpriority financing could result in adequate protection."). Accordingly, the Court should authorize the Debtors to use the Cash Collateral under section 363(c)(2) of the Bankruptcy Code.

### III. The Debtors Should Be Authorized to Pay the Fees Required by the DIP Lenders under the DIP Loan Documents

63. As described above, the Debtors have agreed, subject to Court approval, to pay the reasonable and documented fees, costs and expenses of counsel and financial advisors of the DIP Lenders pursuant to the terms of the DIP Loan Documents.

64. Paying the fees, costs and expenses of counsel and financial advisors to the DIP Lenders taken together with the other provisions of the DIP Loan Documents, represent the most favorable terms to the Debtors on which the DIP Secured Parties would agree to make the DIP Facilities available. The Debtors considered the fees, costs and expenses described above when determining in their sound business judgment that the DIP Facilities constituted the best terms on

which the Debtors could obtain the postpetition financing necessary to continue their operations and prosecute their Chapter 11 Cases. The Debtors believe that paying these amounts in connection with the DIP Facilities is in the best interests of the Debtors' estates, creditors and other parties in interest. Accordingly, the Court should authorize the Debtors to pay the fees, costs, and expenses provided under the DIP Loan Documents.

## IV. The DIP Lenders Should Be Deemed Good-Faith Lenders under Section 364(e) of the Bankruptcy Code

65. Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

66. Here, the DIP Loan Agreements are the result of (a) the Debtors' reasonable and informed determination that the DIP Lenders offered the only available terms on which to obtain needed postpetition financing, and (b) extended arm's length, good-faith negotiations between the Debtors and the DIP Lenders. The terms and conditions of the DIP Loan Agreements are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facilities will be used only for purposes that are permissible under the Bankruptcy Code. Further, no consideration is being provided to any party to the DIP Loan Agreements other than as described herein. Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the

meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

## V.    The Debtors Require Immediate Access to the Cash Collateral and DIP Facilities

67.    The Court may grant interim relief in respect of a motion filed pursuant to sections 363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." FED. R. BANKR. P. 4001(b)(2) and (c)(2).

68.    The Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested herein, including authorizing the Debtors to use the Cash Collateral and to borrow under the DIP Facilities, is not granted promptly. The Debtors believe that the commencement of the Chapter 11 Cases has already and will continue to significantly increase the demands on their cash as a result of, among other things, the costs of administering the Chapter 11 Cases. Indeed, as explained in the First Day Declaration and the Juniper DIP Declaration, unless the Court approves the Debtors' interim access to the funds of the DIP Facilities, the Debtors will run out of cash in the near term. The Debtors have an immediate need for access to liquidity to, among other things, to make payroll, and to satisfy other working capital and operation needs, all of which are required to preserve and maintain the Debtors' going concern value for the benefit of all parties in interest.

69.    Accordingly, for all of the reasons set forth above, prompt entry of the Interim Order is necessary to avert immediate and irreparable harm to the Debtors' estates and is consistent with, and warranted under, Bankruptcy Rules 4001(b)(2) and (c)(2). In addition, to implement the terms of the DIP Facilities, the Debtors request a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of an order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h), or otherwise.

**Request for Final Hearing**

70.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

**Notice**

71.     Notice of this Motion will be provided to: (a) the Office of the United States Trustee for the Northern District of Texas (the "U.S. Trustee"); (b) the entities listed as holding the 20 largest unsecured claims against the Debtors (on a consolidated basis) (the "20 Largest Unsecured Creditors"); (c) Schulte Roth & Zabel LLP and Munsch Hardt Kopf & Harr, P.C., as primary and Texas counsel to the Prepetition Term Loan Agent and the DIP Term Administrative Agent; (d) McGuireWoods LLP, counsel to the Prepetition ABL Agent and the DIP Revolver Administrative Agent; (e) all governmental agencies having a regulatory or statutory interest in these Chapter 11 Cases; (f) any other notice parties required under any Prepetition Loan Document; (g) all parties which, to the best of the Debtors' knowledge, information, and belief, have asserted or may assert a lien in the Debtors' assets; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002.

*[Remainder of Page Intentionally Left Blank]*

## Conclusion

**WHEREFORE**, based on the foregoing, the Debtors respectfully request that the Court

(i) enter the Interim Order attached hereto as **Exhibit 2**, and (ii) grant such other and further relief

as is just and proper.

RESPECTFULLY SUBMITTED this 25th day of June, 2022.


By: */s/ Eli O. Columbus*
Stephen M. Pezanosky
State Bar No. 15881850
Eli O. Columbus
State Bar No. 24028062
David L. Staab
State Bar No. 24093194
Martha Wyrick
State Bar No. 24101606
**HAYNES AND BOONE, LLP**
301 Commerce Street, Suite 2600
Fort Worth, TX 76102
Telephone: 817.347.6600
Facsimile:  817.347.6650
Email: stephen.pezanosky@haynesboone.com
Email: eli.columbus@haynesboone.com
Email:  david.staab@haynesboone.com
Email: martha.wyrick@haynesboone.com

**PROPOSED ATTORNEYS FOR DEBTORS**

## <u>Certificate of Conference</u>

I hereby certify that on or before June 25, 2022, the undersigned counsel for the Debtors conferred with and received comments to the relief requested in this Motion from counsel to the DIP Agents and Prepetition Agents.

By: */s/  Eli O. Columbus*
Eli O. Columbus

**Exhibit 1**

**Juniper DIP Declaration**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Corsicana Bedding, LLC, *et al.*,[1] | § | Case No. 22-90016-elm11 |
| | § | |
| Debtors. | § | Joint Administration Requested |

**DECLARATION OF MICHAEL JUNIPER IN SUPPORT OF DEBTORS'
EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS PURSUANT TO 11
U.S.C. §§ 105, 361, 362, 363, 364, 503 AND 507 (I) AUTHORIZING THE DEBTORS TO
OBTAIN SENIOR SECURED SUPERPRIORITY POSTPETITION FINANCING; (II)
GRANTING (A) LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE
CLAIMS AND (B) ADEQUATE PROTECTION TO CERTAIN PREPETITION
LENDERS; (III) AUTHORIZING USE OF CASH COLLATERAL; (IV) SCHEDULING
A FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

I, Michael Juniper, hereby declare under penalty of perjury:

1.      I am a Partner of the firm, CR3 Partners, LLC ("CR3"), which has its principal

office at 13355 Noel Road, Suite 2005, Dallas, Texas 75240.  In June 2022, I was appointed as the

Debtors' Chief Restructuring Officer ("CRO").

2.      I submit this declaration (the "Juniper DIP Declaration") in support of the *Debtors'*

*Emergency Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363,*

*364, 503 and 507 (I) Authorizing the Debtors to Obtain Senior Secured Superpriority Postpetition*

*Financing; (II) Granting (A) Liens and Superpriority Administrative Expense Claims and (B)*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Corsicana Bedding, LLC (3019) ("Corsicana"); Thetford Leasing LLC (7227) ("Thetford"); Olive Branch Building, LLC (7227) ("Olive Branch"); Eastern Sleep Products Company (1185) ("Eastern Sleep"); Englander-Symbol Mattress of Mississippi, LLC (5490) ("Englander Symbol"); Hylton House Furniture, Inc. (5992) ("Hylton House"); Luuf, LLC (3450) ("Luuf"); Symbol Mattress of Florida, Inc. (4172) ("Symbol Florida"); Symbol Mattress of Pennsylvania, Inc. (3160) ("Symbol Pennsylvania"); Symbol Mattress of Wisconsin, Inc. (0871) ("Symbol Wisconsin"); Symbol Mattress Transportation, Inc. (1185) ("Symbol Transportation"); and Master Craft Sleep Products, Inc. (4961) ("Master Craft").  The location of the Debtors' service address is P.O. Box 3233, Fort Worth, TX 76113.

*Adequate Protection to Certain Prepetition Lenders; (III) Authorizing Use Of Cash Collateral; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (the "Motion").[2]

3. In forming the opinions set forth herein, I have relied upon and/or considered, among other things, the following: (a) my experiences in chapter 11 cases, including with debtor-in-possession ("DIP") financing facilities; (b) the Motion; (c) the *Declaration of Michael Juniper in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), which is incorporated herein by reference; (d) certain of the Debtors' financial statements and reports; (e) documents related to the proposed DIP Financing (as defined below); (f) CR3's analyses regarding the proposed DIP Financing and DIP financings in other chapter 11 cases; (g) discussions with the Debtors' management concerning the Debtors' business and finances; and (h) discussions with certain other professionals at CR3 and other advisors to the Debtors.

4. I am authorized to execute this declaration in support of the Motion, in my capacity as the Debtors' CRO. I am not being compensated specifically for this testimony other than through payments received by CR3 as a professional proposed to be retained by the Debtors in the Chapter 11 Cases. If called upon to testify, I could and would testify to the facts set forth herein.

**A. Qualifications**

5. CR3 is a financial advisory and turnaround firm specializing in underperforming businesses and distressed situations, including financial, balance sheet and operational restructurings, both in and out of bankruptcy. CR3, whose predecessor firm was founded in 2001, provides a range of services to debtors, creditors, shareholders, and other interested parties, including financial advisory, interim management, litigation support, forensic financial review,

---

[2] Each capitalized term used but not defined herein shall have the meaning ascribed to it in the Motion.

and independent oversight services. CR3 and its professionals have on numerous occasions advised debtor-in-possession or official and unofficial committees in large and complicated chapter 11 proceedings.

6.     I have more than 20 years of experience in financial and operational analysis and improvement, turnaround and restructuring consulting, and interim management. I have advised companies across a diverse range of industries. I have assisted clients both in and outside of chapter 11, and have acted as financial advisor to companies, lenders, and unsecured creditors' committees. More specifically, I have served as a CRO for both private and public companies, including companies that have filed chapter 11 bankruptcy.

7.     I attended Washington University in St. Louis, where I earned an MBA. I also attended University of Arkansas at Little Rock, where I earned a BBA in finance. I am a Certified Turnaround Professional by the Turnaround Management Association ("TMA"). I was previously the president of the Dallas/Fort Worth TMA, and I am currently on the Board of the Dallas/Fort Worth TMA. Prior to joining CR3, I served in finance functions for private manufacturing and distribution companies. I have significant experience in structuring and negotiating DIP facilities.

8.     I lead the CR3 professional team assisting the Debtors in connection with the Debtors' proposed use of Cash Collateral and the DIP financing. As explained in the First Day Declaration, I am also serving as the Debtors' CRO. As part of my duties as the CRO, I have been advising and assisting with the Debtors' accounting, operations, reporting, budgets, forecasts, cash flows, and, more recently, overseeing overall turnaround and sale efforts. I am therefore familiar with the Debtors' businesses, financial affairs, books and records, as well as the facts and circumstances surrounding the Debtors' chapter 11 filing and restructuring strategy. I participated directly in discussions, due diligence, and negotiations with respect to the Debtors' DIP financing

and proposed DIP Facilities.  In doing so, I worked closely with the Debtors' management, outside counsel, and other advisors.

## B.     Background

9.     As set forth in further detail in the First Day Declaration, the Debtors' financial performance has been negatively impacted by an ongoing slump in the mattress industry, reduced consumer spending, and increased production costs.  The Debtors have also faced internal obstacles and company-specific business challenges.  Internal logistics obstacles and the Debtors' overall capital structure have resulted in decreased productivity and revenues.  The Debtors continue to experience sales levels below historical levels, resulting in further liquidity pressures. The Debtors' revenue and profitability remain insufficient to support its debt service, working capital, and capital expenditures requirements.

10.     Given the short amount of time between when the Debtors decided to pursue the filing of the Chapter 11 Cases, the Debtors needed to act quickly to agree upon the terms of the DIP Facilities with their lenders.  The DIP Lenders promptly responded to the Debtors' request for term sheets regarding the terms of potential DIP Financing during June 2022.  After extensive arm's length negotiations, the Debtors chose to accept the DIP Financing proposals from the DIP Lenders (the "DIP Financing").  As described below, I contacted several other potential DIP lenders for proposals, but the Debtors chose not to commence a formal marketing process for several reasons, as explained herein.

## C.     The Terms of the Proposed DIP Facilities are Reasonable Under Current Market Conditions, and the Debtors Could Not Obtain Proposals for DIP Financing on Better Terms

11.     The DIP Loan Agreements each contain favorable, below-market pricing terms for loans of the size and nature of the DIP Facilities, particularly in light of uncertainties in the global

corporate debt markets caused by current market conditions and the continued spread of COVID-19. Based upon my experience and the negotiations resulting in the proposed DIP Facilities, the terms of the DIP Facilities, including the ABL Refinancing on the terms set forth in the Revolver DIP Agreement and the Protective Advance Refinancing on the terms set forth in the DIP Term Loan Note, are exceedingly reasonable when evaluated within the backdrop of the Debtors' current secured debt amounts, current operations, including the temporary shutdown of several of its core manufacturing facilities, and current market conditions. The negotiations of the DIP Facilities were based in large part by the terms and conditions on which the DIP Lenders had provided prepetition financing to the Debtors.

12. I believe it would be futile for the Debtors to undertake any further efforts to seek, and they would not obtain, the necessary postpetition financing, let alone on terms more favorable, taken as a whole, than the financing offered by each of the DIP Secured Parties pursuant to the DIP Loan Documents. The Debtors' Prepetition Lenders would not consent to any priming liens being granted to third parties, and the Debtors do not have any significant unencumbered assets to which a non-priming lien could attach. The certainty afforded by the DIP Facilities, with respect to both the consensual nature as well as the likelihood of closing and the DIP Lenders' support of the Chapter 11 Cases, provides additional and ample reason to authorize the proposed DIP Facilities.

13. Moreover, I reached out to eight (8) potential DIP lenders for proposals for DIP financing. Given the circumstances, including the fact that the Prepetition Lenders hold an aggregate of at least $145 million in secured debt and will not consent to third party priming DIP financing, I did not receive any proposals for DIP financing from any of the parties I contacted for

proposals. Further, the Debtors were not able to obtain postpetition financing in the form of unsecured credit as an administrative claim pursuant to section 503(b)(1) of the Bankruptcy Code.

14. Under these circumstances, the Debtors determined that the time and expense involved in pursuing a more formal marketing process for seeking alternative lenders was not justified and would not result in any practical proposals that would be better than the DIP Facilities and the terms set forth in the DIP Credit Agreements.

**D.    The Roll-Up Provisions are Justified Under the Circumstances and Confer Material Benefits on the Debtors**

15. With respect to the ABL Refinancing on the terms set forth in the Revolver DIP Agreement, I was advised during the course of such negotiations, that absent the ABL Refinancing, the DIP Revolver Facility would not have been made available to the Debtors by the DIP Revolver Lenders and that the Prepetition ABL Secured Parties would not otherwise have consented to the use of their Cash Collateral, the subordination of their liens to the Carve Out, the Revolver DIP Liens, the DIP Term Loan Liens and the Prepetition Term Loan Adequate Protection Liens, in each case as provided in the Interim Order, or the extension of credit to fund the Debtors' critical working capital needs in the form of the DIP Revolver Facility. Moreover, in consideration of the entry of the Interim Order authorizing the ABL Refinancing, (x) the Prepetition ABL Lenders have agreed to waive any claims for interest at the Default Rate, (y) the DIP Revolver Lenders agreed to reduce the Availability Block from $8 million to $4 million so as to provide the Debtors with access to significant additional working capital during the Chapter 11 Cases; and (z) the DIP Revolver Lenders have agreed to defer payment of the Exit Fee required to be paid under the Prepetition ABL Credit Agreement until the Maturity of the DIP Revolver Facility. Thus, in light of the commitment of up to $40 million of liquidity available to the Debtors under the DIP Revolver Facility, the ABL Refinancing, will confer material benefits on the Debtors.

16.     The Protective Advances in the amount of $3 million were made by the Prepetition Term Loan Lenders shortly before the commencement of the Chapter 11 Cases so as to provide working capital to avoid immediate and irreparable harm to the Debtors' businesses, their estates, and their creditors as the Debtors prepared for filing the Chapter 11 Cases.  With respect to the Protective Advance Refinancing on the terms set forth in the DIP Term Loan Note, I was advised during the course of such negotiations, that absent the Protective Advance Refinancing, the Prepetition Term Loan Secured Parties would not otherwise have consented to the use of their Cash Collateral, the subordination of their liens to the Carve Out, the Revolver DIP Liens, the DIP Term Loan Liens and the Prepetition Revolver Adequate Protection Liens, in each case as provided in the Interim Order, or the extension of credit to fund the Debtors' critical working capital needs in the form of the DIP Term Loan Facility.  Moreover, in consideration of the entry of the Interim Order authorizing the repayment of the Protective Advances with the proceeds of the DIP Term Loan Facility, the Prepetition Term Loan Secured Parties have agreed to waive any claims for interest at the Default Rate (as such term is defined in the Prepetition Term Loan Agreement) on $3 million of Prepetition Term Loan Obligations.  Based on the foregoing, and in light of a commitment of $18 million available to the Debtors under the DIP Term Loan Facility, the Protective Advance Refinancing will also confer material benefits on the Debtors.

**E.     The Proposed DIP Facilities are Necessary, in the Best Interest of All Stakeholders, and were Negotiated in Good Faith**

17.     The Debtors do not have sufficient liquidity, including Cash Collateral, to operate and maintain their businesses in the ordinary course of business without the financing requested in the Motion.  The Debtors' ability to maintain business relationships with their vendors, suppliers, and customers, to pay their employees, pay certain fees and expenses as set forth herein, and to otherwise fund their operations and other efforts and activities are essential to the Debtors'

continued viability as the Debtors seek to maximize the value of the assets of the Estates for the benefit of all creditors of the Debtors. The ability of the Debtors to obtain sufficient working capital and liquidity through the proposed postpetition financing arrangements with the DIP Secured Parties and the use of Cash Collateral, the DIP Loan Agreements and the other DIP Loan Documents, as applicable, is vital to the preservation and maintenance of the going concern value of each Debtor. Accordingly, the Debtors have an immediate need to obtain the postpetition financing and to use Cash Collateral as requested in the Motion to, among other things, permit the orderly continuation of the operation and maintenance of their businesses, minimize the disruption of their business operations and other efforts and activities and preserve and maximize the value of the assets of the Debtors' Estates to maximize the recovery to all creditors of the Debtors' estates.

18. The Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested in the Motion, including authorizing the Debtors to use the Cash Collateral and to borrow under the DIP Facilities, is not granted promptly. The Debtors believe that the commencement of the Chapter 11 Cases has already and will continue to significantly increase the demands on their cash as a result of, among other things, the costs of administering the Chapter 11 Cases. It is my belief that unless the Court approves the Debtors' interim access to the funds of the DIP Facilities, the Debtors will run out of cash in the near term. The Debtors have an immediate need for access to liquidity to, among other things, to make payroll, and to satisfy other working capital and operation needs, all of which are required to preserve and maintain the Debtors' going concern value for the benefit of all parties in interest.

19. The Debtors also considered that the DIP Agents, each of whom serves as the administrative agent under the Debtors' prepetition secured credit agreements, have intimate

knowledge of the Debtors' business and capital structure, allowing the Debtors to efficiently negotiate and document the DIP Loan Agreements prior to the commencement of the Chapter 11 Cases. Moreover, the Prepetition Secured parties have consented to the terms of the DIP Loan Agreements.

20.     I believe, based on my experience and involvement in the negotiation of the Debtors' DIP Facilities, that the negotiations with the DIP Lenders were conducted at arm's length and in good faith. I believe the Debtors conducted a successful postpetition financing process, as they were able to obtain the DIP Facilities on highly favorable pricing terms. I believe that the fees and expenses associated with the DIP Facilities are usual, customary, and reasonable for facilities of the size and nature of the DIP Facilities.

21.     I believe that, based on the Debtors' projections, the proposed DIP Facilities will allow the Debtors access to the necessary liquidity to fund and continue operations during the Chapter 11 Cases, and will send a strong signal to employees, customers, suppliers, and other parties of the Debtors' long-term prospects. I believe that, if approved, the DIP Facilities will preserve and maximize the value of the Debtors' businesses and give them the liquidity they need to prosecute the Chapter 11 Cases and preserve the Debtors' significant going concern value. I believe that entry into the DIP Agreements to provide Debtors with the liquidity necessary to preserve their going concern value through the pendency of the Chapter 11 Cases is in the best interest of all stakeholders.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 25, 2022
        Dallas, Texas

                                        _/s/ Michael Juniper_____
                                        Michael Juniper
                                        Chief Restructuring Officer
                                        Corsicana Bedding, LLC

**<u>Exhibit 2</u>**

**PROPOSED INTERIM ORDER**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Corsicana Bedding, LLC, *et al.*,[1] | § | Case No. 22-90016-elm-11 |
| | § | |
| Debtors. | § | Jointly Administered |

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503 AND 507 (I) AUTHORIZING THE DEBTORS TO OBTAIN SENIOR SECURED SUPERPRIORITY POSTPETITION FINANCING; (II) GRANTING (A) LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS AND (B) ADEQUATE PROTECTION TO CERTAIN PREPETITION LENDERS; (III) AUTHORIZING USE OF CASH COLLATERAL; (IV) SCHEDULING A FINAL HEARING; AND (V) GRANTING <u>RELATED RELIEF</u>**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Corsicana Bedding, LLC (3019) ("<u>Corsicana</u>"); Thetford Leasing LLC (7227) ("<u>Thetford</u>"); Olive Branch Building, LLC (7227) ("<u>Olive Branch</u>"); Eastern Sleep Products Company (1185) ("<u>Eastern Sleep</u>"); Englander-Symbol Mattress of Mississippi, LLC (5490) ("<u>Englander Symbol</u>"); Hylton House Furniture, Inc. (5992) ("<u>Hylton House</u>"); Luuf, LLC (3450) ("<u>Luuf</u>"); Symbol Mattress of Florida, Inc. (4172) ("<u>Symbol Florida</u>"); Symbol Mattress of Pennsylvania, Inc. (3160) ("<u>Symbol Pennsylvania</u>"); Symbol Mattress of Wisconsin, Inc. (0871) ("<u>Symbol Wisconsin</u>"); Symbol Mattress Transportation, Inc. (1185) ("<u>Symbol Transportation</u>"); and Master Craft Sleep Products, Inc. (4961) ("<u>Master Craft</u>"). The location of the Debtors' service address is P.O. Box 3233, Fort Worth, Texas 76113.

1

Upon the *Debtors' Emergency Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503 and 507 (I) Authorizing the Debtors to Obtain Senior Secured Superpriority Postpetition Financing; (II) Granting (A) Liens and Superpriority Administrative Expense Claims and (B) Adequate Protection to Certain Prepetition Lenders; (III) Authorizing Use Of Cash Collateral; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (the "Motion")[2] of Corsicana Bedding, LLC, *et al.* (collectively, the "Debtors") in the above-captioned chapter 11 cases (collectively, the "Chapter 11 Cases"), for entry of an interim order (this "Interim Order") and a final order (the "Final Order"), pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2) 364(c)(3), 364(d), 364(e), 503 and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001(b) and (c), 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 4001-1 and 9013-1 of the Local Rules of the United States Bankruptcy Court for the Northern District of Texas (together, the "Local Rules"), requesting, among other things:

(1)        authorization for the Borrowers (as defined in the respective DIP Loan Agreements (as defined below)) to obtain postpetition financing pursuant to the DIP Facilities (as defined below), and for each of the Guarantors (as defined in the respective DIP Loan Agreements) to guarantee unconditionally on a joint and several basis, and subject to the terms and limitations set forth in the DIP Loan Agreements in all respects, the applicable Borrowers' obligations under the respective DIP Facilities, consisting of:

> a)        a senior secured super-priority asset-based revolving credit facility (the "DIP Revolver Facility"), on the terms and conditions substantially in the form annexed hereto as **Exhibit A** (as the same may be amended, restated, amended and restated, supplemented, waived, extended or otherwise modified from time to time, the "Revolver DIP Agreement," and, together

---

[2] Each capitalized term used but not defined herein shall have the meaning ascribed to it in the applicable DIP Loan Documents (as defined below).

with any other related agreements, documents, security agreements, or pledge agreements, including this Interim Order and the Final Order, collectively, the "Revolver DIP Documents"), by and among the Borrowers (as defined in the Revolver DIP Documents), the Guarantors (as defined in the Revolver DIP Documents), Wingspire Capital LLC ("Wingspire"), as administrative agent (in such capacity, the "DIP Revolver Administrative Agent"), and the lenders from time to time party thereto (in such capacity, the "DIP Revolver Lenders" and, together with the DIP Revolver Administrative Agent, the "DIP Revolver Secured Parties"), in an aggregate principal amount (subject to availability) of up to $40 million in revolving commitments available for borrowing by the Borrowers subject to the applicable Borrowing Base (as defined in the Revolver DIP Agreement, and, such commitments, the "DIP Revolving Commitments," and the loans outstanding under any of the DIP Revolving Commitments from time to time, collectively, the "DIP Revolving Loans"); and

b)    a senior secured super-priority term loan facility (the "DIP Term Loan Facility," and, together with the DIP Revolver Facility, collectively, the "DIP Facilities"), on the terms and conditions substantially in the form annexed hereto as **Exhibit B** (as the same may be amended, restated, amended and restated, supplemented, waived, extended, or otherwise modified from time to time, the "DIP Term Loan Note," and, together with the Revolver DIP Agreement, collectively, the "DIP Loan Agreements" and the DIP Term Loan Note, together with any other related agreements, documents, security agreements, or pledge agreements, including this Interim Order and the Final Order, collectively, the "DIP Term Documents," and the DIP Term Documents, together with the Revolver DIP Documents, the "DIP Loan Documents"), by and among the Borrowers (as defined in the DIP Term Loan Note), the Guarantors (as defined in the DIP Term Loan Note), Blue Torch Finance, LLC ("Blue Torch"), as administrative agent and collateral agent (in such capacities, the "DIP Term Administrative Agent," and, together with the DIP Revolver Administrative Agent, the "DIP Agents"), and the lenders party thereto from time to time (the "DIP Term Lenders," and, together with the DIP Term Administrative Agent, the "DIP Term Secured Parties," and the DIP Term Lenders, together with the DIP Revolver Lenders, the "DIP Lenders," and the DIP Lenders, together with the DIP Agents, collectively, the "DIP Secured Parties"), in an aggregate principal amount of up to $18 million[3] in term loan commitments, which shall be available as term loans (the "DIP Term Loans," and, together with the DIP Revolving Loans, the "DIP Loans") to the Borrowers (as defined in the DIP Term Loan Note) upon entry of this Interim Order and satisfaction of the other conditions set forth therein in an interim amount not to exceed $9,750,000, which amount is inclusive of the

---

[3] Inclusive of $3,000,000 of Protective Advances (as defined in the Prepetition Term Loan Agreement) made by the Prepetition Term Loan Lenders on June 7, 2022 to provide the Debtors with necessary working capital to avoid immediate and irreparable harm pending the preparation for and commencement of these Chapter 11 Cases.

$3,000,000 Protective Advances (the "Interim DIP Term Loan"), prior to entry of the Final Order, and the remainder of the DIP Term Loan Facility available upon entry of the Final Order to the extent set forth therein.

(2)     authorization for the Debtors to execute, deliver, and enter into the DIP Loan Documents and to perform all of the Debtors' respective obligations thereunder, and such other and further acts as may be required in connection with the DIP Loan Documents;

(3)     authorization for the Debtors to pay the principal, interest, fees, expenses, and other amounts payable to the DIP Secured Parties pursuant to the DIP Loan Documents, including, without limitation, any principal, interest, fees, commitment fees, administrative agent fees, audit fees, closing fees, service fees, facility fees, or other fees, costs, expenses, charges, and disbursements of the respective DIP Secured Parties (including the reasonable and documented fees and expenses of each of the DIP Secured Parties' attorneys, advisors, accountants and other consultants), any obligations in respect of indemnity claims, whether contingent or absolute, in each case, to the extent constituting Debtor and/or Guarantor obligations of any kind under the DIP Loan Documents (such obligations as to the DIP Revolver Facility, the "DIP Revolver Obligations," and such obligations as to the DIP Term Loan Facility, the "DIP Term Loan Obligations," and, collectively, the "DIP Obligations"));

(4)     authorization for the Debtors, immediately upon entry of this Interim Order, to use proceeds of the DIP Facilities as expressly provided in the DIP Loan Documents and solely in accordance with this Interim Order and the applicable Approved Budget (as defined below), subject to permitted variances and other exclusions set forth in the DIP Loan Documents, to: (A) pay costs, premiums, fees, and expenses related to the Chapter 11 Cases and in connection with the DIP Facilities; (B) immediately use borrowings under the DIP Revolver Facility to fully repay the Prepetition ABL Obligations (as defined below) and the Protective Advances (as defined below); (C) make permitted adequate protection payments in respect of the Prepetition Obligations

(as defined below) as provided for in this Interim Order and the Approved Budget; and (D) provide financing for working capital and for other general corporate purposes of the Debtors;

(5)     the grant and approval of superpriority administrative expense claim status, pursuant to sections 364(c)(1), 503(b)(1) and 507(b) of the Bankruptcy Code, to the DIP Agents, for the benefit of themselves and the other DIP Secured Parties, in respect of all DIP Obligations, subject only to the Carve Out (as defined below);

(6)     to grant the DIP Secured Parties valid, enforceable, non-avoidable, automatically and fully perfected DIP Liens (as defined below) in all DIP Collateral (as defined below), including, without limitation, all property constituting Prepetition Collateral (as defined below), including, without limitation, any Cash Collateral (as that term is defined in section 363(a) of the Bankruptcy Code and further defined below), to secure the DIP Obligations, which DIP Liens shall be subject to the Carve Out and Permitted Liens (as defined below) and the relative rankings and priorities set forth herein and in **Exhibit E**;

(7)     authorization for the Debtors to use, solely in accordance with the Approved Budget (subject to permitted variances and other exclusions set forth in the DIP Loan Documents) and the limitations provided herein and in the DIP Loan Documents, any Cash Collateral in which any of the Prepetition Secured Parties (as defined below) may have an interest, and the granting of adequate protection solely to the extent of any postpetition diminution in the value of their respective interests in the Prepetition Collateral, including, without limitation, the Cash Collateral, as a result of (i) the incurrence of the DIP Obligations, (ii) the Debtors' use of Cash Collateral, (iii) the subordination of the Prepetition Obligations to the Carve Out, (iv) any other diminution in value of the Prepetition Collateral arising from the Debtors' use, sale, or disposition of such Prepetition Collateral or the proceeds thereof, (v) the priming of the Prepetition Term Loan Liens

by the Revolver DIP Liens and the DIP Term Loan Liens on the Prepetition ABL Priority Collateral (each as defined below), (vi) the priming of the Prepetition Term Loan Liens by the DIP Term Loan Liens on the Prepetition Term Priority Collateral (as defined below), (vii) the priming of the Prepetition ABL Liens (as defined below) by the Revolver DIP Liens on the Prepetition ABL Priority Collateral, (viii) the priming of the Prepetition ABL Liens by the DIP Term Loan Liens and the Revolver DIP Liens on the Prepetition Term Priority Collateral, and (ix) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (collectively, "Diminution in Value");

(8)     the modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of this Interim Order and the other DIP Loan Documents to the extent hereinafter set forth;

(9)     a waiver of the Debtors' ability to surcharge pursuant to section 506(c) of the Bankruptcy Code against any DIP Collateral and, subject to entry of the Final Order, the Prepetition Collateral, and any right of the Debtors under the "equities of the case" exception in section 552(b) of the Bankruptcy Code;

(10)     this Court's waiver of any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Interim Order;

(11)     the scheduling of a final hearing on the Motion (the "Final Hearing") to consider entry of the Final Order granting the relief requested in the Motion on a final basis, and approving the form of notice with respect to the Final Hearing; and

(12)     granting the Debtors such other and further relief as is just and proper.

The initial hearing on the Motion having been held by this Court on June 27, 2022 (the "Interim Hearing"), and the Court having found that, under the circumstances, due and sufficient

notice of the Motion and Interim Hearing was provided by the Debtors as set forth in Paragraph D of this Interim Order, and upon the record made by the Debtors at the Interim Hearing, including the Motion, the *Declaration of Michael Juniper in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") and the *Declaration of Michael Juniper in Support of Debtors' Emergency Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503 and 507 (I) Authorizing the Debtors to Obtain Senior Secured Superpriority Postpetition Financing; (II) Granting (A) Liens and Superpriority Administrative Expense Claims and (B) Adequate Protection to Certain Prepetition Lenders; (III) Authorizing Use Of Cash Collateral; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (the "Juniper DIP Declaration"), attached as **Exhibit 1** to the Motion; any exhibits in connection with the foregoing, and the filings and pleadings in these Chapter 11 Cases, the Court having found that the interim relief requested in the Motion is fair and reasonable and is in the best interests of the Debtors, the Debtors' bankruptcy estates (as defined under section 541 of the Bankruptcy Code, the "Estates"), their stakeholders and other parties in interest, and represents a sound exercise of the Debtors' business judgment and is essential for the continued operation and maintenance of the Debtors' businesses; it appearing to the Court that granting the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their Estates pending the Final Hearing; and all objections, if any, to the relief requested in the Motion having been withdrawn, resolved, or overruled by the Court; and after due deliberation sufficient cause appearing therefor;

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[4]

(A)    <u>Petition Date</u>. On June 25, 2022 (the "<u>Petition Date</u>"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate and maintain their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No chapter 11 trustee or examiner has been appointed in any of the Chapter 11 Cases.

(B)    <u>Jurisdiction and Venue</u>.  This Court has jurisdiction over these proceedings pursuant to 28 U.S.C. § 1334 and the *Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc* entered by the United States District Court for the Northern District of Texas, dated August 3, 1984.  This is a core proceeding pursuant to 28 U.S.C. § 157(b), and the Debtors confirm their consent to the entry of a final order by the Court in connection with the Motion if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief sought herein are sections 105, 361, 362, 363, 364, 503 and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6003, 6004 and 9014 and Local Rules 4001-1 and 9013-1.

(C)    <u>Committee Formation</u>.  As of the date hereof, no official committee of unsecured creditors under section 1102 of the Bankruptcy Code (the "<u>Committee</u>") or any other statutory committee has been appointed in the Chapter 11 Cases.

---

[4] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

(D)     Notice.  Notice of the Motion, the interim relief requested therein, and the Interim Hearing (the "Notice") has been provided by the Debtors in accordance with Bankruptcy Rules 4001 and 9014 and the Local Rules on: (a) the Office of the United States Trustee for the Northern District of Texas (the "U.S. Trustee"); (b) the entities listed as holding the 20 largest unsecured claims against the Debtors (on a consolidated basis) (the "20 Largest Unsecured Creditors"); (c) Schulte Roth & Zabel LLP and Munsch Hardt Kopf & Harr, P.C., as primary and Texas counsel to the Prepetition Term Loan Agent and the DIP Term Administrative Agent; (d) McGuireWoods LLP, counsel to the Prepetition ABL Agent and the DIP Revolver Administrative Agent; (e) all governmental agencies having a regulatory or statutory interest in these Chapter 11 Cases; (f) any other notice parties required under any Prepetition Loan Document; (g) all parties which, to the best of the Debtors' knowledge, information, and belief, have asserted or may assert a lien in the Debtors' assets; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties").

(E)     Parties' Acknowledgments, Agreements, and Stipulations. In requesting the DIP Facilities and use of Cash Collateral, and in exchange for and as a material inducement to the DIP Secured Parties and the Prepetition Secured Parties to agree to provide, or consent to, the DIP Facilities, access to the Cash Collateral, and subordination of the Prepetition Liens (as defined below) to the Carve Out, as provided herein, and as a condition to providing financing under the DIP Facilities and consenting to the use of Cash Collateral as set forth herein, subject to the rights of parties in interest (other than the Debtors) set forth in Section 4.1 of this Interim Order, the Debtors permanently and irrevocably admit, stipulate, acknowledge, and agree, as follows:

(i)     Prepetition ABL Facility. Corsicana Bedding, LLC (herein, "Corsicana Bedding"), and certain of its affiliates designated therein, as borrowers, Corsicana Parent Co.,

LLC, designated as "Holdings" thereunder, certain other parties (including, without limitation, Holdings) designated as "Guarantors" thereto (such parties, collectively, the "Prepetition ABL Obligors"), the financial institutions from time to time party thereto (collectively, the "Prepetition ABL Lenders"), and Wingspire, as administrative agent (in such capacity, the "Prepetition ABL Agent"), are parties to that certain Credit Agreement, dated as of April 28, 2021 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Prepetition ABL Credit Agreement" and, together with all other agreements, documents, and instruments executed and/or delivered with, to or in favor of the Prepetition ABL Agent and the Prepetition ABL Lenders, including, without limitation, all security agreements, deposit account control agreements (including, without limitation, the Control Agreements (as defined below)), control agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements, documents, and instruments, including any fee letters, executed and/or delivered in connection therewith or related thereto, the "Prepetition ABL Loan Documents").  The Prepetition ABL Credit Agreement provided the Prepetition ABL Obligors with an asset-based revolving credit facility (the "Prepetition ABL Facility") with $40 million of maximum aggregate availability to the borrowers thereunder, subject to a borrowing base (as reduced by reserves), as set forth in the Prepetition ABL Credit Agreement.  As of the Petition Date, approximately **$18,545,929.18** in principal was outstanding under the Prepetition ABL Facility in the form of "Loans" (as defined under the Prepetition ABL Credit Agreement), plus interest accrued and accruing at the rates set forth in the Prepetition ABL Credit Agreement (together with any other amounts outstanding under the Prepetition ABL Loan Documents, including, without limitation, obligations in respect of fees, expenses, and indemnity the "Prepetition ABL Obligations").[5]  The

---

[5] The defined term "Obligations" in the Prepetition ABL Credit Agreement means "the due and punctual payment and performance of all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party [i.e., the

Prepetition ABL Agent and the Prepetition ABL Lenders are referred to collectively herein as the "Prepetition ABL Secured Parties." The Prepetition ABL Facility is secured by (a) first priority security interests in and liens (subject only to certain of the liens permitted under the Prepetition ABL Loan Documents) on certain of the Debtors' property, including (i) all Accounts[6] (other than Accounts which constitute identifiable proceeds of Term Priority Collateral), (ii) all cash, money and cash equivalents (other than, in each instances, as set forth in the Prepetition Intercreditor Agreement), (iii) all Deposit Accounts, Securities Accounts and Commodity Accounts (other than, in each instance as set forth in the Prepetition Intercreditor Agreement), (iv) all Inventory, (v) to the extent evidencing or governing any of the items referred to in clauses (i) through (iv) above, all Documents, General Intangibles, Instruments, Chattel Paper, Commercial Tort Claims, Investment Property and Letter-of-Credit Rights (other than, in each instance, as set forth in the Prepetition Intercreditor Agreement), (vi) ABL Intercompany Debt, certain payments constituting certain proceeds of ABL Priority Collateral and the ABL Secured Parties' Business Interruption Insurance Percentage, (vii) all supporting obligations with respect to the ABL Priority Collateral (other than as set forth in the Prepetition Intercreditor Agreement), (viii) all books and records constituting ABL Priority Collateral, (ix) all collateral security and guarantees with respect to any of the items referred to in the preceding clauses (i) through (viii), and (x) all proceeds of any of

---

Prepetition ABL Obligors] under or pursuant to each of the [Prepetition ABL] Loan Documents or otherwise with respect to any Loan [as defined under the Prepetition ABL Credit Agreement], including, without limitation all principal, interest, fees and other amounts payable under the [Prepetition ABL] Loan Documents, and all costs and expenses incurred in connection with enforcement and collection of the foregoing, including the fees, charges and disbursements of counsel, in each case whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising, and including interest, expenses and fees that accrue after the commencement by or against any Loan Party or any [affiliate] thereof of any proceeding under any [applicable bankruptcy and insolvency laws] naming such [person] as the debtor in such proceeding, regardless of whether such interest, expenses and fees are allowed in such proceeding."

[6] Capitalized terms used but not defined in this paragraph E shall have the meanings ascribed to them in the Prepetition Intercreditor Agreement (as defined below).

the items referred to in the preceding clauses (i) through (ix) (such property, whether now existing or hereafter arising or acquired, in clauses (i) through (ix), collectively, the "Prepetition ABL Priority Collateral"); and (b) second priority security interests in and liens on certain of the Debtors' property, including (i) all Property of the Borrowers and Guarantors, whenever arising and wherever located, on which a Lien is granted as security for any Term Obligations and that does not constitute Prepetition ABL Priority Collateral, and (ii) goodwill (such property, whether now existing or hereafter arising or acquired, in clauses (i) and (ii) collectively, the "Prepetition Term Priority Collateral" and, together with the Prepetition ABL Priority Collateral, the "Prepetition Collateral" and, such liens and security interests in clauses (a) and (b), the "Prepetition ABL Liens") provided further, that the Prepetition Collateral does not include, and the Prepetition ABL Obligations are not secured by, any Excluded Assets (as defined in the Prepetition Documents (as defined below)).

(ii)     Prepetition Term Obligations. Corsicana Bedding, as borrower, and certain of its affiliates designated therein as "Guarantors" (such parties, collectively, the "Prepetition Term Loan Obligors" and, together with the Prepetition ABL Obligors, the "Prepetition Obligors"), each "Lender" from time to time party thereto (collectively, the "Prepetition Term Loan Lenders" and, together with the Prepetition ABL Lenders, the "Prepetition Lenders"), and Blue Torch, as administrative agent and collateral agent (in such capacities, the "Prepetition Term Loan Agent" and, together with the Prepetition ABL Agent, the "Prepetition Agents," and, the Prepetition Term Loan Agent together with the Prepetition Term Loan Lenders, the "Prepetition Term Loan Secured Parties" and, together with the Prepetition ABL Secured Parties, the "Prepetition Secured Parties"), are parties to that certain Financing Agreement, dated as of April 28, 2021 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Prepetition

Term Loan Agreement" and, together with all other agreements, documents, and instruments executed and/or delivered with, to or in favor of the Prepetition Term Loan Secured Parties, including, without limitation, all security agreements, deposit account control agreements (including, without limitation, the Control Agreements (as defined below)), control agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements, documents, and instruments, including any fee letters, executed and/or delivered in connection therewith or related thereto, the "Prepetition Term Loan Documents" and, together with the Prepetition ABL Loan Documents, the "Prepetition Documents").  Pursuant to the Prepetition Term Loan Agreement, the Prepetition Term Loan Lenders made term loans in the aggregate principal amount of $128,500,000, exclusive of the Protective Advance (the "Prepetition Term Loans").  As of the Petition Date, approximately $**129,407,386.16** of indebtedness under the Prepetition Term Loan Agreement was outstanding, which amount includes the Applicable Premium (as such term is defined in the Prepetition Term Loan Agreement) in the amount of $2,512,717.34, capitalized interest in the amount of $161,419.83, and accrued and unpaid interest through the Petition Date in the amount of $1,097,382.22 (and, together with any other amounts outstanding under the Prepetition Term Loan Documents, including interest, fees, and expenses, the "Prepetition Term Loan Obligations" and, together with the Prepetition ABL Obligations, the "Prepetition Obligations").  The Prepetition Term Loans are secured by (a) first priority security interests in and liens (subject only to certain of the liens permitted under the Prepetition Senior Note Documents) on the Prepetition Term Priority Collateral; and (b) second priority security interests in and liens on the Prepetition ABL Priority Collateral (such liens and security interests in clauses (a) and (b), the "Prepetition Term Loan Liens" and, together with the Prepetition ABL Liens, the

"Prepetition Liens"); *provided, that* the Prepetition Term Obligations are not secured by any Excluded Assets (as defined in the Prepetition Term Loan Documents).

(iii)    Prepetition Intercreditor Agreement. Wingspire, in its capacity as Prepetition ABL Agent, and Blue Torch, in its capacity as Prepetition Term Loan Agent, *inter alia*, are parties to that certain Intercreditor Agreement, dated as of April 28, 2021 (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Intercreditor Agreement"). The Prepetition ABL Agent and the Prepetition Term Loan Agent acknowledge and agree that the Prepetition Intercreditor Agreement is a valid and enforceable "subordination agreement" under section 510(a) of the Bankruptcy Code and other applicable non-bankruptcy law and is, as of the Petition Date, binding on the Prepetition ABL Agent, the Prepetition ABL Lenders, the Prepetition Term Loan Agent, the Prepetition Term Loan Lenders and each of the other parties thereto.

(iv)    Prepetition Collateral. To secure the Prepetition Obligations, the Debtors entered into certain guaranty and collateral agreements and certain other security documents governing the Prepetition Secured Parties' respective security interests in the Prepetition Collateral (such agreements, as amended, restated, amended and restated, supplemented or otherwise modified from time to time, and together with any ancillary collateral documents, including, without limitation, any related mortgages and deeds of trust, the "Prepetition Collateral Documents"). Pursuant to the Prepetition Collateral Documents, and on the terms set forth therein and subject to the Prepetition Intercreditor Agreement, the Debtors granted to the Prepetition Secured Parties the Prepetition Liens on the Prepetition Collateral.

(v)    Prepetition Obligations. The Prepetition Obligations owing to the Prepetition Secured Parties constitute legal, valid, and binding obligations of the Debtors and their applicable affiliates, enforceable against them in accordance with their respective terms (other than

in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and no portion of the Prepetition Obligations owing to the Prepetition Secured Parties is subject to avoidance, recharacterization, reduction, set-off, offset, counterclaim, cross-claim, recoupment, defenses, disallowance, impairment, recovery, subordination, or any other challenges pursuant to the Bankruptcy Code or applicable non-bankruptcy law or regulation by any person or entity, including in any Successor Cases (as defined below).

(vi)     Prepetition Liens. The Prepetition Liens granted to the Prepetition Secured Parties constitute legal, valid, binding, enforceable (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), and perfected security interests in and liens on the Prepetition Collateral, were granted to, or for the benefit of, the Prepetition Secured Parties for fair consideration and reasonably equivalent value, and are not subject to defense, counterclaim, recharacterization, subordination, avoidance, or recovery pursuant to the Bankruptcy Code or applicable non-bankruptcy law or regulation by any person or entity.

(vii)    No Challenges/Claims. No offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Liens or Prepetition Obligations exist, and no portion of the Prepetition Liens or Prepetition Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law. The Debtors and their Estates have no valid Claims (as such term is defined in section 101(5) of the Bankruptcy Code) objections, challenges, causes of action, and/or choses in action against any of the Prepetition Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors or employees with respect to the Prepetition Documents, the Prepetition Obligations, the Prepetition Liens, or otherwise,

whether arising at law or at equity, including, without limitation, any challenge, recharacterization, subordination, avoidance, recovery, disallowance, reduction, or other claims arising under or pursuant to sections 105, 502, 510, 541, 542 through 553, inclusive, or 558 of the Bankruptcy Code or applicable state law equivalents. The Prepetition Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code. The aggregate value of the Prepetition ABL Priority Collateral exceeds the amount of the Prepetition ABL Obligations.

(viii)   _Indemnity_. The DIP Agents, the DIP Lenders and the Prepetition Secured Parties have acted in good faith, and without negligence or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining the requisite approvals of the DIP Facilities and the use of Cash Collateral, including in respect of the granting of the DIP Liens and the Prepetition Secured Parties Adequate Protection Liens (as defined below), any challenges or objections to the DIP Facilities or the use of Cash Collateral, and all documents related to any and all transactions contemplated by the foregoing. Accordingly, the Prepetition Secured Parties, the DIP Agents and the DIP Lenders shall be and hereby are indemnified and held harmless by the Debtors in respect of any claim or liability incurred in respect thereof or in any way related thereto, _provided that_, no such parties will be indemnified for any cost, expense, or liability to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from such parties' gross negligence or willful misconduct. No exception or defense exists in contract, law, or equity as to any obligation set forth, as the case may be, in this Paragraph E(viii), in the Prepetition Documents, or in the DIP Loan Documents, to the Debtors' obligation to indemnify and/or hold harmless the Prepetition Secured Parties, the DIP Agents or the DIP Lenders, as the case may be.

(ix)     <u>Release</u>.  Subject to Section 4.1 of this Interim Order, each of the Debtors, their Estates and the Prepetition Obligors, on their own behalf and on behalf of each of their past, present and future predecessors, successors, heirs, subsidiaries, and assigns have agreed to provide releases to each of the Released Parties (as defined below) as provided in Section 5.17 of this Interim Order.

(x)     <u>Cash Collateral</u>. The Debtors admit, stipulate, acknowledge, and agree that all of the cash of the Debtors, wherever located, and all cash equivalents, including any cash in deposit accounts of the Debtors, whether as Prepetition ABL Priority Collateral or Term Loan Priority Collateral, as income, proceeds, products, rents or profits of other Prepetition ABL Priority Collateral or Term Loan Priority Collateral, or otherwise, constitutes "<u>cash collateral</u>" of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code (the "<u>Cash Collateral</u>").

(F)     <u>Findings Regarding the Postpetition Financing and Use of Cash Collateral</u>.

(i)     <u>Request for Postpetition Financing</u>. The Debtors have requested from each of the DIP Secured Parties, and the DIP Secured Parties are willing, subject to the terms of this Interim Order and satisfaction of the conditions set forth in the DIP Loan Agreements, to extend the DIP Loans on the terms and conditions set forth in this Interim Order and the DIP Loan Documents, respectively.

(ii)     <u>Need for Postpetition Financing and Use of Cash Collateral</u>. The Debtors do not have sufficient liquidity, including Cash Collateral, to operate and maintain their businesses in the ordinary course of business without the financing requested in the Motion.  The Debtors' ability to maintain business relationships with their vendors, suppliers, and customers, to pay their employees, pay certain fees and expenses as set forth herein, and to otherwise fund their operations

and other efforts and activities is essential to the Debtors' continued viability as the Debtors seek to maximize the value of the assets of the Estates for the benefit of all creditors of the Debtors. The ability of the Debtors to obtain sufficient working capital and liquidity through the proposed postpetition financing arrangements with the DIP Secured Parties and the use of Cash Collateral as set forth in this Interim Order, the DIP Loan Agreements and the other DIP Loan Documents, as applicable, is vital to the preservation and maintenance of the going concern value of each Debtor. Accordingly, the Debtors have an immediate need to obtain the postpetition financing and to use Cash Collateral as set forth in this Interim Order to, among other things, permit the orderly continuation of the operation and maintenance of their businesses, minimize the disruption of their business operations and other efforts and activities and preserve and maximize the value of the assets of the Debtors' Estates to maximize the recovery to all creditors of the Estates.

(iii)    <u>No Credit Available on More Favorable Terms</u>.  The Debtors are unable to procure financing in the form of unsecured credit allowable as an administrative expense under sections 364(a), 364(b), or 503(b)(1) of the Bankruptcy Code or in exchange for the grant of a superpriority administrative expense, or liens on property of the Estates not subject to a lien pursuant to sections 364(c)(1), 364(c)(2), or 364(c)(3) of the Bankruptcy Code.  The Debtors assert in the Motion, the First Day Declaration, and in the Juniper DIP Declaration, and demonstrated at the Interim Hearing, that it would be futile under the circumstances for the Debtors to undertake further efforts to seek, and they would not obtain, the necessary postpetition financing, let alone on terms more favorable, taken as a whole, than the financing offered by each of the DIP Secured Parties pursuant to the DIP Loan Documents. In light of the foregoing, and considering the futility of all other alternatives, the Debtors have reasonably and properly concluded, in the exercise of their sound business judgment, that the DIP Facilities represent the best financing available to the

Debtors at this time, and are in the best interests of the Debtors, their Estates, and all of their stakeholders.

(iv)     <u>Budget</u>. The Debtors have prepared and delivered to the DIP Agents an initial budget (the "<u>Initial Budget</u>"), a copy of which is attached hereto as **<u>Exhibit C</u>**.  The Initial Budget reflects the Debtors' anticipated cash receipts and anticipated disbursements for each calendar week during the period from the Petition Date through and including the end of the thirteenth (13th) calendar week following the Petition Date (the Initial Budget and each subsequent budget approved by the DIP Agents and then in effect, the "<u>Approved Budget</u>"), in each case, subject to (i) permitted variances with respect to maximum cumulative collection and disbursement variances ("<u>Permitted Variances</u>," which variances shall be tested on a weekly basis), in each case, of (A) in respect of the aggregate amount of Actual Operating Disbursement Amounts, (x) 20% for the Initial Two Week Disbursements Period, (y) 20% for the Initial Three Week Disbursements Period, and (z) 15% for the Initial Four Week Disbursements Period and each Four Week Disbursements Period thereafter, and (B) in respect of Actual Cash Receipts (as determined by reference to the "Total Collected" line of the Approved Budget), (x) 20% for the Initial Two Week Receipts Period, (y) 15% for the Initial Three Week Receipts Period, and (z) 15% for the Initial Four Week Receipts Period and each Four Week Receipts Period thereafter; and (ii) other exclusions set forth in the DIP Loan Documents.  The Debtors believe that the Initial Budget is reasonable under the facts and circumstances.  The DIP Secured Parties are relying upon the Debtors' agreement to comply with the terms set forth in the DIP Loan Agreements, the other DIP Loan Documents and this Interim Order, and with the Approved Budget, in determining to enter into the postpetition financing arrangements provided for herein and to consent to the Debtors' use of Cash Collateral as set forth herein.  The Debtors shall provide the DIP Agents a

revised proposed budget every Thursday beginning on July 14, 2022, and continuing each week thereafter (each, a "Proposed Budget"). If a Proposed Budget is approved by the DIP Agents, it shall become the Approved Budget. If the DIP Agents do not approve a Proposed Budget, the last Approved Budget prior to the delivery of the applicable Proposed Budget shall remain the Approved Budget as provided herein.

(v)     Sale Process. The DIP Lenders' willingness to make the DIP Loans and the Prepetition Secured Parties' willingness to consent to the use of Cash Collateral (each on the terms and subject to the conditions set forth in the DIP Loan Documents and this Interim Order) is predicated upon (i) the Debtors seeking authority to sell all or substantially of their assets to one or more buyers pursuant to Section 363 of the Bankruptcy Code by filing a motion (the "Sale Motion") to approve bidding and sale procedures and the sale of the Debtors' assets to the successful bidder(s) by no later than 3 Business Days after the Petition Date and (ii) the Debtors seeking to retain Houlihan Lokey Capital, Inc. ("Houlihan Lokey") as their investment banker and advisor in connection with the sale of the Debtors' assets. Absent such arrangements, the DIP Lenders and the Prepetition Secured Parties would not have agreed to make the DIP Loans or consent to the use of Cash Collateral as provided in the DIP Loan Documents and this Interim Order.

(vi)     Certain Conditions to DIP Facilities. The DIP Lenders' willingness to make the DIP Loans is conditioned upon, among other things: (a) the Debtors obtaining Court approval to enter into the DIP Loan Documents and to incur all of the obligations thereunder, and to confer upon the DIP Secured Parties all applicable rights, powers, and remedies thereunder in each case as modified by this Interim Order; (b) the Debtors' obtaining Court approval of and compliance with the "Milestones" set forth on **Exhibit D**, which are hereby approved in all respects; (c) the

provision of adequate protection of the Prepetition Secured Parties' interests in the Prepetition Collateral pursuant to sections 361, 363, and 364 of the Bankruptcy Code; and (d) the DIP Secured Parties being granted, as security for the prompt payment of the DIP Facilities and all other obligations of the Debtors under the DIP Loan Documents, subject to the priorities described in **Exhibit E** annexed hereto, superpriority perfected security interests in and liens upon all property and assets of the Debtors, including, but not limited to, a valid and perfected security interest in and lien upon all of the following now existing or hereafter arising or acquired property and assets: (i) all property and assets comprising Prepetition Collateral and (ii) all other property and assets of the Debtors, including any property or assets consisting of "Excluded Assets" under any of the Prepetition Documents (collectively hereinafter referred to as the "DIP Collateral" which, for avoidance of doubt, shall (subject to the entry of the Final Order) include, the proceeds (the "Avoidance Proceeds") of any claim or cause of action arising under or pursuant to chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state, federal, or foreign law (including any other avoidance actions under the Bankruptcy Code) (collectively, the "Avoidance Actions")).

(vii)   Business Judgment and Good Faith Pursuant to Section 364(e). Any credit extended, loans made, and other financial accommodations extended to the Debtors by the DIP Secured Parties, including, without limitation, pursuant to this Interim Order, have been extended, issued, or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Facilities, the DIP Liens, and the DIP Superiority Claims (as defined below) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in

the event that this Interim Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise.

(viii) <u>Sections 506(c) and 552(b)</u>. The Debtors have agreed as a condition to obtaining financing under the DIP Facilities and the use of Cash Collateral as set forth in this Interim Order that as a material inducement to the DIP Secured Parties to agree to provide the DIP Facilities and the Prepetition Secured Parties' consent to the use of Cash Collateral as set forth in this Interim Order, and in exchange for (a) the DIP Secured Parties' willingness to provide the DIP Facilities to the extent set forth herein, (b) the DIP Secured Parties' and the Prepetition Secured Parties' agreement to subordinate their liens and superpriority claims to the Carve Out, and (c) the consensual use of Cash Collateral consistent with the Approved Budget, the terms of the DIP Loan Agreements, and the terms of this Interim Order, each of the DIP Secured Parties and the Prepetition Secured Parties are entitled (subject to the entry of the Final Order) to receive (1) a waiver of any equities of the case exceptions or claims under section 552(b) of the Bankruptcy Code, and (2) a waiver of the provisions of section 506(c) of the Bankruptcy Code.

(ix) <u>Good Cause</u>. Good cause has been shown for the entry of this Interim Order. The relief requested in the Motion is necessary, essential, and appropriate and is in the best interest of and will benefit the Debtors, their creditors, and their Estates, as its implementation will, among other things, provide the Debtors with the necessary liquidity to (1) minimize disruption to the Debtors' remaining operating businesses, on-going operations and other applicable activities and efforts, (2) preserve and maximize the value of the Debtors' Estates for the benefit of all the Debtors' creditors, and (3) avoid immediate and irreparable harm to the Debtors, their creditors, their businesses, their employees, and their assets. The terms of the DIP Facilities and this Interim Order are fair and reasonable, reflect each Debtor's exercise of its business judgment, and are

supported by reasonably equivalent value and fair consideration. The DIP Facilities and this Interim Order are the product of reasonable, arm's length, good faith negotiations between the Debtors, the DIP Secured Parties and the Prepetition Secured Parties.

(x)     Refinancing of Prepetition ABL Obligations and Protective Advances.

(a)     The full and immediate payoff of the Prepetition ABL Obligations with the proceeds of borrowings under the DIP Revolver Facility in accordance with this Interim Order (but subject to the provisions of Section 4.1 hereof) is necessary as the Prepetition ABL Secured Parties have not otherwise consented to the use of their Cash Collateral, the subordination of their liens to the Carve Out, the Revolver DIP Liens, the DIP Term Loan Liens and the Prepetition Term Loan Adequate Protection Liens (as defined below), in each case as provided in this Interim Order, or the extension of credit to fund the Debtors' critical working capital needs in the form of the DIP Revolver Facility. Moreover, as set forth in the Juniper DIP Declaration, in consideration of the entry of this Interim Order authorizing the refinancing of the Prepetition ABL Obligations, (x) the Prepetition ABL Lenders have agreed to waive any claims for interest at the Default Rate (as such term is defined in the Prepetition ABL Credit Agreement), (y) the DIP Revolver Lenders have agreed to reduce the Availability Block (as such term is defined in the Revolver DIP Agreement) from $8 million to $4 million so as to provide the Debtors with access to significant additional working capital, and (z) the DIP Revolver Lenders have agreed to defer payment of the Exit Fee required to be paid under the Prepetition ABL Credit Agreement until the Maturity Date of the DIP Revolver Facility. Thus, the refinancing of the Prepetition ABL Obligations with the DIP Revolver Facility will confer material benefits on the Debtors.

(b)     The full and immediate payoff of the Protective Advances with the proceeds of borrowings under the DIP Term Loan Facility in accordance with this Interim Order (but subject

to the provisions of Section 4.1 hereof) is necessary as the Prepetition Term Loan Secured Parties have not otherwise consented to the use of their Cash Collateral, the subordination of their liens to the Carve Out, the Revolver DIP Liens, the DIP Term Loan Liens and the Prepetition Revolver Adequate Protection Liens (as defined below), in each case as provided in this Interim Order, or the extension of credit to fund the Debtors' critical working capital needs in the form of the DIP Term Loan Facility. Moreover, as set forth in the Juniper DIP Declaration, in consideration of the entry of this Interim Order authorizing the repayment of the Protective Advances with the proceeds of the DIP Term Loan Facility, the Prepetition Term Loan Secured Parties have agreed to waive any claims for interest at the Default Rate (as such term is defined in the Prepetition Term Loan Agreement) on $3,000,000 of Prepetition Term Loan Obligations. As set forth in the Juniper DIP Declaration, the Protective Advances were made by the Prepetition Term Loan Lenders shortly before the commencement of these Chapter 11 Cases so as to avoid immediate and irreparable harm to the Debtors' businesses, their estates and their creditors.

(xi) <u>Adequate Protection</u>. The Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code, to receive adequate protection against any Diminution in Value of their respective interests in the Prepetition Collateral (including Cash Collateral), as set forth in this Interim Order.

(xii) <u>Immediate Entry</u>. Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2). Any objections that were made (to the extent such objections have not been withdrawn, waived, resolved, or settled) are hereby overruled on the merits.

(xiii)  <u>Interim Hearing</u>. Notice of the Interim Hearing and the relief requested in the Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier or hand delivery, to the Notice Parties.

Based upon the foregoing, and upon the record made before the Court at the Interim Hearing and after due consideration and good cause appearing therefor;

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

Section 1.  <u>Authorization and Conditions to Financing and Use of Cash Collateral</u>.

1.1  <u>Motion Granted</u>. The Motion is granted solely to the extent provided in this Interim Order.  Any objections to the entry of this Interim Order that have not been withdrawn, waived, resolved, or settled, and all reservations of rights included therein, are hereby denied and overruled on the merits.

1.2  <u>Authorization of DIP Financing and Use of Cash Collateral</u>.

(a)  The Debtors are hereby authorized to execute and deliver the DIP Loan Documents and to immediately borrow, incur, and guarantee (as applicable), (i) loans under the DIP Revolver Facility, pursuant to the terms and conditions of the Revolver DIP Documents, this Interim Order and the Approved Budget, up to an aggregate principal amount of up to $40 million in DIP Revolving Commitments; and (ii) DIP Term Loans, pursuant to the terms and conditions of the DIP Term Documents, this Interim Order and the Approved Budget, in an aggregate principal amount not to exceed $18 million, with such Interim DIP Term Loan to be made upon entry of this Interim Order and satisfaction of other conditions set forth in the DIP Term Documents and in accordance with the Approved Budget.

(b)  The Debtors are hereby authorized to (i) borrow under the DIP Facilities and use Cash Collateral during the period (the "<u>Interim Financing Period</u>") commencing on the date of this Interim Order through and including the earlier to occur of (x) the date of entry of the

Final Order or (y) the occurrence of a DIP Termination Event (as defined below) solely in accordance with, and for the purposes permitted by, the DIP Loan Documents, this Interim Order and the Approved Budget, (ii) pay all interest, costs, fees, and other amounts and obligations accrued or accruing under the DIP Loan Agreements and other DIP Loan Documents, all pursuant to the terms and conditions of this Interim Order, the Approved Budget, the DIP Loan Agreements, and the other DIP Loan Documents, (iii) complete the ABL Refinancing (as defined below), and (iv) complete the Protective Advance Refinancing (as defined below).  The Initial Budget is hereby approved in all respects.

      1.3    <u>Financing Documents</u>.

      (a)    <u>Authorization</u>. The Debtors are hereby authorized to enter into, execute, deliver, and perform all obligations under the DIP Loan Documents. No obligation, payment, transfer, or grant of security hereunder or under the DIP Loan Documents shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable state, federal, or foreign law (including, without limitation, under chapter 5 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or foreign law), or be subject to any defense, reduction, setoff, counterclaim, recoupment, offset, recharacterization, subordination (whether equitable, contractual or otherwise), cross-claims, or any other challenge under the Bankruptcy Code or any applicable law, rule, or regulation by any person or entity.

      (b)    <u>Approval; Evidence of Borrowing Arrangements</u>. The DIP Loan Documents and DIP Obligations shall be valid, binding, and enforceable against the Debtors, their Estates, and any successors thereto, including, without limitation, any trustee appointed in any of these Chapter 11 Cases or any case under chapter 7 of the Bankruptcy Code upon the conversion

of any of these Chapter 11 Cases (collectively, the "Successor Cases"), and their creditors and other parties in interest, in each case, in accordance with the terms of this Interim Order and the DIP Loan Documents.

(c)     Payment of DIP Fees and Other Expenses. Any and all fees and expenses payable pursuant to the DIP Loan Documents (collectively, any and all such fees and expenses, the "DIP Fees") are hereby approved and the Debtors are hereby authorized and directed to pay, in cash and on a current basis, all reasonable and documented out-of-pocket costs, disbursements, and expenses of the DIP Agents and the DIP Lenders incurred at any time, as provided by the DIP Loan Documents and this Interim Order in accordance with Section 5.15 hereof. The DIP Fees shall not be subject to any offset, defense, claim, counterclaim, or diminution of any type, kind, or nature whatsoever.

(d)     Amendments to DIP Loan Documents. Subject to the terms and conditions of the applicable DIP Loan Documents, the Debtors and the applicable DIP Secured Parties may make amendments, modifications, or supplements to any DIP Loan Document, and the DIP Agents (acting at the direction of the Required Lenders (as defined in the applicable DIP Loan Documents) if so required by the applicable DIP Loan Documents) and the DIP Lenders may waive any provisions in the DIP Loan Documents, without further approval of the Court; *provided that* any amendments, modifications, or supplements to any DIP Loan Documents that operate to increase the aggregate commitments, the rate of interest payable thereunder, or existing fees or add new fees thereunder (excluding, for the avoidance of doubt, any amendment, consent or waiver fee) other than as currently provided in the DIP Loan Documents (collectively, the "Material DIP Amendments"), shall be filed with the Court, and the Debtors shall provide prior written notice of the Material DIP Amendment to (i) counsel to the DIP Agents, (ii) counsel to the DIP Lenders,

(iii) counsel for each of the Prepetition Secured Parties, (iv) counsel to the Committee, or, in the event no such Committee is appointed at the time of such Material DIP Amendment, the 20 Largest Unsecured Creditors, and (v) the U.S. Trustee; *provided*, *further*, that the consent of the foregoing parties will not be necessary to effectuate any such amendment, modification or supplement, except that any Material DIP Amendment that is subject to an objection filed within five (5) Business Days following receipt of such Material DIP Amendment must be approved by the Court. For the avoidance of doubt, the Debtors must receive written consent as to any Material DIP Amendment prior to filing notice thereof with the Court from the applicable Prepetition Agents for any amendment, modification, supplement, or waiver that materially and adversely affects any rights of any Prepetition Secured Parties hereunder or the treatment of the Prepetition Obligations hereunder.

      1.4      <u>Refinancing of Prepetition ABL Obligations and Protective Advances</u>.

      (a)      Upon the entry of this Interim Order and the satisfaction or waiver of all other closing conditions in the Revolver DIP Agreement, without any further action by the Debtors, the Court or any other party, the Debtors shall be (i) authorized to immediately borrow under the Revolver DIP Agreement the full amount necessary to fully and immediately pay off in full all Prepetition ABL Obligations and (ii) subject to Section 4.1 hereof, deemed to have contemporaneously fully repaid all Prepetition ABL Obligations (clauses (i) and (ii) together, the "<u>ABL Refinancing</u>"). Until (a) the payment in full of all DIP Revolver Obligations and Prepetition ABL Obligations, (b) the commitments to lend under the DIP Revolver Facility have terminated, (c) all objections and challenges (including, without limitation, any Challenge Proceeding (as defined in Section 4.1 hereof)) to (1) the liens, security interests and claims of the Prepetition ABL Agent (including, without limitation, liens granted for adequate protection purposes) and/or (2) the

Prepetition ABL Obligations have been waived, denied or barred, and (d) all of the Debtors' Stipulations (as defined in Section 4.1 hereof) have become binding on their estates and parties in interest in accordance with Section 4.1 hereof, all liens, security interests and claims of the Prepetition ABL Agent (including, without limitation, liens granted for adequate protection purposes) shall remain valid and enforceable with the same continuing priority as described herein and the Prepetition ABL Loan Documents shall remain in full force and effect; *provided, however*, that, subject to the results of any applicable Challenge Proceeding, to the extent that Prepetition ABL Obligations have been paid pursuant to the ABL Refinancing and have become and are DIP Revolver Obligations, such Prepetition ABL Obligations shall not be due or owing separately under the Prepetition ABL Loan Documents; *provided, further,* however, that nothing in the foregoing proviso shall alter or diminish, or be deemed to alter or diminish, the Adequate Protection (as defined herein) of the Prepetition ABL Agent and the Prepetition ABL Lenders.

(b) Upon the entry of this Interim Order and the satisfaction or waiver of all other closing conditions in the DIP Term Loan Note, without any further action by the Debtors, the Court or any other party, the Debtors shall be (i) authorized to immediately borrow under the DIP Term Loan Note the full amount necessary to fully and immediately pay off in full the Protective Advances and (ii) subject to Section 4.1 hereof, deemed to have contemporaneously fully repaid all Protective Advances (clauses (i) and (ii) together, the "Protective Advance Refinancing"). Until (a) all objections and challenges (including, without limitation, any Challenge Proceeding (as defined in Section 4.1 hereof)) to (1) the liens, security interests and claims of the Prepetition Term Loan Agent (including, without limitation, liens granted for adequate protection purposes) and/or (2) the Prepetition Term Loan Obligations (in each case in respect of the Protective Advances) have been waived, denied or barred, and (b) all of the Debtors' Stipulations

(as defined in Section 4.1 hereof) have become binding on their estates and parties in interest in accordance with Section 4.1 hereof, all liens, security interests and claims of the Prepetition Term Loan Agent (including, without limitation, liens granted for adequate protection purposes) in respect of the Protective Advances shall remain valid and enforceable with the same continuing priority as described herein and the Prepetition Term Loan Documents shall remain in full force and effect; *provided, however*, that, subject to the results of any applicable Challenge Proceeding, to the extent that Protective Advances Obligations have been paid pursuant to the Protective Advance Refinancing and have become and are DIP Term Loan Obligations, such Protective Advances shall not be due or owing separately under the Prepetition Term Loan Documents; *provided, further,* however, that nothing in the foregoing proviso shall alter or diminish, or be deemed to alter or diminish, the Adequate Protection (as defined herein) of the Prepetition Term Loan Agent and the Prepetition Term Loan Lenders.

1.5    Continuation of Prepetition Procedures; DIP Term Loan Escrow Account; Prepetition Intercreditor Agreement.

(a)    Except to the extent expressly set forth in the Prepetition Documents, DIP Loan Documents, or in other "first day" orders, all prepetition practices and procedures for the payment, collection and application of proceeds of the Prepetition Collateral, sweeping, the turnover of cash, the delivery of property to the Prepetition Agents and the Prepetition Lenders, including that certain (i) Deposit Account Control Agreement, dated as of April 28, 2021 (the "Primis DACA"), among Eastern Sleep Products Company ("Eastern Sleep Products"), the Prepetition ABL Agent, the Prepetition Term Loan Agent and Primis Bank ("Primis"); (ii) Blocked Account Control Agreement, dated as of April 28, 2021 (the "Primis BACA"), among Eastern Sleep Products,  the Prepetition ABL Agent, the Prepetition Term Loan Agent and Primis;

(iii) Deposit Account Control Agreement, entered into as of April 28, 2021 (the "First 5/3 DACA"), among Corsicana Bedding, the Prepetition ABL Agent, the Prepetition Term Loan Agent and Fifth Third Bank, National Association ("5/3"); and (iv) Deposit Account Control Agreement, entered into as of April 28, 2021 (the "Second 5/3 DACA" and, together with the Primis DACA, the Primis BACA and the First 5/3 DACA, the "Control Agreements"), among Corsicana Bedding, the Prepetition ABL Agent, the Prepetition Term Loan Agent and 5/3 and any other similar lockbox or blocked depository bank account arrangements, are hereby approved and shall continue without interruption.

(b) The proceeds of the DIP Term Loans shall be funded into an escrow account at Key Bank in the name of Alter Domus (US) LLC, as escrow agent (the "Escrow Agent"), with the account number ending in x2268 (the "DIP Term Loan Escrow Account"), which DIP Term Loan Escrow Account shall be maintained by the Escrow Agent pursuant to the terms of the Escrow Agreement dated as of June 24, 2022 (the "Escrow Agreement") by and among the DIP Term Administrative Agent and the Escrow Agent. The Debtors shall be permitted to make Withdrawals from the DIP Term Loan Escrow Account upon submission of a Withdrawal Notice to the DIP Term Administrative Agent and the Escrow Agent that provides, among other things, that the amount of the requested Withdrawal complies with the Withdrawal Liquidity Condition.[7] Withdrawals from the DIP Term Loan Escrow Account shall be deposited in the DIP holding

---

[7] The term "Withdrawal" is defined in the DIP Term Loan Note as "a withdrawal from the [DIP Term Loan] Escrow Account made in accordance with Section 2." The term "Withdrawal Liquidity Condition" is defined in the DIP Term Loan Note to mean "with respect to any Withdrawal, the amount of the requested withdrawal does not exceed the positive difference of (a) the amount of disbursements reasonably anticipated to be made during the period from such withdrawal date to the last Business Day of the week following such withdrawal date as set forth in the Approved Budget (subject to Permitted Variances), minus (b) the sum (without duplication) of (x) the amount of cash receipts reasonably expected to be received by the Debtors during the period from such withdrawal date to the last Business Day of the week following such withdrawal date as set forth in the Budget (subject to Permitted Variances), (y) estimated cash in certain designated Debtor bank accounts as of such withdrawal date, and (z) Availability (as defined in the DIP Revolver Facility) expected to be available to the Debtors from the withdrawal date to the last Business Day of the week following such Withdrawal Date."

account ending in x7135 maintained by the Debtors under their cash management system (the "DIP Holding Account").  Funds on deposit in the DIP Holding Account may be transferred to the Debtors' primary disbursement account on a daily basis to the extent necessary to fund the Debtors' disbursements on such day or the immediately succeeding day.  The DIP Holding Account and the DIP Term Loan Escrow Account (and all amounts from time to time on deposit therein) shall constitute Term Loan Priority Collateral for all purposes.

(c)  Except to the extent that it is modified as expressly set forth herein, the Prepetition Intercreditor Agreement shall remain in full force and effect.

1.6  <u>Indemnification</u>. The Debtors are authorized to indemnify and hold harmless the DIP Agents, each DIP Lender, and, solely in their capacities as such, each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders and employees, past, present and future, and their respective heirs, predecessors, successors and assigns (each, an "<u>Indemnified Party</u>"), in accordance with, and subject to, the DIP Loan Documents.

Section 2.  <u>Postpetition Lien; Superpriority Administrative Claim Status</u>.

2.1  <u>Postpetition Lien</u>.

(a)  <u>Postpetition DIP Lien Granting</u>. To secure performance and payment when due (whether at the stated maturity, by acceleration or otherwise) of any and all DIP Obligations of the Debtors to the DIP Secured Parties of whatever kind, nature, or description, whether absolute or contingent, now existing or hereafter arising, the DIP Agents, for the benefit of themselves and the DIP Lenders, shall have and are hereby granted, effective as of the Petition Date, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected security interests in and liens (such security interests and liens as to the DIP Revolver Facility, the

"Revolver DIP Liens" and, such security interests and liens as to the DIP Term Loan Facility, the "DIP Term Loan Liens," and, collectively, the "DIP Liens") in and upon all DIP Collateral, subject to Permitted Liens and the rankings and priority set forth in Section 2.1(b) below and as set forth on **Exhibit E** hereto.

   (b)   <u>DIP Lien Priority in DIP Collateral</u>.

   (i)   <u>Revolver DIP Liens Rankings and Priority</u>. The Revolver DIP Liens on the DIP Collateral securing the DIP Revolver Obligations shall be first and senior in priority to all other interests and liens of every kind, nature, and description, whether created consensually, by an order of the Court or otherwise, including, without limitation, liens or security interests granted in favor of third parties in conjunction with sections 363, 364, or any other section of the Bankruptcy Code or other applicable law; *provided, however,* that the Revolver DIP Liens on (A) the Prepetition ABL Priority Collateral (whether in existence on the Petition Date or hereafter arising) shall be subject to the Carve Out and Permitted Liens[8]; (B) the Prepetition Term Priority Collateral (whether in existence on the Petition Date or hereafter arising) shall be subject to the Carve Out, Permitted Liens, the DIP Term Loan Liens, the Prepetition Term Loan Liens, and the Prepetition Term Loan Adequate Protection Liens; (C) assets of the Debtors (the "<u>Non-Lender Encumbered Assets</u>") that were subject to validly perfected liens or security interests as of the Petition Date other than the Prepetition Liens (if any, the "<u>Non-Lender Existing Liens</u>") shall be subject (notwithstanding anything in the Prepetition Intercreditor Agreement to the contrary) to such Non-Lender Existing Liens, the Carve Out and *pari passu* with the DIP Term Loan Liens; and (D) any other assets of the Debtors ("<u>Unencumbered Assets</u>") that were not subject to any

---

[8] For purposes of this Interim Order, "Permitted Liens" shall mean any liens that are senior by operation of law (including any such liens that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code) or that were, as of the Petition Date, valid, properly perfected, non-avoidable and senior in priority to the Prepetition Liens.

validly perfected liens or security interest as of the Petition Date (including, subject to the entry of a Final Order, Avoidance Proceeds) shall be subject (notwithstanding anything in the Prepetition Intercreditor Agreement to the contrary) to the Carve Out and *pari passu* with the DIP Term Loan Liens, in each case as such priorities are set forth in **Exhibit E**.[9]

(ii)     **DIP Term Loan Liens Rankings and Priority**. The DIP Term Loan Liens on the DIP Collateral securing the DIP Term Loan Obligations shall be first and senior in priority to all other interests and liens of every kind, nature, and description, whether created consensually, by an order of the Court or otherwise, including, without limitation, liens or interests granted in favor of third parties in conjunction with sections 363, 364, or any other section of the Bankruptcy Code or other applicable law; *provided, however*, that the DIP Term Loan Liens on (A) the Prepetition ABL Priority Collateral (whether in existence on the Petition Date or hereafter arising) shall be subject to the Carve Out, Permitted Liens, the Revolver DIP Liens, the Prepetition ABL Liens and the Prepetition ABL Adequate Protection Liens (as defined below); (B) the Prepetition Term Priority Collateral (whether in existence on the Petition Date or hereafter arising) shall be subject to the Carve Out and Permitted Liens; (C) the Non-Lender Encumbered Assets shall be subject (notwithstanding anything in the Prepetition Intercreditor Agreement to the contrary) to the Non-Lender Existing Liens, the Carve Out and *pari passu* with the Revolver DIP Liens; and (D) the Unencumbered Assets shall be subject (notwithstanding anything in the Prepetition Intercreditor Agreement to the contrary) to the Carve Out and *pari passu* with the Revolver DIP Liens, in each case as such priorities are set forth in **Exhibit E**.

---

[9] In the event of any conflict or inconsistency between the terms and provisions of this Interim Order and **Exhibit E**, **Exhibit E** shall control.

(c)      Postpetition Lien Perfection. This Interim Order shall be sufficient and conclusive evidence of the priority, perfection, and validity of the DIP Liens, the Prepetition Secured Parties Adequate Protection Liens, and the other security interests granted herein, effective as of the Petition Date, without any further act and without regard to any other federal, state, or local requirements or law requiring notice, filing, registration, recording, or possession of the DIP Collateral, or other act to validate or perfect such security interest or lien, including, without limitation, control agreements with any financial institution(s) party to a control agreement (including, without limitation, the Control Agreements) or other depository account consisting of DIP Collateral, or requirement to register liens on any certificates of title (a "Perfection Act"). Notwithstanding the foregoing, if any DIP Agent or Prepetition Agent, as applicable, shall, in its sole discretion, elect for any reason to file, record, or otherwise effectuate any Perfection Act, then such DIP Agent or Prepetition Agent, as applicable, is authorized to perform such act, and the Debtors are authorized and directed to perform such act to the extent necessary or required by the DIP Loan Documents and this Interim Order, which act or acts shall be deemed to have been accomplished as of the date and time of entry of this Interim Order notwithstanding the date and time actually accomplished, and, in such event, the subject filing or recording office is authorized to accept, file, or record any document in regard to such act in accordance with applicable law. The DIP Agents or Prepetition Agents, as applicable, may choose to file, record, or present a certified copy of this Interim Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file, or record such certified copy of this Interim Order in accordance with applicable law.  Should any DIP Agent or Prepetition Agent, as applicable, so choose and attempt to file, record, or perform a Perfection Act, no defect or failure in connection with such attempt

shall in any way limit, waive, or alter the validity, enforceability, attachment, priority, or perfection of the postpetition liens and security interests granted herein by virtue of the entry of this Interim Order.

(d)     To the extent that any applicable non-bankruptcy law otherwise would restrict the granting, scope, enforceability, attachment, or perfection of any liens and security interests granted and created by this Interim Order (including the DIP Liens and the Prepetition Secured Parties Adequate Protection Liens) or otherwise would impose filing or registration requirements with respect to such liens and security interests, such law is hereby preempted to the maximum extent permitted by the Bankruptcy Code, applicable federal or foreign law, and the judicial power and authority of this Court; *provided, however,* that nothing herein shall excuse the Debtors from payment of any local fees, if any, required in connection with such liens. By virtue of the terms of this Interim Order, to the extent that any DIP Agent or Prepetition Agent, as applicable, has filed Uniform Commercial Code financing statements, mortgages, deeds of trust, or other security or perfection documents under the names of any of the Debtors (including all Guarantors), such filings shall be deemed to properly perfect its liens and security interests granted and confirmed by this Interim Order without further action by the DIP Agent or Prepetition Agent, as applicable.

(e)     Except as provided in this Interim Order, the DIP Liens, the DIP Superpriority Claims, the Prepetition Secured Parties Adequate Protection Liens, and the Prepetition Secured Parties Adequate Protection Claims (as defined below) (i) shall not be made subject to or *pari passu* with (A) any lien, security interest, or claim heretofore or hereinafter granted in any of these Chapter 11 Cases or any Successor Cases and shall be valid and enforceable against the Debtors, their Estates, any trustee, or any other estate representative appointed or

elected in these Chapter 11 Cases or any Successor Cases and/or upon the dismissal of any of these Chapter 11 Cases or any Successor Cases; (B) any lien that is avoided and preserved for the benefit of the Debtors and their Estates under section 551 of the Bankruptcy Code or otherwise; and (C) any intercompany or affiliate lien or claim; and (ii) shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code.

2.2     <u>Superpriority Administrative Expenses</u>.

(a)     <u>DIP Loans</u>. Subject to the priorities set forth on **<u>Exhibit E</u>** and the Carve Out, on account of all DIP Obligations now existing or hereafter arising pursuant to this Interim Order, the DIP Loan Documents, or otherwise, the DIP Agents, for the benefit of themselves and the DIP Lenders, are granted allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code, having priority in right of payment over any and all other obligations, liabilities, and indebtedness of the Debtors, whether now in existence or hereafter incurred by the Debtors, and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, *inter alia*, sections 105, 326, 328, 330, 331, 364(c)(1), 365, 503(b), 507(a), 507(b), 546(c), 1113, or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, which allowed superpriority administrative claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof (including, subject to entry of the Final Order, proceeds of Avoidance Actions) (such superpriority administrative expense claim as to the DIP Revolver Facility, the "<u>Revolver Superpriority Claim</u>" and, as to such superpriority administrative expense claim as to the DIP Term Loan Facility, the "<u>DIP Term Loan Superpriority Claim</u>" and, collectively, the "<u>DIP Superpriority Claims</u>").

2.3     <u>Carve Out Provisions</u>.

      (a)      <u>Definitions; No Independent Obligation</u>. For purposes of this Interim Order, "<u>Carve Out</u>" shall mean the sum of: (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (collectively, the "<u>Statutory Fees</u>"); (ii) all reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (the "<u>Chapter 7 Trustee Carve Out</u>"); (iii) to the extent allowed at any time, whether by final order, interim order, procedural order, or otherwise, subject to and in the amounts set forth in the Approved Budget, all unpaid fees (excluding any success or transaction fees, *provided, that* the foregoing exclusion does not apply to the Debtors' proposed investment banker, Houlihan Lokey, and any Restructuring Fee or Sale Transaction Fee payable to Houlihan Lokey pursuant to the terms of that certain engagement letter between the Debtors and Houlihan Lokey dated as of June 8, 2022 that is approved by the Court (the "<u>Houlihan Transaction Fee</u>")), costs, disbursements and expenses (the "<u>Allowed Professional Fees</u>") incurred or earned by persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>") and the Committee pursuant to sections 327, 328 or 1103 of the Bankruptcy Code (the "<u>Committee Professionals</u>" and, together with the Debtor Professionals, the "<u>Professional Persons</u>") at any time before or on the first business day following delivery by any DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to, on or after delivery of a Carve Out Trigger Notice (the "<u>Pre-Trigger Carve Out Cap</u>"); and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $200,000 (inclusive of any prepetition retainer held by the applicable Professional Person to the extent not previously applied or returned) incurred after the first business day following delivery by any DIP Agent of the Carve Out Trigger Notice (such date, the "<u>Trigger Date</u>"), to the extent allowed at any time, whether by final order,

interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap" and such amounts set forth in clauses (i) through (iv), the "Carve Out Cap"); *provided that*, nothing herein shall be construed to impair any party's ability to object to court approval of the fees, expenses, reimbursement of expenses or compensation of any Professional Person. For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email by any DIP Agent to the Debtors, their lead restructuring counsel, counsel to the Prepetition Agents, the U.S. Trustee, and counsel to the Committee, if any (collectively, the "Carve Out Trigger Notice Parties"), which notice may be delivered following the occurrence and during the continuation of a DIP Termination Event, and shall describe in reasonable detail such DIP Termination Event that is alleged to have occurred and be continuing and stating that the Post-Carve Out Trigger Notice Cap has been invoked. None of the DIP Secured Parties or the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code, other than payment or reimbursement of any fees or disbursements from proceeds of DIP Collateral to the extent of the Carve Out. Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Secured Parties or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(b)     Carve Out Reserves. On the last business day of each week, the Debtors shall fund a professional fee reserve (the "Professional Fee Reserve") in an amount equal to the professional fees for Professional Persons as set forth in the Approved Budget for the week then ended. All Professional Fee Reserve amounts shall be deposited on a weekly basis in a segregated

account at Fifth Third Bank with the account number ending x7143 (the "<u>Professional Fee Reserve</u> <u>Account</u>"). All funds in the Professional Fee Reserve Account shall be used first to pay the Carve Out (whether such fees are allowed on an interim or final basis) for Allowed Professional Fees of Professional Persons, and all Professional Persons shall have all professional fees paid from the Professional Fee Reserve prior to seeking payment from any other DIP Collateral. If, after payment in full of the Carve Out for Allowed Professional Fees of Professional Persons, the Professional Fee Reserve has not been reduced to zero, all remaining funds in the Professional Fee Reserve Account shall be returned to the DIP Term Administrative Agent on behalf of the DIP Term Lenders. Upon the closing of any sale, restructuring, or other transaction (collectively, a "<u>Transaction</u>") upon which the Houlihan Transaction Fee is earned and payable, to the extent (i) the Houlihan Transaction Fee is not paid to Houlihan Lokey upon the closing of such Transaction out of the cash proceeds of such Transaction or otherwise, or (ii) budgeted amounts for the Houlihan Transaction Fee have not previously been deposited in the Professional Fee Reserve Account, the Debtors shall deposit into the Professional Fee Reserve Account an amount equal to the portion(s) of the Houlihan Transaction Fee that has not been paid to Houlihan Lokey or previously deposited in the Professional Fee Reserve Account.

      2.4    <u>Prepetition Secured Parties Adequate Protection</u>.

      (a)    <u>Adequate Protection Claims and Liens</u>. The Prepetition Secured Parties are entitled, pursuant to sections 361, 363(e), 364(d)(1), 503(b), 507(a), and 507(b) of the Bankruptcy Code and effective as of the Petition Date, to adequate protection of their respective interests in the Prepetition Collateral, including any Cash Collateral, in an amount equal to the aggregate Diminution in Value of the Prepetition Secured Parties' respective interests in the Prepetition Collateral from and after the Petition Date. On account of such adequate protection, the Prepetition

Secured Parties are hereby granted the following, in each case subject to the priorities set forth on **Exhibit E** and the Carve Out (collectively, the "Adequate Protection"):

        (i)        Prepetition ABL Adequate Protection Liens. The Prepetition ABL Secured Parties are hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of any Perfection Act) valid and perfected postpetition replacement security interests in and liens upon the DIP Collateral (the "Prepetition ABL Adequate Protection Liens"), which liens shall be, with respect to: (A) the Prepetition ABL Priority Collateral (whether in existence on the Petition Date or hereafter arising), subject and subordinate solely to the Carve Out, Permitted Liens, the Revolver DIP Liens and the Prepetition ABL Liens; (B) the Prepetition Term Priority Collateral (whether in existence on the Petition Date or hereafter arising), subject and subordinate solely to the Carve Out, Permitted Liens, the DIP Liens, the Prepetition Liens and the Prepetition Term Loan Adequate Protection Liens; (C) the Non-Lender Encumbered Assets, subject to the Non-Lender Existing Liens, the Carve Out and the DIP Liens, and *pari passu* with the Term Loan Adequate Protection Liens; and (D) Unencumbered Assets, subject to the Carve Out and the DIP Liens, and *pari passu* with the Prepetition Term Loan Adequate Protection Liens, in each case as such priorities are set forth in **Exhibit E**.

        (ii)        Prepetition Term Loan Adequate Protection Liens. The Prepetition Term Loan Secured Parties are hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of any Perfection Act) valid and perfected postpetition replacement security interests in and liens upon the DIP Collateral (the "Prepetition Term Loan Adequate Protection Liens" and, together with the Prepetition ABL Adequate Protection Liens, the "Prepetition Secured Parties Adequate Protection Liens"), which liens shall be, with respect to: (A) the Prepetition ABL Priority Collateral (whether in existence on the Petition Date or

hereafter arising), subject and subordinate solely to the Carve Out, Permitted Liens, the DIP Liens, the Prepetition Liens and the Prepetition ABL Adequate Protection Liens; (B) the Prepetition Term Priority Collateral (whether in existence on the Petition Date or hereafter arising), subject and subordinate solely to the Carve Out, Permitted Liens, the DIP Term Loan Liens and the Prepetition Term Loan Liens; (C) the Non-Lender Encumbered Assets, subject to the Non-Lender Existing Liens, the Carve Out and the DIP Liens, and *pari passu* with the Prepetition ABL Adequate Protection Liens; and (D) the Unencumbered Assets, subject to the Carve Out and the DIP Liens, and *pari passu* with the Prepetition ABL Adequate Protection Liens, in each case as such priorities are set forth in **Exhibit E**.

(iii)     Adequate Protection Payments. Subject to the Approved Budget, the Debtors are authorized to pay to the Prepetition ABL Lenders on the first business day of each calendar month after the entry of this Interim Order, an amount equal to all accrued and unpaid prepetition or postpetition interest (at the non-default rate), fees, and costs under the Prepetition ABL Documents.  For the avoidance of doubt, (a) no payment of interest pursuant to this Paragraph shall be required so long as interest is being timely paid in respect of the Revolver DIP Obligations, and (b) the payment of interest pursuant to this Paragraph shall be without prejudice to the rights of the Prepetition ABL Secured Parties to assert claims for payment of interest at the default rate in accordance with the Prepetition Documents in the event of a successful Challenge to the ABL Refinancing.

(iv)     Adequate Protection Superpriority Claims. The Prepetition Secured Parties are hereby granted allowed superpriority administrative expense claims pursuant to sections 503(b), 507(a), and 507(b) of the Bankruptcy Code (the "Prepetition Secured Parties Adequate Protection Claims"), which shall be allowed claims against each of the Debtors (jointly and

severally), with priority (except as otherwise provided herein) over any and all administrative expenses and all other claims against the Debtors now existing or hereafter arising, of any kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and all other administrative expenses or other claims arising under any other provision of the Bankruptcy Code, including, without limitation, sections 105, 326, 327, 328, 330, 331, 365, 503(b), 507(a), 507(b), or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy, or attachment. The Prepetition Secured Parties Adequate Protection Claims shall be payable from and have recourse to all pre- and post-petition property of the Debtors, subject to the Carve Out, Permitted Liens and the rankings and priorities set forth in **Exhibit E**.

(b)     Reporting. The Debtors shall timely provide the Prepetition Secured Parties with (x) reasonable access to the Debtors' facilities, management, books, and records required under the Prepetition Documents and (y) copies of all financial reporting provided to the DIP Agent and DIP Lenders pursuant to the DIP Loan Documents substantially simultaneously with such delivery to the DIP Lenders. The Debtors are also directed to allow the Prepetition Secured Parties (and their representatives and advisors), reasonable access to all of the Debtors' premises, information systems, facilities, management, books, and records for the purpose of enabling Prepetition Secured Parties to inspect, appraise and audit the DIP Collateral.

(c)     Fees and Expenses. The Debtors are authorized and directed to pay: (i) on the date of the first advance under the DIP Facilities, all reasonable and documented fees and out-of-pocket expenses of the Prepetition Agents that are required to be paid by the Debtors under the Prepetition Documents, including such fees and expenses of counsel and financial advisors to such Prepetition Agents; and (ii) on an ongoing basis, from time to time after the Petition Date, and

without duplication, all reasonable and documented fees and out-of-pocket expenses incurred by such Prepetition Agents and required to be paid by the Debtors under the Prepetition Documents and incurred by the Prepetition ABL Lenders, including the reasonable and documented fees and out-of-pocket expenses of (A) Schulte Roth & Zabel LLP, (B) Munsch Hardt Kopf & Harr, P.C., (C) McGuireWoods LLP, and (D) Carl Marks Advisors (such professionals, the "Adequate Protection Professionals," and such fees and expenses, collectively, the "Adequate Protection Professional Fees and Expenses").

(d)    Requests for Payment of Fees and Expenses. With respect to Adequate Protection Professional Fees and Expenses incurred postpetition, such Adequate Protection Professionals shall deliver an invoice in summary form (which shall not be required to include time entry detail, but shall include a general, brief description of the nature of the matters for which services were performed, and which may be redacted for privileged or confidential information) to counsel to the Debtors, the U.S. Trustee, and any Committee, with a copy of such invoices delivered simultaneously to counsel to the DIP Lenders, the DIP Agents, the Prepetition Secured Parties, and the Prepetition Agents. If no written objection is received by 12:00 p.m., prevailing Central Time, on the date that is ten (10) calendar days after delivery of such invoice, the Debtors shall promptly pay such fees and expenses in full.  If an objection to a professional's invoice is timely received, the undisputed portion of any such invoice will be deemed allowed, the Debtors shall promptly pay such undisputed amount and the Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute consensually. Notwithstanding the foregoing, the Debtors are authorized and directed to pay on the Closing Date (as defined in the DIP Term Loan Note) or the Effective Date (as defined in the DIP Revolver Agreement) all Adequate Protection Professional Fees and Expenses incurred on or prior to

(including prior to the Petition Date) such date without the need for any Adequate Protection Professionals to first deliver a copy of its invoice as provided for herein. The Adequate Protection Professionals shall not be required to comply with the U.S. Trustee fee guidelines or file applications or motions with, or obtain approval of, the Court for the payment of any of their fees or out-of-pocket expenses (other than with respect to disputed amounts). Subject to Section 4.1 hereof, payments of any amounts set forth in this Paragraph are not subject to recharacterization, avoidance, subordination, or disgorgement.

Section 3.    DIP Termination Events; Waivers; Rights and Remedies; Relief from Stay.

3.1    DIP Termination Events. Each of the following shall constitute a "DIP Termination Event" unless waived in writing by the applicable DIP Secured Parties and in accordance with the applicable DIP Loan Documents: (i) the occurrence of any "Event of Default" as that term is defined in each of the DIP Loan Agreements; (ii) any failure to meet or satisfy any Milestone in accordance with the applicable DIP Loan Documents; (iii) the occurrence of the "Maturity Date" as defined in each of the DIP Term Loan Note and the Revolver DIP Agreement; (iv) any material violation, breach, or default by any Debtor with respect to any of its obligations under this Interim Order or the DIP Loan Documents, (v) the termination of the DIP Loan Documents, or the modification of the DIP Loan Documents or this Interim Order in a manner adverse to any of the DIP Secured Parties or the Prepetition Secured Parties without the prior written consent of such party, (vi) entry of any order authorizing any party in interest to reclaim any of the DIP Collateral, granting any party in interest relief from the automatic stay with respect to the DIP Collateral, or requiring that Debtors turnover any of the DIP Collateral, in each case prior to full, final and indefeasible repayment of all DIP Obligations and Prepetition Obligations and with respect to DIP Collateral having value in excess of $50,000; (vii) conversion of any Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code; (viii) a trustee is appointed or elected in any Chapter 11

Case, or an examiner with the power to operate the Debtors' businesses is appointed in any Chapter 11 Case; (ix) (A) with respect to the Debtors, commencement of an adversary proceeding or contested matter objecting to the extent, validity or priority of any Prepetition Obligations and/or the Prepetition Liens and (B) with respect to any party in interest with standing (other than the Debtors), commencement of such proceeding or matter to the extent such proceeding or matter is not overruled by the Court or dismissed within thirty (30) days; (x) the date that is thirty-five (35) calendar days following the entry of this Interim Order if a Final Order is not entered in form and substance acceptable to the DIP Secured Parties and the Prepetition Secured Parties by such date; (xi) the date of the Final Hearing, if this Interim Order is modified at the Final Hearing in a manner unacceptable to the DIP Secured Parties or the Prepetition Secured Parties; (xii) the Debtors shall withdraw the Sale Motion and/or propose an alternative restructuring transaction, chapter 11 plan, or course of these Chapter 11 Cases, other than a sale of substantially all assets pursuant to the Sale Motion (in any event, the "New Approach") that, in any case, does not provide for the repayment in full, in cash, of the DIP Obligations substantially contemporaneously with such withdrawal of the Sale Motion or proposal of such New Approach; and (xiii) any modification, amendment, vacatur or stay of this Interim Order in any manner not consented to in writing by the DIP Agents and the Prepetition Agents.

       3.2    <u>Additional DIP Termination Events</u>.

       (a)    Prior to the payment in full of all Prepetition Obligations and all DIP Obligations, any request by the Debtors with respect to the following shall also constitute a DIP Termination Event: (i) to obtain postpetition loans or other financial accommodations pursuant to section 364(c) or 364(d) of the Bankruptcy Code that does not provide for the repayment in full of the DIP Obligations and the Prepetition Obligations, other than as provided in this Interim Order

or as may be otherwise permitted pursuant to the DIP Loan Documents; (ii) to challenge the application of any payments authorized by this Interim Order pursuant to section 506(b) of the Bankruptcy Code; and (iii) to propose or support any challenge pursuant to Section 4.1 of this Interim Order, or any challenge by any party in interest seeking to limit or prevent the DIP Secured Parties or the Prepetition Secured Parties from exercising their credit bid rights in connection with the sale of any assets of the Debtors; *provided*, that the Debtors' response to any information request by a party in interest shall not constitute "support" of a challenge; or (iv) to seek relief under the Bankruptcy Code, including, without limitation, under section 105 of the Bankruptcy Code, to the extent any such relief would restrict or impair (A) the rights and remedies of any of the DIP Secured Parties or the Prepetition Secured Parties against the Debtors as provided in this Interim Order, any of the DIP Loan Documents, or any of the Prepetition Documents (B) the exercise of such rights or remedies by any of the DIP Secured Parties or the Prepetition Secured Parties against the Debtors in accordance with the DIP Loan Documents, this Interim Order or the Prepetition Documents; *provided*, *however*, that the DIP Agents and the Prepetition Agents may otherwise consent in writing, but no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Secured Parties and the Prepetition Secured Parties.

(b)     It shall also be a DIP Termination Event if the Debtors propose or support any chapter 11 plan or the sale of all or substantially all of the Debtors' assets (other than pursuant to the Sale Motion), or seek entry of an order confirming a chapter 11 plan or approving such non-conforming sale, that is not conditioned upon the payment of the DIP Obligations, the Prepetition Obligations and the Debtors' obligations with respect to the Adequate Protection granted hereunder, in full in cash, within a commercially reasonable period of time, and in any event no

later than the effective date of such chapter 11 plan or sale, without the written consent of the DIP Agents and the Prepetition Agents, as applicable.

       3.3    <u>Rights and Remedies upon a DIP Termination Event</u>. Upon the expiration of five (5) Business Days following the delivery of a written notice by any DIP Agent or Prepetition Agent, as applicable, of the occurrence of and during the continuance of a DIP Termination Event (the "<u>Remedies Notice Period</u>"), (a) the DIP Agents shall each be entitled to independently take any act or exercise any right or remedy as provided in this Interim Order or any DIP Loan Document, as applicable, including, without limitation, (i) declare all DIP Obligations owing under their respective DIP Loan Documents to be immediately due and payable; (ii) terminate, reduce, or restrict any commitment to extend additional credit to the Debtors to the extent any such commitment remains; (iii) terminate the DIP Facilities and any DIP Loan Document as to any future liability or obligation of the DIP Secured Parties, but without affecting any of the DIP Obligations or the DIP Liens securing the DIP Obligations; (iv) invoke the right to charge interest at the default rate under the DIP Loan Documents; and/or (v) stop lending; and (b) the Prepetition Agents shall (i) be entitled to terminate and/or revoke the Debtors' right, if any, under this Interim Order and the other DIP Loan Documents to use any Cash Collateral and all such authority to use Cash Collateral shall cease and (ii) each have automatic and immediate relief from the automatic stay with respect to the Prepetition Collateral (without regard to the passage of time provided for in Fed. R. Bankr. P. 4001(a)(3)), and shall be entitled to exercise all rights and remedies available under the Prepetition Documents and applicable non-bankruptcy law (subject to the Prepetition Intercreditor Agreement). For the avoidance of doubt, notwithstanding the foregoing, during the Remedies Notice Period, the Debtors (x) may not borrow under the DIP Revolver Facility or make any Withdrawal from the Escrow Account, and (y) may use Cash Collateral solely in amounts

necessary to avoid immediate and irreparable harm to the Debtors' Estates (including funding payroll and paying other administrative expenses) all in accordance with this Interim Order and the Approved Budget, or that have otherwise been approved in advance in writing by the DIP Secured Parties.

3.4    <u>Modification of Automatic Stay</u>. The automatic stay provisions of section 362 of the Bankruptcy Code and any other restriction imposed by an order of the Court or applicable law are hereby modified without further notice, application, or order of the Court to the extent necessary to (i) permit the DIP Agents and Prepetition Agents to perform any act authorized or permitted under or by virtue of this Interim Order, the DIP Loan Agreements, or the other DIP Loan Documents, as applicable, including, without limitation, (i) to implement the postpetition financing arrangements authorized by this Interim Order, (ii) to take any act to create, validate, evidence, attach or perfect any lien, security interest, right or claim in the DIP Collateral, (iii) to assess, charge, collect, advance, deduct, and receive payments with respect to the Prepetition Obligations and DIP Obligations (or any portion thereof), including, without limitation, all interests, fees, costs, and expenses permitted under any of the DIP Loan Documents and apply such payments to the Prepetition Obligations, and (iv) subject to the Remedies Notice Period, to take any action and exercise all rights and remedies provided to it by this Interim Order, the DIP Loan Documents, or applicable law.

Section 4.    <u>Representations and Covenants</u>.

4.1    <u>Reservation of Third Party Challenge Rights</u>. The stipulations, releases, agreements, and admissions contained in this Interim Order, including, without limitation, Paragraph E hereof, and the releases contained in clause (ix) thereof (collectively, the "<u>Debtors' Stipulations</u>"), shall be binding on the Debtors in all circumstances.  The Debtors' Stipulations shall be binding on each other party in interest, including, without limitation, the Committee (if

any), unless, and solely to the extent that (a) any such party in interest, including the Committee (if any), with standing and requisite authority has timely commenced an adversary proceeding or other appropriate contested matter (subject to the limitations contained herein, including, inter alia, in this Section 4.1) by no later than either (i) the earlier of (A) (1) with respect to parties in interest with standing (other than a Committee), 75 calendar days after entry of this Interim Order or (2) with respect to a Committee, if any, 60 calendar days after the appointment of the Committee or (B) subject to the entry of a Final Order, the deadline to object to the entry of the order approving the bidding and sale procedures portion of the Sale Motion, (ii) any such later date as has been agreed to, in writing, by the applicable Prepetition Agent (with the consent of the applicable Prepetition Secured Parties), or (iii) such later date as set by an order of the Court for cause shown (such time period established by the foregoing clauses (i) through (iii), the "Challenge Period") against the Prepetition Secured Parties in connection with matters arising from or related to the Prepetition Documents, the Prepetition Obligations, the Prepetition Liens, and the Prepetition Collateral, and notwithstanding the ABL Refinancing, including by (A) objecting to or challenging the amount, validity, perfection, enforceability, priority, or extent of the Prepetition Obligations or Prepetition Liens, or (B) otherwise asserting or prosecuting any action for preferences, fraudulent transfers or conveyances, other avoidance power claims or any other claims, counterclaims, or causes of action (including, without limitation, causes of action asserting claims for equitable subordination or lender liability), objections, contests, or defenses with respect to the Prepetition Obligations or Prepetition Liens or otherwise seeking affirmative relief (a "Challenge Proceeding") and (b) there is a final, non-appealable order in favor of the plaintiff sustaining any Challenge Proceeding in any such timely filed adversary proceeding or contested matter; *provided that*, any pleadings filed in connection with any Challenge Proceeding shall set forth with

specificity the basis for such Challenge Proceeding and any challenges or claims not so specified prior to the expiration of the Challenge Period shall be deemed forever waived, released, and barred; *provided, further,* that the Challenge Period shall be extended for a chapter 7 trustee for an additional 45 days if the case is converted prior to the expiration of the Challenge Period. For the avoidance of doubt, a party in interest's commencement of a timely Challenge Proceeding shall preserve the Challenge Period only with respect to such party in interest commencing the Challenge Proceeding and only to the extent of the express content of such Challenge Proceeding. If no such Challenge Proceeding is timely commenced, then: (v) the Debtors' stipulations, admissions, agreements, and releases contained in this Interim Order, including, without limitation, those contained in Paragraph E of this Interim Order, and the releases contained in clause (ix) thereof, shall be binding on all parties in interest; (w) any and all Challenge Proceedings by any party (including, without limitation, the Committee, any chapter 11 trustee, or any examiner and/or other estate representative appointed or elected in these Chapter 11 Cases, and any chapter 7 trustee and/or examiner or other estate representative appointed or elected in any Successor Case) shall be deemed to be forever waived, released, and barred; (x) to the extent not theretofore repaid, the Prepetition Obligations shall constitute allowed claims, not subject to counterclaim, setoff, subordination, recharacterization, reduction, defense or avoidance, for all purposes in these Chapter 11 Cases and any subsequent chapter 7 case; (y) the Prepetition Liens on the Prepetition Collateral shall be deemed to have been, as of the Petition Date, and to be, legal, valid, binding, perfected and of the priority specified in Paragraph E hereof, not subject to defense, counterclaim, recharacterization, subordination or avoidance; and (z) the obligations under the Prepetition Documents and the Prepetition Liens on the Prepetition Collateral shall not be subject to any other or further challenge by the Debtors, the Committee (if any) or any other party in interest, including,

without limitation, any successor thereto (including, without limitation, any estate representative or a chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors with respect thereto). If any Challenge Proceeding is timely commenced, the stipulations, releases, agreements, and admissions contained in Paragraph E of this Interim Order, and the releases contained in clause (ix) thereof, shall nonetheless remain binding and preclusive (as provided in this Paragraph) on the Debtors, the Committee (if any), and any other person or entity, except as to any such findings and admissions that were expressly and successfully challenged in such Challenge Proceeding as set forth in a final, non-appealable order of a court of competent jurisdiction. In the event of a successful Challenge Proceeding in accordance with this Section 4.1 with respect to the ABL Refinancing, the Court may fashion any appropriate remedy in accordance with applicable law. Nothing in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including the Committee (if any), standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, claims and defenses with respect to the Prepetition Documents or the Prepetition Liens on the Prepetition Collateral.

Section 5.     Other Rights and DIP Obligations.

5.1     No Modification or Stay of this Interim Order. The DIP Agents and the DIP Lenders have acted in good faith in connection with the DIP Facilities and with this Interim Order, and their reliance on this Interim Order is in good faith, and the DIP Agents and the DIP Lenders are entitled to the protections of section 364(e) of the Bankruptcy Code.

5.2     Rights of Access and Information. The Debtors shall comply with the rights of access and information afforded to the DIP Secured Parties under the DIP Loan Documents and the Prepetition Secured Parties under the Prepetition Documents.

5.3     Power to Waive Rights; Duties to Third Parties.

(a)     Subject to the terms of the DIP Loan Documents, the DIP Revolver Administrative Agent and the DIP Term Administrative Agent shall have the right (acting at the direction of the Required Lenders (as defined in the applicable DIP Loan Documents) if so required by the applicable DIP Loan Documents) to waive any of the terms, rights, and remedies provided or acknowledged in this Interim Order that are in favor of the DIP Revolver Lenders and the DIP Term Lenders, respectively (as applicable, the "DIP Lender Rights"), and shall have no obligation or duty to any other party with respect to the exercise or enforcement, or failure to exercise or enforce, any DIP Lender Rights; *provided that*, the DIP Agents shall obtain the prior written consent of the applicable Prepetition Agent for any waiver that affects any rights of the Prepetition Secured Parties hereunder or any treatment of the Prepetition Obligations. Any waiver by the DIP Agents of any DIP Lender Rights shall not be nor shall it constitute a continuing waiver unless otherwise expressly provided therein.  Any delay in or failure to exercise or enforce any DIP Lender Right shall neither constitute a waiver of such DIP Lender Right, subject the DIP Agents or any DIP Lender to any liability to any other party, nor cause or enable any party other than the Debtors to rely upon or in any way seek to assert as a defense to any obligation owed by the Debtors to the DIP Agents or any DIP Lender.

(b)     Each of the Prepetition ABL Agent and the Prepetition Term Loan Agent shall have the right to waive any of the terms, rights, and remedies provided or acknowledged in this Interim Order that are in favor of the Prepetition ABL Lenders and the Prepetition Term Loan Lenders, respectively (as applicable, the "Prepetition Lender Rights"), and shall have no obligation or duty to any other party with respect to the exercise or enforcement, or failure to exercise or enforce, any Prepetition Lender Rights; *provided that*, the Prepetition Agents shall obtain the prior written consent of the applicable DIP Agent for any waiver that affects any rights of the DIP

Secured Parties hereunder or any treatment of the DIP Obligations. Any waiver by the Prepetition Agents of any Prepetition Lender Rights shall not be nor shall it constitute a continuing waiver unless otherwise expressly provided therein. Any delay in or failure to exercise or enforce any Prepetition Lender Right shall neither constitute a waiver of such Prepetition Lender Right, subject the Prepetition Agents or any Prepetition Lender to any liability to any other party, nor cause or enable any party other than the Debtors to rely upon or in any way seek to assert as a defense to any obligation owed by the Debtors to the Prepetition Agents or any Prepetition Lender.

5.4    No Unauthorized Disposition of Collateral; Use of Cash Collateral; Investigation Budget.

(a)    The Debtors shall not sell, transfer, lease, encumber, use, or otherwise dispose of any portion of the DIP Collateral (including inventory and Cash Collateral), other than pursuant to the terms of this Interim Order or as permitted by the DIP Loan Documents, and the Debtors are authorized to use Cash Collateral solely in a manner consistent with this Interim Order, the Approved Budget and the DIP Loan Documents (including permitted variances and exclusions to the Approved Budget permitted thereunder).

(b)    Notwithstanding anything herein to the contrary, no portion of the proceeds of the DIP Revolver Facility, the DIP Term Loan Facility, the DIP Collateral or the Prepetition Collateral, including Cash Collateral, may be used for the payment of professional fees, disbursements, costs, or expenses incurred by any person in connection with (i) preventing, hindering, impeding, or delaying any of the DIP Secured Parties' or Prepetition Secured Parties' enforcement or realization upon, or exercise of rights in respect of, any of the DIP Collateral or Prepetition Collateral, other than to seek a determination that a Termination Event (as defined below) has not occurred or is not continuing or in connection with a remedies hearing, (ii) seeking

to amend or modify any of the rights or interests granted to the DIP Secured Parties or Prepetition Secured Parties under this Interim Order or the DIP Loan Documents, including seeking to use Cash Collateral on a contested basis, (iii) asserting, commencing, or prosecuting any claims or causes of action, including, without limitation, any Challenge or any other actions under chapter 5 of the Bankruptcy Code (or any similar law), against any DIP Secured Party or Prepetition Secured Party, or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, or employees, or (iv) asserting, joining, commencing, supporting, investigating, or prosecuting any Challenge, or any other action for any claim, counterclaim, action, cause of action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or similar relief against, or adverse to the material interests of any DIP Secured Party or Prepetition Secured Party, arising out of, in connection with, or relating to the DIP Loan Documents or the Prepetition Documents, or the transactions contemplated thereunder, including, without limitation, (A) any action arising under the Bankruptcy Code, (B) any so-called "lender liability" claims and causes of action, (C) any action with respect to the validity and extent of the DIP Obligations or the Prepetition Obligations or the validity, extent, perfection and priority of the DIP Liens or the Prepetition Liens, (D) any action seeking to invalidate, set aside, avoid, reduce, set off, offset, re-characterize, subordinate (whether equitable, contractual, or otherwise), recoup against, disallow, impair, raise any defenses, cross-claims, or counterclaims, or raise any other challenges under the Bankruptcy Code or any other applicable domestic or foreign law or regulation against, or with respect to, the DIP Liens or the Prepetition Liens, in whole or in part, or (E) appeal or otherwise challenge this Interim Order or the Final Order. Notwithstanding the foregoing, no more than $25,000 in the aggregate of the proceeds of the DIP Facilities, DIP

Collateral, or Cash Collateral may be used by any Committee in connection with the investigation of, but not litigation of, any potential Challenge.

5.5     No Waiver. The failure of the DIP Lenders or the Prepetition Lenders, as applicable, to seek relief or otherwise exercise their rights and remedies under the DIP Loan Documents, the DIP Facilities, the Prepetition Documents, or this Interim Order, as applicable, shall not constitute a waiver of any of the DIP Lenders' or Prepetition Lenders' rights hereunder, thereunder, or otherwise.  Notwithstanding anything herein, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair the rights of the DIP Lenders or the Prepetition Lenders under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the rights of the DIP Lenders and the Prepetition Lenders to: (a) request conversion of the Chapter 11 Cases to cases under chapter 7, dismissal of the Chapter 11 Cases, or the appointment of a trustee in the Chapter 11 Cases; (b) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a plan; or (c) exercise any of the rights, claims, or privileges (whether legal, equitable, or otherwise) of the DIP Lenders or the Prepetition Lenders.

5.6     Maintenance of Collateral. Unless the DIP Agents, acting at the direction of the applicable Required Lenders (as defined in the DIP Loan Documents), otherwise consent in writing, until (i) the payment in full or otherwise acceptable satisfaction of all DIP Obligations and (ii) the termination of the DIP Agents' and the DIP Lenders' obligations to extend credit under the DIP Facilities, the Debtors shall comply with the covenants contained in the DIP Loan Documents regarding the maintenance and insurance of the DIP Collateral. Upon entry of this Interim Order and to the fullest extent provided by applicable law, each of the DIP Agents (on behalf of the applicable DIP Lenders) shall be, and shall be deemed to be, without any further action or notice,

named as additional insureds and loss payees on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral.

5.7 <u>Reservation of Rights</u>. The terms, conditions, and provisions of this Interim Order are in addition to and without prejudice to the rights of each DIP Secured Party and Prepetition Secured Party, as applicable, to pursue any and all rights and remedies under the Bankruptcy Code, the DIP Loan Documents, the Prepetition Documents, or any other applicable agreement or law, including, without limitation, rights to seek adequate protection and/or additional or different adequate protection, to seek relief from the automatic stay, to seek an injunction, to oppose any request for use of Cash Collateral or granting of any interest in the DIP Collateral or the Prepetition Collateral, as applicable, or priority in favor of any other party, to object to any sale of assets, and to object to applications for allowance and/or payment of compensation of professionals or other parties seeking compensation or reimbursement from the Estates.

5.8 <u>Binding Effect</u>.

(a) All of the provisions of this Interim Order and the DIP Loan Documents, the DIP Obligations, all liens, and claims granted hereunder in favor of each of the DIP Secured Parties and the Prepetition Secured Parties, and any and all rights, remedies, privileges, immunities and benefits in favor of each DIP Agent, DIP Lender, and Prepetition Secured Party set forth herein, including, without limitation, the parties' acknowledgements, stipulations, and agreements in Paragraph E of this Interim Order, subject to Section 4.1 hereof (without each of which the DIP Secured Parties would not have entered into or provided funds under the DIP Loan Documents and the Prepetition Secured Parties would not have consented to the priming of the Prepetition Liens as set forth herein and use of Cash Collateral provided for hereunder) provided or acknowledged in this Interim Order, and any actions taken pursuant thereto, shall be effective and

enforceable as of the Petition Date immediately upon entry of this Interim Order and not subject to any stay of execution or effectiveness (all of which are hereby waived), notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, and 9024, or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, shall continue in full force and effect, and shall survive entry of any other order or action, including, without limitation, any order which may be entered confirming any chapter 11 plan providing for the refinancing, repayment, or replacement of the DIP Obligations, converting one or more of the Chapter 11 Cases to any other chapter under the Bankruptcy Code, dismissing one or more of the Chapter 11 Cases, approving any sale of any or all of the DIP Collateral or the Prepetition Collateral, or vacating, terminating, reconsidering, revoking, or otherwise modifying this Interim Order or any provision hereof; *provided that*, in the event a Final Order is entered, the terms and conditions of such Final Order shall control over this Interim Order; *provided further* that such Final Order must affirm each of the provisions, protections, grants, statements, stipulations, and agreements in this Interim Order in order for such provisions, protections, grants, statements, stipulations, and agreements to remain in effect after entry of the Final Order.

(b)     Nothing in these Chapter 11 Cases may impair the DIP Superpriority Claim, the Prepetition Secured Parties Adequate Protection Claims, and the DIP Secured Parties' and the Prepetition Secured Parties' respective liens on and security interests in the DIP Collateral and the Prepetition Collateral, respectively, and all other claims, liens, adequate protections, and other rights granted pursuant to the terms of this Interim Order, which shall continue in full force and effect notwithstanding such dismissal until the DIP Obligations and Prepetition Obligations are indefeasibly paid and satisfied in full. Notwithstanding any such dismissal, this Court shall retain

jurisdiction for the purposes of enforcing all such claims, liens, protections, and rights referenced in this Paragraph and otherwise in this Interim Order.

(c)     Except as set forth in this Interim Order, in the event this Court modifies, reverses, vacates, or stays any of the provisions of this Interim Order or any of the DIP Loan Documents, such modifications, reversals, vacatur, or stays shall not affect the (i) validity, priority, or enforceability of any DIP Obligations incurred prior to the actual receipt of written notice by the DIP Agents or Prepetition Agents, as applicable, of the effective date of such modification, reversal, vacatur, or stay, (ii) validity, priority, or enforceability of the DIP Liens, the DIP Superpriority Claims, the Prepetition Secured Parties Adequate Protection Liens and the Prepetition Secured Parties Adequate Protection Claims or (iii) rights or priorities of any DIP Secured Party or Prepetition Secured Party pursuant to this Interim Order with respect to the DIP Collateral or any portion of the DIP Obligations. All such liens, security interests, claims and other benefits shall be governed in all respects by the original provisions of this Interim Order, and the DIP Secured Parties and the Prepetition Secured Parties shall be entitled to all the rights, remedies, privileges and benefits granted hereto, including the liens and priorities granted herein.

(d)     This Interim Order shall be binding upon the Debtors, all parties in interest in the Chapter 11 Cases, and their respective successors and assigns, including, without limitation, (i) any trustee or other fiduciary appointed in the Chapter 11 Cases or any subsequently converted bankruptcy case(s) of any Debtor and (ii) any liquidator, receiver, administrator, or similar such person or entity appointed in any jurisdiction or under any applicable law. This Interim Order shall also inure to the benefit of the Debtors, DIP Agents, DIP Lenders, Prepetition Secured Parties, and each of their respective successors and assigns.

5.9     No Discharge. The DIP Obligations and the obligations of the Debtors with respect to adequate protection hereunder, including granting the Prepetition Secured Parties Adequate Protection Liens and the Prepetition Secured Parties Adequate Protection Claims, shall not be discharged by the entry of an order confirming any plan of reorganization in any of these Chapter 11 Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been indefeasibly paid in full in cash, on or before the effective date of such confirmed plan of reorganization, or each of the DIP Secured Parties or the Prepetition Secured Parties, as applicable, has otherwise agreed in writing.

5.10    No Priming of Prepetition Obligations. Notwithstanding anything to the contrary herein, from and after the entry of this Interim Order, absent the express written consent of the applicable Prepetition Lenders, no Debtor shall seek authorization from this Court to obtain or incur any indebtedness or enter into an alternative financing facility other than the DIP Facilities (a "Competing DIP Facility") seeking to impose liens on any Prepetition Collateral ranking on a *pari passu* or priming basis with respect to the Prepetition Liens held by the Prepetition Secured Parties; *provided, however,* that nothing herein shall preclude the Debtors from seeking authorization to incur any indebtedness or enter into any Competing DIP Facility that provides for the payment in full of the DIP Obligations and the Prepetition Obligations at the initial closing of such Competing DIP Facility.

5.11    Section 506(c) Waiver. No costs or expenses of administration which have been or may be incurred in these Chapter 11 Cases at any time (including, without limitation, any costs and expenses incurred in connection with the preservation, protection, or enhancement of value by the DIP Agents or the DIP Lenders upon the DIP Collateral, or by the Prepetition Secured Parties upon the Prepetition Collateral, as applicable) shall be charged against any of the DIP Agents, DIP

Lenders, or (subject to entry of the Final Order) the Prepetition Secured Parties, or any of the DIP Obligations or Prepetition Obligations or the DIP Collateral or the Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise without the prior express written consent of the affected DIP Secured Parties and/or affected Prepetition Secured Parties, in their sole discretion, and no such consent shall be implied, directly or indirectly, from any other action, inaction, or acquiescence by any such agents or creditors (including, without limitation, consent to the Carve Out or the approval of any budget hereunder).

5.12    <u>Section 552(b) Waiver</u>. The Debtors have agreed as a condition to obtaining financing under the DIP Facilities and using Cash Collateral as provided in this Interim Order that the Prepetition Secured Parties are and shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and that the "equities of the case" exception under section 552(b) shall not apply to the DIP Agents, the DIP Lenders, the DIP Obligations, the Prepetition Secured Parties, or the Prepetition Obligations.

5.13    <u>No Marshaling/Application of Proceeds</u>.

(a)    In no event shall the DIP Agents, the DIP Lenders, or, subject to the entry of the Final Order, the Prepetition Secured Parties be subject to the equitable doctrine of "<u>marshaling</u>" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral, as applicable, and all proceeds shall be received and applied in accordance with the DIP Loan Documents and the Prepetition Documents (including the Prepetition Intercreditor Agreement), as applicable.

(b)    Notwithstanding anything to the contrary in this Interim Order, but subject in all respects to the priorities set forth on **<u>Exhibit E</u>** hereto, the respective DIP Obligations shall be satisfied from the proceeds of DIP Collateral.

5.14 <u>Right to Credit Bid</u>. The Debtors acknowledge and agree that, pursuant to Section 363(k) of the Bankruptcy Code and subject to the Prepetition Intercreditor Agreement, each of the DIP Revolver Secured Parties, Prepetition ABL Secured Parties, the DIP Term Secured Parties and the Prepetition Term Loan Secured Parties shall have the right to credit bid the full amount of the DIP Revolver Obligations, the Prepetition ABL Obligations, the DIP Term Loan Obligations and the Prepetition Term Loan Obligations, respectively, in connection with any sale of the Debtors' assets pursuant to the Sale Motion or otherwise.

5.15 <u>Payment of DIP Lender Fees and Expenses</u>. The Debtors shall pay (i) the reasonable and documented fees and expenses reimbursable under the DIP Facilities, the DIP Loan Agreements, or the other DIP Loan Documents, as applicable, whether incurred before or after the Petition Date and (ii) all reasonable and documented out-of-pocket costs and expenses of the DIP Agents and the DIP Revolver Lenders including, without limitation, reasonable and documented fees and disbursements of counsel in connection with the enforcement or preservation of any rights under the DIP Facilities, the DIP Loan Agreements, or the other DIP Loan Documents. With respect to payment of fees and expenses incurred from and after the Petition Date, the DIP Agents and the DIP Revolver Lenders shall comply with the procedures set forth in Section 2.4(d) hereof.

5.16 <u>Limits on Lender Liability</u>.

(a) Solely as a result of making any loan under the DIP Loan Agreements, authorizing the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Loan Documents, the DIP Agents, the DIP Lenders, and, subject to entry of the Final Order, the Prepetition Secured Parties, shall not be deemed to (i) be in control of the operations of the Debtors or to be acting as a "<u>controlling person,</u>" "<u>responsible person,</u>" or "<u>owner or operator</u>" with respect to the operation or management of the

Debtors, so long as the such party's actions do not constitute, within the meaning of 42 U.S.C. § 9601(20)(F), actual participation in the management or operational affairs of a facility owned or operated by a Debtor, or otherwise cause liability to arise to the federal or state government or the status of responsible person or managing agent to exist under applicable law (as such terms, or any similar terms, are used in the Internal Revenue Code, WARN Act, the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 et seq., as amended, or any similar federal or state statute) or (ii) owe any fiduciary duty to any of the Debtors. Furthermore, nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon any of the DIP Secured Parties or, subject to the entry of the Final Order, the Prepetition Secured Parties, of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective affiliates (as defined in section 101(2) of the Bankruptcy Code).

(b)      As to the United States, its agencies, departments, or agents, nothing in this Interim Order or the DIP Loan Documents shall discharge, release or otherwise preclude any valid right of setoff or recoupment that any such entity may have.

5.17      Release. Subject to Section 4.1 of this Interim Order, each of the Debtors, their Estates and the Prepetition Obligors, on their own behalf and on behalf of each of their past, present and future predecessors, successors, heirs, subsidiaries, and assigns, hereby forever, unconditionally, permanently, and irrevocably release, discharge, and acquit each of the DIP Secured Parties and the Prepetition Secured Parties, and (in such capacity) each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective

heirs, predecessors, successors and assigns (collectively, the "Released Parties") of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including, without limitation, attorneys' fees), debts, liens, actions, and causes of action of any and every nature whatsoever, whether arising in law or otherwise, and whether known or unknown, matured or contingent, arising under, in connection with, or relating to (i) the Prepetition Obligations and the DIP Facilities or (ii) the DIP Loan Documents and the Prepetition Documents, as applicable, including, without limitation, (a) any so-called "lender liability" or equitable subordination claims or defenses, (b) any and all "claims" (as defined in the Bankruptcy Code) and causes of action arising under the Bankruptcy Code, and (c) any and all offsets, defenses, claims, counterclaims, set off rights, objections, challenges, causes of action, and/or choses in action of any kind or nature whatsoever, whether arising at law or in equity, including any recharacterization, recoupment, subordination, avoidance, or other claim or cause of action arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state, federal, or foreign law, including, without limitation, any right to assert any disgorgement or recovery, in each case, with respect to the extent, amount, validity, enforceability, priority, security, and perfection of any of the Prepetition Obligations and the DIP Obligations, the Prepetition Documents and the DIP Loan Documents, or the Prepetition Liens and the DIP Liens, and further waive and release any defense, right of counterclaim, right of setoff, or deduction to the payment of the Prepetition Obligations and the DIP Obligations that the Debtors now have or may claim to have against the Released Parties, arising under, in connection with, based upon, or related to any and all acts, omissions, conduct undertaken, or events occurring prior to entry of this Interim Order. The Debtors are authorized in any payoff letter or similar agreement into which they enter upon payment in full of any DIP Obligations to provide a waiver and release

substantially similar to the waiver and release set forth in this Section 5.17 of the applicable DIP Agent(s) and the applicable DIP Lenders and their respective related parties.

5.18 <u>Survival</u>. The provisions of this Interim Order, the validity, priority, and enforceability of the DIP Liens, the DIP Superpriority Claims, the Prepetition Secured Parties Adequate Protection Liens, the Prepetition Secured Parties Adequate Protection Claims, and any actions taken pursuant hereto shall survive, and shall not be modified, impaired or discharged by, entry of any order that may be entered (a) confirming any plan of reorganization in any of these Chapter 11 Cases, (b) converting any or all of these Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (c) dismissing any or all of these Chapter 11 Cases, (d) terminating the joint administration of these Chapter 11 Cases or any other act or omission, (e) approving the sale of any DIP Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent permitted by the DIP Loan Documents), or (f) pursuant to which the Court abstains from hearing any of these Chapter 11 Cases. The terms and provisions of this Interim Order, including the claims, liens, security interests, and other protections (as applicable) granted to the DIP Agents, the DIP Lenders, and the Prepetition Secured Parties pursuant to this Interim Order, notwithstanding the entry of any such order, shall continue in any of these Chapter 11 Cases, following dismissal of any of these Chapter 11 Cases or any Successor Cases, and shall maintain their priority as provided by this Interim Order until (i) in respect of the DIP Facilities, all of the DIP Obligations, pursuant to the DIP Loan Documents and this Interim Order, have been indefeasibly paid in full in cash (such payment being without prejudice to any terms of provisions contained in the DIP Facilities which survive such discharge by their terms) and all commitments to extend credit under the DIP Facilities are terminated, and (ii) in respect of the Prepetition Obligations, all of the adequate protection obligations owed to the Prepetition Secured Parties

provided for in this Interim Order and under the Prepetition Documents have been indefeasibly paid in full in cash.

5.19 <u>Proofs of Claim</u>. None of the Prepetition Secured Parties shall be required to file proofs of claim in any of these Chapter 11 Cases or subsequent cases of any of the Debtors under any chapter of the Bankruptcy Code, and the Debtors' Stipulations in this Interim Order shall be deemed to constitute a timely filed proof of claim against the applicable Debtor(s). Notwithstanding the foregoing, each Prepetition Agent (on behalf of itself and the applicable Prepetition Lenders) is hereby authorized and entitled, in its discretion, but not required, to file (and amend and/or supplement, as applicable) a master proof of claim in the Debtors' lead Case (and such master proof of claim shall be also deemed filed in each of the Debtors' individual Cases) for any claims of the applicable Prepetition Secured Parties arising from the Prepetition Documents or in respect of the Prepetition Obligations; provided, however, that nothing in this Interim Order shall waive the right of any Prepetition Lender to file its own proof of claim against any of the Debtors.

5.20 <u>No Third Party Rights</u>. Except as specifically provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holders, or any direct, indirect, or incidental beneficiary.

5.21 <u>No Avoidance</u>. No obligations incurred or payments or other transfers made by or on behalf of the Debtors on account of the DIP Facilities shall be avoidable or recoverable from the DIP Agents or the DIP Lenders under any section of the Bankruptcy Code, or any other federal, state, or other applicable law, *provided that*, nothing within this Paragraph is intended to limit or curtail the provisions of Section 4.1 hereof, with respect to the Prepetition Obligations.

5.22    <u>Reliance on Order</u>. All postpetition advances under the DIP Loan Documents are made in reliance on this Interim Order.

5.23    <u>Payments Free and Clear</u>. Subject to Section 4.1, any and all payments or proceeds remitted to the DIP Agents on behalf of the applicable DIP Secured Parties or the Prepetition Agents on behalf of the applicable Prepetition Secured Parties, pursuant to the provisions of this Interim Order, any subsequent order of this Court or the DIP Loan Documents, shall, subject to the terms of this Section 5.23, be irrevocable, received free and clear of any claims, charge, assessment, or other liability, including, without limitation, any such claim or charge arising out of or based on, directly or indirectly, section 506(c) of the Bankruptcy Code or section 552(b) of the Bankruptcy Code, whether asserted or assessed by, through or on behalf of the Debtors, and in the case of payments made or proceeds remitted after the delivery of a Trigger Notice, subject to the Carve Out in all respects.

5.24    <u>Limited Effect</u>. In the event of a conflict between the terms and provisions of any of the DIP Loan Documents and this Interim Order, the terms and provisions of this Interim Order shall govern.

5.25    <u>Headings</u>. Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

5.26    <u>Bankruptcy Rules</u>. The requirements of Bankruptcy Rules 4001, 6003, and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

5.27    <u>General Authorization</u>. The Debtors, the DIP Secured Parties, and the Prepetition Secured Parties are authorized to take any and all actions necessary to effectuate the relief granted in this Interim Order.

5.28    Retention of Exclusive Jurisdiction. This Court shall retain exclusive jurisdiction and power with respect to all matters arising from or related to the implementation or interpretation of this Interim Order, the DIP Loan Agreements, and the other DIP Loan Documents.

5.29    Final Hearing and Response Dates. The Final Hearing on the Motion pursuant to Bankruptcy Rule 4001(c)(2) will be held on July __, 2022, at __:__ _.m., prevailing Central Time. The Debtors shall promptly mail copies of this Interim Order to the Notice Parties, and to any other party that has filed a request for notices with this Court and to any Committee after same has been appointed, or the Committee's counsel if same shall have filed a request for notice.  The Debtors may serve the Motion and this Interim Order without the exhibits attached thereto as such exhibits are voluminous and available, free of charge, at the Debtors' claims and noting agent's website: www.donlinrecano.com/corsicana, and such notice is deemed good and sufficient, and no further notice need be given.  Any party in interest objecting to the relief sought at the Final Hearing shall serve and file written objections, which objections shall be served upon the Notice Parties and shall be filed with the Clerk of the Court, in each case, to allow actual receipt of the foregoing no later than 4:00 p.m. (prevailing Central Time), on July __, 2022.

### #   END OF ORDER   # # #

**Submitted by:**

Stephen M. Pezanosky
State Bar No. 15881850
Eli O. Columbus
State Bar No. 24028062
David L. Staab
State Bar No. 24093194
Martha Wyrick
State Bar No. 24101606
HAYNES AND BOONE, LLP
301 Commerce Street, Suite 2600
Fort Worth, TX 76102
Telephone: 817.347.6600
Facsimile:  817.347.6650
Email: stephen.pezanosky@haynesboone.com
Email: eli.columbus@haynesboone.com

Email: david.staab@haynesboone.com
Email: martha.wyrick@haynesboone.com

**PROPOSED ATTORNEYS FOR DEBTORS**

**EXHIBIT A**
(Revolver DIP Agreement)

**Execution Version**



**SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

**dated as of June 25, 2022**

**among**

**CORSICANA PARENT CO., LLC,**
as Holdings,

**CORSICANA BEDDING, LLC**
and
**CERTAIN OF ITS SUBSIDIARIES,**
as Borrowers,

**CERTAIN OF ITS SUBSIDIARIES,**
as Guarantors,

**THE LENDERS PARTY HERETO,**

and

**WINGSPIRE CAPITAL LLC,**
as Administrative Agent

# TABLE OF CONTENTS

**Page**

ARTICLE 1 DEFINITIONS AND RULES OF CONSTRUCTION ........................................................ 2
 Section 1.1  Definitions ............................................................................................. 2
 Section 1.2  Terms Generally .................................................................................. 38
 Section 1.3  Accounting Terms; GAAP; Financial Covenants ......................................... 38
 Section 1.4  Rounding ............................................................................................. 39
 Section 1.5  References to Time .............................................................................. 39
 Section 1.6  Resolution of Drafting Ambiguities ........................................................ 39
 Section 1.7  Reserved ............................................................................................. 39
 Section 1.8  Divisions ............................................................................................. 39
 Section 1.9  Status of Obligations .......................................................................... 39

ARTICLE 2 THE CREDITS ............................................................................................. 40
 Section 2.1  Commitments ...................................................................................... 40
 Section 2.2  Borrowings of Revolving Loans ............................................................ 40
 Section 2.3  Termination and Reduction of Commitments ............................................. 41
 Section 2.4  Repayment of Loans; Evidence of Debt .................................................. 42
 Section 2.5  Prepayments ....................................................................................... 42
 Section 2.6  Payments Generally; Administrative Agent's Clawback ............................. 43
 Section 2.7  Defaulting Lenders .............................................................................. 46
 Section 2.8  Joint and Several Liability .................................................................... 47
 Section 2.9  Prepetition ABL Obligations ................................................................ 49
 Section 2.10  Super-Priority Nature of Obligations and Administrative Agent's Liens; Payment of Obligations. ..................................................................... 49

ARTICLE 3 INTEREST, FEES, YIELD PROTECTION, ETC. ................................................. 50
 Section 3.1  Interest ............................................................................................... 50
 Section 3.2  Fees ................................................................................................... 50
 Section 3.3  [Reserved] .......................................................................................... 51
 Section 3.4  Increased Costs; Illegality .................................................................... 51
 Section 3.5  Taxes ................................................................................................. 52
 Section 3.6  Mitigation Obligations; Replacement of Lenders .................................... 55

ARTICLE 4 CONDITIONS PRECEDENT TO LOANS ........................................................... 56
 Section 4.1  Conditions to Initial Loans .................................................................. 56
 Section 4.2  Conditions to All Loans ....................................................................... 59

ARTICLE 5 REPRESENTATIONS AND WARRANTIES ........................................................ 60

    Section 5.1       Existence, Qualification and Power; Compliance with Laws ..................... 60

    Section 5.2       Authorization; No Contravention ................................................................ 60

    Section 5.3       Governmental Authorization; Other Consents ............................................ 60

    Section 5.4       Binding Effect ........................................................................................... 61

    Section 5.5       No Material Adverse Effect ....................................................................... 61

    Section 5.6       Litigation .................................................................................................. 61

    Section 5.7       Environmental Matters .............................................................................. 61

    Section 5.8       Ownership of Properties; Liens ................................................................. 63

    Section 5.9       Casualty, Etc. ............................................................................................ 63

    Section 5.10     Investment Company Status, Etc. .............................................................. 63

    Section 5.11     Taxes ........................................................................................................ 63

    Section 5.12     ERISA ...................................................................................................... 63

    Section 5.13     Subsidiaries; Equity Interests ................................................................... 64

    Section 5.14     Insurance .................................................................................................. 65

    Section 5.15     Federal Reserve Regulations, Etc. ............................................................ 65

    Section 5.16     [Reserved] ................................................................................................ 65

    Section 5.17     [Reserved] ................................................................................................ 65

    Section 5.18     Anti-Corruption Laws; Sanctions; Anti-Terrorism Laws............................ 65

    Section 5.19     Real Property ............................................................................................ 66

    Section 5.20     Accuracy of Information, Etc. ................................................................... 66

    Section 5.21     Labor Matters ........................................................................................... 66

    Section 5.22     Absence of Certain Restrictions ............................................................... 67

    Section 5.23     No Default ................................................................................................ 67

    Section 5.24     Common Enterprise .................................................................................. 67

    Section 5.25     Brokers' Fees ............................................................................................ 67

    Section 5.26     Affected Financial Institutions ................................................................. 67

    Section 5.27     Accounts ................................................................................................... 67

    Section 5.28     Approved Budget ...................................................................................... 68

    Section 5.29     Chapter 11 Cases ...................................................................................... 68

ARTICLE 6 AFFIRMATIVE COVENANTS ...................................................................... 69

    Section 6.1       Financial Statements and Other Information............................................... 69

    Section 6.2       Notices of Material Events ........................................................................ 70

    Section 6.3       Existence; Conduct of Business ................................................................ 71

    Section 6.4       Payment and Performance of Obligations.................................................. 71

| Section 6.5 | Maintenance of Properties | 71 |
| Section 6.6 | Books and Records; Inspection Rights and Appraisals | 72 |
| Section 6.7 | Compliance with Laws | 72 |
| Section 6.8 | Use of Proceeds | 72 |
| Section 6.9 | Information Concerning Collateral | 73 |
| Section 6.10 | Insurance | 73 |
| Section 6.11 | Casualty Events | 74 |
| Section 6.12 | Covenant to Guarantee and Provide Security | 74 |
| Section 6.13 | Environmental Matters | 76 |
| Section 6.14 | Cash Management. | 76 |
| Section 6.15 | Borrowing Base Certificates; Collateral Administration. | 77 |
| Section 6.16 | Post-Effective Date Obligations | 78 |
| Section 6.17 | Approved Budget | 79 |
| Section 6.18 | Required Milestones | 80 |
| Section 6.19 | Loan Parties' Advisors | 80 |
| Section 6.20 | Administrative Agent's Advisors | 81 |
| Section 6.21 | Order | 81 |
| Section 6.22 | Debtor-in-Possession Obligations | 81 |
| Section 6.23 | DIP Term Loan Facilities | 81 |
| Section 6.24 | Qualified Bidder; Carve-Out; Challenge Period; Consultation Party | 81 |
| ARTICLE 7 NEGATIVE COVENANTS | | 82 |
| Section 7.1 | Indebtedness; Equity Interests | 82 |
| Section 7.2 | Liens | 83 |
| Section 7.3 | Fundamental Changes; Business; Fiscal Year | 84 |
| Section 7.4 | Investments, Loans, Advances, Guarantees and Acquisitions | 85 |
| Section 7.5 | Dispositions | 86 |
| Section 7.6 | Sale Leaseback Transactions | 87 |
| Section 7.7 | Swap Agreements | 87 |
| Section 7.8 | Restricted Payments | 88 |
| Section 7.9 | Transactions with Affiliates | 88 |
| Section 7.10 | Restrictive Agreements | 88 |
| Section 7.11 | Amendments of Organizational Documents and Certain Material Agreements | 88 |
| Section 7.12 | [Reserved] | 89 |
| Section 7.13 | Payments on Certain Debt | 89 |

Section 7.14    Hazardous Materials ................................................................. 89

Section 7.15    Additional Covenants Applicable to Holdings ........................... 89

Section 7.16    Reclamation Claims .................................................................. 90

Section 7.17    Insolvency Proceeding Claims .................................................. 90

Section 7.18    Bankruptcy Actions .................................................................. 90

Section 7.19    Subrogation .............................................................................. 90

ARTICLE 8 EVENTS OF DEFAULT ................................................................... 90

Section 8.1    Events of Default...................................................................... 90

Section 8.2    Remedies Upon Event of Default............................................. 96

Section 8.3    Application of Funds ................................................................. 98

ARTICLE 9 THE ADMINISTRATIVE AGENT ................................................... 98

Section 9.1    Appointment and Authority...................................................... 98

Section 9.2    Rights as a Lender .................................................................... 99

Section 9.3    Exculpatory Provisions ............................................................ 99

Section 9.4    Reliance by Administrative Agent .......................................... 100

Section 9.5    Delegation of Duties............................................................... 100

Section 9.6    Resignation of Administrative Agent....................................... 100

Section 9.7    Non-Reliance on Administrative Agent and Other Lenders ..... 101

Section 9.8    No Other Duties, Etc .............................................................. 102

Section 9.9    [Reserved] .............................................................................. 102

Section 9.10    Collateral and Guarantee Matters........................................... 102

ARTICLE 10 MISCELLANEOUS ...................................................................... 102

Section 10.1    Notices................................................................................... 102

Section 10.2    Waivers; Amendments ........................................................... 104

Section 10.3    Expenses; Indemnity; Damage Waiver .................................... 106

Section 10.4    Successors and Assigns .......................................................... 108

Section 10.5    Survival ................................................................................. 112

Section 10.6    Counterparts; Integration; Effectiveness; Electronic Execution ................ 112

Section 10.7    Severability............................................................................ 113

Section 10.8    Right of Setoff ....................................................................... 113

Section 10.9    Governing Law; Jurisdiction; Consent to Service of Process ..... 113

Section 10.10    WAIVER OF JURY TRIAL ................................................... 114

Section 10.11    Payments Set Aside ................................................................ 114

Section 10.12    Headings................................................................................ 114

Section 10.13    Interest Rate Limitation.......................................................... 114

Section 10.14    Treatment of Certain Information; Confidentiality ...................................... 115

Section 10.15    USA PATRIOT Act Notice......................................................................... 116

Section 10.16    No Fiduciary Duty...................................................................................... 116

Section 10.17    Acknowledgement and Consent to Bail-In of Affected
Financial Institutions ................................................................. 116

Section 10.18    Certain ERISA Matters ............................................................................. 117

Section 10.19    The Company as Agent for Borrowers........................................................ 118

Section 10.20    Acknowledgement Regarding Any Supported QFCs.................................. 119

Section 10.21    Parties Including Trustees; Bankruptcy Court Proceedings ........................ 119

ARTICLE 11 LOAN GUARANTY ................................................................................. 120

Section 11.1    Guaranty .................................................................................................... 120

Section 11.2    Guaranty of Payment................................................................................. 120

Section 11.3    No Discharge or Diminishment of Loan Guaranty ..................................... 120

Section 11.4    Defenses Waived ....................................................................................... 121

Section 11.5    Rights of Subrogation................................................................................ 121

Section 11.6    Reinstatement; Stay of Acceleration .......................................................... 121

Section 11.7    Information ................................................................................................ 122

Section 11.8    Termination ............................................................................................... 122

Section 11.9    Taxes ........................................................................................................ 122

Section 11.10    Maximum Liability ................................................................................... 122

Section 11.11    Contribution .............................................................................................. 122

Section 11.12    Liability Cumulative ................................................................................. 123

Section 11.13    Keepwell.................................................................................................... 123

ANNEX:

    Annex A        Initial Approved Budget

SCHEDULES:

| | |
|---|---|
| Schedule 2.1 | Commitments |
| Schedule 5.6 | Disclosed Matters |
| Schedule 5.7 | Environmental Matters |
| Schedule 5.13 | Subsidiaries; Equity Interests |
| Schedule 5.14 | Insurance |
| Schedule 5.16 | UCC Filing Offices |
| Schedule 5.19 | Real Property |
| Schedule 6.16 | Certain Post-Closing Obligations |
| Schedule 6.18 | Required Milestones |

| Schedule 7.1 | Existing Indebtedness |
| Schedule 7.2 | Existing Liens |
| Schedule 7.4 | Existing Investments |
| Schedule 7.10 | Existing Restrictions |

EXHIBITS:

| Exhibit A | Form of Assignment and Assumption |
| Exhibit B | Form of Borrowing Base Certificate |
| Exhibit C | Form of Borrowing Request |
| Exhibit D | Form of Budget Compliance Certificate |

**SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

This SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT (this "Agreement"), dated as of June 25, 2022, is entered into by and among **CORSICANA PARENT CO., LLC**, a ("Holdings"), **CORSICANA BEDDING, LLC**, a Delaware limited liability company (the "Company"), the Subsidiaries of the Company from time to time party hereto as Borrowers (together with the Company each, a "Borrower" and individually and collectively, jointly and severally, the "Borrowers"), the Subsidiaries of the Company from time to time party hereto as Guarantors (together with Holdings, each, a "Guarantor" and collectively, the "Guarantors"), the financial institutions from time to time party hereto as lenders (each, a "Lender" and, collectively, the "Lenders"), and **WINGSPIRE CAPITAL LLC**, as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "Administrative Agent").

RECITALS

A.      On June 25, 2022 (the "Petition Date"), (i) the Company, (ii) Eastern Sleep Products Company, a Virginia corporation, (iii) Englander-Symbol Mattress of Mississippi, LLC, a Virginia limited liability company, (iv) Hylton House Furniture, Inc., a Virginia corporation, (v) Luuf, LLC, a Virginia limited liability company, (vi) Master Craft Sleep Products, Inc., an Alabama corporation, (vii) Olive Branch Building, LLC, a Virginia limited liability company, (viii) Symbol Mattress of Florida, Inc., a Virginia corporation, (ix) Symbol Mattress of Pennsylvania, Inc., a Virginia corporation, (x) Symbol Mattress of Wisconsin, Inc., a Virginia corporation, (xi) Symbol Mattress Transportation, Inc., a Virginia corporation., and (xii) Thetford Leasing, LLC, a Virginia limited liability company (clauses (i) through (xii) collectively, the "Debtors" and each individually, a "Debtor"), commenced chapter 11 Case Nos. 22-90016-elm11 through 22-90027-elm11, as administratively consolidated as chapter 11 Case No. 22-90016-elm11 (collectively, the "Chapter 11 Cases" and each individually, a "Chapter 11 Case"), with the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division (the "Bankruptcy Court"). The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

B.      Prior to the Petition Date, the Lenders provided financing to the Borrowers pursuant to that certain Credit Agreement, dated as of April 28, 2021, by and among the Company, the other Borrowers, Holdings, certain Subsidiaries of the Company party thereto as Borrowers, and certain Subsidiaries of the Company party thereto as Guarantors, Wingspire Capital LLC, as administrative agent (in such capacity, the "Prepetition ABL Agent"), and the lenders from time to time party thereto (the "Prepetition ABL Lenders") (as amended, restated, modified, waived or supplemented through the date hereof, the "Prepetition ABL Credit Agreement").

C.      As of the Petition Date, the Prepetition ABL Lenders under the Prepetition ABL Credit Agreement were owed: $18,545,929.18 in outstanding principal with respect to Loans (as such term is defined in the Prepetition ABL Credit Agreement), plus interest, fees, costs and expenses and all other Prepetition ABL Obligations under the Prepetition ABL Credit Agreement.

D.      The Prepetition ABL Obligations (as defined below) are secured by a security interest in certain existing and after-acquired assets of the Loan Parties as more fully set forth in the Prepetition ABL Loan Documents (as defined below) and such security interest is perfected and has, with certain exceptions as described in the Prepetition ABL Loan Documents, priority over other security interests;

E.      The Borrowers have requested, and, upon the terms and conditions set forth in this Agreement, the Lenders have agreed to make available to the Borrowers, a senior secured, super-priority revolving credit facility of up to $40,000,000 in the aggregate to fund the working capital requirements of

the Borrowers and other transactions as more fully set forth in <u>Section 6.8</u> during the pendency of the Chapter 11 Cases;

F.       Each Loan Party has agreed to secure all of the Obligations under the Loan Documents by granting to the Administrative Agent, for the benefit of the Administrative Agent and the other Secured Parties, a security interest in and lien upon substantially all of their existing and after-acquired personal property (subject to the limitations and priorities contained in the Loan Documents and the Orders);

G.       Each Loan Party's business is a mutual and collective enterprise and the Loan Parties believe that the loans and other financial accommodations to the Borrowers under this Agreement will enhance the aggregate borrowing powers of the Borrowers and facilitate the administration of the Chapter 11 Cases and their loan relationship with the Administrative Agent and the Lenders, all to the mutual advantage of the Loan Parties;

H.       Each Loan Party acknowledges that it will receive substantial direct and indirect benefits by reason of the making of loans and other financial accommodations to the Borrowers as provided in this Agreement; and

I.       The Administrative Agent's and the Lenders' willingness to extend financial accommodations to the Borrowers, as more fully set forth in this Agreement and the other Loan Documents, is done solely as an accommodation to the Loan Parties and at the Loan Parties' request and in furtherance of the Loan Parties' mutual and collective enterprise.

NOW THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

ARTICLE 1

DEFINITIONS AND RULES OF CONSTRUCTION

Section 1.1       <u>Definitions</u>.  As used in this Agreement, the following terms have the meanings specified below:

"<u>ABLSoft</u>" means the electronic and/or internet-based system approved by the Administrative Agent for the purpose of making notices, requests, deliveries, communications and for the other purposes contemplated in this Agreement or otherwise approved by Lender, whether such system is owned, operated or hosted by the Administrative Agent, any of its Affiliates or any other Person.

"<u>Account Debtor</u>" means each Person who is or may become obligated to a Loan Party in respect of any Receivable or any Supporting Obligation or Collateral Support relating thereto.

"<u>Acquisition</u>" means any transaction or series of related transactions resulting, directly or indirectly, in:  (a) the acquisition by any Person of (i) all or substantially all of the assets of another Person or (ii) all or substantially all of any business line, unit or division of another Person, (b) the acquisition by any Person (i) of in excess of 50% of the Equity Interests of any other Person, or (ii) otherwise causing any other Person to become a Subsidiary of such Person, or (c) a merger, amalgamation consolidation, or any other combination of any Person with another Person (other than a Person that is a Loan Party or a Subsidiary of a Loan Party) in which a Loan Party or any of its Subsidiaries is the surviving Person.

"<u>Actual Cash Receipts</u>" shall mean with respect to any period, the actual amount that corresponds to the line item "Total Operating Receipts" as determined by reference to the Budget as then in effect.

"<u>Actual Net Operating Cash Flow</u>" shall mean with respect to any period, the actual amount that corresponds to the line item "Net Cash Flow" in the Budget as then in effect.

"<u>Actual Operating Disbursement Amounts</u>" shall mean with respect to any period, the actual amount that corresponds to the line item "Total Operating Disbursements" in the Budget as then in effect.

"<u>Actual Outstanding Debt</u>" shall mean with respect to any period, the actual amount that corresponds to the "Ending Loan Balance" line item under the "Wingspire Post-Petition DIP Loan Balances" and "BT DIP Loan Balance" in the Budget as then in effect.

"<u>Adequate Protection Liens</u>" has the meaning assigned to the term "Prepetition Secured Parties Adequate Protection Liens" in the Interim Order (or the Final Order, when applicable).

"<u>Adequate Protection Superpriority Claims</u>" has the meaning assigned to the term "Prepetition Secured Parties Adequate Protection Claims" in the Interim Order (or the Final Order, when applicable).

"<u>Administrative Agent</u>" has the meaning assigned to such term in the preamble of this Agreement.

"<u>Administrative Agent Advisor</u>" means any financial advisor, attorney, accountant, appraiser, auditor, business valuation expert, environmental engineer or consultant, turnaround consultant, and other consultants, professionals and experts retained by the Administrative Agent or other advisors of the Administrative Agent on behalf of the Administrative Agent in connection with the Loan Documents.

"<u>Administrative Agent's Payment Office</u>" means the Administrative Agent's office located at Deerfield Corporate Center, 13010 Morris Road, Building One, Suite 175, Alpharetta, GA 30004, or such other office as to which the Administrative Agent may from time to time notify the Borrower Agent and the Lenders.

"<u>Administrative Questionnaire</u>" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"<u>Affected Financial Institution</u>" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"<u>Affiliate</u>" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"<u>Alternate Base Rate</u>" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, and (b) the Federal Funds Effective Rate in effect on such day <u>plus</u> 0.50% per annum, <u>provided</u> that the Alternate Base Rate shall at no time be less than 1.00% per annum. Any change in the Alternate Base Rate due to a change in the Prime Rate or the Federal Funds Effective Rate shall be effective from and including the effective date of such change in the Prime Rate or the Federal Funds Effective Rate.

"<u>Anti-Corruption Laws</u>" means all laws, rules, and regulations of any jurisdiction applicable to the Loan Parties or their respective Subsidiaries from time to time concerning or relating to bribery or corruption.

"<u>Anti-Money Laundering Laws</u>" means the applicable laws, regulations, and sanctions, state and federal, criminal and civil, in any jurisdiction in which any Loan Party or any of its Subsidiaries or Affiliates

is located or is doing business that: (a) limit the use of and/or seek the forfeiture of proceeds from illegal transactions; (b) limit commercial transactions with designated countries or individuals believed to be terrorists, narcotics dealers or otherwise engaged in activities contrary to the interests of the United States; (c) require identification and documentation of the parties with whom a financial institution conducts business; or (d) are designed to disrupt the flow of funds to terrorist organizations. Such laws, regulations and sanctions shall be deemed to include the USA PATRIOT Act, the Bank Secrecy Act, 31 U.S.C. § 5311 *et seq*., the Trading with the Enemy Act, 50 U.S.C. App. § 1 *et seq*., the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et seq*., and the sanction regulations promulgated pursuant thereto by the OFAC, as well as laws relating to prevention and detection of money laundering in 18 U.S.C. §§ 1956 and 1957.

"Anti-Terrorism Laws" has the meaning assigned to such term in Section 5.18(e).

"Applicable Margin" means, with respect to Revolving Loans which are Base Rate Loans, 3.75%.

"Applicable Percentage" means, at any time with respect to any Revolving Lender, the percentage equal to a fraction the numerator of which is the amount of such Lender's Revolving Commitment and the denominator of which is the aggregate amount of all Revolving Commitments of all Revolving Lenders (provided that if the Revolving Commitments have terminated or expired, the Applicable Percentages of the Revolving Lenders shall be determined based upon the Revolving Exposure of the Revolving Lenders at such time of the determination).

"Approved Budget" means the budget prepared by the Borrowers in the form of Annex A, as the same may be updated, modified or supplemented from time to time as provided in Section 6.17.

"Approved Budget Variance Report" means a report provided by the Borrowers to the Administrative Agent and the Lenders (a) showing, in each case, on a line item by line item and a cumulative basis, the Actual Cash Receipts, the Actual Operating Disbursement Amounts, the Actual Net Operating Cash Flow and the Actual Outstanding Debt, in each case as of the last day of the Variance Testing Period then most recently ended, noting therein (i) all variances, on a cumulative basis, from the Budgeted Cash Receipts, the Budgeted Operating Disbursement Amounts, the Budgeted Net Operating Cash Flow and the Budgeted Outstanding Debt for such period as set forth in the Approved Budget as in effect for such period and (ii) containing an indication as to whether each variance is temporary or permanent and analysis and explanations for all material variances, (iii) certifying compliance or non-compliance in such Variance Testing Period with the Permitted Variances and (iv) including explanations for all material variances and violations, if any, of such covenant and if any such violation exists, setting forth the actions which the Borrowers have taken or intend to take with respect thereto and (b) which such reports shall contain supporting information, satisfactory to the Administrative Agent in its sole discretion.

"Approved Electronic Communication" means each notice, demand, communication, information, document and other material transmitted, posted or otherwise made or communicated by e-mail, facsimile, ABLSoft or any other equivalent electronic service, whether owned, operated or hosted by the Administrative Agent, any of its Affiliates or any other Person, that any party is obligated to, or otherwise chooses to, provide to the Administrative Agent pursuant to this Agreement or any other Loan Document, including any financial statement, financial and other report, notice, request, certificate and other information or material; provided, that Approved Electronic Communications shall not include any notice, demand, communication, information, document or other material that the Administrative Agent specifically instructs a Person to deliver in physical form.

"Approved Fund" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Approved Line of Business" means, collectively, (a) those lines of business in which Holdings and its Subsidiaries operate on the Effective Date and (b) any business or activity that is the same, similar or otherwise reasonably related, ancillary, complementary or incidental thereto.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 10.4) and accepted by the Administrative Agent, in substantially the form of Exhibit A or any other form approved by the Administrative Agent.

"Attorney Costs" means, with respect to (a) the Administrative Agent, all reasonable, documented, and out-of-pocket fees and out-of-pocket expenses, charges, disbursements and other charges of counsel to the Administrative Agent (limited to McGuireWoods LLP), and (b) the Credit Parties other than the Administrative Agent, all reasonable, documented and out-of-pocket fees and out of pocket expenses, charges, disbursements and other charges of one law firm (and one local counsel in each relevant jurisdiction and one special or regulatory counsel for each relevant subject matter to the extent reasonably necessary) for such Credit Parties and, solely in the case of an actual or potential conflict of interest, one additional counsel (and one additional local counsel in each relevant jurisdiction one special or regulatory counsel for each relevant subject matter to the extent reasonably necessary) for such Credit Parties affected by such conflict of interest.

"Attributable Indebtedness" means, at any date, (a) in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, and (b) in respect of any Synthetic Lease Obligation of any Person, the capitalized or principal amount of the remaining lease payments under the relevant lease that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease or other agreement were accounted for as a Capitalized Lease.

"Automatic Stay" shall mean the automatic stay provided under Section 362 of the Bankruptcy Code.

"Availability" means, at any time, the difference of (a) the lesser of (i) Revolving Credit Maximum Amount, and (ii) the Borrowing Base at such time, minus (b) the amount of the Total Revolving Outstandings at such time.

"Availability Block" means $4,000,000.

"Availability Period" means the period from and including the Effective Date to but excluding the earlier of the Maturity Date.

"Avoidance Action" means any and all claims and causes of action of any Borrower's estate arising under sections 542, 544, 545, 547, 548, 549, 550, 551, 553(b) or 724(a) of the Bankruptcy Code, together with any proceeds therefrom.

"Avoided Payment" has the meaning assigned to such term in Section 2.9(b).

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation" means (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation, rule or requirement for such EEA Member Country from time to time that is

described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"<u>Bankruptcy Code</u>" means Title 11 of the United State Code or any similar federal or state law for the relief of debtors.

"<u>Bankruptcy Court</u>" has the meaning assigned to such term in the Recitals.

"<u>Bankruptcy Rules</u>" shall mean the Federal Rules of Bankruptcy Procedure, as the same may from time to time be in effect and applicable to the Chapter 11 Cases.

"<u>Base Rate Loan</u>" means a Loan bearing interest based on the Alternate Base Rate.

"<u>Beneficial Ownership Certification</u>" means, with respect to any Loan Party, a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"<u>Beneficial Ownership Regulation</u>" means 31 C.F.R. § 1010.230.

"<u>Benefit Plan</u>" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"<u>BHC Act Affiliate</u>" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. § 1841(k)) of such party.

"<u>Board</u>" means the Board of Governors of the Federal Reserve System of the United States.

"<u>Board of Directors</u>" means with respect to (a) any corporation, the board of directors of the corporation or any committee thereof duly authorized to act on behalf of such board, (b) a partnership, the board of directors of the general partner of the partnership, (c) a limited liability company, the managing member or members or any controlling committee or board of directors of such company or the sole member or the managing member thereof, and (d) any other Person, the board or committee of such Person serving a similar function.

"<u>Borrower</u>" has the meaning assigned to such term in the preamble to this Agreement.

"<u>Borrower Agent</u>" has the meaning assigned to such term in <u>Section 10.19</u>.

"<u>Borrowing</u>" means a borrowing consisting of Revolving Loans made on the same day by the Lenders (or Administrative Agent on behalf thereof) or by Administrative Agent in the case of an Overadvance.

"<u>Borrowing Base</u>" means, on any date of determination, an amount equal to the sum of:

> (a)  90% of the Value of Eligible Accounts; <u>plus</u>

> (b)  the least of (i) 70% of the Value of Eligible Inventory, (ii) 90% of the NOLV of Eligible Inventory and (iii) $20,000,000; <u>minus</u>

      (c)     the Availability Block, <u>minus</u>

      (d)     all Reserves.

"<u>Borrowing Base Certificate</u>" means a certificate by a Responsible Officer of Borrower Agent, on its own behalf and on behalf of all other Borrowers, substantially in the form of <u>Exhibit B</u> (or such other form as may be agreed to by the Administrative Agent) setting forth the calculation of the Borrowing Base (including each component thereof), in form and substance satisfactory to Administrative Agent.

"<u>Borrowing Request</u>" has the meaning given such term in <u>Section 2.2(b)</u>.

"<u>Budget</u>" shall mean a rolling thirteen (13) week forecast of projected receipts, disbursements, net cash flow, liquidity and loans for the immediately following consecutive thirteen (13) weeks after the date of delivery, which shall be in substantially the form of the initial Approved Budget or otherwise in form and substance acceptable to Administrative Agent and shall be approved by the Administrative Agent, in Administrative Agent's sole discretion. The initial Approved Budget is attached hereto as <u>Annex A</u>.

"<u>Budgeted Cash Receipts</u>" shall mean with respect to any period, the amount that corresponds to the line item "Total Cash Receipts" in the Budget, as then in effect.

"<u>Budget Compliance Certificate</u>" means a certificate substantially in the form of <u>Exhibit D</u>.

"<u>Budgeted Net Operating Cash Flow</u>" shall mean with respect to any period, the actual amount that corresponds to the line item "Net Cash Flow" in the Budget as then in effect.

"<u>Budgeted Operating Disbursement Amounts</u>" shall mean with respect to any period, the amount that corresponds to the line item "Total Operating Disbursements" in the Budget.

"<u>Budgeted Outstanding Debt</u>" shall mean with respect to any period, the actual amount that corresponds to the "Ending Loan Balance" line item under the "Wingspire Post-Petition DIP Loan Balances" and "BT DIP Loan Balance" in the Budget as then in effect.

"<u>Business Day</u>" means any day other than a Saturday, Sunday or day on which banks in Atlanta, Georgia are authorized or required by law to close.

"<u>Capitalized Lease Obligations</u>" means, at any time of determination, the amount of the liabilities in respect of Capitalized Leases that would at such time be required to be capitalized and reflected as a liability on a balance sheet prepared in accordance with GAAP.

"<u>Capitalized Leases</u>" means all leases that are required to be capitalized in accordance with GAAP.

"<u>Carve Out</u>" has the meaning assigned to the term "Carve Out" in the Interim Order (or Final Order, when applicable).

"<u>Cash Equivalents</u>" means each of the following:

      (a)     debt obligations maturing within one year from the date of acquisition thereof to the extent the principal thereof and interest thereon is backed by the full faith and credit of the United States;

      (b)     commercial paper maturing within 270 days from the date of acquisition thereof and having, at such date of acquisition, the highest credit rating obtainable from S&P or Moody's;

(c)      certificates of deposit, banker's acceptances and time deposits maturing within 270 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the laws of the United States or any state, commonwealth or other political subdivision thereof that has a combined capital and surplus and undivided profits of not less than $500,000,000 or, to the extent not otherwise included, any Lender, and which is rated at least A-2 by S&P and P-2 by Moody's in the note or commercial paper rating category;

(d)      repurchase agreements with a term of not more than 30 days for securities described in clause (a) of this definition and entered into with a financial institution satisfying the criteria described in clause (c) of this definition; and

(e)      money market mutual funds, substantially all of the investments of which are in cash or investments contemplated by clauses (a), (b) and (c) of this definition.

"Cash Management Order" means the order of the Bankruptcy Court entered in the Chapter 11 Cases after the "first day" hearing, together with all extensions, modifications and amendments thereto, in form and substance reasonably satisfactory to the Administrative Agent, which among other matters authorizes the Debtors to maintain their existing cash management and treasury arrangements (as set forth in the Prepetition ABL Credit Agreement and the Orders) or such other arrangements as shall be reasonably acceptable to the Administrative Agent in all material respects.

"Casualty Event" means any event that gives rise to the receipt by any Loan Party or any of its Subsidiaries of insurance proceeds or condemnation awards arising from any damage to, destruction of, or other casualty or loss involving, or any seizure, condemnation, confiscation or taking under power of eminent domain of, or requisition of title or use of or relating to or in respect of any inventory, equipment, fixed assets or Real Property (including any improvements thereon) of such Loan Party or Subsidiary.

"Change in Law" means the occurrence, after the Effective Date, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority or the compliance therewith by any Credit Party; provided that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines and directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means each occurrence of any of the following:

(a)      Permitted Holders cease to beneficially and of record own and control, directly or indirectly, at least 50.1% on a fully diluted basis of the aggregate outstanding voting or economic power of the Equity Interests of Holdings;

(b)      the acquisition, directly or indirectly, by any person or group (within the meaning of Section 13(d)(3) of the Securities and Exchange Act of 1934) other than a Permitted Holder of beneficial ownership of more than 35% of the aggregate outstanding voting or economic power of the Equity Interests of Holdings;

(c)    at any time a majority of the Board of Directors of Holdings have not been approved by a vote of Permitted Holders or a majority of directions on the Board of Directors of Holdings previously approved by vote of Permitted Holders;

(d)    Holdings shall cease to have beneficial ownership (as defined in Rule 13d-3 under the Securities and Exchange Act of 1934) of 100% of the aggregate voting or economic power of the Equity Interests of each other Loan Party and each of its Subsidiaries (other than in connection with any transaction permitted by the Loan Documents), free and clear of all Liens (other than Liens permitted under Section 7.2); or

(e)    a "change of control" (or any comparable term or provision) under or with respect to any of the Equity Interests, or Indebtedness of Holdings or any of its Subsidiaries, including, without limitation, the Prepetition Term Loan Agreement or the DIP Term Loan Agreement.

"Chapter 11 Case" and "Chapter 11 Cases" each have the meaning specified in the Recitals

"Code" means the Internal Revenue Code of 1986, and the rules and regulations issued thereunder.

"Collateral" means all the "Collateral" as defined in the Collateral Documents and all other property of whatever kind and nature pledged or charged, or purported to be pledged or charged, as collateral under any Collateral Document, including, without limitation, the "DIP Collateral" as referred to in the Orders, it being understood that "Collateral" hereunder shall include all such "DIP Collateral" irrespective of whether any such property was excluded form "Collateral" (as defined in the Prepetition ABL Credit Agreement) pursuant to the Prepetition ABL Loan Documents.  For the avoidance of doubt, the Collateral shall exclude all Excluded Assets.

"Collateral Access Agreement" means each landlord waiver, bailee waiver or other agreement between the Administrative Agent and any third party (including any bailee, assignee, consignee, customs broker, or other similar Person) in possession of any Collateral or any landlord of any Loan Party for any Real Property where any Collateral is located, in each case, in form and substance reasonably satisfactory to the Administrative Agent.

"Collateral and Guarantee Requirement" means, at any time, the requirement that:

(a)    the Administrative Agent shall have received each Collateral Document required to be delivered on the Effective Date pursuant to Section 4.1, or, following the Effective Date, pursuant to pursuant to Section 6.16 or Section 6.12, duly executed by each applicable Loan Party;

(b)    all Obligations shall have been unconditionally guaranteed jointly and severally on a senior basis by the Guarantors;

(c)    except to the extent otherwise provided hereunder or under any Collateral Document, the Obligations shall have been secured by a perfected first priority (subject only to Liens expressly permitted pursuant to Section 7.2) security interest in all Collateral of each Loan Party; and

(d)    none of the Collateral shall be subject to any Lien other than Liens expressly permitted by Section 7.2.

The foregoing definition shall not require the creation or perfection of pledges of or security interests in particular assets if and for so long as the Administrative Agent agrees in writing that the cost of creating or

perfecting such pledges or security interests in such assets shall be excessive in view of the benefits to be obtained by the Lenders therefrom.

"Collateral Documents" means, collectively, the Orders, and each security agreement, instrument or other document executed or delivered to secure any of the Obligations.

"Collateral Reporting Trigger Event" means any Disposition (whether pursuant to the sale of Equity Interests in a Subsidiary, an Investment, a Restricted Payment or otherwise) that would result in the elimination of Collateral from the Borrowing Base constituting 10.0% or more of the Borrowing Base (on a net basis, after giving effect to all applicable advance rates and NOLVs, but before giving effect to any Reserves) in effect immediately prior to giving effect to such Disposition. In determining whether a Collateral Reporting Trigger Event has occurred in connection with any Disposition, such Disposition shall be taken together with all other Dispositions that have occurred since the delivery of the most recent Borrowing Base required hereunder.

"Collateral Support" means all property (real or personal) assigned, hypothecated or otherwise securing any of the Obligations, and shall include any security agreement or other agreement granting a lien or security interest in such real or personal property.

"Collections Account" has the meaning assigned to such term in Section 6.14(a).

"Commitment" means with respect to any Lender, such Lender's Revolving Commitment.

"Committee" means the official committee of unsecured creditors appointed in the Chapter 11 Cases by the U.S. Trustee, if any.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.) and any successor statute.

"Company" has the meaning assigned to such term in the preamble of this Agreement.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Contested in Good Faith" means, with respect to any matter, that such matter is being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its properties is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings analogous thereto. Without limiting the generality of the foregoing, a Person shall be deemed to be Controlled by another Person if such other Person possesses, directly or indirectly, power to vote 10% or more of the securities having ordinary voting power for the election of directors, managing general partners or any equivalent thereof.

"Control Agreement" means an agreement, in form and substance satisfactory to the Administrative Agent, among the applicable Loan Party, the Administrative Agent and a financial institution or securities

intermediary, with respect to a Deposit Account or Securities Account maintained by such Loan Party with such financial institution or securities intermediary.

"Controlled Account" means, as the context may require, a Deposit Account and/or Securities Account that is subject to a first-priority security interest and Lien in favor of the Administrative Agent.

"Copyrights" means all of the following: (a) all copyright rights in any work subject to the copyright laws of the United States of America or any other country, whether as author, assignee, transferee or otherwise, (b) all registrations and applications for registration of any such copyright in the United States of America or any other country, including registrations, recordings, supplemental registrations and pending applications for registration in the United States Copyright Office or any similar offices in the United States of America or any other country, (c) all rights and privileges arising under applicable law with respect to the use of such copyrights, (d) all reissues, renewals, continuations and extensions thereof and amendments thereto, and (e) all income, fees, royalties, damages, claims and payments now or hereafter due and/or payable with respect thereto, including damages and payments for past, present or future infringements thereof.

"Covered Entity" means any of the following:  (a) "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82; (b) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or (c) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"Credit Parties" means the Administrative Agent and each of the Lenders.

"Debtor Relief Laws" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

"Default" means any event or condition which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Default Rate" means, with respect to any Loans and other Obligations, a rate of interest equal to the Alternate Base Rate plus the highest Applicable Margin applicable to Base Rate Loans plus 3.00% per annum.

"Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"Defaulting Lender" means, subject to Section 2.7(b), any Lender that (a) has failed to (i) fund all or any portion of its Loans within two Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Borrower Agent in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within two Business Days of the date when due, (b) has notified the Borrower Agent or the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied),

(c) has failed, within three Business Days after written request by the Administrative Agent or the Borrower Agent, to confirm in writing to the Administrative Agent and the Borrower Agent that it will comply with its prospective funding obligations hereunder, <u>provided</u> that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Borrower Agent, or (d) has, or has a direct or indirect holding company that has, (i) become the subject of a proceeding under any Debtor Relief Law, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity or (iii) become the subject of a Bail-In Action; <u>provided</u> that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect holding company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to <u>Section 2.7(b)</u>) upon delivery of written notice of such determination to the Borrower Agent and each Lender.

"<u>Designated Account</u>" means Borrower Agent's account number 1700008915 maintained at Fifth Third Bank, National Association (or such other deposit account of the Borrower Agent that has been designated as such, in writing, by the Borrower Agent to the Administrative Agent).

"<u>DIP ABL Priority Collateral</u>" means the DIP Collateral (as such term is defined in the Order) on which the Administrative Agent holds a first priority lien pursuant to Section 2.1(b)(i) of the applicable Order.

"<u>DIP Term Loan Agent</u>" means, initially, Blue Torch Finance, LLC, in its capacity as administrative agent and collateral agent for the DIP Term Loan Lenders and any successor, joint or replacement "Agent" (or such similar defined term used therein) as such term is defined in the DIP Term Loan Agreement.

"<u>DIP Term Loan Agreement</u>" means that certain DIP Term Loan Note, dated as of the Effective Date, by and among Company, the other Loan Parties defined therein, the DIP Term Loan Agent, and the DIP Term Loan Lenders party thereto, as in effect on the date hereof and as the may be amended from time to time with the prior written consent of the Administrative Agent.

"<u>DIP Term Loan Documents</u>" means the "DIP Documents" (as defined in the DIP Term Loan Agreement), each as in effect on the date hereof and as the same may be amended from time to time with the prior written consent of the Administrative Agent.

"<u>DIP Term Loan Escrow Account</u>" means the deposit account of the Borrowers, which shall not be a Controlled Account, established with KeyBank, account number ending in -2268; all amounts held therein being acknowledged as constituting DIP Term Priority Collateral.

"<u>DIP Term Loan Facility</u>" means the term loan facility provided by the DIP Term Loan Lenders under the DIP Term Loan Agreement in an aggregate principal amount not less than $18,000,000.00.

"<u>DIP Term Loan Lenders</u>" means the "Lenders" under and as defined in the DIP Term Loan Agreement.

"DIP Term Loan Obligations" means the "Obligations" as defined in the DIP Term Loan Agreement.

"DIP Term Loan Proceeds Account" means the deposit account of the Borrowers, which shall not be a Controlled Account, established with Fifth Third Bank, account number ending in -7135; all amounts held therein being acknowledged as constituting DIP Term Priority Collateral.

"DIP Term Loan Required Lenders" means the "Required Lenders" under and as defined in the DIP Term Loan Agreement.

"DIP Term Priority Collateral" means the DIP Collateral (as such term is defined in the Order) on which the DIP Term Loan Agent holds a first priority lien pursuant to Section 2.1(b)(ii) of the applicable Order.

"Disposition" means, with respect to any Person, the sale, transfer, license, lease or other disposition (including by way of Division, Sale Leaseback or any sale or issuance of Equity Interests by way of a merger or otherwise) by such Person to any other Person, with or without recourse, of (a) any notes or accounts receivable or any rights and claims associated therewith, (b) any Equity Interests of any Subsidiary (other than directors' qualifying shares), or (c) any other assets, provided, however, that none of the following shall constitute a Disposition: (i) any sale, transfer, license, lease or other disposition by (A) a Loan Party (other than Holdings) to another Loan Party (other than Holdings) or (B) a Non-Loan Party Subsidiary to a Loan Party or to another Non-Loan Party Subsidiary, in each case, on terms which are no less favorable than are obtainable from any Person which is not one of its Affiliates, (ii) the collection of accounts receivable and other obligations in the ordinary course of business and (iii) sales of inventory in the ordinary course of business. Each of the terms "Dispose" and "Disposed" when used as a verb shall have an analogous meaning.

"Disqualified Equity Interest" means, with respect to any Person, any Equity Interest of such Person which, by its terms, or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable, or upon the happening of any event or condition, (a) matures or is mandatorily redeemable (other than solely for shares of common stock) pursuant to a sinking fund obligation or otherwise, (b) is redeemable at the option of the holder thereof (other than solely for shares of common stock), in whole or in part, (c) provides for the scheduled payments of dividends in cash, or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is ninety-one (91) days after the Maturity Date.

"Division" means the division of the assets, liabilities and/or obligations of a Person (the "Dividing Person") among two or more Persons, whether pursuant to a "plan of division" or similar arrangement pursuant to Section 18-217 of the Delaware Limited Liability Company Act or any similar provision under the laws of any other applicable jurisdiction and pursuant to which the Dividing Person may or may not survive.

"Dollars" or "$" refers to lawful money of the United States.

"E-Signature" means the process of attaching to or logically associating with an Approved Electronic Communication an electronic symbol, encryption, digital signature, or process (including the name or an abbreviation of the name of the party transmitting the Approved Electronic Communication) with the intent to sign, authenticate, or accept such Approved Electronic Communication.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country that is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country that is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country that is a Subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Date" means the first date, which shall be no later than 3 Business Days after the Petition Date, upon which all the conditions precedent in Section 4.1 are satisfied or waived in accordance with Section 10.2.

"Eligible Account" means an Account arising in the ordinary course of the business of a Borrower from the sale of goods or rendition of services which the Administrative Agent, in its Permitted Discretion, deems to be an Eligible Account. Without limiting the generality of the foregoing, no Account shall be an Eligible Account if:

(a) it arises out of a sale made or services rendered by a Borrower to another Loan Party or a Subsidiary or an Affiliate of a Loan Party; or

(b) it remains unpaid more than (i) 60 days after the original due date shown on the invoice or (ii) 90 days after the original invoice date shown on the invoice; or

(c) the total unpaid Accounts of the Account Debtor exceed (i) with respect to each of Costco, Mattress Firm, BJ's Wholesale, QVC, and RSS (Boxdrop), 30% of the net amount of all Eligible Accounts, but only to the extent of such excess and (ii) for all other Account Debtors, 20% of the net amount of all Eligible Accounts, but only to the extent of such excess; or

(d) any covenant, representation or warranty contained in this Agreement or any other Loan Document with respect to such Account has been breached; or

(e) the Account Debtor is also a creditor or supplier of a Loan Party or any Subsidiary of a Loan Party, or the Account Debtor has disputed liability with respect to such Account, or the Account Debtor has made any claim with respect to any other Account due from such Account Debtor to a Loan Party or any Subsidiary of a Loan Party, or the Account otherwise is or may become subject to right of setoff by the Account Debtor; provided that any such Account shall be eligible to the extent such amount exceeds such contract, dispute, claim, setoff or similar right; or

(f) the Account Debtor has commenced a voluntary case under any Debtor Relief Laws, or any other petition or other application for relief under Debtor Relief Laws has been filed against the Account Debtor, or if the Account Debtor has failed, suspended business, ceased to be Solvent, or consented to or suffered a receiver, trustee, assignee for the benefit of creditors, liquidator or custodian to be appointed for it or for all or a significant portion of its assets or affairs; or

(g) it arises from a sale made or services rendered to an Account Debtor outside the United States or Canada (other than the Province of Quebec), unless backed by a letter of credit or credit insurance in each case, in form and substance acceptable to the Administrative Agent; or

(h) (i) it arises from a sale to an Account Debtor on a bill-and-hold, guaranteed sale, sale-or-return, sale-on-approval, consignment, or any other repurchase or return basis, or (ii) it is subject to a reserve established by a Loan Party for potential returns or refunds, to the extent of such reserve, or (iii) it arises from a sale to an Account Debtor that is subject to cash-on-delivery terms, or (iv) it arises from a sale for personal, family or household purposes; or

(i) the Account Debtor is the United States of America or any department, agency or instrumentality thereof, unless the applicable Loan Party assigns its right to payment of such Account to the Administrative Agent, in a manner satisfactory to the Administrative Agent, in its Permitted Discretion, so as to comply with the Assignment of Claims Act of 1940 (31 U.S.C. §203 et seq., as amended); or

(j) it is not at all times subject to the Administrative Agent's perfected, first priority security interest (subject only to Permitted Encumbrances); or

(k) the goods giving rise to such Account have not been delivered to and accepted by the Account Debtor or the services giving rise to such Account have not been performed by the applicable Loan Party and accepted by the Account Debtor or the Account otherwise does not represent a final sale; or

(l) the Loan Parties have not sent a bill or invoice for the goods or services giving rise to such Account to the applicable Account Debtor; or

(m) it represents the right to receive progress payments or other advance billings that are due prior to the completion of performance by the applicable Borrower of the subject contract for goods or services; or

(n) it represents credit card sales; or

(o) the Account is evidenced by chattel paper or an instrument of any kind, or has been reduced to judgment; or

(p) any Loan Party or a Subsidiary of any Loan Party has made any agreement with the Account Debtor for any extension, compromise, settlement or modification of the Account or deduction therefrom, except for discounts or allowances which are made in the ordinary course of business for prompt payment and which discounts or allowances are reflected in the calculation of the face value of each invoice related to such Account; or

(q) 50% or more of the Accounts owing from the Account Debtor are not Eligible Accounts pursuant to clause (b) of this definition; or

(r) it represents service charges, late fees or similar charges; or

(s) it is not denominated in Dollars; or

(t) it is not otherwise acceptable to the Administrative Agent in its Permitted Discretion.

Notwithstanding the foregoing, no Accounts acquired through an Acquisition shall be Eligible Accounts until such time as the Administrative Agent shall have received and be satisfied with the results of a field examination with respect thereto.

"Eligible Assignee" means any Person that meets the requirements to be an assignee under Section 10.4(b)(iii), (v) and (vi) (subject to such consents, if any, as may be required under Section 10.4(b)(iii)).

"Eligible Inventory" means Inventory of a Borrower which the Administrative Agent, in its Permitted Discretion, deems to be Eligible Inventory. Without limiting the generality of the foregoing, no Inventory shall be Eligible Inventory if:

(a)     it is (i) raw materials, unless such raw materials are, in the Administrative Agent's sole discretion, readily marketable in its current form and the Administrative Agent shall have received an inventory appraisal with respect to such raw materials, or (ii) work in process; or

(b)     it is not in good, new and saleable condition; or

(c)     it is slow-moving, obsolete or unmerchantable; or

(d)     it does not meet all standards imposed by any Governmental Authority; or

(e)     it does not conform in all respects to any covenants, warranties and representations set forth in this Agreement or any other Loan Document; or

(f)     it is not at all times subject to the Administrative Agent's duly perfected, first priority security interest or is subject to a Lien that is not a Permitted Encumbrance; or

(g)     it is situated at a location outside the United States of America; or

(h)     it is not situated at a location in compliance with this Agreement, provided that Inventory situated at a location not owned by a Loan Party will be Eligible Inventory only if the Administrative Agent has received a satisfactory Collateral Access Agreement with respect to such location or if the Administrative Agent has established an applicable Reserve; or

(i)     it is in transit (other than Inventory that is in transit between locations of the Loan Parties within the United States); or

(j)     it consists of packaging materials, supplies, tooling, or samples; or

(k)     it is subject to any licensing, royalty or other Intellectual Property agreement with any third party (i) which would require any consent of any third party for the Disposition of such Inventory (which consent has not been obtained) or the payment of any monies to any third party upon such Disposition (to the extent of such monies), (ii) from whom any Loan Party has received written notice of a dispute in respect of such agreement, to the extent that the Administrative Agent determines, in its Permitted Discretion, that such dispute could be expected to prevent or impair the Disposition of such Inventory or (iii) the Administrative Agent otherwise determines, in its Permitted Discretion, that such Inventory cannot be freely Disposed of by the Administrative Agent during the continuance of an Event of Default; or

(l)     it is not otherwise acceptable to the Administrative Agent in its Permitted Discretion.

Notwithstanding the foregoing, no Inventory acquired through an Acquisition shall be Eligible Inventory until such time as the Administrative Agent shall have received and be satisfied with the results of a field examination and inventory appraisal with respect thereto.

"Environmental Claims" means any and all administrative, regulatory or judicial actions, suits, demands, claims, liens, notices of liability, non-compliance or violation, investigations, proceedings, settlements, consent decrees, consent orders, consent agreements and all costs and liabilities relating to or arising from or under any Environmental Law, including (a) any and all claims by Governmental Authorities for enforcement, investigation, corrective action, cleanup, removal, response, remedial or other actions, cost recovery, damages, natural resource damages or penalties pursuant to or arising under any Environmental Law, (b) any and all claims by any one or more Persons seeking damages, contribution, restitution, indemnification, cost recovery, compensation or injunctive relief directly or indirectly resulting from, based upon or arising under Environmental Law, pertaining to Hazardous Materials or an alleged injury or threat of injury to human health, safety, natural resources, or the indoor or outdoor environment, and (c) all liabilities contingent or otherwise, expenses, obligations, losses, damages, fines and penalties arising under any Environmental Law.

"Environmental Law" means, individually and collectively any and all federal, state, local, or foreign statute, rule, regulation, code, guidance, ordinance, order, judgment, directive, decree, injunction or common law as now or previously in effect and regulating, relating to or imposing liability or standards of conduct concerning: the environment; protection of the environment and natural resources; air emissions; water discharges; noise emissions; the Release, threatened Release or discharge into the environment and physical hazards of any Hazardous Material; the generation, handling, management, treatment, storage, transport or disposal of any Hazardous Material or otherwise concerning pollution or the protection of the outdoor or indoor environment, preservation or restoration of natural resources, employee or human health or safety, and potential or actual exposure to or injury from Hazardous Materials.

"Environmental Liability" means, in respect of any Person, any statutory, common law or equitable liability, contingent or otherwise of such Person directly or indirectly resulting from, arising out of or based upon (a) the violation of any Environmental Law or Environmental Permit, or (b) an Environmental Claim.

"Environmental Permit" means any permit, approval, authorization, certificate, license, variance, filing or permission required by or from any Governmental Authority pursuant to any Environmental Law.

"Equity Interests" means, with respect to any Person, (a) shares of capital stock of (or other ownership or profit interests in) such Person, (b) warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, (c) securities (other than Indebtedness) convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), (d) all other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or non-voting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination and (e) any Security Entitlement in respect of any Equity Interest described in this definition.

"ERISA" means the Employee Retirement Income Security Act of 1974, and the rules and regulations issued thereunder.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with any Loan Party, is treated as a single employer under Section 414(b) or 414(c) of the Code or, solely for

purposes of Sections 302 and 303 of ERISA and Sections 412 and 430 of the Code, is treated as a single employer under subsection (b), (c), (m) or (o) of Section 414 of the Code.

"ERISA Event" means (a) any "reportable event", as defined in Section 4043(c) of ERISA with respect to a Pension Plan; (b) the existence with respect to any Pension Plan of a non-exempt "prohibited transaction," as defined in Section 406 of ERISA or Section 4975(c)(1) of the Code; (c) any failure of any Pension Plan to satisfy the "minimum funding standard" applicable to such Pension Plan under Section 412 or Section 430 of the Code or Section 302 or Section 303 of ERISA, whether or not waived; (d) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Pension Plan, the failure to make by its due date a required installment under Section 430(j)(3) of the Code with respect to any Pension Plan or the failure of any Loan Party or ERISA Affiliate to make any required contribution to any Multiemployer Plan; (e) a determination that any Pension Plan is, or is expected to be, in "at-risk" status (as defined in Section 430(i)(4) of the Code or Section 303(i)(4) of ERISA); (f) the incurrence by any Loan Party or any ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Pension Plan including the imposition of any Lien in favor of the PBGC or any Pension Plan(other than for PBGC premiums due but not delinquent under Section 4007 of ERISA); (g) the filing of a notice of intent to terminate, the treatment of a Pension Plan amendment as a termination under Section 4041 or Section 4041A or ERISA, the receipt by any Loan Party or any ERISA Affiliate from the PBGC or a Pension Plan administrator of any notice relating to an intention to terminate any Pension Plan or Pension Plans or to appoint a trustee to administer any Pension Plan under Section 4042 of ERISA or the occurrence of an event or condition which constitutes grounds under Section 4042 of ERISA or the termination of, or the appointment of a trustee to administrator, any Pension Plan; (h) any limitations under Section 436 of the Code become applicable; (i) the incurrence by any Loan Party or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Pension Plan or Multiemployer Plan; (j) a withdrawal by any Loan Party or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (k) the receipt by any Loan Party or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from any Loan Party or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA or in endangered or critical status within the meaning of Section 432 of the Code or Section 305 or Title IV of ERISA; or (l) the imposition on any Loan Party or any ERISA Affiliate of any tax under Chapter 43 of Subtitle D of the Code, or the assessment of a civil penalty on any Loan Party or any ERISA Affiliate under Section 502(c) of ERISA.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" has the meaning assigned to such term in Section 8.1.

"Excluded Accounts" means (a) any Deposit Account that is a zero balance account, (b) any Deposit Account so long as the average daily balance in such Deposit Account, together with the average daily balance of all such other Deposit Accounts excluded pursuant to clause (b) of this definition at any time, does not exceed $20,000 individually or $200,000 in the aggregate, (c) any Deposit Account that is solely used for the holding of (i) funds used for payroll and payroll taxes and other employee benefit payments to or for the benefit of a Loan Party's employees, and (ii) taxes required to be collected, remitted or withheld (including federal and state withholding taxes (including the employer's share thereof)), (d) any Deposit Account that is used for withholding, escrow, customs, insurance, or trustor fiduciary purposes, (e) any Deposit Account used to hold cash collateral for obligations permitted under the Loan Documents, including with respect to letters of credit, and (f) the DIP Term Loan Proceeds Account.

"Excluded Assets" means (a) any United States intent-to-use trademark application prior to the filing of a "Statement of Use" or "Amendment to Allege Use" with respect thereto, (b) any right under any contract or agreement constituting a General Intangible, but only to the extent and for so long as the granting of a security interest therein or an assignment thereof would violate any applicable law (but only to the extent any such prohibition on the granting of security interests is not rendered ineffective by, or is not otherwise unenforceable under, the Uniform Commercial Code or applicable law), other than proceeds and receivables thereof, the assignment of which is expressly deemed effective under the Uniform Commercial Code or other similar applicable law notwithstanding such prohibition, (c) other than Accounts or any proceeds of the following, any contract, instrument, document, lease, license or other agreement to which a Loan Party or any of its property is subject with any Person if, to the extent and for so long as the grant of a lien thereon constitutes a breach of or a default under, or creates a right of termination in favor of any party (other than such Loan Party or any of its Affiliates) to, such contract, instrument, document, lease, license or other agreement (but only to the extent any such prohibition on the granting of liens is not rendered ineffective by, or is otherwise unenforceable under, the Uniform Commercial Code or applicable law), (d) any property which, subject to the terms of Section 7.1(a)(iii), is subject to a Lien of the type described in Section 7.2(d) pursuant to documents which prohibit such Loan Party from granting any other Liens in such property, (e) any United States intent-to-use trademark applications to the extent that, and solely during the period in which, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark applications under applicable federal law, provided that upon submission and acceptance by the United States Patent and Trademark Office of an amendment to allege use pursuant to 15 U.S.C. Section 1060(a) (or any successor provision), such intent-to-use trademark application shall not be considered Excluded Assets, (f) any particular asset, if the pledge thereof or the security interest therein is prohibited by applicable law (but only so long as such prohibition remains in effect), other than to the extent such prohibition is rendered ineffective under the UCC or other applicable laws, (g) any motor vehicle or other equipment subject to a certificate of title, but only to the extent that a security interest therein cannot be perfected by the filing of a UCC financing statement, and (h) any other particular assets if and for so long as, in the reasonable judgment of the Administrative Agent and the Borrower Agent, the cost of obtaining a security interest in such assets exceeds the practical benefits to the Secured Parties afforded thereby.

"Excluded Swap Obligation" means, with respect to any Guarantor, any Swap Obligation if, and only to the extent that, all or a portion of the Guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any Guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof), including by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the Guarantee of such Guarantor or the grant of such security interest becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such Guarantee or security interest is or becomes illegal.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its funding office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loans or Commitments or (ii) such Lender changes its funding office, except in each case to the extent that,

pursuant to <u>Section 3.5</u>, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its funding office, (c) Taxes attributable to such Recipient's failure to comply with <u>Section 3.5 (g)</u> and (d) any U.S. federal withholding Taxes imposed under FATCA.

"<u>FATCA</u>" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"<u>Federal Funds Effective Rate</u>" means, for any day, a rate per annum (expressed as a decimal, rounded upwards, if necessary, to the next higher 1/100 of 1%) equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day, <u>provided</u> that (a) if the day for which such rate is to be determined is not a Business Day, the Federal Funds Effective Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, (b) if such rate is not so published for any day, the Federal Funds Effective Rate for such day shall be the average of the quotations for such day on such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it and (c) if the Federal Funds Effective Rate shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"<u>Federal Reserve Bank of New York's Website</u>" means the website of the Federal Reserve Bank of New York at http://www.newyorkfed.org, or any successor source.

"<u>Fee Letter</u>" means the Fee Letter dated as of the date hereof by and among the Borrowers and the Administrative Agent.

"<u>Final Order</u>" means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court, which order shall be reasonably satisfactory in form and substance to the Administrative Agent, and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied with no further appeal and the time for filing such appeal has passed (unless Administrative Agent waives such requirement), together with all extensions, modifications, and amendments thereto, in form and substance satisfactory to the Administrative Agent, which, among other matters but not by way of limitation, authorizes the Loan Parties to obtain credit, incur (or guaranty) Indebtedness, and grant Liens under this Agreement and the other Loan Documents, as the case may be, and provides for the super-priority status of the Administrative Agent's and the Lenders' claims.

"<u>Financial Officer</u>" means, with respect to any Person, the chief financial officer, principal accounting officer, treasurer or comptroller of such Person (or such other financial officer as is acceptable to the Administrative Agent).

"<u>Fiscal Year</u>" means the 12 fiscal month period of Holdings ending on December 31 of each calendar year.

"<u>Flood Laws</u>" means, collectively, (i) the National Flood Insurance Reform Act of 1994 (which comprehensively revised the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act

of 1973) as now or hereafter in effect or any successor statute thereto, (ii) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto and (iii) the Biggert-Waters Flood Insurance Reform Act of 2012 as now or hereafter in effect or any successor statute thereto.

"Foreign Lender" means (a) if any Borrower is a U.S. Person, a Lender that is not a U.S. Person, and (b) if any Borrower is not a U.S. Person, a Lender that is resident or organized under the laws of a jurisdiction other than that in which such Borrower is resident for tax purposes.

"Foreign Plan" means any employee pension benefit plan or arrangement (a) maintained, or contributed to by any Loan Party or Subsidiary that is not subject to the laws of the United States, or (b) mandated by a government other than the United States for employees of any Loan Party or Subsidiary.

"Fund" means any Person (other than a natural Person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit in the ordinary course of its activities.

"GAAP" means generally accepted accounting principles in effect from time to time in the United States.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any department, commission, board, bureau, agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra national bodies such as the European Union or the European Central Bank) and any group or body charged with setting financial accounting or regulatory capital rules or standards (including the Financial Accounting Standards Board, the Bank for International Settlements or the Basel Committee on Banking Supervision or any successor or similar authority to any of the foregoing).

"Guaranteed Obligations" has the meaning given such term in Article 11.

"Guarantees" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation, provided that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business. The term "Guaranteed" has a meaning analogous thereto. The amount of any Guarantee at any time shall be deemed to be an amount equal to the lesser at such time of (i) the stated or determinable amount of the primary obligation in respect of which such Guarantee is made (or, if not stated or determinable, the maximum reasonably anticipated amount of the obligations in respect of which such Guarantee is made) and (ii) the maximum amount for which the guarantor may be liable pursuant to the terms of the instrument embodying such Guarantee.

"Guarantors" means Holdings, each of the Persons listed on the signature pages hereto as a "Guarantor", and each other Person who executes or becomes a party to this Agreement as a guarantor

pursuant to <u>Article 11</u> or otherwise executes and delivers a guaranty agreement acceptable to the Administrative Agent guaranteeing any of the Obligations.

"<u>Hazardous Materials</u>" means all substances, wastes, chemicals, pollutants, or other contaminants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, mold, infectious, pharmaceutical or medical wastes and all other substances of any nature that are now or hereafter regulated under any Environmental Law or are now or hereafter defined, listed, classified, considered or described as hazardous, dangerous or toxic by any Governmental Authority or under any Environmental Law.

"<u>Holdings</u>" has the meaning assigned to such term in the preamble to this Agreement.

"<u>Indebtedness</u>" of any Person means, without duplication:

    (a)    all obligations of such Person for borrowed money;

    (b)    all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments, including seller paper;

    (c)    the maximum amount (after giving effect to any prior drawings or reductions which have been reimbursed) of all letters of credit (including standby and commercial), banker's acceptances, bank guaranties, surety bonds, and similar instruments issued or created by or for the account of such Person;

    (d)    the Swap Termination Value of each Swap Agreement (to the extent reflecting an amount owed by such Person or an amount that would be owing were such Swap Agreement terminated);

    (e)    the Attributable Indebtedness of such Person in respect of Capitalized Lease Obligations, Synthetic Debt and Synthetic Lease Obligations of such Person (regardless of whether accounted for as indebtedness under GAAP);

    (f)    all obligations of such Person to pay the deferred purchase price of property or services (other than (i) trade accounts payable in the ordinary course of business which are paid within 90 days of their respective due dates and (ii) any purchase price adjustments, earn-out or similar obligations until such obligation has become due and payable);

    (g)    indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements and mortgage, industrial revenue bond, industrial development bond and similar financings), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

    (h)    all obligations of such Person in respect of Disqualified Equity Interests;

    (i)    all obligations of such Person to pay a specified purchase price for goods or services whether or not delivered or accepted (<u>e.g.</u>, take or pay obligations) or similar obligations and, without duplication, all obligations of such Person under conditional sale or other title retention agreements relating to property or assets purchased by such Person; and

    (j)    all Guarantees by such Person of any of the foregoing.

The Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation, company, or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person. The amount of Indebtedness of any Person for purposes of clause (g) shall be deemed to be equal to the greater of (i) the aggregate unpaid amount of such Indebtedness and (ii) the fair market value of the property encumbered thereby as determined by such Person in good faith.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"Indemnitee" has the meaning assigned to such term in Section 10.3(b).

"Information" has the meaning assigned to such term in Section 10.14(b).

"Intellectual Property" means, collectively, with respect to an Loan Party, all of such Loan Party's rights, priorities and privileges relating to all intellectual and similar property of every kind and nature, whether arising under United States, multinational or foreign laws or otherwise, now existing or hereafter adopted or acquired, including, without limitation inventions, designs, Patents, Copyrights, Trademarks, Licenses, domain names, Trade Secrets, confidential or proprietary technical and business information, know how, show how or other data or information, software and databases and all embodiments or fixations thereof and related documentation, registrations and franchises, and all additions, improvements and accessions to, and books and records describing or used in connection with, any of the foregoing, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"Interest Payment Date" means (a) the last day of each month and (b) the Maturity Date.

"Interim Order" means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing (assuming satisfaction of the standard prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), together with all extensions, modifications, and amendments thereto, in form and substance reasonably satisfactory to the Administrative Agent, which, among other matters but not by way of limitation, authorizes, on an interim basis, the Loan Parties to execute and perform under the terms of this Agreement and the other Loan Documents.

"Investment" means, as to any Person, (a) any Acquisition by such Person, (b) any direct or indirect acquisition or investment by such Person in another Person, whether by means of the purchase or other acquisition of Equity Interests or debt or other securities of another Person (including any partnership or joint venture interest), or (c) any direct or indirect loan, advance or capital contribution to, Guarantee with respect to any Indebtedness or other obligation of, such other Person. For purposes of covenant compliance, the amount of any Investment on any date of determination shall be, in the case of any Investment in the form of (i) a loan or an advance, the principal amount thereof outstanding on such date, (ii) a Guarantee, the amount of such Guarantee as determined in accordance with the last sentence of the definition of such term, (iii) a transfer of Equity Interests or other property by the investor to the investee, including any such transfer in the form of a capital contribution, or the issuance of Equity Interests to such investor, the fair market value (as determined reasonably and in good faith by the chief financial officer of the Company) of such Equity Interests or other property as of the time of the transfer or issuance, without any adjustment for increases or decreases in value of, or write-ups, write-downs or write-offs with respect to, such Investment, and (iv) any Investment (other than any Investment referred to in clauses (i), (ii) or (iii) above) in the form of an Acquisition or a purchase or other acquisition for value of any evidences of Indebtedness or other securities of any other Person, the original cost of such Investment (including any Indebtedness assumed in

connection therewith), plus the cost of all additions, as of such date, thereto, and minus the amount, as of such date, of any portion of such Investment repaid to the investor in cash as a repayment of principal or a return of capital, as the case may be, but without any other adjustment for increases or decreases in value of, or write-ups, write-downs or write-offs with respect to, such Investment.

"Investors" means Corsicana Investors, LLC, a Delaware limited liability company.

"IRS" means the United States Internal Revenue Service.

"Lenders" has the meaning assigned to such term in the preamble of this Agreement.

"License" means any written agreement, now or hereafter in effect, granting to any third party any right to use any Copyright, Patent, Trademark or Trade Secret now or hereafter owned or held by or on behalf of any Loan Party or which such Loan Party otherwise has the right to license, or granting to any Loan Party any right to use any Copyright, Patent, Trademark or Trade Secret now or hereafter owned by any third party,

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, Capitalized Lease or title retention agreement relating to such asset, and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Line Cap" means, at any time, the lesser of (a) the Revolving Credit Maximum Amount and (b) the Borrowing Base.

"Loan" means an extension of credit by a Lender to the Borrowers under Article 2 in the form of a Revolving Loan.

"Loan Documents" means, collectively, this Agreement (including the Loan Guaranty), the Notes, the Fee Letter, the Collateral Documents, and each other document entered into in connection herewith.

"Loan Guarantor" means each Loan Party.

"Loan Guaranty" means Article 11 of this Agreement.

"Loan Parties" means, collectively, (a) each Borrower and (b) each Guarantor.

"Margin Stock" has the meaning assigned to such term in Regulation U.

"Master Agreement" has the meaning assigned to such term in the definition of "Swap Agreement."

"Material Adverse Effect" means a material adverse effect on (a) the business, assets, operations, liabilities, prospects or condition, financial or otherwise, of the Loan Parties and their respective Subsidiaries (in each case, excluding the effect of filing, commencement, announcement, prosecution and continuation of the Chapter 11 Cases, the events and conditions related and/or leading up thereto and the effects thereof and any action required to be taken under the Loan Documents or under the Orders), (b) the legality, validity or enforceability of any Loan Document, (c) the ability of any Loan Party to perform any of its obligations under any Loan Document, (d) the rights of or remedies available to the Credit Parties under any Loan Document or (e) a material impairment of the enforceability or priority of the Administrative Agent's Liens with respect to all or a material portion of the Collateral.

"<u>Material Indebtedness</u>" means, as of any date, Indebtedness consisting of the Prepetition Term Loan Obligations, Indebtedness arising under the DIP Term Loan Documents, and any other Indebtedness (other than Indebtedness under the Loan Documents) in an aggregate principal amount exceeding $50,000.

"<u>Material Real Property</u>" means, unless otherwise agreed to be excluded as a Material Real Property in writing by the Administrative Agent at its sole option, any Real Property owned by any Loan Party with a fair market value in excess of $500,000.

"<u>Maturity Date</u>" means the earliest of (a) October 23, 2022, or if such date is not a Business Day the immediately following Business Day, (b) July 30, 2022, if the Final Order has not been entered by the Bankruptcy Court on or prior to such date, or if such date is not a Business Day the immediately following Business Day, (c) the maturity date of the DIP Term Loan Facility, (d) the date of the substantial consummation (as defined in section 1101(2) of the Bankruptcy Code) of a plan of reorganization that has been confirmed by an order of the Bankruptcy Court, (e) the date of termination of all of the Revolving Commitments pursuant to <u>Section 2.3</u>, (f) the date on which the Obligations become due and payable pursuant to this Agreement, whether by acceleration or otherwise, (g) the date of consummation of a sale of all or substantially all of the Debtors' assets under section 363 of the Bankruptcy Code, (h) the date of consummation of a sale of all or substantially all of the Collateral under section 363 of the Bankruptcy Code, (i) the date the Loan Parties' file a motion seeking to convert any or all of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (j) (i) the date of conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or (ii) the appointment or election of a trustee under Chapter 11 of the Bankruptcy Code or a responsible officer or examiner with enlarged powers relating to the operation of the Loan Parties' business (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106 of the Bankruptcy Code, (k) the date the Loan Parties' file a motion seeking a dismissal of any or all of the Chapter 11 Cases, or (l) the date of dismissal of any of the Chapter 11 Cases.

"<u>Moody's</u>" means Moody's Investors Service, Inc. and any successor to its rating agency business.

"<u>Mortgage</u>" means each mortgage, deed of trust, deed to secure debt, assignment of leases and rents, modification and other collateral documents delivered pursuant to <u>Section 6.12</u>, each in form and substance reasonably satisfactory to the Administrative Agent.

"<u>Mortgage Requirement</u>" means, with respect to any Real Property for which the Administrative Agent is granted a Lien in accordance with <u>Section 6.12</u>, the requirement that the Administrative Agent shall have received the following, each in form and substance satisfactory to the Administrative Agent: (a) a Mortgage with respect to such Real Property duly executed and delivered by the record owner of such Real Property; (b) an appraisal with respect to such Real Property; (c) a survey with respect to such Real Property; (d) a title insurance policy (including any endorsements thereto) and appropriate lien searches with respect to such Real Property; (e) with respect to such Real Property: environmental reports, audits and analyses (whether produced by any Loan Party or its Subsidiaries or any third party or Governmental Authority) and Phase I or Phase II reports; (f) if any such parcel of Real Property is determined by the Administrative Agent to be in a "Special Flood Hazard Area" as designated on maps prepared by the Federal Emergency Management Agency, a flood notification form signed by the Borrower Agent and evidence that the Borrowers have complied with the insurance requirements set forth in <u>Section 6.10</u>; (g) evidence of earthquake insurance with respect to such Real Property; (h) legal opinions with respect to such Mortgage and related matters, and (i) such other information, documentation, and certifications as may be reasonably required by the Administrative Agent.

"<u>Multiemployer Plan</u>" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"<u>NOLV</u>" means, with respect to Inventory of any Person, the orderly liquidation value thereof identified in the most recent Inventory appraisal ordered by the Administrative Agent and as determined in a manner acceptable to the Administrative Agent by an appraiser acceptable to the Administrative Agent, net of all costs of liquidation thereof.

"<u>Non-Consenting Lender</u>" means any Lender that does not approve any consent, waiver or amendment that (a) requires the approval of all or all affected Lenders in accordance with the terms of <u>Section 10.2</u> and (b) has been approved by the Required Lenders.

"<u>Non-Defaulting Lender</u>" means, at any time, each Lender that is not a Defaulting Lender at such time.

"<u>Non-Loan Party Subsidiary</u>" means any Subsidiary of Holdings that is not a Loan Party.

"<u>Notes</u>" means, collectively, the Revolving Loan Notes.

"<u>Obligations</u>" means the due and punctual payment and performance of all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party under or pursuant to each of the Loan Documents or otherwise with respect to any Loan, including, without limitation all principal, interest, fees and other amounts payable under the Loan Documents, and all costs and expenses incurred in connection with enforcement and collection of the foregoing, including the fees, charges and disbursements of counsel, in each case whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising, and including interest, expenses and fees that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest, expenses and fees are allowed claims in such proceeding.

"<u>OFAC</u>" means the U.S. Department of the Treasury's Office of Foreign Assets Control, and any successor thereto.

"<u>Order</u>" means (i) until entry of the Final Order, the Interim Order and (ii) after the entry of the Final Order, the Final Order, or the Interim Order and the Final Order as the "<u>Orders</u>".

"<u>Organizational Documents</u>" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-United States jurisdiction), (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating or limited liability company agreement and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"<u>Other Connection Taxes</u>" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"<u>Other Taxes</u>" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to <u>Section 3.6(b)</u>).

"<u>Overadvance</u>" has the meaning assigned to such term <u>Section 2.2(e)</u>.

"<u>Participant</u>" has the meaning assigned to such term in <u>Section 10.4(d)</u>.

"<u>Participant Register</u>" has the meaning assigned to such term in <u>Section 10.4(d)</u>.

"<u>Patents</u>" means all of the following: (a) all letters patent of the United States of America or any other country, all registrations and recordings thereof and all applications for letters patent of the United States of America or any other country, including registrations, recordings and pending applications in the United States Patent and Trademark Office or any similar offices in the United States of America or any other country, (b) all inventions and improvements described and claimed therein, including the right to make, use and/or sell the inventions disclosed or claimed therein, (c) all reissues, continuations, divisions, continuations in part, renewals or extensions thereof and amendments thereto, and the inventions disclosed or claimed therein, and (d) all income, fees, royalties, damages, claims and payments now or hereafter due and/or payable thereunder and with respect thereto.

"<u>PBGC</u>" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA.

"<u>Pension Plan</u>" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 or Section 430 of the Code or Section 302 or Section 303 of ERISA, and in respect of which any Loan Party or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"<u>Permitted Discretion</u>" means a determination made by the Administrative Agent in its commercially reasonable credit or business judgment (from the perspective of a secured asset-based lender) exercised in good faith.

"<u>Permitted Encumbrances</u>" means:

       (a)     Liens imposed by law for taxes, assessments or other governmental charges that are not yet due or are being Contested in Good Faith, <u>provided</u> that enforcement of such Liens is stayed pending such contest;

       (b)     landlords', vendors', carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than 30 days or are being Contested in Good Faith, <u>provided</u> that enforcement of such Liens is stayed pending such contest;

       (c)     pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations;

       (d)     deposits to secure the performance of bids, trade contracts (other than contracts for the payment of money), leases (other than Capitalized Lease Obligations), statutory obligations, surety and

appeal bonds, performance bonds and other obligations of a like nature, in each case incurred in the ordinary course of business;

(e)     judgment liens in respect of judgments that do not constitute an Event of Default under Section 8.1(h);

(f)     easements, zoning restrictions, rights of way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligation and do not materially detract from the value of the affected property or interfere with the ordinary conduct of business of the Loan Parties and their respective Subsidiaries;

(g)     any interest or title of a licensor, sublicensor, lessor or sublessor with respect to any assets under any license or lease agreement entered into in the ordinary course of business, provided that the same do not in any material respect interfere with the business of the Loan Parties or their Subsidiaries or materially detract from the value of the relevant assets of the Loan Parties or its Subsidiaries;

(h)     licenses, sublicenses, leases or subleases with respect to any assets granted to third Persons in the ordinary course of business, provided that the same do not in any material respect interfere with the business of the Loan Parties or their Subsidiaries or materially detract from the value of the relevant assets of the Loan Parties or their Subsidiaries;

(i)     customary rights of set off, bankers' liens, refunds or charge backs, under deposit agreements, the Uniform Commercial Code or common law, of banks or other financial institutions where any Loan Party or any of such Loan Party's Subsidiaries maintains deposits (other than deposits intended as cash collateral) in the ordinary course of business;

(j)     Liens (i) on earnest money deposits made in cash by a Borrowers or any of its Subsidiaries in connection with any letter of intent or purchase agreement in connection with an Acquisition or other Investment permitted under this Agreement or (ii) on amounts deposited as "security deposits" (or their equivalent) in the ordinary course of business in connection with actions or transactions not prohibited by this Agreement;

(k)     Liens in favor of customs and revenue authorities arising in the ordinary course of business as a matter of law to secure payment of customs duties in connection with the importation of goods;

(l)     Liens resulting from the filing of precautionary UCC-1 financing statements (or equivalent) with respect to operating leases;

(m)     Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into by any Loan Party or any of its Subsidiaries in the ordinary course of business; and

(n)     Liens incurred in the ordinary course of business imposed by law in connection with the purchase or shipping of goods or assets (or the related assets and proceeds thereof), which Liens are in favor of the seller or shipper of such goods or assets and only attach to such goods or assets;

(o)     any interest of title of a lessor under, and Liens arising from precautionary UCC financing statements (or equivalent filings, registrations or agreements in foreign jurisdictions) solely evidencing such lessor's interest under, leases permitted by this Agreement;

(p)      Liens of a collection bank arising under Section 4-210 of the UCC on items in the course of collection;

(q)      deposits made in the ordinary course of business to secure liability for insurance premiums to insurance carriers;

(r)      bankers' Liens, rights of setoff and other similar Liens existing solely with respect to cash, Cash Equivalents, securities, commodities and other funds on deposit in one or more accounts maintained by a Loan Party, in each case arising in the ordinary course of business in favor of banks, other depositary institutions, securities or commodities intermediaries or brokerages with which such accounts are maintained securing amounts owing to such banks or financial institutions with respect solely to cash-management and operating account management or arising under Section 4-208 or 4-210 of the UCC on items in the course of collection (and not with respect to any Indebtedness for borrowed money); and

(s)      Liens consisting of judgment, appeal bonds, judicial attachment liens or other similar Liens arising in connection with court proceedings, provided that the enforcement of such Liens is effectively stayed and all such Liens secure judgments the existence of which do not constitute an Event of Default under Section 8.1(h);

"Permitted Holders" means, collectively, Blue Torch Finance, LLC, Blue Torch Credit Opportunities KRS Fund LP, Blue Torch Credit Opportunities Fund II LP, Blue Torch Credit Opportunities SBAF Fund LP, and Swiss Capital BTC OL Private Debt Fund L.P., or any Affiliate of any of the foregoing.

"Permitted Variances" shall mean, with respect to any Variance Testing Period, (a) in respect of the aggregate amount of Actual Operating Disbursement Amounts, (x) 20% for the Initial Two Week Disbursements Period, (y) 20% for the Initial Three Week Disbursements Period, and (z) 15% for the Initial Four Week Disbursements Period and each Four Week Disbursements Period and (b) in respect of Actual Cash Receipts, (x) 20% for the Initial Two Week Receipts Period, (y) 15% for the Initial Three Week Receipts Period, and (z) 15% for the Initial Four Week Receipts Period and each Four Week Receipts Period thereafter.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Petition Date" has the meaning assigned to such term in the Recitals.

"Postpetition" means the time period commencing immediately upon the filing of the applicable Chapter 11 Case.

"Prepayment Event" means:

(a)      any Disposition (including pursuant to a sale and leaseback transaction) of any assets of any Loan Party or any Subsidiary (other than Dispositions of DIP Term Priority Collateral or Dispositions described in Section 7.5(a), (b), (c), (d), (e), (f), (h), (j), (k), (l), (m), and (n), and other than, for the avoidance of doubt, the transfer of any Collateral among Loan Parties);

(b)      any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any assets (other than DIP Term Priority Collateral) of any Loan Party or any Subsidiary; or

(c)      the incurrence by a Loan Party of any Indebtedness (other than Indebtedness permitted under Section 7.1 of this Agreement) for borrowed money.

"Prepetition" means the time period ending immediately prior to the filing of the applicable Chapter 11 Case.

"Prepetition ABL Agent" has the meaning assigned to such term in the Recitals.

"Prepetition ABL Credit Agreement" has the meaning assigned to such term in the Recitals.

"Prepetition ABL Lenders" has the meaning assigned to such term in the Recitals.

"Prepetition ABL Loan Documents" means the "Loan Documents" as defined in the Prepetition ABL Credit Agreement.

"Prepetition ABL Obligations" means "Obligations" as defined in the Prepetition ABL Credit Agreement.

"Prepetition ABL Priority Collateral" means the "ABL Priority Collateral" as such term is defined in the Prepetition Intercreditor Agreement.

"Prepetition Intercreditor Agreement" means that certain Intercreditor Agreement among the Prepetition ABL Agent and the Prepetition Term Loan Agent, and acknowledged by the Loan Parties, dated as of April 28, 2021.

"Prepetition Term Loan Agent" means Blue Torch Finance, LLC, a Delaware limited liability company in its capacity as administrative agent and collateral agent under any of the Prepetition Term Loan Documents.

"Prepetition Term Loan Agreement" means that certain Financing Agreement dated as April 28, 2021, among the Prepetition Term Loan Agent, certain financial institutions party thereto as lenders, and the Loan Parties, as amended, restated, supplemented or otherwise modified through the date hereof.

"Prepetition Term Loan Documents" means the "Loan Documents" as defined in the Prepetition Term Loan Agreement.

"Prepetition Term Loan Lenders" means the "Term Loan Lenders" as defined in the Prepetition Term Loan Agreement.

"Prepetition Term Loan Obligations" means "Obligations" as defined in the Prepetition Term Loan Agreement.

"Prime Rate" means the U.S. prime rate as shown in the Eastern Edition of The Wall Street Journal on such day, or, if such day is not a Business Day, on the immediately preceding Business Day (and, if the Eastern Edition of The Wall Street Journal for any reason ceases to publish a U.S. prime rate, then the Prime Rate shall be such prime rate as published from time to time in any other publication or reference source designated by the Administrative Agent in its discretion); provided, that the prime rate is a reference rate and does not necessarily represent the best or lowest rate charged by any Lender.

"Protective Advance" means an advance of the type described in clauses (ii)(A), (B) or (C) of Section 2.2(e), whether or not constituting an Overadvance at the time made.

"PTE" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. § 5390(c)(8)(D).

"QFC Credit Support" has the meaning assigned to it in Section 10.20.

"Qualified ECP Guarantor" means, in respect of any Swap Obligation, each Loan Party that has total assets exceeding $10,000,000 at the time the relevant Loan Guaranty or grant of the relevant security interest becomes or would become effective with respect to such Swap Obligation or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"Real Property" means, collectively, all right, title and interest in and to any and all parcels of or interests in real property owned or leased by any Person, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures and equipment, all general intangibles and contract rights and other property and rights incidental to the ownership thereof.

"Recipient" means the Administrative Agent or any Lender, as applicable.

"Refinancing Indebtedness" means Indebtedness of any Loan Party or its Subsidiaries arising after the Effective Date issued in exchange for, or the proceeds of which are used to extend, refinance, refund, replace, renew, continue or substitute for other Indebtedness (such extended, refinanced, refunded, replaced, renewed, continued or substituted Indebtedness, the "Refinanced Obligations"); provided that (a) the principal amount of such Refinancing Indebtedness shall not exceed the principal amount of the Refinanced Obligations (plus any interest capitalized in connection with such Refinanced Obligations, the amount of prepayment premium, if any, original issue discount, if any, and reasonable fees, costs, and expenses incurred in connection therewith), (b) such Refinancing Indebtedness shall have a final maturity that is no earlier than the final maturity date of such Refinanced Obligations, (c) such Refinancing Indebtedness shall have a Weighted Average Life to Maturity not less than the weighted average life to maturity of the Refinanced Obligations, (d) such Refinancing Indebtedness shall rank in right of payment no more senior than, and be subordinated (if subordinated) to the Obligations on terms not materially less favorable to the Secured Parties than the Refinanced Obligations, (e) as of the date of incurring such Refinancing Indebtedness and after giving effect thereto, no Default or Event of Default shall exist or have occurred and be continuing, (f) if the Refinanced Obligations or any Guarantees thereof are unsecured, such Refinancing Indebtedness and any Guarantees thereof shall be unsecured, (g) if the Refinanced Obligations or any Guarantees thereof are secured, (i) such Refinancing Indebtedness and any Guarantees thereof shall be secured by substantially the same or less collateral as secured such Refinanced Obligations or any Guarantees thereof, on terms not materially less favorable to the Secured Parties and (ii) the Liens to secure such Refinancing Indebtedness shall not have a priority more senior than the Liens securing the Refinanced Obligations and if subordinated to any other Liens on such property, shall be subordinated to the Administrative Agent's Liens on terms and conditions not materially less favorable to the Secured Parties, (h) the obligors in respect of the Refinanced Obligations immediately prior to such refinancing, refunding, extending, renewing, continuing, substituting or replacing thereof shall be the only obligors on such Refinancing Indebtedness, and (i) the terms and conditions (excluding as to pricing, premiums and optional prepayment or redemption provisions) of any such Refinancing Indebtedness are not materially less favorable to the Loan Parties than the terms and conditions of the Refinanced Obligations.

"Register" has the meaning assigned to such term in Section 10.4(c).

"Regulation D" means Regulation D of the Board.

"Regulation T, U or X" means Regulation T, U or X, respectively, of the Board.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, members, directors, officers, employees, agents, trustees, administrators, managers, advisors, attorneys-in-fact and representatives of such Person and of such Person's Affiliates.

"Release" means any actual or threatened releasing, spilling, leaking, pumping, pouring, leaching, seeping, emitting, migration, emptying, discharging, injecting, escaping, depositing, disposing, or dumping of Hazardous Materials into the indoor or outdoor environment, including the movement of any Hazardous Material through the air, soil, surface water, groundwater or property and any other conditions resulting in potential or actual human exposure to Hazardous Materials within a structure.

"Remedies Notice Period" has the meaning assigned to such term in the Interim Order (or Final Order, when applicable).

"Removal Effective Date" has the meaning assigned to such term in Section 9.6(b).

"Required Lenders" means, at any time, Lenders having Total Credit Exposures representing more than 50% of the Total Credit Exposures of all Lenders; provided that if there are two or more Lenders (other than Defaulting Lenders) that are not Affiliates, then at least two Lenders (other than Defaulting Lenders) that are not Affiliates shall be required to constitute Required Lenders. The Total Credit Exposure of any Defaulting Lender shall be disregarded in determining Required Lenders at any time.

"Required Milestones" means the covenants set forth on Schedule 6.18.

"Reserves" means reserves in such amounts, and with respect to such matters, as the Administrative Agent shall deem necessary or appropriate in its Permitted Discretion, to establish and maintain against the Borrowing Base or the Revolving Credit Maximum Amount, including without limitation with respect to (i) price adjustments, damages, unearned discounts, returned products or other matters for which credit memoranda are issued in the ordinary course of any Loan Party's business; (ii) potential dilution related to Accounts (equal to 1.0% for each percentage (or portion thereof) that dilution exceeds 5.0%); (iii) shrinkage, spoilage and obsolescence of any Loan Party's Inventory; (iv) slow moving Inventory; (v) other sums chargeable against the Loan Parties under any provision of this Agreement; (vi) amounts owing by any Loan Party to any Person to the extent secured by a Lien on, or trust over, any property of any Loan Party; (vii) rent for locations at which Inventory is stored and as to which the Administrative Agent has not received a satisfactory Collateral Access Agreement; (viii) [reserved]; and (ix) such other specific events, conditions or contingencies as to which the Administrative Agent, in its Permitted Discretion, determines reserves should be established from time to time hereunder.

"Resignation Effective Date" has the meaning assigned to such term in Section 9.6(a).

"Resolution Authority" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"Responsible Officer" means the chief executive officer, president, vice president, chief financial officer, treasurer, assistant treasurer, or other similar officer of a Loan Party. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, limited liability company, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Payment" means, as to any Person, (a) any dividend or other distribution by such Person (whether in cash, securities or other property) with respect to any Equity Interests of such Person, (b) any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such Equity Interest, or on account of any return of capital to the holders of Equity Interests of such Person, (c) the acquisition for value by such Person of any Equity Interests issued by such Person or any other Person that Controls such Person, (d) the payment of management fees or similar fees and expenses to any other Person, including to any holders of Equity Interests in such Person, or any Affiliate thereof (other than payment of compensation in the ordinary course of business to such other Person that is an employee of such Person), and (e) with respect to clauses (a) through (d), any transaction that has a substantially similar effect.

"Revolving Borrowing" means a Borrowing consisting of Revolving Loans.

"Revolving Commitment" means, with respect to each Revolving Lender, the commitment hereunder of such Revolving Lender to make Revolving Loans in an aggregate outstanding amount not exceeding the amount of such Revolving Lender's Revolving Commitment as set forth on Schedule 2.1 or in the Assignment and Assumption pursuant to which such Revolving Lender shall have assumed its Revolving Commitment in accordance with Section 10.4(b), as applicable, as such Revolving Commitment may be adjusted from time to time pursuant to Section 2.3 or Section 2.8 or pursuant to assignments by or to such Revolving Lender pursuant to Section 10.4.

"Revolving Credit Maximum Amount" means the aggregate amount of the Revolving Commitments at any time, as such amount may be increased or reduced from time to time pursuant to the terms hereof. The initial Revolving Credit Maximum Amount on the Effective Date is $40,000,000.

"Revolving Exposure" means, as to any Lender at any time, the sum of the outstanding principal amount of its Revolving Loans.

"Revolving Lender" means a Lender having a Revolving Commitment or, if the Revolving Commitments have expired or terminated, having Revolving Exposure.

"Revolving Loan" means a loan referred to in Section 2.1(a) and made pursuant to Section 2.2.

"Revolving Loan Note" means with respect to a Revolving Lender, a promissory note evidencing the Revolving Loans of such Lender payable to the order of such Lender in a form approved by the Administrative Agent.

"S&P" means Standard & Poor's Financial Services LLC, a subsidiary of S&P Global Inc.

"Sale Leaseback" means any transaction or series of related transactions pursuant to which any Loan Party or any of its Subsidiaries (a) sells, transfers or otherwise Disposes of any property, real or personal, whether now owned or hereafter acquired, and (b) as part of such transaction, thereafter rents or leases such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold, transferred or otherwise Disposed.

"Sanctioned Country" means any country, territory or region which is itself the subject or target of any comprehensive Sanctions (which may include the Crimean region of Ukraine, Cuba, Iran, North Korea, Darfur, Russia, South Sudan and Syria).

"Sanctioned Person" means (a) any Person or group listed in any Sanctions related list of designated Persons maintained by OFAC, including the List of Specially Designated Nationals and Blocked Persons, or the U.S. Department of State, the United Nations Security Council, the European Union or any EU member state, (b) any Person subject to any law that would prohibit all or substantially all financial or other transactions with that Person or would require that assets of that Person that come into the possession of a third-party be blocked (c) any legal entity organized or domiciled in a Sanctioned Country, (d) any agency, political subdivision or instrumentality of the government of a Sanctioned Country, (e) any natural person ordinarily resident in a Sanctioned Country, or (f) any Person 50% or more owned, directly or indirectly, individually or in the aggregate by any of the above.

"Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by OFAC or the U.S. Department of State or (b) the United Nations Security Council, the European Union or any European Union member state, Her Majesty's Treasury of the United Kingdom or other relevant sanctions authority.

"Secured Parties" means, collectively, (a) the Administrative Agent, (b) each Lender, (c) the beneficiaries of each indemnification obligation undertaken by any Loan Party under any Loan Document and (d) the permitted successors and assigns of each of the foregoing.

"Second Amendment Date" means December 30, 2021.

"Solvent" and "Solvency" mean, with respect to any Person on any date of determination, that on such date (a) the fair value of the present assets of such Person and its Subsidiaries, taken as a whole, is not less than the sum of the debt (including contingent liabilities) of such Person and its Subsidiaries, taken as a whole, (b) the present fair salable value of the assets of such Person and its Subsidiaries, taken as a whole, is not less than the amount that will be required to pay the probable liabilities (including contingent liabilities) of such Person and its Subsidiaries, taken as a whole, on their debts as they become absolute and matured, (c) the capital of such Person and its Subsidiaries, taken as a whole, is not unreasonably small in relation to the business of such Person or its Subsidiaries, taken as a whole, contemplated as of such date and (d) such Person and its Subsidiaries, taken as a whole, do not intend to incur, or believe that they will incur, debts (including current obligations and contingent liabilities) beyond their ability to pay such debts as they mature in the ordinary course of business.

"Sponsor" means Long Point Capital Fund III, L.P., a Delaware limited partnership.

"Subordinated Indebtedness" means Indebtedness incurred by a Loan Party that is subordinated in right of payment to the prior payment of the Obligations of such Loan Party and contains subordination and other terms acceptable to the Administrative Agent.

"Subsidiary" means, with respect to any Person, as of any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of such Person in such Person's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power is or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held by such Person or one or more subsidiaries of such Person.

"Subsidiary Joinder Agreement" means a Subsidiary Joinder Agreement, in a form approved by the Administrative Agent, pursuant to which a Subsidiary becomes a party to this Agreement and each other applicable Loan Document.

"Successor Cases" means, with respect to the Chapter 11 Cases, any subsequent proceedings under chapter 7 of the Bankruptcy Code.

"Swap Agreement" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Swap Obligation" means, with respect to any Loan Party, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"Swap Termination Value" means, in respect of any one or more Swap Agreements, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Agreements, (a) for any date on or after the date such Swap Agreements have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Agreements, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Agreements (which may include a Lender or any Affiliate of a Lender).

"Synthetic Debt" means, with respect to any Person as of any date of determination thereof, all obligations of such Person in respect of transactions entered into by such Person that are intended to function primarily as a borrowing of funds (including any minority interest transactions that function primarily as a borrowing but are not otherwise included in the definition of "Indebtedness" or as a liability on the consolidated balance sheet of such Person and its Subsidiaries in accordance with GAAP).

"Synthetic Lease Obligation" means the monetary obligation of a Person at any time of determination under (a) a so called synthetic, off balance sheet or tax retention lease, or (b) an agreement for the use or possession of property, in each case, creating obligations that do not appear on the balance sheet of such Person but which could be characterized as the indebtedness of such Person (without regard to accounting treatment) (other than operating leases arising as a result of Sale Leaseback transactions).

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Termination Date" means the date upon which all Commitments have terminated and the Loans and all other Obligations (other than unasserted contingent indemnification and expense reimbursement obligations in each case not yet due and payable), have been paid in full in cash.

"Threshold Amount" means $1,000,000.

"Total Credit Exposure" means, as to any Lender at any time, the unused Commitments, Revolving Exposure of such Lender at such time.

"Total Revolving Outstandings" means at any time, the aggregate outstanding principal amount of all Revolving Loans at such time.

"Trade Secrets" means all trade secrets and all other confidential or proprietary information and know-how now or hereafter owned or used in, or contemplated at any time for use in, the business of any Loan Party, whether or not such Trade Secret has been reduced to a writing or other tangible form, including all documents and things embodying, incorporating or referring in any way to such Trade Secret, the right to sue for any past, present and future infringement of any Trade Secret, and all proceeds of the foregoing, including licenses, royalties, income, payments, claims, damages and proceeds of suit.

"Trademarks" means all of the following: (a) all trademarks, service marks, trade names, corporate names, company names, business names, fictitious business names, trade styles, trade dress, logos, other source or business identifiers, prints and labels on which any of the foregoing have appeared or appear, uniform resource locations (URL's), domain names, designs and general intangibles of like nature, now existing or hereafter adopted or acquired, (b) all registrations and recordings thereof and all registration and recording applications filed in connection therewith, including registrations and registration applications in the United States Patent and Trademark Office or any similar offices in the United States of America or any other country, and all common-law rights related thereto, (c) all reissues, continuations, extensions and renewals thereof and amendments thereto, (d) all goodwill associated therewith or symbolized by any of the foregoing, (e) all income, fees, royalties, damages and payments now and hereafter due and/or payable thereunder and with respect thereto and (f) all other assets, rights and interests that uniquely reflect or embody such goodwill.

"Transaction Expenses" means any fees or expenses incurred or paid by Holdings or any Subsidiary in connection with the Transactions, this Agreement and the other Loan Documents and the transactions contemplated hereby and thereby in connection therewith.

"Transactions" means (a) the execution, delivery and performance by each Loan Party of each Loan Document to which it is a party, (b) the borrowing of the Loans and the use of the proceeds thereof, (c) the execution, delivery and performance by the Loan Parties of the DIP Term Loan Documents, the borrowing under the DIP Term Loan Facility and the use of proceeds thereof, and (d) the commencement of the Chapter 11 Cases.

"UK Financial Institution" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"Uniform Commercial Code" or "UCC" means the Uniform Commercial Code as the same may from time to time be in effect in the State of New York; provided that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "Uniform Commercial Code" or "UCC" means the Uniform Commercial Code as in effect from time to time in such other

jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"United States" and "U.S." mean the United States of America.

"Unused Line Fee" has the meaning assigned to such term in Section 3.2(a).

"USA PATRIOT Act" means The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)).

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" has the meaning assigned to such term in Section 3.5 (g)(ii).

"U.S. Trustee" means the United States Trustee responsible for overseeing the administration of the Chapter 11 Cases.

"Value" means (a) for an Account, the face amount of such Account less any and all returns, rebates, discounts (which may, at Administrative Agent's option, be calculated on shortest terms), credits, allowances or excise taxes of any nature at any time issued, owing, claimed by the Account Debtor, granted, outstanding or payable in connection with such Account at such time, and (b) for Inventory, its value determined on the first-in, first-out, lower of cost or market basis in accordance with GAAP.

"Variance Testing Period" means each of (a) in respect of Actual Operating Disbursement Amounts, (w) the two week period ending on July 15, 2022 ("Initial Two Week Disbursements Period"), (x) the three week period ending on July 22, 2022 ("Initial Three Week Disbursements Period"), (y) the four week period ending on July 29, 2022 ("Initial Four Week Disbursements Period"), and (z) thereafter the rolling four week period ending on each Friday (each a, "Four Week Disbursements Period") and (b) in respect of Actual Cash Receipts, (w) the two week period ending on July 15, 2022 ("Initial Two Week Receipts Period"), (x) the three week period ending on July 22, 2022 ("Initial Three Week Receipts Period"), (y) the four week period ending on July 29, 2022 ("Initial Four Week Receipts Period"), and (z) thereafter the rolling four week period ending on each Friday (each a, "Four Week Receipts Period").

"Weighted Average Life to Maturity" means, when applied to any Indebtedness at any date, the number of years obtained by dividing: (a) the sum of the products obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (b) the then outstanding principal amount of such Indebtedness.

"Wingspire" means Wingspire Capital LLC, a Delaware limited liability company.

"Withdrawal Liability" means a liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"Withholding Agent" means any Loan Party and the Administrative Agent.

"Write-Down and Conversion Powers" means (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-

In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

Section 1.2     <u>Terms Generally</u>. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including." Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (e) any reference to any law or regulation herein shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (f) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights. Any terms used in this Agreement that are defined in the UCC shall be construed and defined as set forth in the UCC unless otherwise defined herein; <u>provided</u>, that to the extent that the UCC is used to define any term herein and such term is defined differently in different Articles of the UCC, the definition of such term contained in Article 9 of the UCC shall govern.

Section 1.3     <u>Accounting Terms; GAAP; Financial Covenants</u>.

(a)     All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, applied in a manner consistent with that used in preparing the financial statements under the Prepetition ABL Credit Agreement, except as otherwise specifically prescribed herein.

(b)     [Reserved].

(c)     If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Borrower Agent or the Required Lenders shall so request, the Administrative Agent, the Lenders and the Borrower Agent shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); <u>provided</u> that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Borrower Agent shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a

reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP. Without limiting the foregoing, leases shall continue to be classified and accounted for on a basis consistent with that reflected in the audited financial statements specified in Section 4.1(k) for all purposes of this Agreement (including the definition of Capitalized Leases and Capitalized Lease Obligations), notwithstanding any change in GAAP relating thereto, unless the parties hereto shall enter into a mutually acceptable amendment addressing such change as provided for above.

(d)    Notwithstanding anything to the contrary herein, a breach of a financial covenant shall be deemed to have occurred as of the last day of any specified measurement period regardless of when the financial statements or the related compliance certificate or Approved Budget Variance Report reflecting such breach are delivered to the Administrative Agent

Section 1.4    Rounding.  Any financial ratios required to be maintained by the Loan Parties pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

Section 1.5    References to Time.  Unless the context otherwise requires, references to a time shall refer to Eastern Standard Time or Eastern Daylight Savings Time, as applicable.

Section 1.6    Resolution of Drafting Ambiguities.  Each Loan Party acknowledges and agrees that it was represented by counsel in connection with the execution and delivery of the Loan Documents to which it is a party, that it and its counsel reviewed and participated in the preparation and negotiation hereof and thereof and that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation hereof or thereof.

Section 1.7    Reserved.

Section 1.8    Divisions.  For all purposes under the Loan Documents, in connection with Division: (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

Section 1.9    Status of Obligations.  In the event that any Loan Party shall at any time issue or have outstanding any Subordinated Indebtedness, the Borrowers shall take or cause each other Loan Party to take all such actions as shall be necessary to cause the Obligations to constitute senior indebtedness (however denominated) in respect of such Subordinated Indebtedness and to enable the Administrative Agent and the Lenders to have and exercise any payment blockage or other remedies available or potentially available to holders of senior indebtedness under the terms of such Subordinated Indebtedness. Without limiting the foregoing, the Obligations are hereby designated as "senior indebtedness" and as "designated senior indebtedness" and words of similar import under and in respect of the agreements or instruments under which such Subordinated Indebtedness is issued and are further given all such other designations as shall be required under the terms of any such Subordinated Indebtedness in order that the Administrative Agent and the Lenders may have and exercise any payment blockage or other remedies available or potentially available to holders of senior indebtedness under the terms of such Subordinated Indebtedness.

ARTICLE 2

THE CREDITS

Section 2.1 Commitments.

(a) Revolving Commitments. Subject to the terms and conditions hereof and the terms of the Orders, as in effect from time to time, relying upon the representations and warranties herein set forth, each Revolving Lender agrees, severally and not jointly, to make Revolving Loans to the Borrowers in Dollars from time to time during the Availability Period in an aggregate principal amount that will not result in (i) such Revolving Lender's Revolving Exposure exceeding such Revolving Lender's Revolving Commitment, or (ii) the Total Revolving Outstandings exceeding the Line Cap, subject to the Administrative Agent's authority, in its sole discretion, to make Overadvances pursuant to the terms of Section 2.2(e). Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrowers may borrow, prepay and reborrow Revolving Loans.

(b) As of the effective date, all outstanding Prepetition ABL Obligations (other than unasserted contingent indemnification obligations relating to the Prepetition ABL Obligations) shall be paid in full and refinanced under this Agreement.

(c) Notwithstanding anything to the contrary in this Section 2.1, the Administrative Agent shall have the right (but not the obligation) at any time, in the exercise of its Permitted Discretion, to establish and increase or decrease Reserves against the Borrowing Base or the Revolving Credit Maximum Amount.

Section 2.2 Borrowings of Revolving Loans.

(a) Each Revolving Borrowing shall be made upon the Borrower Agent's irrevocable notice to the Administrative Agent. Each such notice must be received by the Administrative Agent not later than 12:00 noon on the date of the proposed Borrowing.

(b) Each notice by the Borrower Agent pursuant to Section 2.2(a) shall be made by submitting such request by ABLSoft (or, if requested by the Administrative Agent, by delivering, in writing or by an Approved Electronic Communication, a Borrowing Request in the form of Exhibit C) (each such request, a "Borrowing Request") appropriately completed and signed by a Responsible Officer of the Borrower Agent. Each Borrowing of Revolving Loans shall be in a principal amount of not less than $25,000. Each Borrowing Request shall specify (A) the requested date of the Borrowing (which shall be a Business Day) and (B) the principal amount of Loans to be borrowed.

(c) Following receipt of a Borrowing Request, the Administrative Agent shall promptly notify each Revolving Lender of the amount of its Applicable Percentage of the requested Revolving Loans, and each Revolving Lender shall make the amount of its Revolving Loan available to the Administrative Agent, by transfer in immediately available funds to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders, not later than 1:00 p.m. on the Business Day specified in the applicable Borrowing Request. Upon satisfaction or waiver of the applicable conditions set forth in Section 4.2 (and, if such Borrowing is the initial Revolving Loan hereunder, Section 4.1), the Administrative Agent shall make all funds so received available to the Borrowers in like funds as received by transfer to the Designated Account.

(d) The failure of any Revolving Lender to make any Revolving Loan required to be made by it shall not relieve any other Revolving Lender of its obligations hereunder, provided that the

Commitments of the Lenders are several, and no Lender shall be responsible for any other Lender's failure to make Revolving Loans as required.

(e)     Notwithstanding anything herein to the contrary, (i) the Borrower Agent may request, and the Administrative Agent may, in its sole and absolute discretion, make, Revolving Loans to the Borrowers or (ii) the Administrative Agent may, in its sole discretion, make Revolving Loans, on behalf of the Revolving Lenders, if Administrative Agent, in its Permitted Discretion, deems that such Revolving Loans are necessary or desirable (A) to protect or preserve all or any portion of the Collateral, (B) to enhance the likelihood, or maximize the amount of, repayment of the Obligations, or (C) to pay any other amount chargeable to the Borrowers pursuant to this Agreement, in each case, at a time when the Total Revolving Outstandings exceed, or would exceed with the making of any such Revolving Loan, the Line Cap (such Loan or Loans being herein referred to individually as an "<u>Overadvance</u>" and collectively, as "<u>Overadvances</u>"); <u>provided</u>, <u>however</u>, that (x) the aggregate amount of Overadvances outstanding at any time shall not exceed the lesser of (1) 10% of the Borrowing Base or (2) $5,000,000, (y) unless otherwise consented to by the Required Lenders, Overadvances shall not be outstanding for more than 60 consecutive days and (z) unless otherwise consented to by all Revolving Lenders, no Overadvances shall be permitted to the extent that such Overadvances would cause the Total Revolving Outstandings to exceed the Revolving Credit Maximum Amount.  All Overadvances shall be repaid on demand, shall be secured by the Collateral and shall bear interest as provided in this Agreement for Revolving Loans generally.  Any Overadvance made pursuant to the terms hereof shall be made by all Revolving Lenders ratably in accordance with their respective Applicable Percentages.

(f)     Upon the entry of the Interim Order, subject to the terms and conditions set forth therein, the Borrower Agent shall be deemed to have made an irrevocable Borrowing Request to the Administrative Agent for a Borrowing in the amount of the Prepetition ABL Obligations comprised of a Base Rate Loan.

Section 2.3     <u>Termination and Reduction of Commitments</u>.

(a)     Unless previously terminated, the Revolving Commitments shall terminate on the last day of the Availability Period.

(b)     Subject to <u>Section 2.5(b)(i)</u>, the Borrowers may at any time terminate, or from time to time reduce, the Revolving Commitments, <u>provided</u> that (i) the Borrowers shall not terminate or reduce the Revolving Commitments if, after giving effect to any concurrent prepayment or repayment of the Revolving Loans in accordance with <u>Section 2.5</u>, the sum of the Revolving Exposures of all Revolving Lenders would exceed the aggregate Revolving Commitments, and (ii) each such reduction of the Revolving Commitments shall be in an amount that is an integral multiple of $500,000 and not less than $1,000,000; <u>provided</u>, that except in connection with a termination of the entire Revolving Commitment, no such reduction shall reduce the aggregate Revolving Commitments to an amount less than $25,000,000. Any such termination or reduction of the Revolving Commitments shall be subject to <u>Section 2.5(e)</u>.  If at any time, as a result of such a partial reduction or termination as provided in this <u>Section 2.3(b)</u>, the Revolving Exposure of all Lenders would exceed the aggregate Revolving Commitments, then the Borrowers shall on the date of such reduction or termination of Revolving Commitments, repay or prepay Revolving Loans in an aggregate amount equal to such excess.

(c)     In addition to any termination or reduction of the Revolving Commitments under paragraphs (a) and (b) of this Section, the Revolving Commitments shall be reduced as required under <u>Section 2.6(b)</u>.

(d)     The Borrower Agent shall notify the Administrative Agent of any election to terminate or reduce the Revolving Commitments under paragraph (b) of this Section at least three Business Days prior to the effective date of such termination or reduction, specifying the effective date thereof. Promptly following receipt of any such notice, the Administrative Agent shall advise the Revolving Lenders of the contents thereof. Each notice delivered by the Borrower Agent pursuant to this Section shall be irrevocable, provided that a notice of termination of the Revolving Commitments may state that such notice is conditioned upon the effectiveness of other credit facilities, in which case such notice may be revoked by the Borrower Agent (by written notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied subject to the Borrowers' obligation to indemnify the Lenders pursuant to Section 3.5. Each reduction, and any termination, of the Revolving Commitments shall be permanent and each reduction of the Revolving Commitments shall be made ratably among the Revolving Lenders in accordance with their respective Revolving Commitments.

Section 2.4     Repayment of Loans; Evidence of Debt.

(a)     Payment at Maturity. Each Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Revolving Lender the then unpaid principal amount of each Revolving Loan together with all accrued interest thereon on the earlier of the Maturity Date and, if different, the date of the termination of the Revolving Commitments in accordance with the provisions of this Agreement.

(b)     Notes. Any Lender may request through the Administrative Agent that Loans made by it be evidenced by a promissory note. In such event, the Borrowers shall execute and deliver to (i) in the case of a Revolving Lender, a Revolving Loan Note. In addition, if requested by a Lender, its Note may be made payable to such Lender and its registered assigns in which case all Loans evidenced by such Note and interest thereon shall at all times (including after assignment pursuant to Section 10.4) be represented by one or more Notes in like form payable to the order of the payee named therein and its registered assigns.

(c)     Lender Records. Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrowers to such Lender resulting from each Loan owing to such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(d)     Register. Entries made in good faith by the Administrative Agent in the Register pursuant to Section 10.4(c), and by each Lender in its account or accounts pursuant to Section 2.4(d), shall be prima facie evidence of the amount of principal and interest due and payable or to become due and payable from the Borrowers to, in the case of the Register, each Lender and, in the case of such account or accounts, such Lender, under this Agreement, absent manifest error; provided, however, that the failure of the Administrative Agent or such Lender to make an entry, or any finding that an entry is incorrect, in the Register or such account or accounts shall not limit or otherwise affect the obligations of the Borrowers under this Agreement.

Section 2.5     Prepayments.

(a)     Optional Prepayments.

(i)     Revolving Loans may be borrowed, repaid and prepaid, and reborrowed, in each case on the terms and conditions set forth in this Agreement.

(ii)     [Reserved].

(b)    Mandatory Prepayments.

(i)    Overadvances.  If for any reason the Total Revolving Outstandings (other than any Overadvances to the extent permitted hereunder) at any time exceed the Line Cap then in effect, the Borrowers shall immediately prepay, without premium or penalty, Revolving Loans in an aggregate amount equal to such excess.

(ii)    Prepayment Events.  If any Prepayment Event occurs, the Borrowers shall, subject to the terms of the Orders, and the Prepetition Intercreditor Agreement, prepay, Revolving Loans in an aggregate amount equal to 100% of the cash proceeds of such Prepayment Event promptly upon receipt thereof by the applicable Loan Party, without premium or penalty.

(iii)    Change of Control.  Upon the occurrence of a Change of Control, the Commitments shall terminate and the Borrowers shall immediately prepay the Revolving Loans and repay all other Obligations.

(iv)    Application of Mandatory Prepayments.  Each mandatory prepayment required to be made pursuant to Section 2.5(b)(i) shall be applied to the prepayment of the Revolving Loans, without a permanent reduction of the Revolving Commitments.

All prepayments shall be subject to Section 2.5(e) (to the extent applicable) and Section 3.5, but shall otherwise be without premium or penalty.  Each prepayment of a Borrowing shall be applied ratably to the applicable Loans of each Lender.  All prepayments shall be accompanied by accrued interest thereon and any additional amounts required pursuant to Section 3.5.

(c)    [Reserved].

(d)    [Reserved].

(e)    Exit Fee.  Borrowers shall pay to the Administrative Agent, for the ratable benefit of Lenders, upon the Maturity Date, an exit fee in the amount $800,000, which fee represents (i) two percent (2.0%) multiplied by (ii) the aggregate amount of the Revolving Commitments on the Second Amendment Date. Such fee was fully-earned on the Second Amendment Date, and shall be due and payable upon the Maturity Date.

Section 2.6    Payments Generally; Administrative Agent's Clawback.

(a)    General.  Each Loan Party shall make each payment required to be made by it hereunder or under any other Loan Document (whether of principal of Loans, interest or fees, or of amounts payable under Sections 3.4, 3.5, or 10.3, or otherwise) prior to 12:00 noon on the date when due, in immediately available funds.  In furtherance of the foregoing, each Borrower hereby irrevocably authorizes the Administrative Agent, in the Administrative Agent's sole discretion, to request on behalf of the Borrowers, Revolving Loans (which shall be Base Rate Loans), in an amount sufficient to pay all principal, interest, fees, or other amounts from time to time due and payable by any Loan Party to any Credit Party hereunder or under any other Loan Document.  All payments to be made by a Loan Party hereunder shall be made free and clear of and without condition or deduction for any counterclaim, defense, recoupment or setoff, without setoff or counterclaim.  Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Administrative Agent's Payment Office, except that payments pursuant to Sections 3.4, 3.5, or 10.3, shall be made directly to the Persons entitled thereto.  The Administrative Agent shall distribute any such payments received by

it for the account of any other Person to the appropriate recipient promptly following receipt thereof. If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension. All payments hereunder shall be made in Dollars.

(b)      Pro Rata Treatment.  Except as otherwise provided in this Section 2.6 and as otherwise required under Section 3.4(b) and (e), each Borrowing, each payment or prepayment of principal of any Borrowing, each payment of interest on the Loans, each payment of fees, each reduction of the Revolving Commitments shall be allocated pro rata among the Revolving Lenders in accordance with their respective applicable Commitments (or, if such Commitments shall have expired or been terminated, in accordance with the respective principal amounts of their outstanding Loans). Each Lender agrees that in computing such Lender's portion of any Borrowing to be made hereunder, the Administrative Agent may, in its discretion, round each Lender's percentage of such Borrowing to the next higher or lower whole Dollar amount.

(c)      Administrative Agent's Clawback.

(i)      Funding by Lenders; Presumption by Administrative Agent.  Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with Section 2.2 and may, in reliance upon such assumption, make available to the Borrowers a corresponding amount. In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the Revolving Lenders and the Borrowers severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount with interest thereon for each day from and including the date such amount is made available to the Borrowers to but excluding the date of payment to the Administrative Agent, at (A) in the case of a payment to be made by such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, and (B) in the case of a payment to be made by the Borrowers, the interest rate applicable to Base Rate Loans. If the Borrowers and such Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrowers the amount of such interest paid by the Borrowers for such period. If such Lender pays its share of the applicable Borrowing to the Administrative Agent, then the amount so paid shall constitute such Lender's Loan included in such Borrowing. Any payment by the Borrowers shall be without prejudice to any claim the Borrowers may have against a Lender that shall have failed to make such payment to the Administrative Agent.

(ii)      Payments by Borrowers; Presumptions by Administrative Agent.  Unless the Administrative Agent shall have received notice from the Borrower Agent prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrowers will not make such payment, the Administrative Agent may assume that the Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due. In such event, if the Borrowers have not in fact made such payment, then each of the Lenders, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender, with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(iii)      Notice by Administrative Agent.  A notice from the Administrative Agent to any Lender or the Borrowers with respect to any amount owing under this paragraph (c) shall be conclusive, absent manifest error.

(d)      Obligations of Lenders Several.  The obligations of the Lenders hereunder to make Loans and to make payments pursuant to Section 10.3(c) are several and not joint.  The failure of any Lender to make any Loan or make any payment under Section 10.3(c) on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan or to make its payment under Section 10.3(c).

(e)      Failure to Satisfy Conditions Precedent.  If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this Article 2, and such funds are not made available to the Borrowers by the Administrative Agent because the conditions to the borrowing of Loans set forth in Article 4 are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(f)      Funding Source.  Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

(g)      Insufficient Payment.  Subject to the provisions of Article 8, whenever any payment received by the Administrative Agent under this Agreement or any of the other Loan Documents is insufficient to pay in full all amounts due and payable to the Credit Parties under or in respect of this Agreement and the other Loan Documents on any date, such payment shall be distributed by the Administrative Agent and applied by the Administrative Agent (i) first, towards payment of all fees and expenses due to the Administrative Agent under the Loan Documents, (ii) second, towards payment of all expenses then due hereunder, ratably among the parties entitled thereto in accordance herewith, (iii) third, towards payment of interest, fees and commissions then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest, fees and commissions then due to such parties, and (iv) fourth, towards payment of principal of Loans then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal of Loans then due to such parties.

(h)      Sharing of Payments by Lenders.  If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans or other obligations hereunder resulting in such Lender receiving payment of a proportion of the aggregate amount of its Loans and accrued interest thereon or other such obligations greater than its pro rata share thereof as provided herein, then such Lender shall (x) notify the Administrative Agent of such fact, and (y) purchase (for cash at face value) participations in the Loans and such other obligations of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and other amounts owing them; provided that:

(i)      if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii)      the provisions of this paragraph shall not be construed to apply to (x) any payment made by the Borrowers pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender),

or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant.

Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against each Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of each Loan Party in the amount of such participation.

Section 2.7    Defaulting Lenders.

(a)    Defaulting Lender Adjustments.  Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(i)    Waivers and Amendments.  Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of Required Lenders.

(ii)    Defaulting Lender Waterfall.  Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article 8 or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to Section 10.8 shall be applied at such time or times as may be determined by the Administrative Agent as follows: first, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; second, as the Borrower Agent may request (so long as no Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; third, if so determined by the Administrative Agent and the Borrower Agent, to be held in a deposit account and released pro rata in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement; fourth, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; fifth, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrowers as a result of any judgment of a court of competent jurisdiction obtained by the Borrowers against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and sixth, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if (x) such payment is a payment of the principal amount of any Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Loans were made at a time when the conditions set forth in Section 4.2 were satisfied or waived, such payment shall be applied solely to pay the Loans of all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of such Defaulting Lender until such time as all Loans are held by the Lenders pro rata in accordance with the Commitments.  Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender pursuant to this Section 2.7(a)(ii) shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(iii)    Certain Fees.  No Defaulting Lender shall be entitled to receive any Unused Line Fee for any period during which that Lender is a Defaulting Lender (and the Borrowers shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender).

(b)        Defaulting Lender Cure.  If the Borrower Agent and the Administrative Agent agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans to be held pro rata by the Lenders in accordance with the Commitments, whereupon such Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrowers while that Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

Section 2.8        Joint and Several Liability.

(a)        Each Borrower is accepting joint and several liability hereunder and under the other Loan Documents in consideration of the financial accommodations to be provided by the Credit Parties under this Agreement for the mutual benefit, directly and indirectly, of each Borrower and in consideration of the undertakings of the other Borrowers to accept joint and several liability for the Obligations.

(b)        Each Borrower, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Borrowers, with respect to the payment and performance of all of the Obligations, it being the intention of the parties hereto that all of the Obligations shall be the joint and several obligations of each Borrower without preferences or distinction among them.  Accordingly, each Borrower hereby waives any and all suretyship defenses that would otherwise be available to such Borrower under applicable law.

(c)        If and to the extent that any Borrower shall fail to make any payment with respect to any of the Obligations as and when due, whether upon maturity, acceleration, or otherwise, or to perform any of the Obligations in accordance with the terms thereof, then in each such event the other Borrowers will make such payment with respect to, or perform, such Obligations until such time as all of the Obligations are paid in full, and without the need for demand, protest, or any other notice or formality.

(d)        The obligations of each Borrower under the provisions of this Section 2.8 constitute the absolute and unconditional, full recourse obligations of each Borrower enforceable against each Borrower to the full extent of its properties and assets, irrespective of the validity, regularity or enforceability of the provisions of this Agreement or any other Loan Document or any other circumstance whatsoever.

(e)        Each Borrower hereby waives, for the benefit of the Credit Parties:  (i) any right to require any Credit Party, as a condition of payment or performance by such Borrower, to (A) proceed against any other Borrower, any Guarantor or any other Person, (B) proceed against or exhaust any security held from any other Borrower, any Guarantor or any other Person, (C) proceed against or have resort to any balance of any deposit account or credit on the books of any Credit Party in favor of any other Borrower, any Guarantor or any other Person, or (D) pursue any other remedy in the power of any Credit Party whatsoever; (ii) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of any other Borrower or any Guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of any other Borrower or any Guarantor from any cause other than the indefeasible payment in full in cash of the Obligations; (iii) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects

more burdensome than that of the principal; (iv) any defense based upon any Credit Party's errors or omissions in the administration of the Obligations; (v)(A) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of such Borrower's obligations hereunder, (B) the benefit of any statute of limitations affecting such Borrower's liability hereunder or the enforcement hereof, (C) any rights to set offs, recoupments and counterclaims, and (D) promptness, diligence and any requirement that any Credit Party protect, secure, perfect or insure any security interest or Lien or any property subject thereto; (vi) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default, notices of any renewal, extension or modification of the Obligations or any agreement related thereto, notices of any extension of credit to such Borrower and any right to consent to any thereof; and (vii) any defenses or benefits that may be derived from or afforded by law which limit the ability of or exonerate guarantors or sureties, or which may conflict with the terms hereof.

(f)     Each Borrower represents and warrants to the Credit Parties that such Borrower is currently informed of the financial condition of the other Borrowers and of all other circumstances which a diligent inquiry would reveal and which bear upon the risk of nonpayment of the Obligations. Each Borrower further represents and warrants to the Credit Parties that such Borrower has read and understands the terms and conditions of the Loan Documents. Each Borrower hereby covenants that such Borrower will continue to keep informed of each other Borrower's financial condition and of all other circumstances which bear upon the risk of nonpayment or nonperformance of the Obligations.

(g)     The provisions of this Section 2.8 are made for the benefit of each Credit Party and its successors and assigns, and may be enforced by it or them from time to time against any or all Borrowers as often as occasion therefor may arise and without requirement on the part of any Credit Party of any of its successors or assigns first to marshal any of its or their claims or to exercise any of its or their rights against any Borrower or any Guarantor or to exhaust any remedies available to it or them against any Borrower or any Guarantor or to resort to any other source or means of obtaining payment of any of the Obligations or to elect any other remedy. The provisions of this Section 2.8 shall remain in effect until the occurrence of the Termination Date. If at any time any payment, or any part thereof, made in respect of any of the Obligations is rescinded or must otherwise be restored or returned by any Credit Party upon the insolvency, bankruptcy or reorganization of any Borrower, or otherwise, the provisions of this Section 2.8 will forthwith be reinstated in effect, as though such payment had not been made.

(h)     Each Borrower hereby agrees that it will not enforce any of its rights that arise from the existence, payment, performance or enforcement of the provisions of this Section 2.8, including rights of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of any Credit Party against any Borrower, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including the right to take or receive from any Borrower, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security solely on account of such claim, remedy or right, unless and until the Termination Date has occurred. Any claim which any Borrower may have against any other Borrower with respect to any payments to any Credit Party hereunder are hereby expressly made subordinate and junior in right of payment to the indefeasible payment in full in cash of the Obligations and occurrence of the Termination Date and, in the event of any insolvency, bankruptcy, receivership, liquidation, reorganization or other similar proceeding under the laws of any jurisdiction relating to any Borrower, its debts or its assets, whether voluntary or involuntary, all such Obligations shall be paid in full in cash and the Termination Date shall occur before any payment or distribution of any character, whether in cash, securities or other property, shall be made to any other Borrower therefor. If any amount shall be paid to any Borrower in violation of the immediately preceding sentence, such amount shall be held in trust for the benefit of the Credit Parties, and shall forthwith be paid to Administrative Agent to be credited and applied

to the Obligations and all other amounts payable under this Agreement, whether matured or unmatured, in accordance with the terms of this Agreement, or to be held as Collateral for any Obligations or other amounts payable under this Agreement thereafter arising.

Section 2.9    Prepetition ABL Obligations.

(a)    Continuation of Liens.  Subject to the terms of the Interim Order or the Final Order, as applicable, until (i) the indefeasible payment in full in cash of the Guaranteed Obligations (including Prepetition ABL Obligations), (ii) all objections and challenges (including, without limitation, any Challenge Proceeding (as defined in the Order)) to (A) the liens, security interests and claims of the Prepetition ABL Agent (including, without limitation, liens granted for adequate protection purposes) and/or (B) the Prepetition ABL Obligations have been waived, denied or barred, and (iii) all of the Debtors' Stipulations (as defined in the Order) have become binding on their estates and parties in interest in accordance with the Order, all liens, security interests and claims of the Prepetition ABL Agent (including, without limitation, liens granted for adequate protection purposes) shall remain valid and enforceable with the same continuing priority as described herein and the Prepetition ABL Loan Documents shall remain in full force and effect; provided, however, that, subject to the results of any applicable Challenge Proceeding (as defined in the Order), to the extent that Prepetition ABL Obligations have been paid pursuant to this Agreement and have become and are Obligations, such Prepetition ABL Obligations shall not be due or owing separately under the Prepetition ABL Loan Documents; provided, further, however, that nothing in the foregoing proviso shall alter or diminish, or be deemed to alter or diminish, the Adequate Protection (as defined in the Order) of the Prepetition ABL Agent and the Prepetition ABL Lenders.

(b)    Avoided Payments.  In the event that Prepetition ABL Agent or any of the Prepetition ABL Lenders are required to repay or disgorge to any Loan Party or any representatives of the Loan Parties' estate (as agents, with derivative standing or otherwise) all or any portion of the Prepetition ABL Obligations authorized and directed to be repaid pursuant to the Interim Order, or any payment on account of the Prepetition ABL Obligations made to Prepetition ABL Agent or any Prepetition ABL Lender is rescinded for any reason whatsoever, including, but not limited to, as a result of any Avoidance Action, or any other action, suit, proceeding or claim brought under any other provision of any applicable Bankruptcy Code or other applicable debtor relief law or any applicable state law, or any other similar provisions under any other state or federal statutory or common law (all such amounts being hereafter referred to as the "Avoided Payments"), then, in such event, the Loan Parties shall prepay the Revolving Loans, in an amount equal to 100% of such Avoided Payments immediately upon receipt of the Avoided Payments by any Loan Party or any representative of the Loan Parties' estate.

Section 2.10    Super-Priority Nature of Obligations and Administrative Agent's Liens; Payment of Obligations.

(a)    The priority of Administrative Agent's Liens on the Collateral, claims and other interests shall be as set forth in the Interim Order and Final Order.

(b)    Upon the maturity (whether by acceleration or otherwise) of any of the Obligations, the Administrative Agent and Lenders shall be entitled to immediate payment of such Obligations without further application to or order of the Court.

ARTICLE 3

INTEREST, FEES, YIELD PROTECTION, ETC.

Section 3.1    Interest.

(a)    Interest Rate Generally.  Each Loan and all other Obligations hereunder shall bear interest at a rate per annum equal to the Alternate Base Rate plus the Applicable Margin.

(b)    Default Rate.

(i)    Notwithstanding the foregoing, if any principal of or interest on any Loan or any fee or other amount payable by the Borrowers hereunder is not paid when due, whether at stated maturity, upon acceleration or otherwise, such overdue amount shall bear interest, after as well as before judgment, at a rate per annum equal to the Default Rate to the fullest extent permitted by applicable law.

(ii)    Notwithstanding the foregoing, if an Event of Default has occurred and is continuing and the Administrative Agent, at the request of the Required Lenders, so notifies the Borrower Agent (provided that no such notification shall be required, and the following interest shall automatically be payable, in the case of an Event of Default under Sections 8.1(a) or (b)), then, so long as such Event of Default is continuing, all outstanding principal of each Loan shall, without duplication of amounts payable under the preceding sentence, bear interest, after as well as before judgment, at a rate per annum equal to the Default Rate to the fullest extent permitted by applicable law.

(iii)    Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c)    Adjustment of Interest Rate.  The rate of interest on any Base Rate Loan shall be adjusted automatically and without notice on and as of any change in the Alternate Base Rate as provided in the definition thereof.

(d)    Interest Payment Dates.  Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan and at such other times as may be specified herein, provided that (i) interest accrued pursuant to paragraph (b) of this Section shall be payable on demand and (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment.

(e)    Computation of Interest.  All interest hereunder shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and, in each case, shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

Section 3.2    Fees.

(a)    Unused Line Fee.  Each Borrower agrees to pay to the Administrative Agent for the account of each Revolving Lender, an unused line fee (the "Unused Line Fee"), which shall accrue at a rate per annum equal to 0.50% on the average daily unused amount of the Revolving Commitment of such Revolving Lender during the period from and including the date on which this Agreement becomes effective pursuant to Section 10.6(a) to but excluding the date on which such Revolving Commitment terminates.  For purposes of computing Unused Line Fees, the Revolving Commitment of any Revolving

Lender shall be deemed to be used to the extent of the aggregate principal amount at such time of its outstanding Revolving Loans. Accrued Unused Line Fees shall be payable in arrears on the last day of each month, each date on which the Revolving Commitments are permanently reduced and on the date on which the Revolving Commitments terminate, commencing on the first such date to occur after the Effective Date. All Unused Line Fees shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(b)     Collection Days. Each Borrower agrees to pay to the Administrative Agent a fee equal to the additional interest that the Borrowers would have paid in respect of the Revolving Loans, at the Alternate Base Rate plus the Applicable Margin, as if each payment received (whether in the form of cash, check or otherwise) which has been presented for application to the Revolving Loans had not been received in the Collections Account and credited to the Borrowers until three Business Days after the Business Day that such payment was actually received in the Collections Account. Such fee will be payable (i) monthly in arrears, (ii) on the Maturity Date, and (iii) if different from the Maturity Date, the Termination Date.

(c)     [Reserved.]

(d)     Other Fees. Each Borrower agrees to pay to the Administrative Agent fees and other amounts payable in the amounts and at the times separately agreed upon between the Borrowers and the Administrative Agent (including, without limitation, those set forth in the Fee Letter).

(e)     Payment of Fees Generally. All fees and other amounts payable hereunder shall be paid on the dates due, in immediately available funds. Fees and other amounts paid shall not be refundable under any circumstances.

Section 3.3     [Reserved].

Section 3.4     Increased Costs; Illegality.

(a)     Increased Costs Generally. If any Change in Law shall:

(i)     impose, modify or deem applicable any reserve, special deposit, liquidity, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender;

(ii)     subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)     impose on any Lender or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or Loans made by such Lender or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender or such other Recipient of making or maintaining any Loan or of maintaining its obligation to make any such Loan, or to reduce the amount of any sum received or receivable by such Lender or other Recipient hereunder (whether of principal, interest or any other amount) then, upon request of such Lender or other Recipient, the Borrowers will pay to such Lender or other Recipient, as the case may be, such additional amount or amounts as will

compensate such Lender or other Recipient, as the case may be, for such additional costs incurred or reduction suffered.

(b)     Capital Requirements.  If any Lender determines that any Change in Law affecting such Lender regarding capital or liquidity requirements, has or would have the effect of reducing the rate of return on such Lender's capital as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender to a level below that which such Lender could have achieved but for such Change in Law (taking into consideration such Lender's policies with respect to capital adequacy and liquidity), then from time to time the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender for any such reduction suffered.

(c)     Certificates for Reimbursement.  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender as specified Section 3.4 (a) or (b) and delivered to the Borrower Agent shall be conclusive absent manifest error.  The Borrowers shall pay such Lender the amount shown as due on any such certificate within ten days after receipt thereof.

(d)     Delay in Requests.  Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; provided that the Borrowers shall not be required to compensate a Lender pursuant to this Section for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender notifies the Borrower Agent of the Change in Law giving rise to such increased costs or reductions, and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

Section 3.5     Taxes.

(a)     Defined Terms.  For purposes of this Section 3.5, the term "applicable law" includes FATCA.

(b)     Payments Free of Taxes.  Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(c)     Payment of Other Taxes by the Loan Parties.  Without duplication of other amounts payable by a Loan Party under this Section, each of the Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(d)     Indemnification by the Loan Parties.  Each of the Loan Parties shall jointly and severally indemnify each Recipient, within ten days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Recipient or required to be withheld or deducted from a payment

to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower Agent by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(e)        Indemnification by the Lenders.  Each Lender shall severally indemnify the Administrative Agent, within ten days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.4(d) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (e).

(f)        Evidence of Payments.  As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 3.5, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(g)        Status of Lenders.  (i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower Agent and the Administrative Agent, at the time or times reasonably requested by the Borrower Agent or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower Agent or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrower Agent or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower Agent or the Administrative Agent as will enable the Borrower Agent or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 3.5 (g)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender (it being understood that providing any information currently required by any U.S. federal income tax withholding form shall not be considered prejudicial to the position of a Recipient).

(ii)        Without limiting the generality of the foregoing,

(A)        any Lender that is a U.S. Person shall deliver to the Borrower Agent and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower Agent or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower Agent or the Administrative Agent), whichever of the following is applicable:

(1)     in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (A) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (B) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)     executed copies of IRS Form W-8ECI;

(3)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (A) a certificate in form satisfactory to the Administrative Agent to the effect that such Foreign Lender is not a "<u>bank</u>" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of any Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "<u>controlled foreign corporation</u>" described in Section 881(c)(3)(C) of the Code (a "<u>U.S. Tax Compliance Certificate</u>") and (B) executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable; or

(4)     to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, a U.S. Tax Compliance Certificate in form satisfactory to the Administrative Agent, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; <u>provided</u> that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate in form satisfactory to the Administrative Agent on behalf of each such direct and indirect partner;

(C)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower Agent and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower Agent or the Administrative Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrowers or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)     if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower Agent and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower Agent or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower Agent or the Administrative Agent as may be necessary for the Borrowers and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower Agent and the Administrative Agent in writing of its legal inability to do so.

(h)     Treatment of Certain Refunds.  If any indemnified party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 3.5 (including by the payment of additional amounts pursuant to this Section 3.5), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 3.5 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (h) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this paragraph (h), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (h) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.

(i)     Survival.  Each party's obligations under this Section 3.5 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender and the Termination Date.

(j)     Confidentiality.  Nothing contained in this Section 3.5 shall require any Credit Party or any other indemnified party to make available any of its Tax returns (or any other information that it deems to be confidential or proprietary) to the indemnifying party or any other Person.

Section 3.6     Mitigation Obligations; Replacement of Lenders.

(a)     Designation of a Different Lending Office.  If any Lender requests compensation under Section 3.4, or requires the Borrowers to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.5, then such Lender shall (at the request of the Borrower Agent) use reasonable efforts to designate a different funding office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another

of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.4 or Section 3.5, as the case may be, in the future, and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Borrowers hereby agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)     Replacement of Lenders. If any Lender requests compensation under Section 3.4 or if the Borrowers are required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.5 and, in each case, such Lender has declined or is unable to designate a different funding office, or if any Lender is a Defaulting Lender or a Non-Consenting Lender, then the Borrowers may, at their sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10.4), all of its interests, rights (other than its existing rights to payments pursuant to Section 3.4 or Section 3.5) and obligations under this Agreement and the related Loan Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that:

(i)     unless waived by the Administrative Agent in its sole discretion, the Borrowers shall have paid to the Administrative Agent the assignment fee (if any) specified in Section 10.4;

(ii)     such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts);

(iii)     in the case of any such assignment resulting from a claim for compensation under Section 3.4 or payments required to be made pursuant to Section 3.5, such assignment will result in a reduction in such compensation or payments thereafter;

(iv)     such assignment does not conflict with applicable law; and

(v)     in the case of any assignment resulting from a Lender becoming a Non-Consenting Lender, the applicable assignee shall have consented (or is willing to consent upon becoming a Lender) to the applicable amendment, waiver or consent.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrowers to require such assignment and delegation cease to apply.

ARTICLE 4

CONDITIONS PRECEDENT TO LOANS

Section 4.1     Conditions to Initial Loans. The effectiveness of this Agreement and the obligation of each Lender to make its initial Loans hereunder on the Effective Date is subject to satisfaction or waiver of the following conditions precedent:

(a)     Credit Agreement.  The Administrative Agent (or its counsel) shall have received a counterpart of this Agreement that, when taken together, bear the signatures of each Loan Party and each Lender.

(b)     Notes.  The Administrative Agent shall have received a Note for each Lender that shall have requested one, signed by the Borrowers.

(c)     Officers' Closing Certificate.  The Administrative Agent shall have received a certificate, dated the Effective Date and signed by a Responsible Officer of the Borrower Agent confirming that the conditions set forth in this Section 4.1 and Section 4.2 shall be satisfied.

(d)     Fees and Expenses.  Substantially contemporaneously with the making of the Loans to be made on the Effective Date, the Borrowers shall have paid all fees and expenses that under the terms hereof or of the Fee Letter are due and payable on or prior to the Effective Date, as well as the reasonable fees, disbursements and other charges of counsel to the Administrative Agent in connection with the Transactions to the extent invoiced on or prior to the Effective Date.

(e)     Appraisal and Field Examination.  The Administrative Agent shall have received, reviewed and be satisfied with (i) an appraisal of the Company's Inventory and (ii) a field examination of the Collateral (which appraisals and field examination shall have been performed, at the Borrowers' expense, by appraisers and a field examination firm satisfactory to the Administrative Agent).

(f)     Borrowing Request.  The Administrative Agent shall have received a completed Borrowing Request, duly executed by a Responsible Officer of the Borrower Agent with respect to the Loans to be made on the Effective Date, including, among other Borrowings, an amount required under Section 2.1(f).

(g)     Insurance.  The Administrative Agent shall have received evidence that all insurance required to be maintained pursuant to the Loan Documents has been obtained and is in effect and that the Administrative Agent has been named as lender's loss payee and/or additional insured, as applicable, under each insurance policy with respect thereto and all endorsements thereto have been delivered, in each case, in accordance with the terms of the Loan Documents, and the Administrative Agent is otherwise satisfied with all of the insurance arrangements of the Loan Parties and their Subsidiaries.

(h)     [Reserved]

(i)     Approved Budget.  The Administrative Agent shall have received the Approved Budget.

(j)     Additional Due Diligence.  The Administrative Agent shall have completed and found satisfactory all legal, regulatory and business due diligence.

(k)     Officer's Certificates.  The Administrative Agent shall have received a certificate of a Responsible Officer of each Loan Party, dated the Effective Date, (i) attesting to the resolutions of such Loan Party's board of directors or managers authorizing its execution, delivery, and performance of the Loan Documents to which it is a party, (ii) authorizing specific officers of such Loan Party to execute the same, (iii) attesting to the incumbency and signatures of such specific officers of such Loan Party, (iv) attaching copies of such Loan Party's Organizational Documents, and (v) attaching copies of a certificate of status with respect to such Loan Party, dated within 30 days of the Effective Date, such certificate to be issued by the appropriate officer of the jurisdiction of organization of such Loan Party,

which certificate shall indicate that such Loan Party is in good standing in such jurisdiction (or other similar status, as applicable).

(l)    [Reserved]

(m)    Borrowing Base Certificate / Availability. The Administrative Agent shall have received a Borrowing Base Certificate, dated the Effective Date and signed by a Financial Officer of the Borrower Agent, prepared as of such date as the Administrative Agent may elect, evidencing that, immediately after the making of the initial Loans and after giving effect to the Transactions (including the payment of all Transaction Expenses), Availability shall be at least the amount set forth in the Approved Budget for the initial Borrowing.

(n)    Security Interest. The Administrative Agent and each Lender shall be satisfied that the Loan Documents and the Interim Order shall be effective to create in favor of the Administrative Agent for the benefit of the Secured Parties a legal, valid, perfected and enforceable security interest and Lien upon the Collateral, with the priority set forth in the Interim Order and the terms thereof.

(o)    First Day Orders. The Court has approved and entered all "first day" orders, including the Cash Management Order and the Interim Order, each of which shall be in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders.

(p)    DIP Term Loan Facility. After entry of the Interim Order, the Administrative Agent and each Lender shall have received (i) fully executed copies of the DIP Term Loan Agreement and the other material DIP Term Loan Documents, in form and substance reasonably satisfactory to Administrative Agent, and (ii) evidence, in form and substance reasonably satisfactory to Administrative Agent, that on the Effective Date, Borrowers have received in the DIP Term Loan Escrow Account net proceeds of a borrowing of loans under the DIP Term Loan Facility of no less than $6,750,000 (which amount excludes the $3,000,000 utilized to refinance the Protective Advances (as such term is defined in the Interim Order)).

(q)    No Material Adverse Effect.

(i)    Since the Petition Date, other than those events or circumstances arising from the commencement of the Chapter 11 Cases, there has been no event or circumstance, either individually or in the aggregate, that has or would reasonably be expected to have a Material Adverse Effect.

(ii)    Except for actions, suits, investigations, proceedings, claims or disputes stayed by section 362 of the Bankruptcy Code, no orders, injunctions or pending litigation exists which would reasonably be expected to have a Material Adverse Effect or which challenges this Agreement, the Loan Documents or the credit facilities contemplated hereunder.

(iii)    Since the Petition Date, there has been no material increase in the liabilities, liquidated or contingent, of the Borrowers and the Guarantors taken as a whole, or material decrease in the assets of the Borrowers and the Guarantors taken as a whole (other than the incurrence of the Indebtedness pursuant to the DIP Term Loan Agreement and the fees and expenses related to the Chapter 11 Cases).

(iv)    Except for any defaults or events of default arising solely as a result of the commencement of the Chapter 11 Cases, any defaults or events of default under the Prepetition ABL Credit Agreement to the extent the Prepetition ABL Obligations have not been fully converted

to Obligations in accordance with this Agreement or any defaults or events of default under any lease or subleases contemplated by Section 5.8(c), no Default or Event of Default shall have occurred and be continuing or shall arise hereunder immediately after giving effect to this Agreement and the Transactions contemplated hereby.

(v) Other than those resulting from the commencement of the Chapter 11 Cases, since the Petition Date there shall have been no adverse change in the ability of the Administrative Agent and the Lenders to enforce the Loan Documents and the Obligations of the Borrowers and the Guarantors hereunder.

(r) Insolvency Matters – Chapter 11 Cases. (i) The Bankruptcy Court shall have entered an Interim Order by no later than three (3) Business Days after the Petition Date; (ii) the Administrative Agent shall have received drafts of the "first day" pleadings for the Chapter 11 Cases, in each case, in form and substance reasonably satisfactory to the Administrative Agent and the Lenders not later than a reasonable time in advance of the Petition Date for Administrative Agent's counsel to review and analyze the same; and (iii) all motions, orders (including the "first day" orders and the Cash Management Order) and other documents to be filed with and submitted to the Bankruptcy Court on the Petition Date shall be in form and substance reasonably satisfactory to the Administrative Agent and the Lenders, and the Bankruptcy Court shall have approved and entered all "first day" orders, including, without limitation, the Cash Management Order.

For purposes of determining whether the Effective Date has occurred, each Lender that has executed this Agreement shall be deemed to have consented to, approved or accepted, or to be satisfied with, each document or other matter required hereunder to be consented to or approved by or acceptable or satisfactory Administrative Agent or such Lender, as the case may be, unless such Lender has notified the Administrative Agent of any disagreement prior to the initial Loans hereunder.

Section 4.2    Conditions to All Loans. The obligation of each Lender to honor any Borrowing Request hereunder is subject to the satisfaction of the following conditions precedent:

(a) Each of the representations and warranties of the Loan Parties set forth in the Loan Documents shall be true and correct in all material respects, in each case on and as of such date as if made on and as of such date, provided that to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; provided further that any representation and warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates.

(b) No Default or Event of Default shall exist, or would result from such proposed Loan or from the application of the proceeds therefrom.

(c) The Administrative Agent shall have received a Borrowing Request in accordance with the requirements hereof.

(d) The Interim Order or the Final Order, as applicable, shall not have been vacated, stayed, reversed, modified, or amended without the Administrative Agent's prior written consent and shall otherwise be in full force and effect and no motion for reconsideration of the Interim Order or the Final Order, as applicable, shall have been timely filed by a Debtor of any of its Subsidiaries.

(e) After giving effect to such proposed Loan, (i) the Total Revolving Outstandings (other than any Overadvances to the extent permitted hereunder) shall not exceed the Line Cap then in

effect, and (ii) there shall not exist or have occurred since the Petition Date, any condition, even or act that could reasonably be expected to have a Material Adverse Effect.

Each Borrowing Request submitted by the Borrower Agent shall be deemed to be a representation and warranty that the conditions specified in Sections 4.2(a), (b), and (d) have been satisfied on and as of the date of the applicable Loan.

ARTICLE 5

REPRESENTATIONS AND WARRANTIES

Each Loan Party represents and warrants to the Administrative Agent and the Lenders that:

Section 5.1    Existence, Qualification and Power; Compliance with Laws.  Each Loan Party and each of its Subsidiaries (a) is duly incorporated, organized or formed, and validly existing and, where applicable, in good standing under the laws of the jurisdiction of its incorporation or organization, (b) subject to the Bankruptcy Code, the Bankruptcy Rules, entry of the Interim Order or the Final Order, as applicable, and such other orders as have been or may hereafter be entered by the Bankruptcy Court in the Chapter 11 cases, has all requisite power and authority to (i) own or lease its assets and carry on its business as now conducted and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party, (c) is duly qualified and, where applicable, in good standing under the laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, and (d) has all requisite governmental licenses, authorizations, consents and approvals to operate its business as currently conducted; except in each case referred to in clauses (c) through (d), (A) where the failure to so qualify is the result of the status of the Loan parties as debtors in possession in the Chapter 11 Cases, or (B) to the extent that failure to do so could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  Each of Holdings and its Subsidiaries are in compliance with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property and maintains all permits and licenses necessary to conduct its business, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

Section 5.2    Authorization; No Contravention.  Subject to entry of the Interim Order or the Final Order, as applicable, the execution and delivery by each Loan Party of each Loan Document to which such Loan Party is a party, and the performance of all of its obligations thereunder, are within such Loan Party's corporate, limited liability company or other analogous powers, have been duly authorized by all necessary corporate, limited liability company or other analogous action, and do not and will not (a) contravene the terms of any of such Person's Organizational Documents, (b) conflict with or result in any breach or contravention of, or the creation of any Lien under (other than under the Loan Documents), or require any payment to be made under (i) any Contractual Obligation not subject to the Automatic Stay imposed as a result of the Chapter 11 Cases to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries, or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject, or (c) violate any law; except with respect to any conflict, breach or contravention or payment (but not creation of Liens) referred to in clause (b)(i), to the extent that such conflict, breach, contravention or payment could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.3    Governmental Authorization; Other Consents.  No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with (a) the execution, delivery or performance by, or

enforcement against, any Loan Party of any Loan Document to which it is a party, or for the consummation of the Transactions, (b) the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents, (c) the perfection or maintenance of the Liens created under the Collateral Documents (including the priority thereof) or (d) the exercise by the Administrative Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Loan Documents, except for (i) filings and recordings necessary to satisfy the Collateral and Guarantee Requirement, (ii) the approvals, consents, exemptions, authorizations, actions, notices and filings which have been duly obtained, taken, given or made and are in full force and effect, and (iii) consent or approval of the Bankruptcy Court.

Section 5.4    <u>Binding Effect</u>.  Each Loan Document has been duly executed and delivered by each Loan Party that is party thereto and, subject to entry of the Interim Order or Final Order, as applicable, constitutes a legal, valid and binding obligation of each such Loan Party, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

Section 5.5    <u>No Material Adverse Effect</u>.  Since the Petition Date, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect other than customarily resulting from the commencement of the Chapter 11 Cases.

Section 5.6    <u>Litigation</u>.  There are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against any Loan Party or, to the knowledge of any Loan Party, threatened against or affecting the Loan Parties or any of their Subsidiaries (a) except for the Chapter 11 Cases or as set forth on <u>Schedule 5.6</u>, as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect or (b) that involve or affect, or that purport to or could reasonably be expected to involve or affect, any Loan Document or the Transactions.  Since the Effective Date, there has been no change in the status of the matters set forth on <u>Schedule 5.6</u> that, individually or in the aggregate, has resulted in, or materially increased the likelihood of, a Material Adverse Effect.

Section 5.7    <u>Environmental Matters</u>.

(a)    As of the Effective Date, except (x) as set forth on <u>Schedule 5.7</u>, (y) for Environmental Claims which have been fully resolved with no remaining obligations or conditions, or (z) as could not reasonably be expected to have a Material Adverse Effect:

(i)    each Loan Party and its Subsidiaries possess all Environmental Permits required under applicable Environmental Law to conduct their respective businesses and are, and within applicable statutes of limitation, have been, in material compliance with the terms of such Environmental Permits.  No Loan Party or any of its Subsidiaries has received written notice that any Environmental Permits possessed by any of them will be revoked, suspended or will not be renewed;

(ii)    the execution and delivery of this Agreement and the consummation by the Loan Parties of the Transactions does not require any notification, registration, reporting, filing, investigation, or environmental response action under any Environmental Law;

(iii)    each of the Loan Parties and their Subsidiaries are currently, and within applicable statutes of limitation, have been, in material compliance with all applicable Environmental Law;

(iv)     no Loan Party nor any of its Subsidiaries has received (A) notice of any pending or threatened civil, criminal or administrative action, suit, demand, claim, hearing, notice of violation, investigation, notice or demand letter or request for information under any Environmental Law, or (B) notice of actual or potential liability under any Environmental Law including any Environmental Liability that such Loan Party or Subsidiary may have retained or assumed either contractually or by operation of law or of any Environmental Claim, in either case with respect to clauses (A) or (B) that reasonably could be expected to result in material expenditure by such Loan Party or Subsidiary.  No Loan Party or any of its Subsidiaries has knowledge of any circumstances that reasonably could be expected to result in a material Environmental Liability;

(v)     as of the Effective Date: (A) no property or facility currently, or to the knowledge of each Loan Party, formerly owned, operated or leased by any Loan Party or any of its current or former Subsidiaries or by any respective predecessor in interest, and (B) no property at which Hazardous Materials generated, owned or controlled by any Loan Party, any of its present or former Subsidiaries or any predecessor in interest have been stored, treated or disposed of, have been identified by a Governmental Authority as recommended for or requiring or potentially requiring environmental assessment and/or response actions under Environmental Law;

(vi)     (A) there has been no disposal, spill, discharge or Release of any Hazardous Material generated, used, owned, stored or controlled by any Loan Party, any of its Subsidiaries or any predecessor in interest, on, at or under any property currently or formerly owned, leased or operated by any Loan Party, any of its current or former Subsidiaries or any predecessor in interest, (B) there are no Hazardous Materials located in, at, on or under such facility or property, or at any other location, in either case (A) or (B), that reasonably could be expected to require investigation, removal, remedial or corrective measures by any Loan Party or any of its Subsidiaries or that reasonably could result in material liabilities of, or material losses, damages or costs to any Loan Party or any of its Subsidiaries under any Environmental Law, and (C) neither the Loan Parties nor any of their Subsidiaries has retained or assumed any liability contractually or by operation of law with regard to the generation, treatment, storage or disposal of Hazardous Materials or compliance with Environmental Law that could reasonably be expected to result in material expenditures by any Loan Party or any of its Subsidiaries;

(vii)     (A) there has not been any underground or aboveground storage tank or other underground storage receptacle or related piping, or any impoundment or other disposal area in each case containing Hazardous Materials located on any facility or property currently or formerly owned, leased or operated by any Loan Party or any of its Subsidiaries, and (B) no asbestos or polychlorinated biphenyls have been used or disposed of, or have been located at, on or under any facility or property currently or formerly owned, leased or operated by any Loan Party or any of its Subsidiaries, in either case (A) or (B) except in material compliance with applicable Environmental Laws or as would not result in material Environmental Liability;

(viii)     no Lien has been recorded against any properties, assets or facilities currently owned, leased or operated by any Loan Party or any of its Subsidiaries under any Environmental Law.

(b)     Since the Effective Date, there has been no change in the status of the matters set forth on Schedule 5.7 that, individually or in the aggregate, has resulted in, or materially increased the likelihood of, a Material Adverse Effect.

(c)     The Loan Parties and their Subsidiaries have provided to the Administrative Agent and its authorized representatives all material records and files, including all material assessments, reports,

studies, analyses, audits, tests and data in their possession or under their control concerning any Environmental Claim, the existence of Hazardous Materials or any other environmental concern at properties, assets or facilities currently or formerly owned, operated or leased by any Loan Party or any of their present or former Subsidiaries or predecessor in interest, or concerning compliance by any Loan Party or any such Subsidiary with, or liability under any Environmental Law.

Section 5.8    Ownership of Properties; Liens.  Each Loan Party and its Subsidiaries (a) has good title to, or valid leasehold interests in, all its real and personal property material to its business, except for minor defects in title that do not interfere with its ability to conduct its business as currently conducted or to utilize such properties for their intended purposes, free and clear of all Liens, other than Liens permitted under Section 7.2; (b) owns, or is entitled to use, all trademarks, service marks, trade names, domain names, copyrights, patents, patent rights, technology, software, know-how database rights, design rights and other intellectual property rights material to its business, and the use thereof by the Loan Parties and their respective Subsidiaries does not infringe upon the rights of any other Person, except for where the failure to own, or have entitlement to use, any such intellectual property (or intellectual property rights) or any such infringements that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, (c) has complied in all material respects with all obligations under all material leases to which it is a party and all such leases are in full force and effect and is not in default of any material terms thereof, other than defaults arising solely as a result of the commencement of the Chapter 11 Cases; and (d) enjoys peaceful and undisturbed possession under all such material leases.

Section 5.9    Casualty, Etc.  Neither the businesses nor the properties of any Loan Party or any of its Subsidiaries are affected by any fire, explosion, accident, strike, lockout or other labor dispute, drought, storm, hail, earthquake, embargo, act of God or of the public enemy or other casualty (whether or not covered by insurance) that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

Section 5.10    Investment Company Status, Etc.  No Loan Party or any of its Subsidiaries is (a) an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940 or (b) otherwise subject to any other regulatory scheme limiting its ability to incur debt.

Section 5.11    Taxes.  Each Loan Party and its Subsidiaries has timely filed or caused to be filed all federal and material state, municipal and other Tax returns and reports required to be filed, and have timely paid all federal and material state, municipal and Taxes levied or imposed upon them or their properties, income or assets otherwise due and payable, except (a) those which are being Contested in Good Faith, which contest conclusively operates to stay imposition of any penalty, fine, or Lien resulting from the non-payment thereof, (b) to the extent excused or enforcement in respect of which is stayed as a result of the Chapter 11 Cases, and (c) failures to file or pay as could not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

Section 5.12    ERISA.

(a)    Each Loan Party and each of its ERISA Affiliates is in compliance in all material respects with the applicable provisions of ERISA and the Code and the regulations and published interpretations thereunder.  No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur, could reasonably be expected to result in a Material Adverse Effect.  No event described in Section 4062(e) of ERISA has occurred and is continuing with respect to any Pension Plan.  The present value of all accumulated benefit obligations under each Pension Plan (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of such Pension Plan and the

present value of all accumulated benefit obligations of all underfunded Pension Plans (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of all such underfunded Pension Plans.

(b)     Each Pension Plan that is intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the IRS or an application for such a letter is currently being processed by the IRS with respect thereto and, to the knowledge of the Loan Parties, nothing has occurred which would prevent, or cause the loss of, such qualification.  Each Loan Party and ERISA Affiliate has made all required contributions to each Pension Plan subject to Section 412 of the Code, and no application for a funding waiver pursuant to Section 412 of the Code has been made with respect to any Pension Plan.

(c)     There are no pending or, to the knowledge of the Loan Parties, threatened claims, actions, or lawsuits, or action by any Governmental Authority, with respect to any Pension Plan that could reasonably be expected to have a Material Adverse Effect.  There has been no violation of the fiduciary responsibility rules of ERISA with respect to any Pension Plan that has resulted in or could reasonably be expected to have a Material Adverse Effect.

(d)     No Loan Party or ERISA Affiliate (i) has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due and not delinquent under Section 4007 of ERISA), (ii) has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Section 4201 of ERISA with respect to a Multiemployer Plan, and (iii) has engaged in a transaction that could be subject to Section 4069 or Section 4212(c) of ERISA.

(e)     No such Pension Plan or trust created thereunder, or party in interest (as defined in Section 3(14) of ERISA), or any fiduciary (as defined in Section 3(21) of ERISA), has engaged in a "prohibited transaction" (as such term is defined in Section 406 of ERISA or Section 4975 of the Code) which would subject such Pension Plan or any other plan of any Loan Party or any of its ERISA Affiliates, any trust created thereunder, or any such party in interest or fiduciary, or any party dealing with any such Pension Plan or any such trust, to any material penalty or tax on "prohibited transactions" imposed by Section 502 of ERISA or Section 4975 of the Code.

(f)     With respect to any Foreign Plan, (i) all employer and employee contributions required by law or by the terms of the Foreign Plan have been made, or, if applicable, accrued, in accordance with normal accounting practices; (ii) the fair market value of the assets of each funded Foreign Plan, the liability of each insurer for any Foreign Plan funded through insurance, or the book reserve established for any Foreign Plan, together with any accrued contributions, is sufficient to procure or provide for the accrued benefit obligations with respect to all current and former participants in such Foreign Plan according to the actuarial assumptions and valuations most recently used to account for such obligations in accordance with applicable generally accepted accounting principles; and (iii) it has been registered as required and has been maintained in good standing with applicable regulatory authorities.

Section 5.13   Subsidiaries; Equity Interests.  As of the Effective Date, no Loan Party has any direct or indirect Subsidiaries or investments in, or joint ventures or partnerships with, any Person, except as disclosed in Schedule 5.13.  Such Schedule sets forth (a) the name and jurisdiction of organization or incorporation of each Subsidiary and (b) the ownership interest of each Loan Party and tier respective Subsidiaries in each of their respective Subsidiaries, including the percentage of such ownership.  Neither any Loan Party nor any of its Subsidiaries has issued any Disqualified Equity Interests and there are no outstanding options or warrants to purchase Equity Interests of any Loan Party or any of its Subsidiaries of any class or kind, and there are no agreements, voting trusts or understandings with respect thereto or

affecting in any manner the sale, pledge, assignment or other disposition thereof, including any right of first refusal, option, redemption, call or other rights with respect thereto, whether similar or dissimilar to any of the foregoing. All of the issued and outstanding Equity Interests owned by any Loan Party in its Subsidiaries have been duly authorized and issued and are fully paid and non-assessable and are free and clear of all Liens other than Liens in favor of the Administrative Agent under the Collateral Documents, and Liens created under the Prepetition ABL Loan Documents, the DIP Term Loan Documents, and the Prepetition Term Loan Documents.

Section 5.14    Insurance. As of the Effective Date, Schedule 5.14 sets forth a description of all insurance maintained by or on behalf of the Loan Parties and their Subsidiaries on the Effective Date (including names of carriers, policy number, expiration dates, insurance types and coverage amounts). As of the Effective Date, all premiums in respect of such insurance that are due and payable have been paid.

Section 5.15    Federal Reserve Regulations, Etc. Neither any Loan Party nor any of its Subsidiaries is engaged principally, or as one of their important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock. Immediately before and after giving effect to the making of each Loan, Margin Stock will constitute less than 25% of each Loan Party's assets as determined in accordance with Regulation U. No part of the proceeds of any Loan will be used, directly or indirectly, (a) to purchase, acquire or carry any Margin Stock or for any purpose that entails a violation of, or that is inconsistent with, the provisions of the regulations of the Board, including Regulation T, U or X or (b) for any purpose that would violate any Anti-Corruption Laws, Anti-Money Laundering Laws, or applicable Sanctions.

Section 5.16    [Reserved].

Section 5.17    [Reserved].

Section 5.18    Anti-Corruption Laws; Sanctions; Anti-Terrorism Laws.

(a)    Each Loan Party, its Subsidiaries and their respective officers, employees, directors and agents, are in compliance with Anti-Corruption Laws, Anti-Money Laundering Laws, and applicable Sanctions. None of the Loan Parties, any of their Subsidiaries or any director, officer, employee, agent, or affiliate of any Loan Party or any of its Subsidiaries is an individual or entity that is, or is owned or controlled by, a Sanctioned Person or is located, organized or resident in a country or territory that is a Sanctioned Country. Each Loan Party and each of its Subsidiaries has implemented and maintains in effect policies and procedures reasonably designed to ensure compliance by such Loan Party, its Subsidiaries and their respective directors, officers, employees and agents with all applicable Anti-Corruption Laws, Anti-Money Laundering Laws, and Sanctions.

(b)    The Borrowers will not, directly or indirectly, use the proceeds of any Loan or other transaction contemplated hereby or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint venture partner or other Person, (i) to fund any activities or business of or with any Person, or in any country or territory, that, at the time of funding, is the subject of Sanctions, or (ii) in any other manner that would result in a violation of Sanctions by any Person. Neither the making of the Loans or other transactions contemplated hereby nor the use of the proceeds thereof will violate Anti-Corruption Laws, Anti-Money Laundering Laws or Sanctions. No part of the proceeds of the Loans will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the Anti-Corruption Laws.

(c)     Borrowers have taken, and shall continue to take until the Loan is fully repaid, such measures as are required by law to assure that the funds used to repay the Loan are derived: (i) from transactions that do not violate United States law nor, to the extent such funds originate outside the United States, do not violate the laws of the jurisdiction in which they originated; and (ii) from permissible sources under United States law and to the extent such funds originate outside the United States, under the laws of the jurisdiction in which they originated.

(d)     To the best of Borrowers' knowledge after making due inquiry, neither any Loan Party nor any Person providing funds to Borrowers:  (i) is under investigation by any Governmental Authority for, or has been charged with, or convicted of, money laundering, drug trafficking, terrorist related activities, any crimes which in the United States would be predicate crimes to money laundering, or any violation of any Anti-Money Laundering Laws; (ii) has been assessed civil or criminal penalties under any Anti-Money Laundering Laws; or (iii) has had any of its funds seized or forfeited in any action under any Anti-Money Laundering Laws.

(e)     Neither the making of the Loans hereunder nor the use of the proceeds thereof will violate the any regulations passed under the USA PATRIOT Act or will violate the Trading with the Enemy Act, the International Emergency Economic Powers Act, or any regulations passed thereunder, including the foreign assets control regulations of the United States Treasury Department (31 C.F.R., Subtitle B, Chapter V) or any enabling legislation or executive order relating thereto or successor statute thereto (together with Sanctions, "Anti-Terrorism Laws").  Each Loan Party and each of its Subsidiaries are in compliance with applicable Anti-Terrorism Laws.

Section 5.19    Real Property.  Schedule 5.19 lists completely and correctly as of the Effective Date all Real Property owned by any Loan Party and the addresses thereof.  One or more of the Loan Parties own in fee all the real property set forth on Schedule 5.19.

Section 5.20    Accuracy of Information, Etc.

(a)     Each Loan Party has disclosed to the Credit Parties all agreements, instruments and corporate or other restrictions to which it or any of its Subsidiaries is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  None of the reports, financial statements, certificates or other information furnished (whether in writing or orally) by or on behalf of any Loan Party to any Credit Party in connection with the transactions contemplated hereby contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, provided that, with respect to projected financial information, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

(b)     As of the Effective Date, the information included in the Beneficial Ownership Certification is true and correct in all respects.

(c)     Each Loan Party prepared the Approved Budget as in effect on the Effective Date in good faith, based upon assumptions believed by the Borrowers to be reasonable at the time of the delivery thereof to the Administrative Agent.

Section 5.21    Labor Matters.  There are no strikes, lockouts or slowdowns against any Loan Party or any of its Subsidiaries pending or, to the knowledge of any Loan Party, threatened.  The hours worked by and payments made to employees of the Loan Parties and their Subsidiaries have not been in violation in any material respect of the Fair Labor Standards Act or any other applicable Federal, state, local or

foreign law dealing with such matters. All material payments due from the Loan Parties or any of their Subsidiaries, or for which any claim may be made against any of the Loan Parties or any of their Subsidiaries, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of such Loan Party or such Subsidiary. The consummation of the Transactions will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any of the Loan Parties or any of their Subsidiaries is bound.

Section 5.22    Absence of Certain Restrictions. No indenture, certificate of designation for preferred stock, agreement or instrument to which any Loan Party or any of its Subsidiaries is a party (other than this Agreement), prohibits or limits in any way, directly or indirectly the ability of any Subsidiary to make Restricted Payments or loans to, to make any advance on behalf of, or to repay any Indebtedness to, any Loan Party or to another Subsidiary.

Section 5.23    No Default. Except for any defaults or events of default arising solely as a result of the commencement of the Chapter 11 Cases, any defaults or events of default arising under the Prepetition ABL Credit Agreement to the extent the Prepetition ABL Obligations have not been converted to Obligations in accordance with this Agreement, or any defaults under any leases or subleases contemplated by Section 5.8(c), no Loan Party nor any of its Subsidiaries is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound in any respect that could reasonably be expected to have a Material Adverse Effect. Except for any defaults or events of default arising solely as a result of the commencement of the Chapter 11 Cases, no Default or Event of Default has occurred and is continuing.

Section 5.24    Common Enterprise. The successful operation and condition of each of the Loan Parties is dependent on the continued successful performance of the functions of the group of the Loan Parties as a whole and the successful operation of each of the Loan Parties is dependent on the successful performance and operation of each other Loan Party. Each Loan Party expects to derive benefit (and its Board of Directors or other governing body has determined that it may reasonably be expected to derive benefit), directly and indirectly, from (a) successful operations of each of the other Loan Parties and (b) the credit extended by the Lenders to the Borrowers hereunder, both in their separate capacities and as members of the group of companies. Each Loan Party has determined that execution, delivery, and performance of this Agreement and any other Loan Documents to be executed by such Loan Party is within its purpose, will be of direct and indirect benefit to such Loan Party, and is in its best interest.

Section 5.25    Brokers' Fees. None of the Loan Parties or their Subsidiaries has any obligation to any Person in respect of any finder's, broker's, investment banking or other similar fee in connection with any of the transactions contemplated under the Loan Documents other than the closing and other fees payable pursuant to this Agreement and as set forth in the Fee Letter.

Section 5.26    Affected Financial Institutions. No Loan Party is an Affected Financial Institution.

Section 5.27    Accounts. With respect to each of the Loan Parties' Eligible Accounts, unless otherwise disclosed to the Administrative Agent in writing:

(a)    It is genuine and in all respects what it purports to be, and it is not evidenced by a judgment;

(b)    It arises out of a completed, bona fide sale and delivery of goods or rendition of services by a Loan Party, in the ordinary course of its business and in accordance with the terms and

conditions of all purchase orders, contracts or other documents relating thereto and forming a part of the contract between a Loan Party and the Account Debtor;

(c)     It is for a liquidated amount maturing as stated in the duplicate invoice covering such sale or rendition of services, a copy of which has been furnished or is available to the Administrative Agent;

(d)     There are no facts, events or occurrences which in any way impair the validity or enforceability of any Accounts or tend to reduce the amount payable thereunder from the face amount of the invoice and statements delivered or made available to the Administrative Agent with respect thereto;

(e)     To the best of the Loan Parties' knowledge, the Account Debtor thereunder (i) had the capacity to contract at the time any contract or other document giving rise to the Account was executed and (ii) such Account Debtor is Solvent; and

(f)     To the best of the Loan Parties' knowledge, there are no proceedings or actions which are threatened or pending against the Account Debtor thereunder which might result in any material adverse change in such Account Debtor's financial condition or the collectability of such Account.

Section 5.28     Approved Budget.  Each of the initial Approved Budget, attached hereto as Annex A, which was delivered to the Administrative Agent on or prior to the Effective Date, and the then-applicable Approved Budget, was prepared in good faith upon assumptions the Borrowers believed to be reasonable assumptions on the date of delivery of the then-applicable Approved Budget or update thereto.  To the knowledge of the Borrowers, no facts exist that (individually or in the aggregate) would result in any material change in the then-applicable Approved Budget.

Section 5.29     Chapter 11 Cases.

(a)     The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable law and proper notice thereof was given for (i) the motion seeking approval of the Loan Documents and the Interim Order and Final Order, (ii) the hearing for the entry of the Interim Order, and (iii) the hearing for the entry of the Final Order.  The Debtors shall give, on a timely basis as specified in the Interim Order or the Final Order, as applicable, all notices required to be given to all parties specified in the Interim Order or Final Order, as applicable.

(b)     After the entry of the Interim Order, and pursuant to and to the extent permitted in the Interim Order and the Final Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Cases having priority over all administrative expense claims and unsecured claims against the Debtors now existing or hereafter arising, of any kind whatsoever, including all administrative expense claims of the kind specified in sections 105, 326, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under section 364(c)(l) of the Bankruptcy Code, subject to (i) the Carve Out and (ii) such other exceptions, if any, set forth in the Interim Order or Final Order, as applicable.

(c)     After the entry of the Interim Order and pursuant to and to the extent provided in the Interim Order and the Final Order, the Obligations will be secured by a valid and perfected first priority Lien on all of the Collateral subject, as to priority, only to (i) the Carve Out, and (ii) the Liens permitted pursuant to Section 7.2(g) and (h).

(d)     The Interim Order (with respect to the period on and after entry of the Interim Order and prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final

Order), as the case may be, is in full force and effect and has not been reversed, stayed (whether by statutory stay or otherwise), vacated, or, without the Administrative Agent's consent, modified or amended. The Loan Parties are in compliance in all material respects with the applicable Order.

(e)     Notwithstanding the provisions of section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Interim Order or the Final Order, as the case may be, upon the Maturity Date (whether by acceleration or otherwise) of any of the Obligations, the Administrative Agent and Lenders shall be entitled to immediate payment of such Obligations and to enforce the remedies provided for hereunder or under applicable law, without further notice, motion or application to, hearing before, or order from, the Bankruptcy Court.

ARTICLE 6

AFFIRMATIVE COVENANTS

Until the Termination Date, each Loan Party covenants and agrees with the Credit Parties that:

Section 6.1     <u>Financial Statements and Other Information</u>. Each Loan Party will furnish or cause to be furnished to the Administrative Agent and each Lender either in hard copy or by posted to ABLSoft, or, if requested by the Administrative Agent, by another form of Approved Electronic Communication pursuant to procedures approved in writing by the Administrative Agent:

(a)     [Reserved];

(b)     [Reserved];

(c)     [Reserved];

(d)     [Reserved];

(e)     [Reserved];

(f)     [Reserved];

(g)     [Reserved];

(h)     promptly following any request therefor, (i) such other information and documentation reasonably requested by the Administrative Agent or any Lender for purposes of compliance with applicable "know your customer" requirements under the USA Patriot Act, the Beneficial Ownership Regulation or other applicable Anti-Corruption Laws, Anti-Money Laundering Laws, and Anti-Terrorism Laws (including those passed pursuant to the USA PATRIOT Act), and (ii) such other information regarding the operations, business affairs and financial condition of Holdings or any Subsidiary, or compliance with the terms of the Loan Documents, as the Administrative Agent or any Lender may reasonably request;

(i)     [Reserved];

(j)     substantially contemporaneously with the delivery thereunder, all notices, certifications or other information or deliverables provided to the DIP Term Loan Agent and/or the lenders under the DIP Term Loan Agreement pursuant to the terms thereof; and

(k)     promptly upon request, such other information concerning the condition or operations, financial or otherwise, of any Loan Party as the Administrative Agent may from time to time may reasonably request.

Section 6.2   <u>Notices of Material Events</u>. Each Loan Party will furnish or caused to be furnished to the Administrative Agent each Lender prompt written notice of the following:

(a)     the occurrence of any Default or Event of Default, or any "Default" or "Event of Default" under the DIP Term Loan Agreement, in each case specifying the nature and extent thereof;

(b)     the filing or commencement of, or any threat or notice of intention of any Person to file or commence, any action, suit or proceeding, whether at law or in equity or by or before any Governmental Authority, against, or affecting, any Loan Party or any of its Subsidiaries that could reasonably be expected to result in a Material Adverse Effect;

(c)     if requested by Administrative Agent from time to time, copies of any annual report required to be filed in connection with each Pension Plan or Foreign Plan, and as soon as possible after, and in any event within ten days after any Loan Party or any ERISA Affiliate knows or has reason to know that, any ERISA Event (or any similar event with respect to a Foreign Plan) has occurred that, alone or together with any other ERISA Event (or any similar event with respect to a Foreign Plan) could reasonably be expected to result in liability of any Loan Party or any ERISA Affiliate that could reasonably be expected to result in a Material Adverse Effect;

(d)     as soon as possible and in no event later than five Business Days after the receipt by any Loan Party or any of its Subsidiaries, of a copy of any notice, summons, citation or other written communication concerning any actual, alleged, suspected or threatened violation of any Environmental Law by, Environmental Claim against or Environmental Liability of, any Loan Party or any of its Subsidiaries, in each case, which could reasonably be expected to have a Material Adverse Effect;

(e)     promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by any Loan Party or any of its Subsidiaries with the Securities and Exchange Commission, or any Governmental Authority succeeding to any or all of the functions of said Commission, or with any national securities exchange, or distributed by any Loan Party to its shareholders generally, as the case may be;

(f)     promptly after the furnishing thereof, copies of any statement or report furnished to any holder of debt securities of any Loan Party or of any of its Subsidiaries pursuant to the terms of any indenture, loan or credit or similar agreement and not otherwise required to be furnished to the Lenders pursuant to any other clause of this <u>Section 6.2</u>;

(g)     any pending or threatened labor dispute, strike or walkout, or the expiration of any material labor contract;

(h)     promptly after any Loan Party or any of its Subsidiaries (i) being required to file reports under Section 15(d) of the Securities Exchange Act of 1934, or (ii) registering securities under Section 12 of the Securities Exchange Act of 1934;

(i)     in the event that any Person shall become, or cease to be, a Subsidiary or a Guarantor, the Borrower Agent shall promptly furnish to the Administrative Agent an updated list of Subsidiaries or Guarantors, as the case may be;

(j)      (i) as soon as practicable in advance of filing with the Bankruptcy Court or delivering to the Committee appointed in a Chapter 11 Case, if any, or to the U.S. Trustee, as the case may be, the Final Order, all other material proposed orders and pleadings related to or that could affect (all of which must be in form and substance reasonably satisfactory to the Administrative Agent) the Prepetition ABL Credit Agreement, this Agreement and the credit facilities contemplated thereby, the ABL Priority Collateral, the rights and remedies of the Administrative Agent or Lenders, the DIP Term Loan Facility and/or any sale contemplated in accordance with the Required Milestones and/or any disclosure statement related thereto (all of which must be in form and substance reasonably satisfactory to the Administrative Agent), and (ii) substantially simultaneously with the filing with the Bankruptcy Court or delivering to the Committee appointed in any Chapter 11 Case, if any, or to the U.S. Trustee, as the case may be (which may be delivered via ECF notice to counsel for the Administrative Agent), monthly written operating reports and all other written notices, filings, motions, pleadings or other written information concerning the financial condition of the Loan Parties or their Subsidiaries that may be filed with the Bankruptcy Court or delivered to the Committee appointed in any Chapter 11 Case, if any, or to the U.S. Trustee, in each case, excluding any such reports, notices, filings, motions, pleadings or other information subject to privilege (provided, that the Loan Parties may redact any confidential information contained in any such report, notice, filing, motion, pleading or information if it provides a summary of the nature of the information redacted to the Administrative Agent);

(k)      the occurrence of any other development that has resulted in, or could reasonably be expected to result in, a Material Adverse Effect; and

(l)      any change in the information provided in the most recently delivered Beneficial Ownership Certification that would result in a change to the list of beneficial owners identified therein.

Each notice delivered under this Section shall be accompanied by a statement of a Financial Officer of the Borrower Agent or other executive officer of the Borrower Agent setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

Section 6.3      Existence; Conduct of Business.  Each Loan Party will, and will cause each of its Subsidiaries to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits, privileges and franchises material to the conduct of its business, provided that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 7.3 or any sale, lease, transfer or other disposition permitted by Section 7.5.

Section 6.4      Payment and Performance of Obligations.  Subject to the Orders and the terms thereof and the Approved Budget, each Loan Party will, and will cause each of its Subsidiaries to, pay or discharge all obligations under its respective Contractual Obligations and all other material liabilities and obligations, including Taxes, incurred after the Petition Date (but for the avoidance of doubt, Taxes incurred before the Petition Date which are required to be paid in accordance with the Orders or any other order of the Bankruptcy Court shall be permitted to be paid), before the same shall become delinquent or in default (after giving effect to any applicable cure periods), but all in accordance with and subject to the Approved Budget (and the permitted variances provided for therein), except where either (a) the validity or amount thereof is being Contested in Good Faith or (b) such payment or discharge is subject to the Automatic Stay imposed as a result of the Chapter 11 Cases.

Section 6.5      Maintenance of Properties.  Each Loan Party will, and will cause each of its Subsidiaries to, keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted.

Section 6.6     Books and Records; Inspection Rights and Appraisals.  Each Loan Party will, and will cause each of its Subsidiaries to (a) keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities, (b) permit the Administrative Agent and its representatives to conduct field examinations and/or appraisals of Inventory or other Collateral, and (c) permit any representatives designated by the Administrative Agent or any Lender, to visit and inspect its properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accounting firm, all at the expense of the Borrowers and at such reasonable times and as often as reasonably requested; provided, however, so long as no Default or Event of Default has occurred and is continuing, the Borrowers shall only be responsible for the costs and expenses of (i) four (4) commercial field examinations per year of the Loan Parties, the Collateral, and such other matters as the Administrative Agent shall deem appropriate in its Permitted Discretion, and (ii) two (2) appraisals per year from appraisers stating the then current fair market value or orderly liquidation value of the Inventory of the Loan Parties, which appraisals and field examinations may be conducted by employees of the Administrative Agent or by third parties hired by the Administrative Agent; provided further, during the existence of a Default or Event of Default, the Administrative Agent or any Lender (or any of their respective representatives) may do any of the foregoing at the expense of the Borrowers at any time during normal business hours and without advance notice.

Section 6.7     Compliance with Laws.  Each Loan Party will, and will cause each of its Subsidiaries to comply with (a) all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property and maintain all permits and licenses necessary to conduct its business, except where (i) the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect or (ii) such compliance is stayed by the Chapter 11 Cases, and (b) the Bankruptcy Code, the Bankruptcy Rules, the Orders, and any other order of the Bankruptcy Court in all material respects.  In addition, and without limiting the foregoing, each Loan Party will, and will cause each of its Subsidiaries to, comply with all applicable Environmental Laws in all material respects, and with Anti-Corruption Laws, Anti-Money Laundering Laws, applicable Sanctions and the USA PATRIOT Act and the regulations promulgated thereunder in all respects.

Section 6.8     Use of Proceeds.

(a)     The proceeds of the Loans will be used on and after the Effective Date only (i) to fund the Chapter 11 Cases in accordance with the Approved Budget (subject to variances permitted under Section 6.17), (ii) for the financing of the Company's and its Subsidiaries' ordinary working capital and other general corporate needs including certain fees and expenses of professionals retained by the Loan Parties, subject to the Carve Out, in each case, to the extent permitted under this Agreement and in accordance with the Approved Budget, (iii) for certain other Prepetition and pre-filing expenses and payments that are approved by the Bankruptcy Court and permitted by the Approved Budget, and (iv) to pay the Prepetition ABL Obligations.  The Loan Parties shall not be permitted to use the proceeds of the Loans in contravention of the provisions of the applicable Order or the Bankruptcy Code, including any restrictions or limitations on the use of proceeds contained therein.  The Postpetition payment of Prepetition ABL Obligations, including principal, interest, fees, penalties or recoverable costs, due and payable in connection with the Prepetition ABL Credit Agreement with the proceeds of the Collateral (as defined herein) or Collateral (as defined in the Prepetition ABL Credit Agreement) shall be made in accordance herewith.

(b)     No part of the proceeds of any Loan will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, (i) to purchase, acquire or carry any Margin Stock or (ii) for any purpose that entails a violation of any of the regulations of the Board, including Regulations T, U, and X.  The Borrowers will not request any Loan, and the Borrowers shall not use, and shall ensure that each Loan Party, their respective Subsidiaries and their respective directors, officers, employees and agents

shall not use, the proceeds of any Loan (A) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws or (B) in any manner that would result in the violation of any Anti-Money Laundering Laws, applicable Sanctions or any Anti-Terrorism Laws by any Person, including any Credit Party.

Section 6.9    Information Concerning Collateral.    Each Loan Party will furnish to the Administrative Agent (a) at least thirty (30) days written notice before any change in (i) the legal name or jurisdiction of incorporation or formation of any Loan Party, or (ii) the identity or organizational structure of any Loan Party, or the Federal Taxpayer Identification Number or company organizational number of any Loan Party, and (b) prompt written notice (and in no event later than ten (10) days) after any change in the location of the chief executive office of any Loan Party, its principal place of business, any office in which it maintains books or records relating to Collateral owned or held by it or on its behalf or any office or facility at which Collateral owned or held by it or on its behalf (including the establishment of any such new office or facility).

Section 6.10    Insurance.

(a)    Each Loan Party will, and will cause each of its Subsidiaries to, maintain, with financially sound and reputable insurance companies, adequate insurance for its insurable properties, all to such extent and against such risks, including fire, casualty, business interruption and other risks insured against by extended coverage, as is customary with companies in the same or similar businesses operating in the same or similar locations and of same or similar size, including public liability insurance against claims for personal injury or death or property damage occurring upon, in, about or in connection with the use of any properties owned, occupied or controlled by it (including all insurance required pursuant to the Collateral Documents); and maintain such other insurance as may be required by law.

(b)    The Loan Parties shall maintain flood insurance on all Real Property constituting Collateral, from such providers, in amounts and on terms in accordance with the Flood Laws or as otherwise satisfactory to all Lenders.

(c)    Each Loan Party will, and will cause each of its Subsidiaries to, (i) cause all such policies to be endorsed or otherwise amended to include an additional insured endorsement or a "standard" or "New York" lender's loss payable endorsement, as appropriate, each in form and substance reasonably satisfactory to the Administrative Agent, and which lender's loss payable endorsement or amendment shall provide that, from and after the Effective Date, if the insurance carrier shall have received written notice from the Administrative Agent of the occurrence of an Event of Default, the insurance carrier shall pay all proceeds otherwise payable to such Loan Party under such policies directly to the Administrative Agent, (ii) cause all such policies to provide that neither such Loan Party, any Subsidiary or the Administrative Agent nor any other party shall be a co-insurer thereunder and to contain a "Replacement Cost Endorsement", without any deduction for depreciation, and such other provisions as the Administrative Agent may reasonably require from time to time to protect its interests, (iii) upon request by the Administrative Agent deliver original or certified copies of all such policies to the Administrative Agent, (iv) cause each such policy to provide that it shall not be canceled, modified or not renewed for any other reason upon not less than thirty (30) days' (or 10 days' in the case of cancellation or non-renewal as a result of the failure to pay the premium of any such policy) prior written notice thereof by the insurer to the Administrative Agent, (v) deliver to the Administrative Agent, prior to the cancellation, modification or non-renewal of any such policy of insurance, a copy of a renewal or replacement policy (or other evidence of renewal of a policy previously delivered to the Administrative Agent) together with evidence satisfactory to the Administrative Agent of payment of the premium therefor.

(d)     Each Loan Party will promptly upon request of the Administrative Agent or any other Lender, deliver to the Administrative Agent (for distribution to all Lenders), evidence of compliance by all Loan Parties with the requirements contained Sections 6.10(a) through (c) in form and substance reasonably acceptable to the Administrative Agent and the Lenders, including, without limitation, evidence of annual renewals of such insurance.

(e)     In connection with the covenants set forth in this Section 6.10, it is understood and agreed that:

(i)     no Credit Party or any of its Related Parties shall be liable for any loss or damage insured by the insurance policies required to be maintained under this Section 6.10, it being understood that (A) each Loan Party shall look solely to its insurance companies or any other parties other than the aforesaid parties for the recovery of such loss or damage and (B) such insurance companies shall have no rights of subrogation against any Credit Party or any of their Related Parties, provided, however, that if the insurance policies do not provide waiver of subrogation rights against such parties, as required above, then each Loan Party (for itself and each of its Subsidiaries) hereby agrees, to the extent permitted by law, to waive its right of recovery, if any, against the Credit Parties and their Related Parties; and

(ii)     the designation of any form, type or amount of insurance coverage by the Administrative Agent or the Required Lenders under this Section 6.10 shall in no event be deemed a representation, warranty or advice by any Credit Party that such insurance is adequate for the purposes of the business of any Loan Party or its Subsidiaries or the protection of their properties and the Administrative Agent and the Required Lenders shall have the right from time to time to require the Loan Parties and their respective Subsidiaries to keep other insurance in such form and amount as the Administrative Agent or the Required Lenders may reasonably request; provided that such insurance shall be obtainable on commercially reasonable terms.

Section 6.11    Casualty Events. Each Loan Party will, and will cause each of its Subsidiaries to, furnish to the Credit Parties prompt written notice of (a) each Casualty Event or other insured damage to any portion of the Collateral in an amount in excess of $250,000, or (b) the commencement of any action or proceeding for the condemnation or other taking of any property or any part thereof or interest therein under power of eminent domain or by condemnation or similar proceeding having a value in excess of $250,000.

Section 6.12    Covenant to Guarantee and Provide Security.

(a)     Additional Subsidiaries. If any Subsidiary of a Loan Party is formed or acquired after the Effective Date, the Borrower Agent will notify the Credit Parties in writing thereof within five Business Days following the date on which such Subsidiary is formed or acquired (or such later date as may be acceptable to the Administrative Agent in its sole discretion) and, within 30 days of such date (or, if in connection with an Acquisition, by such date):

(i)     the Loan Parties will cause each such Subsidiary to (A) execute and deliver a Subsidiary Joinder Agreement and (B) promptly take such actions to create and perfect Liens on such Subsidiary's assets to secure the Obligations as the Administrative Agent shall reasonably request (including the execution and delivery of any collateral document necessary or appropriate to create and perfect Liens with respect to such Subsidiary's owned or leased real property or any Collateral Access Agreement or similar document),

(ii)     if any Equity Interests issued by any such Subsidiary are owned or held by or on behalf of any Loan Party, the Loan Parties will cause such Equity Interests to be pledged pursuant to the Collateral Documents not later than the tenth Business Day after the date on which such Subsidiary is formed or acquired, and

(iii)     the Loan Parties will deliver or cause to be delivered to the Administrative Agent such certificates, instruments and other deliverables as would have been required had such Subsidiary been a Guarantor on the Effective Date or as otherwise requested by the Administrative Agent.

(b)     <u>Further Assurances</u>.

(i)     Each Borrower will, and will cause each of the Loan Parties to, grant to the Administrative Agent, for the benefit of the Secured Parties, security interests in such of its assets and properties as are not covered by the Collateral Documents in order that the Borrowers be in compliance with the Collateral and Guarantee Requirement.  Such security interests shall (i) be granted pursuant to documentation reasonably satisfactory in form and substance to the Administrative Agent and (ii) constitute valid and enforceable perfected security interests superior to and prior to the rights of all third Persons, and subject to no other Liens, except Liens permitted by <u>Section 7.2</u>.  Such additional collateral documents and the other instruments related thereto shall have been duly recorded or filed in such manner and in such places as are required by law to establish, perfect, preserve and protect the Liens in favor of the Administrative Agent required to be granted pursuant to such additional collateral documents and all taxes, fees and other charges payable in connection therewith shall have been paid in full.

(ii)     Each Borrower will, and will cause each of the Loan Parties to, at its own expense, make, execute, endorse, acknowledge, file or deliver to the Administrative Agent from time to time such vouchers, invoices, schedules, confirmatory assignments, conveyances, financing statements, transfer endorsements, powers of attorney, certificates, surveys, reports and other assurances or instruments, and take such further steps relating to the Collateral covered by any of the Collateral Documents as the Administrative Agent may reasonably require.  Each Borrower shall cause to be delivered to the Administrative Agent such opinions of counsel and other related documents as may be reasonably requested by the Administrative Agent.

(iii)     Each action required by this <u>Section 6.12(b)</u> shall be completed as soon as possible, but in no event later than 30 days (or such longer period in the case of actions involving third parties as determined by the Administrative Agent in its reasonable discretion) after any such assets or properties are acquired or such action is requested to be taken by the Administrative Agent, as the case may be.

(c)     <u>Real Property</u>.

(i)     Upon the acquisition by any Loan Party after Effective Date of any Material Real Property or if any Real Property becomes Material Real Property, the Borrower Agent shall immediately notify the Administrative Agent, setting forth with specificity a description of such Material Real Property, including the location thereof, any structures or improvements thereon and, as determined by the Administrative Agent in its sole discretion, either an appraisal or Borrower Agent's good faith estimate of the current value of such Material Real Property.  Within 60 days of the delivery of such notice and unless the Administrative Agent in its sole discretion determines not to require a Mortgage on such Material Real Property:

(A) the Loan Party that owns such Material Real Property shall have satisfied the Mortgage Requirement, and

(B) the Borrowers shall, or shall cause such Loan Party to, pay all fees and expenses, including Attorney Costs, and all title insurances charges and premiums, in connection with each Loan Party's obligations under this Section.

(ii) Notwithstanding the foregoing, no Real Property shall be taken as Collateral unless Lenders receive 60 days advance notice and each Lender confirms to the Administrative Agent that it has completed all flood due diligence, received copies of all flood insurance documentation and confirmed flood insurance compliance as required by the Flood Laws or as otherwise satisfactory to such Lender.  At any time that any Real Property constitutes Collateral, no modification of a Loan Document shall add, increase, renew or extend any loan, commitment or credit line hereunder until the completion of flood due diligence, documentation and coverage as required by the Flood Laws or as otherwise satisfactory to all Lenders.

Section 6.13 <u>Environmental Matters</u>.  Each Loan Party will, and will cause each of their respective Subsidiaries to, (a) conduct its operations in material compliance with all applicable Environmental Laws, (b) implement any and all investigation, remediation, removal and response actions that either are necessary to materially comply with Environmental Laws pertaining to the presence, generation, treatment, storage, use, disposal, transportation or Release of any Hazardous Material on, at, under, or from any of their owned or leased property or are requested by any Governmental Authority pursuant to Environmental Law, (c) notify the Administrative Agent promptly upon becoming aware of any violation of Environmental Laws or any Release of Hazardous Materials on, at, under, or from, any property that is reasonably likely to result in an Environmental Claim against any Loan Party or any of its Subsidiaries that could reasonably be expected to result in a Material Adverse Effect and promptly forward to the Administrative Agent a copy of any written communication received in connection therewith.  If the Administrative Agent at any time has a reasonable basis to believe that there may be a violation of any Environmental Laws or a Release of Hazardous Materials on, at, under, or from any property owned or leased by any Loan Party or any of its Subsidiaries in excess of the Threshold Amount, then, subject to <u>Section 9.3(d)</u>, upon request by the Administrative Agent the Borrowers shall cause such Loan Party to permit the Administrative Agent to appoint a nationally-recognized independent environmental testing firm or such other consultant as the Administrative Agent shall determine, at the Loan Parties' expense, to have access to all property owned or leased by each Loan Party and each of its Subsidiaries for the purpose of conducting such environmental testing, including subsurface sampling of soil and groundwater, as the Administrative Agent deems appropriate to investigate the subject of the potential violation or Release.

Section 6.14 <u>Cash Management.</u>

(a) <u>Maintenance of Controlled Accounts</u>.  The Borrowers shall maintain with a financial institution acceptable to the Administrative Agent, one or more deposit accounts and related lockboxes, for the purpose of receiving payments on Accounts and proceeds of Collateral and in respect of which only the Administrative Agent shall have access to withdraw or otherwise direct the disposition of the funds on deposit therein (collectively, the "<u>Collections Account</u>").  The Administrative Agent shall have control over and a Lien on all funds deposited in the Collections Account and each other Controlled Account, for the ratable benefit of Lenders.  If requested by the Administrative Agent, the Loan Parties shall deliver to the Administrative Agent a Control Agreement in respect of each such deposit account and related lockboxes.  The Loan Parties shall not maintain any deposit accounts (other than Excluded Accounts) which are not Controlled Accounts.

(b)     Collection of Accounts Generally; Proceeds of Collateral.  Each Loan Party agrees that all invoices rendered and other requests made by any Loan Party for payment in respect of Accounts shall contain a written statement directing payment in respect of such Accounts to be paid to the Collections Account (or a lockbox associated with the Collections Account).  All remittances received by any Loan Party in respect of Accounts, together with the proceeds of any other Collateral and all other cash, shall be deposited promptly (and in no event more than one Business Day after receipt) in the Collections Account and, until so deposited, shall be held in trust for the benefit of the Credit Parties.  The Administrative Agent retains the right at all times after the occurrence and during the continuance of a Default or an Event of Default to notify Account Debtors that the Loan Parties' Accounts have been assigned to Administrative Agent and to collect the Loan Parties' Accounts directly in its own name, or in the name of the Administrative Agent's agent, and to charge the collection costs and expenses, including attorneys' fees, to the Loan Parties.

Section 6.15     Borrowing Base Certificates; Collateral Administration.

(a)     Borrowing Base Certificates; Account and Inventory Reporting.  On the third Business Day after (x) the last day of each week and (y) the last day of each month, the Loan Parties shall deliver to the Administrative Agent, in form acceptable to the Administrative Agent, a Borrowing Base Certificate as of each such last day, with such supporting materials as the Administrative Agent shall reasonably request.  In addition to the foregoing, the Loan Parties shall deliver to the Administrative Agent, in the form reasonably acceptable to the Administrative Agent:

(i)     Together with each delivery of each monthly Borrowing Base Certificate, (i) reconciliations of the Accounts as shown on the month-end Borrowing Base Certificate for the immediately preceding month to the Loan Parties' accounts receivable agings, to the Loan Parties' general ledger and to the Loan Parties' most recent financial statements, (ii) a reasonably detailed aged trial balance of the Accounts, specifying the names, addresses, face values, dates of invoices and due dates for each Account Debtor obligated on an Account so listed in a form consistent with reports currently prepared by the Loan Parties with respect to such information, (iii) a reasonably detailed accounts payable aging, (iv) reporting regarding any funds transferred into the DIP Term Loan Proceeds Account from the DIP Term Loan Escrow Account, (v) reconciliations of the Loan Parties' Inventory as shown on the Loan Parties' perpetual inventory, to the Loan Parties' general ledger and to the Loan Parties' financial statements, and (vi) Inventory reports in such format and detail as the Administrative Agent shall request and which shall include a current list of all locations of the Loan Parties' Inventory, all with supporting materials as the Administrative Agent shall reasonably request;

(ii)     Each Business Day, prepared as of the end of the most recent Business Day, a report listing (A) all Accounts of Borrowers, (B) the amount and age of each Account on an original invoice date aging basis, (C) the name of each Account Debtor, (D) all Accounts which do not constitute Eligible Accounts, and (E) such other information as the Administrative Agent may request; and

(iii)     On or before the third Business Day of each week, prepared as of the last day of the most recent week, a report listing (A) all Inventory and all Eligible Inventory of Borrowers, (B) the cost thereof, (C) raw materials, work-in-process, and finished goods, (D) all Inventory which has not been timely sold in the ordinary course of business, and (E) such other information as the Administrative Agent may request.

(b)     Collateral Reporting Trigger Event.  Prior to the occurrence of each Collateral Reporting Trigger Event, the Loan Parties shall deliver to the Administrative Agent an updated Borrowing

Base Certificate reflecting such Collateral Reporting Trigger Event on a pro forma basis and demonstrating that after giving effect to such Collateral Reporting Trigger Event, (A) the Total Revolving Outstandings will not exceed the Line Cap and (B) the Borrowers will be in compliance with the applicable financial covenant.

(c)     Account Verification.  The Administrative Agent's officers, employees or agents shall have the right, at any time or times if an Event of Default has occurred and is continuing, in the name of the Administrative Agent, any designee of the Administrative Agent or any Loan Party, to verify the validity, amount or any other matter relating to any Accounts by mail, telephone, electronic communication or otherwise.  The Loan Parties shall cooperate fully with the Administrative Agent in an effort to facilitate and promptly conclude any such verification process.

(d)     Records, Schedules and Assignments of Accounts.  The Loan Parties shall keep records of their Accounts and all payments and collections thereon, which records shall be complete and accurate in all material respects.  The Loan Parties shall submit to the Administrative Agent (i) on such periodic basis as the Administrative Agent shall reasonably request, a sales and collections report for the preceding period, in form acceptable to the Administrative Agent, in its Permitted Discretion, and consistent with the reports currently prepared by the Loan Parties with respect to such information and (ii) upon the Administrative Agent's request therefor, copies of proof of delivery and the original copy of all documents, including, without limitation, repayment histories and present status reports, relating to the Accounts and such other matters and information relating to the status of then existing Accounts as the Administrative Agent shall reasonably request.  Upon request by the Administrative Agent following the occurrence and during the continuation of an Event of Default, the Loan Parties shall execute and deliver to the Administrative Agent formal written assignments of all of their Accounts on such periodic basis as the Administrative Agent shall request, which shall include all Accounts that have been created since the date of the last assignment, together with copies of invoices or invoice registers related thereto.

(e)     Administration of Inventory.  The Loan Parties shall keep records of their Inventory, which records shall be complete and accurate in all material respects.  The Loan Parties (or their accountants) shall conduct a physical inventory no less frequently than annually and shall provide to Administrative Agent a report based on each such physical inventory promptly thereafter, together with such supporting information as Administrative Agent shall reasonably request.

(f)     Administration of Equipment.  The Loan Parties shall keep records of their Equipment, which records shall be complete and accurate in all material respects itemizing and describing the kind, type, quality, quantity and book value of its Equipment.

(g)     Collateral Access Agreements.  Any time any Collateral with a book value in excess of $50,000 (when aggregated with all other Collateral at the same location) is located on any real property of a Loan Party (whether such real property is now existing or acquired after the Effective Date) which is not owned by a Loan Party, or is stored on the premises of a bailee, warehouseman, or similar party, the Loan Parties shall use commercially reasonable efforts to provide the Administrative Agent with a Collateral Access Agreement with respect to such premises.  In the event the Loan Parties do not provide the Administrative Agent with a Collateral Access Agreement with respect to any such premises, the Loan Parties acknowledge that the Administrative Agent may, in the Administrative Agent's Permitted Discretion, (i) not include Inventory at such location as Eligible Inventory or (ii) establish a Reserve for such location.

Section 6.16     Post-Effective Date Obligations.  As promptly as practicable, and in any event within the time periods after the Effective Date specified in Schedule 6.16 or such later date as the

Administrative Agent reasonably agrees to in writing, each Loan Party shall deliver the documents or take the actions specified on Schedule 6.16.

Section 6.17    Approved Budget.

(a)    The use of proceeds of the Loans and other extensions of credit by the Loan Parties under this Agreement and the other Loan Documents shall be limited in accordance with the Approved Budget (subject to variances permitted under this Section 6.17) and the terms hereof. The initial Approved Budget shall depict, on a weekly basis, cash receipts, operating disbursements, operating cash flow, debt payments, bankruptcy related disbursements, net cash flow, beginning and ending cash and debt balances, excess availability, total liquidity, borrowing base calculations and the other items set forth therein, for the first thirteen (13) week period from the Effective Date and such initial Approved Budget shall be approved by, and in form and substance satisfactory to, the Administrative Agent and the Required Lenders (it being acknowledged and agreed that the initial Approved Budget attached hereto as Annex A is approved by and satisfactory to the Administrative Agent and the Required Lenders). Commencing on July 14, 2022, and every Thursday of each week ending thereafter, the Loan Parties shall deliver to Administrative Agent a revised proposed budget, and each such updated, modified or supplemented budget shall be approved in writing (including by email) by, and shall be in form and substance reasonably satisfactory to, the Administrative Agent in its sole discretion and no such updated, modified or supplemented budget shall be effective until so approved and once so approved shall be deemed an Approved Budget; provided, however, that in the event the Administrative Agent, on the one hand, and the Borrowers, on the other hand, cannot agree as to an updated, modified or supplemented budget, such disagreement shall give rise to an Event of Default once the period covered by the prior Approved Budget has terminated; provided further, that until such time as such proposed budget becomes the Approved Budget, the prior Approved Budget shall continue to be the Approved Budget. Each Approved Budget delivered to the Administrative Agent shall be accompanied by such supporting documentation as reasonably requested by the Administrative Agent and the Required Lenders. Each Approved Budget shall be prepared in good faith based upon assumptions which the Borrowers believe to be reasonable at the time made.

(b)    Commencing with the third calendar week following the Petition Date and for each calendar week thereafter, the Borrowers shall not permit:

(i)    the variances with respect to the aggregate Actual Operating Disbursement Amounts to be greater than:

(A)    for the Initial Two Week Disbursements Period, 20%;

(B)    for the Initial Three Week Disbursements Period, 20%; and

(C)    for the Initial Four Week Disbursements Period and each Four Week Disbursement Period thereafter, 15%; and

(ii)    the variances with respect to the Actual Cash Receipts to be greater than:

(A)    for the Initial Two Weeks Receipts Period, 15%;

(B)    for the Initial Three Week Receipts Period, 15%; and

(C)    for the Initial Four Weeks Receipts Period and each Four Week Receipts Period thereafter, 15%.

(c)     The Borrowers shall deliver to the Administrative Agent on or before 12:00 p.m. on Thursday (or such later time as approved by the Administrative Agent in its sole discretion) of each week, commencing on July 7, 2022, a Budget Compliance Certificate and such Budget Compliance Certificate shall include such detail as is reasonably satisfactory to the Administrative Agent, signed by a Responsible Officer of the Borrower Agent (i) certifying that (A) the Borrowers are in compliance with the covenant contained in clause (b) of this Section 6.17 and (B) no Default or Event of Default has occurred or, if such a Default or Event of Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto, and (ii) attaching an Approved Budget Variance Report.

(d)     The Administrative Agent and the Lenders (i) may assume that the Loan Parties will comply with the Approved Budget, (ii) shall have no duty to monitor such compliance and (iii) shall not be obligated to pay (directly or indirectly from the Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to any Approved Budget.  The line items in the Approved Budget for payment of interest, expenses and other amounts to the Administrative Agent and the Lenders are estimates only, and the Loan Parties remain obligated to pay any and all Obligations in accordance with the terms of the Loan Documents and the applicable Order regardless of whether such amounts exceed such estimates.  Nothing in any Approved Budget (including any estimates of a loan balance in excess of borrowing base restrictions) shall constitute an amendment or other modification of any Loan Document or any of the borrowing base restrictions or other lending limits set forth therein.

(e)     The Borrowers shall deliver by no later than 12 p.m. on Thursday after the end of each calendar week (commencing on the Thursday following the Effective Date), a rolling 13-week cash flow forecast for the Loan Parties and their Subsidiaries, commencing with such week, consistent with the form and level of detail set forth in the Approved Budget.

Section 6.18     Required Milestones.  The Loan Parties shall comply with each of the covenants contained on Schedule 6.18 upon the terms and at the times provided for therein (as such times may be extended by the Administrative Agent up to five (5) Business Days, or longer with the consent of the Required Lenders).

Section 6.19     Loan Parties' Advisors.  (a)  The Loan Parties shall continue to retain CR3 Partners, LLC, as financial advisor, and Houlihan Lokey, as investment banker and such additional advisors as may be reasonably requested by the Administrative Agent (collectively, the "Loan Party Advisors" and each a "Loan Party Advisor") and on terms and conditions reasonably satisfactory to Administrative Agent.  The Loan Parties and their representatives will cooperate with any such advisors and consultants (including the Loan Party Advisors) and grant them access to the books and records of the Loan Parties.  The Loan Parties hereby (i) authorize the Administrative Agent (or its agents or advisors) to communicate directly with the Loan Party Advisors regarding any and all matters related to the Loan Parties and their Affiliates, including, without limitation, all financial reports and projections developed, reviewed or verified by the Loan Party Advisors and all additional information, reports and statements reasonably requested by the Administrative Agent (provided, that (A) representatives of the Loan Parties shall be given the opportunity to participate in any such communications and (B) if an issue is to be discussed or otherwise arises which, in the good faith judgment of the Loan Parties, cannot be discussed in the presence of such advisors and consultants in order to preserve an attorney-client or accountant-client privilege, then such issue may be discussed without such advisor or consultant being present and may be redacted as necessary to preserve such privilege from any materials being distributed in connection with such communications), and (ii) authorize and direct each Loan Party Advisor to provide the Administrative Agent (or its agents or advisors) with copies of reports and other information or materials prepared or reviewed by such Loan Party Advisor as the Administrative Agent may reasonably request (in each case, subject to protection as necessary in respect of bona fide attorney-client privilege).  The Loan Parties shall host periodic telephonic conference

calls with the Administrative Agent, the Lenders and the Administrative Agent's Advisors, if requested by the Administrative Agent, to discuss such matters as the Administrative Agent may reasonably request (which may include calls with the Loan Party Advisors to discuss the contents of variance reports). Notwithstanding anything to the contrary contained in this Section 6.19 or any other provision contained herein or in any other Loan Document, none of the Loan Parties will be required to disclose or permit access to any document, information or other matter (i) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by law or any binding agreement or (ii) that is subject to attorney client or similar privilege or constitutes attorney work product.

Section 6.20    Administrative Agent's Advisors. The Administrative Agent, on behalf of itself and the Lenders, shall be entitled to retain or to continue to retain (either directly or through counsel) any Administrative Agent's Advisors as it may deem reasonably necessary to provide advice, analysis and reporting for the benefit of the Administrative Agent and the Lenders. The Loan Parties shall pay all reasonable and documented fees and expenses of each Administrative Agent's Advisor and all such reasonable and documented fees and expenses shall constitute Obligations and be secured by the Collateral. The Loan Parties and the Loan Party Advisors shall grant access to, and cooperate with, the Administrative Agent, the Lenders, the Administrative Agent's Advisors, and any other representatives of the foregoing and provide all information that such parties may request in a timely manner (subject to the last sentence of Section 6.19).

Section 6.21    Order. Notwithstanding anything herein to the contrary, no portion or proceeds of the Loans or the Collateral, and no disbursements set forth in the Approved Budget, shall be used for the payments or purposes which would violate the terms of the Order.

Section 6.22    Debtor-in-Possession Obligations.   Comply in a timely manner with its obligations and responsibilities as a debtor in possession under the Bankruptcy Code, the Bankruptcy Rules, and any other order of the Bankruptcy Court.

Section 6.23    DIP Term Loan Facilities. The Loan Parties shall keep and maintain the DIP Term Loan Agreement in full force and effect and use the proceeds of advances thereunder solely for purposes and in amounts set forth in the Approved Budget (subject to variances permitted under Section 6.17) and as permitted by the DIP Term Loan Agreement, the DIP Term Loan Documents and the Orders.

Section 6.24    Qualified Bidder; Carve-Out; Challenge Period; Consultation Party.

(a)    Wingspire, as the Administrative Agent and Prepetition ABL Agent, shall be designated a qualified bidder and be permitted to credit bid on the Prepetition ABL Priority Collateral and the DIP ABL Priority Collateral pursuant to section 363(k) of the Bankruptcy Code.

(b)    The Carve Out shall be acceptable to the Prepetition ABL Agent, Prepetition ABL Lenders, the Administrative Agent and the Lenders.

(c)    The Challenge Period (as defined in the Order) shall have a period of no more than 75 days after the entry of the Interim Order, or with respect to a Committee, if any, 60 days after appointment of the Committee.

(d)    Subject to the terms of the order approving the Sale Motion (as defined in the Interim Order), Wingspire, as the Administrative Agent and Prepetition ABL Agent, shall be designated a "consultation party" with respect to the sale process and shall receive copies of all indicative proposals and analyses thereof by the Debtors' advisors.

ARTICLE 7

NEGATIVE COVENANTS

Until the Termination Date, each Loan Party covenants and agrees with the Credit Parties that:

Section 7.1    Indebtedness; Equity Interests.

(a)    The Loan Parties will not, and will not permit any of their Subsidiaries to, create, incur, assume or permit to exist any Indebtedness, except:

(i)    Indebtedness created under the Loan Documents;

(ii)    Indebtedness existing on the Petition Date and set forth in Schedule 7.1, and any and any Refinancing Indebtedness with respect thereto;

(iii)    Indebtedness of any Borrower or any of its Subsidiaries incurred to finance the acquisition, construction or improvement of any fixed or capital assets, including Capitalized Lease Obligations and any Indebtedness assumed in connection with the acquisition of any such assets or secured by a Lien on any such assets prior to the acquisition thereof, and any Refinancing Indebtedness with respect thereto, provided that (A) such Indebtedness (other than Refinancing Indebtedness) is incurred prior to or within 20 days after such acquisition or the completion of such construction or improvement, and (B) the aggregate outstanding principal amount of such Indebtedness permitted under this clause (iii) shall not, without duplication, exceed $2,000,000 at any time;

(iv)    intercompany Indebtedness of any Borrower or any Subsidiary owing to and held by Holdings or any of its Subsidiaries;

(v)    Guarantees by any Loan Party of Indebtedness of any other Loan Party, provided that such Indebtedness is otherwise permitted by this Section 7.1(a);

(vi)    [Reserved];

(vii)    Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or other similar instrument drawn against insufficient funds in the ordinary course of business;

(viii)    unsecured guarantees arising as a result of customary indemnification obligations to purchasers that are not Affiliates of a Loan Party in connection with any Disposition permitted by Section 7.5;

(ix)    Indebtedness incurred in the ordinary course of business under (A) appeal bonds or similar instruments and (B) surety bonds, payment bonds, performance bonds, bid bonds, completion guarantees and similar obligations, workers' compensation claims, health, disability or other employee benefits, and bankers acceptances issued for the account of any Loan Party or its Subsidiaries and unsecured guarantees thereof;

(x)    Indebtedness consisting of the Prepetition Term Loan Obligations, so long as such Indebtedness is subject to the Prepetition Intercreditor Agreement;

(xi)     the Indebtedness under the DIP Term Loan Documents in an aggregate principal amount outstanding at any time not to exceed the amount thereof approved in the Orders;

(xii)    unsecured Indebtedness in an aggregate principal amount not to exceed $1,000,000 at any one time outstanding;

(xiii)   letters of credit in an aggregate amount at any time outstanding not to exceed $2,000,000;

(xiv)    to the extent constituting Indebtedness, obligations incurred in the ordinary course of business for the financing of unpaid insurance premiums;

(xv)     Indebtedness incurred in connection with the endorsement of instruments for deposit in the ordinary course of business; and

(xvi)    to the extent constituting Indebtedness, obligations in respect of netting services or overdraft protection in connection with deposit or securities accounts in the ordinary course of business.

Notwithstanding any of the foregoing, no Indebtedness permitted under this Section 7.1(a) shall be permitted to have an administrative expense claim status under the Bankruptcy Code senior to or pari passu with the superpriority administrative expense claims of (A) the Administrative Agent and the Lenders and (B) the Prepetition ABL Agent and the Prepetition ABL Lenders, in each case, as set forth herein and in the applicable Order, other than (1) solely with respect to Collateral that is not DIP ABL Priority Collateral, Indebtedness under the DIP Term Loan Agreement permitted under Section 7.1(a)(xi) and (2) solely with respect to Collateral that is not Prepetition ABL Priority Collateral, Indebtedness under the Prepetition Term Loan Agreement permitted under Section 7.1(a)(x).

(b)      The Loan Parties will not, and will not permit any of their respective Subsidiaries to, (i) issue any Disqualified Equity Interests, or (ii) be or become liable in respect of any obligation (contingent or otherwise) to purchase, redeem, retire, acquire or make any other payment in respect of any Equity Interests of any Loan Party or any of its Subsidiaries, except as permitted under Section 7.8.

Section 7.2      Liens.  The Loan Parties will not, and will not permit any of their respective Subsidiaries to, create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, except:

(a)      Liens created under the Loan Documents and Liens in favor of the Prepetition ABL Agent in connection with the Prepetition ABL Credit Agreement;

(b)      Permitted Encumbrances;

(c)      any Lien on any property or asset of any Borrower or any Subsidiary existing on the Petition Date and (x) that are senior by operation of law or (y) secure Indebtedness of the type specified in Section 7.1(a) to the extent permitted under the Prepetition ABL Credit Agreement, and any renewals and extensions thereof, provided that (i) the property or asset covered thereby has not changed, and (ii) the outstanding principal amount thereof secured by such property or asset does not increase, and (iii) the Borrower or Subsidiary liable with respect there to has not changed;

(d)      any Lien on fixed or capital assets acquired, constructed or improved by any Borrower or any Subsidiary, provided that (i) such Lien secures Indebtedness permitted by Section 7.1(a)(iii), (ii) such Lien and the Indebtedness secured thereby are incurred prior to or within 20

days after such acquisition or the completion of such construction or improvement, (iii) the Indebtedness secured thereby does not exceed the cost of acquiring, constructing or improving such fixed or capital assets and (iv) such Lien shall not apply to any other property or assets of Holdings, any Borrower or any Subsidiary;

(e)     any Lien existing on any property or asset at the time such Person is acquired by, merged into or consolidated with any Borrower or any Subsidiary or existing on any property or asset of any Person that becomes a Subsidiary after the Effective Date prior to the time such Person becomes a Subsidiary, provided that (i) such Lien secures Indebtedness permitted by Sections 7.1(a)(iv) or (xiii), (ii) such Lien is not created in contemplation of or in connection with such acquisition or such Person becoming a Subsidiary, as applicable, (iii) such Lien shall not apply to any other property or assets of Holdings, any Borrower, or any Subsidiary and (iv) such Lien shall secure only the Indebtedness and other obligations that it secures on the date of such acquisition or the date such Person becomes a Subsidiary, as applicable, and any extensions, renewals and replacements thereof that do not increase the outstanding principal amount thereof;

(f)     Liens not otherwise permitted by this Section; provided, that (i) such Liens are subordinate to the Liens securing the Obligations, (ii) such Liens do not secure Indebtedness for borrowed money, and (iii) neither the aggregate outstanding principal amount of the obligations secured thereby nor the aggregate fair market value (determined as of the date such Lien is incurred) of the assets subject thereto exceeds (as to all Loan Parties) $1,000,000 at any one time outstanding;

(g)     Liens securing the Prepetition Term Loan Obligations, so long as such Liens are subject to the Prepetition Intercreditor Agreement and the Orders;

(h)     Liens on assets securing Indebtedness under the DIP Term Loan Documents, so long as such Liens are subject to the Orders; and

(i)     The Adequate Protection Liens and Adequate Protection Superpriority Claims.

The prohibition for in this Section 7.2 specifically includes any effort by any Debtor, an official committee in any Chapter 11 Case or any other party in interest in the Chapter 11 Cases, as applicable, to prime or create pari passu to any claims, Liens or interests of (A) the Administrative Agent and the Lenders or (B) until the indefeasible payment in full in cash of the Prepetition ABL Obligations, the Prepetition ABL Agent and the Prepetition ABL Lenders, any Lien, in each case, other than as set forth in the applicable Orders and irrespective of whether such claims, Liens or interests may be "adequately protected".

Section 7.3     Fundamental Changes; Business; Fiscal Year.

(a)     The Loan Parties will not, and will not permit any of their respective Subsidiaries to, merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or sell, transfer, lease or otherwise Dispose of (in one transaction or in a series of transactions) all or substantially all of its assets, or all or substantially all of the Equity Interests issued by any of its Subsidiaries (in each case, whether now owned or hereafter acquired), or liquidate or dissolve or consummate a Division, provided that, if at the time thereof and immediately after giving effect thereto, no Default or Event of Default shall or would have occurred and be continuing:

(i)     any Borrower or any Subsidiary may merge into or consolidate with any Person (other than Holdings) in a transaction that is not permitted by Section 7.3(a)(i), provided that (A) in the case of a merger involving the Company, the Company shall be the surviving entity of such merger, (B) in the case of a merger involving any Borrower (other than the Company), such Borrower shall be the surviving entity of such merger, (C) such merger is permitted by Section 7.4

and either (1) the Guarantor shall be the surviving entity or (2) such other Person shall become a Guarantor pursuant to Section 6.12, and (D) such merger shall not be prohibited by Section 7.5;

(ii)     any Guarantor (other than Holdings) may sell, transfer, lease or otherwise Dispose of all or substantially all of its assets to any Borrower or to any Guarantor;

(iii)    any Borrower or any of their respective Subsidiaries may sell, transfer, lease or otherwise Dispose of its assets in a transaction that is not permitted by Section 7.3(a)(iii), provided that such sale, transfer, lease or other Disposition is permitted by Section 7.5; and

(iv)    any Guarantor (other than Holdings) may liquidate or dissolve so long as any remaining assets of such Guarantor are transferred to another Loan Party; provided that, in each case, the Borrower Agent determines in good faith that such liquidation or dissolution is in the best interests of the Loan Parties and their Subsidiaries and is not disadvantageous to the Administrative Agent or any Lender in any material respect.

(b)     The Loan Parties will not, and will not permit any of their Subsidiaries to, engage to any material extent in any business other than an Approved Line of Business.

(c)     The Loan Parties will not, and will not permit any of their Subsidiaries to, change its Fiscal Year.

Section 7.4     Investments, Loans, Advances, Guarantees and Acquisitions.  The Loan Parties will not, and will not permit any of their Subsidiaries to, purchase, hold or acquire (including pursuant to any merger or Division) any Investment except:

(a)     Investments in cash and Cash Equivalents;

(b)     Investments existing on the Effective Date and set forth in Schedule 5.13 and Schedule 7.4;

(c)     Investments made by Holdings in the Equity Interests of the Company, equity Investments made by the Borrowers in the Equity Interests of any Guarantor (other than Holdings) and made by any Guarantor (other than Holdings) in the Equity Interests of any other Guarantor (other than Holdings);

(d)     Investments constituting Indebtedness made by (i) any Loan Party to any Subsidiary thereof or (ii) any Subsidiary to any Loan Party or another Subsidiary, in each case subject to the limitations set forth in Section 7.1(a)(iv) and (v) and Section 7.15, and are otherwise in accordance with the Approved Budget;

(e)     Guarantees permitted by Section 7.1(a);

(f)     [Reserved];

(g)     [Reserved];

(h)     Investments to the extent expressly set forth in the Approved Budget;

(i)     (i) promissory notes and other non-cash consideration received in connection with Dispositions permitted by Section 7.5 and (ii) Investments received in settlement of amounts due to any

Loan Party or any of its Subsidiaries effected in the ordinary course of business as a result of insolvency, bankruptcy, reorganization, or other similar proceeding involving an Account Debtor;

(j) Investments of any Person existing at the time such Person becomes a Subsidiary or consolidates or merges with Borrower, Holdings or any Subsidiary thereof so long as such Investments were not made in contemplation of such Person becoming a Subsidiary or of such consolidation or merger;

(k) deposits of cash made in the ordinary course of business to secure performance of (i) operating leases and (ii) other contractual obligations that do not constitute Indebtedness;

(l) Investments in negotiable instruments deposited or to be deposited for collection in the ordinary course of business;

(m) guaranty obligations in respect of Real Property leases or of other obligations that do not constitute Indebtedness, in each case entered into in the ordinary course of business;

(n) Accounts created, acquired or made and trade credit extended in the ordinary course of business and payable or dischargeable in accordance with customary trade terms;

(o) capital expenditures otherwise permitted hereunder and in accordance with the Approved Budget;

(p) Investments received in connection with a Disposition made in accordance with the requirements of Section 7.5(m); and

(q) Investments constituting deposits made in connection with the purchase of goods or services in the ordinary course of business or otherwise constituting deposits permitted pursuant to (d) and (f) of "Permitted Encumbrances".

In determining the amount of Investments, acquisitions, loans, and advances permitted under this Section 7.4, Investments and acquisitions shall always be taken at the original cost thereof (regardless of any subsequent appreciation or depreciation therein), and loans and advances shall be taken at the principal amount thereof then remaining unpaid.

Section 7.5 Dispositions. The Loan Parties will not, and will not permit any of their Subsidiaries to, Dispose of any of its assets except:

(a) issuances of Equity Interests (other than Disqualified Equity Interests) by (i) any Subsidiary of a Loan Party to a Loan Party or (ii) Holdings to its direct or indirect parent entities, in each case subject to the Collateral and Guarantee Requirement and Section 2.5(b);

(b) the sale or lease of inventory in the ordinary course of business;

(c) the use or transfer of money, cash or Cash Equivalents in a manner that is not prohibited by the terms of this Agreement or the other Loan Documents and is otherwise in accordance with the Approved Budget;

(d) the granting of Liens permitted by Section 7.2, the making of Investments permitted by Section 7.4, and the making of Restricted Payments permitted by Section 7.8;

(e)        the licensing and sublicensing on a non-exclusive basis of patents, trademarks, copyrights, and other intellectual property rights in the ordinary course of business;

(f)        the granting of Liens permitted hereunder and the other transactions permitted by Section 7.2;

(g)        any Casualty Event and the Disposition of any property subject thereto;

(h)        (i) the abandonment, cancellation or lapse of issued patents, registered trademarks and other registered intellectual property of a Loan Party or Subsidiary thereof to the extent, in such Loan Party's reasonable business judgment, not economically desirable in the conduct of such Loan Party's business or so long as such lapse is not materially adverse to the interests of the Lenders and (ii) the expiration of patents in accordance with their statutory terms;

(i)        the sale of assets (other than Equity Interests of any Subsidiary, unless all of the Equity Interests of such Subsidiary (other than any Borrower or Holdings) are sold in accordance with this clause (i)) for at least fair market value, so long as (A) no Default or Event of Default then exists or would immediately result therefrom, (B) at least 75% of the consideration received by the applicable Loan Party consists of cash or Cash Equivalents and is paid at the time of the closing of such sale, (C) the net cash proceeds therefrom are applied to the repayment of the Obligations and/or reinvested in replacement Collateral, (D) the aggregate amount of the cash and non-cash proceeds received from all assets sold pursuant to this clause (i) shall not exceed $200,000 in the aggregate in any Fiscal Year (for this purpose, using the fair market value of property other than cash and Cash Equivalents) and, (E) such sale is in accordance with the Approved Budget;

(j)        any trade in of equipment in exchange for other equipment in the ordinary course of business;

(k)        [Reserved];

(l)        the sale, transfer or other disposition of obsolete or worn out tangible personal property or Real Property interests which is no longer used or useful in the conduct of business of the Loan Parties and their Subsidiaries, including the termination or surrender of any Real Property lease, in each case so long as such disposition is made in accordance with the Approved Budget;

(m)        the sale, transfer or other disposition of Accounts constituting bad debts in connection with the compromise, settlement or collection thereof in the ordinary course of business (and not as part of a bulk sale or receivables financing) so long as the proceeds thereof are remitted directly to the Administrative Agent at the time of such sale, transfer or other disposition for application to the Obligations;

(n)        leases or subleases of Real Property or personal property in the ordinary course of business and in accordance with the applicable Loan Documents.

Section 7.6      Sale Leaseback Transactions.  The Loan Parties will not, and will not permit any of their Subsidiaries to, enter into any Sale Leaseback arrangement, directly or indirectly, with any Person.

Section 7.7      Swap Agreements.  The Loan Parties will not, and will not permit any of their Subsidiaries to, enter into any Swap Agreement.

Section 7.8    Restricted Payments.  The Loan Parties will not, and will not permit any of their Subsidiaries to, declare or make, or agree to pay for or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except:

(a)    subject to the Collateral and Guarantee Requirement, any Subsidiary of Holdings may declare and pay, and agree to pay, dividends and other distributions with respect to its Equity Interests payable solely in common Equity Interests (other than Disqualified Equity Interests), and

(b)    any Subsidiary of Holdings may declare and pay dividends or other distributions with respect to its Equity Interests to any direct or indirect parent that is a Loan Party (other than Holdings).

Section 7.9    Transactions with Affiliates.  The Loan Parties will not, and will not permit any of their Subsidiaries to, Dispose (including pursuant to a merger or Division) of any property or assets to, or purchase, lease or otherwise acquire (including pursuant to a merger or Division) any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except transactions in the ordinary course of business and at prices and on terms and conditions not less favorable to such Loan Party or such Subsidiary than could be obtained on an arm's-length basis from unrelated third parties (it being understood that this Section shall not apply to any transaction that is expressly permitted under Sections 7.1, 7.3, 7.4, 7.5, or 7.8 between or among the Loan Parties and not involving any other Affiliate).

Section 7.10    Restrictive Agreements.  The Loan Parties will not, and will not permit any of their Subsidiaries to, directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (a) the ability of any Loan Party or any of its Subsidiaries to create, incur or permit to exist any Lien upon any of its property or assets (unless such agreement or arrangement does not prohibit, restrict or impose any condition upon the ability of any Loan Party to create, incur or permit to exist, or the ability of the Administrative Agent to exercise any right or remedy with respect to, any Lien in favor of the Secured Parties created under the Loan Documents) or (b) the ability of any Subsidiary to pay dividends or make other distributions with respect to any of its Equity Interests or to make or repay loans or advances to the Borrowers or any other Subsidiary or to Guarantee Indebtedness of the Borrowers or any other Subsidiary, provided that (i) the foregoing shall not apply to (A) restrictions and conditions imposed by law or by the Loan Documents, the Prepetition ABL Loan Documents, the DIP Term Loan Documents, and the Prepetition Term Loan Documents;  (B) restrictions and conditions existing on the Effective Date identified on Schedule 7.10 (but shall apply to any extension or renewal of, or any amendment or modification expanding the scope of, any such restriction or condition), and (C) customary restrictions on assignment in leases and other contracts.

Section 7.11    Amendments of Organizational Documents and Certain Material Agreements.

(a)    The Loan Parties will not, and will not permit any of their Subsidiaries to, amend, supplement, modify the DIP Term Loan Documents or the Prepetition Term Loan Documents except to the extent permitted under the Prepetition Intercreditor Agreement and the Orders, respectively.

(b)    The Loan Parties will not, and will not permit any of their Subsidiaries to, amend, supplement, modify or waive any of its rights under any of its Organizational Documents, other than immaterial amendments, modifications or waivers that could not reasonably be expected to adversely affect the Credit Parties or the Loan Parties, provided that the Borrower Agent shall deliver or cause to be delivered to the Administrative Agent and each Lender a copy of all amendments, modifications or waivers thereto promptly after the execution and delivery thereof.

Section 7.12     [Reserved].

Section 7.13     Payments on Certain Debt.  The Loan Parties will not, and will not permit any of their Subsidiaries to, declare or make, or agree to pay for or make, directly or indirectly, (a) any payment of principal or interest or any purchase, redemption, retirement, acquisition or defeasance with respect to any Indebtedness of such Person which is subordinated to the payment of the Obligations except that the Company, or any Subsidiary may make payments of Subordinated Indebtedness to the extent permitted by the subordination provisions applicable thereto or (b) payments on Indebtedness for borrowed money prior to the due date under the agreement evidencing such Indebtedness as in effect on the Petition Date (or as amended thereafter with the consent of the Administrative Agent), other than:

       (i)     payments in respect of the Obligations;

       (ii)     regularly scheduled or mandatory payments, redemptions or defeasances of Indebtedness under the (A) DIP Term Loan Facility in accordance with the DIP Term Loan Documents and the Orders made in accordance with the Approved Budget, or (B) the Prepetition Term Loan documents and the Prepetition ABL Loan Documents in accordance with the Prepetition Intercreditor Agreement and made in accordance with the Approved Budget; and

       (iii)     regularly scheduled or mandatory prepayments, redemptions or defeasances of other Indebtedness permitted under Section 7.1(a) made in accordance with the Approved Budget.

Without limiting any other provision hereof, except pursuant to the Approved Budget, without express prior written consent of the Administrative Agent and pursuant to an order of the Bankruptcy Court (including any Order) after notice and a hearing, no Loan Party shall make any payment or transfer with respect to any Lien or Indebtedness incurred or arising prior to the Petition Date that is subject to the automatic stay provisions of the Bankruptcy Court whether by way of "adequate protection" under the Bankruptcy Code or otherwise.

Section 7.14     Hazardous Materials.  The Loan Parties will not, and will not permit any of their Subsidiaries or agents to, cause or permit a Release or threat of Release of Hazardous Materials on, at, in, above, to, from or about any of the property where such Release or threat of Release would (a) violate, or form the basis for any Environmental Claims under, any Environmental Law or any Environmental Permit or (b) otherwise adversely impact the value or marketability of any property of any Loan Party or any of its Subsidiaries or any of the Collateral, other than such Release, violation or Environmental Claim as could not reasonably be expected to result in a material Environmental Liability.

Section 7.15     Additional Covenants Applicable to Holdings.  Holdings shall not (a) incur, directly or indirectly, any Indebtedness or any other obligation or liability whatsoever other than the Indebtedness incurred under the Loan Documents, the Prepetition ABL Loan Documents, the DIP Term Loan Documents, and the Prepetition Term Loan Documents; (b) create or suffer to exist any Lien upon any property or assets now owned or hereafter acquired by it other than Liens permitted under Section 7.2 of this Agreement; (c) engage in any business or activity or own any assets other than (i) holding 100% of the Equity Interests of the Company; (ii) performing its obligations and activities incidental thereto under the Loan Documents; (iii) making Restricted Payments and Investments to the extent permitted by this Agreement; (iv) maintenance of its legal existence (including the ability to incur fees, costs and expenses relating to such maintenance); (v) participating in tax and other administrative matters as a member of the consolidated group of Holdings, Company, and Company's Subsidiaries, in the ordinary course of business; (vi) holding any cash incidental to any activities permitted under this Section 7.15, in the ordinary course of business; (vii) providing indemnification to officers, managers, and directors, in the ordinary course of

business; and (viii) activities and undertakings performed directly in furtherance of the foregoing; (d) consolidate with or merge with or into, or convey, transfer, divide, allocate or lease all or substantially all its assets to, any Person; (e) sell or otherwise dispose of any Equity Interests of any of its Subsidiaries; (f) create or acquire any Subsidiary or make or own any Investment in any Person other than Company; or (g) fail to hold itself out to the public as a legal entity separate and distinct from all other Persons.

Section 7.16    Reclamation Claims.  Except as set forth in the Approved Budget, no Loan Party shall enter into any agreement to return any of its Inventory to any of its creditors for application against any Prepetition Indebtedness, Prepetition trade payables or other Prepetition claims under section 546(c) of the Bankruptcy Code or allow any creditor to take any setoff or recoupment against any of its Prepetition Indebtedness, Prepetition trade payables or other Prepetition claims based upon any such return pursuant to section 553(b)(1) of the Bankruptcy Code or otherwise.

Section 7.17    Insolvency Proceeding Claims.  No Loan Party shall incur, create, assume, suffer to exist or permit any other superpriority administrative claim which is pari passu with or senior to the claim of the Administrative Agent or the Lenders against the Debtors, except as set forth in the applicable Order.

Section 7.18    Bankruptcy Actions.  No Loan Party shall seek, consent to, or permit to exist, without the prior written consent of the Administrative Agent, any order granting authority to take any action that is prohibited by the terms of this Agreement, the Order or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement, the Order or any of the other Loan Documents.

Section 7.19    Subrogation.  No Loan Party shall assert any right of subrogation or contribution against any other Loan Party.

ARTICLE 8

EVENTS OF DEFAULT

Section 8.1      Events of Default.  Notwithstanding the provisions of section 362 of the Bankruptcy Code, and without notice, application or motion, hearing before, or order of the Bankruptcy Court or any notice to any Loan Party, any of the following shall constitute an Event of Default:

(a)      Non-Payment of Principal or Interest.  Any Loan Party shall fail to pay any principal of, or interest on, any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise.

(b)      Other Non-Payment.  Any Loan Party shall fail to pay any fee, commission or any other amount (other than an amount referred to in clause (a) of this Section) payable under any Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three Business Days.

(c)      Representations and Warranties.  Any representation or warranty made or deemed made by or on behalf of any Loan Party or any of its Subsidiaries in or in connection with any Loan Document, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with any Loan Document (including, without limitation, any Approved Budget Variance Report, Borrowing Base Certificate, or Budget Compliance Certificate), shall prove to have been incorrect in any material respect when made or deemed made.

(d)    <u>Specific Covenants</u>.  Any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in <u>Sections 6.1</u>, <u>6.2(a)</u>, <u>6.3</u>, <u>6.7</u>, <u>6.8</u>, <u>6.10</u>, <u>6.12</u>, <u>6.14</u>, <u>6.15</u>, <u>6.16</u>, <u>6.17</u>, <u>6.18</u>, <u>6.19</u>, <u>6.20</u>, <u>6.21</u>, <u>6.22</u>, <u>6.23</u>, or <u>6.24</u>, in <u>Article 7</u> or any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in any Collateral Document to which it is a party.

(e)    <u>Other Covenants</u>.  Any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in any Loan Document to which it is a party (other than those specified in <u>Section 8.1(a)</u>, (b) or (d)), and such failure shall continue unremedied for a period of 30 days after the occurrence thereof.

(f)    <u>Cross Default - Payment Default on Material Indebtedness</u>.  Except for defaults occasioned by the filing of the Chapter 11 Cases or entry into this Agreement and the DIP Term Loan Agreement or resulting from obligations with respect to which the Bankruptcy Code prohibits any Loan Party or Subsidiary from complying or permits any Loan Party not to comply, any Loan Party shall fail to make any payment (whether of principal, interest or otherwise and regardless of amount) in respect of the DIP Term Loan Facility, the Prepetition Term Loan Obligations or any other Material Indebtedness when and as the same shall become due and payable (after giving effect to any applicable grace period).

(g)    <u>Other Cross-Defaults</u>.  Except for defaults occasioned by the filing of the Chapter 11 Cases or entry into this Agreement and the DIP Term Loan Agreement or resulting from obligations with respect to which the Bankruptcy Code prohibits any Loan Party or Subsidiary from complying or permits any Loan Party not to comply, any event or condition occurs that results in the DIP Term Loan Facility, the Prepetition Term Loan Obligations or any other Material Indebtedness becoming due prior to its scheduled maturity or payment date, or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of the Indebtedness arising under the DIP Term Loan Agreement or any such Material Indebtedness or any trustee or agent on its or their behalf to cause the Term Loan Indebtedness or any such Material Indebtedness to become due prior to their scheduled maturity or payment date or to require the prepayment, repurchase, redemption or defeasance thereof prior to their scheduled maturity or payment date (in each case after giving effect to any applicable notice and any applicable cure period).

(h)    <u>Judgments</u>.  One or more (i) non-monetary judgments which could, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, or (ii) judgments for the payment of money in an aggregate amount in excess of the Threshold Amount, shall be rendered against any Loan Party or any of its Subsidiaries or any combination thereof (which shall not be fully covered (without taking into account any applicable deductibles) by insurance from an unaffiliated insurance company with an A.M. Best financial strength rating of at least A-, it being understood that even if such amounts are covered by insurance from such an insurance company, such amounts shall count against such basket if responsibility for such amounts has been denied by such insurance company) and the same shall remain undischarged or unbonded for a period of 30 consecutive days during which execution shall not be stayed pursuant to section 362 of the Bankruptcy Code.

(i)    <u>ERISA Events</u>.  (i) An ERISA Event shall have occurred that, in the opinion of the Required Lenders, when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in liability of any Loan Party or any of its Subsidiaries (or in the case of an ERISA Event described in subsection (b) of the definition of that term in <u>Section 1.1</u>, could reasonably be expected to subject any Loan Party, any of its Subsidiaries, any Pension Plan, any trust created thereunder, any trustee or administrator thereof, or any party dealing with any Pension Plan or trust to a tax or penalty on "prohibited transactions" under Section 502 of ERISA or Section 4975 of the Code) in an aggregate amount exceeding the Threshold Amount, individually or in the aggregate, (ii) an ERISA Event shall occur with respect to a Pension Plan or Multiemployer Plan that constitutes grounds for appointment of a trustee for

or termination by the PBGC of any Pension Plan or Multiemployer Plan; (iii) a Loan Party or ERISA Affiliate shall fail to pay when due any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan; or (iv) any event similar to the foregoing shall occur or exist with respect to a Foreign Plan; or (v) there shall be at any time a Lien imposed against the assets of any Loan Party or ERISA Affiliate under Section 412 or Section 430 of the Code or Sections 302, Section 303, or Section 4068 of ERISA.

(j)  Invalidity of Loan Documents.  Any Loan Document or Prepetition ABL Loan Document shall cease, for any reason, to be in full force and effect, or any Loan Party shall so assert in writing or shall disavow any of its obligations thereunder.

(k)  Guarantees.  The Loan Guaranty hereunder or the "Loan Guaranty" under (and defined in) the Prepetition ABL Credit Agreement shall fail to remain in full force or effect or any action shall be taken to discontinue or to assert the invalidity or unenforceability of the Loan Guaranty hereunder or thereunder, or any Guarantor shall fail to comply with any of the terms or provisions of the Loan Guaranty hereunder or thereunder, or any Guarantor shall deny that it has any further liability under the Loan Guaranty hereunder or thereunder or shall give notice to such effect, including, but not limited to notice of termination delivered pursuant to Article 11 hereof or under the Prepetition ABL Credit Agreement.

(l)  Liens.  Any Lien purported to be created under any Collateral Document or under the Prepetition ABL Loan Documents shall cease to be, or shall be asserted by any Loan Party not to be, a valid and perfected Lien on any material portion of the Collateral, with the priority required by the applicable Collateral Document or Prepetition ABL Loan Document, except as a result of the sale or other disposition of the applicable Collateral in a transaction permitted under the Loan Documents and the Prepetition ABL Loan Documents.

(m)  Licenses.  There shall occur the loss, suspension or revocation of, or failure to renew any license or permit now held or hereafter acquired if such loss, suspension, revocation or failure to renew could reasonably be expected to have a Material Adverse Effect.

(n)  Change of Control.  A Change of Control shall occur.

(o)  Cessation of Business.  There shall occur a cessation of a substantial part of the business of any Loan Party which could reasonably be expected to have a Material Adverse Effect.

(p)  Criminal Forfeiture.  Any Loan Party shall be criminally indicted or convicted under any law that could lead to a forfeiture of any property of any Loan Party.

(q)  Invalidity of Subordination Provisions.  The subordination provisions of any agreement or instrument governing any Subordinated Indebtedness shall for any reason be revoked or invalidated, or otherwise cease to be in full force and effect, or any Loan Party shall contest in any manner the validity or enforceability thereof or deny that it has any further liability or obligation thereunder, or the Obligations for any reason shall not have the priority contemplated by this Agreement or such subordination provisions.

(r)  Invalidity of Intercreditor Provisions.  The provisions of the Prepetition Intercreditor Agreement shall for any reason be revoked or invalidated, or otherwise cease to be in full force and effect, or any Loan Party shall contest in any manner the validity or enforceability thereof or deny that it has any further liability or obligation thereunder, or the Obligations for any reason shall not have the priority contemplated by this Agreement or such intercreditor provisions.

(s)     DIP Funding.  If the DIP Term Loan Lenders fail to fund any loans or credit extensions under the DIP Term Loan Facility, or the DIP Term Loan Agent fails to release any funds to the Borrowers, in each case, following a request therefor by any Borrower and after satisfying each of the conditions precedent for such loan or credit extension.

(t)     Chapter 11 Defaults.  The occurrence of any of the following in the Chapter 11 Cases:

(i)     the bringing of a motion, taking of any action or the filing of any plan of reorganization or disclosure statement attendant thereto by any of the Loan Parties or any Subsidiary, or any Person claiming by or through any Loan Party or any Subsidiary, in the Chapter 11 Cases: (A) to obtain additional financing under section 364(c) or section 364(d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement; (B) to grant any Lien other than Liens permitted pursuant to Section 7.2 upon or affecting any Collateral; (C) except as provided in the Interim Order or the Final Order, as the case may be, to use cash collateral of the Administrative Agent and the other Secured Parties under section 363(c) of the Bankruptcy Code without the prior written consent of the Administrative Agent; or (D) any other action or actions materially adverse to the Administrative Agent and the Lenders or their rights and remedies hereunder, under any other Loan Document, or their interest in the Collateral;

(ii)     (A) the filing of any plan of reorganization or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, by a Loan Party that does not propose to indefeasibly repay in full in cash the Obligations under this Agreement. or by any other Person to which the Administrative Agent and the Required Lenders do not consent, or any of the Loan Parties or their Subsidiaries, to seek, support or fail to contest in good faith the filing or confirmation of any such plan or entry of any such order, (B) the entry of any order terminating any Loan Party's exclusive right to file a plan of reorganization, or (C) the expiration of any Loan Party's exclusive right to file a plan of reorganization;

(iii)     the entry of an order in any of the Chapter 11 Cases confirming a plan of reorganization that (A) is not reasonably acceptable to the Administrative Agent and the Required Lenders, or (B) does not contain a provision for termination of the commitments and indefeasible repayment in full in cash of all of the Obligations under this Agreement on or before the effective date of such plan of reorganization;

(iv)     (A) the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Loan Documents or the Interim Order or the Final Order without the written consent of the Administrative Agent and the Required Lenders or the filing of a motion by the Loan Parties or their Affiliates for reconsideration with respect to the Interim Order or the Final Order without the prior written consent of the Administrative Agent, or the Interim Order or the Final Order shall otherwise not be in full force and effect without the prior written consent of the Administrative Agent and the Required Lenders or (B) any Loan Party or any Subsidiary shall fail to comply with any Order in any material respect;

(v)     the payment of, or application for authority to pay, any Prepetition claim without the Administrative Agent's prior written consent unless in accordance with the Approved Budget or pursuant to an order of the Bankruptcy Court;

(vi)     the allowance of any claim or claims under section 506(c) of the Bankruptcy Code or otherwise against the Administrative Agent, any Lender or any of the Collateral;

(vii)     (A) the appointment of an interim or permanent trustee in the Chapter 11 Cases or the appointment of a trustee receiver or an examiner in the Chapter 11 Cases with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Loan Parties; or (B) the sale without the Administrative Agent's and the Required Lenders' consent of all or substantially all of the Debtors' assets either through a sale under section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Cases or otherwise that does not result in payment in full in cash of all of the Obligations under this Agreement at the closing of such sale or initial payment of the purchase price or effectiveness of such plan, as applicable;

(viii)     the dismissal of any Chapter 11 Case, or the conversion of any Chapter 11 Case from one under chapter 11 to one under chapter 7 of the Bankruptcy Code or any Loan Party shall file a motion or other pleading seeking the dismissal of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise or the conversion of the Chapter 11 Cases to chapter 7 of the Bankruptcy Code in each case, without the prior written consent of the Administrative Agent;

(ix)     any Loan Party shall file a motion seeking, or the Bankruptcy Court shall enter an order granting, relief from or modifying the Automatic Stay (A) to allow any creditor (other than the Administrative Agent) to execute upon or enforce a Lien on any Collateral not approved by the Administrative Agent, (B) approving any settlement or other stipulation not approved by the Administrative Agent with any secured creditor of any Loan Party providing for payments as adequate protection or otherwise to such secured creditor, (C) with respect to any Lien on or the granting of any Lien on any Collateral not approved by the Administrative Agent to any federal, state or local environmental or regulatory agency or authority, which in either case involves a claim that could have a Material Adverse Effect on the Debtors or their estates or (D) permit other actions that could have a Material Adverse Effect on the Debtors or their estates;

(x)     the commencement of a suit or an action (but not including a motion for standing to commence a suit or an action) against the Administrative Agent or any Lender and, as to any suit or action brought by any Person other than a Loan Party or a Subsidiary, officer or employee of a Loan Party, the continuation thereof without dismissal for twenty (20) days after service thereof on the Administrative Agent or such Lender, that asserts or seeks by or on behalf of a Loan Party, any state or federal environmental protection or health and safety agency, any official committee in any Chapter 11 Case or any other party in interest in any Chapter 11 Cases, a claim or any legal or equitable remedy that would (A) have the effect of invalidating, subordinating or challenging any or all of the Obligations or Liens of the Administrative Agent or any Lender under the Loan Documents to any other claim, or (B) have a material adverse effect on the rights and remedies of the Administrative Agent or any Lender under any Loan Document or the collectability of all or any portion of the Obligations;

(xi)     the entry of an order in the Chapter 11 Cases avoiding or permitting recovery of any portion of the payments made on account of the Obligations owing under this Agreement or any other Loan Document or Prepetition ABL Loan Document;

(xii)     the failure of any Loan Party to perform any of its material obligations under, or the occurrence of an event of default under or as defined in, the Interim Order or the Final Order;

(xiii)     the existence of any claims or charges, or the entry of any order of the Bankruptcy Court authorizing any claims or charges, other than in respect of this Agreement and the other Loan Documents, the DIP Term Loan Documents, or as otherwise permitted under the

applicable Loan Documents or permitted under the Orders, entitled to superpriority administrative expense claim status in any Chapter 11 Case pursuant to section 364(c)(1) of the Bankruptcy Code pari passu with or senior to the claims of the Administrative Agent and the Secured Parties under this Agreement and the other Loan Documents, or there shall arise or be granted by the Bankruptcy Court (A) any claim having priority over any or all administrative expenses of the kind specified in clause (b) of section 503 or clause (b) of section 507 of the Bankruptcy Code or (B) any Lien on the Collateral having a priority senior to or pari passu with the Liens and security interests granted herein, except, in each case, as expressly provided in the Loan Documents or in the Orders then in effect (but only in the event specifically consented to by the Administrative Agent and the Required Lenders);

(xiv)    the Orders shall cease to create a valid and perfected Lien on the Collateral or to be in full force and effect, shall have been reversed, modified, amended, stayed, vacated, or subject to stay pending appeal, in the case of modification or amendment, without prior written consent of the Administrative Agent and the Required Lenders;

(xv)    an order in the Chapter 11 Cases shall be entered charging any of the Collateral under section 506(c) of the Bankruptcy Code against the Administrative Agent and the Secured Parties, or the commencement of any other action that is materially adverse to the Administrative Agent, the Secured Parties or their respective rights and remedies under the Loan Documents in any of the Chapter 11 Cases or inconsistent with any of the Loan Documents;

(xvi)    if the Final Order does not include a waiver, in form and substance satisfactory to the Administrative Agent, of the right to surcharge the Collateral under section 506(c) of the Bankruptcy Code;

(xvii)    without the Administrative Agent's and the Required Lenders' prior written consent, an order of the Bankruptcy Court shall be entered denying or terminating use of cash collateral by the Loan Parties;

(xviii)    an order materially adversely impacting the rights and interests of the Administrative Agent and the Lenders, as determined by the Administrative Agent or the Required Lenders, shall have been entered by the Bankruptcy Court;

(xix)    any Loan Party shall challenge, support or encourage a challenge of any payments made to the Administrative Agent or any Lender with respect to the Obligations;

(xx)    without the Administrative Agent's prior written consent, the entry of any order by the Bankruptcy Court granting, or the filing by any Loan Party or any of its Subsidiaries of any motion or other request with the Bankruptcy Court (in each case, other than the Orders and motions seeking entry thereof or permitted amendments or modifications thereto) seeking, authority to use any cash proceeds of any of the Collateral without the Administrative Agent's prior written consent or to obtain any financing under section 364 of the Bankruptcy Code other than the financing under the Loan Documents and the DIP Term Loan Documents without the Administrative Agent's prior written consent;

(xxi)    any Loan Party or any Person on behalf of any Loan Party shall file any motion seeking authority to consummate a sale of assets of the Loan Parties or the Collateral to the extent having a value in excess of $100,000 outside the ordinary course of business and not otherwise permitted hereunder (including under the Approved Budget) and without the Administrative Agent's prior written consent;

(xxii)    any Loan Party shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any Prepetition Indebtedness or payables other than payments (A) in respect of accrued payroll and related expenses as of the commencement of the Chapter 11 Cases, (B) in respect of certain creditors as may be reasonably acceptable to the Administrative Agent and (C) permitted under this Agreement, in each case, to the extent authorized or required by one or more "first day" or "second day" orders or any of the Orders (or other orders with the consent of the Administrative Agent) and consistent with the Approved Budget;

(xxiii)   if an order of the Bankruptcy Court shall be entered providing for a change of venue with respect to any of the Chapter 11 Cases and such order shall not be reversed or vacated within ten (10) days;

(xxiv)   any Loan Party or any Subsidiary thereof shall file any motion or other request with the Bankruptcy Court seeking (A) to grant or impose, under section 364 of the Bankruptcy Code or otherwise, liens or security interests in any DIP Collateral (as defined in the Orders), whether senior, equal or subordinate to the Administrative Agent's or the DIP Term Loan Agent's liens and security interests; or (B) to modify or affect any of the rights of the Administrative Agent, the Lenders, the DIP Term Loan Agent or the DIP Term Loan Lenders under any Order, any Loan Document or any DIP Term Loan Document by any plan of reorganization confirmed in the Chapter 11 Cases or subsequent order entered in the Chapter 11 Cases;

(xxv)    any Loan Party or any Subsidiary thereof shall take any action in support of any matter set forth in this Section 8.1(s) or any other Person shall do so and such application is not contested in good faith by the Loan Parties and the relief requested is granted in an order that is not stayed pending appeal;

(xxvi)   the engagement of the Loan Party Advisors shall cease to be in full force and effect for a period of five (5) Business Days without a replacement being appointed on terms and conditions (including scope of authority) acceptable to the Administrative Agent;

(xxvii)  the assertion by any of the Loan Parties in any pleading filed in any court that any material provision of the Interim Order or the Final Order is not valid and binding for any reason;

(xxviii) any material provision of the Interim Order, the Final Order, or any other order of the Bankruptcy Court approving the use of cash collateral ceases to be valid and binding, without the Administrative Agent's prior consent; or

(xxix)   the occurrence of a DIP Termination Event (as defined in the Orders).

Section 8.2    Remedies Upon Event of Default.  If any Event of Default occurs and is continuing, subject to the Orders and the terms thereof and notwithstanding the provisions of section 362 of the Bankruptcy Code and without notice, application or motion, hearing before, or order to the Bankruptcy Court, then, and in every such event, and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, by five (5) Business Days' notice to the Borrower Agent, take either or both of the following actions (whether before or after the Effective Date), at the same or different times:

(a)      terminate the Commitments, and thereupon the Commitments shall terminate immediately;

(b)     declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of each Loan Party accrued under the Loan Documents, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Loan Party;

(c)     declare that the application of the Carve Out has occurred through the delivery of a Carve Out Trigger Notice (as defined in the Orders) to the Borrower Agent;

(d)     subject to the Remedies Notice Period, direct any or all of the Loan Parties to sell or otherwise dispose of any or all of the Collateral (subject to the Orders) on terms and conditions acceptable to the Administrative Agent pursuant to section 363, section 365 and other applicable provisions of the Bankruptcy Code (and, without limiting the foregoing, direct any Loan Party to assume and assign any lease or executory contract included in the Collateral (subject to the Orders) to the Administrative Agent's designees in accordance with and subject to section 365 of the Bankruptcy Code);

(e)     subject to the Remedies Notice Period, (i) exercise on behalf of itself and the Secured Parties all rights and remedies available to it and the Secured Parties under the Loan Documents or applicable law or (ii) take any and all actions described in the Orders, including, without limitation, those actions specified in the Orders; and/or

(f)     exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable law.

At any hearing during the Remedies Notice Period to contest the enforcement of remedies, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred, and the Loan Parties hereby waive their right to and shall not be entitled to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent that such relief would in way impair or restrict the rights and remedies of the Administrative Agent or the Secured Parties, as set forth in this Agreement, the applicable Order or other Loan Documents.

Subject to the Orders, the automatic stay of section 362 of the Bankruptcy Code shall be modified and vacated to permit the Administrative Agent and the Lenders to exercise all rights and remedies under this Agreement, the other Loan Documents or applicable law, without further notice, motion or application to, hearing before, or order from, the Bankruptcy Court.

The Administrative Agent (together with its agents, representatives and designees) is hereby granted an irrevocable, non-exclusive license or other right to use, license or sub-license (without payment of royalty or other compensation to any Person) any or all Intellectual Property of the Loan Parties, computer hardware and software, trade secrets, brochures, customer lists, promotional and advertising materials, labels, packaging materials and other property, in advertising for sale, marketing, selling, collecting, completing manufacture of, or otherwise exercising any rights or remedies with respect to, any Collateral, in each case, after the occurrence and during the continuance of an Event of Default, subject to the rights, remedies and priorities of the DIP Term Loan Agent under the Orders. The Administrative Agent (together with its agents, representatives and designees) is hereby granted a non-exclusive right to have access to, and a rent-free right to use, any and all owned or leased locations (including, without limitation, warehouse locations and distribution centers) for the purpose of arranging for and effecting the sale or disposition of Collateral, subject to the Orders, including the production, completion, packaging and other preparation of such Collateral for sale or disposition, and to engage in bulk sales of Collateral, which rights shall be subject to the Orders. It is further understood and agreed that the Administrative Agent and its

representatives (and persons employed on their behalf) may continue to operate, service, maintain, process and sell the Collateral, subject to the Orders. Upon the occurrence and the continuance of an Event of Default and the exercise by the Administrative Agent or Lenders of their rights and remedies under this Agreement and the other Loan Documents, the Loan Parties shall assist the Administrative Agent and Lenders in effecting a sale or other disposition of the Collateral upon such terms as are reasonably acceptable to the Administrative Agent, subject to the Orders.

Section 8.3    Application of Funds. After the exercise of remedies provided for in Section 8.2 (or after the Loans have automatically become immediately due and payable), any amounts received on account of the Obligations shall be applied by the Administrative Agent in the following order:

First, to the payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including fees, charges and disbursements of counsel to the Administrative Agent and amounts payable under Article 3), in each case payable to the Administrative Agent in its capacity as such;

Second, to the extent of any excess of such proceeds, to the payment of that portion of the Obligations constituting fees, indemnities and other amounts, payable to the Credit Parties (including fees, charges and disbursements of counsel to the respective Credit Parties and amounts payable under Article 3), ratably among them in proportion to the respective amounts described in this clause Second payable to them;

Third, to the extent of any excess of such proceeds, to the payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans and other Obligations, ratably among the Credit Parties in proportion to the respective amounts described in this clause Third payable to them;

Fourth, to the extent of any excess of such proceeds, to the payment of that portion of the Obligations constituting unpaid principal of the Loans, ratably among the Secured Parties in proportion to the respective amounts described in this clause Fourth held by them;

Fifth, to the extent of any excess of such proceeds, to the payment of all other Obligations that are due and payable to the Secured Parties or any other holder of Obligations, or any of them, on such date, ratably based on the respective aggregate amounts of all such Obligations owing to the Secured Parties on such date; and

Last, to the extent of any excess of such proceeds, the balance, if any, after all of the Obligations have been paid in full, to the Borrowers or as otherwise required by law.

Notwithstanding anything to the contrary set forth above, Excluded Swap Obligations with respect to any Guarantor shall not be paid with amounts received from such Guarantor or its assets, but appropriate adjustments shall be made with respect to payments from other Loan Parties to preserve the allocation to Obligations otherwise set forth above in this Section.

## ARTICLE 9

## THE ADMINISTRATIVE AGENT

Section 9.1    Appointment and Authority. Each of the Lenders hereby irrevocably appoints Wingspire to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as

are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. Without limiting the generality of the foregoing, each Lender hereby authorizes the Administrative Agent to consent, on behalf of each Lender, to the Interim Order and the Final Order, each to be negotiated between the Loan Parties, the Administrative Agent, certain other parties and any statutory committees appointed pursuant to sections 327 and 1103 of the Bankruptcy Code. The provisions of this Article are solely for the benefit of the Administrative Agent and the Lenders, and neither any Borrower nor any other Loan Party shall have rights as a third-party beneficiary of any of such provisions. It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

Section 9.2    <u>Rights as a Lender</u>.  The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for, and generally engage in any kind of business with, Holdings or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

Section 9.3    <u>Exculpatory Provisions</u>.

(a)    The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents, and its duties hereunder shall be administrative in nature. Without limiting the generality of the foregoing, the Administrative Agent:

(i)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing;

(ii)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); <u>provided</u> that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law; and

(iii)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to Holdings or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity.

(b)    The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary,

under the circumstances as provided in Section 8.2 and Section 10.2), or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and non-appealable judgment. The Administrative Agent shall be deemed not to have knowledge of any Default or Event of Default unless and until notice describing such Default or Event of Default is given to the Administrative Agent in writing by the Borrower Agent or a Lender.

(c)     The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article 4 or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

(d)     The Administrative Agent shall not be responsible or have any liability for, or have any duty to investigate a violation or potential violation of an Environmental Law or a Release or threat of Release of a Hazardous Material pursuant to Section 6.13, nor shall it have any liability for any action it takes or does not take in connection with any such investigation.

Section 9.4     Reliance by Administrative Agent.  The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan, that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan.  The Administrative Agent may consult with legal counsel (who may be counsel for the Loan Parties), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Section 9.5     Delegation of Duties.  The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent.  The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of this Agreement as well as activities as Administrative Agent. The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

Section 9.6     Resignation of Administrative Agent.

(a)     The Administrative Agent may at any time give notice of its resignation to the Lenders and the Borrower Agent.  Upon receipt of any such notice of resignation, the Required Lenders

shall have the right, in consultation with the Borrower Agent, to appoint a successor, which shall be a bank with an office in New York, New York, or an Affiliate of any such bank with an office in New York, New York. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation (or such earlier day as shall be agreed by the Required Lenders) (the "Resignation Effective Date"), then the retiring Administrative Agent may (but shall not be obligated to), on behalf of the Lenders, appoint a successor Administrative Agent meeting the qualifications set forth above, provided that in no event shall any such successor Administrative Agent be a Defaulting Lender. Whether or not a successor has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date.

(b)     If the Person serving as Administrative Agent is a Defaulting Lender pursuant to clause (d) of the definition thereof, the Required Lenders may, to the extent permitted by applicable law, by notice in writing to the Borrower Agent and such Person remove such Person as Administrative Agent and, in consultation with the Borrower Agent, appoint a successor. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days (or such earlier day as shall be agreed by the Required Lenders) (the "Removal Effective Date"), then such removal shall nonetheless become effective in accordance with such notice on the Removal Effective Date.

(c)     With effect from the Resignation Effective Date or the Removal Effective Date (as applicable) (i) the retiring or removed Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders under any of the Loan Documents, the retiring or removed Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (ii) except for any indemnity payments owed to the retiring or removed Administrative Agent, all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided for above. Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring or removed Administrative Agent (other than any rights to indemnity payments owed to the retiring or removed Administrative Agent), and the retiring or removed Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents. The fees payable by the Borrowers to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrowers and such successor. After the retiring or removed Administrative Agent's resignation or removal hereunder and under the other Loan Documents, the provisions of this Article and Section 10.3 shall continue in effect for the benefit of such retiring or removed Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring or removed Administrative Agent was acting as Administrative Agent.

Section 9.7     Non-Reliance on Administrative Agent and Other Lenders.  Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

Section 9.8    No Other Duties, Etc.  Anything herein to the contrary notwithstanding, no agent listed on the cover page hereof shall have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as the Administrative Agent, a Lender hereunder.

Section 9.9    [Reserved].

Section 9.10    Collateral and Guarantee Matters.

(a)    The Secured Parties irrevocably authorize the Administrative Agent, at its option and in its discretion,

(i)    to release any Lien on any property granted to or held by the Administrative Agent under any Loan Document (A) at the Termination Date, (B) that is sold or otherwise Disposed of or to be sold or otherwise Disposed of as part of or in connection with any sale or other Disposition permitted under the Loan Documents (including all of the Collateral of a Guarantor which is released from its obligations under the Loan Documents pursuant to clause (iii) below); provided, however, any sale or Disposition of all or substantially all of the Collateral or all or substantially all of the value of the Guarantees under the Loan Guaranty shall be subject to Section 10.2(b), or (C) subject to Section 10.2, if approved, authorized or ratified in writing by the Required Lenders;

(ii)    to subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted by Section 7.2(d); and

(iii)    to release any Guarantor from its obligations under the Loan Documents if such Person ceases to be a Subsidiary as a result of a transaction permitted under the Loan Documents, provided, however, that the release of all or substantially all of the Collateral or all or substantially all of the value of the Guarantees under the Loan Guaranty shall be subject to Section 10.2(b).

Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Loan Documents pursuant to this Section 9.10.

(b)    The Administrative Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Administrative Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall the Administrative Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.

ARTICLE 10

MISCELLANEOUS

Section 10.1    Notices.

(a)    Notices Generally.  Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in paragraph (b) below), all notices

and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile as follows:

  (i)  if to any Loan Party:

    c/o Corsicana Bedding, LLC
    1420 W. Mockingbird Lane, Suite 800
    Dallas, TX 75247
    Attn: Eric Rhea
    E-mail: erhea@corsicanamattress.com

    with copy to (which shall not constitute notice):

    Haynes and Boone, LLP
    2323 Victory Avenue, Suite 700
    Dallas, TX 75220
    Attn: Steve Pezanosky
    E-mail: steve.pezanosky@haynesboone.com

  (ii)  the Administrative Agent:

    Wingspire Capital LLC
    Deerfield Corporate Center
    13010 Morris Road
    Building One, Suite 175
    Alpharetta, GA 30004
    Attn: Corsicana Bedding Loan Administration
    E-mail: jolsen@wingspirecapital.com

    with copy to (which shall not constitute notice):

    McGuireWoods LLP
    1251 Avenue of the Americas, 20th Floor
    New York, NY 10020-1104
    Attn: Brian Swett, Shawn Fox and Demetra Liggins
    E-mail: bswett@mcguirewoods.com, sfox@mcguirewoods.com, DLiggins@mcguirewoods.com

  (iii)  if to any other Credit Party, the address or electronic mail address number specified in its Administrative Questionnaire.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient). Notices delivered through electronic communications to the extent provided in paragraph (b) below, shall be effective as provided in said paragraph (b).

  (b)  <u>Electronic Communications</u>. The Administrative Agent and each of its Affiliates is authorized to transmit, post or otherwise make or communicate, in its sole discretion (but shall not be required to do so), by Approved Electronic Communications in connection with this Agreement or any

other Loan Document and the transactions contemplated therein. The Administrative Agent is hereby authorized to establish procedures to provide access to and to make available or deliver, or to accept, notices, documents and similar items by posting to ABLSoft. All uses of ABLSoft and other Approved Electronic Communications shall be governed by and subject to, in addition to the terms of this Agreement, the separate terms, conditions and privacy policy posted or referenced in such system (or such terms, conditions and privacy policy as may be updated from time to time, including on such system) and any related contractual obligations executed by the Administrative Agent and Loan Parties in connection with the use of such system. Each of the Loan Parties and the Administrative Agent hereby acknowledges and agrees that the use of ABLSoft and other Approved Electronic Communications is not necessarily secure and that there are risks associated with such use, including risks of interception, disclosure and abuse and each indicates it assumes and accepts such risks by hereby authorizing the Administrative Agent and each of its Affiliates to transmit Approved Electronic Communications. ABLSoft and all Approved Electronic Communications shall be provided "as is" and "as available". None of the Administrative Agent or any of its Affiliates or related persons warrants the accuracy, adequacy or completeness of ABLSoft or any other electronic platform or electronic transmission and disclaims all liability for errors or omissions therein. No warranty of any kind is made by the Administrative Agent or any of its Affiliates or related persons in connection with ABLSoft or any other electronic platform or electronic transmission, including any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or freedom from viruses or other code defects. Each of Borrower and each other Loan Party executing this Agreement agrees that the Administrative Agent has no responsibility for maintaining or providing any equipment, software, services or any testing required in connection with ABLSoft, any Approved Electronic Communication or otherwise required for ABLSoft or any Approved Electronic Communication. No Approved Electronic Communications shall be denied legal effect merely because it is made electronically. Approved Electronic Communications that are not readily capable of bearing either a signature or a reproduction of a signature may be signed, and shall be deemed signed, by attaching to, or logically associating with such Approved Electronic Communication, an E-Signature, upon which the Administrative Agent and the Loan Parties may rely and assume the authenticity thereof. Each Approved Electronic Communication containing a signature, a reproduction of a signature or an E-Signature shall, for all intents and purposes, have the same effect and weight as a signed paper original. Each E-Signature shall be deemed sufficient to satisfy any requirement for a "signature" and each Approved Electronic Communication shall be deemed sufficient to satisfy any requirement for a "writing", in each case including pursuant to this Agreement, any other Loan Document, the UCC, the Uniform Electronic Transactions Act, the Electronic Signatures in Global and National Commerce Act and any substantive or procedural law governing such subject matter. Each party or beneficiary hereto agrees not to contest the validity or enforceability of an Approved Electronic Communication or E-Signature under the provisions of any applicable law requiring certain documents to be in writing or signed; provided, that nothing herein shall limit such party's or beneficiary's right to contest whether an Approved Electronic Communication or E-Signature has been altered after transmission.

(c)    <u>Change of Address, Etc</u>. Any party hereto may change its address or facsimile number for notices and other communications hereunder by notice to the other parties hereto.

Section 10.2   <u>Waivers; Amendments</u>.

(a)    No failure or delay by any Credit Party in exercising any right or power under any Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Credit Parties under the Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted

by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default or Event of Default, regardless of whether any Credit Party may have had notice or knowledge of such Default or Event of Default at the time.

(b)     Except as expressly provided by Section 2.8 Section 3.3(b), or in the other paragraphs of this Section 10.2, neither this Agreement, any other Loan Document (other than the Fee Letter) nor any provision thereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Loan Parties and the Required Lenders, or by the Borrowers and the Administrative Agent with the consent of the Required Lenders; provided that no such agreement shall:

(i)     extend or increase any Commitment of any Lender without the written consent of such Lender (it being understood that a waiver of any condition precedent set forth in Article 4 or the waiver of any Default or Event of Default shall not constitute an extension or increase of any Commitment of any Lender);

(ii)     reduce the principal amount of any Loan or reduce the rate of any interest, or reduce any fees or other amounts, payable under the Loan Documents, without the written consent of each Credit Party directly and adversely affected thereby; provided that only the consent of the Required Lenders shall be necessary to amend or modify the definition of "Default Rate" or to waive any obligation of the Borrowers to pay interest at the Default Rate, in each case, notwithstanding the fact that any such amendment or modification actually results in reduction in the rate of interest or fees;

(iii)     postpone any date scheduled for any payment of principal of, or interest on, any Loan, or any fees or other amounts payable hereunder or under any other Loan Document, or reduce the amount of, waive or excuse any such payment, or postpone the stated termination or expiration of the Revolving Commitments or reduce the amount of or postpone the date of any prepayment required by Section 2.5(b) without the written consent of each Credit Party directly and adversely affected thereby;

(iv)     except as provided in subsection (c) below change any provision hereof in a manner that would alter the pro rata sharing of payments required by Section 2.6(b) or the pro rata reduction of Revolving Commitments required by Section 2.3(d), without the written consent of each Credit Party directly and adversely affected thereby;

(v)     change any of the provisions of this Section or the definition of the terms "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to waive, amend or modify any rights hereunder or make any determination or grant any consent hereunder;

(vi)     change the currency in which any Commitment or Loan is, or is to be, denominated without the written consent of each Lender directly affected thereby;

(vii)     release any Guarantor from its Guarantee under the Loan Guaranty (except as expressly provided therein or in Section 9.10), or limit its liability in respect of such Guarantee, without the written consent of each Lender;

(viii)     release all or substantially all of the Collateral from the Liens of the Loan Documents (except as expressly provided in the applicable Collateral Document or in connection with a transaction permitted by Section 7.3), without the consent of each Lender; or

(ix) make any modification to the definition of the term "<u>Borrowing Base</u>" (or any defined term used in the definition of "<u>Borrowing Base</u>") which would have the effect of increasing the availability thereunder to the Loan Parties (other than changes in Reserves implemented by the Administrative Agent in accordance with the terms of this Agreement), without the written consent of each Lender;

<u>provided</u>, <u>further</u>, that no such amendment, waiver or consent shall amend, modify or otherwise affect the rights or duties hereunder or under any other Loan Document of the Administrative Agent, unless in writing executed by the Administrative Agent, in addition to the Borrowers and the Lenders required above.

(c) Notwithstanding anything herein to the contrary, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent that by its terms requires the consent of all the Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except that (x) the Commitment of any Defaulting Lender may not be increased or extended, or the maturity of any of its Loan may not be extended, the rate of interest on any of its Loans may not be reduced and the principal amount of any of its Loans may not be forgiven, in each case without the consent of such Defaulting Lender and (y) any amendment, waiver or consent requiring the consent of all the Lenders or each affected Lender that by its terms affects any Defaulting Lender more adversely than the other affected Lenders shall require the consent of such Defaulting Lender.

(d) In addition, notwithstanding anything in this Section to the contrary, if the Administrative Agent and the Borrowers shall have jointly identified an obvious error or any error or omission of a technical nature, in each case, in any provision of the Loan Documents, then the Administrative Agent and the Borrowers shall be permitted to amend such provision, and, in each case, such amendment shall become effective without any further action or consent of any other party to any Loan Document if the same is not objected to in writing by the Required Lenders to the Administrative Agent within ten Business Days following receipt of notice thereof.

Section 10.3    <u>Expenses; Indemnity; Damage Waiver</u>.

(a) <u>Costs and Expenses</u>. The Loan Parties, jointly and severally, shall pay all reasonable out-of-pocket expenses incurred by the Administrative Agent and its Affiliates in connection with this Agreement and the other Loan Documents, the Interim Order, the Final Order and any transaction contemplated thereby (whether or not the transactions contemplated hereby or thereby shall be consummated) and any refinancing of the obligations hereunder or any "exit financing" requested by the Loan Parties in connection with the Chapter 11 Cases or Successor Cases (whether or not the transactions contemplated hereby or thereby shall be consummated), including all (i) reasonable fees, charges and disbursements of all Administrative Agent Advisors (other than Attorney Costs), (ii) reasonable out-of-pocket costs and expenses in connection with field examinations, appraisals and insurance reviews (including reasonable fees charged by a third party retained by the Administrative Agent); (iii) environmental site assessments; (iv) all reasonable out-of-pocket expenses incurred by the Administrative Agent and its Affiliates (including Attorney Costs of one counsel for the Administrative Agent) in connection with the syndication of the credit facilities provided for herein, the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated) and (vi) all out-of-pocket expenses incurred by the Administrative Agent or any Credit Party (including Attorney Costs of the Administrative Agent or any Credit Party), in connection with the enforcement or protection of its rights (whether through negotiations, legal proceedings or otherwise) (A) in connection with this Agreement and the other Loan Documents, including its rights under this Section, or (B) in connection with the Loans made hereunder,

including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans.

(b)      Indemnification by Loan Parties.  The Loan Parties, jointly and severally, shall indemnify the Administrative Agent (and any sub-agent thereof), each Credit Party, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including Attorney Costs), incurred by any Indemnitee or asserted against any Indemnitee by any third party or by any Loan Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or Release of Hazardous Materials at, on, under or from any property owned or operated by any Loan Party or any of its Subsidiaries, or any Environmental Claim or Environmental Liability related in any way to any Loan Party or any of its Subsidiaries, (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by any Loan Party, and regardless of whether any Indemnitee is a party thereto or (v) any government investigation, audit, hearing or enforcement action resulting from any Loan Party's or any of its Affiliate's noncompliance (or purported noncompliance) with any applicable Sanctions, other Anti-Terrorism Laws or Anti-Corruption Laws (it being understood and agreed that the Indemnitees shall be entitled to indemnification pursuant to this clause (including indemnification for fines, penalties and other expenses) regardless of whether any adverse finding is made against any Loan Party or any of its Affiliates), provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or (y) result from a claim brought by any Loan Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if such Loan Party has obtained a final and non-appealable judgment in its favor on such claim as determined by a court of competent jurisdiction.  To the extent that the indemnity set forth above in this paragraph shall be held to be unenforceable in whole or in part because it is violative of any law or public policy, the Loan Parties shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all indemnified amounts incurred by Indemnitees or any of them.  Paragraph (b) of this Section shall not apply with respect to Taxes other than Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(c)      Reimbursement by Lenders.  To the extent that the Loan Parties for any reason fail to indefeasibly pay any amount required under paragraph (a) or (b) of this Section to be paid by it to the Administrative Agent (or any sub-agent thereof) or any Related Party, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent) or such Related Party, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought based on each Lender's share of the Total Credit Exposure at such time) of such unpaid amount (including any such unpaid amount in respect of a claim asserted by such Lender); provided, that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent) or against any Related Party acting for the Administrative Agent (or any such sub-agent) in connection with such capacity. The obligations of the Lenders under this paragraph (c) are subject to the provisions of Section 2.6(d).

(d)      Waiver of Consequential Damages, Etc.  To the fullest extent permitted by applicable law, no Loan Party shall assert, and each Loan Party hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed

to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof. No Indemnitee referred to in paragraph (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.

(e)     Payments. All amounts due under this Section shall be payable promptly and in no event later than ten days after demand therefor.

Section 10.4     Successors and Assigns.

(a)     Successors and Assigns Generally. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Loan Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of paragraph (b) of this Section, (ii) by way of participation in accordance with the provisions of paragraph (d) of this Section or (iii) by way of pledge or assignment of a security interest subject to the restrictions of paragraph (e) of this Section (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in paragraph (d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of Credit Party) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     Assignments by Lenders. Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans at the time owing to it); provided that any such assignment shall be subject to the following conditions:

(i)     Minimum Amounts.

(A)     in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and/or the Loans at the time owing to it or contemporaneous assignments to related Approved Funds (determined after giving effect to such assignments) that equal at least the amount specified in paragraph (b)(i)(B) of this Section in the aggregate or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)     in any case not described in paragraph (b)(i)(A) of this Section, the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the applicable Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date) shall not be less than $5,000,000, unless each of the Administrative Agent and, so long as no Event of Default has occurred and is continuing, the Borrower Agent otherwise consents (each such consent not to be unreasonably withheld or delayed).

(ii) <u>Proportionate Amounts</u>. Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loan or the Commitment assigned.

(iii) <u>Required Consents</u>. No consent shall be required for any assignment except to the extent required by paragraph (b)(i)(B) of this Section and, in addition:

(A) the consent of the Borrower Agent (such consent not to be unreasonably withheld or delayed) shall be required unless (x) an Event of Default has occurred and is continuing at the time of such assignment or (y) such assignment is to a Lender (other than a Defaulting Lender), an Affiliate of a Lender (other than a Defaulting Lender) or an Approved Fund, <u>provided</u> that the Borrower Agent shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within five Business Days after written notice of such assignment shall have delivered to the Borrower Agent; and

(B) the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments to a Person who is not a Lender, an Affiliate of a Lender or an Approved Fund.

(iv) <u>Assignment and Assumption</u>. The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500, and the assignee, if it is not a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire. In addition, each assignee shall, on or before the effective date of such assignment, deliver to the Borrower Agent and the Administrative Agent certification as to exemption from deduction or withholding of any United States Taxes in accordance with <u>Section 3.5 (g)</u>.

(v) <u>No Assignment to Certain Persons</u>. No such assignment shall be made to (A) the Company or any of the Company's Affiliates or Subsidiaries, (B) any Defaulting Lender or any of its Subsidiaries, or any Person who, upon becoming a Lender hereunder, would constitute a Defaulting Lender or a Subsidiary thereof or (C) a Person who, at the time of such assignment, is a Sanctioned Person if such assignment would violate applicable law.

(vi) <u>No Assignment to Natural Persons</u>. No such assignment shall be made to a natural person (or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural person).

(vii) <u>Certain Additional Payments</u>. In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the prior written consent of the Borrower Agent and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full pro rata share of all Loans in accordance with its Applicable Percentage. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall

become effective under applicable law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to paragraph (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Section 3.5 and Section 10.3 with respect to facts and circumstances occurring prior to the effective date of such assignment. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (d) of this Section.

(c)     Register.  The Administrative Agent, acting solely for this purpose as an agent of the Borrowers, shall maintain a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive, and the Borrowers, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrowers and any Lender, at any reasonable time and from time to time upon reasonable prior notice. The parties intend that any interest in or with respect to the Loans under this Agreement be treated as being issued and maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2), and 881(c)(2) of the Code and any regulations thereunder (and any successor provisions), including without limitation under United States Treasury Regulations Section 5f.103-1(c) and Proposed Regulations Section 1.163-5 (and any successor provisions), and the provisions of this Agreement shall be construed in a manner that gives effect to such intent.

(d)     Participations.  Any Lender may at any time, without the consent of, or notice to, the Borrower Agent or the Administrative Agent, sell participations to any Person (other than (i) a natural person (or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural person), (ii) Holdings or any of Holdings' Affiliates or Subsidiaries, (iii) any Defaulting Lender or any of its Subsidiaries, or (iv) a Person who, at the time of such participation, is a Sanctioned Person if the sale of such participation would violate applicable law) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Revolving Commitment and/or the Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and (C) the Borrowers, the Administrative Agent and each Credit Party shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in Section 10.2(b) that affects such Participant. Each Borrower agrees that each Participant shall be entitled to the benefits of Sections 3.4 and 3.5 (subject to the requirements and

limitations therein, including the requirements under Section 3.5 (it being understood that the documentation required under Section 3.5(g) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section; provided that such Participant (A) agrees to be subject to the provisions of Sections 3.6 as if it were an assignee under paragraph (b) of this Section; and (B) shall not be entitled to receive any greater payment under Section 3.5, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation. Each Lender that sells a participation agrees, at the Borrower Agent's request and expense, to use reasonable efforts to cooperate with the Borrowers to effectuate the provisions of Section 3.6(b) with respect to any Participant. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.8 as though it were a Lender; provided that such Participant agrees to be subject to Section 2.6(h) as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrowers, maintain a register complying with the requirements of Sections 163(f), 871(h) and 881(c)(2) of the Code and the Treasury regulations issued thereunder on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(e)     Certain Pledges. Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement and the Loan Documents to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(f)     Cashless Settlement. Notwithstanding anything to the contrary contained in this Agreement, any Lender may exchange, continue or rollover all or a portion of its Loans in connection with any refinancing, extension, loan modification or similar transaction permitted by the terms of this Agreement, pursuant to a cashless settlement mechanism approved by the Borrower Agent, the Administrative Agent and such Lender.

(g)     Transactions Among Wingspire Affiliates. Notwithstanding anything in this Agreement or any other Loan Document to the contrary, (i) neither Wingspire nor any Affiliate thereof (each, a "Wingspire Party") shall be required to comply with this Section 10.4 in connection with any transaction involving any Wingspire Party or any of its or their lenders or funding or financing sources, and no Wingspire Party shall have any obligation to disclose any such transaction to any Person, and (ii) there shall be no limitation or restriction on (A) the ability of any Wingspire Party to assign or otherwise transfer its rights and/or obligations under this Agreement or any other Loan Document, any Commitment, any Loan, or any other Obligation to any Wingspire Party or any lender or financing or funding source of a Wingspire Party or (B) the ability of any such lender or funding or financing source to assign or otherwise transfer its rights and/or obligations under this Agreement or any other Loan Document, any Commitment, any Loan, or any other Obligation; provided, however, that to the extent that any Wingspire Party or any

such other Person covered by the provisions of this Section 10.4(g) fails to qualify as a "Lender" under this Agreement, Wingspire shall continue to be responsible for all of its obligations under this Agreement and the other Loan Documents as a "Lender". Without limiting the foregoing, any assignment by Wingspire of its rights and obligations to a Wingspire Party under this Agreement may include Wingspire's rights and obligations as the Administrative Agent hereunder and, in such event, the applicable Wingspire Party shall for all purposes be the Administrative Agent under this Agreement and Wingspire shall be deemed to be a sub-agent of such Person duly appointed pursuant to Section 9.5 of this Agreement.

Section 10.5    Survival. All covenants, agreements, representations and warranties made by Loan Parties herein and in the certificates or other instruments prepared or delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of any Loan Document and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that any Credit Party may have had notice or knowledge of any Default or Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under the Loan Documents is outstanding and unpaid and so long as the Commitments have not expired or terminated.  The provisions of Sections 3.4, 3.5, 10.3, 10.9, and 10.10 and Article 9 shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby or the Termination Date.

Section 10.6    Counterparts; Integration; Effectiveness; Electronic Execution.

(a)    Counterparts; Integration; Effectiveness.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents, and any separate letter agreements with respect to fees payable to the Administrative Agent, constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in Section 4.1, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or in electronic (e.g., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement.

(b)    Electronic Execution of Assignments.  The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, any other similar state laws based on the Uniform Electronic Transactions Act, the Uniform Commercial Code, each as amended, and the parties hereto hereby waive any objection to the contrary, provided that (i) nothing herein shall require the Administrative Agent to accept electronic signature counterparts in any form or format and (ii) the Administrative Agent reserves the right to require, at any time and at its sole discretion, the delivery of manually executed counterpart signature pages to this Agreement and the parties hereto agree to promptly deliver such manually executed counterpart signature pages.

Section 10.7    Severability.  In the event any one or more of the provisions contained in this Agreement should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction).  The parties shall endeavor in good faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

Section 10.8    Right of Setoff.  If an Event of Default shall have occurred and be continuing, each Credit Party and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable law (notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from, the Bankruptcy Court), to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by Credit Party or any such Affiliate to or for the credit or the account of any Loan Party or any of its Subsidiaries against any and all of the obligations of such Loan Party or such Subsidiary now or hereafter existing under this Agreement or any other Loan Document to such Credit Party or Affiliate, irrespective of whether or not such Credit Party shall have made any demand under this Agreement or any other Loan Document and although such obligations of such Loan Party or Subsidiary may be contingent or unmatured or are owed to a branch or office of such Credit Party different from the branch or office holding such deposit or obligated on such indebtedness, provided, that in the event that any Defaulting Lender shall exercise any right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.7 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.  The rights of each Credit Party and its Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Credit Party and its Affiliates may have.  Each Credit Party agrees to notify the Borrower Agent and the Administrative Agent promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

Section 10.9    Governing Law; Jurisdiction; Consent to Service of Process.

(a)    Governing Law.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York and, to the extent applicable, the Bankruptcy Code.

(b)    Submission to Jurisdiction.  Each of Loan Parties irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of (i) the courts of the State of New York sitting in New York County and of the United States District Court for the Southern District of New York and any appellate court from any thereof or (ii) the Bankruptcy Court, in any action or proceeding arising out of or relating to this Agreement or any other Loan Document, or for recognition or enforcement of any judgment, and each of the parties hereto irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State court or, to the fullest extent permitted by applicable law, in such Federal court or the Bankruptcy Court and hereby agrees to waive any rights it may have to object to adjudication by a judge of the Bankruptcy Court on the basis of a right to have matters adjudicated in front of an Article III judge.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement or in any other Loan Document shall affect any right that any Credit Party may otherwise have to bring any

action or proceeding relating to this Agreement or any other Loan Document against Holdings or any other Loan Party or its properties in the courts of any jurisdiction.

(c)   Waiver of Objection to Venue.   Each of the parties hereto irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in paragraph (b) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)   Service of Process.   Each of the parties hereto irrevocably consents to service of process in the manner provided for notices in Section 10.1. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

Section 10.10   WAIVER OF JURY TRIAL.   EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO HEREBY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 10.11   Payments Set Aside.   To the extent that any payment by or on behalf of the Borrowers is made to the Administrative Agent or any Lender, or the Administrative Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, Uniform Voidable Transactions Act or similar statute or common law, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share of any amount so recovered from or repaid by the Administrative Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Effective Rate.

Section 10.12   Headings.   Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 10.13   Interest Rate Limitation.   Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts that are treated as interest thereon under applicable law (collectively the "charges"), shall exceed the maximum lawful rate (the "maximum rate") that may be contracted for, charged, taken, received or reserved by the Lender holding an interest in such Loan in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all of the charges payable in respect thereof, shall be limited

to the maximum rate and, to the extent lawful, the interest and the charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated, and the interest and the charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the maximum rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

Section 10.14 <u>Treatment of Certain Information; Confidentiality</u>.

(a) Each Credit Party agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (i) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, advisors and other representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (ii) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (iii) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (iv) to any other party hereto, (v) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding (including, without limitation, the Chapter 11 Cases and/or any Successor Cases) relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (vi) subject to an agreement containing provisions substantially the same as those of this Section, to (A) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (B) any actual or prospective party (or its Related Parties) to any swap, derivative or other transaction under which payments are to be made by reference to the Borrowers and their obligations, this Agreement or payments hereunder, (vii) on a confidential basis to (A) any rating agency in connection with rating the Borrowers, their Subsidiaries or this Agreement or (B) the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers with respect to the credit facilities, (viii) with the consent of the Borrower Agent or (ix) to the extent such Information (A) becomes publicly available other than as a result of a breach of this Section or (B) becomes available to the Administrative Agent, any Credit Party or any of their respective Affiliates on a non-confidential basis from a source other than a Loan Party or (C) is independently generated by the Administrative Agent, any Credit Party or any of their respective Affiliates. In addition, the Administrative Agent and the Lenders may disclose the existence of this Agreement and information about this Agreement to market data collectors, league table providers and other similar service providers to the lending industry and service providers to the Administrative Agent and the Lenders.

(b) For purposes of this Section, "<u>Information</u>" means all information received from any Loan Party or any of its Subsidiaries relating to any Loan Party or any of its Subsidiaries or any of their respective businesses, other than any such information that is available to the Administrative Agent or any other Credit Party on a non-confidential basis prior to disclosure by any Loan Party or any Subsidiary or that is independently prepared by the Administrative Agent or any other Credit Party, <u>provided</u> that, in the case of information received from any Loan Party or any of its Subsidiaries after the Effective Date, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information. Notwithstanding anything herein to the contrary, "Information" shall not include, and each Credit Party (and their Affiliates and respective partners, directors, officers, employees, agents, advisors and representatives) may disclose to any and all persons, without limitation of any kind, any information with respect to the U.S. federal income tax treatment and U.S. federal income tax structure of the transactions contemplated hereby and all

materials of any kind (including opinions or other tax analyses) that are provided to such Credit Party relating to such tax treatment and tax structure.

(c)     The Loan Parties agree, on behalf of themselves and their Affiliates, that they will not in the future issue any press releases or other public disclosure using the name of the Administrative Agent or any Lender or their respective Affiliates or referring to this Agreement or any of the other Loan Documents without the prior written consent of such Person, unless (and only to the extent that) the Loan Parties or such Affiliate is required to do so under law and then, in any event, the Loan Parties or such Affiliate will consult with such Person before issuing such press release or other public disclosure.

(d)     The Loan Parties consent to the publication by the Administrative Agent or any Lender of customary advertising material relating to the Transactions using the name, product photographs, logo or trademark of the Loan Parties.

Section 10.15   USA PATRIOT Act Notice.  Each Lender that is subject to the USA PATRIOT Act and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Loan Parties that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify each Loan Party in accordance with the USA PATRIOT Act.  Each Loan Party shall, and shall cause each Subsidiary to, provide such information and take such actions as are reasonably requested by the Administrative Agent or any Lender in order to assist the Administrative Agent and the Lenders in maintaining compliance with the USA PATRIOT Act.

Section 10.16   No Fiduciary Duty.  Each Loan Party agrees that in connection with all aspects of the transactions contemplated hereby and any communications in connection therewith, such Loan Party and its Affiliates, on the one hand, and the Administrative Agent, the other Credit Parties and their respective Affiliates, on the other hand, will have a business relationship that does not create, by implication or otherwise, any fiduciary duty on the part of the Administrative Agent, the other Credit Parties or their respective Affiliates and no such duty will be deemed to have arisen in connection with any such transactions or communications.

Section 10.17   Acknowledgement and Consent to Bail-In of Affected Financial Institutions.  Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)     the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)     the effects of any Bail-in Action on any such liability, including, if applicable:

(i)     a reduction in full or in part or cancellation of any such liability;

(ii)     a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other

instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii) the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any applicable Resolution Authority.

Section 10.18    Certain ERISA Matters.

(a) Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and its Affiliates, and not, for the avoidance of doubt, to or for the benefit of Holdings or any other Loan Party, that at least one of the following is and will be true:

(i) such Lender is not using "plan assets" (within the meaning of 29 CFR § 2510.3-101, as modified by Section 3(42) of ERISA) of one or more Benefit Plans in connection with the Loans or the Commitments,

(ii) the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement,

(iii) (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement, or

(iv) such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b) In addition, unless clause (i) in the immediately preceding paragraph (a) is true with respect to a Lender or such Lender has not provided another representation, warranty and covenant as provided in clause (iv) in the immediately preceding paragraph (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and its Affiliates, and not, for the avoidance of doubt, to or for the benefit of Holdings or any other Loan Party, that:

(i) none of the Administrative Agent nor any of its Affiliates is a fiduciary with respect to the assets of such Lender (including in connection with the reservation or exercise

of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related to hereto or thereto),

(ii) the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement is independent (within the meaning of 29 CFR § 2510.3-21) and is a bank, an insurance carrier, an investment adviser, a broker-dealer or other person that holds, or has under management or control, total assets of at least $50 million, in each case as described in 29 CFR § 2510.3-21(c)(1)(i)(A)-(E),

(iii) the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement is capable of evaluating investment risks independently, both in general and with regard to particular transactions and investment strategies (including in respect of the Obligations),

(iv) the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement is a fiduciary under ERISA or the Code, or both, with respect to the Loans, the Commitments and this Agreement and is responsible for exercising independent judgment in evaluating the transactions hereunder, and

(v) no fee or other compensation is being paid directly to the Administrative Agent or any its Affiliates for investment advice (as opposed to other services) in connection with the Loans, the Commitments or this Agreement.

(c) The Administrative Agent hereby informs the Lenders that each such Person is not undertaking to provide impartial investment advice, or to give advice in a fiduciary capacity, in connection with the transactions contemplated hereby, and that such Person has a financial interest in the transactions contemplated hereby in that such Person or an Affiliate thereof (i) may receive interest or other payments with respect to the Loans, the Commitments and this Agreement, (ii) may recognize a gain if it extended the Loans or the Commitments for an amount less than the amount being paid for an interest in the Loans, or the Commitments by such Lender or (iii) may receive fees or other payments in connection with the transactions contemplated hereby, the Loan Documents or otherwise, including structuring fees, commitment fees, arrangement fees, facility fees, upfront fees, underwriting fees, ticking fees, agency fees, administrative or other agent fees, utilization fees, minimum usage fees, letter of credit fees, fronting fees, deal-away or alternate transaction fees, amendment fees, processing fees, term out premiums, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing.

Section 10.19    The Company as Agent for Borrowers.    Each Borrower hereby irrevocably appoints the Company as the borrowing agent and attorney-in-fact for all Borrowers (the "Borrower Agent") which appointment shall remain in full force and effect unless and until the Administrative Agent shall have received prior written notice signed by each Borrower that such appointment has been revoked and that another Borrower has been appointed Borrower Agent. Each Borrower hereby irrevocably appoints and authorizes the Borrower Agent (a) to provide the Administrative Agent with all notices with respect to Loans obtained for the benefit of any Borrower and all other notices and instructions under this Agreement and the other Loan Documents (and any notice or instruction provided by Borrower Agent shall be deemed to be given by Borrowers hereunder and shall bind each Borrower), (b) to receive notices and instructions from any Credit Party (and any notice or instruction provided by any Credit Party to the Borrower Agent in accordance with the terms hereof shall be deemed to have been given to each Borrower), and (c) to take such action as the Borrower Agent deems appropriate on its behalf to obtain Revolving

Loans and to exercise such other powers as are reasonably incidental thereto to carry out the purposes of this Agreement. It is understood that the handling of the Loans and Collateral in a combined fashion, as more fully set forth herein, is done solely as an accommodation to Borrowers in order to utilize the collective borrowing powers of Borrowers in the most efficient and economical manner and at their request, and that no Credit Party shall incur liability to any Borrower as a result hereof. Each Borrower expects to derive benefit, directly or indirectly, from the handling of the Loans and the Collateral in a combined fashion since the successful operation of each Borrower is dependent on the continued successful performance of the integrated group. To induce the Credit Parties to do so, and in consideration thereof, each Borrower hereby jointly and severally agrees to indemnify each Credit Party and hold each Credit Party harmless against any and all liability, expense, loss or claim of damage or injury, made against such Credit Party by any Borrower or by any third party whosoever, arising from or incurred by reason of (i) the handling of the Loans and Collateral of Borrowers as herein provided, or (ii) such Credit Party's relying on any instructions of the Borrower Agent, except that Borrowers will have no liability to the relevant Credit Party under this <u>Section 10.19</u> with respect to any liability that has been finally determined by a court of competent jurisdiction to have resulted solely from the gross negligence or willful misconduct of such Credit Party, as the case may be.

Section 10.20  <u>Acknowledgement Regarding Any Supported QFCs</u>. To the extent that the Loan Documents provide support, through a guarantee or otherwise, for Swap Agreements or any other agreement or instrument that is a QFC (such support "<u>QFC Credit Support</u>" and each such QFC a "<u>Supported QFC</u>"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

In the event a Covered Entity that is party to a Supported QFC (each, a "<u>Covered Party</u>") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

Section 10.21  <u>Parties Including Trustees; Bankruptcy Court Proceedings</u>. This Agreement, the other Loan Documents, and all Liens created pursuant to any Loan Document shall be binding upon each Loan Party, the estate of each Loan Party, and any trustee or successor in interest of any Loan Party in any Chapter 11 Case or any Successor Case or under any other bankruptcy or insolvency laws, and shall not be subject to section 365 of the Bankruptcy Code. The Liens created by this Agreement and the other Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or

conversion of any Chapter 11 Case or any other bankruptcy case of any Loan Party to a case under chapter 7 of the Bankruptcy Code, or in the event of dismissal of any Chapter 11 Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Administrative Agent or any Lender file financing statements or otherwise perfect its security interests or Liens under applicable law.

ARTICLE 11

LOAN GUARANTY

Section 11.1    Guaranty.  Each Loan Guarantor (other than those that have delivered a separate guaranty) hereby agrees that it is jointly and severally liable for, and, as a primary obligor and not merely as surety, absolutely, unconditionally and irrevocably guarantees to the Secured Parties, the prompt payment when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter, of the Obligations and all costs and expenses, including, without limitation, all court costs and attorneys' and paralegals' fees (including allocated costs of in-house counsel and paralegals) and expenses paid or incurred by the Administrative Agent and the Lenders in endeavoring to collect all or any part of the Obligations from, or in prosecuting any action against, any Borrower, any Loan Guarantor or any other guarantor of all or any part of the Obligations (such costs and expenses, together with the Obligations, collectively the "Guaranteed Obligations"; provided, however, that the definition of "Guaranteed Obligations" shall not create any guarantee by any Loan Guarantor of (or grant of security interest by any Loan Guarantor to support, as applicable) any Excluded Swap Obligations of such Loan Guarantor for purposes of determining any obligations of any Loan Guarantor).  Each Loan Guarantor further agrees that the Guaranteed Obligations may be extended or renewed in whole or in part without notice to or further assent from it, and that it remains bound upon its guarantee notwithstanding any such extension or renewal.  All terms of this Loan Guaranty apply to and may be enforced by or on behalf of any domestic or foreign branch or Affiliate of any Lender that extended any portion of the Guaranteed Obligations.

Section 11.2    Guaranty of Payment.  This Loan Guaranty is a guaranty of payment and not of collection.  Each Loan Guarantor waives any right to require the Administrative Agent or any Lender to sue any Borrower, any Loan Guarantor, any other guarantor of, or any other Person obligated for, all or any part of the Guaranteed Obligations (each, an "Obligated Party"), or otherwise to enforce its payment against any collateral securing all or any part of the Guaranteed Obligations.

Section 11.3    No Discharge or Diminishment of Loan Guaranty.

(a)    Except as otherwise provided for herein, the obligations of each Loan Guarantor hereunder are unconditional and absolute and not subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible payment in full of the Guaranteed Obligations), including:  (i) any claim of waiver, release, extension, renewal, settlement, surrender, alteration or compromise of any of the Guaranteed Obligations, by operation of law or otherwise; (ii) any change in the corporate existence, structure or ownership of any Borrower or any other Obligated Party liable for any of the Guaranteed Obligations; (iii) any insolvency, bankruptcy, reorganization or other similar proceeding affecting any Obligated Party or their assets or any resulting release or discharge of any obligation of any Obligated Party; or (iv) the existence of any claim, setoff or other rights which any Loan Guarantor may have at any time against any Obligated Party, the Administrative Agent, any Lender, or any other Person, whether in connection herewith or in any unrelated transactions.

(b)    The obligations of each Loan Guarantor hereunder are not subject to any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of the Guaranteed Obligations or otherwise, or any provision of applicable law or

regulation purporting to prohibit payment by any Obligated Party, of the Guaranteed Obligations or any part thereof.

(c)     Further, the obligations of any Loan Guarantor hereunder are not discharged or impaired or otherwise affected by:  (i) the failure of the Administrative Agent or any Lender to assert any claim or demand or to enforce any remedy with respect to all or any part of the Guaranteed Obligations; (ii) any waiver or modification of or supplement to any provision of any agreement relating to the Guaranteed Obligations; (iii) any release, non-perfection or invalidity of any indirect or direct security for the obligations of any Borrower for all or any part of the Guaranteed Obligations or any obligations of any other Obligated Party liable for any of the Guaranteed Obligations; (iv) any action or failure to act by the Administrative Agent or any Lender with respect to any collateral securing any part of the Guaranteed Obligations; or (v) any default, failure or delay, willful or otherwise, in the payment or performance of any of the Guaranteed Obligations, or any other circumstance, act, omission or delay that might in any manner or to any extent vary the risk of such Loan Guarantor or that would otherwise operate as a discharge of any Loan Guarantor as a matter of law or equity (other than the indefeasible payment in full of the Guaranteed Obligations).

Section 11.4     Defenses Waived.  To the fullest extent permitted by applicable law, each Loan Guarantor hereby waives any defense based on or arising out of any defense of any Borrower or any Loan Guarantor or the unenforceability of all or any part of the Guaranteed Obligations from any cause, or the cessation from any cause of the liability of any Borrower, any Loan Guarantor or any other Obligated Party, other than indefeasible payment in full of the Guaranteed Obligations.  Without limiting the generality of the foregoing, each Loan Guarantor irrevocably waives acceptance hereof, presentment, demand, protest and, to the fullest extent permitted by law, any notice not provided for herein, as well as any requirement that at any time any action be taken by any Person against any Obligated Party or any other Person.  Each Loan Guarantor confirms that it is not a surety under any state law and shall not raise any such law as a defense to its obligations hereunder.  The Administrative Agent may, at its election, foreclose on any Collateral held by it by one or more judicial or nonjudicial sales, accept an assignment of any such Collateral in lieu of foreclosure or otherwise act or fail to act with respect to any collateral securing all or a part of the Guaranteed Obligations, compromise or adjust any part of the Guaranteed Obligations, make any other accommodation with any Obligated Party or exercise any other right or remedy available to it against any Obligated Party, without affecting or impairing in any way the liability of such Loan Guarantor under this Loan Guaranty except to the extent the Guaranteed Obligations have been paid in full.  To the fullest extent permitted by applicable law, each Loan Guarantor waives any defense arising out of any such election even though that election may operate, pursuant to applicable law, to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Loan Guarantor against any Obligated Party or any security.

Section 11.5     Rights of Subrogation.  No Loan Guarantor will assert any right, claim or cause of action, including, without limitation, a claim of subrogation, contribution or indemnification, that it has against any Obligated Party or any collateral, until the Loan Parties and the Loan Guarantors have fully performed all their obligations to the Administrative Agent and the Lenders.

Section 11.6     Reinstatement; Stay of Acceleration.  If at any time any payment of any portion of the Guaranteed Obligations (including a payment effected through exercise of a right of setoff) is rescinded, or must otherwise be restored or returned upon the insolvency, bankruptcy or reorganization of any Borrower or otherwise (including pursuant to any settlement entered into by a Secured Party in its discretion), each Loan Guarantor's obligations under this Loan Guaranty with respect to that payment shall be reinstated at such time as though the payment had not been made and whether or not the Administrative Agent and the Lenders are in possession of this Loan Guaranty.  If acceleration of the time for payment of any of the Guaranteed Obligations is stayed upon the insolvency, bankruptcy or reorganization of any

Borrower, all such amounts otherwise subject to acceleration under the terms of any agreement relating to the Guaranteed Obligations shall nonetheless be payable by the Loan Guarantors forthwith on demand by the Administrative Agent.

Section 11.7    Information.  Each Loan Guarantor assumes all responsibility for being and keeping itself informed of the Borrowers' financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks that each Loan Guarantor assumes and incurs under this Loan Guaranty, and agrees that none of the Administrative Agent or any Lender shall have any duty to advise any Loan Guarantor of information known to it regarding those circumstances or risks.

Section 11.8    Termination.  Each of the Lenders may continue to make loans or extend credit to the Borrowers based on this Loan Guaranty until five days after it receives written notice of termination from any Loan Guarantor.  Notwithstanding receipt of any such notice, each Loan Guarantor will continue to be liable to the Lenders for any Guaranteed Obligations created, assumed or committed to prior to the fifth day after receipt of the notice, and all subsequent renewals, extensions, modifications and amendments with respect to, or substitutions for, all or any part of such Guaranteed Obligations.  Nothing in this Section 11.8 shall be deemed to constitute a waiver of, or eliminate, limit, reduce or otherwise impair any rights or remedies the Administrative Agent or any Lender may have in respect of, any Default or Event of Default that shall exist under Section 8.1(k) as a result of any such notice of termination.

Section 11.9    Taxes.  Each payment of the Guaranteed Obligations will be made by each Loan Guarantor without withholding for any Taxes, unless such withholding is required by law.  If any Loan Guarantor determines, in its sole discretion exercised in good faith, that it is so required to withhold Taxes, then such Loan Guarantor may so withhold and shall timely pay the full amount of withheld Taxes to the relevant Governmental Authority in accordance with applicable law.  If such Taxes are Indemnified Taxes, then the amount payable by such Loan Guarantor shall be increased as necessary so that, net of such withholding (including such withholding applicable to additional amounts payable under this Section), the Administrative Agent or Lender receives the amount it would have received had no such withholding been made.

Section 11.10    Maximum Liability.  Notwithstanding any other provision of this Loan Guaranty, the amount guaranteed by each Loan Guarantor hereunder shall be limited to the extent, if any, required so that its obligations hereunder shall not be subject to avoidance under Section 548 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, Uniform Voidable Transactions Act or similar statute or common law.  In determining the limitations, if any, on the amount of any Loan Guarantor's obligations hereunder pursuant to the preceding sentence, it is the intention of the parties hereto that any rights of subrogation, indemnification or contribution which such Loan Guarantor may have under this Loan Guaranty, any other agreement or applicable law shall be taken into account.

Section 11.11    Contribution.

(a)    To the extent that any Loan Guarantor shall make a payment under this Loan Guaranty (a "Guarantor Payment") which, taking into account all other Guarantor Payments then previously or concurrently made by any other Loan Guarantor, exceeds the amount which otherwise would have been paid by or attributable to such Loan Guarantor if each Loan Guarantor had paid the aggregate Guaranteed Obligations satisfied by such Guarantor Payment in the same proportion as such Loan Guarantor's "Allocable Amount" (as defined below) (as determined immediately prior to such Guarantor Payment) bore to the aggregate Allocable Amounts of each of the Loan Guarantors as determined immediately prior to the making of such Guarantor Payment, then, following indefeasible payment in full in cash of the Guarantor

Payment and the indefeasible payment in full of the Guaranteed Obligations and the termination of this Agreement, such Loan Guarantor shall be entitled to receive contribution and indemnification payments from, and be reimbursed by, each other Loan Guarantor for the amount of such excess, pro rata based upon their respective Allocable Amounts in effect immediately prior to such Guarantor Payment.

(b)     As of any date of determination, the "Allocable Amount" of any Loan Guarantor shall be equal to the excess of the fair saleable value of the property of such Loan Guarantor over the total liabilities of such Loan Guarantor (including the maximum amount reasonably expected to become due in respect of contingent liabilities, calculated, without duplication, assuming each other Loan Guarantor that is also liable for such contingent liability pays its ratable share thereof), giving effect to all payments made by other Loan Guarantors as of such date in a manner to maximize the amount of such contributions.

(c)     This Section 11.11 is intended only to define the relative rights of the Loan Guarantors, and nothing set forth in this Section 11.11 is intended to or shall impair the obligations of the Loan Guarantors, jointly and severally, to pay any amounts as and when the same shall become due and payable in accordance with the terms of this Loan Guaranty.

(d)     The parties hereto acknowledge that the rights of contribution and indemnification hereunder shall constitute assets of the Loan Guarantor or Loan Guarantors to which such contribution and indemnification is owing.

(e)     The rights of the indemnifying Loan Guarantors against other Loan Guarantors under this Section 11.11 shall be exercisable upon the indefeasible payment in full of the Guaranteed Obligations and the termination of this Agreement.

Section 11.12     Liability Cumulative.  The liability of each Loan Party as a Loan Guarantor under this Article 11 is in addition to and shall be cumulative with all liabilities of each Loan Party to the Administrative Agent and the Lenders under this Agreement and the other Loan Documents to which such Loan Party is a party or in respect of any obligations or liabilities of the other Loan Parties, without any limitation as to amount, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

Section 11.13     Keepwell.  Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Loan Party to honor all of its obligations under this Guarantee in respect of a Swap Obligation (provided, however, that each Qualified ECP Guarantor shall only be liable under this Section for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section or otherwise under this Loan Guaranty voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount).  Except as otherwise provided herein, the obligations of each Qualified ECP Guarantor under this Section shall remain in full force and effect until the termination of all Swap Obligations.  Each Qualified ECP Guarantor intends that this Section constitute, and this Section shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Loan Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

[Signature page follows]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**BORROWERS:**

**CORSICANA BEDDING, LLC**, a Delaware limited liability company

By: _____
Name:
Title:

**EASTERN SLEEP PRODUCTS COMPANY**, a Virginia corporation

By: _____
Name:
Title:

**GUARANTORS:**

**CORSICANA PARENT CO., LLC**, a Delaware limited liability company

By: _____
Name:
Title:

**CHESTERFIELD LANDCO, L.L.C.**, a Virginia limited liability company

By: _____
Name:
Title:

**EASTERN SLEEP-FORT WAYNE, LLC**, a Virginia limited liability company

By: _____
Name:
Title:

[Credit Agreement]

**EASTERN SLEEP-POINCIANA, LLC**, a Virginia limited liability company

By: _____
Name:
Title:

**ENGLANDER-SYMBOL MATTRESS OF MISSISSIPPI, LLC**, a Virginia limited liability company

By: _____
Name:
Title:

**HYLTON HOUSE FURNITURE, INC.**, a Virginia corporation

By: _____
Name:
Title:

**LUUF, LLC**, a Virginia limited liability company

By: _____
Name:
Title:

**MASTER CRAFT SLEEP PRODUCTS, INC.**, an Alabama corporation

By: _____
Name:
Title:

**OLIVE BRANCH BUILDING, LLC**, a Virginia limited liability company

By: _____
Name:
Title:


**SYMBOL MATTRESS - LAS VEGAS, LLC**, a Virginia limited liability company

By: _____
Name:
Title:


**SYMBOL MATTRESS OF FLORIDA, INC.**, a Virginia corporation

By: _____
Name:
Title:


**SYMBOL MATTRESS OF PENNSYLVANIA, INC.**, a Virginia corporation

By: _____
Name:
Title:


**SYMBOL MATTRESS OF WISCONSIN, INC.**, a Virginia corporation

By: _____
Name:
Title:

**SYMBOL MATTRESS TRANSPORTATION, INC.**, a Virginia corporation

By: _____
Name:
Title:


**THETFORD LEASING, LLC**, a Virginia limited liability company

By: _____
Name:
Title:

[Credit Agreement]

**WINGSPIRE CAPITAL LLC**, as the Administrative Agent and a Lender

By: _____
Name:
Title:

[Credit Agreement]

## ANNEX A

Initial Approved Budget


See attached.

**Schedule 2.1**

**Commitments**

| Lender | Revolving Commitment |
|---|---|
| Wingspire Capital LLC | $40,000,000 |

**Schedule 6.18**

**Required Milestones**

(i)  No later than 3 Business Days after the Petition Date[1], the Interim Order approving the DIP Facilities and the adequate protection of the Prepetition Liens shall be entered by the Bankruptcy Court;

(ii)  No later than 3 Business Days following the Petition Date, the Debtors shall file the Sale Motion, which motion shall be in form and substance acceptable to the DIP Agents;

(iii)  No later than 35 days after the Petition Date, the Final Order approving the DIP Facilities and the adequate protection of the Prepetition Liens shall be entered by the Bankruptcy Court;

(iv)  No later than 35 days after the Petition Date the Bankruptcy Court shall have entered an order approving bid and auction procedures, in form and substance reasonably acceptable to the DIP Secured Parties;

(v)  If the asset purchase agreement provided by the stalking horse bidder in connection with the Sale Motion does not provide for the payment in full in cash of the DIP Revolver Facility (and the Prepetition ABL Facility to the extent any amounts remain due and owing thereunder), then no later than the later of 50 days after the Petition Date or 3 Business Days prior to the deadline for objecting to the approval of the sale of all or substantially all of the Debtors' assets, the stalking horse bidder shall have provided a commitment letter for replacement/refinancing of the DIP Revolver Facility (and the Prepetition ABL Facility to the extent any amounts remain due and owing thereunder), in form and substance reasonably acceptable to the DIP Revolver Administrative Agent and DIP Revolver Lenders.  For the avoidance of doubt, Wingspire may provide such commitment letter;

(vi)  No later than 60 days after the Petition Date the Bankruptcy Court shall have entered one or more orders authorizing and approving the sale of all or substantially all of the Debtors' assets pursuant to one or a series of related or unrelated transactions, and such order(s) shall be in a form and substance reasonably acceptable to the DIP Secured Parties; and

(vii)  No later than 75 days after the Petition Date the approved sale(s) of all or substantially all of the Debtors' assets shall have been consummated.

---

[1] Capitalized terms used within this Schedule 6.18 shall have the meanings ascribed them in the Orders.

4872-4759-0438 v.3

**<u>EXHIBIT B</u>**
(DIP Term Loan Note)

# DEBTOR IN POSSESSION SECURED
# TERM PROMISSORY NOTE

$18,000,000

New York, New York
June 25, 2022

On June 25, 2022 (the "Petition Date"), CORSICANA BEDDING, LLC., a Delaware limited liability company (the "Borrower"), and certain of its direct and indirect subsidiaries[1] commenced Chapter 11 cases, which cases are being jointly administered under Chapter 11 Case No. 22-90016 (elm) (each a "Chapter 11 Case" and collectively, the "Chapter 11 Cases"), by filing separate voluntary petitions for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), with the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division (the "Bankruptcy Court"). The Loan Parties (as defined herein) continue to operate their respective businesses and manage their respective properties as debtors and debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. The Borrower has requested that the lenders (the "DIP Lenders") from time to time party to this Debtor in Possession Secured Term Promissory Note (as amended, restated, amended and restated, supplemented, waived, extended, or otherwise modified from time to time, this "Note"), make term loans (the "Term Loans") from time to time evidenced by this Note. Certain subsidiaries of the Borrower who comprise the other debtors in the Chapter 11 Cases wish to guaranty the Borrower's Obligations under this Note (collectively, the "Guarantors"), and are simultaneously executing Guarantees in favor of Blue Torch Finance, LLC, as agent for the DIP Lenders (in such capacity, the "Agent"). The Borrower intends to utilize such Term Loans, subject to the Financing Orders, to (i) fund general corporate needs, including without limitation working capital and other needs, and (ii) pay costs, premiums, fees, and expenses incurred to administer or related to of the Chapter 11 Cases, including fees and expenses of professionals, in each case in accordance with the Budget, subject to any Permitted Variances, or as otherwise provided by the Financing Orders. Capitalized terms used herein and not otherwise defined herein shall have the meanings provided in Section 18 of this Note.

    1.    Term Loans.

    (a)    Subject to the terms and conditions hereof including the Agent's receipt of a Borrowing Request (as defined below), the DIP Lenders agree to provide the Borrower with Term Loans on the Closing Date in the principal amount of up to $18,000,000 (of which $3,000,000 shall be in the form of a "roll up" of protective advances constituting Obligations

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Corsicana Bedding, LLC (3019) ("Corsicana"); Thetford Leasing LLC (7227) ("Thetford"); Olive Branch Building, LLC (7227) ("Olive Branch"); Eastern Sleep Products Company (1185) ("Eastern Sleep"); Englander-Symbol Mattress of Mississippi, LLC (5490) ("Englander Symbol"); Hylton House Furniture, Inc. (5992) ("Hylton House"); Luuf, LLC (3450) ("Luuf"); Symbol Mattress of Florida, Inc. (4172) ("Symbol Florida"); Symbol Mattress of Pennsylvania, Inc. (3160) ("Symbol Pennsylvania"); Symbol Mattress of Wisconsin, Inc. (0871) ("Symbol Wisconsin"); Symbol Mattress Transportation, Inc. (1185) ("Symbol Transportation"); and Master Craft Sleep Products, Inc. (4961) ("Master Craft"). The Debtors' service address is P.O. Box 3233, Fort Worth, Texas, 76113.

under the Prepetition Term Loan Agreement; the "Term Loans"). Subject to the terms and conditions hereof, to the extent the Interim Order does not permit the full amount of the Term Loans to be incurred by the Borrower on the Closing Date, (i) the full amount so authorized shall be drawn by the Borrower in a single draw on the Closing Date, and (ii) the DIP Lenders shall advance any remaining amount of the Term Loans that are authorized in the Final Order in one draw on the date or during the period permitted by the Final Order (any such Term Loans, the "Final Order Term Loans"). The Final Order Term Loans shall be Term Loans for all purposes of this Note. The Borrower may request the Term Loans pursuant to written notice (which may be by email) (a "Borrowing Request") delivered to the Agent by a Responsible Officer no later than 12:00 p.m. New York City time on the proposed borrowing date of the Term Loans (or such shorter period as the Agent may agree) or, with respect to any Final Order Term Loans, one (1) Business Day prior to the proposed borrowing day of the Final Order Term Loans (or such shorter period as the Agent may agree). The Borrowing Request shall be in a form reasonably satisfactory to the Agent and shall specify (i) the principal amount of the proposed Term Loan, (ii) the initial Interest Period with respect thereto, and (iii) the proposed borrowing date, which must be a Business Day. Each DIP Lender shall provide each Term Loan in an aggregate amount not to exceed its Commitment with respect to such Term Loan and the obligation of each DIP Lender to make the Term Loans under this Note shall be several and not joint and several. Upon receipt of a Borrowing Request with respect to any Term Loan, subject to the satisfaction (or waiver) of the conditions set forth in Section 2(a) hereof, each DIP Lender shall simultaneously and proportionately to its Pro Rata Share of its Commitment with respect to such Term Loan, make the proceeds of such Term Loan available to the Borrower on the applicable date of funding of the Term Loan by transferring immediately available funds equal to such proceeds to the Escrow Account (or to the Agent, which will then transfer such proceeds to the Escrow Account). The relevant Commitment of each DIP Lender shall be permanently reduced upon the making of the relevant Term Loan in an amount equal to such Term Loan advanced by such DIP Lender. The Borrower may request Withdrawals from the Escrow Account in accordance with Section 2(b) of this Note. Any principal amount of the Term Loan which is repaid or prepaid may not be reborrowed.

(b) The aggregate principal amount of Terms Loans outstanding (inclusive of $3,000,000 of a "roll up" of protective advances constituting Obligations under the Prepetition Term Loan Agreement) shall not exceed $18,000,000, subject to any limitation of credit extensions under this Note and the Financing Orders (the "Maximum Amount").

(c) The Agent shall be entitled to rely upon, and shall be fully protected in relying upon, any Borrowing Request or similar notice believed by the Agent to be genuine. The Agent may assume that each Person executing and/or delivering any such notice was duly authorized, unless the responsible individual acting thereon for the Agent has actual knowledge to the contrary.

(d) The Borrower shall utilize the proceeds of Term Loans, subject to the Financing Orders, to (i) fund general corporate needs, including without limitation working capital and other needs and (ii) pay costs, premiums, fees, and expenses incurred to administer or related to the Chapter 11 Cases, including fees and expenses of professionals (including funding of the Carve-Out in accordance with the Financing Orders), in each case in accordance with the Budget, subject to any Permitted Variances, this Note, the Bankruptcy Code, and the Financing

Orders); provided, that, unless otherwise provided in the Budget, subject to any Permitted Variance, or approved by the Agent, no portion of any Term Loan shall be used, directly or indirectly: (A) to make any payment in respect of, or repurchase, redeem, retire or defease any, prepetition Indebtedness or to finance or make any Restricted Payment, except pursuant to the terms of the Financing Orders, (B) to pay any fees or similar amounts payable to any Person who has proposed or may propose to purchase interests in any of the Borrower or any of its respective Subsidiaries or affiliates or who otherwise has proposed or may propose to invest in the Borrower or any of its respective Subsidiaries or affiliates (including so-called "topping fees," "exit fees," and similar amounts), or (C) to make any distribution under a plan of reorganization in the Chapter 11 Cases or any similar proceeding of any of the Subsidiaries or affiliates of any of the Borrower.

(e)       The Borrower shall not transfer any amounts from the Escrow Account other than to the DIP Holding Account, and in no event shall any amounts transferred from the DIP Holding Account to the ABL Holding Account exceed, for any day or the immediately succeeding Business Day, the positive difference of (i) the amount of disbursements required to be paid on such day (the "Disbursement Amount") minus (ii) the sum (without duplication) of (y) the amount of funds in the ABL Holding Account on such day before giving effect to any such transfer and (z) Availability (as defined in the DIP Revolver Facility).  Any amounts transferred from the DIP Holding Account to the ABL Holding Account on any day shall be used to pay the Disbursement Amount for such day or the immediately succeeding Business Day).

2.       Certain Conditions to Making Term Loans and Withdrawals from the Escrow Account.

(a)       The effectiveness of this Note and the obligation of each DIP Lender to fund the Term Loans requested to be made by it shall be subject to the prior or concurrent satisfaction (or waiver by the Agent) of each of the conditions precedent set forth in this clause (a):

(1)       the Borrower shall have paid any Obligations then payable hereunder (including the reasonable and documented out-of-pocket fees and expenses of the Agent, including, without limitation, those of counsel for the Agent) or under any other DIP Document;

(2)       the Loan Parties shall have delivered corporate resolutions, incumbency certificates and similar documents, in form and substance reasonably satisfactory to Agent with respect to this Note and the other DIP Documents and the transactions contemplated hereby and thereby;

(3)       the Escrow Agreement shall be in full force and effect and the Escrow Account shall not be subject to any Liens or claims, except for Liens granted in favor of the Agent;

(4)       the Loan Parties shall have delivered guarantees of each of the Guarantors, each in form and substance reasonably satisfactory to Agent with respect to this Note and the other DIP Documents and the transactions contemplated hereby and thereby;

(5)	the Loan Parties shall have delivered fully executed copies of all other DIP Documents, each in form and substance reasonably satisfactory to Agent;

(6)	any representation or warranty by any Loan Party contained herein or in any other DIP Document shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of such date, except to the extent that such representation or warranty expressly relates to an earlier date;

(7)	(i) with respect to the Term Loan made on the Closing Date, (A) the Bankruptcy Court shall have entered the Interim Order and (B) the Interim Order shall not have been stayed, vacated, reversed, modified or amended without Agent's consent, or (ii) with respect to the Final Order Term Loan, (A) the Bankruptcy Court shall have entered the Final Order and (B) the Final Order shall have not been stayed, vacated, reversed, modified or amended without Agent's consent;

(8)	no Default or Event of Default shall have occurred and be continuing or would result after giving effect to the Term Loans and the transactions contemplated herein;

(9)	after giving effect to the making of the Term Loans, the outstanding principal amount of all Term Loans would not exceed the Maximum Amount;

(10)	the Agent shall have received and approved the Budget in accordance with this Note and the Financing Orders; and

(11)	the Bankruptcy Court shall have entered an order, in form and substance reasonably acceptable to the Agent, authorizing the Loan Parties to use Cash Collateral of the Prepetition Secured Parties in a manner consistent with the Budget and authorizing the DIP Revolver Facility.

(b)	The Borrower shall not request a Withdrawal (and no Withdrawal will be permitted), if, in each case, as of the date thereof:

(1)	any representation or warranty by any Loan Party contained herein or in any other DIP Document shall be untrue or incorrect in any material respect (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of such date, except to the extent that such representation or warranty expressly relates to an earlier date;

(2)	after entry of the Interim Order, the Interim Order shall have been stayed, vacated, reversed, modified or amended without Agent's consent;

(3)	after the entry of the Final Order, the Final Order shall have been stayed, vacated, reversed, modified or amended without Agent's consent;

-4-

(4)    the Withdrawal Liquidity Condition shall not have been satisfied;

(5)    the proceeds of such Withdrawal shall not have been directed to be deposited in the DIP Holding Account;

(6)    any Default or Event of Default shall have occurred and be continuing or would result after giving effect to the advance of the Final Order Term Loans or any release of proceeds of the Term Loans from the Escrow Account; and

(7)    the Agent shall have not received from the Borrower at least two (2) Business Days (or such shorter period as the Agent may agree) prior to the date of such Withdrawal, a Withdrawal Notice and a calculation evidencing satisfaction of the Withdrawal Liquidity Condition, which calculation shall be in form and substance satisfactory to the Agent.

Upon receipt of the Withdrawal Notice, satisfaction of the conditions set forth in Section 2(a) and none of the events set forth in Section 2(b) being in existence as of the date thereof, the Agent shall promptly direct the Escrow Agent to disburse funds to the DIP Holding Account on the funding date set forth in the applicable Withdrawal Notice. Notwithstanding the foregoing, if the Agent determines in its sole discretion that one of more of the events set forth in Section 2(b) are in existence or one or more conditions in Section 2(a) are not satisfied as of any requested Withdrawal Date, then the Agent may decline to direct the Escrow Agent to fund such Withdrawal and shall communicate the same to the Escrow Agent and the Borrower.

The request and acceptance in the Escrow Account by the Borrower of the proceeds of the Term Loans and the request of a Withdrawal shall, in each case, be deemed to constitute, as of the date of such request, acceptance or incurrence, a representation and warranty by the Borrower that (A) with respect to the request and acceptance in the Escrow Account by the Borrower of the proceeds of the Term Loans, the conditions in Section 2(a) have been satisfied and (B) with respect to the request of a Withdrawal, the conditions in Section 2(a) have been satisfied and none of the events set forth in Section 2(b) are in existence as of the proposed Withdrawal Date.

3.    <u>Payment of Principal</u>. FOR VALUE RECEIVED, the Borrower promises to pay to the Agent, for the benefit of the DIP Lenders, the lesser of (x) $18,000,000 and (y) the unpaid principal amount of all Term Loans, on the Maturity Date, together with all accrued and unpaid interest, fees and expenses to the extent required by this Note.

4.    <u>Payment of Interest</u>.

(a)    Subject to the terms of this Note, the Term Loans or any portion thereof shall bear interest on the principal amount thereof from time to time outstanding, from the date of the Term Loan until repaid, at a rate per annum equal to the Adjusted Term SOFR plus 9.00%.

(b)    Interest on the Term Loans shall be payable monthly, in arrears, on the last Business Day of each month, commencing on the last Business Day of the month in

which the applicable Term Loan is made. If any payment of any of the Obligations becomes due and payable on a day other than a Business Day, the maturity thereof will be extended to the next succeeding Business Day and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension.

(c)     All computations of fees and interest shall be made by the Agent on the basis of a 360-day year, in each case for the actual number of days occurring in the period for which such fees or interest are payable (including the first day and the last day). Each determination by the Agent of an interest rate hereunder shall be final, binding and conclusive on the Borrower (absent manifest error).

(d)     So long as an Event of Default shall have occurred and be continuing, and at the election of the Agent, the interest rate applicable to the Obligations shall be increased by two percentage points (2.00%) per annum above the rate of interest otherwise applicable hereunder (the "Default Rate"), and all outstanding Obligations shall bear interest at the Default Rate applicable to such Obligations. Interest at the Default Rate shall accrue from the date of such Event of Default until such Event of Default is cured or waived (notwithstanding when the election by the Agent was made) and shall be payable upon demand.

(e)     It is the intention of the parties hereto that the Agent and each DIP Lender shall conform strictly to usury laws applicable to it. Accordingly, if the transactions contemplated hereby or by any other DIP Document would be usurious as to the Agent or any DIP Lender under laws applicable to it (including the laws of the United States of America and the State of New York or any other jurisdiction whose laws may be mandatorily applicable to the Agent or such DIP Lender notwithstanding the other provisions of this Note), then, in that event, notwithstanding anything to the contrary in this Note or any other DIP Document or any agreement entered into in connection with or as security for the Obligations, it is agreed that the aggregate of all consideration which constitutes interest under law applicable to the Agent or any DIP Lender that is contracted for, taken, reserved, charged or received by the Agent or such DIP Lender under this Note or any other DIP Document or agreements or otherwise in connection with the Obligations shall under no circumstances exceed the maximum amount allowed by such applicable law, any excess shall be canceled automatically and if theretofore paid shall be credited by the Agent or such DIP Lender on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by the Agent or such DIP Lender, as applicable, to the Borrower). If at any time and from time to time (i) the amount of interest payable to the Agent or any DIP Lender on any date shall be computed at the highest lawful rate applicable to the Agent or such DIP Lender pursuant to this Section 4(e) and (ii) in respect of any subsequent interest computation period the amount of interest otherwise payable to the Agent or such DIP Lender would be less than the amount of interest payable to the Agent or such DIP Lender computed at the highest lawful rate applicable to the Agent or such DIP Lender, then the amount of interest payable to the Agent or such DIP Lender in respect of such subsequent interest computation period shall continue to be computed at the highest lawful rate applicable to the Agent or such DIP Lender until the total amount of interest payable to the Agent or such DIP Lender shall equal the total amount of interest which would have been payable to the Agent or such DIP Lender if the total amount of interest had been computed without giving effect to this Section 4(e).

(f)      If, after the date hereof, the DIP Lenders determine that (i) the adoption of or change in any law, rule, regulation or guideline regarding capital requirements for banks or bank holding companies, or any change in the interpretation or application thereof by any governmental authority charged with the administration thereof, or (ii) compliance by the DIP Lenders or its parent bank holding company with any guideline, request, or directive of any such entity regarding capital adequacy (whether or not having the force of law), has the effect of reducing the return on the DIP Lender's or such holding company's capital as a consequence of the DIP Lender's Term Loans hereunder to a level below that which the DIP Lender or such holding company could have achieved but for such adoption, change, or compliance (taking into consideration the DIP Lender's or such holding company's then existing policies with respect to capital adequacy and assuming the full utilization of such entity's capital) by any amount reasonably deemed by the DIP Lender to be material, then the DIP Lender may notify the Borrower thereof.  Following receipt of such notice, the Borrower agrees to pay the DIP Lender on demand the amount of such reduction of return of capital as and when such reduction is determined, payable promptly (but in no event later than fifteen (15) days) after presentation by the DIP Lender to the Borrower of a statement in the amount and setting forth in reasonable detail the DIP Lender's calculation thereof and the assumptions upon which such calculation was based (which statement shall be deemed true and correct absent manifest error).  In determining such amount, the DIP Lender may use any reasonable averaging and attribution methods.

5.      <u>Payments</u>.  All payments of principal, interest and all other Obligations in respect of this Note shall be made in lawful money of the United States of America in same day funds to the Agent at the account as shall be designated in a written notice delivered by the Agent to the Borrower.  Each payment made hereunder shall be credited first to fees and expenses then due and payable, second to interest then due and payable and the remainder of such payment shall be credited to principal, and interest shall thereupon cease to accrue upon the principal so repaid.  The Borrower shall make each payment required under this Note prior to 2:00 p.m. New York City time on the date when due, in immediately available funds.  Any amounts received after such time on any date may, in the sole discretion of the Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.

6.      <u>Optional Prepayments</u>.  Subject to the terms and conditions of the Financing Orders and the Intercreditor Agreement, the Borrower shall have the right at any time and from time to time to prepay any Term Loans under this Note in whole or in part (without premium or penalty) upon two (2) Business Days' written notice to the Agent by 1:00 p.m. New York City time (or such shorter time as the Agent may agree); <u>provided</u> that each such prepayment shall be in a minimum amount of $100,000.  Notice of prepayment having been given as aforesaid, the principal amount specified in such notice shall become due and payable on the prepayment date specified therein in the aggregate principal amount specified therein unless such repayment is conditioned on the receipt of any third party funds or the consummation of certain transactions that are not received or consummated.  Any prepayment or repayment hereunder shall be accompanied by interest on the principal amount of the Note being prepaid or repaid to the date of prepayment or repayment.

7.      <u>Mandatory Prepayments</u>.

(a)    In each case, subject to the terms and conditions of the Financing Orders, the Intercreditor Agreement and the Budget:

i.    No later than one (1) Business Day following receipt by any Loan Party of cash proceeds of any asset Disposition, unless the Agent agrees otherwise, the Borrower shall prepay the Term Loans in an amount equal to all such proceeds, net of (x) commissions and other reasonable and customary transaction costs, fees and expenses properly attributable to such transaction and payable by the Borrower or any Loan Party in connection therewith (in each case, paid to non-affiliates), and (y) with respect to proceeds from the Disposition of assets securing obligations owed to a third party (including, without limitation under the DIP Revolver Facility), which Lien is senior to the Liens securing the Obligations under this Note, the amount of such proceeds required by an order of the Bankruptcy Court to repay such third party obligations.

ii.    No later than one (1) Business Day following receipt by any Loan Party of cash proceeds of any debt securities or other indebtedness not permitted under this Note, the Borrower shall prepay the Term Loans in an amount equal to all such proceeds, net of underwriting discounts and commissions and other reasonable costs or fees paid to non-affiliates in connection therewith.

iii.    No later than one (1) Business Day following receipt by any Loan Party of any Extraordinary Receipts, the Borrower shall prepay the outstanding principal of the Term Loans in an amount equal to all such Extraordinary Receipts, net of (x) any expenses (including reasonable broker's fees or commissions and legal fees) incurred in connection with such Extraordinary Receipts,  and (y) with respect to Extraordinary Receipts from assets securing obligations owed to a third party, which Lien is senior to the Liens securing the Obligations under this Note, the amount of such Extraordinary Receipts required by an order of the Bankruptcy Court to repay such third party obligations.

(b)    Nothing in this Section 7 shall be construed to constitute the Agent's or any DIP Lender's consent to any transaction that is not permitted by other provisions of the Financing Orders, this Note or the other DIP Documents.

8.    <u>Fees</u>.  Borrower shall pay to the Agent the following fees:

(a)    <u>Facility Fee</u>.  On the Closing Date, the Borrower shall pay to the Agent, for the account of the DIP Lenders, an upfront fee in an aggregate amount equal to 2.0% of the aggregate principal amount of the Commitments, which fee shall be fully earned upon the entry of the Interim Order and non-refundable when paid.

(b)    <u>Agent Fee</u>.  On the Closing Date, the Borrower shall pay to the Agent an annual agent administration fee equal to $100,000 per annum.   The first annual agent administration fee will be fully earned upon the entry of the Interim Order and non-refundable when paid.  Thereafter, the annual agent administration fee shall be due on the anniversary of the Closing Date to the extent that the Obligations have not been repaid in full prior to such date.

(c)    <u>Exit Fee</u>.  On the earlier of (i) the date that all of the Obligations under this Note are paid in full in cash and (ii) the Maturity Date, the Borrower shall pay to the Agent, for

the account of the DIP Lenders, an exit fee equal to 2.0% of the aggregate principal amount of the Commitments, of which, an amount equal to 2.0% of the Term Loans authorized to be borrowed on the Closing Date shall be earned upon the entry of the Interim Order and the remainder of which shall be earned upon entry of the Final Order, and which shall be non-refundable when paid.

9.      Indemnity.  The Borrower shall indemnify and hold harmless the Agent and each DIP Lender and each of their respective affiliates, and each such Person's respective officers, directors, employees, attorneys, agents and representatives (each, an "Indemnified Person"), from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities and expenses (including reasonable attorneys' fees and disbursements and other costs of investigation or defense, including those incurred upon any appeal but limited to the legal fees and reasonable and documented out-of-pocket costs and expenses of one legal counsel (and one local counsel in each relevant jurisdiction)) that may be instituted or asserted against or incurred by any such Indemnified Person as the result of credit having been extended, suspended or terminated under this Note and the other DIP Documents and the administration of such credit, and in connection with or arising out of the transactions contemplated hereunder and thereunder and any actions or failures to act in connection therewith, and legal costs and expenses arising out of or incurred in connection with disputes between the Agent and the DIP Lenders on the one hand and the Loan Parties on the other hand; provided, that (i) the Borrower shall not be liable for any indemnification to an Indemnified Person to the extent that any such suit, action, proceeding, claim, damage, loss, liability or expense results solely from that Indemnified Person's gross negligence or willful misconduct as determined in a final nonappealable judgment by a court of competent jurisdiction and (ii) this Section 9 shall not apply with respect to taxes other than any taxes that represent losses, claims, damages, etc. arising from any non-tax claim. **NO INDEMNIFIED PERSON SHALL BE RESPONSIBLE OR LIABLE TO ANY OTHER PARTY TO ANY DIP DOCUMENT, ANY SUCCESSOR, ASSIGNEE OR THIRD PARTY BENEFICIARY OF SUCH PERSON OR ANY OTHER PERSON ASSERTING CLAIMS DERIVATIVELY THROUGH SUCH PARTY, FOR INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES THAT MAY BE ALLEGED AS A RESULT OF CREDIT HAVING BEEN EXTENDED, SUSPENDED OR TERMINATED UNDER ANY DIP DOCUMENT OR AS A RESULT OF ANY OTHER TRANSACTION CONTEMPLATED HEREUNDER OR THEREUNDER.**

10.     Adjustments for Withholding, Capital Adequacy Etc.

All payments to the Agent by the Borrower under this Note shall be made free and clear of and without deduction or withholding for any and all taxes, duties, levies, imposts, deductions, charges or withholdings and all related liabilities (all such taxes, duties, levies, imposts, deductions, charges, withholdings and liabilities being referred to as "Taxes") imposed by the United States of America or any other nation or jurisdiction (or any political subdivision or taxing authority of either thereof), unless such Taxes are required by applicable law to be deducted or withheld.  If the Borrower shall be required by applicable law to deduct or withhold any such Taxes from or in respect of any amount payable under this Note other than taxes imposed on the Agent or any DIP Lender's overall net income, then (A) if such Tax is an Indemnified Tax, the amount payable shall be increased as may be necessary so that after making all required deductions or withholdings, (including deductions or withholdings applicable to any additional amounts paid under this Note) the Agent receives an amount equal to the amount it

would have received if no such deduction or withholding had been made, (B) the Borrower shall make such deductions or withholdings, and (C) the Borrower shall timely pay the full amount deducted or withheld to the relevant governmental entity in accordance with applicable law.

If the effect of the adoption, effectiveness, phase-in or applicability after the date hereof of any law, rule or regulation (including without limitation any tax, duty, charge or withholding on or from payments due from the Borrower (but excluding Indemnified Taxes, Excluded Taxes, and taxation on the overall net income of the DIP Lenders)), or any change therein or in the interpretation or administration thereof by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, is to reduce the rate of return on the capital of the Agent with respect to this Note or to increase the cost to the Agent of making or maintaining amounts available under this Note, the Borrower agrees to pay to the Agent such additional amount or amounts as will compensate the Agent on an after-tax basis for such reduction or increase.

The Borrower agrees to timely pay any present or future stamp or documentary taxes or any other excise or property taxes, charges, financial institutions duties, debits taxes or similar levies (all such taxes, charges, duties and levies being referred to as "Other Taxes") which arise from any payment made by the Borrower under this Note or from the execution, delivery or registration of, or otherwise with respect to, this Note.

The Borrower shall indemnify the Agent and each of the DIP Lenders for the full amount of Indemnified Taxes (including, without limitation, any Indemnified Taxes imposed by any jurisdiction on amounts payable by the Borrower hereunder) paid by the Agent or any DIP Lender and any liability (including penalties, interest and expenses) arising from or with respect to such Indemnified Taxes, whether or not they were correctly or legally asserted, excluding taxes imposed on the Agent or any DIP Lender's overall net income. Payment under this indemnification shall be made upon demand. A certificate as to the amount of such Indemnified Taxes submitted to the Borrower by the Agent shall be conclusive evidence, absent manifest error, of the amount due from the Borrower to the DIP Lenders.

The Borrower shall furnish to the DIP Lenders the original or a certified copy of a receipt evidencing any payment of Taxes made by the Borrower pursuant to this Section 10 within thirty (30) days after the date of any such payment. If any Recipient becomes aware that it has received a refund of any Taxes with respect to which the Borrower has paid any amount pursuant to this Section 10, such Recipient shall pay the amount of such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such Recipient and without interest (other than any interest received from the relevant governmental authority with respect thereto), to the Borrower promptly after receipt thereof.

Any Recipient of a payment hereunder shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Agent on or prior to the date hereof (and from time to time thereafter upon the reasonable request of the Borrower or the Agent), two properly completed and executed copies of IRS Forms W-8 or W-9 and properly completed and executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding tax, together with such supplementary documentation as

may be prescribed by applicable law to permit the Borrower or the Agent to determine the withholding or deduction (if any) required to be made.  In addition, any such Recipient, if reasonably requested by the Borrower or the Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Agent as will enable the Borrower or the Agent to determine whether or not such Recipient is subject to backup withholding or information reporting requirements. Each Recipient agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall timely update such form or certification or promptly notify the Borrower and the Agent in writing of its legal inability to do so.

      11.    <u>Priority of Obligations and DIP Lenders' Liens</u>.

      (a)    To secure all of the Borrower's Obligations now existing or hereafter arising, the Agent is granted (i) a super-priority administrative claim against each of the Borrower and Guarantors pursuant to Section 364(c)(1) of the Bankruptcy Code, and except as set forth in the Financing Orders (including with respect to the DIP Revolver Facility and the Carve-Out), having a priority over all other costs and expenses of administration of any kind, including those specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 363, 364, 503, 506, 507, 546, 726, 1113 or 1114 or any other provision of the Bankruptcy Code or otherwise (whether incurred in these Chapter 11 Cases and any Successor Case), and, except as set forth in the Financing Orders (including with respect to the Carve-Out), shall at all times be senior to the rights of the Borrower or any domestic or foreign Subsidiary of the Borrower, any successor trustee or estate representative, or any other creditor or party in interest in the Chapter 11 Cases or any Successor Case, and (ii) pursuant to Sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code and subject to clause (b) below, Liens on, and security interests in, the Collateral; provided that no Liens shall be permitted on either the Escrow Agreement, the Escrow Account or the DIP Holding Account, or amounts held therein or proceeds thereof other than the lien of the Agent (and, to the extent constituting a Lien, the Carve-Out).  The security interests and Liens granted to the Agent hereunder pursuant to Sections 364(c)(2) shall not be (i) subject to any Lien or security interest that is avoided and preserved for the benefit of the Loan Parties' estate under Section 551 of the Bankruptcy Code, or (ii) except as set forth in the Financing Orders (including with respect to the DIP Revolver Facility and the Carve-Out), subordinated to or made <u>pari passu</u> with any other Lien or security interest under Section 364(d) of the Bankruptcy Code or otherwise.

      (b)    The priority of the Agent's Liens on the Collateral shall be as set forth in the Financing Orders and shall be subject to the Intercreditor Agreement (where applicable).

      (c)    Notwithstanding anything herein to the contrary (i) all proceeds received by the Agent and the DIP Lenders from the Collateral subject to the Liens granted in this Section 11 and in each other DIP Document and by the Financing Orders shall be subject to the priorities set forth in the Financing Orders and the Intercreditor Agreement, the Carve-Out and Permitted Prior Liens (provided that neither the Escrow Agreement, nor the Escrow Account, nor the DIP Holding Account, nor amounts held therein or proceeds thereof shall be subject to Permitted Prior Liens), and (ii) no Person entitled to the Carve Out shall be entitled to sell, or otherwise Dispose, or seek or object to the sale or other Disposition of, such Collateral, subject to any such Person's fiduciary obligations.

(d)     Each of the Loan Parties agrees for itself that the Obligations of such Person shall constitute allowed administrative expenses in the Chapter 11 Cases, having priority over all administrative expenses of and unsecured claims against such Person now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code, except as set forth in the Financing Orders.

12.     <u>Further Assurances</u>.  The Borrower agrees that it shall, at the Borrower's expense and upon the reasonable request of the Agent, duly execute and deliver or cause to be duly executed and delivered, to the Agent or such DIP Lender, as the Agent shall direct such Borrower such further instruments and do and cause to be done such further acts as may be necessary or proper in the reasonable opinion of the Agent to carry out more effectively the provisions and purposes of this Note or any other DIP Document, including, upon the written request of the Agent and in form and substance reasonably satisfactory to the Agent, security agreements, UCC-l financing statements and other Collateral Documents confirming and perfecting the granting to the Agent, on behalf of the DIP Lenders, of the Liens (subject to the Financing Orders) in the Collateral to secure the Obligations.

13.     [Reserved.]

14.     <u>Affirmative Covenants</u>.  The Borrower agrees that until the Commitments shall have expired or been terminated and the Obligations payable under the DIP Documents shall have been paid in full in cash:

(a)     Upon reasonable request of the Agent, the Loan Parties will permit any officer, employee, attorney or accountant or agent of the Agent to audit, review, make extracts from or copy, at the Borrower's expense, any and all corporate and financial and other books and records of the Loan Parties at all times during ordinary business hours and, in the absence of an Event of Default, upon reasonable advance notice, to discuss the Loan Parties' affairs with any of their directors, officers, employees or accountants, so long as a Responsible Officer of a Loan Party is invited to attend such discussions.  The Borrower will permit the Agent, or any of its officers, employees, accountants, attorneys or agent, to examine and inspect any Collateral or any other property of the Loan Parties at any time during ordinary business hours and, in the absence of an Event of Default, upon reasonable prior notice. Notwithstanding the foregoing, none of the Loan Parties will be required to disclose information to the Agent (or any agent or representative thereof) that is prohibited by applicable law or is subject to attorney-client or similar privilege or constitutes attorney work product.

(b)     (i) The Borrower and its Subsidiaries will comply with all requirements of applicable law, the non-compliance with which could reasonably be expected to have a Material Adverse Effect and (ii) the Borrower and its Subsidiaries will obtain, maintain in effect and comply with all permits, licenses and similar approvals necessary for the operation of its business as now or hereafter conducted other than to the extent contemplated by the Budget or the Financing Orders.

(c)     The Borrower and its Subsidiaries will pay or discharge, when due, (i) all

material taxes, assessments and governmental charges levied or imposed upon it or upon its income or profits, upon any properties of the Borrower and its Subsidiaries (including, without limitation, the Collateral) or upon or against the creation, perfection or continuance of the security interest, prior to the date on which penalties attach thereto, except in each case (1) where the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves in accordance with GAAP are being maintained by the Borrower or such Subsidiary or (2) taxes the nonpayment of which is permitted or required by the Bankruptcy Code or this Note, (ii) all federal, state and local taxes required to be withheld by it, and (iii) all lawful claims for labor, materials and supplies which, if unpaid, might by law become a lien or charge upon any properties of Borrower and its Subsidiaries.

(d)     (i) The Borrower and each of its Subsidiaries will keep and maintain the Collateral and all of its other properties necessary or useful in its business in good condition, repair and working order (normal wear and tear excepted) other than to the extent contemplated by the Budget or the Financing Orders, (ii) the Borrower and each of its Subsidiaries will defend the Collateral against all claims or demands of all Persons (other than Permitted Encumbrances) claiming the Collateral or any interest therein, and (iii) the Borrower and each of its Subsidiaries will keep all Collateral free and clear of all security interests, liens and encumbrances, except Permitted Encumbrances and liens otherwise permitted by the Financing Orders.

(e)     The Borrower and its Subsidiaries will:

(1)     Maintain insurance with respect to the Collateral, covering casualty, hazard, theft, flood and other risks, in amounts, with endorsements and with insurers (with a Best's Financial Strength Rating of at least A, unless otherwise approved by the Agent in its discretion) satisfactory to the Agent. All proceeds under each policy covering Collateral shall be payable to the Agent as a lender loss payee/mortgagee, other than proceeds required by an order of the Bankruptcy Court to be applied to the repayment of debt secured by a Lien on the related assets that is senior to the Liens securing the Obligations under this Note. From time to time upon request, the Borrower shall deliver to the Agent the originals or certified copies of its insurance policies. Unless the Agent shall agree otherwise, each policy shall include satisfactory endorsements that (i) provide for not less than 30 days prior notice to the Agent of termination, lapse or cancellation of such insurance, (ii) with respect to insurance covering Collateral, name the Agent as loss payee/mortgagee and additional insured, and (iii) specify that the interest of the Agent shall not be impaired or invalidated by any act or negligence of any Loan Party or the owner of the property, nor by the occupation of the premises for purposes more hazardous than are permitted by the policy. If the Borrower fails to provide and pay for any insurance, the Agent may, at its option, but shall not be required to, procure the insurance and charge the Borrower therefor. The Borrower agrees to deliver to the Agent, promptly as rendered, copies of all reports made to insurance companies. The Loan Parties may settle, adjust or compromise any insurance claim on terms reasonably acceptable to the Agent, as long as the proceeds are delivered to the Agent pursuant to this Note and the Financing Orders.

(2)     In addition to the insurance required under clause (e)(1) with respect to Collateral, maintain insurance with insurers (with a Best's Financial Strength Rating of at least A, unless otherwise approved by the Agent in its discretion) satisfactory

to the Agent, with respect to the properties and business of the Loan Parties, of such type (including product liability, workers' compensation, larceny, embezzlement, or other criminal misappropriation insurance), in such amounts, and with such coverages and deductibles as are at the time of placing such insurance customary for companies similarly situated and which are available at commercially reasonable rates.

(f)     The Borrower and its Subsidiaries will preserve and maintain their existence and all of their rights, privileges and franchises necessary or desirable in the normal conduct of its business, except to the extent contemplated by the Budget or the Financing Orders or as permitted hereunder.

(g)     The Borrower and its Subsidiaries shall at all times provide reasonable access for, and reasonable cooperation with, any financial advisors or other professionals to the Agent.

(h)     The Borrower and its Subsidiaries each agree that they shall take all actions necessary to cause each of the following to occur:

(1)     no later than 3 Business Days after the Petition Date, the Interim Order approving the Note shall be entered by the Bankruptcy Court;

(2)     no later than 3 Business Days after the Petition Date, the Loan Parties shall file one or more motions seeking entry of orders authorizing and approving bid and sale procedures for all or substantially all of the Loan Parties' assets (the "Sale Motion"), in form and substance reasonably acceptable to the Agent;

(3)     no later than 35 days after the Petition Date, the Final Order approving this Note shall be entered by the Bankruptcy Court;

(4)     no later than 35 days after the Petition Date the Bankruptcy Court shall have entered one or more orders, in form and substance reasonably acceptable to the Agent, approving the bid and sale procedures requested in the Sale Motion (including, if appropriate, approval of stalking horse and related protections);

(5)     if the asset purchase agreement provided by the stalking horse bidder in connection with the Sale Motion does not provide for the payment in full in cash of the DIP Revolver Facility (and the Prepetition ABL Facility to the extent any amounts remain due and owing thereunder), then no later than the later of 50 days after the Petition Date or 3 Business Days prior to the deadline for objecting to the approval of the sale of all or substantially all of the Debtors' assets, the stalking horse bidder shall have provided a commitment letter for replacement/refinancing of the DIP Revolver Facility (and the Prepetition ABL Facility to the extent any amounts remain due and owing thereunder), in form and substance reasonably acceptable to the DIP Revolver Administrative Agent and DIP Revolver Lenders. For the avoidance of doubt, Wingspire may provide such commitment letter;

(6)     no later than 60 days after the Petition Date the Bankruptcy Court shall have entered one or more orders authorizing and approving the sale of all or

-14-

substantially all of the Loan Parties' assets pursuant to one or a series of related or unrelated sale transactions; and

(7)    no later than 75 days after the Petition Date the sale of all of all or substantially all of the Debtors' assets approved by the Bankruptcy Court pursuant to one or a series of related or unrelated sale transactions shall have been consummated in full.

(i)    The Borrower agrees that it shall deliver (which delivery may be made by electronic communication (including email)) to the Agent each of the reports and other items set forth on Schedule I attached hereto no later than the times specified therein (or such later time as the Agent may agree).  No less than once per week, the Borrower shall make its senior management and its advisors available at reasonable times and upon reasonable notice to the Agent and DIP Lenders to discuss the financial position, cash flows, variances, operations, sale process and general case status of the Loan Parties.

15.    Negative Covenants.  So long as any DIP Lender shall have any Commitment hereunder, or any Term Loan or other Obligation hereunder shall remain unpaid or unsatisfied, the Borrower shall not, nor shall it permit any Subsidiary to, without the prior written consent of the Agent:

(a)    Neither the Borrower nor any of its Subsidiaries shall directly or indirectly, by operation of law or otherwise, (i) form or acquire any Subsidiary, or (ii) merge with, consolidate with, acquire all or substantially all of the assets or Equity Interests of, or otherwise combine with or acquire, any Person, except in the case of this clause (ii), with respect to existing Subsidiaries to the extent consented to by the Agent (which consent shall not be unreasonably withheld), other than, in each case, any such action approved by an order of the Bankruptcy Court.

(b)    Neither the Borrower nor any of its Subsidiaries shall create, incur, assume or permit to exist any Indebtedness, except (without duplication), to the extent not prohibited by the Financing Orders, Permitted Indebtedness.

(c)    Neither the Borrower nor any of its Subsidiaries shall create, incur, assume or permit to exist any Lien on or with respect to any of its properties or assets (whether now owned or hereafter acquired) except for Permitted Encumbrances.

(d)    Neither the Borrower nor any of its Subsidiaries shall (i) make any Restricted Payment, except dividends and distributions by Subsidiaries of the Borrower paid to the Borrower or other wholly-owned Subsidiaries of the Borrower and (ii) make any payment in respect of, or repurchase, redeem, retire or defease any, prepetition Indebtedness, except pursuant to the terms of the Financing Orders.

(e)    Neither the Borrower nor any of its Subsidiaries will assume, guarantee, endorse or otherwise become directly or contingently liable in connection with any obligations of any other Person (other than the Borrower or any of its Subsidiaries), except the endorsement of negotiable instruments by Borrower and its Subsidiaries for the deposit or collection or similar transactions in the ordinary course of business.

(f)     Neither the Borrower nor any of its Subsidiaries will Dispose of any of its property, business or assets, whether now owned or hereinafter acquired other than (i) the sale of Inventory in the ordinary course of business, (ii) the Disposition of obsolete equipment, (iii) the sale of other property on terms acceptable to the Agent, and (iv) the Disposition of assets approved by an order of the Bankruptcy Court.

(g)     Neither the Borrower nor any of its Subsidiaries shall consent to any amendment, supplement or other modification of any of the terms or provisions contained in, or applicable to, (i) the Financing Orders or (ii) the Prepetition Obligations.  Except for (A) claims of employees for unpaid wages, bonuses, accrued vacation and sick leave time, business expenses and contributions to employee benefit plans for the period immediately preceding the Petition Date and prepetition severance obligations, in each case to the extent permitted to be paid by order of the Bankruptcy Court, and (B) payments permitted by the Financing Orders and the Budget, subject to Permitted Variance, neither the Borrower nor any of its Subsidiaries shall make any payment in respect of, or repurchase, redeem, retire or defease any, prepetition Indebtedness, except for other payments consented to by the Agent in writing.

(h)     Neither the Borrower nor any of its Subsidiaries shall make any investment in, or make loans or advances of money to, any Person (other than another Loan Party), through the direct or indirect lending of money, holding of securities or otherwise.

(i)     Neither the Borrower nor any of its Subsidiaries shall change its fiscal year.

(j)     For each most recently ended Variance Testing Period, the Borrower shall not permit: (x) the Actual Cash Receipts to be less than Budgeted Cash Receipts (each calculated on a cumulative basis as opposed to on a line by line basis), in each case, for such Variance Testing Period, by more than the Permitted Variance for such Variance Testing Period, and (y) the aggregate amount of Actual Operating Disbursement Amounts to exceed the aggregate amount of Budgeted Operating Disbursement Amounts (each calculated on a cumulative basis as opposed to on a line by line basis), in each case, for such Variance Testing Period, by more than the Permitted Variance.

(k)     Neither the Borrower nor any of its Subsidiaries shall, directly or indirectly, use the Term Loans or the proceeds of the Term Loans, or lend, contribute or otherwise make available the Term Loans or the proceeds of the Term Loans to any Person, to fund any activities of or business with any Person, or in any Designated Jurisdiction, that, at the time of such funding, is the subject of Sanctions, or in any other manner that will result in a violation by any Person (including any Person participating in the transaction, whether as DIP Lender, Agent or otherwise) of Sanctions.

16.     <u>Events of Default; Rights and Remedies</u>.  Notwithstanding the provisions of Section 362 of the Bankruptcy Code and without application or motion to the Bankruptcy Court, the occurrence of any one or more of the following events (regardless of the reason therefor) shall constitute an "Event of Default" hereunder:

(a)     The Borrower (i) shall fail to make any payment of principal of, or interest

on, or fees owing in respect of, the Term Loans or any of the other Obligations when due and payable, or (ii) shall fail to pay or reimburse the Agent on behalf of the DIP Lenders for any expense reimbursable hereunder or under any other DIP Document within three (3) Business Days following the Agent's demands for such reimbursement or payment and the passage of any notice period required in the Financing Orders.

(b)     Any Loan Party shall fail to comply with any of the provisions of Sections 1(d), 1(e), 14(f), 14(g), 14(h), 14(i) and 15 of this Note.

(c)     Any Loan Party shall fail to comply with any other provision of this Note or any of the other DIP Documents (other than any provision embodied in or covered by any other clause of this Section 16) and the same, if capable of being remedied, shall remain unremedied for ten (10) Business Days after the earlier of the date (i) a senior officer of any Loan Party becomes aware of such failure and (ii) the date written notice of such default shall have been given by the Agent to such Loan Party.

(d)     Except for defaults occasioned by the filing of the Chapter 11 Cases and defaults resulting from obligations with respect to which the Bankruptcy Code prohibits any Loan Party from complying or permits any Loan Party not to comply, a default or breach shall occur under any agreement, document or instrument to which any Loan Party is a party (other than agreements, documents and instruments evidencing Prepetition Obligations) that is not cured within any applicable grace period therefor, and such default or breach (i) involves the failure to make any payment when due in respect of any Indebtedness (other than the Obligations) of any Loan Party in excess of $50,000 in the aggregate, or (ii) causes, or permits any holder of such Indebtedness or a trustee to cause, Indebtedness or a portion thereof in excess of $50,000 in the aggregate to become due prior to its stated maturity or prior to its regularly scheduled dates of payment, regardless of whether such default is waived, or such right is exercised, by such holder or trustee.

(e)     Any representation or warranty herein or in any other DIP Document or in any written statement, report, financial statement or certificate made or delivered to DIP Lenders by any Loan Party is untrue or incorrect in any material respect (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of the date when made or deemed made.

(f)     Any Loan Party shall bring a motion in any Chapter 11 Case:  (i) to obtain financing from any Person other than DIP Lenders or the DIP Revolving Lenders under Section 364(c) or 364(d) of the Bankruptcy Code, except to the extent the proceeds of such financing would be used to repay in full all of the Obligations under this Note; (ii) to grant any Lien other than Permitted Encumbrances upon or affecting any Collateral, except to the extent the proceeds of any such financing secured by such Lien would be used to repay in full all of the Obligations under this Note; or (iii) to authorize any other action or actions adverse to the Agent or the DIP Lenders, or the Agent's rights and remedies hereunder or their interests in the Collateral.

(g)     The entry of an order in any of the Chapter 11 Cases confirming a plan or plans of reorganization that does not contain a provision for the termination of the DIP Lenders' commitment to make Term Loans and the repayment in full in cash of all the Obligations under

this Note on or before the effective date of such plan or plans.

(h)     The filing of any motion by the Borrower or any Loan Party against the DIP Lenders seeking, or the entry of any order in the Chapter 11 Cases in respect of, any claim or claims under Section 506(c) of the Bankruptcy Code against or with respect to any Collateral.

(i)     The sale, without the Agent's consent, of all or substantially all of the Loan Parties' assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Cases, or otherwise, that does not provide for payment in full in cash of the Obligations and termination of the DIP Lenders' commitment to make Term Loans.

(j)     The entry by the Bankruptcy Court of an order authorizing the appointment of an interim or permanent trustee in the Chapter 11 Cases or the appointment of an examiner in the Chapter 11 Cases with expanded powers to operate or manage the financial affairs, business, or reorganization of any Loan Party.

(k)     The Chapter 11 Cases, or any of them, shall be dismissed or converted from cases under Chapter 11 to cases under Chapter 7 of the Bankruptcy Code.

(l)     The entry of an order in any Chapter 11 Case avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Note or the other DIP Documents.

(m)     The entry of an order in any Chapter 11 Case granting any other super-priority administrative claim or Lien equal to or superior to that granted to the Agent (other than any such claim or Lien permitted by the Financing Orders), unless (i) consented to by the Agent or (ii) the Obligations are paid in full in cash and the DIP Lenders' commitment to make Term Loans is terminated.

(n)     The entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code to allow any creditor (other than the Agent) to execute upon or enforce a Lien on any Collateral except with respect to Permitted Encumbrances arising prior to the Petition Date in an aggregate amount not to exceed $50,000.

(o)     The Financing Orders (or either of them) shall be stayed, amended, modified, reversed or revoked in any respect without the Agent's prior written consent.

(p)     There shall commence any suit or action against the Agent or any DIP Lender by or on behalf of (i) any Loan Party or (ii) any official committee in the Chapter 11 Cases (other than a motion for standing to commence a suit or action), in each case, that asserts a claim or seeks a legal or equitable remedy that would have the effect of subordinating the claim or Lien of DIP Lenders and, if such suit or action is commenced by any Person other than Borrower or any Subsidiary, officer, or employee of Borrower, such suit or action shall not have been dismissed or stayed within 10 days after service thereof on the Agent or any DIP Lender, as applicable, and, if stayed, such stay shall have been lifted.

(q)     Any provision of any DIP Document shall for any reason cease to be valid, binding and enforceable in accordance with its terms (or any Loan Party shall challenge the enforceability of any DIP Document or shall assert in writing, or engage in any action or inaction based on any such assertion, that any provision of any DIP Document has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms), or any Lien created under any DIP Document shall cease to be a valid and perfected first priority Lien (except as otherwise permitted herein or in the Financing Orders) in any of the Collateral purported to be covered thereby.

(r)     The occurrence of (i) a DIP Termination Event (as defined in the Financing Orders) or (ii) an Event of Default under the DIP Revolver Facility.

(s)     Assets of any Loan Party with a fair market value of $200,000 or more are attached, seized, levied upon or subjected to a writ or distress warrant, or come within the possession of any receiver, trustee, custodian or assignee for the benefit of creditors of any Loan Party and such condition continues for ten (10) days or more.

(t)     A breach by any Loan Party of the terms of the Financing Orders.

(u)     Any agreement for the sale of the Loan Parties' assets entered into pursuant to the Sale Motion and approved by the Bankruptcy Court, or any provision thereof, (i) shall fail to be in full force and effect or binding upon and enforceable against any Loan Party  or any other party thereto in accordance with its terms, (ii) has been amended or modified without the consent of the Agent, or (iii) has been breached due to the action or inaction of any Loan Party or any other party thereto.  Any party to a sale agreement shall have notified any other party to such agreement of its intent to terminate such agreement or any other event shall occur, or shall fail to occur, which, subject to a notice requirement or passage of time, would result in the termination of any such agreement.

(v)     Entry of an order authorizing and/or directing the reclamation of goods pursuant to section 546(c) of the Bankruptcy Code in excess of $50,000.

If any Event of Default shall have occurred and be continuing, then the Agent may, upon five (5) Business Days' written notice to the Borrower and subject to the terms of the Financing Orders (the "Remedies Notice Period"): (i) terminate the Commitment of each DIP Lender with respect to further Term Loans; (ii) declare all or any portion of the Obligations, including all or any portion of any Term Loan, to be forthwith due and payable; (iii) revoke the Borrower's rights to use Cash Collateral in which the Agent and the DIP Lenders have an interest; and (iv) exercise any rights and remedies under the DIP Documents (including, without limitation, termination of the Escrow Account) or at law or in equity, all in accordance with the Financing Orders and the Intercreditor Agreement.  Upon the occurrence of an Event of Default and the exercise by the Agent or the DIP Lenders of their rights and remedies under this Note and the other DIP Documents pursuant to clause (iv) above and subject to the Financing Orders, each Loan Party shall assist the Agent in effecting a Disposition of the Collateral upon such terms as are designed to maximize the proceeds obtainable from such Disposition.  On any date on which the Term Loans shall have been accelerated, subject to the Financing Orders, any amounts remaining in either the DIP Holding Account or the Escrow Account (other than with

respect to amounts necessary to fund the Carve-Out) may be applied by the Agent to reduce the Term Loans and other Obligations then outstanding. None of the Loan Parties shall have (and each Loan Party hereby affirmatively waives) any right to withdraw, claim or assert any property interest in any funds on deposit in the DIP Holding Account or the Escrow Account upon the occurrence and continuance of any Default or Event of Default. For the avoidance of doubt, notwithstanding the foregoing, during the Remedies Notice Period, unless otherwise provided herein, the Debtors (x) may not make any Withdrawal from the Escrow Account, and (y) may use Cash Collateral solely in amounts necessary to avoid immediate and irreparable harm to the Debtors' Estates (including funding payroll and paying other administrative expenses) all in accordance with the Financing Orders and the Approved Budget, or that have otherwise been approved in advance in writing by the Agent.

Except as otherwise provided for in this Note, the Financing Orders or by applicable law, the Borrower waives: (a) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by the Agent on which the Borrower may in any way be liable, and hereby ratifies and confirms whatever the Agent may do in this regard; (b) all rights to notice and a hearing prior to the Agent taking possession or control of, or Agent's replevy, attachment or levy upon, the Collateral or any bond or security that might be required by any court prior to allowing Agent to exercise any of its remedies; and (c) the benefit of all valuation, appraisal, marshaling and exemption laws.

To the extent permitted by law and subject in all respects to the terms of the Financing Orders, the Agent's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under section 9-207 of the Uniform Commercial Code or otherwise, shall be to deal with it in the same manner as Agent deals with similar securities and property for its own account, the Agent's duty of care with respect to Collateral in the custody or possession of a bailee or other third person shall be deemed fulfilled if the Agent exercises reasonable care in the selection of the bailee or other third person, and the Agent need not otherwise preserve, protect, insure or care for any Collateral, and the Agent shall not be obligated to preserve any rights any Loan Party may have against prior parties.

Any amount or payment received by the Agent or any DIP Lender from any Loan Party or from the proceeds of Collateral (subject to the terms of the Financing Orders) following (i) any acceleration of the Obligations under this Note or (ii) at the direction of the Agent or the Required Lenders after any Event of Default, shall be applied to the Obligations as determined by the Agent in its sole discretion and once paid in full, any excess shall be paid to the Borrower or as otherwise required by applicable law.

17. <u>Reference Agreements</u>. This Note evidences the Term Loans that may be made to Borrower from time to time in the aggregate principal amount outstanding of up to $18,000,000 and is issued pursuant to and entitled to the benefits of the Financing Orders, to which reference is hereby made for a more complete statement of the terms and conditions under which the Term Loans evidenced by this Note are made and are to be repaid.

18. <u>Definitions; Certain Terms</u>.

(a)     <u>Definitions</u>.  The following terms used in this Note shall have the following meanings (and any of such terms may, unless the context otherwise requires, be used in the singular or the plural depending on the reference):

"<u>ABL Holding Account</u>" shall mean the account number ending in -8915 at Fifth Third Bank.

"<u>Actual Cash Receipts</u>" shall mean with respect to any period, the actual amount that corresponds to the line item "Total Operating Receipts" as determined by reference to the Budget as then in effect.

"<u>Actual Net Operating Cash Flow</u>" shall mean with respect to any period, the actual amount that corresponds to the line item "Net Cash Flow" in the Budget as then in effect.

"<u>Actual Operating Disbursement Amounts</u>" shall mean with respect to any period, the actual amount that corresponds to the line item "Total Operating Disbursements" in the Budget as then in effect.

"<u>Actual Outstanding Debt</u>" shall mean with respect to any period, the actual amount that corresponds to the "Ending Loan Balance" line item under the "Wingspire Post-Petition DIP Loan Balances" and "BT DIP Loan Balance" in the Budget as then in effect.

"<u>Adjusted Term SOFR</u>" means, for purposes of any calculation, the rate per annum equal to (a) Term SOFR for such calculation plus (b) the Term SOFR Adjustment.

"<u>Anticipated Net Disbursements</u>" shall mean, with respect to Friday of any week, the positive difference of (a) the amount of disbursements reasonably anticipated to be made during the week immediately following such Friday as set forth in the Budget (subject to Permitted Variance), minus (b) the sum of (x) the amount of cash receipts expected to be received by the Loan Parties during such week as set forth in the Budget (subject to Permitted Variance), (y) estimated cash in the ABL Holding Account as of such Friday, and (z) estimated Availability under the DIP Revolver Facility.

"<u>Approved Budget Variance Report</u>" shall mean a report provided by the Borrower to the Agent and the DIP Lenders (a) showing, in each case, on a line item by line item and a cumulative basis, the Actual Cash Receipts, the Actual Operating Disbursement Amounts, the Actual Net Operating Cash Flow and the Actual Outstanding Debt, in each case as of the last day of the Variance Testing Period then most recently ended, noting therein (i) all variances, on a cumulative basis, from the Budgeted Cash Receipts, the Budgeted Operating Disbursement Amounts, the Budgeted Net Operating Cash Flow and the Budgeted Outstanding Debt for such period as set forth in the Approved Budget as in effect for such period and (ii) containing an indication as to whether each variance is temporary or permanent and analysis and explanations for all material variances, (iii) certifying compliance or non-compliance in such Variance Testing Period with the Permitted Variances and (iv) including explanations for all material variances and violations, if any, of such covenant and if any such violation exists, setting forth the actions which the Borrower has taken or intend to take with respect thereto and (b) which such reports

shall contain supporting information, satisfactory to the Agent in its sole discretion.

"Bankruptcy Code" shall have the meaning given such term in the recital to this Note.

"Bankruptcy Court" shall have the meaning given such term in the recital to this Note.

"Borrower" shall have the meaning given such term in the recital to this Note.

"Budget" shall mean a rolling thirteen (13) week forecast of projected receipts, disbursements, net cash flow, liquidity and loans for the immediately following consecutive thirteen (13) weeks after the date of delivery, which shall be in substantially the form of the Initial Budget or otherwise in form and substance acceptable to the Agent and shall be approved by the Agent, in the Agent's sole discretion. The initial Budget (the "Initial Budget") is attached hereto as Exhibit A.

"Budgeted Cash Receipts" shall mean with respect to any period, the amount that corresponds to the line item "Total Cash Receipts" in the Budget, as then in effect.

"Budgeted Net Operating Cash Flow" shall mean with respect to any period, the actual amount that corresponds to the line item "Net Cash Flow" in the Budget as then in effect.

"Budgeted Operating Disbursement Amounts" shall mean with respect to any period, the amount that corresponds to the line item "Total Operating Disbursements" in the Budget.

"Budgeted Outstanding Debt" shall mean with respect to any period, the actual amount that corresponds to the "Ending Loan Balance" line item for the "Wingspire Post-Petition DIP Loan Balances" and "BT DIP Loan Balance" in the Budget as then in effect.

"Business Day" shall mean (a) for all purposes other than as described in clause (b) below, any day other than a Saturday, Sunday or legal holiday under the laws of the State of New York or any other day on which banking institutions located in the State of New York are authorized or required by law or other governmental action to close, and (b) with respect to the borrowing, payment or continuation of, or determination of interest rate on the Term Loans, any U.S. Government Securities Business Day.

"Carve-Out" shall have the meaning given such term in the Financing Orders.

"Cash Collateral" shall have the meaning given to such term in the Financing Orders.

"Chapter 11 Case" and "Chapter 11 Cases" shall have the respective meanings given such terms in the recital to this Note.

"Closing Date" shall mean the Business Day when each of the conditions applicable to the funding of the Term Loans (other than any Final Order Term Loans) and listed in Section

2(a) of this Note shall have been satisfied or waived in a manner satisfactory to the Agent.

"Collateral" shall mean the assets and property covered by the Financing Orders and the other Collateral Documents and any other assets and property, real or personal, tangible or intangible, now existing or hereafter acquired, that may at any time be or become subject to a security interest or Lien in favor of the Agent on behalf of the DIP Lenders, to secure the Obligations and the Guaranteed Obligations. Without limiting the foregoing, the Collateral shall include all present and future property of each Loan Party under Section 541(a) of the Bankruptcy Code (including, without limitation, the proceeds of avoidance actions upon entry of the Final Order) and all proceeds thereof.

"Collateral Documents" shall mean each agreement entered into pursuant to Section 12 hereof and all similar agreements entered into guaranteeing payment of, or granting a Lien upon property as security for payment of, the Obligations and the Guaranteed Obligations, including the Financing Orders and the Guaranty.

"Commitment" shall mean, with respect to each DIP Lender, the commitment of such DIP Lender to make its portion of the Term Loans to the Borrower in the principal amount set forth on Schedule II hereto, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"Conforming Changes" means, with respect to the use or administration of Term SOFR, any technical, administrative or operational changes (including changes to the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, and other technical, administrative or operational matters) that the Agent decides may be necessary or appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by the Agent in a manner substantially consistent with market practice (or, if the Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Agent determines that no market practice for the administration of any such rate exists, in such other manner of administration as the Agent decides is reasonably necessary or appropriate in connection with the administration of this Agreement and the other DIP Documents).

"Debtors" shall have the meaning given to such term in the Financing Orders.

"Default" shall mean an event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"Default Rate" shall have the meaning given such term in Section 4(d) of this Note.

"Designated Jurisdiction" shall mean any country or territory that is the target of a Sanction.

"DIP Documents" shall mean the Note, the Collateral Documents, the Guaranty, the Escrow Agreement and all other agreements, instruments, documents and certificates executed

and delivered to, or in favor of the Agent in connection with this Note. Any reference in this Note or any other DIP Document to a DIP Document shall include all appendices, exhibits or schedules thereto, and all amendments, restatements, amendments and restatements supplements or other modifications thereto, and shall refer to such DIP Document as the same may be in effect at any and all times such reference becomes operative.

"DIP Holding Account" shall mean the account into which the proceeds of each Withdrawal from the Escrow Account shall be deposited and maintained pending transfer to the ABL Holding Account.

"DIP Lenders" shall have the meaning given such term in the recital to this Note.

"DIP Revolver Agent" shall have the meaning given to such term in the Financing Order.

"DIP Revolver Facility" shall have the meaning given to such term in the Financing Orders.

"DIP Revolver Lenders" shall have the meaning given to such term in the Financing Order.

"Dispose" or "Disposition" means any transaction, or series of related transactions, pursuant to which any Person or any of its Subsidiaries sells, assigns, transfers, leases, licenses (as licensor) or otherwise disposes of any property or assets (whether now owned or hereafter acquired) to any other Person, in each case, whether or not the consideration therefor consists of cash, securities or other assets owned by the acquiring Person. For purposes of clarification, "Disposition" shall include (a) the sale or other disposition for value of any contracts, (b) any disposition of property through a "plan of division" under the Delaware Limited Liability Company Act or any comparable transaction under any similar law, (c) the early termination or modification of any contract resulting in the receipt by any Loan Party of a cash payment or other consideration in exchange for such event (other than payments in the ordinary course for accrued and unpaid amounts due through the date of termination or modification) or (d) any sale of merchant accounts (or any rights thereto (including, without limitation, any rights to any residual payment stream with respect thereto)) by any Loan Party.

"Dollars" or "$" shall mean lawful currency of the United States of America.

"Equity Interests" shall have the meaning given such term in the Prepetition Term Loan Credit Agreement whether or not such agreement remains in effect.

"Escrow Account" shall mean an escrow account with the Escrow Agent into which the proceeds of the Term Loans (and amounts described in Section 1(f)) shall be deposited and retained subject to withdrawal thereof by the Borrower pursuant to the terms hereof for use in accordance with the terms hereof and of the Budget (subject to any Permitted Variance) or return thereof to the DIP Lenders upon the occurrence of the Maturity Date.

"Escrow Agent" shall mean Alter Domus.

"Escrow Agreement" shall mean an Escrow Agreement dated as of the Closing Date (as amended, restated, amended and restated, supplemented or otherwise modified from time to time) among the Borrower, the Escrow Agent and the Agent (for and on behalf of the DIP Lenders) relating to the Escrow Account in form and substance reasonably satisfactory to the DIP Agent and the Borrower.

"Event of Default" shall have the meaning given such term in Section 16 of this Note.

"Excluded Taxes" shall mean any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any DIP Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof), (b) in the case of a DIP Lender, federal withholding Taxes imposed on amounts payable to or for the account of such DIP Lender with respect to an applicable interest in Term Loans or Commitment pursuant to a law in effect on the date on which (i) such DIP Lender acquires such interest in the Term Loans or Commitment or (ii) such DIP Lender changes its lending office, except in each case to the extent that, pursuant to Section 10, amounts with respect to such Taxes were payable either to such DIP Lender's assignor immediately before such DIP Lender became a party hereto or to such DIP Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to provide the Borrower with the tax documentation described in Section 10 hereof and (d) any withholding Taxes imposed under FATCA.

"Extraordinary Receipts" shall mean any cash received by Borrower or any of its Subsidiaries not in the ordinary course of business (and not consisting of proceeds described in Sections 7(a)(i) and 7(a)(ii) hereof) from (i) foreign, United States, state or local tax refunds, (ii) pension plan reversions, (iii) proceeds of insurance (other than to the extent such insurance proceeds are immediately payable to a Person that is not Corsicana Parent Co., LLC ("Parent"), a Delaware limited liability company, or any of its Subsidiaries), (iv) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, (v) condemnation awards (and payments in lieu thereof), (vi) indemnity payments (other than to the extent such payments described in the foregoing clauses (iv), (v) and (vi) are immediately payable to a Person that is not an affiliate of the Parent or any of its Subsidiaries) and (vii) any purchase price adjustment received in connection with any purchase agreement.

"FATCA" shall mean Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Note (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among governmental authorities and implementing such Sections of the Internal Revenue Code.

"Final Order" shall mean the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing pursuant to Section 364 of the Bankruptcy Code and Bankruptcy

Rule 4001, in form and substance satisfactory to the Agent, together with all extensions, modifications and amendments thereto, authorizing Borrower to obtain credit, incur Indebtedness, and grant Liens under this Note and/or certain financing documentation, all as set forth in such order.

"Final Order Term Loan" shall have the meaning given such term in Section 1(a).

"Financing Orders" shall mean, collectively, the Interim Order and the Final Order, as applicable.

"Floor" shall mean a rate of interest equal to 1.5%.

"GAAP" shall mean generally accepted accounting principles in the United States of America.

"Guaranteed Obligations" shall mean the obligations to be guaranteed by each Guarantor pursuant to the terms of the Guaranty.

"Guarantor" shall have the meaning given such term in the recital to this Note.

"Guaranty" shall mean the Guaranty, dated as of the date hereof, made by the Guarantors in favor of the Agent.

"Indebtedness" shall have the meaning given such term in the Prepetition Term Loan Credit Agreement (and the defined terms used in such definition and defined in the Prepetition Term Loan Credit Agreement shall have the meanings given such terms therein, unless any such term is also defined herein, in which case each such defined term used in such definition shall have the meaning provided herein) whether or not such agreement remains in effect and without giving effect to any amendments or other modifications thereto made after the Closing Date.

"Indemnified Person" shall have the meaning given such term in Section 9 of this Note.

"Indemnified Taxes" shall mean (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under any DIP Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Intercreditor Agreement" shall have the meaning given to such term in the Financing Orders.

"Interest Period" means, with respect to each Term Loan, a period commencing on the date of the making of such Term Loan (or the continuation of a Term Loan) and ending 3 months thereafter; provided, however, that (a) if any Interest Period would end on a day that is not a Business Day, such Interest Period shall be extended (subject to clauses (c)-(e) below) to the next succeeding Business Day, (b) interest shall accrue at the applicable rate based upon Adjusted Term SOFR from and including the first day of each Interest Period to, but excluding, the day on which any Interest Period expires, (c) any Interest Period that would end on a day that

is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day, (d) with respect to an Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period), the Interest Period shall end on the last Business Day of the calendar month that is 3 months after the date on which the Interest Period began, as applicable, and (e) the Borrowers may not elect an Interest Period which will end after the Maturity Date.

"Interim Order" shall mean the interim order of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), together with all extensions, modifications and amendments thereto, satisfactory in form and substance to the Agent, authorizing, on an interim basis, Borrower to execute and perform under the terms of this Note and the other DIP Documents.

"Inventory" shall have the meaning given such term in the Prepetition ABL Credit Agreement whether or not such agreement remains in effect.

"Lien" shall mean any mortgage or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any lease or any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Uniform Commercial Code or comparable law of any jurisdiction).

"Loan Party" shall mean the Borrower and any Guarantor.

"Material Adverse Effect" shall mean a material adverse effect on (i) the operations, business, assets, properties or financial condition of the Loan Parties taken as a whole, (ii) the ability of the Loan Parties to perform payment or other material obligations under any DIP Document, (iii) the legality, validity or enforceability of this Note or any other DIP Document, (iv) the rights and remedies of the Agent and the DIP Lenders under any DIP Document, or (v) the validity, perfection or priority of a Lien in favor of DIP Lenders on any of the Collateral; provided, however that "Material Adverse Effect" shall expressly exclude any change, event or occurrence, arising individually or in the aggregate, from events that could reasonably be expected to result from the filing or commencement of the Chapter 11 Cases or the announcement of the filing or commencement of the Chapter 11 Cases.

"Maturity Date" shall mean the earliest to occur of (i) October 23, 2022, or if such date is not a Business Day the immediately following Business Day, (ii) July 30, 2022, if the Final Order has not been entered by the Bankruptcy Court on or prior to such date, or if such date is not a Business Day the immediately following Business Day, (iii) the consummation of a sale of all or substantially of the Debtors' assets pursuant to the Sale Motion or otherwise; (iv) the substantial consummation of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order of the Bankruptcy Court, or (v) the date on which the Term Loans are accelerated

pursuant to Section 16.

"Maximum Amount" shall have the meaning given such term in Section 1 of this Note.

"Note" shall have the meaning given such term in the recital to this Note.

"Obligations" shall mean all loans, advances, debts, liabilities and obligations for the performance of covenants, tasks or duties or for payment of monetary amounts (whether or not such performance is then required or contingent, or such amounts are liquidated or determinable) owing by Borrower to Agent and DIP Lenders arising under the Note or any of the other DIP Documents, and all covenants and duties regarding such amounts, of any kind or nature, present or future, arising under the Note or any of the other DIP Documents. This term includes all principal, interest, fees, charges, expenses, reasonable and documented attorneys' fees and any other sum chargeable to Borrower under the Note or any of the other DIP Documents.

"OFAC" shall mean the Office of Foreign Assets Control of the United States Department of the Treasury.

"Other Taxes" shall have the meaning given such term in Section 10 of this Note.

"Participant Register" shall have the meaning given such term in Section 21 of this Note.

"Payment Office" shall mean such account, office or offices of the Agent as may be designated in writing from time to time by the Agent to Borrower.

"Periodic Term SOFR Determination Day" has the meaning specified therefor in the definition of "Term SOFR".

"Permitted Encumbrances" shall mean the following encumbrances: (a) Liens for taxes or assessments or other governmental charges (i) not yet due and payable, (ii) that are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP, or (iii) the nonpayment of which is permitted or required by the Bankruptcy Code; (b) pledges or deposits of money securing statutory obligations under workmen's compensation, unemployment insurance, social security or public liability laws or similar legislation (excluding Liens under ERISA); (c) pledges or deposits of money securing bids, tenders, contracts (other than contracts for the payment of money) or leases to which any Loan Party is a party as lessee made in the ordinary course of business; (d) carriers', warehousemen's, suppliers' or other similar possessory liens arising in the ordinary course of business; (e) deposits securing, or in lieu of, surety, appeal or customs bonds in proceedings to which any Loan Party is a party; (f) zoning restrictions, easements, licenses, or other restrictions on the use of any real estate or other minor irregularities in title (including leasehold title) thereto so long as the same do not materially impair the use, value, or marketability of such real estate; (g) the Agent's and DIP Lenders' Liens; (h) Liens existing on the Petition Date (to the extent valid, enforceable, perfected and not subject to avoidance as of the Petition Date or perfected after the Petition Date pursuant to section 546(b) of the Bankruptcy Code); (i) Liens in favor of the Prepetition Secured Parties and other Liens granted

pursuant to the Financing Orders (including, to the extent constituting a Lien, the Carve-Out); and (j) to the extent constituting Liens, Liens on goods delivered to any Loan Party after the Petition Date under any consignment or similar title retention agreements; provided that no encumbrance (other than the Liens described in clause (g) above and the Carve-Out) on the Escrow Agreement, the DIP Holding Account or the Escrow Account or amounts held therein or proceeds thereof shall be a Permitted Encumbrance.

"Permitted Indebtedness" shall mean: (a) current Indebtedness incurred in the ordinary course of business for inventory, supplies, equipment, services, taxes or labor; (b) Indebtedness arising under this Note and the other DIP Documents; (c) DIP Revolver Facility Indebtedness; (d) Prepetition Obligations; (e) deferred taxes and other expenses incurred in the ordinary course of business; (f) any Indebtedness existing on the Petition Date; and (g) administrative expenses of Borrower for which the Bankruptcy Court has not directed payment.

"Permitted Prior Liens" shall mean certain permitted senior liens as expressly set forth in the Financing Orders.

"Permitted Variances" shall mean, with respect to any Variance Testing Period, (a) in respect of the aggregate amount of Actual Operating Disbursement Amounts, (x) 20% for the Initial Two Week Disbursements Period, (y) 20% for the Initial Three Week Disbursements Period, and (z) 15% for the Initial Four Week Disbursements Period and each Four Week Disbursements Period and (b) in respect of Actual Cash Receipts (x) 20% for the Initial Two Week Receipts Period, (y) 15% for the Initial Three Week Receipts Period, and (z) 15% for the Initial Four Week Receipts Period and each Four Week Receipts Period thereafter..

"Person" shall mean any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, other entity or government (whether federal, state, county, city, municipal, local, foreign, or otherwise, including any instrumentality, division, agency, body or department thereof).

"Petition Date" shall have the meaning given such term in the recital to this Note.

"Prepetition Obligations" shall have the meaning given such term in the Financing Orders.

"Prepetition Secured Parties" shall have the meaning given such term in the Financing Orders.

"Prepetition Term Loan Agreement" shall have the meaning given to such term in the Financing Orders.

"Pro Rata Share" shall mean with respect to a DIP Lender's obligation to make Term Loans and receive payments of interest, fees and principal with respect thereto, the percentage obtained by dividing (i) such DIP Lender's Commitment by (ii) the Maximum Amount.

"Recipient" shall mean the Agent or any DIP Lender, as applicable.

"Register" shall have the meaning given such term in Section 21 of this Note.

"Registered Loan" shall have the meaning given such term in Section 21 of this Note.

"Related Fund" shall mean, with respect to any Person, an affiliate of such Person, or a fund or account managed by such Person or an affiliate of such Person.

"Related Parties" shall mean, with respect to any specified Person, such Person's affiliates and the respective managers, administrators, trustees, partners, investors, directors, officers, employees, agents, advisors, sub-advisors or other representatives of such Person and such Person's affiliates.

"Relevant Governmental Body" shall mean the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or any successor thereto.

"Required Lenders" shall mean, at any time, DIP Lenders whose aggregate Pro Rata Shares exceed 50%.

"Reserve Percentage" means, on any day, for any DIP Lender, the maximum percentage prescribed by the Board (or any successor Governmental Authority) for determining the reserve requirements (including any basic, supplemental, marginal, or emergency reserves) that are in effect on such date with respect to eurocurrency funding (currently referred to as "eurocurrency liabilities") of that DIP Lender, but so long as such DIP Lender is not required or directed under applicable regulations to maintain such reserves, the Reserve Percentage shall be zero.

"Resignation Effective Date" shall have the meaning given such term in Section 20(g)(1).

"Restricted Payment" shall mean any dividend or other distribution (whether in cash, securities or other property) with respect to any capital stock or other Equity Interest of any Person or any of its Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such capital stock or other Equity Interest, or on account of any return of capital to any Person's stockholders, partners or members (or the equivalent of any thereof), or any option, warrant or other right to acquire any such dividend or other distribution or payment.

"Responsible Officer" means the chief executive officer, chief financial officer, chief operating officer, general counsel or chief restructuring officer of the Borrower.

"Sale Motion" shall have the meaning given such term in Section 14 of this Note.

"Sanction" shall mean any sanction administered or enforced by the United States Government (including, without limitation, OFAC), the United Nations Security Council, the

European Union, Her Majesty's Treasury or other relevant sanctions authority.

"SOFR" means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"SOFR Administrator" means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"Subsidiary" of a Person shall mean a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Successor Case" shall have the meaning given such term in the Financing Orders.

"Taxes" shall have the meaning given such term in Section 10 of this Note.

"Term Loans" shall have the meaning given such term in Section 1 of this Note.

"Term SOFR" shall mean the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the day (such day, the "Periodic Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; *provided*, *however*, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day; *provided*, *further*, that if Term SOFR determined as provided above (including as determined in the first proviso) shall ever be less than the Floor, then Term SOFR shall be deemed to be the Floor.

"Term SOFR Adjustment" means, for any calculation with respect to a Term Loan, a percentage per annum equal to 0.26161%.

"Term SOFR Administrator" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Agent in its reasonable discretion).

"Term SOFR Reference Rate" means the forward-looking term rate based on SOFR.

"U.S. Government Securities Business Day" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income department of its members be closed for the entire day for purposes of trading in United States government securities.

"Variance Testing Period" shall mean each of (a) in respect of Actual Operating Disbursement Amounts, (w) the two week period ending on July 15, 2022 ("Initial Two Week Disbursements Period"), (x) the three week period ending on July 22, 2022 ("Initial Three Week Disbursements Period"), (y) the four week period ending on July 29, 2022 ("Initial Four Week Disbursements Period"), and (z) thereafter the rolling four week period ending on each Friday (each a, "Four Week Disbursements Period") and (b) in respect of Actual Cash Receipts (w) the two week period ending on July 15, 2022 ("Initial Two Week Receipts Period"), (x) the three week period ending on July 22, 2022 ("Initial Three Week Receipts Period"), (y) the four week period ending on July 29, 2022 ("Initial Four Week Receipts Period"), and (z) thereafter the rolling four week period ending on each Friday (each a "Four Week Receipts Period").

"Withdrawal" means a withdrawal from the Escrow Account made in accordance with Section 2.

"Withdrawal Date" means the date of the making of any Withdrawal.

"Withdrawal Liquidity Condition" shall mean, with respect to any Withdrawal, the amount of the requested withdrawal does not exceed the positive difference of (a) the amount of disbursements reasonably anticipated to be made during the period from such withdrawal date to the last Business Day of the week following such withdrawal date as set forth in the Approved Budget (subject to Permitted Variances), minus (b) the sum (without duplication) of (x) the amount of cash receipts reasonably expected to be received by the Debtors during the period from such withdrawal date to the last Business Day of the week following such withdrawal date as set forth in the Budget (subject to Permitted Variances), (y) estimated cash in Debtor bank accounts as of such withdrawal date, and (z) Availability (as defined in the DIP Revolver Facility) expected to be available to the Debtors from the withdrawal date to the last Business Day of the week following such Withdrawal Date.

"Withdrawal Notice" means a request to make a Withdrawal, which shall include the Withdrawal Date and a certification by a Responsible Officer of the satisfaction of the Withdrawal Liquidity Condition for such Withdrawal.

(b)     Rates.  The Agent does not warrant or accept responsibility for, and shall not have any liability with respect to (a) the continuation of, administration of, submission of, calculation of or any other matter related to the Term SOFR Reference Rate, Adjusted Term SOFR or Term SOFR, or any component definition thereof or rates referred to in the definition thereof, or (b) the effect, implementation or composition of any Conforming Changes.  The Agent and its Affiliates or other related entities may engage in transactions that affect the calculation of the Term SOFR Reference Rate, Term SOFR, Adjusted Term SOFR, or any relevant adjustments thereto, in each case, in a manner adverse to the Borrowers.  The Agent may select information sources or services in its reasonable discretion to ascertain the Term SOFR Reference Rate, Term SOFR, Adjusted Term SOFR, in each case pursuant to the terms of this Note, and shall have no liability

to the Borrower, any Lender or any other Person for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

19.    Representations and Warranties.  The Borrower and each of the other Loan Parties represents as follows:

(a)    the Borrower and each of the Loan Parties are duly formed and/or organized and validly existing under the laws of their jurisdictions of incorporation or formation;

(b)    upon entry of the Financing Orders, the execution and delivery of this Note and the other DIP Documents and the performance by the Borrower of the Borrower's obligations hereunder and under the other DIP Documents are within its corporate powers, have been duly authorized by all necessary corporate action of the Borrower, have received all necessary bankruptcy, insolvency or governmental approvals, and do not and will not contravene or conflict with any provisions of applicable material law or of the Borrower's corporate charter or by-laws or of any agreements binding upon or applicable to the Borrower or any of its Subsidiaries or any of their properties;

(c)    the Chapter 11 Cases have been duly authorized by all necessary legal and corporate action by or on behalf of each Loan Party and have been duly and properly commenced;

(d)    upon entry of the Financing Orders, this Note and each other DIP Document is a legal, valid and binding obligation, enforceable against the Borrower in accordance with its terms subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally, including the entry of the Financing Orders and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law;

(e)    other than as a result of the Chapter 11 Cases and subject to any necessary orders or authorization of the Bankruptcy Court, the Borrower and the Loan Parties have good and marketable title to, or valid leasehold interests in, all of its material property and assets; none of the properties and assets of the Borrower and its Subsidiaries are subject to any Liens other than Permitted Encumbrances;

(f)    no written statement furnished by or on behalf of the Borrower and its Subsidiaries to the DIP Lenders pursuant to the terms of this Note (other than any projections, the Budget, estimates and information of a general economic nature or general industry nature), when taken as a whole, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not materially misleading in light of all of the circumstances under which they were made;

(g)    upon entry of the Financing Orders, the Liens granted to the DIP Lenders pursuant to the Collateral Documents and the Financing Orders will at all times be fully perfected Liens in and to the Collateral described therein, subject, as to priority, only to Permitted Prior Liens or other Liens permitted to have such priority under the Financing Orders and the Intercreditor Agreement;

(h)      except for proceedings in or related to the Chapter 11 Cases, no action, claim, lawsuit, demand, investigation or proceeding is now pending or, to the knowledge of the Borrower, threatened in writing against the Borrower of its Subsidiaries before any governmental authority or before any arbitrator or panel of arbitrators that challenges the rights or powers of the Borrower or its Subsidiaries to enter into or perform any of its obligations under the DIP Documents to which it is a party, or the validity or enforceability of any DIP Document or any action taken thereunder;

(i)      each Loan Party is in compliance in all material respects with the requirements of all laws and regulations and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances in which (a) such requirement of law or regulation or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (b) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect;

(j)      none of the Loan Parties is an "investment company", "affiliated person", "promoter" of, or "principal underwriter" of or for, an "investment company", as such terms are defined in the Investment Company Act of 1940, as amended;

(k)      no Loan Party, nor, to the knowledge of the Loan Parties, any director, officer, employee, agent, affiliate or representative thereof, is an individual or entity that is, or is owned or controlled by any individual or entity that is, (i) currently the subject or target of any Sanctions or (ii) located, organized or resident in a Designated Jurisdiction;

(l)      since the Petition Date, there has been no event or circumstance that has had or would reasonably be expected to have a Material Adverse Effect; and

(m)      the Borrower and its Subsidiaries have filed all material federal, state and other tax returns and reports required to be filed, and have paid all material federal, state and other taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable other than those not yet delinquent or are being contested in good faith by appropriate proceedings.

20.      Agent.

(a)      Appointment.  Each DIP Lender hereby irrevocably appoints and authorizes the Agent to perform the duties of the Agent as set forth in this Note including:  (i) to receive on behalf of each DIP Lender any payment of principal of or interest on the Term Loans outstanding hereunder and all other amounts accrued hereunder for the account of the DIP Lenders and paid to the Agent, and to distribute promptly to each DIP Lender its Pro Rata Share of all payments so received; (ii) to distribute to each DIP Lender copies of all material notices and agreements received by the Agent; (iii) to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Obligations, the Term Loans, and related matters and to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Collateral and related matters; (iv) to execute or file any and all notices, amendments, renewals, supplements, documents, instruments, proofs of claim, notices and other written agreements with respect to this Note or any other DIP Document; (v) to perform, exercise,

and enforce any and all other rights and remedies of the DIP Lenders with respect to the Borrower, the Obligations, or otherwise related to any of same to the extent reasonably incidental to the exercise by the Agent of the rights and remedies specifically authorized to be exercised by the Agent by the terms of this Note or any other DIP Document; (vi) to incur and pay such fees necessary or appropriate for the performance and fulfillment of its functions and powers pursuant to this Note or any other DIP Document; and (vii) to take such action as the Agent deems appropriate on its behalf to administer the Term Loans and the DIP Documents and to exercise such other powers delegated to the Agent by the terms hereof or the other DIP Documents together with such powers as are reasonably incidental thereto to carry out the purposes hereof and thereof. The Agent may perform any of its duties hereunder or under the other DIP Documents by or through any one or more sub-agents or attorneys-in-fact appointed by the Agent. The Agent and any such sub-agent or attorney-in-fact may perform any and all of its duties and exercise its rights and powers through their respective Related Parties. The exculpatory provisions set forth in this Section 20 shall apply to any such sub-agent or attorney-in-fact and the Related Parties of the Agent, any such sub-agent and any such attorney-in-fact and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Agent.

(b)  Nature of Duties.  The Agent shall have no duties or responsibilities except those expressly set forth in this Note or in the other DIP Documents.

(c)  Rights, Exculpation, Etc.  The Agent and its directors, officers, agents or employees shall not be liable for any action taken or omitted to be taken by them under or in connection with this Note or the other DIP Documents, except for their own gross negligence or willful misconduct as determined by a final nonappealable judgment of a court of competent jurisdiction.

(d)  Reliance.  The Agent shall be entitled to rely upon any written notices, statements, certificates, orders or other documents or any telephone message believed by it in good faith to be genuine and correct and to have been signed, sent or made by the proper Person, and with respect to all matters pertaining to this Note or any of the other DIP Documents and its duties hereunder or thereunder, upon advice of counsel selected by it.

(e)  Indemnification.  To the extent that the Agent is not reimbursed and indemnified by the Borrower, the DIP Lenders will reimburse and indemnify the Agent from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, advances or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against the Agent in any way relating to or arising out of this Note or any of the other DIP Documents or any action taken or omitted by the Agent under this Note or any of the other DIP Documents, in proportion to each DIP Lender's Pro Rata Share.

(f)  Collateral Matters.

(1)  The DIP Lenders hereby irrevocably authorize the Agent, to release any Lien granted to or held by the Agent upon any Collateral upon cancellation of the Note and payment and satisfaction of the Term Loans and all other Obligations which have matured and which the Agent has been notified in writing are then due and payable;

or constituting property Disposed of in the ordinary course of the Borrower's business or otherwise in compliance with or as permitted by the terms of this Note and the other DIP Documents; or if approved, authorized or ratified in writing by the DIP Lenders.

(2)     Without in any manner limiting the Agent's authority to act without any specific or further authorization or consent by the DIP Lenders, each DIP Lender agrees to confirm in writing, upon request by the Agent, the authority to release Collateral conferred upon the Agent under paragraph (f)(1) above.

The Agent shall have no obligation whatsoever to any DIP Lender to assure that the Collateral exists or is owned by the Loan Parties, or is cared for, protected or insured or has been encumbered or that the Lien granted to the Agent pursuant to this Note or any other DIP Document has been properly or sufficiently or lawfully created, perfected, protected or enforced or is entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to the Agent in this section or in any other DIP Document, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Agent may act in any manner it may deem appropriate, in its sole discretion, given the Agent's own interest in the Collateral as one of the DIP Lenders and that the Agent shall have no duty or liability whatsoever to any other DIP Lender, except as otherwise provided herein.

(g)     Successor Agent.

(1)     The Agent may at any time give at least 30 days prior written notice of its resignation to the DIP Lenders and the Borrower. Upon receipt of any such notice of resignation, the Required Lenders shall have the right to appoint a successor Agent which is reasonably acceptable to the Borrower. If no such successor Agent shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation (or such earlier day as shall be agreed by the Required Lenders) (the "Resignation Effective Date"), then the retiring Agent may (but shall not be obligated to), on behalf of the DIP Lenders, appoint a successor Agent. Whether or not a successor Agent has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date.

(2)     With effect from the Resignation Effective Date, (i) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other DIP Documents (except that in the case of any Collateral held by such Agent on behalf of the DIP Lenders under any of the DIP Documents, the retiring Agent shall continue to hold such collateral security until such time as a successor Agent is appointed) and (ii) all payments, communications and determinations provided to be made by, to or through such retiring Agent shall instead be made by or to each DIP Lender directly, until such time, if any, as a successor Agent shall have been appointed as provided for above. Upon the acceptance of a successor's Agent's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other DIP Documents. After the retiring Agent's resignation hereunder and under the other DIP Documents, the provisions of this

Article, Section 9 and Section 21(b) shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by it while the retiring Agent was acting as Agent.

21.   Miscellaneous.

(a)   All notices and other communications provided for hereunder shall be in writing (including facsimile communication) and mailed, emailed or delivered as follows:

| | |
|---|---|
| If to Borrower: | Corsicana Bedding, LLC<br>1420 W. Mockingbird Land, Suite 800<br>Dallas, TX 75247<br>Attn: Eric Rhea<br>Email: erhea@corsicanamattress.com |
| with copies to (which shall not constitute notice): | Haynes Boone<br>301 Commerce Street<br>Suite 2600<br>Fort Worth, TX 76102<br>Attn: Steve Pezanosky and Ian Peck<br>Email:  Stephen.pezanosky@haynesboone.com<br>Ian.peck@haynesboone.com |
| If to Agent or any Lender: | Blue Torch Finance, LLC<br>c/o Blue Torch Capital LP<br>150 East 58th Street, 18th Floor<br>New York, New York 10155<br>Email:  BlueTorchAgency@alterdomus.com |
| with copies to: | SEI- Blue Torch Capital Loan Ops<br>1 Freedom Valley Drive<br>Oaks, Pennsylvania 19456<br>Email:  bluetorch.loanops@seic.com |
| | Schulte Roth & Zabel LLP<br>919 Third Avenue<br>New York, New York 10022<br>Attn:  Adam Harris<br>Email: adam.harris@srz.com |

All such notices and communications shall, when mailed or sent by overnight courier, be effective when deposited in the mails or delivered to the overnight courier, as the case may be, or when sent by email be effective when confirmation is received.

(b)   The Borrower shall reimburse the Agent for all reasonable and documented out-of-pocket expenses incurred in connection with the negotiation and preparation

of the DIP Documents and the obtaining of approval of the DIP Documents by the Bankruptcy Court, including fees, costs and expenses of financial and other advisors (provided, that, with respect to legal fees and expenses, limited to the legal fees and reasonable and documented out-of-pocket costs and expenses of one legal counsel (and one local counsel in each relevant jurisdiction)). Subject to the foregoing, the Borrower shall reimburse the Agent for all reasonable and documented out-of-pocket fees, costs and expenses (provided, that, with respect to legal fees and expenses, limited to the legal fees and reasonable and documented out-of-pocket costs and expenses of one legal counsel (and one local counsel in each relevant jurisdiction)), including fees, costs and expenses of financial and other advisors, in connection with:

(1)     any amendment, modification or waiver of, consent with respect to, or termination or enforcement of, any of the DIP Documents or advice in connection with the administration of the Term Loans made pursuant hereto or its rights hereunder or thereunder;

(2)     the review of pleadings and documents related to the Chapter 11 Cases and any subsequent Chapter 7 case, attendance at meetings related to the Chapter 11 Cases and any subsequent Chapter 7 case, and general monitoring of the Chapter 11 Cases and any subsequent Chapter 7 case;

(3)     any litigation, contest, dispute, suit, proceeding or action (whether instituted by the Agent, the Borrower or any other Person, and whether as a party, witness or otherwise) in any way relating to the Collateral, any of the DIP Documents or any other agreement to be executed or delivered in connection herewith or therewith, including any litigation, contest, dispute, suit, case, proceeding or action, and any appeal or review thereof, in connection with a case commenced by or against Borrower or any other Person that may be obligated to the Agent by virtue of the DIP Documents, including any such litigation, contest, dispute, suit, proceeding or action arising in connection with any work-out or restructuring of the Term Loans during the pendency of one or more Events of Default;

(4)     any attempt to enforce any remedies of the Agent against any or all of the Borrower or any other Person that may be obligated to the Agent by virtue of any of the DIP Documents, including any such attempt to enforce any such remedies in the course of any work-out or restructuring of the Term Loans during the pendency of one or more Events of Default;

(5)     any work-out or restructuring of the Term Loans during the pendency of one or more Events of Default; and

(6)     any efforts to (A) monitor the Term Loans or any of the other Obligations, (B) evaluate, observe or assess any of the Borrower or their respective affairs, (C) verify, protect, evaluate, assess, appraise, collect, sell, liquidate or otherwise Dispose of any of the Collateral and (D) monitor any sales;

all of which shall, subject to the Financing Orders, be payable within 10 Business Days of the

Borrower's receipt of an invoice. Without limiting the generality of the foregoing, such expenses, costs, charges and fees may include: fees, costs and expenses of accountants, appraisers, investment bankers, management and other consultants and paralegals; court costs and expenses; photocopying and duplication expenses; court reporter fees, costs and expenses; long distance telephone charges; air express charges; and expenses for travel, lodging and food paid or incurred in connection with the performance of such legal or other advisory services. All expenses incurred by the Agent shall receive super-priority administrative expense status per Section 364 of the Bankruptcy Code (subject to the Financing Orders).

(c)     No failure or delay on the part of the Agent or any other holder of this Note to exercise any right, power or privilege under this Note and no course of dealing between Borrower and the Agent shall impair such right, power or privilege or operate as a waiver of any default or an acquiescence therein, nor shall any single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies expressly provided in this Note are cumulative to, and not exclusive of, any rights or remedies that the Agent would otherwise have. No notice to or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances or constitute a waiver of the right of the Agent to any other or further action in any circumstances without notice or demand.

(d)     Borrower and any endorser of this Note hereby consent to renewals and extensions of time at or after the maturity hereof without notice, and hereby waive diligence, presentment, protest, demand and notice of every kind and, to the full extent permitted by law, the right to plead any statute of limitations as a defense to any demand hereunder.

(e)     If any provision in or obligation under this Note shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

(f)     **THIS NOTE AND THE RIGHTS AND OBLIGATIONS OF THE BORROWER AND THE AGENT HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK (INCLUDING WITHOUT LIMITATION SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.**

(g)     Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court and, if the Bankruptcy Court does not have (or abstains from) jurisdiction, the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Note or any DIP Document, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court.

(h) **THE BORROWER AND, BY THEIR ACCEPTANCE OF THIS NOTE, THE AGENT, ANY DIP LENDER AND ANY SUBSEQUENT HOLDER OF THIS NOTE, HEREBY IRREVOCABLY AGREE TO WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS NOTE OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS NOTE AND THE AGENT'S/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED**. The scope of this waiver is intended to be all-encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of this transaction, including without limitation contract claims, tort claims, breach of duty claims and all other common law and statutory claims. The Borrower and, by their acceptance of this Note, the Agent, any DIP Lender and any subsequent holder of this Note, each (i) acknowledges that this waiver is a material inducement to enter into a business relationship, that each has already relied on this waiver in entering into this relationship, and that each will continue to rely on this waiver in their related future dealings and (ii) further warrants and represents that each has reviewed this waiver with its legal counsel and that each knowingly and voluntarily waives its jury trial rights following consultation with legal counsel. **THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING) THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS OF THIS NOTE**. In the event of litigation, this provision may be filed as a written consent a trial by the court.

(i) The Borrower shall not have the right to assign their obligations or liabilities under this Note without the prior written consent of the Agent. The DIP Lenders may, with the prior written consent of the Agent and to the extent no Event of Default then exists the Borrower (which consent of the Borrower shall not be required for any assignment to the Agent, a DIP Lender, a Related Fund or an affiliate of the Agent or a DIP Lender or which consent shall not be unreasonably conditioned, withheld or delayed), assign to one or more entitles all or any part of, or may grant participation's to one or more entities in or to all or any part of, the amounts outstanding hereunder, and to the extent of any such assignment or participation (unless otherwise stated therein) the assignee or participant shall have the same rights and benefits hereunder as it would have if it were a DIP Lender hereunder. An assigning DIP Lender shall deliver to the Agent (and notify the Borrower thereof) an assignment agreement in a form approved by the Agent, which shall include a description of the assignment and include customary instructions from the DIP Lender and such assignee with respect to the making of payments and other communications with the DIP Lender and such assignee, together with a processing and recordation fee of $3,500 and all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations.

(j) The Agent shall, acting solely for this purpose as a non-fiduciary agent of Borrower, maintain, or cause to be maintained at one of its offices, a copy of each assignment notice delivered to and accepted by it and a register (the "Register") for the recordation of the names and addresses of the Persons, if any, that take an assignment from it and the principal amount of the Term Loans and stated interest thereon (the "Registered Loans") owing to each DIP Lender from time to time. The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrower and the Agent may treat each Person whose name is recorded in the Register as a DIP Lender hereunder for all purposes of this Note. The

Register shall be available for inspection by Borrower and the DIP Lenders at any reasonable time and from time to time upon reasonable prior written notice.

(k)     Upon receipt by the Agent of an assignment notice, subject to the consent rights in clause (i) above, the Agent shall accept such assignment and record the information contained therein in the Register.

(l)     A Registered Loan may be assigned or sold in whole or in part only by registration of such assignment or sale on the Register. Any assignment or sale of all or part of such Registered Loan may be effected only by registration of such assignment or sale on the Register. Prior to the registration of assignment or sale of any Registered Loan, the Agent shall treat the Person in whose name such Registered Loan is registered as the owner thereof for the purpose of receiving all payments thereon and for all other purposes, notwithstanding notice to the contrary.

(m)     In the event that a DIP Lender sells participations in a Registered Loan, such DIP Lender shall maintain a register for this purpose as a non-fiduciary agent of Borrower on which it enters the name of all participants in the Registered Loans held by it and the principal amount (and stated interest thereon) of the portion of the Registered Loan that is the subject of the participation (the "Participant Register"). A Registered Loan may be participated in whole or in part only by registration of such participation on the Participant Register. Any participation of such Registered Loan may be effected only by the registration of such participation on the Participant Register. The Participant Register shall be available for inspection by the Borrower and the DIP Lenders at any reasonable time and from time to time upon reasonable prior notice.

(n)     No provision of this Note may be amended or waived unless such amendment or waiver is in writing and is signed by the Borrower, the Agent and the Required Lenders.

(o)     This Note may be executed and delivered in any number of counterparts, and by different parties hereto on separate counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute one and the same instrument. Execution of this Note via facsimile or electronic mail shall be effective, and signatures received via facsimile or electronic mail shall be binding upon the parties hereto and shall be effective as originals. The parties hereto irrevocably and unreservedly agree that this Note may be executed by way of electronic signatures and the parties agree that neither this Note, nor any part hereof, shall be challenged or denied any legal effect, validity and/or enforceability solely on the ground that it is in the form of an electronic record.

(p)     This Note, the other DIP Documents, and all Liens created hereby or pursuant to the Collateral Documents or any other DIP Document shall be binding upon the Borrower and each other Loan Party, the estates of the Borrower, and any trustee or successor in interest of the Borrower and each other Loan Party in the Chapter 11 Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code, and shall not be subject to Section 365 of the Bankruptcy Code. This Note and the other DIP Documents and the Financing Orders shall be binding upon, and inure to the benefit of, the successors of the Agent and the DIP Lenders and each of their respective permitted assigns, transferees and endorsees. The Liens created by this

Note, and the other DIP Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of the Chapter 11 Case or any other bankruptcy case of any Loan Party to a case under chapter 7 of the Bankruptcy Code or in the event of dismissal of the Chapter 11 Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Agent file financing statements or otherwise perfect its security interests or Liens under applicable law.

(q)     In the event of any inconsistency between the terms and conditions of this Note and the Financing Orders, the provisions of the Financing Orders shall govern and control.

(r)     THIS WRITTEN PROMISSORY NOTE REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES, AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

\*     \*     \*     \*     \*

IN WITNESS WHEREOF, the Borrower has caused this Note to be executed and delivered by its duly authorized officer as of the day and year and at the place first above written.

CORSICANA BEDDING, LLC, as Debtor and Debtor in Possession

By: _____
    Name:
    Title

Acknowledged and Agreed

BLUE TORCH FINANCE, LLC, as Agent

By: _____
    Name: Kevin Genda
    Title: Authorized Signer

<u>LENDERS:</u>

**BTC HOLDINGS FUND II LLC**

By: Blue Torch Credit Opportunities Fund II LP, its sole member
By: Blue Torch Credit Opportunities GP II LLC, its general partner
By: KPG BTC Management LLC, its sole member

By: _____
Name: Kevin Genda
Title: Authorized Signer

**BTC HOLDINGS SBAF FUND LLC**

By: Blue Torch Credit Opportunities SBAF Fund LP, its sole member
By: Blue Torch Credit Opportunities SBAF GP LLC, its general partner
By: KPG BTC Management LLC, its sole member

By: _____
Name: Kevin Genda
Title: Authorized Signer

**BTC HOLDINGS KRS FUND LLC**

By: Blue Torch Credit Opportunities KRS Fund LP,
its sole member
By: Blue Torch Credit Opportunities KRS GP LLC,
its general partner
By: KPG BTC Management LLC, its sole member


By: _____
Name: Kevin Genda
Title: Authorized Signer

**BTC OFFSHORE HOLDINGS FUND II-B LLC**

By: Blue Torch Offshore Credit Opportunities
Master Fund II LP, its Sole Member
By: Blue Torch Offshore Credit Opportunities GP II
LLC, its General Partner
By: KPG BTC Management LLC, its sole member


By: _____
Name: Kevin Genda
Title: Authorized Signer


**BTC HOLDINGS SC FUND LLC**

By: Blue Torch Credit Opportunities SC Master
Fund LP, its sole member
By: Blue Torch Credit Opportunities SC GP LLC,
its general partner
By: KPG BTC Management LLC, its sole member


By: _____
Name: Kevin Genda
Title: Authorized Signer

**SWISS CAPITAL BTC OL PRIVATE DEBT OFFSHORE SP**
A SEGREGATED PORTFOLIO OF SWISS CAPITAL PRIVATE DEBT (OFFSHORE) FUNDS SPC

By:_____
Name: Kevin Genda
Title: Authorized Signatory of Blue Torch Capital LP in its capacity as investment manager to SWISS CAPITAL BTC OL PRIVATE DEBT OFFSHORE SP

**Swiss Capital BTC OL Private Debt Fund L.P.**

By:_____
Name: Kevin Genda, in his capacity as authorized signatory of Blue Torch Capital LP, as agent and attorney-in-fact for Swiss Capital BTC OL Private Debt Fund L.P.

Protective Advance Holders:

**BLUE TORCH CREDIT OPPORTUNITIES
SBAF FUND LP**

By: Blue Torch Credit Opportunities SBAF GP LLC,
its general partner
By: KPG BTC Management LLC, its sole member


By: _____
Name: Kevin Genda
Title: Authorized Signer

**BLUE TORCH CREDIT OPPORTUNITIES SC
MASTER FUND LP**

By: Blue Torch Credit Opportunities SC GP LLC, its
general partner
By: KPG BTC Management LLC, its sole member


By: _____
Name: Kevin Genda
Title: Authorized Signer

**BLUE TORCH OFFSHORE CREDIT
OPPORTUNITIES MASTER FUND II LP**

By: Blue Torch Offshore Credit Opportunities GP II
LLC, its General Partner
By: KPG BTC Management LLC, its sole member


By: _____
Name: Kevin Genda
Title: Authorized Signer

**BLUE TORCH CREDIT OPPORTUNITIES FUND II LP**

By: Blue Torch Credit Opportunities GP II LLC, its general partner
By: KPG BTC Management LLC, its sole member


By: _____
Name: Kevin Genda
Title: Authorized Signer

**BLUE TORCH CREDIT OPPORTUNITIES KRS FUND LP**

By: Blue Torch Credit Opportunities KRS GP LLC, its general partner
By: KPG BTC Management LLC, its sole member


By: _____
Name: Kevin Genda
Title: Authorized Signer

**SWISS CAPITAL BTC OL PRIVATE DEBT OFFSHORE SP**
A SEGREGATED PORTFOLIO OF SWISS CAPITAL PRIVATE DEBT (OFFSHORE) FUNDS SPC


By:_____
Name: Kevin Genda
Title: Authorized Signatory of Blue Torch Capital LP in its capacity as investment manager to SWISS CAPITAL BTC OL PRIVATE DEBT OFFSHORE SP

**Swiss Capital BTC OL Private Debt Fund L.P.**


By:_____
Name: Kevin Genda, in his capacity as authorized signatory of Blue Torch Capital LP, as agent and attorney-in-fact for Swiss Capital BTC OL Private Debt Fund L.P.


[Signature Page to DIP Note]

<u>Schedule I</u>

Deliver (which delivery may be made by electronic communication (including email)) to the Agent, the monthly reports and quarterly reports and other information required by Section 7.01(a) (commencing with the fiscal quarter ending June 30, 2022) of the Prepetition Term Loan Agreement (and the defined terms used in such sections and defined in the Prepetition Term Loan Agreement shall have the meanings given such terms therein, unless any such term is also defined herein, in which case each such defined term used in such definition shall have the meaning provided herein) (whether or not such agreement remains in effect and without giving effect to any amendments or other modifications thereto made after the Closing Date unless the Agent shall otherwise agree) and each of the financial statements, reports, or other items set forth below at the following times in form reasonably satisfactory to the Agent:

| on July 7, 2022 and every Thursday of each week ending thereafter | (a)     a certificate which shall include such detail as is reasonably satisfactory to the Agent (i) certifying that the Loan Parties are in compliance with the covenants contained in <u>Section 15(j)</u> and (ii) certifying that no Default or Event of Default has occurred or, if such a Default or Event of Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto, and attaching thereto the Approved Budget Variance Report which shall be prepared by the Borrower as of the last day of the most recently ended Variance Testing Period, |
|---|---|
| on July 14, 2022 and every Thursday of each week ending thereafter | (b)     a revised proposed budget (it being understood that upon written approval of such proposed budget by the Agent (and not before such written approval), in its sole discretion, such proposed budget shall become the "<u>Approved Budget</u>" and provided that until such time as such proposed budget becomes the Approved Budget, the prior Approved Budget shall continue to be the Approved Budget) and timing changes with respect to any periods that were included in a previously delivered report and which shall be in form and substance acceptable to the Agent and DIP Lenders, |
| promptly, to the extent reasonably feasible, | (c)     copies of all material pleadings, motions, applications or financial information filed by any Loan Party with the Bankruptcy Court; <u>provided</u> that any such documents that are publicly available shall be deemed to have been delivered, |
| promptly, but in any event within five (5) Business Days after Borrower has knowledge of any event or condition that constitutes a Default, | (d)     notice of such event or condition and a statement of the curative action that Borrower proposes to take with respect thereto, and |

| Promptly following delivery thereof, | (e)    copies of all borrowing base certificates, notices and other information delivered to any Prepetition Secured Parties, and |
|---|---|
| upon the reasonable request of the Agent, | (f)    any other information relating to the business, financial, legal or corporate affairs of the Borrower or its Subsidiaries. |

<u>Schedule II</u>

Commitments

Term Loan Principal Amounts

| Fund | Allocation % | Allocation Amount |
|---|---|---|
| BTC Holdings Fund II LLC | 28.06% | 4,208,340.23 |
| BTC Offshore Holdings Fund II-B LLC | 26.10% | 3,915,723.92 |
| BTC Holdings SC Fund LLC | 10.87% | 1,630,489.99 |
| BTC Holdings SBAF Fund LLC | 14.39% | 2,158,561.64 |
| BTC Holdings KRS Fund LLC | 9.82% | 1,472,900.88 |
| Swiss Capital BTC OL Private Debt Fund L.P. | 6.62% | 993,220.52 |
| Swiss Capital BTC OL Private Debt Offshore SP | 4.14% | 620,762.82 |
| | | 15,000,000.00 |

Protective Advance Amounts

| Fund | Allocation % | Allocation Amount |
|---|---|---|
| Blue Torch Credit Opportunities Fund II, LP | 28.06% | 841,668.05 |
| Blue Torch Offshore Credit Opportunities Master Fund II, LP | 26.10% | 783,144.78 |
| Blue Torch Credit Opportunities SC Master Fund LP | 10.87% | 326,098.00 |
| Blue Torch Credit Opportunities SBAF Fund LP | 14.39% | 431,712.33 |
| Blue Torch Credit Opportunities KRS Master Fund LP | 9.82% | 294,580.18 |
| Swiss Capital BTC OL Private Debt Fund L.P. | 6.62% | 198,644.10 |
| Swiss Capital BTC OL Private Debt Offshore SP | 4.14% | 124,152.56 |
| | | 3,000,000.00 |

<u>EXHIBIT A</u>

(Budget)

**<u>EXHIBIT C</u>**
**(Approved Budget)**

**DIP Budget**                                                                                                                                                       *Unaudited*

## Consolidated 13 Week Cash Flow

| | EST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Values in $000s | Wk 0 | Wk 1 | Wk 2 | Wk 3 | Wk 4 | Wk 5 | Wk 6 | Wk 7 | Wk 8 | Wk 9 | Wk 10 | Wk 11 | Wk 12 | Wk 13 | FINAL | Total |
| Week Ending | 6/25/22 | 7/2/22 | 7/9/22 | 7/16/22 | 7/23/22 | 7/30/22 | 8/6/22 | 8/13/22 | 8/20/22 | 8/27/22 | 9/3/22 | 9/10/22 | 9/17/22 | 9/24/22 | FINAL | Total |
| Total Gross Sales | | 5,384 | 4,526 | 4,776 | 4,917 | 4,888 | 5,075 | 5,381 | 5,416 | 5,098 | 5,583 | 5,311 | | | | 56,355 |
| Total Net Sales | | 4,999 | 4,232 | 4,491 | 4,619 | 4,590 | 4,771 | 5,046 | 5,074 | 4,758 | 5,228 | 4,988 | | | | 52,796 |
| **Total Cash Receipts** | | **3,342** | **3,261** | **3,257** | **3,093** | **4,452** | **4,682** | **4,745** | **4,578** | **4,659** | **4,989** | **4,998** | | | | **46,056** |
| **Operating Disbursements** | | | | | | | | | | | | | | | | |
| Materials Purchase | | (3,909) | (2,857) | (2,902) | (2,866) | (2,587) | (2,524) | (3,005) | (2,778) | (2,736) | (2,630) | (2,666) | - | - | - | (31,461) |
| Payroll & Benefits | | (1,194) | (1,341) | (621) | (1,160) | (1,101) | (1,116) | (661) | (1,185) | (696) | (1,630) | (737) | - | - | - | (11,443) |
| Freight | | (877) | (669) | (848) | (780) | (812) | (568) | (493) | (527) | (529) | (536) | (687) | - | - | - | (7,325) |
| Insurance | | (301) | - | (63) | (146) | - | (155) | (63) | - | - | (11) | - | - | - | - | (739) |
| Rents & Utilities | | (587) | (45) | (45) | (205) | (156) | (543) | (45) | (45) | (45) | (543) | (45) | - | - | - | (2,304) |
| Other | | (379) | (405) | (304) | (304) | (779) | (499) | (329) | (329) | (329) | (499) | (329) | - | - | - | (4,488) |
| **Total Operating Disbursements** | | **(7,248)** | **(5,316)** | **(4,783)** | **(5,461)** | **(5,436)** | **(5,405)** | **(4,597)** | **(4,864)** | **(4,335)** | **(5,850)** | **(4,465)** | **-** | **-** | **-** | **(57,760)** |
| **Oper. CF Before Debt Svc & Pro Fees** | | **(3,906)** | **(2,056)** | **(1,527)** | **(2,368)** | **(983)** | **(723)** | **149** | **(286)** | **324** | **(861)** | **534** | **-** | **-** | **-** | **(11,704)** |
| **Debt Service, Mgt Fees and Pro Fees** | | | | | | | | | | | | | | | | |
| Debt Service / WS Interest | | (225) | - | - | - | - | (160) | - | - | - | (195) | (65) | - | - | - | (644) |
| DIP Origination / Interest | | - | - | - | - | - | (186) | - | - | - | (135) | (45) | - | - | - | (366) |
| UCC | | (27) | (27) | (27) | (27) | (27) | (27) | (27) | (27) | (27) | (27) | (27) | - | - | - | (300) |
| KEIP | | - | - | - | - | - | - | - | - | - | - | (360) | - | - | - | (360) |
| Lender Professionals | | (600) | (234) | - | - | - | - | (517) | - | - | - | (467) | - | - | - | (1,818) |
| Debtor Professionals | | (303) | (303) | (403) | (303) | (253) | (253) | (353) | (253) | (228) | (228) | (1,078) | - | - | - | (3,958) |
| Claims Agent | | (52) | (42) | (20) | (20) | (20) | (20) | (20) | (20) | (20) | (20) | (20) | - | - | - | (274) |
| UST Fees | | - | - | - | - | (100) | - | - | - | - | - | (503) | - | - | - | (603) |
| **Debt Svc, Mgt Fees and Pro Fees** | | **(1,207)** | **(606)** | **(450)** | **(350)** | **(400)** | **(646)** | **(917)** | **(300)** | **(275)** | **(605)** | **(2,565)** | **-** | **-** | **-** | **(8,323)** |
| **Net Cash Flow After Debt Svc & Other** | | **(5,113)** | **(2,662)** | **(1,977)** | **(2,719)** | **(1,384)** | **(1,370)** | **(769)** | **(586)** | **49** | **(1,466)** | **(2,031)** | **-** | **-** | **-** | **(20,027)** |
| **Outside Capital Contributions** | | | | | | | | | | | | | | | | |
| Capital Contributions | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Disbursements** | | **(8,455)** | **(5,922)** | **(5,233)** | **(5,811)** | **(5,836)** | **(6,052)** | **(5,514)** | **(5,165)** | **(4,610)** | **(6,455)** | **(7,029)** | **-** | **-** | **-** | **(66,083)** |
| **Net Cash Flow** | | **(5,113)** | **(2,662)** | **(1,977)** | **(2,719)** | **(1,384)** | **(1,370)** | **(769)** | **(586)** | **49** | **(1,466)** | **(2,031)** | **-** | **-** | **-** | **(20,027)** |
| *Cumulative NCF* | | *(5,113)* | *(7,774)* | *(9,751)* | *(12,470)* | *(13,853)* | *(15,223)* | *(15,992)* | *(16,578)* | *(16,530)* | *(17,996)* | *(20,027)* | *(20,027)* | *(20,027)* | *(20,027)* | |
| **Beginning Book Cash** | 549 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 448 |
| Net Cash Flow | (841) | (5,113) | (2,662) | (1,977) | (2,719) | (1,384) | (1,370) | (769) | (586) | 49 | (1,466) | (2,031) | - | - | - | (20,027) |
| Revolver Paydown Sweeps | (3,903) | (3,342) | (3,261) | (3,257) | (3,093) | (4,452) | (4,682) | (4,745) | (4,578) | (4,659) | (4,989) | (4,998) | | | | (46,056) |
| Revolver Draws | 4,594 | 8,451 | 4,949 | 4,402 | 4,472 | 4,625 | 4,812 | 5,018 | 5,010 | 4,606 | 5,324 | 4,991 | | | | 56,660 |
| BT DIP Draws | - | - | 973 | 831 | 1,339 | 1,211 | 1,239 | 496 | 155 | 4 | 1,131 | 2,039 | | | | 9,418 |
| Bank Variance Adjustment | 0 | 0 | - | - | 0 | 0 | (0) | (0) | - | 0 | - | - | (0) | 0 | (0) | 0 |
| **Ending Book Cash** | 400 | 396 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 444 |

**Corsicana Bedding, LLC and Subsidiaries**   Case Number 22-_____

**DIP Budget**   *Unaudited*

### Consolidated 13 Week Cash Flow

| | EST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST | FCST |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Values in $000s | Wk 0 | Wk 1 | Wk 2 | Wk 3 | Wk 4 | Wk 5 | Wk 6 | Wk 7 | Wk 8 | Wk 9 | Wk 10 | Wk 11 | Wk 12 | Wk 13 | FINAL | Total |
| Week Ending | 6/25/22 | 7/2/22 | 7/9/22 | 7/16/22 | 7/23/22 | 7/30/22 | 8/6/22 | 8/13/22 | 8/20/22 | 8/27/22 | 9/3/22 | 9/10/22 | 9/17/22 | 9/24/22 | FINAL | |
| **Wingspire Pre-Petition Loan Balances** | | | | | | | | | | | | | | | | |
| Beginning Loan Balance | 17,500 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 17,500 |
| Less: Revolver Paydown | (17,500) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (17,500) |
| Plus: Revolver Draws | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Ending Loan Balance** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** |
| **Wingspire Post-Petition DIP Loan Balances** | | | | | | | | | | | | | | | | |
| Beginning Loan Balance | | 17,500 | 22,608 | 24,297 | 25,443 | 26,822 | 26,995 | 27,125 | 27,398 | 27,829 | 27,777 | 28,112 | 28,104 | 28,104 | 28,104 | 17,500 |
| Less: Revolver Paydown | | (3,342) | (3,261) | (3,257) | (3,093) | (4,452) | (4,682) | (4,745) | (4,578) | (4,659) | (4,989) | (4,998) | - | - | - | (46,056) |
| Plus: Revolver Draws | 17,500 | 8,451 | 4,949 | 4,402 | 4,472 | 4,625 | 4,812 | 5,018 | 5,010 | 4,606 | 5,324 | 4,991 | - | - | - | 56,660 |
| **Ending Loan Balance** | **17,500** | **22,608** | **24,297** | **25,443** | **26,822** | **26,995** | **27,125** | **27,398** | **27,829** | **27,777** | **28,112** | **28,104** | **28,104** | **28,104** | **28,104** | **28,104** |
| **BT Protective Advance Loan Balance** | | | | | | | | | | | | | | | | |
| Beginning Loan Balance | 3,000 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 3,000 |
| Plus: Draws | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Less: Paydowns | (3,000) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (3,000) |
| **Ending Loan Balance** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** |
| **BT DIP Loan Balance** | | | | | | | | | | | | | | | | |
| Beginning Loan Balance | | 3,000 | 3,000 | 3,973 | 4,804 | 6,143 | 7,354 | 8,594 | 9,090 | 9,245 | 9,249 | 10,379 | 12,418 | 12,418 | 12,418 | 3,000 |
| Plus: Draws | 3,000 | - | 973 | 831 | 1,339 | 1,211 | 1,239 | 496 | 155 | 4 | 1,131 | 2,039 | - | - | - | 9,418 |
| Less: Paydowns | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Ending Loan Balance** | **3,000** | **3,000** | **3,973** | **4,804** | **6,143** | **7,354** | **8,594** | **9,090** | **9,245** | **9,249** | **10,379** | **12,418** | **12,418** | **12,418** | **12,418** | **12,418** |

**Global Notes:**

1) All items after week 11 remain subject further review, analysis, and ongoing discussion with the proposed stalking horse bidder.

2) Ending balances as of 6/25/22 are preliminary estimate subject to final cash reconciliation.

## **EXHIBIT D**
### **(Milestones)**

(i)  No later than 3 Business Days after the Petition Date, the Interim Order approving the DIP Facilities and the adequate protection of the Prepetition Liens shall be entered by the Bankruptcy Court;

(ii) No later than 3 Business Days following the Petition Date, the Debtors shall file the Sale Motion, which motion shall be in form and substance reasonably acceptable to the DIP Agents;

(iii) No later than 35 days after the Petition Date, the Final Order approving the DIP Facilities and the adequate protection of the Prepetition Liens shall be entered by the Bankruptcy Court;

(iv)  No later than 35 days after the Petition Date the Bankruptcy Court shall have entered an order approving bid and auction procedures, in form and substance reasonably acceptable to the DIP Secured Parties;

(v)  If the asset purchase agreement provided by the stalking horse bidder in connection with the Sale Motion does not provide for the payment in full in cash of the DIP Revolver Facility (and the Prepetition ABL Facility to the extent any amounts remain due and owing thereunder), then no later than the later of 50 days after the Petition Date or 3 Business Days prior to the deadline for objecting to the approval of the sale of all or substantially all of the Debtors' assets, the stalking horse bidder shall have provided a commitment letter for replacement/refinancing of the DIP Revolver Facility (and the Prepetition ABL Facility to the extent any amounts remain due and owing thereunder), in form and substance reasonably acceptable to the DIP Revolver Administrative Agent and DIP Revolver Lenders.  For the avoidance of doubt, Wingspire may provide such commitment letter;

(vi) No later than 60 days after the Petition Date the Bankruptcy Court shall have entered one or more orders authorizing and approving the sale of all or substantially all of the Debtors' assets pursuant to one or a series of related or unrelated transactions, and such order(s) shall be in a form and substance reasonably acceptable to the DIP Secured Parties; and

(vii)  No later than 75 days after the Petition Date the approved sale(s) of all or substantially all of the Debtors' assets shall have been consummated.

## EXHIBIT E

## Lien and Superpriority Claim Priority

| Order of Priority | Prepetition ABL Priority Collateral (whether in existence on the Petition Date or thereafter arising) | Prepetition Term Priority Collateral (whether in existence on the Petition Date or thereafter arising) | Non-Lender Encumbered Assets | Unencumbered Assets | Superpriority Claims |
|---|---|---|---|---|---|
| 1st | Carve Out and Permitted Liens | Carve Out and Permitted Liens | Non-Lender Existing Liens | Carve Out | Carve Out and Permitted Liens |
| 2nd | Revolver DIP Liens | DIP Term Loan Liens | Carve Out | Revolver DIP Liens and DIP Term Loan Liens | Revolver Superpriority Claim and DIP Term Loan Superpriority Claim |
| 3rd | Prepetition ABL Liens | Prepetition Term Loan Liens | Revolver DIP Liens and DIP Term Loan Liens | Prepetition ABL Adequate Protection Liens and Prepetition Term Loan Adequate Protection Liens | Prepetition ABL Adequate Protection Claims and Prepetition Term Loan Adequate Protection Claims |
| 4th | Prepetition ABL Adequate Protection Liens | Prepetition Term Loan Adequate Protection Liens | Prepetition ABL Adequate Protection Liens and Prepetition Term Loan Adequate Protection Liens | | |
| 5th | DIP Term Loan Liens | Revolver DIP Liens | | | |
| 6th | Prepetition Term Loan Liens | Prepetition ABL Liens | | | |
| 7th | Prepetition Term Loan Adequate Protection Liens | Prepetition ABL Adequate Protection Liens | | | |