Stephen M. Pezanosky
State Bar No. 15881850
Ian T. Peck
State Bar No. 24013306
David L. Staab
State Bar No. 24093194
HAYNES AND BOONE, LLP
301 Commerce Street, Suite 2600
Fort Worth, TX 76102
Telephone:  817.347.6600
Facsimile:  817.347.6650
Email: stephen.pezanosky@haynesboone.com
Email: ian.peck@haynesboone.com
Email: david.staab@haynesboone.com

**PROPOSED ATTORNEYS FOR DEBTORS**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Corsicana Bedding, LLC, *et al.*,[1] | § | Case No. 22-90016-elm11 |
| | § | |
| Debtors. | § | Joint Administration Requested |

## DECLARATION OF MICHAEL JUNIPER IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

Pursuant to 28 U.S.C. § 1746, I, Michael Juniper, hereby submit this declaration (this

"Declaration") under penalty of perjury:

1.      On June 25, 2022 (the "Petition Date"), Corsicana Bedding, LLC and each of its

direct and indirect subsidiaries (collectively, the "Debtors," "Corsicana," or the "Company") each

filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Corsicana Bedding, LLC (3019); Thetford Leasing LLC (7227) ("Thetford"); Olive Branch Building, LLC (7227) ("Olive Branch"); Eastern Sleep Products Company (1185) ("Eastern Sleep"); Englander-Symbol Mattress of Mississippi, LLC (5490) ("Englander Symbol"); Hylton House Furniture, Inc. (5992) ("Hylton House"); Luuf, LLC (3450) ("Luuf"); Symbol Mattress of Florida, Inc. (4172) ("Symbol Florida"); Symbol Mattress of Pennsylvania, Inc. (3160) ("Symbol Pennsylvania"); Symbol Mattress of Wisconsin, Inc. (0871) ("Symbol Wisconsin"); Symbol Mattress Transportation, Inc. (1185) ("Symbol Transportation"); and Master Craft Sleep Products, Inc. (4961) ("Master Craft").  The location of the Debtors' service address is P.O. Box 3233, Fort Worth, TX 76113.

"Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division. The Debtors are operating their businesses as debtors-in-possession under sections 1107(a) and 1108 of the Bankruptcy Code.

2.      I submit this Declaration to provide an overview of the Debtors' business and operations and these chapter 11 cases (the "Chapter 11 Cases"), as well as in support of the Debtors' bankruptcy petitions and their request to obtain certain other "first day" relief (the "First Day Pleadings") in the pleadings filed concurrently therewith.

3.      I am the Chief Restructuring Officer ("CRO") of the Debtors. I am also a Partner with CR3 Partners, LLC ("CR3").

4.      I have more than 20 years of experience in financial and operational analysis and improvement, turnaround and restructuring consulting, and interim management and have advised companies across a diverse range of industries. I have assisted clients both in and outside of Chapter 11, and have acted as financial advisor to companies, lenders, and unsecured creditors' committees. More specifically, I have served as a CRO for both private and public companies, including companies that have filed chapter 11 bankruptcy. I attended Washington University in St. Louis, where I earned an MBA. I also attended University of Arkansas at Little Rock, where I earned a BBA in finance. I am a Certified Turnaround Professional by the Turnaround Management Association ("TMA"). I was previously the president of the Dallas/Fort Worth TMA, and I am currently on the Board of the Dallas/Fort Worth TMA. Prior to joining CR3, I served in finance functions for private manufacturing and distribution companies.

5.      I am familiar with the contents of each First Day Pleading and believe that the relief sought in each First Day Pleading is necessary to enable the Debtors to operate in Chapter 11 with minimal disruption. I further believe that the relief sought in each First Day Pleading constitutes a

critical element in achieving a successful reorganization of the Debtors, and best serves the Debtors' estate and creditors' interests.

6.      I was appointed CRO in June 2022. As part of my duties as the CRO, I have been advising and assisting with the Debtors' accounting, operations, reporting, budgets, forecasts, cash flows, and, more recently, overseeing overall turnaround and sale efforts. I am therefore familiar with the Debtors' businesses, financial affairs, books and records, as well as the facts and circumstances surrounding the Debtors' chapter 11 filing and restructuring strategy.

7.      Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge of Corsicana's business, my review of relevant documents, information provided to me or verified by other executives of the Debtors, Corsicana's professional advisors, including Haynes and Boone, LLP ("Haynes and Boone"), and upon my experience in the manufacturing industry generally. Unless otherwise indicated, the financial information contained in this Declaration is unaudited and subject to change. I was involved with the preparation of the petitions and First Day Pleadings. I am authorized to submit this Declaration on behalf of Corsicana in my capacity as the Debtors' CRO. If called upon to testify, I could and would testify to the facts set forth herein.

8.      This Declaration is organized into five sections. Part I provides a general background of the Debtors' business, operations; Part II describes the Debtors' capital structure; Part III describes the circumstances giving rise to the commencement of these Chapter 11 cases; Part IV describes the Debtors' proposed course for these Chapter 11 Cases; and Part V sets forth certain facts in support of the First Day Pleadings.

## PRELIMINARY STATEMENT

9.      Corsicana is a U.S. based manufacturer of mattresses and foundations that offers a

full range of products featuring the latest in sleep technology. The Debtors are one of the nation's largest mattress producers, serving a diverse base of more than 2,400 customers.

10.     The Debtors currently burdened with over $145 million of funded debt. This capital structure is unsustainable in light of Corsicana's decline in operating performance. The decline was caused by a combination of factors, including industry-wide challenges, underperforming strategic initiatives, and unsatisfactory business performance.

11.     Corsicana's has undertaken arduous efforts to improve sales and profits. For example, Corsicana recently revamped its product offerings (SKUs) to reduce costs and meet current customer demands. Corsicana has and is continuing to reduce product costs by further simplification of SKUs and more economical raw materials. Corsicana recently developed a new product lineup for a key customer. Corsicana has reduced overhead expenses, is in the process of closing and exiting a facility in Indiana and just announced another facility closure in Virginia. Despite these efforts, Corsicana's financial performance continued to decline, and the Company was left with outsized operating costs and a liquidity shortage.

12.     In sum, the overleveraged capital structure combined with general industry volume decline have made it increasingly difficult to both invest in necessary capital expenditures and marketing in order to grow the business while also servicing the current debt load and maintaining the necessary working capital to operate the business unencumbered.

13.     As a result, in early 2022, the Debtors hired restructuring advisors to help evaluate their strategic options. Ultimately, the Company determined to commence a sale process, seeking a buyer that could provide the necessary capital to the business to effectuate management's turnaround strategies.

14.     After extensive negotiations, Blue Torch Finance LLC ("Blue Torch"), the

administrative and collateral agent on behalf of the Debtors' lenders under term loan facilities agreed to provide debtor in possession financing and to serve as a stalking horse bidder in a section 363 sale of substantially all of the Company's assets.

15.    Considering these circumstances, the Debtors, in consultation with their advisors, elected to commence these chapter 11 cases to effectuate a transaction with Blue Torch, or such other party that may emerge through the section 363 sale process. In furtherance of the proposed sale, Blue Torch agreed to (i) provide post-petition debtor in possession financing and authorize the Debtors to use cash collateral subject to their pre-petition security interest, and (ii) to serve as a stalking horse bidder in connection with the marketing and sale of substantially all of the Debtors' assets.   This proposed transaction, including the financing package, sends a clear message to vendors, customers, and all stakeholders that the Debtors have the resources to maintain operations while pursuing a value-maximizing sale of their business.

16.    By streamlining operations, reducing their operational costs and lease footprint, and deleveraging their balance sheets, the Debtors aim to maximize the value of their enterprise as a going concern. With right-sized operations, a healthy balance sheet, and a well-capitalized business, the Debtors will be more marketable and better positioned to complete a swift, value-maximizing sale process.

## I.    CORSICANA'S BUSINESS

17.    Founded in 1971, Corsicana is a privately owned limited liability company formed under the laws of the State of Virginia and is one of the mattress industry's largest manufacturers. The Company offers a full range of promotional and step-up products that feature the latest in sleep technology, including innerspring, memory foam and hybrid models. The Company also has mattress-in-a-box programs that simplify delivery. The Company is headquartered in Texas and

operates manufacturing facilities located in Texas, Arizona, Connecticut, Florida, North Carolina, Tennessee, Washington, and Wisconsin. Corsicana owns, directly or indirectly, each of the Debtor-affiliates.

18.     In 2021, Corsicana acquired Richmond, Virginia-based Symbol Mattress, creating the nation's largest manufacturing organization serving consumers looking to purchase mattresses for under $3,000.

19.     Corsicana leverages its national manufacturing presence to provide industry-leading quality, value, delivery, and customer service. The Company has sold millions of mattresses since its founding 50 years ago.

20.     The Company historically focused on the promotional end of the market, defined as mattresses sold at a price point under $1,000, but has recently expanded its product offering to include a wide range of high quality, branded and private label mattresses across the cost spectrum.

21.     The Company sells products under the Sleep Inc, American Bedding, Renue, Early Bird, and Nightsbridge brands in addition to its private label offering. Corsicana sells through 13 sales channels including specialty bedding stores, furniture retailers, rent to own stores, department stores, wholesale distributors, other consumer goods retailers and various e-Commerce platforms

## II.     CAPITAL STRUCTURE

22.     As of May 30, 2022, Corsicana's unaudited balance sheets reflected total assets of approximately $151 million and total liabilities of approximately $260 million. The Debtors' principal assets consist of accounts receivable, inventory, equipment, and fixed assets, including information technology assets and leasehold improvements.

23.     Corsicana's prepetition debt structure primarily consists of: (i) the Prepetition Term Loans, and (ii) the Prepetition ABL Debt. The Debtors also have outstanding obligations under

various lease agreements and owe certain amounts to vendors and other general unsecured creditors.

## A. ABL Facility

24. Corsicana Bedding, LLC and certain of its affiliates designated therein, as borrowers, Corsicana Parent Co., LLC, designated as "Holdings" thereunder, certain other parties (including, without limitation, Holdings) designated as "Guarantors" thereto (such parties, collectively, the "Prepetition ABL Obligors"), the financial institutions from time to time party thereto (collectively, the "Prepetition ABL Lenders"), and Wingspire, as administrative agent (in such capacity, the "Prepetition ABL Agent"), are parties to that certain Credit Agreement, dated as of April 28, 2021 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Prepetition ABL Credit Agreement" and, together with all other agreements, documents, and instruments executed and/or delivered with, to or in favor of the Prepetition ABL Agent and the Prepetition ABL Lenders, including, without limitation, all security agreements, deposit account control agreements (including, without limitation, the Control Agreements (as defined below)), control agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements, documents, and instruments, including any fee letters, executed and/or delivered in connection therewith or related thereto, the "Prepetition ABL Loan Documents"). The Prepetition ABL Credit Agreement provided the Prepetition ABL Obligors with an asset-based revolving credit facility (the "Prepetition ABL Facility") with $40 million of maximum aggregate availability to the borrowers thereunder, subject to a borrowing base (as reduced by reserves), as set forth in the Prepetition ABL Credit Agreement.

25. As of the Petition Date, approximately $18,545,929.18 in principal was outstanding under the Prepetition ABL Facility in the form of "Loans" (as defined under the Prepetition ABL

Credit Agreement), plus interest accrued and accruing at the rates set forth in the Prepetition ABL

Credit Agreement (together with any other amounts outstanding under the Prepetition ABL Loan

Documents, including, without limitation, obligations in respect of fees, expenses, and indemnity

the "Prepetition ABL Obligations").[2] The Prepetition ABL Agent and the Prepetition ABL

Lenders are referred to collectively herein as the "Prepetition ABL Secured Parties."

26.     As more specifically described in the various loan documents entered into in

connection with the Prepetition ABL Facility, the Prepetition ABL Facility is secured by (a) first

priority security interests in and liens (subject only to certain of the liens permitted under the

Prepetition ABL Loan Documents) on certain of the Debtors' property, including (i) all Accounts[3]

(other than Accounts which constitute identifiable proceeds of Term Priority Collateral), (ii) all

cash, money and cash equivalents (other than, in each instances, as set forth in the Prepetition

Intercreditor Agreement), (iii) all Deposit Accounts, Securities Accounts and Commodity

Accounts (other than, in each instance as set forth in the Prepetition Intercreditor Agreement), (iv)

all Inventory, (v) to the extent evidencing or governing any of the items referred to in clauses (i)

through (iv) above, all Documents, General Intangibles, Instruments, Chattel Paper, Commercial

Tort Claims, Investment Property and Letter-of-Credit Rights (other than, in each instance as set

forth in the Prepetition Intercreditor Agreement), (vi) ABL Intercompany Debt, certain payments

---

[2] The defined term "Obligations" in the Prepetition ABL Credit Agreement means "the due and punctual payment and performance of all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party [i.e., the Prepetition ABL Obligors] under or pursuant to each of the [Prepetition ABL] Loan Documents or otherwise with respect to any Loan [as defined under the Prepetition ABL Credit Agreement], including, without limitation all principal, interest, fees and other amounts payable under the [Prepetition ABL] Loan Documents, and all costs and expenses incurred in connection with enforcement and collection of the foregoing, including the fees, charges and disbursements of counsel, in each case whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising, and including interest, expenses and fees that accrue after the commencement by or against any Loan Party or any [affiliate] thereof of any proceeding under any [applicable bankruptcy and insolvency laws] naming such [person] as the debtor in such proceeding, regardless of whether such interest, expenses and fees are allowed in such proceeding."

[3] Capitalized terms used but not defined in this paragraph shall have the meanings ascribed to them in the Interim Order.

constituting certain proceeds of ABL Priority Collateral and the ABL Secured Parties' Business Interruption Insurance Percentage, (vii) all supporting obligations with respect to the ABL Priority Collateral (other than as set forth in the Prepetition Intercreditor Agreement), (viii) all books and records constituting ABL Priority Collateral, (ix) all collateral security and guarantees with respect to any of the items referred to in the preceding clauses (i) through (viii), and (x) all proceeds of any of the items referred to in the preceding clauses (i) through (ix) (such property, whether now existing or hereafter arising or acquired, in clauses (i) through (ix), collectively, the "Prepetition ABL Priority Collateral"); and (b) second priority security interests in and liens on certain of the Debtors' property, including (i) all Property of the Borrowers and Guarantors, whenever arising and wherever located, on which a Lien is granted as security for any Term Obligations and that does not constitute Prepetition ABL Priority Collateral, and (ii) goodwill (such property, whether now existing or hereafter arising or acquired, in clauses (i) and (ii) collectively, the "Prepetition Term Priority Collateral" and, together with the Prepetition ABL Priority Collateral, the "Prepetition Collateral" and, such liens and security interests in clauses (a) and (b), the "Prepetition ABL Liens") provided further, that the Prepetition Collateral does not include, and the Prepetition ABL Obligations are not secured by, any Excluded Assets (as defined in the Prepetition Documents (as defined below)).

**B.      Term Obligations**

27.     Corsicana Bedding, as borrower, and certain of its affiliates designated therein as "Guarantors" (such parties, collectively, the "Prepetition Term Loan Obligors" and, together with the Prepetition ABL Obligors, the "Prepetition Obligors"),[4] each "Lender" from time to time party thereto (collectively, the "Prepetition Term Loan Lenders" and, together with the Prepetition ABL

---

[4] The Prepetition Obligors include certain non-debtor affiliates.

Lenders, the "Prepetition Lenders"), and Blue Torch, as administrative agent and collateral agent (in such capacities, the "Prepetition Term Loan Agent" and, together with the Prepetition ABL Agent, the "Prepetition Agents", and, the Prepetition Term Loan Agent together with the Prepetition Term Loan Lenders, the "Prepetition Term Loan Secured Parties" and, together with the Prepetition ABL Secured Parties, the "Prepetition Secured Parties"), are parties to that certain Financing Agreement, dated as of April 28, 2021 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Prepetition Term Loan Agreement" and, together with all other agreements, documents, and instruments executed and/or delivered with, to or in favor of the Prepetition Term Loan Secured Parties, including, without limitation, all security agreements, deposit account control agreements (including, without limitation, the Control Agreements (as defined in the Interim order)), control agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements, documents, and instruments, including any fee letters, executed and/or delivered in connection therewith or related thereto, the "Prepetition Term Loan Documents" and, together with the Prepetition ABL Loan Documents, the "Prepetition Documents"). Pursuant to the Prepetition Term Loan Agreement, the Prepetition Term Loan Lenders made term loans in the aggregate principal amount of $128,500,000, exclusive of the Protective Advance (the "Prepetition Term Loans").

28. As of the Petition Date, approximately **$129,407,386.16** of indebtedness under the Prepetition Term Loan Agreement was outstanding, which amount includes the Applicable Premium (as such term is defined in the Prepetition Term Loan Agreement) in the amount of $2,512,717.34, capitalized interest in the amount of $161,419.83, and accrued and unpaid interest through the Petition Date in the amount of $1,097,382.22 (and, together with any other amounts outstanding under the Prepetition Term Loan Documents, including interest, fees, and expenses,

the "Prepetition Term Loan Obligations" and, together with the Prepetition ABL Obligations, the "Prepetition Obligations").

29. As more specifically described in the various loan documents entered into in connection with the Prepetition Term Loan Obligations, the Prepetition Term Loans are secured by (a) first priority security interests in and liens (subject only to certain of the liens permitted under the Prepetition Senior Note Documents) on the Prepetition Term Priority Collateral; and (b) second priority security interests in and liens on the Prepetition ABL Priority Collateral (such liens and security interests in clauses (a) and (b), the "Prepetition Term Loan Liens" and, together with the Prepetition ABL Liens, the "Prepetition Liens"); *provided, that* the Prepetition Term Obligations are not secured by any Excluded Assets (as defined in the Prepetition Term Loan Documents).

**C. Intercreditor Agreement**

30. Wingspire, in its capacity as Prepetition ABL Agent, and Blue Torch, in its capacity as Prepetition Term Loan Agent, *inter alia*, are parties to that certain Intercreditor Agreement, dated as of April 28, 2021 (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Intercreditor Agreement"). As more specifically set forth and defined in the Prepetition Intercreditor Agreement, (i) the Prepetition ABL Liens have (a) first priority with respect to the ABL Priority Collateral, which includes all Accounts, cash, money, and cash equivalents, and Inventory, among others and (b) second priority with respect to Term Priority Collateral, and (ii) the Prepetition Term Loan Liens have (a) first priority with respect to Term Priority Collateral, which includes the Equity Interests, Equipment, Real Estate, Fixtures, and Intellectual Property, among others and (b) second priority with respect to the ABL Priority Collateral.

31.    To secure the Prepetition Obligations, the Debtors entered into certain guaranty and collateral agreements and certain other security documents governing the Prepetition Secured Parties' respective security interests in the Prepetition Collateral (such agreements, as amended, restated, amended and restated, supplemented or otherwise modified from time to time, and together with any ancillary collateral documents, including, without limitation, any related mortgages and deeds of trust, the "Prepetition Collateral Documents").  Pursuant to the Prepetition Collateral Documents, and on the terms set forth therein and subject to the Prepetition Intercreditor Agreement, the Debtors granted to the Prepetition Secured Parties the Prepetition Liens on the Prepetition Collateral.

## D.    Lease Obligations

32.    Corsicana is a party to various lease agreements in connection with certain equipment, buildings, office equipment, and real property. As of the Petition Date, the Debtors have 19 leased locations, which are located in Texas, Arizona, Connecticut, Florida, North Carolina, Tennessee, Washington, and Wisconsin.

## H.    General Unsecured Creditors

33.    In addition to the Debtors' outstanding obligations under the Prepetition ABL Facility, Prepetition Term Loans, and the Lease Obligations, the Debtors also have unsecured debt obligations, including, *inter alia*, amounts owed to trade vendors. As of the Petition Date, the Debtors estimate that the total amount owed to general unsecured creditors is approximately $45,000,000.

## III. EVENTS LEADINGS TO BANKRUPTCY AND PREPETITION RESTRUCTURING INITIATIVES

### A. Events Leading to Bankruptcy

34. The Debtors' financial performance has been negatively by an ongoing slump in the mattress industry, reduced consumer spending, and increased production costs.

35. The Debtors have also faced internal obstacles and company-specific business challenges. Internal logistics obstacles and the Debtors' overall capital structure have resulted in decreased productivity and revenues. The Debtors continue to experience sales levels below historical levels, resulting in further liquidity pressures. The Debtors' revenue and profitability remain insufficient to support its debt service, working capital, and capital expenditures requirements.

36. To address the financial challenges suffered by the Debtors and preserve the going-concern value of their business, the Debtors seek relief from this Court to implement a restructuring of the business in a manner that will be most beneficial to its various creditors.

### B. Prepetition Restructuring Initiatives

37. The Debtors have engaged in a number of cost savings initiatives, including revamping its product offerings (SKUs) to reduce costs and meet current customer demands. Corsicana has and is continuing to reduce product costs by further simplification of SKUs and more economical raw materials. Corsicana has reduced overhead expenses, is in the process of closing and exiting a facility in Indiana and just announced another facility closure in Virginia.

38. The Debtors engaged Haynes & Boone and CR3 Partners, LLC to advise them in exploring various strategic alternatives to right-size and recapitalize their operations and balance sheet. The Debtors have undertaken a review of their business to determine how to address continuing liquidity constraints. As part of this review, the Debtors, their officers, and

professionals have considered various operational and strategic options to increase revenue and control costs. The review has also involved an analysis of Corsicana's relationships with strategic partners, lease expenses, and a number of other components of the business to identify opportunities to re-direct Corsicana's business to more financially viable outlets to continue providing high-quality mattresses to Corsicana's loyal customer base.

39. After several months of efforts by the Debtors, with the assistance of their advisors, the Debtors determined that they did not have sufficient liquidity to operate and meet certain debt service obligations during the remainder of 2022, and therefore required additional sources of financing. Left with no other alternative, the Debtors began to consider a Chapter 11 process and began engaging in restructuring discussions with the prepetition creditors.

40. I believe that the Chapter 11 Cases will provide the Debtors with the best opportunity to preserve the business as a going concern, make necessary changes to the Debtors' business plan, eliminate costly contracts and lease obligations, and thereby preserve value for the Debtors' estates.

## IV. Proposed Restructuring Path

41. During the weeks leading up to the Petition Date, the Debtors and Blue Torch engaged in arm's-length, good faith negotiations over debtor in possession financing and the structure and potential terms of a sale transaction.

42. After evaluating alternatives, the Debtors' board of directors, in consultation with their advisors, filing chapter 11 was the best and most efficient way to maximize a return for the Company and its stakeholders.

### a.    Sale Transaction

43.    Pursuant to a forthcoming stalking horse bid, Blue Torch will, with the Court's approval and the approval of the Debtors' board, serve as a stalking horse bidder to purchase substantially all of the Debtors' assets and assume certain of the Debtors' liabilities pursuant to section 363 of the Bankruptcy Code, subject to higher and better bids that may be received after a postpetition marketing period. The terms of the sale/stalking horse APA are near finalization. The Debtors expect to file a bid procedures motion on or before Wednesday, June 29, 2022.

### b.    Proposed DIP Facility

44.    Given that the Company had been nearing a liquidity shortfall for weeks prior to the Petition Date, they required access to new capital in order to operate its business while in chapter 11 and effectuate the section 363 sale. Working with its advisors, the Company identified its cash needs over the coming weeks and months and prepared a budget outlining the Debtors' postpetition cash needs. Given its substantial interest in the success of the proposed sale, Blue Torch agreed, in conjunction with its stalking horse bid, to provide a superpriority senior secured debtor-in-possession facility and to consent to the Debtors' use of its "cash collateral".

## V.    First Day Pleadings

45.    Below is an overview of the First Day Pleadings other than the DIP Motion. In the First Day Pleadings, the Debtors seek relief intended to facilitate a smooth transition into Chapter 11 and minimize disruptions to the Debtors' restructuring efforts.  Capitalized terms used but not otherwise defined in this section of the Declaration shall have the meanings ascribed to them in the relevant First Day Pleading.

## A.    Joint Administration Motion

46.    Through the *Debtors' Emergency Motion for Entry of Order Authorizing Joint*

*Administration of Chapter 11 Cases Pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure* (the "Joint Administration Motion"), the Debtors request authorization to jointly administer their Chapter 11 cases for procedural purposes only. The Debtors are "affiliates" as defined in section 101(2) of the Bankruptcy Code, as Debtor Corsicana Bedding, LLC directly or indirectly owns and controls 100 percent of the equity interests of all of the other Debtors.

47.     Because joint administration of these cases will remove the need to prepare, replicate, file, and serve duplicative notices, applications and orders, the Debtors and their estates will save substantial time and expense. Further, joint administration will relieve the Court of entering duplicative orders and maintaining duplicative files and dockets. The United States Trustee for the Northern District of Texas (the "U.S. Trustee") and other parties in interest will similarly benefit from joint administration of these Chapter 11 Cases by sparing them the time and effort of reviewing duplicative pleadings and papers. Joint administration will not adversely affect creditors' rights because this Motion requests only the administrative consolidation of the estates. This Motion does not seek substantive consolidation. As such, each creditor may still file its claim against a particular estate.

48.     I believe that the relief requested in the Joint Administration Motion is in the best interest of the Debtors' estates, creditors, and all other parties in interest. Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

## B.      Claims Agent Application

49.     In *Debtors' Emergency Application for Authorization to Retain and Employ Donlin, Recano & Company, Inc. as Claims, Noticing and Solicitation Agent Nunc Pro Tunc to the Petition Date* (the "Claims Agent Application"), the Debtors seek entry of an order appointing Donlin, Recano & Company, Inc. ("DRC") as the Claims and Noticing Agent for the Debtors in

the Chapter 11 Cases in accordance with the terms and conditions set forth in the Services Agreement, effective *nunc pro tunc* to the Petition Date. The Debtors wish to retain DRC as the Claims and Noticing Agent for these Chapter 11 Cases, to, among other tasks: (i) serve as the noticing agent to mail notices to the estates' creditors, equity security holders, and parties in interest; (ii) provide computerized claims, objection, solicitation, and balloting database services; and (iii) provide expertise, consultation, and assistance in claim and ballot processing and other administrative services with respect to these Chapter 11 Cases. Based on all engagement proposals obtained and reviewed, I believe that DRC's rates are competitive and reasonable given DRC's quality of services and expertise.

50.     I believe that the relief requested in the Claims Agent Application is in the best interest of the Debtors' estates, creditors, and all other parties in interest. Accordingly, on behalf of the Debtors, I respectfully submit that the Claims Agent Application should be approved.

**C.      Notice Motion**

51.     In the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to File a Consolidated List of Creditors, (II) Authorizing the Debtors to Redact Certain Personal Identification Information of Individual Creditors and Current and Former Employees, and (III) Approving the Form and Manner of Notifying Creditors of the Commencement of the Debtors' Chapter 11 Cases and Bar Date* (the "Notice Motion"), the Debtors request entry of an order: (i) authorizing the Debtors to file a consolidated list of creditors, (ii) authorizing the Debtors to redact certain personal identification information of individual creditors and current and former employees, and (iii) approving the form and manner of notice of commencement of these Chapter 11 Cases, the scheduling of the meeting of creditors to be held pursuant to Bankruptcy Code § 341 and the bar date for filing proofs of claim (the "Notice of Commencement"), including a

customized proof of claim form (the "Proof of Claim Form").

52.     In complex chapter 11 bankruptcy cases filed in the Northern District of Texas, debtors may file a consolidated creditor matrix. *See* Exhibit G to the *Procedures for Complex Chapter 11 Bankruptcy Cases for the United States Bankruptcy Court for the Northern District of Texas*. Because the preparation of separate lists of creditors for each Debtor would be expensive, time consuming, and administratively burdensome, the Debtors propose to file one Consolidated Creditor Matrix for all Debtors. The Debtors also propose to redact from any paper filed or to be filed with the Court in these Chapter 11 Cases, including the Schedules and Statements, the home addresses of individual creditors—including the Debtors' employees and contract workers because such information can be used to perpetrate identity theft or locate survivors of domestic violence, harassment, or stalking.

53.     Through DRC, the Debtors' proposed Noticing and Claims Agent, the Debtors propose to serve the Notice of Commencement and Proof of Claim Form substantially in the form annexed to the Proposed Order as Exhibit 1 on all parties entitled to such notice and, at the same time, to advise them of the section 341 meeting. Service of a single Notice of Commencement will not only avoid confusion among creditors, but will also prevent the Debtors' estates from incurring unnecessary costs associated with serving multiple notices to the parties listed on the Consolidated Creditor Matrix if required to serve an individual Notice of Commencement for each Debtor. Accordingly, the Debtors submit that service of a single Notice of Commencement is warranted. Additionally, the Debtors have tailored the proposed Notice of Commencement to include contact information for DRC in an effort to reduce the number of inquiries directed to the Clerk's Office.

54.     In addition, the Debtors propose to publish, as soon as practicable, the Notice of Commencement (with such changes as may be required for publication) once in the national

edition of USA Today. The Debtors submit that publication of the Notice of Commencement is the most practical method by which to notify those creditors and other parties in interest who do not receive the Notice of Commencement by mail of the commencement of these Chapter 11 Cases and constitutes an efficient use of the estates' resources.

55. I believe that the relief requested in the Notice Motion is in the best interests of the Debtors' estates, creditors, and all other parties in interest. Accordingly, on behalf of the Debtors, I respectfully submit that the Notice Motion should be approved.

**D. Wage and Benefits Motion**

56. The Debtors also filed *Debtors' Emergency Motion for Order (I) Authorizing Debtors to Pay Certain Prepetition Employee Wages, Other Compensation and Reimbursable Employee Expenses; (II) Continuing Employee Benefits Programs; (III) Authorizing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations Pursuant to Sections 105(a), 363(a), and 507(a) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004; and (IV) Granting Related Relief* (the "Wage and Benefits Motion"). In the Wage and Benefits Motion, the Debtors seek authority under Bankruptcy Code sections 105(a), 363(a), 507 and Bankruptcy Rule 6003 (i) authorizing, but not directing, the Debtors to (a) pay, in their sole discretion, all obligations related to wages, salaries, other compensation, payroll taxes and deductions, reimbursable employee expenses, payroll benefit providers, employee benefits, and service fees (collectively, the "Employee Obligations") and all costs related to the foregoing, and (b) maintain and continue to honor their practices, programs, and policies in place for their employees, as such may be modified, amended, or supplemented from time to time in the ordinary

course of business,[5] and (ii) authorizing and directing the Debtors' banks and financial institutions

to receive, process, honor, and pay checks presented for payment and electronic payment requests

relating to the Employee Obligations, subject to the terms set forth in the proposed order attached

to the Wages and Benefits Motion. The Debtors are not seeking authority to pay any employee of

any of their non-Debtor affiliates. Additionally, the Debtors seek to modify the automatic stay in

favor of claimants seeking to recover under the Workers' Compensation Program (defined below);

provided, however, that such claims are pursued in accordance with the Workers' Compensation

Program, and recoveries, if any, are limited to the proceeds from the applicable Workers'

Compensation Program.

57.     As of the Petition Date, the Debtors employ approximately 865 individuals on a

full-time or part-time basis (the "Employees") and 58 individuals on a contractual or temporary

basis (the "Temporary Workforce," and together with the Employees, the "Workforce"). The

Debtors' Workforce performs a wide variety of functions critical to the Debtors' operations,

including: mattress production and quality control, plant management and administration, product

development, purchasing, receiving, warehousing, maintenance, safety, logistics, sales and

marketing, human resources, accounting, payroll, information technology, company management

and administration.

### i.      Wage and Bonus Obligations

58.     In the ordinary course of business, the Debtors incur wage and salary obligations

to Employees and other compensation obligations to the Debtors' Temporary Workforce

---

[5] The summary of the Debtors' various Employee Obligations provided herein is qualified entirely by the Debtors' official policies or other practices, programs or agreements, whether written or unwritten, evidencing an arrangement among the Debtors and their Employees (as defined herein) (each, an "Official Policy"). In the event of any inconsistency or ambiguity between the summary contained in the Motion and an Official Policy, the terms of such Official Policy shall govern.

(collectively, the "Workforce Obligations").

### a. *Employee Wages and Salaries*

59. The Debtors typically pay obligations relating to Employee wages and salaries on a weekly or bi-weekly basis, where hourly employees are paid either weekly or bi-weekly, and salaried employees are paid bi-weekly. In the ordinary course of business, the Debtors pay their Employees through Paycom Payroll, LLC ("Paycom"), a third-party service provider, which makes payments either directly to Employees through direct deposits with funds advanced by the Debtors or by check. The Debtors advance funds to Paycom one (1) day prior to the Debtors' regularly scheduled payroll. Subsequently, Paycom makes payments to the Employees and to various third parties as described below.

60. The Debtors estimate their average weekly payroll to hourly employees to be approximately $700,000 and their average bi-weekly payroll to salary employees to be approximately $600,000. The Debtors estimate that up to **$990,000** in wages and salaries earned by the Employees prior to the Petition Date may remain unpaid as of the Petition Date (collectively, the "Unpaid Wage Obligations"). The Debtors do not believe that any of the Employees are owed Wage Obligations in an amount exceeding the $15,150[6] priority cap imposed by section 507(a)(4) of the Bankruptcy Code (the "Priority Wage Cap") and, accordingly, do not seek relief to pay any prepetition Unpaid Wage Obligations in excess of such cap. The Debtors seek authority, but not direction, to pay all Unpaid Wage Obligations only to the extent permitted by section 507(a)(4) of the Bankruptcy Code and to continue to satisfy all Wage Obligations in the ordinary course of business.

---

[6] Adjusted as of April 1, 2022 pursuant to 11 U.S.C. § 104.

### b. Temporary Workforce Obligations

61. In the ordinary course of business, the Debtors incur and pay the Temporary Workforce compensation based on various hourly rates and sales commissions to Indirect Sales Representatives based on various percentages of sales volume (only to the extent cash is collected) less returns (the "Temporary Workforce Obligations"). Amounts owed on behalf of Temporary Workforce Obligations are paid by the Debtors weekly in the case of temporary workers and bi-weekly or monthly in the case of Indirect Sales Representatives.

62. The Debtors estimate that approximately **$230,000** in compensation earned by the Temporary Workforce prior to the Petition Date may remain unpaid as of the Petition Date (collectively, the "Unpaid Temporary Workforce Obligations"), all of which will become due and owing within the first 21 days of these Chapter 11 Cases. The Debtors do not believe that any members of the Temporary Workforce are owed Unpaid Temporary Workforce Obligations in an amount exceeding the Priority Wage Cap and, accordingly, do not seek relief to pay any Unpaid Temporary Workforce Obligations in excess of such cap. The Debtors seek authority, but not direction, to pay all Unpaid Temporary Workforce Obligations to the extent permitted by Section 507(a)(4) of the Bankruptcy Code and to continue to satisfy all Temporary Workforce Obligations in the ordinary course of business.

### ii. Payroll Taxes and Deductions

63. In various jurisdictions, the Debtors are required by law to withhold amounts from the Wage Obligations related to income taxes, healthcare taxes, and other social welfare benefits, including social security, Medicare taxes, and unemployment insurance (collectively, the "Withholding Taxes") and to remit the same and certain other amounts to the appropriate taxing authorities (collectively, the "Taxing Authorities") according to schedules established by such

Taxing Authorities.

64.     In certain circumstances, the Debtors are also required to make additional payments from their own funds in connection with the Withholding Taxes (the "<u>Employer Taxes</u>" and, together with the Withholding Taxes, the "<u>Payroll Taxes</u>"). In the aggregate, the Payroll Taxes, including both the Employee and Employer portions, total approximately $880,000 for each bi-weekly payroll. As of the Petition Date, the Debtors estimate that they owe approximately **$140,000** on account of prepetition employer Payroll Taxes and that they are holding approximately **$300,000** of prepetition Employee Payroll Taxes, each of which has yet to be remitted.

65.     During each applicable pay period, the Debtors, directly through Paycom, also routinely withhold other amounts from certain Employees' gross pay, including garnishments, child support, and deductions related to various Retirement Plans and other Employee Benefits (each hereinafter defined) (collectively, the "<u>Deductions</u>" and, together with the Payroll Taxes, the "<u>Payroll Taxes and Deductions</u>"). In 2021, the Debtors withheld approximately $20,875,000 on account of Payroll Taxes and Deductions. As of the Petition Date, the Debtors estimate that they owe approximately **$935,000** on account of prepetition Deductions.

66.     To the extent any of the Payroll Taxes and Deductions may not have been forwarded to the appropriate third-party recipients or checks or electronic transfers in respect thereof may not have cleared prior to the Petition Date, the Debtors seek authority to remit such Payroll Taxes and Deductions (and to continue to forward Payroll Taxes and Deductions on a post-petition basis whether or not related to the prepetition period) to the applicable third-party recipients in the ordinary course of business.[7]

---

[7] All Payroll Taxes and Deductions are administered by Paycom.

### iii. Bonus Programs

67. The Debtors offer four bonus programs to active Employees: a Management Incentive Program ("MIP"), a Retention Bonus Program, a Sign-Up Bonus Program and a Retirement Incentive Program.

68. The MIP is an ad hoc bonus program that the Debtors have effectively terminated. Employees qualified for a bonus under the MIP (a "MIP Bonus") on a year-by-year, case-by-case basis, and the decision to award a MIP Bonus was entirely within the discretion of the Board of Managers of non-debtor entity Corsicana Parent Co., LLC. As of the Petition Date, there are forty (40) Employees of the Debtors with an accrued MIP Bonus. Estimated accrued and unpaid MIP Bonuses as of the Petition Date are $2,319,782.21 (the "Unpaid MIP Bonuses"), including $1,582,343.52 for calendar year 2021 and approximately $737,438.69 for 2022 through the Petition Date. However, the Debtors do not seek authority to pay the Unpaid MIP Bonuses and the Debtors do not seek authority to continue the MIP on a postpetition basis. Instead, the Debtors have effectively terminated the MIP as of the Petition Date and are simply disclosing the Unpaid MIP Bonuses in the interest of full transparency.

69. The Retention Bonus Program is designed to incentivize new hires to remain with the company for at least six (6) months after their hire date and minimize the number of absences during that timeframe. The Retention Bonus is discretionary and is available to production Employees with no unapproved absences and pays $200 after three (3) months and $300 after six (6) months, for a total potential bonus of $500 per new hire. As of the Petition Date, there were approximately seventy-five (75) Employees hired within the past six (6) months who are eligible for the $300 Retention Bonus, forty-four (44) of which were hired within the past three months and are thus not yet eligible for a Retention Bonus. Not all of the seventy-five (75) Employees will

be eligible for a Retention Bonus due to unapproved absences and planned terminations at certain operating facilities. As of the Petition Date, the Debtors estimate that the total amount of accrued and unpaid Retention Bonuses is **$25,000** (the "<u>Unpaid Retention Bonuses</u>"). The Debtors believe paying the accrued Unpaid Retention Bonuses and continuing the Retention Bonus Program postpetition is crucial to maintaining Employee morale throughout the Chapter 11 Cases. Accordingly, the Debtors seek authority to pay the Unpaid Retention Bonuses and to continue the Retention Bonus Program in the ordinary course of business on a postpetition basis.

70.     The Referral Bonus Program is designed to incentivize current Employees to refer hardworking and reliable friends and family to work for the Debtors. A referred Employee must be employed for three (3) months, at which point the referring Employee is eligible for a $250 Referral Bonus at the Debtors' discretion. The Debtors reasonably believe they do not owe any accrued and unpaid Referral Bonuses as of the Petition Date. Nonetheless, the Debtors believe continuing the Referral Bonus Program postpetition is crucial to maintaining Employee morale throughout the Chapter 11 Cases. Accordingly, the Debtors seek authority to continue the Referral Bonus Program and pay Referral Bonuses in the ordinary course of business on a postpetition basis.

71.     The Retirement Incentive Program is designed to incentivize corporate loyalty and career longevity by offering a $50 bonus for each year of service at the Debtors upon retirement. The Retirement Incentive Bonus is available to Employees who have a minimum of ten (10) years of service time and who give forty-five (45) days' notice of retirement while working through the last day given on retirement notice. The Retirement Incentive Bonus is discretionary. No eligible Employees with varying years of service have announced their retirement within forty-five (45) days of the Petition Date. The Debtors reasonably believe they do not owe any accrued and unpaid

Retirement Incentive Bonuses as of the Petition Date. Nonetheless, the Debtors believe continuing the Retirement Incentive Program postpetition is crucial to maintaining Employee morale throughout the Chapter 11 Cases. Accordingly, the Debtors seek authority to continue the Retirement Incentive Program and pay Retirement Incentive Bonuses in the ordinary course of business on a postpetition basis.

72.     In the Wages and Benefits Motion, the Debtors seek authority to pay the Unpaid Retention Bonuses but not the accrued and unpaid MIP bonuses. The Debtors further seek to continue the Retention Bonus Program, Referral Bonus Program and Retirement Incentive Program by paying out Retention Bonuses, Referral Bonuses and Retirement Incentive Bonuses in the ordinary course of business on a postpetition basis. The Debtors do not seek to continue the MIP on a postpetition basis.

### iv.     Reimbursable Expenses

73.     In the ordinary course of business, the Debtors reimburse certain Employees in accordance with the Debtors' policies for reasonable, customary, and approved expenses incurred on behalf of the Debtors in the scope of such Employees' employment and service, including travel mileage, hotel rooms, meals, vehicle, equipment, and business-related telephone charges (collectively, the "Reimbursable Expenses"). The Debtors reimburse the Reimbursable Expenses as part of the scheduled payroll immediately following the Debtors' approval. Because of the irregular nature of requests for Reimbursable Expenses, it is difficult to determine the amount of Reimbursable Expenses outstanding at any given time. The Debtors estimate that Reimbursable Expenses average approximately $123,000 per month, and approximately one month of Reimbursable Expenses, or **$123,000**, may remain outstanding as of the Petition Date. The Debtors seek authority, but not direction, to pay any unpaid prepetition Reimbursable Expenses and to

continue to satisfy all Reimbursable Expenses postpetition in the ordinary course of business.

### v.    Vacation and Sick Leave

74.    The Debtors provide the Employees with paid time off ("PTO") for vacation, illness, and other personal leave. Employees accrue forty (40) hours of sick leave annually and may roll eighty (80) hours over each year. Vacation accrues per pay period and the available leave is dependent upon an Employee's length of employment, with Employees being able to roll over ten (10), twenty (20), thirty (30) or forty (40) hours each year depending on length of employment. Employees who terminate voluntarily upon at least two (2) weeks' notice are entitled to cash out their accrued vacation but not their sick leave. Employees who are involuntarily terminated are not entitled to cash out vacation or sick leave. The estimated cash balance of PTO as of the Petition Date is **$1,203,000**, including $538,000 of accrued vacation and $665,000 of accrued sick leave.

75.    In the Wages and Benefits Motion, the Debtors seek authority to honor their respective vacation and sick leave policies in the ordinary course of Debtors' business. The Debtors request authority to permit their Employees to use accrued PTO, and the Debtors are asking for authority, but not direction, to pay Employees for unused PTO in accordance with their prepetition policies; provided, however, that any payment of a cash-out PTO balance that accrued prior to the Petition Date will be subject to the Priority Wage Cap.

### Paycom Fees

76.    As mentioned above, the Debtors have engaged Paycom to help administer payroll and provide other services in exchange for fees of $5,500 per biweekly payroll and $3,000 per weekly payroll (collectively, the "Paycom Fees"), which are debited as part of payroll funding every paycheck. The Debtors reasonably believe that there are no accrued and unpaid Paycom Fees as of the Petition Date. Nonetheless, by this Motion the Debtors seek authority to continue

paying the Paycom Fees in the ordinary course of business on a postpetition basis.

## Employee Benefit Plans

77.     The Debtors maintain various employee benefit plans and policies for health care, dental, vision, short and long-term disability, life, accidental death and dismemberment insurance, 401(k) savings plans, and workers' compensation (collectively, and as discussed in more detail below, the "Employee Benefits"). The Employee Benefits are administered by several different providers (collectively the "Benefits Providers"), depending upon the benefit.

78.     Each Benefits Provider charges the Debtors either an annual or a monthly premium for the provision of the Employee Benefits. These premiums are either wholly or partially borne by the Debtors. When the Debtors fund only a portion of these premiums, covered Employees contribute their pro rata portion of the remainder, which is withheld from these Employees' paychecks. Pursuant to this Motion, the Debtors seek authority, but not direction, to pay certain prepetition amounts in respect of the Employee Benefits and to continue the Employee Benefits programs in the ordinary course of business, and to make payments thereunder.

### i.      Health Benefits

79.     All regular, full-time Employees are eligible to receive medical, prescription drug, dental, and vision insurance coverage (collectively, the "Health Benefits") provided by BlueCross BlueShield of Texas  ("BCBS TX").

80.     As part of the Health Benefits, Employees may choose from two in-network PPO Plans, Bronze and Silver, with the Silver plan offering a lower deductible and copay. Amounts contributed to the FSA are deducted from an Employee's payroll and deposited into an account over which such Employee has control. Employees who enroll in the Debtors' Health Benefits Program are automatically enrolled in the telemedicine benefit through MDLive, which offers

Employees and their covered dependents 24/7 non-emergency care from a board-certified doctor through virtual visits by phone, video or mobile app. Employees also have the option of saving pre-tax dollars to Flexible Spending Accounts ("<u>FSA</u>") managed by Higginbotham to pay for qualified health and dependent care expenses that are not covered by other benefit plans.

81.     The Debtors pay an employer subsidy for the Health Benefits, and the Employees' portion of premiums for the Health Benefits is deducted from each participating Employees' payroll amount.[8] The employer subsidy varies depending on the Employee's salary and coverage elections but ranges from $209.88 per employee per month to $574.36 per employee per month for medical coverage and from $4.40 per employee per month to $16.60 per employee per month for dental coverage. Vision coverage is 100% Employee-paid. The Debtors estimate that the employer subsidy under the Health Benefits plans averages approximately **$460,000** per month[9], and approximately one month of obligations, or **$460,000**, for premiums under the Health Benefits plan may remain outstanding as of the Petition Date (the "<u>Unpaid Health Benefits</u>"). The Health Benefits are vital to the health and well-being of the Debtors' Employees and their families, so the Debtors seek authority to remit any Unpaid Health Benefits and to continue providing the Health Benefits in the ordinary course of business on a post-petition basis.

**ii.     Life and Accidental Death and Dismemberment Insurance**

82.     The Debtors provide basic group term life insurance and accidental death and dismemberment insurance coverage (collectively, the "<u>Basic Life and AD&D Insurance</u>"). The Debtors provide Basic Life and AD&D insurance through Dearborn Life Insurance Company ("<u>Dearborn</u>") at no cost to the Employee. The Basic Life and AD&D benefit is equal to $50,000

---

[8] The Employee contributions for medical, FSA, dental, and vision are deducted on a pre-tax basis.
[9] The estimate of obligations for premiums under the Health Benefits plans is based on the annual premium projection of $5,495,558 divided by twelve (12).

for Executives and $20,000 for all other full-time Employees, and Employees are automatically enrolled on the first of the month following thirty (30) days of service. Employees may also elect to purchase Supplemental Life and AD&D insurance on behalf of the Employee, his or her spouse, or child; however, the premium for Supplemental Life and AD&D insurance is borne by the Employee and paid through Payroll Deductions.

83.     The Debtors estimate that monthly Basic Life and AD&D Insurance premiums average approximately **$1,200** per month. The Debtors reasonably believe that none of the Basic Life and AD&D Insurance premiums remain outstanding as of the Petition Date. Nonetheless, the Debtors seek authority to continue the Basic Life and AD&D Insurance on a postpetition basis and pay related premiums in the ordinary course of business.

### iii.     Other Voluntary Benefits

84.     Each Employee that works at least thirty (30) hours per week may elect to receive short or long-term disability insurance through Dearborn. The short-term disability plan entitles an Employee to receive 60% of their income, with a weekly benefit of up to $1,000 for up to eleven (11) weeks. The long-term disability plan begins to pay a benefit after ninety (90) days of illness or disability and entitles an Employee to receive 60% of their income of up to $5,000 per month for up to two (2) years of payments. Both the short-term and long-term disability plans are voluntary and, therefore, 100% Employee funded. Accordingly, the Debtors do not owe any accrued and unpaid premiums on account of the short-term and long-term disability plans as of the Petition Date.

85.     Additional voluntary benefits (the "Voluntary Benefits") available to Employees include:

- •     Critical Illness Insurance through MetLife, which is designed to protect an Employee's income and personal assets when out-of-pocket expenses increase as a

result of an illness, such as heart attack, stroke, major organ transplant, kidney failure, and others. The premium varies depending on factors such as age, whether the Employee uses tobacco, and whether a spouse or dependent(s) are added to the coverage;

- Pet Insurance through PetAssure or MetLife. Under the PetAssure Plan, premiums range from $2.71 per week for one pet to $4.26 per week for multiple pets, which premiums are withheld from the Employee's paycheck and remitted to PetAssure by the Debtors. The MetLife Pet Insurance Plan is not withheld from Employee paychecks but is, instead, billed directly to the Employee;

- Accident Insurance through MetLife, which is designed to supplement an Employee's Health Benefits to pay for copays, deductibles and other medical and rehabilitation expenses in the event of certain accidents and emergency room visits. Depending on the extent of Accident Insurance coverage elected, premiums ranging from $2.27 to $6.39 per week are withheld from Employee paychecks and remitted to MetLife by the Debtors;

- Hospital Indemnity Insurance through MetLife, which is designed to help Employees manage expenses if the Employee or a loved one becomes hospitalized by providing a lump-sum payment to cover hospital stays, intensive-care unit stays, inpatient rehab stays and more. The benefit amount is up to $1,400 ($1,000 for admission and $400 for two days of confinement following admission). Depending on the extent of Accident Insurance coverage elected, premiums ranging from $4.72 to $15.30 per week are withheld from Employee paychecks and remitted to MetLife by the Debtors; and

- Prepaid Legal coverage through LegalShield, which offers participating Employees low-cost access to attorneys for a wide variety of personal legal services, including estate planning, real estate, traffic offenses, family law, and more. Premiums of $5.13 per week are withheld from Employee paychecks and remitted to LegalShield.

86.     The Voluntary Benefits are ancillary to the Health Benefits administered by BCBS TX and 100% Employee funded. Accordingly, the Debtors are not required to pay premiums to the providers of the Voluntary Benefits.

**iv.     Retirement Plans**

87.     The Debtors also provide certain eligible Employees with retirement benefits. The Debtors maintain a retirement savings plan with Fidelity NetBenefits ("Fidelity") for the benefit of all Employees who meet the requirements of section 401(k) of the Internal Revenue Code (the "401(k) Plan"). The 401(k) Plan is a defined contribution 401(k) profit sharing plan and is compliant with ERISA 404(c). All amounts contributed to the 401(k) Plan are wired directly from

the Debtors to Fidelity.

88.     Employees must elect to participate in the 401(k) Plan, they are not automatically enrolled in it. Employees who are at least twenty-one (21) years old become eligible to participate in the 401(k) Plan on the first of the month after a thirty (30)-day waiting period. Employees may invest up to 100% of their regular earnings on a pre-tax basis through automatic regular payroll deductions. The Debtors match up to 4% of Employee contributions (100% of the first 3% of Employee pay and 50% of the next 2% of Employee pay).

89.     In the first quarter of 2022, the Debtors withheld an aggregate amount of approximately $140,000 each month from participants' paychecks on account of their 401(k) contributions and the Debtors paid $75,000 each month in matching contributions (the "Matching Contributions"). As of the Petition Date, the Debtors estimate that they hold a total of approximately **$35,000** of Employee 401(k) Plan contributions and Matching Contributions that have yet to be remitted to the 401(k) Plan (the "Unremitted 401(k) Contributions"). Thus, the Debtors seek authority to: (a) release the Unremitted 401(k) Contributions held in trust for their Employees and the Matching Contributions; and (b) continue operating the 401(k) Plan and to make all prepetition and postpetition payments thereunder in the ordinary course of business, including any associated administration fees.

90.     The Debtors also pay a quarterly fee of $1,115.41 to Fidelity for administering the Employee 401(k) Plan (the "Fidelity Fee," and together with the Paycom Fees, the "Benefit Service Provider Fees"). As of the Petition Date, the accrued and unpaid Fidelity Fee is approximately **$744** (the "Accrued and Unpaid Fidelity Fee"). By this Motion, the Debtors seek authority to pay the Accrued and Unpaid Fidelity Fee and to continue paying the Fidelity Fee in the ordinary course of business on a postpetition basis.

####     v.        Workers' Compensation Program

91.        The Debtors also provide Employees with workers' compensation and employer's liability coverage (the "Workers' Compensation Program") through The Travelers Indemnity Company ("Travelers"). The Debtors are responsible for the full amount of the premiums for the Workers' Compensation Program for the benefit of Employees. On average, the Debtors have historically paid approximately **$1,184,000** in annual Workers' Compensation premiums, which are paid in ten (10) monthly installments beginning with the first month of policy coverage. As of the Petition Date, there are two (2) monthly installments remaining on the policy under the Workers' Compensation Program, of which one (1) installment of **$118,400** will come due within the first twenty-one (21) days of the Chapter 11 Cases. The Debtors seek authority, but not direction, to pay any and all prepetition obligations related to the Workers' Compensation Program and to continue paying Workers' Compensation premiums in the ordinary course of business. Additionally, the Debtors request authority to continue the Workers' Compensation Program and make post-petition payments thereunder in the ordinary course of business.

### E.      Cash Management Motion

92.        Through the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing Maintenance of Existing Corporate Bank Accounts and Cash Management System; (II) Waiving Certain U.S. Trustee Requirements; and (III) Authorizing Continuation of Intercompany Transactions with Section 364(a) Administrative Priority* (the "Cash Management Motion") the Debtors are requesting, pursuant to Bankruptcy Code §§ 105(a), 345(b), 363(c), 364(a), 1107 and 1108, the entry of an order: (i) authorizing the Debtors to maintain the Bank Accounts and Cash Management System; (ii) granting the Debtors a waiver of certain Guidelines and Section 345(b) of the Bankruptcy Code; and (iii) authorizing continuation of Intercompany Transactions

consistent with historical practice.

93. The Debtors maintain a centralized cash management system (the "Cash Management System") to collect, transfer, and disburse funds. The Debtors' Cash Management System is similar to those commonly employed by enterprises of comparable size and complexity. Among other benefits, the Cash Management System permits the Debtors to accurately monitor cash availability at all times. The Cash Management System also permits the Debtors to centrally manage and track the collection and transfer of funds, which reduces administrative burden and expense and minimizes interest expense. The Cash Management System is summarized on Exhibit B to the Cash Management Motion and is described in more detail below.

### i. The Debtors' Bank Accounts

94. Prior to the Petition Date, in the ordinary course of business, the Debtors maintained twenty-two (22) bank accounts (collectively, the "Accounts" or "Bank Accounts"), which formed the Cash Management System. The Cash Management system includes the following Bank Accounts and banks (collectively, the "Banks"):

    i. six (6) Bank Accounts with Fifth Third Bank ("Fifth Third");
    ii. three (3) Bank Accounts with Primis Financial Corp. (f/k/a Southern National Bancorp of Virginia Inc. & Sonabank) ("Primis");
    iii. one (1) Bank Account with Community National Bank & Trust ("Community National");
    iv. one (1) Bank Account with First Community Bank, Tennessee ("FCB");
    v. six (6) Bank Accounts with various state branches of Bank of America ("BofA");
    vi. two (2) Bank Account with various state branches of Truist ("Truist");
    vii. one (1) Bank Account with Synovus (f/k/a First Bank of Jasper) ("Synovus");
    viii. one (1) Bank Account with Citizens Bank ("Citizens"); and
one (1) Bank Account with BMO Harris Bank ("BMO").

95. Each of the Debtors' Accounts is identified below on a Debtor-by-Debtor basis with a brief description of the historical function and use of each Account:

| Bank | Acct. | Description |
|------|-------|-------------|
| | | **Corsicana Bedding, LLC** |
| | x8915 | **Corsicana Main Operating Account**. The Corsicana Main Operating Account is the Debtors' primary operating account that is used: (i) to fund the Eastern Sleep Disbursement Account with Primis (x7418); (ii) to fund the Eastern Sleep Main Operating Account with Fifth Third (x2653); (iii) to fund the Corsicana Zero Balance Account (x6629); (iv) to issue checks; (v) to pay payroll; and (vi) to make other necessary disbursements.<br><br>The Corsicana Main Operating Account is primarily funded from draws on the Debtors' Prepetition ABL Facility and Prepetition Term Loans. Additionally, the Corsicana Main Operating Account receives miscellaneous amounts from e-commerce sales, which amounts cannot go directly to the Wingspire Sweep Accounts due to the deposit account control agreements. |
| Fifth Third | x0140 | **Wingspire Sweep Account**. This Account is funded by Corsicana's customer collections and excess from the Stand-Alone Accounts, and excess from the Stand-Alone Accounts. Wingspire sweeps this Account automatically daily to pay down the Debtors' obligations under the Prepetition ABL Credit Agreement. Wingspire maintains a deposit account control agreement over this Account pursuant to the Prepetition ABL Credit Agreement. |
| | x6629 | **Corsicana Zero Balance Disbursement Account**. This Account is funded by the Corsicana Main Operating Account (x8915). The Debtors use this Account primarily to manually disburse checks. Once the checks clear, this Account has a zero balance. |
| | x0590 | **Payroll Account**. This Account is a prior payroll funding account. It is currently not utilized. |
| Community National | x6755 | **Petty Cash Account.** The Debtors maintain various Petty Cash Accounts. The use for each Petty Cash Account varies slightly from Account to Account. Generally, the Petty Cash Accounts are primarily depository accounts that collect petty cash from: (i) the Debtors' products that are sold to the Debtors' employees; (ii) drivers who receive checks upon delivery of the Debtors' products; and (iii) other minor collections.<br><br>Typically, all of the amounts in the Petty Cash Accounts (generally less than $5,000 per Account) are maintained in the respective Account. |
| FCB | x792 | **Petty Cash Account.** *See above*. |
| BofA, North Carolina | x9158 | **Petty Cash Account.** *See above*. |
| BofA, Arizona | x9161 | **Petty Cash Account.** *See above*. |

| | | |
|---|---|---|
| BofA, Illinois | x9145 | **Petty Cash Account.** *See above.* |
| BofA, Washington | x9129 | **Petty Cash Account.** *See above.* |
| BofA, CT | x9132 | **Petty Cash Account.** *See above.* |
| Truist, FL (f/k/a BB&T, Florida) | x4846 | **Petty Cash Account.** *See above.* |
| **Eastern Sleep Products Company** | | |
| Fifth Third | x2653 | **Eastern Sleep Main Operating Account.** This Account is Eastern Sleep's primary operating account. This Account is funded by the Corsicana Main Operating Account (x8915) and is used: (i) to fund the Eastern Sleep Zero Balance Account (x2661), (ii) to initiate wires and ACH for payments on the Symbol-side of the Debtors' business, and (iii) to pay other amounts associated with the Symbol-side of the Debtors' business. |
| | x2661 | **Eastern Sleep Zero Balance Disbursement Account.** This Account is automatically funded by the Eastern Sleep Main Operating Account (x2653). The Debtors use this Account primarily to manually disburse checks. Once the checks clear, this Account has a zero balance. |
| Primis | x7415 | **Wingspire Sweep Account**. This Account is funded by Eastern Sleep's customer collections and by the Luuf Operating Account. Wingspire sweeps this Account manually, by wire, daily to pay down the Debtors' obligations under the Prepetition ABL Credit Agreement. Wingspire maintains a deposit account control agreement over this Account pursuant to the Prepetition ABL Credit Agreement. |
| | x7418 | **Eastern Sleep Checking Disbursement Account**. This Account receives miscellaneous amounts from general e-commerce sales (non-Luuf, LLC sales), which amounts cannot go directly to Wingspire Sweep Accounts due to the deposit account control agreements. Miscellaneous amounts for credit card processing and other automatically drafted items are also withdrawn from this Account. To the extent of any shortfalls, this Account is funded by the Corsicana Main Operating Account (x8915). |
| Truist VA (f/k/a SunTrust Bank) | x2787 | **Stand-Alone Depository Account**. The Debtors maintain various Stand-Alone Depository Accounts, which serve as depository Account for checks received at the Debtors' locations. The excess amounts in the Stand-Alone Depository Accounts are transferred by check to the Corsicana Wingspire Sweep Account (x0140). |
| **Luuf, LLC** | | |
| Primis | x2867 | **Luuf Operating Account.** This Account is the Debtors' primary operating account associated with the Debtors' online direct-to-consumer products. This Account receives and pays amounts related to Luuf's ecommerce operations. In the event of a shortfall, this Account receives amounts from |

| | | the Eastern Sleep Checking Disbursement Account (x7418). Any excess amounts are manually transferred to the Eastern Sleep Wingspire Sweep Account (x7415). |
|---|---|---|
| **Master Craft Sleep Products, Inc.** | | |
| Synovus | x14-4 | **Stand-Alone Depository Account.** *See above.* |
| **Symbol Mattress of Florida, Inc.** | | |
| BofA, Florida | x7699 | **Petty Cash Account.** *See above.* |
| **Symbol Mattress of Pennsylvania, Inc.** | | |
| Citizens | x8243 | **Stand-Alone Depository Account.** *See above.* |
| **Symbol Mattress of Wisconsin Inc.** | | |
| BMO | x9510 | **Stand-Alone Depository Account.** *See above.* |

96. The Debtors manage their cash receipts, transfers, and disbursements in the Cash Management System through routine deposits, withdrawals, and fund transfers to, from, and between the Bank Accounts by various methods including check, wire transfer, automated clearing house transfer, and electronic funds transfer. The Cash Management System is centered around the Corsicana Main Operating Account.

**ii. Collections Under the Prepetition ABL Facility and the Prepetition Term Loans**

97. At certain times prior to the Petition Date, the Debtors requested draws under their credit facilities with: (i) Wingspire Capital LLC ("Wingspire"), the administrative agent on behalf of the Debtors' lenders under an asset-based loan facility (the "Prepetition ABL Facility") and (ii) Blue Torch Finance LLC, the administrative and collateral agent on behalf of the Debtors' lenders under term loan facilities (the "Preptition Term Loans"). The availability of funds under the Prepetition ABL Facility and the Prepetition Term Loan are determined based on the metrics outlined in the applicable loan documents. Funds drawn by the Debtors under the Prepetition ABL Facility and the Prepetition Term Loans are initially deposited into the Corsicana Main Operating

Account.

### iii. Disbursements and Utility Reserve

98.    The Debtors' disbursements are directed through the Corsicana Main Operating Account, the Luuf Operating Account, the Eastern Sleep Disbursement Account, the Corsicana Zero Balance Disbursement Account, and the Eastern Sleep Zero Balance Disbursement Account (collectively, the "Operating Accounts").  The Corsicana Main Operating Account funds the Luuf Operating Account and the Eastern Sleep Disbursement Account if there is a shortfall.  Paycom Payroll, LLC ("Paycom") automatically withdraws amounts to fund payroll from the Corsicana Main Operating Account.  Subsequently, Paycom makes payments to the Debtors' employees and to various third parties, as more fully described in the Wages and Benefits Motion.

99.    In conjunction with the transfers to the Payroll Accounts, the Debtors also transfer designated funds from the Operating Accounts to Paycom, which distributes all payroll taxes, garnishments, employee benefit deductions, workers' compensation and other miscellaneous deductions to the appropriate designees.   401(k) Contributions are distributed to Fidelity Netbenefits by online payments every Thursday or Friday.  Further, the Debtors transfer funds from the Corsicana Main Operating Account to pay applicable taxes.  Funds are periodically transferred to the appropriate taxing authorities directly by the Debtors to facilitate tax payments.  Moreover, funds necessary to make required payments are regularly transferred from the Corsicana Main Operating Account for disbursement to vendors and other payees.

100.    As set forth in more detail in the Utilities Motion, as proposed adequate assurance for future Utility Services, the Debtors propose to establish a reserve of not less than $97,912, which amount is equal to approximately 50% of the Debtors' historical monthly cost of their Utility Services.

### iv.      The Debtors' Credit Cards

101.    In the ordinary course of business, the Debtors maintain various credit cards (collectively, the "Credit Cards").  The Credit Cards are issued through: (i) Chase Bank, N.A., (ii) Capital One, and (iii) Fifth Third.  In general, the Credit Cards are used for various corporate expenses, including, but not limited to, online advertising expenses, employee-required training seminars, travel expenses, miscellaneous IT services, printing services, employee relation costs, and other miscellaneous expenses.  The Debtors' accounting staff monitors the expenses charged to the Credit Cards to ensure that the Credit Cards are only used for appropriate expenses in compliance with company policies.

102.    As of the Petition Date, there are five (5) issued and active Credit Cards.  As of the Petition Date, I understand that the Debtors have the following outstanding balances on the Credit Cards:    (i)  Chase  Credit  Card,  approximately  $7,477.49,  (ii)  Capital  One  Credit  Cards, approximately $3,967, and (iii) Fifth Third Credit Card, approximately $5,235.76.   Other than these *de minimis* balances, the Debtors do not believe there are other material amounts owed on the Credit Cards.  To avoid any disruption in the use of the Credit Cards, the Debtors request authority to satisfy any prepetition obligations that may be owing on account of the Credit Cards. The Debtors request authority to continue to make all payments on a postpetition basis in the ordinary course of business and consistent with the Debtors' past practices.

### v.      Intercompany Transactions

103.    In the ordinary course of business, the Debtors maintain business relationships with each  other,  resulting  in  intercompany  receivables  and  payables  (the  "Intercompany Transactions").[10]   At any given time, there may be balances due and owing by and among the

---

[10] The Debtors do not anticipate any Intercompany Transactions with any non-debtor affiliate entities during these Chapter 11 Cases.

Debtors' various entities. The Debtors maintain records of, and can ascertain, trace and account for, the Intercompany Transactions. Periodically, there is a true-up or netting of the obligations among the Debtors, and those debits and credits are consolidated to a net intercompany balance between the applicable Debtors. Moreover, the Debtors and the Banks will continue to maintain such records, including records of all current intercompany accounts receivables and payables, in the postpetition period. Thus, the propriety of all Intercompany Transactions can be verified.

### vi. Collections, Borrowings, and Disbursements Under Proposed DIP Facilities

104. Contemporaneously with the filing of the Cash Management Motion, the Debtors filed a motion for authorization to obtain debtor-in-possession financing (the "DIP Motion")[11] through two facilities (the "DIP Facilities"): (i) a senior secured super-priority asset-based revolving credit facility (the "DIP Revolver Facility") and (ii) a senior secured super-priority term loan facility (the "DIP Term Loan Facility").

105. Pursuant to the Interim DIP Order and DIP Loan Agreements, the following accounts have also been established for use by the Debtors (collectively, the "DIP Order Accounts"): (i) the DIP Term Loan Escrow Account (as defined in the Interim DIP Order), an escrow account at Key Bank in the name of Alter Domus (US) LLC, as escrow agent, where proceeds of the DIP Term Loans will be deposited and held subject to withdrawals pursuant to the Interim DIP Order and DIP Term Documents; (ii) the DIP Holding Account (as defined in the Interim DIP Order) where permitted withdrawals from the DIP Term Loan Escrow Account will be deposited for subsequent transfer to the Debtors' primary disbursement account to the extent

---

[11] Capitalized terms used in this section but not defined have the meanings given to such terms in *Debtors' Emergency Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503 and 507 (I) Authorizing the Debtors to Obtain Senior Secured Superpriority Postpetition Financing; (II) Granting (A) Liens and Superpriority Administrative Expense Claims and (B) Adequate Protection To Certain Prepetition Lenders; (III) Authorizing Use Of Cash Collateral; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (the "DIP Motion"). To the extent any statements herein conflict with the DIP Motion or the Interim DIP Order, the applicable DIP Documents shall govern.

necessary to fund approved disbursements; and (iii) the Professional Fee Reserve Account (as defined in the Interim DIP Order) to fund a professional fee reserve in accordance with the terms of the Interim DIP Order.

### vii. The U.S. Trustee Guidelines

106.    The United States Trustee (the "U.S. Trustee") has established its *Region VI Guidelines for Debtors in Possession* (the "Guidelines") in order to supervise the administration of chapter 11 cases. These Guidelines require debtors in possession to, among other things, (a) close all existing bank accounts and open new accounts, including an operating account, a tax account, a payroll account, and, if required by the Court, a cash collateral account and (b) maintain their bank accounts with a depository bank approved by the U.S. Trustee. As explained in further detail below, the Debtors seek a waiver of certain of these requirements in the Cash Management Motion.

### viii. Maintaining the Existing Cash Management System is Essential to the Debtors' Restructuring Efforts

107.    The Debtors seek authority to maintain their existing Bank Accounts and Cash Management System in accordance with their usual and customary practices to ensure a smooth transition into Chapter 11 with minimal disruption to their reorganization efforts. The Debtors also request authority to close any of the Bank Accounts or open new bank accounts if, in the exercise of their business judgment, the Debtors determine that such action is in the best interest of their estates or if a new bank account is required to comply with an order of this Court, subject to providing prior written notice to the DIP Secured Parties (as defined in the DIP Motion) and the U.S. Trustee.

108.    I believe the Debtors' Cash Management System constitutes an ordinary course, essential business practice providing significant benefits to the Debtors including, among other

things, the ability to (i) control funds, (ii) ensure the availability of funds when necessary, and (iii) reduce costs and administrative expenses by facilitating the movement of funds and the development of more timely and accurate account balance information. I believe that any disruption of the Cash Management System may have a severe and adverse impact upon the Debtors' reorganization efforts.

### ix. Waiver of Conflicting U.S. Trustee Guidelines and Section 345(b) is Warranted

109.    The Debtors seek a waiver of the Guidelines to the extent that the requirements of such Guidelines otherwise conflict with (a) the Debtors' existing practices under the Cash Management System or (b) any action taken by the Debtors in accordance with any Order granting this Motion. The use of the Debtors' Cash Management System is an ordinary course, customary, essential business practice. I believe that requiring that the Debtors alter their current practices to comply with certain of the Guidelines would risk disruption to the Debtors' business and be inefficient.

110.    Five (5) of the Debtors' Bank Accounts are maintained at BofA and one (1) Account is maintained with Citizens, which are both authorized depositories pursuant to the U.S. Trustee's Authorized Depository Listing established for the Northern District of Texas (the "UST Approved Depository List").

111.    BMO, Community National, Fifth Third, First Community, Primis, Synovus, and Truist (collectively, the "Unapproved Depositories") are not currently included on the UST Approved Depository List.  In the interest of maintaining the continued and efficient operation of the Cash Management System during the pendency of the Chapter 11 Cases, the Debtors request that the Banks, including the Unapproved Depositories, be authorized and directed to continue to administer, service, and maintain the Bank Accounts as such accounts were administered, serviced,

and maintained prepetition, without interruption and in the ordinary course, and to pay any and all checks, drafts wires, ACH transfers, electronic fund transfers, or other items presented, issued, or drawn on the Bank Accounts on account of a claim arising on or after the Petition Date so long as there are sufficient funds in the relevant Bank Accounts.

112.    To my knowledge, each of the Unapproved Depositories are financially stable banking institutions with the Federal Deposit Insurance Corporation or other appropriate government-guaranteed deposit protection insurance. Requiring the Debtors to change their deposits and other procedures could result in harm to the Debtors, their creditors, and the estates because such change would disrupt the Cash Management System. Conversely, the Debtors' estates and creditors will not be harmed by the Debtors' maintenance of the status quo because of the relatively safe and prudent practices already utilized by the Debtors.

113.    The Debtors request a waiver of the Guidelines to enable the Debtors to maintain and continue to use the Bank Accounts with the same account numbers as are currently employed, including the Accounts at the Unapproved Depositories. The Debtors request authorization to: (i) instruct the Banks to add the designation, "Debtor-in-Possession" to their current and any future Accounts; (ii) treat the Accounts for all purposes as Accounts of the Debtors as Debtors-in-Possession; (iii) maintain records that recognize the distinction between prepetition and postpetition transfers; (iv) attach redacted bank statements with respect to any Accounts at the Unapproved Depositories to the Debtors' monthly operating reports; and (v) attach redacted bank statements of any Accounts that are not DIP Accounts opened after the Petition Date to the Debtors' monthly operating reports. Additionally, the Debtors will add the designation "Debtor-in-Possession" (without abbreviation) to any existing or future checks.

114.    The Debtors' continued use of the Bank Accounts with the same account numbers

is necessary for a smooth and orderly transition into Chapter 11, with minimal interference with the Debtors' restructuring efforts. Requiring the Debtors to open new accounts and obtain checks for those accounts will cause delay and disruption to the Debtors' businesses.

115.    I believe that by preserving business continuity and avoiding operational and administrative paralysis that closing the existing Bank Accounts and opening new ones would create, all parties-in-interest will be best served by authorizing the Debtors to maintain their existing Bank Accounts and Cash Management System.

116.    I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, creditors, and all other parties in interest. Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

F.      **Tax Motion**

117.    In the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing Debtors to Pay Prepetition Taxes and (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers Pursuant to Sections 105(a), 363(b), 507(a)(8), and 541(d) of the Bankruptcy Code* (the "Tax Motion"), the Debtors seek the entry of an order, pursuant to Bankruptcy Code §§ 105(a), 363(b), 507(a)(8), and 541(d) (i) authorizing, but not directing, the Debtors to pay pre-petition Taxes due and owing to various Governmental Authorities, including any Taxes determined owing postpetition for the period prior to the Petition Date, and (ii) authorizing applicable banks and financial institutions (collectively, the "Banks") to receive, honor, process, and pay all checks issued or to be issued and electronic funds transfers requested or to be requested relating to the above.

118.    In the ordinary course of their businesses, the Debtors collect and incur certain sales and use, franchise, income, and property taxes, U.S. customs duties and fees, licensing and

reporting fees, and other similar charges and assessments taxes (the "Taxes")[12] that are payable directly to various federal, state, and local taxing authorities (collectively, the "Governmental Authorities"). A non-exclusive list of the Governmental Authorities for the Taxes is attached to the proposed order to the Tax Motion as Exhibit 1 (the "Governmental Authorities List").[13]

119.     The principal categories of Taxes collected and incurred by the Debtors, as well as the accrued and unpaid amounts with respect to such Taxes as of the Petition Date, are described below:

a.     Sales and Use Taxes. In the ordinary course of their businesses, the Debtors collect and remit sales and use taxes to various state taxing authorities in connection with the operation of the Debtors' business and sale and distribution of products. The Debtors also incur sales taxes for sales that are direct-to-consumer and for rental and hospitality customers. As of the Petition Date, the Debtors do not have any amounts in sales and use taxes have accrued and remain unpaid for the prepetition period.

b.     Franchise and Income Taxes. The Debtors pay certain franchise and income taxes to various state taxing authorities in connection with operating in such states. As of the Petition Date, approximately **$227,400** in franchise and income taxes have accrued and remain unpaid.

c.     Business and Bedding License Fees. Because of the nature of their business, the Debtors are subject to certain state business and bedding license fees associated with the manufacturing of bedding. As of the Petition Date, the Debtors do not have any amounts in business and bedding license fees that have accrued and remain unpaid for the prepetition period.

d.     Real and Personal Property Taxes. Where the Debtors have operations and personal property, the Debtors are subject to property tax levied by state and local governments. In the ordinary course of business, the Debtors pay, in their capacity as lessee, the amounts sufficient to cover the real property

---

[12] Contemporaneously herewith, the Debtors filed the *Debtors' Emergency Motion for Order (I) Authorizing Debtors to Pay Certain Prepetition Employee Wages, Other Compensation and Reimbursable Employee Expenses; (III) Authorizing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations Pursuant to Sections 105(a), 363(a), and 507(a) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, and (IV) Granting Related Relief*, by which the Debtors seek authority to pay and remit various federal, state, and local income taxes, Social Security, Medicare taxes and federal and state unemployment insurance to applicable authorities.

[13] The Debtors believe that the list of the Governmental Authorities in **Exhibit 1** is substantially complete. Notwithstanding that belief, the Debtors request that the requested relief herein apply to any and all Governmental Authorities regardless of any omission from **Exhibit 1**. In addition, the Debtors reserve the right to assert that any of the entities now or hereafter listed on **Exhibit 1** are not Governmental Authorities.

taxes as additional rent through their various leases of real property.[14] As of the Petition Date, the Debtors do not have any amounts in real and personal property taxes have accrued and remain unpaid.

120.    The Debtors seek to obtain authority to pay the prepetition Taxes to avoid interference with the Debtors' efforts to successfully reorganize. Nonpayment of these obligations may cause the Governmental Authorities to take precipitous action, including, but not limited to, asserting liens, preventing the Debtors from conducting business in the applicable jurisdictions, or seeking to lift the automatic stay, which potentially impose significant costs on the Debtors' estates. Failure to satisfy the prepetition Taxes may jeopardize the Debtors' maintenance of good standing to operate in the jurisdictions in which they do business.

121.    To the extent that any prepetition Taxes remain unpaid by the Debtors, certain of the Debtors' officers and directors may be subject to lawsuits or criminal prosecution during the pendency of these Chapter 11 Cases. The dedicated and active participation of the Debtors' directors, officers, and other employees is essential to the orderly administration of these Chapter 11 Cases. The threat of a lawsuit or criminal prosecution, and any ensuing liability, would distract the Debtors and their personnel from important tasks, to the detriment of all parties in interest.

122.    I believe that payment of the prepetition Taxes is an exercise of sound business judgment and necessary to permit a successful reorganization. Significant disruptions of the Debtors' operations of the types described above threaten to irreparably impair the Debtors' ability to conduct a successful reorganization process and thereby maximize the value of the Debtors' estates for the benefit of creditors.

123.    Therefore, I believe that the relief requested in the Tax Motion is immediately necessary to avoid irreparable harm and is in the best interests of the Debtors' estates, creditors,

---

[14] The Debtors do not own any real property.

and all other parties in interest. Accordingly, on behalf of the Debtors, I respectfully submit that the Tax Motion should be approved.

**G.    Utilities Motion**

124.    Through the *Debtors' Emergency Motion for an Order Under 11 U.S.C. §§ 105(a) and 366 (I) Prohibiting Utility Companies From Altering or Discontinuing Service on Account of Prepetition Invoices, (II) Approving Deposit Account as Adequate Assurance of Payment, and (III) Establishing Procedures for Resolving Requests by Utility Companies for Additional Assurance of Payment* (the "Utilities Motion"), the Debtors seek entry of an order ") (i) prohibiting the Utility Companies from altering or discontinuing service on account of unpaid prepetition invoices, (ii) establishing the Procedures (as defined below) for resolving any disputes regarding requests for adequate assurance of payment, and (iii) scheduling a final hearing on this Motion (the "Final Hearing") within thirty (30) days of the Petition Date.

125.    In the normal conduct of their business operations, the Debtors have relationships with many different utility companies and other providers (each a "Utility Company" and, collectively, the "Utility Companies") for the provision of electric, water, sewer, natural gas, trash removal, telephone, cellular telephone, internet services, and similar utility products and services (collectively, the "Utility Services") at their various locations.  The Utility Companies include, without limitation, the entities set forth on the list attached to the proposed order granting the Utilities Motion as Exhibit 1.

126.    It is my understanding that the historical average monthly amount owed to the Utility Companies in the aggregate is approximately $195,824. I believe that the Debtors owe certain amounts to Utility Companies as of the Petition Date for prepetition Utility Services. Due to the timing of the Petition Date in relationship to the Utility Companies' billing cycles, certain

Utility Services have been invoiced but not yet paid and other Utility Services have been provided but not yet invoiced to the Debtors.

127.    Uninterrupted Utility Services are essential to the Debtors' businesses. If the Utility Companies refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely disrupted. If such disruption occurred, the impact on the Debtors' business and revenue would be extremely harmful and would jeopardize the Debtors' reorganization efforts. I believe that it is critical that Utility Services continue uninterrupted.

128.    The Debtors anticipate their access to cash collateral and proposed debtor-in-possession financing will be sufficient to allow them to satisfy all administrative expenses, and the Debtors intend to pay all postpetition obligations owed to the Utility Companies in a timely manner. Nevertheless, to provide additional adequate assurance of payment for future Utility Services, the Debtors shall maintain a reserve of not less than **$97,912**, a sum equal to approximately 50 percent of the Debtors' historical monthly cost of their Utility Services with respect to their proposed adequate assurance of payment for future Utility Services (the "Utility Reserve"). The Debtors shall make this Utility Reserve within twenty (20) business days after the Petition Date and such Utility Reserve shall be subject to the terms and conditions of any cash collateral and debtor-in-possession financing orders that may be entered in the Chapter 11 Cases. The Debtors propose to maintain the Utility Reserve with a minimum balance equal to 50 percent of the Debtors' historical monthly cost of Utility Services from Utility Companies, which may be adjusted by the Debtors to account for the termination of Utility Services by the Debtors or other arrangements with respect to adequate assurance of payment reached with individual Utility Companies.

129.    I believe that the Utility Reserve, together with the Debtors' anticipated access to

cash collateral and debtor-in-possession financing, provides protection well in excess of that required to grant adequate assurance to the Utility Companies. Therefore, the Debtors are confident that the Utility Reserve combined with the Debtors anticipated access to cash collateral and debtor-in-possession financing will be sufficient to ensure that Utility Companies are paid in full for post-petition Utility Services.

130.    I believe that the Procedures set forth in the Utility Motion provide a fair, reasonable, and orderly mechanism for the Utility Companies to seek additional adequate assurance, while temporarily maintaining the status quo for the benefit of all stakeholders.

131.    Separate negotiations with each of the Utility Companies would be time-consuming and unnecessarily divert the Debtors' personnel from other critical tasks related to the operation of their business and the restructuring.  This is especially true given the fact that the Debtors operate at multiple locations, many of which have separate utility arrangements.  During the first days of the Chapter 11 Cases, it would be incredibly difficult, costly, and would divert the Debtors' limited personnel resources to engage in separate negotiations with each potential Utility Company.  Further, if individual negotiations were required and the Debtors were to fail to reach early agreement with each Utility Company, the Debtors would likely have to file further motions seeking expedited determinations as to adequate assurance or risk service termination

132.    I believe that the relief requested in the Utilities Motion is immediately necessary to avoid irreparable harm and is in the best interests of the Debtors' estates, creditors, and all other parties in interest. Accordingly, on behalf of the Debtors, I respectfully submit that the Utilities Motion should be approved.

**H.**    **Omnibus Contract Rejection Motion**

133.    Through the *Debtors' First Omnibus Motion to Reject Certain Executory Contracts*

*and Unexpired Leases Pursuant to Section 365 of the Bankruptcy Code and Bankruptcy Rule 6006* (the "Omnibus Contract Rejection Motion"), the Debtors seek entry of an order authorizing and approving the rejection of the executory contracts and unexpired leases listed on Exhibit 1 of the proposed order (collectively, the "Contracts"). The Debtors further request that rejection of the Contracts be authorized and approved as of the effective date specified therein (the "Effective Date").

134.    In connection with the operation of their businesses, the Debtors have entered into numerous executory contracts and leases with various vendors and service providers, certain of which are no longer necessary for the Debtors' ongoing business operations.

135.    In the sound exercise of their business judgment, the Debtors have determined that rejecting the Contracts is in the best interests of their estates and creditors. The Debtors have carefully reviewed the necessity of the Contracts and the fees and expenses associated with the Contracts. The Debtors, in their business judgment, believe that the cost and burden to the Debtors and their estates of maintaining the Contracts outweighs any benefits that the Debtors or their estates might receive. The Debtors do not have a need for the Contracts going forward. The Contracts are not necessary to the Debtors' business and are a drain on the Debtors' resources.

136.    The Contracts are no longer of value to the Debtors' estates and rejection effective as of the Effective Date will permit the Debtors to avoid paying for unnecessary services, thereby minimizing the Debtors' administrative expense obligations.

137.    I believe that the relief requested in the Omnibus Contract Rejection Motion is in the best interests of the Debtors' estates, creditors, and all other parties in interest. Accordingly, on behalf of the Debtors, I respectfully submit that the Omnibus Contract Rejection Motion should be approved.

### I. Insurance Motion

138. Through the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered not Prepetition and Satisfy Prepetition and Postpetition Obligations Thereunder, (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, and (III) Granting Related Relief* (the "Insurance Motion"), the Debtors seek entry of an order authorizing the Debtors (i) to continue to administer the Insurance Policies in the ordinary course of business, (ii) to renew their Insurance Policies or obtain replacement policies as needed in the ordinary course of business without further Court approval, (iii) to pay or reimburse Insurance Carriers for, in their discretion, all undisputed premiums, charges, claims, deductibles, retentions, administrative fees, Insurance Brokerage Fees (as defined below) and all other obligations relating to the Insurance Policies that are or may come due and payable, including any prepetition amounts and amounts that may come due under any premium finance agreement (collectively, the "Insurance Obligations").

### i. Insurance Policies and Related Payment Obligations

139. In the ordinary course of business, the Debtors maintain various liability, property, umbrella and other insurance policies (whether current or expired, and together with any agreements related thereto and any new policies that may be entered into, the "Insurance Policies") through several different insurance carriers (together with any third-party administrators, the "Insurance Carriers"), including, but not limited to, the currently in-force Insurance Policies and Insurance Carriers identified in the schedule attached to the proposed order to the Insurance Motion as Exhibit 1. The Insurance Policies provide the Debtors with insurance coverage for liabilities related to, among other things, general liability, directors' and officers' liability, workers' compensation and employer's liability, automobile liability and environmental liability. The

Debtors may also enter into replacement, extension, or new Insurance Policies after the date hereof due to the expiration or other termination of currently in-force Insurance Policies.

140. The aggregate amount of annual premiums on account of all of the current Insurance Policies is approximately **$3,900,000**. As of the Petition Date, all amounts due under the fourteen (14) insurance policies have been paid in full.

141. In addition to annual premiums, pursuant to certain of the Insurance Policies, the Debtors may be required to pay various other amounts, including deductibles, retentions, administrative fees, and claims asserted under such policies. It is possible that the failure to pay these amounts may result in a loss of coverage under the Insurance Policies or other disputes with the Insurance Carriers over the parties' respective rights and obligations if such amounts remain unpaid. As of the Petition Date, no such amounts are outstanding.

142. I believe that continuation of the current Insurance Policies and entry into new insurance policies are essential to the operation of the Debtors' business and are necessary to protect the Debtors from catastrophic, potential liability.

**ii.     Insurance Brokers**

143. The Debtors obtain their Insurance Policies through their insurance brokers, Aon PLC[15] ("Aon") and Higginbotham Insurance Agency, Inc. ("Higginbotham," and together with Aon, the "Insurance Brokers"). The Insurance Brokers assist the Debtors in obtaining comprehensive insurance coverage for their operations in the most cost-effective manner by, among other things, negotiating policy terms, provisions, and premiums, assisting the Debtors with claims, and providing ongoing support throughout the applicable policy periods. The Debtors pay

---

[15] The Debtors utilize several brokers within the Aon corporate family, including Aon Private Risk Management Insurance Agency, Inc., AON Risk Services Southwest, Inc., and others. For purposes of this Motion, the term Aon includes all Aon insurance brokers that have sold active policies to the Debtors.

brokerage fees (the "Insurance Brokerage Fees") to the Insurance Carriers for Insurance Policies brokered through the Insurance Brokers. These fees are built into the premium amounts and are not billed separately. As of the Petition Date, I understand that the Debtors do not believe they owe any amounts to the Insurance Broker on account of Insurance Brokerage Fees or any other prepetition obligations.

### iii.    Insurance Premium Financing Agreements

144.    The Debtors financed the premiums for certain of their insurance policies through two financing companies, AFCO Credit Corporation ("AFCO") and Peoples Premium Financing ("Peoples"). The premiums due on the directors and officers and management liability policies (the "D&O Policies") were financed by AFCO pursuant to a commercial premium finance agreement (the "AFCO Finance Agreement"). The premiums due on the Debtors' property and windstorm insurance policies (the "Property and Windstorm Policies") were financed by Peoples pursuant to a commercial premium finance agreement (the "Peoples Finance Agreement").

### a.    AFCO Finance Agreement

145.    Pursuant to the AFCO Finance Agreement, AFCO paid the insurance premiums due under the D&O Policies upfront in exchange for nine (9) monthly installment payments from the Debtors that include a built-in finance charge. The Debtors' obligation under the AFCO Finance Agreement is secured by all sums due under the AFCO Finance Agreement and any unearned premiums or other sums that may become payable under the D&O Policies.

146.    The premiums under the AFCO Finance Agreement total $740,486.10. Under the AFCO Finance Agreement, the Debtors made an initial down payment of $185,148.00 and agreed to make nine (9) monthly payments of $62,828.02 with an annual percentage rate of 4.350%. As of the Petition Date, the Debtors are current on payments under the AFCO Financing Agreement.

Nonetheless, through the Insurance Motion the Debtors seek relief to continue paying premiums under the AFCO Finance Agreement in the ordinary course of business on a postpetition basis.

### b. People's Finance Agreement

147. Pursuant to the Peoples Finance Agreement, Peoples paid the insurance premiums due under the Property and Windstorm Policies upfront in exchange for ten (10) monthly installment payments from the Debtors that include a built-in finance charge. The Debtors' obligation under the Peoples Finance Agreement is secured by all sums due under the Peoples Finance Agreement and any unearned premiums or other sums that may become payable under the Property and Windstorm Policies.

148. The premiums under the Peoples Finance Agreement total $1,648,108.10. Under the Peoples Finance Agreement, the Debtors made an initial down payment of $242,691.00 and agreed to make ten (10) monthly payments of $140,542.71 with an annual percentage rate of 2.486%. As of the Petition Date, the Debtors are current on payments under the Peoples Financing Agreement. Nonetheless, through the Insurance Motion, the Debtors seek relief to continue paying premiums under the Peoples Finance Agreement in the ordinary course of business on a postpetition basis.

149. I believe that the relief requested in the Insurance Motion is in the best interest of the Debtors' estates, creditors, and all other parties in interest. Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be approved.

## J. Customer Programs Motion

150. Through the *Debtors' Emergency Motion for Entry of an Order Authorizing the Debtors to Honor Certain Prepetition Obligations to Customers and to Otherwise Continue Customer Programs in the Ordinary Course of Business* (the "Customer Programs Motion"), the

Debtors seek entry of an order authorizing the Debtors to (a) maintain and administer the Customer Programs; (b) honor prepetition obligations to customers arising under the Customer Programs in the ordinary course of business and in a manner consistent with past practice (collectively, the "Prepetition Customer Obligations"); and (c) renew, replace, implement, modify or terminate any of the Customer Programs as the Debtors deem appropriate in their business judgment and in the ordinary course of business, without further application to the Court. The Debtors also request the Court to authorize and direct the Debtors' banks to receive, process, honor and pay all checks, credit card payments, and electronic payment requests relating to the foregoing.

151. In the ordinary course of their businesses, the Debtors maintain and administer customer-related programs, practices, and policies (collectively, the "Customer Programs") designed to drive sales, meet competitive pressures, and build key customer relationships. The viability and success of the Debtors' businesses depends on fostering the loyalty of their various customers.

152. The Debtors' products are sold through various sales channels, including specialty bedding stores, furniture retailers, department stores, wholesale distributors, other retailers, and various e-commerce platforms. The Debtors implement the Customer Programs to encourage their customers to increase their purchasing frequency and volume, resulting in larger net revenues for the Debtors. The Debtors seek to continue the Customer Programs because they have produced positive results in the past, and are responsible for generating valuable goodwill, repeat business and increased revenue.

153. The Debtors' Customer Programs include, but are not limited to, the following programs:

i. **Warranty Program**

154. Consistent with common industry practices, the Debtors provide warranties to most of their customers on the various bedding products that they supply (the "Warranty Program"). The Warranty Program subjects the Debtors to standard terms and conditions in warranty clauses that include workmanship of the Debtors' products. The Warranty Program generally provides the Debtors' customers with warranties ranging from five to ten years, depending on the bed quality and brand. To the extent that customers identify workmanship issues with the Debtors' products or any other claims for coverage under the Debtors' warranties, the Debtors may be held liable to remedy such defects or reimburse the customer per the warranty terms. In such event, the Debtors generally provide a replacement product or prorated credit toward a purchase. The Debtors facilitate the Warranty Program through their retail customers, rather than directly with the consumer, and pay the costs associated with the Warranty Program as they are incurred. Accordingly, the Debtors do not maintain a reserve for the Warranty Program.

**ii.    Rebate Programs**

155. The Debtors maintain two rebate programs: (i) the Rebates, Discounts, and Allowances Program (as defined below) and the (ii) Volume Incentives Program (as defined below, and (i) and (ii) together, the "Rebate Programs"). In connection with the Rebate Programs, the Debtors have one reserve on their balance sheet related to potential obligations under the Rebate Programs, which as of the Petition Date, the Debtors held approximately **$358,000**. Each of the Rebate Programs are described below.

**a.    Rebates, Discounts, and Allowance Program**

156. The Debtors maintain a program that includes rebates, discounts, and allowances (the "Rebates, Discounts, and Allowances Program"). The Rebates, Discounts, and Allowances Program incentivize the majority of supplier contracts and coordinated customer purchasing. For

example, the Debtors allow customer rebates as determined on a retailer-by-retailer basis, such as when a retailer seeks to include the Debtors' products in a special sale program or discount situation.

### b. Volume Incentives Program

157.    The Debtors customarily provide certain of their retail customers and aftermarket installers discounts and other incentives that are tied to the amount of products purchased (the "Volume Incentives Program").  Generally, larger retailers in the bedding market are accustomed to receiving such incentives.  Without the Volume Incentives Program, suppliers with limited consumer brands are particularly vulnerable in current market conditions, as larger retailers can easily find replacement products elsewhere.  Notably, sales to retailers represent a significant amount of the Debtors' net sales.  The Volume Incentives Program is essential to the Debtors' retention of their customer base and is critical to future sales growth.

### iii.    Marketing and Advertising Programs

158.    The Debtors maintain two marketing and advertising programs:  (i) the In-Store Marketing Program (as defined below) and (ii) Co-Op Advertising (as defined below, and (i) and (ii) together, the "Marketing and Advertising Programs").  The Debtors believe that the Marketing and Advertising Programs are critical to their efforts to foster partnerships with retailers.  In connection with the Marketing and Advertising Programs, the Debtors have one reserve on their balance sheet related to potential obligations under the Marketing and Advertising Programs, which as of the Petition Date, the Debtors held approximately $440,000.  Each of the Marketing and Advertising Programs are described below.

### a.    In-Store Marketing Program

159.    The Debtors maintain a program that is designed to increase the volume of sales of

several of the Debtors' products (the "In-Store Marketing Program"). The program includes interactive product displays and promotions for its retail customers.

### b. Co-Op Advertising

160. The Debtors also maintain a program pursuant to which they contribute to a retail customer's advertising campaign to promote the Debtors' products ("Co-Op Advertising").

### iv. Defective Allowance Program

161. The Debtors maintain a defective allowance program (the "Defective Allowance Program") pursuant to which the Debtors provide a discount to retail customers due to defective products, which permits the retailer to retain the product rather than returning the product to the Debtors. The Debtors maintain the Defective Allowance Program with approximately four to five retailers. The Debtors monitor the Defective Allowance Program to ensure the allowances do not exceed the normal return rate. Given the nature of the program, the Debtors do not maintain a reserve for the Defective Allowance Program.

162. Continuing and honoring the Customer Programs is essential for maintaining the Debtors' customers' goodwill and continuing the Debtors' business. I believe that the negative impact of refusing to honor the Customer Programs would harm the Debtors' relationships with its customers and jeopardize the Debtors' Chapter 11 Cases. Accordingly, on behalf of the Debtors, I respectfully submit that the Customer Programs Motion should be approved.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing Declaration is true and correct.

Dated: June 25, 2022

By: ___ /s/ Michael Juniper___

Name: Michael Juniper

Title: Chief Restructuring Officer

*Signature Page to Juniper Declaration*