Stephen M. Pezanosky
State Bar No. 15881850
Ian Peck
State Bar No. 24013306
Eli O. Columbus
State Bar No. 24028062
Martha Wyrick
State Bar No. 24101606
HAYNES AND BOONE, LLP
301 Commerce Street, Suite 2600
Fort Worth, TX 76102
Telephone: 817.347.6600
Facsimile: 817.347.6650
Email: stephen.pezanosky@haynesboone.com
Email: ian.peck@haynesboone.com
Email: eli.columbus@haynesboone.com
Email: martha.wyrick@haynesboone.com

**PROPOSED ATTORNEYS FOR DEBTORS**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Corsicana Bedding, LLC, *et al.*,[1] | § | Case No. 22-90016-elm11 |
| | § | |
| Debtors. | § | Jointly Administered |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER: (I) APPROVING DEBTORS' KEY EMPLOYEE INCENTIVE PLAN AND (II) GRANTING RELATED RELIEF

Corsicana Bedding, LLC and its debtor affiliates, as debtors and debtors-in-possession in

the above-referenced chapter 11 cases (collectively, the "Debtors") hereby file this *Debtors'*

*Motion for Entry of an Order: (I) Approving Debtors' Key Employee Incentive Plan and (II)*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Corsicana Bedding, LLC (3019) ("Corsicana"); Thetford Leasing LLC (7227) ("Thetford"); Olive Branch Building, LLC (7227) ("Olive Branch"); Eastern Sleep Products Company (1185) ("Eastern Sleep"); Englander-Symbol Mattress of Mississippi, LLC (5490) ("Englander Symbol"); Hylton House Furniture, Inc. (5992) ("Hylton House"); Luuf, LLC (3450) ("Luuf"); Symbol Mattress of Florida, Inc. (4172) ("Symbol Florida"); Symbol Mattress of Pennsylvania, Inc. (3160) ("Symbol Pennsylvania"); Symbol Mattress of Wisconsin, Inc. (0871) ("Symbol Wisconsin"); Symbol Mattress Transportation, Inc. (1185) ("Symbol Transportation"); and Master Craft Sleep Products, Inc. (4961) ("Master Craft"). The location of the Debtors' service address is P.O. Box 3233, Fort Worth, Texas 76113.

*Granting Related Relief* (the "<u>Motion</u>"). In support of the Motion, the Debtors respectfully state as follows:

<u>**Jurisdiction and Venue**</u>

1.      The United States District Court for the Northern District of Texas (the "<u>District Court</u>") has jurisdiction over the subject matter of this Motion pursuant to 28 U.S.C. § 1334. The District Court's jurisdiction has been referred to this Court pursuant to 28 U.S.C. § 157 and the District Court's Miscellaneous Order No. 33, *Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc* dated August 3, 1984. This is a core matter pursuant to 28 U.S.C. § 157(b), which may be heard and finally determined by this Court. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

<u>**Background**</u>

**A.      General Background**

2.      On June 25, 2022 (the "<u>Petition Date</u>"), the Debtors each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") commencing the above captioned cases (the "<u>Chapter 11 Cases</u>"). The Debtors continue to manage and operate their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been requested or appointed in these Chapter 11 Cases.

3.      On July 8, 2022, the U.S. Trustee appointed an official committee of unsecured creditors in these Chapter 11 Cases (the "<u>Committee</u>").

4.      A detailed description of the Debtors and their businesses and the Debtors' Chapter 11 Cases are set forth in greater detail in the *Declaration of Mike Juniper in Support of*

the Debtors' Chapter 11 Petitions and First Day Motions [Doc. No. 15] (the "First Day Declaration").

**B.      DIP Financing**

5.      On the Petition Date, the Debtors filed the *Debtors' Emergency Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503 and 507 (I) Authorizing the Debtors to Obtain Senior Secured Superpriority Postpetition Financing; (II) Granting (A) Liens and Superpriority Administrative Expense Claims and (B) Adequate Protection to Certain Prepetition Lenders; (III) Authorizing Use Of Cash Collateral; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* [Doc. Nos. 13 & 14] (the "DIP Motion").

6.      On June 28, 2022, the Court entered an interim order approving the DIP Motion [Doc. No. 53] (the "Interim DIP Order").  Pursuant to the Interim DIP Order, the Court authorized the Debtors to use cash collateral and the proceeds of the DIP Facilities on the terms set forth in the DIP Loan Documents, subject to the terms of the Interim Order and the Approved Budget (as such terms are defined herein).  For purposes of this Motion, the Approved Budget is referred to herein as the "DIP Budget."  A copy of the DIP Budget is attached to the Interim DIP Order as Exhibit C.

7.      Pursuant to the Interim DIP Order, the Debtors are required to pursue a sale process for the sale of all or substantially all of their assets pursuant to section 363 of the Bankruptcy Code.  Interim DIP Order, ¶ (F)(v).

**C.      The Bid Procedures Motion**

8.      As required under the Interim DIP Order, on June 29, 2022, the Debtors filed the *Debtors' Motion Pursuant to Bankruptcy Code §§ 105(a), 363, and 365, and Bankruptcy Rules*

*2002, 6004, and 6006, for Entry of an Order (A) Approving Sale and Bidding Procedures and Limited Bid Protections in Connection with Sale of Assets of the Debtors, (B) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, and (C) Granting Related Relief* [Doc. Nos. 68 & 108] (as amended, the "Bid Procedures Motion").

9.     Pursuant to the Bid Procedures Motion, the Debtors seek to sell substantially all of their Assets (as defined therein) (the "Sale Transaction").  As described more fully in the Bid Procedures Motion, the Debtors' prepetition term loan lenders have agreed to serve as the Stalking Horse Bidder (as defined in the Bid Procedures Motion).

## The Key Employee Incentive Plan

### A.     The Debtors' Need for the KEIP

10.     The sale process contemplates a robust marketing process followed by a competitive bidding process to enable the Debtors to obtain the highest or other best offer for their Assets.   The key employee incentive plan (the "KEIP") establishes certain financial performance metrics based upon the Debtors' weekly cash flow forecast to ensure that the financial performance metrics are challenging and will require a strong performance by the Debtors and the KEIP Participants.  The KEIP also establishes certain volume sales metrics to exceed the projected sales revenues contemplated in the DIP Budget for the third quarter of 2022 which will also require a strong performance by the Debtors and the sales team.  The KEIP is designed for the purpose of maintaining and enhancing the enterprise value for the benefit of all of the Debtors' stakeholders.

11.     The Debtors seek authority to implement the KEIP for non-insider employees and one insider employee to enable the Debtors to prosecute and complete an orderly and value-

maximizing sale process in the optimal manner. As described further herein, the goals of the KEIP are as follows:

- to incentivize key employees throughout the sale process;

- to motivate key personnel through the sale process;

- to facilitate the successful sale of the Assets;

- to reward key employees if critical goals are satisfied with respect to the DIP Budget and the sale process; and

- to maximize the value of the Debtors' estate for the benefit of all stakeholders.

**B.      Development of the KEIP**

12.      The Debtors enlisted the services of their financial advisor, CR3 Partners, LLC ("CR3"), and counsel, Haynes and Boone, LLP, to help develop the KEIP. The Debtors, their counsel, and CR3, reviewed the Debtors' employment requirements during these Chapter 11 Cases, and the attendant necessary features of an incentive plan. CR3 assisted the Debtors in designing the KEIP, keeping in mind the Debtors' goals of maximizing the value of the Debtors' assets through the Sale Process, enhancing the Debtors' financial condition, and ensuring effective management throughout the Chapter 11 Cases. The KEIP was designed in a reasonable, cost-effective way to promote the appropriate incentives and to retain personnel essential to the success of the Chapter 11 Cases. Importantly, the benefits to the Debtors' estates that are contemplated under the KEIP, either through increased revenue from gross sales or from conserving cash, exceed the cost of funding the KEIP.

13.      CR3 also worked closely with the Debtors to ensure that the KEIP was competitive within the industry, and that the incentives set forth in the KEIP were appropriate. The Debtors and CR3 based the plans' initial proposed payments upon market comparisons within a Chapter 11 bankruptcy context.

14.     As more fully described in the Juniper KEIP Declaration (as defined below), to assess the overall reasonableness of the KEIP, the Debtors' advisors compared the proposed KEIP to incentive plans approved by bankruptcy courts since 2016, from companies with pre-petition assets of $500 million or less and target sale proceeds of approximately $550 million or less (the "Comparable KEIPs"), including:

| | |
|---|---|
| *In re Country Fresh Holding Co.*, Case No. 21-30574 (Bankr. S.D. Tex. 2021) (Isgur) | *In re Fred's, Inc.*, Case No. 19-11984 (Bankr. D. Del. 2019) (Sontchi) |
| *In re Studio Movie Grill Holdings, LLC*, Case No. 20-32633 (Bankr. N.D. Tex. 2020) (Jernigan) | *In re Fairway Group Holdings Corp.*, Case No. 20-10161 (Bankr. S.D.N.Y. 2020) (Garrity) |
| *In re Trivascular Sales LLC*, Case No. 20-31840 (Bankr. N.D. Tex. 2020) (Jernigan) | *In re Aralez Pharmaceuticals US Inc*, Case No. 18-12425 (Bankr. S.D.N.Y. 2018) (Glenn) |
| *In-Shape Holdings, LLC*, Case No. 20-13130 (Bankr. D. Del. 2020) (Silverstein) | *In re Brookstone Holdings*, Case No. 18-11780 (Bankr. D. Del. 2018) (Shannon). |
| *In re Approach Res. Inc.*, Case No. 19-36444 (Bankr. S.D. Tex. 2019) (Isgur) | *In re GreenHunter Res. Inc.*, Case No. 16-40956 (Bankr. N.D. Tex. 2016) (Nelms) |
| *In re Melinta Therapeutics, Inc.*, Case No. 19-12748 (Bankr D. Del. 2019) (Silverstein) | |

15.     The Debtors and CR3 developed the KEIP to be comparable to plans similar in design and scope which have been recently approved by bankruptcy courts.  CR3 and the Debtors used this market research in preparing proposals for the KEIP which underwent several rounds of revisions before being submitted for consideration to the Debtors' board of directors (the "Board of Directors").  The Board of Directors reviewed the proposed plans, and commented, asked questions, and provided modifications before approving the current versions of the KEIP prior to the filing of this Motion.

16.     The Debtors and their advisors focused all of their efforts at the outset of these cases on obtaining approval of "First Day" and "Second Day" relief, the bid procedures governing the sale process, and the DIP financing to fund these cases.  The Debtors then discussed the KEIP with the DIP Agents (as defined in the Interim DIP Order).  The DIP Agents

reviewed, commented on, and made modifications and clarifications to the KEIP. The Debtors

obtained support from the DIP Agents for the KEIP insofar as the programs comply with the DIP

Budget, the Interim (and Final, as applicable) DIP Order, and the Bid Procedures Motion. Thus,

the proposed terms of the KEIP set forth herein reflect consensus among the Debtors and the DIP

Agents.

## C.    Terms of the KEIP

### i.    *Eligible Employees*

17.    The Debtors have identified 43 key employees eligible to receive payments under

the KEIP (the "<u>KEIP Participants</u>").  All of the KEIP Participants possess institutional

knowledge and skills that are essential to the Debtors' sale process and success of these Chapter

11 Cases.  In addition to responsibilities related to the Debtors' everyday operations, the KEIP

Participants have assumed, and will continue to assume, considerable added responsibilities in

connection with the Chapter 11 Cases and the sale process.  Such responsibilities may include

continuing business operations with all of the challenges attendant to being in bankruptcy,

facilitating and conducting management presentations for potential bidders, responding to bidder

information and diligence requests, and otherwise taking whatever steps are necessary to obtain

the highest and best bid for the Debtors' assets.  The Debtors submit that payments made under

the KEIP are necessary to incentivize key employees to perform these duties in an optimal

manner, and reward them for their efforts during these Chapter 11 Cases.  Relatedly, without the

KEIP, the Debtors likely will lose key personnel who recognize the potential need to seek further

employment in a going concern sale and yet remain critical to the success of these Chapter 11

Cases and the Sale Process.  In fact, in the last few months, approximately three key sales

representatives  and  various  other  key  employees  resigned  to  pursue  other  employment

opportunities, putting substantial additional demands and pressures on the remaining KEIP Participants.

### ii. Summary of the KEIP

18. The Debtors designed the KEIP to incentivize the KEIP Participants to continue to meet and exceed challenging performance targets during these Chapter 11 Cases. If the KEIP Participants achieve the KEIP Metrics (as defined below), they would be entitled to payments under the KEIP at a maximum aggregate amount of **$980,000**, broken down as follows: (i) $330,000 for achieving the Restructuring Metric (as defined below); (ii) $210,000 for achieving the Cash Saving Metric (as defined below), and (iii) up to $440,000 for achieving the Sales Volume Metric (as defined below).[2] If the KEIP Participants do not achieve the Restructuring Metric, they are ineligible to obtain the payments contemplated under the other KEIP Metrics. The Debtors believe these award opportunities are necessary and appropriate to drive business performance during the Chapter 11 Cases.

19. A summary of the key terms of the KEIP is below:[3]

    a. **KEIP Participants.** The Debtors' selected 43 of their most vital employees who will play significant roles in optimizing the Debtors' overall financial performance in these Chapter 11 Cases.

    b. **KEIP Metrics.** The KEIP provides three (3) separate incentive payments to the KEIP Participants, based on three (3) performance metrics: (i) consummation of a Sale Transaction or Alternative Transaction[4] (the "Restructuring Metric"), (ii) achieving a savings of 15% of operating cash (excluding professional or other-related bankruptcy costs) as compared against the DIP Budget (the "Cash Saving Metric"); and (iii) gross sales above the DIP Budget estimate for gross sales (the "Sales Volume Metric," and collectively, the "KEIP Metrics"). For a KEIP Participant to obtain any benefits under the Cash Saving Metric or the Sales

---

[2] These amounts represent gross payroll dollars. The actual cost to the Debtors may be higher to account for any employer-required taxes, if applicable. The Debtors estimate such costs to be less than 10% of the total payments.

[3] In the event of a discrepancy between this Motion and the KEIP, the KEIP shall control.

[4] Capitalized terms used but not defined herein shall have the meanings given to them in the KEIP (**Exhibit B**).

Volume Metric, the Restructuring Metric must be satisfied. The KEIP Metrics are described more fully below.

c. **Retention Requirements.** In order to be eligible to participate under the KEIP, each KEIP Participant must remain employed by the Debtors on the Payment Date (as defined in the KEIP), unless that person is terminated by the Debtors without Cause prior to the Payment Date or upon the KEIP Participants' death or Total and Permanent Disability. In the event any KEIP Participant becomes ineligible, the amounts allocated for the KEIP shall not be redistributed to the remaining KEIP Participants. Likewise, no person hired into a vacated KEIP Participant position shall be eligible to participate in the KEIP.

d. **Measurement Period.** The measurement period shall run from the Petition Date until the earliest of: (i) the closing date of a Sale; and (ii) the consummation of the Alternative Transaction.

e. **Award Payment Date.** Any award under the KEIP shall be paid by the Debtors (or the purchaser of substantially all of their assets, successor, or assign, as applicable) 60 days after the Restructuring Metric is achieved (i.e., the Payment Date, as defined in the KEIP).

### iii.    *The KEIP Metrics*

20.    ***The Restructuring Metric.*** The KEIP Participants entitled to receive payments under the KEIP for reaching the Restructuring Metric include one insider employee and other non-insider employees in management, operations, and accounting. These KEIP Participants have control and oversight of the sale process and remain critical to its conclusion. Accordingly, incentivizing their performance will ensure that the sale process takes place efficiently, diligently and in a value-maximizing manner.

21.    Upon the occurrence of: (i) a Sale Transaction that is consummated no later than 75 days after the Petition Date, unless otherwise extended as agreed to in writing between the Debtors and the DIP Secured Parties, or (ii) an alternative restructuring transaction or chapter 11 plan, other than a Sale Transaction (the "Alternative Transaction"), that is consummated no later than 100 days after the Petition Date, unless otherwise extended as agreed to in writing between the Debtors and the DIP Secured Parties, *provided that* (i) and (ii) are on terms reasonably

acceptable to the DIP Secured Parties (as defined in the Interim DIP Order), those certain KEIP Participants listed in the KEIP shall be entitled to receive the amounts (the "Restructuring Transaction Fee") described in the KEIP.

22. ***The Cash Saving Metric.*** The KEIP Participants entitled to receive payments under the KEIP for reaching the Cash Saving Metric include one insider employee and other non-insider employees in management, operations, and accounting. These KEIP Participants have oversight over the Debtors' cash flow needs and can work to find ways to conserve cash during these Chapter 11 Cases. The amounts that will be saved upon a successful completion of the Cash Saving Metric is less than the amount contemplated to be paid to the KEIP Participants for achieving this metric.

23. Upon completion of the Restructuring Transaction or the Alternative Transaction, those certain KEIP Participants entitled to receive the Restructuring Transaction Fee shall also be entitled to additional amounts based on the Cash Saving Metric as described in the KEIP for achieving the Cash Saving Metric. The Cash Saving Metric is achieved provided that there is a savings of 15% of operating cash as compared to the DIP Budget, excluding professional or other-related bankruptcy costs, measured over the course of the Chapter 11 Cases, beginning on the Petition Date and ending on the closing of the Restructuring Transaction or the Alternative Transaction; *provided that,* for purposes of determining the Cash Saving Metric, net cash flow can be adjusted to account for the effect of post-petition accounts payable (excluding payroll), if any.

24. ***The Sales Volume Metric.*** The Sales Volume Metric is divided in to two (2) tiers. The payments thereunder vary depending on the level of gross sales that are achieved above and beyond the levels contemplated under the DIP Budget ($68,000,000) for the third

quarter of 2022. The KEIP Participants entitled to receive payments under the KEIP for reaching the Sales Volume Metric primarily include employees involved in sales of the Debtors' product. This metric incentivizes the Debtors' sales employees to continue to work to reach and exceed sales targets during the Chapter 11 Cases, which will ultimately lead to maintaining and increasing the Debtors' going concern value for their Assets. Moreover, it is critical that the Debtors' customer sales and relationships are maintained during the Chapter 11 Cases. The increased margins from the gross sales targets that are required for KEIP Participants to reach the Sales Volume Metric are higher than the amount contemplated to be paid to the KEIP Participants for achieving this metric.

25.    Upon completion of the Restructuring Transaction or the Alternative Transaction, those certain KEIP Participants listed in the KEIP shall be entitled to receive the amounts described in the KEIP for achieving the Sales Volume Metric. The first tier of the Sales Volume Metric is achieved if these KEIP Participants achieve a gross sales target of $75,000,000 of the Debtors' products for the third quarter. The second tier of the Sales Volume Metric is achieved is these KEIP Participants achieve a gross sales target of $85,000,000 of the Debtors' products for the third quarter.

**Relief Requested**

26.    The Debtors request the entry of an order, substantially in the form attached hereto as **Exhibit A** (i) authorizing implementation of the KEIP and (ii) granting related relief. Specifically, the Debtors seek authority to implement the KEIP, which is attached to the Motion as **Exhibit B**.[5]

---

[5] Contemporaneously herewith, the Debtors filed a motion to seal the KEIP because it contains identifying information of the KEIP Participants, including their names and potential KEIP payments, which the Debtors submit should be protected from public disclosure.

27.     In support of the Motion, the Debtors submit the declaration of Michael Juniper, the Debtors' Chief Restructuring Officer, which is attached hereto as **Exhibit C** (the "Juniper KEIP Declaration").

<strong>Basis for Relief Requested</strong>

**A.     Sections 503(c)(1) and (c)(2) Do Not Apply to the KEIP**

28.     Section 503(c)(1) of the Bankruptcy Code governs retention payments to insiders, and section 503(c)(2) of the Bankruptcy Code governs only severance payments to insiders. These provisions are generally inapplicable here because the KEIP Participants are not insiders and/or because the KEIP awards KEIP Participants for performance instead of retention. *See, e.g., In re Dana Corp.*, 358 B.R. 567, 576 (Bankr. S.D.N.Y. 2006) (applying section 503(c)(3) of the Bankruptcy Code to evaluate management incentive plan in absence of applicability of sections 503(c)(1) or 503(c)(2)); *In re Alpha Nat. Res., Inc.*, 546 B.R. 348, 35556 (Bankr. E.D. Va. 2016) ("[T]he analysis under § 503(c) changes when a debtor purports to make a payment not to retain an insider, but primarily to incentivize the insider to achieve certain goals, [and] [o]n its face, § 503(c)(1) does not apply to the KEIP because the payments thereunder are incentive and not purely retentive.").

29.     Section 101(31)(B) of the Bankruptcy Code defines the term "insider" as to entities to include directors, officers, and personal in control of the debtor.  The majority of the KEIP Participants do not include anyone at the highest level of the Debtors' existing management.[6]  Regardless of any KEIP Participants that are insiders, the KEIP does not provide

---

[6] Certain of the KEIP Participants hold titles such as "vice president," but such titles are not determinative of insider status. *In re Global Aviation Holdings, Inc.*, 478 B.R. 142, 148 (Bankr. E.D.N.Y. 2012) ("[T]itles such as 'vice president' are not determinative."); *In re Borders Grp., Inc.*, 453 B.R. 459, 469 (Bankr. S.D.N.Y. 2012) (holding an individual's title, by itself, is insufficient to establish insider status under section 101(31) of the Bankruptcy Code); *In re Foothills Tex., Inc.*, 408 B.R. 573, 583 (Bankr. D. Del. 2009) (noting "the type of evidence that might support finding a person to be an [insider] may vary from case to case based on the facts and circumstances surrounding the debtor's business"); *In re Longview Aluminum, L.L.C.*, 419 B.R. 351, 355 (Bankr. N.D. Ill. 2009) (noting an

benefits to the KEIP Participants upon termination of their employment or provide retention bonuses. *See In re Dana*, 358 B.R. at 575 (applying section 503(c)(3) of the Bankruptcy Code to evaluate management incentive plan in absence of applicability of sections 503(c)(1) or 503(c)(2) of the Bankruptcy Code). Instead, the KEIP distributes payments based on the successful achievement of the KEIP Metrics over which the KEIP Participants have influence. Therefore, even though the KEIP includes certain "insiders" within the Bankruptcy Code, those persons are still eligible under sections 503(c)(1) and (c)(2) of the Bankruptcy Code because the KEIP is an objective incentivization plan, and without requisite performance, there will be no payout under the KEIP.

30. Although the KEIP was not designed with the goal of retaining the KEIP Participants, the fact that the KEIP may encourage the KEIP Participants to remain employed with the Debtors throughout the Chapter 11 Cases should not bar implementation of the KEIP. The indirect benefit of retention should not act as a bar to the authorization of the KEIP. *See In re Alpha Nat. Res., Inc*., 546 B.R. at 356 ("[A] KEIP that merely has some retentive effect should not be analyzed under § 503(c)(1)."). As summarized above, payouts under the KEIP require a far higher threshold than merely remaining employed and there is no guarantee that the KEIP Participants will receive any payouts.

31. For these reasons, the Debtors respectfully submit that sections 503(c)(1) and (c)(2) of the Bankruptcy Code do not apply to the KEIP. The KEIP is well-tailored to maximize value for the benefit of the Debtors' estates.

---

individual's title alone as an "officer" or "director" is insufficient to establish that an individual is an insider). None of the KEIP Participants with such titles hold executive positions with the Debtors.

**B. The KEIP Satisfies Section 503(c)(3) of the Bankruptcy Code**

32. Section 503(c)(3) of the Bankruptcy Code permits payments to a debtor's employees outside the ordinary course of business if such payments are justified by "the facts and circumstances of the case." 11 U.S.C. § 503(c)(3). Some courts have concluded that whether payments to employees are justified by the "facts and circumstances" of a case is to be determined by application of the business judgment rule. *See In re Dana*, 358 B.R. at 576–77 (describing six factors that courts may consider when determining whether the structure of a compensation proposal meets the "sound business judgment test" in accordance with section 503(c)(3) of the Bankruptcy Code). Some courts, including in this District, have applied a slightly higher bar for payments under section 503(c)(3) of the Bankruptcy Code. *See, e.g., In re Pilgrim's Pride Corp.*, 401 B.R. 229, 236–37 (Bankr. N.D. Tex. 2009) (holding that section 503(c)(3) of the Bankruptcy Code requires that the proposed transfer be in the best interests of creditors and the debtor's estate in addition to the business judgment standard); *In re Dura Automotive Systems, Inc.*, Case No. 06-11201, Hr'g Tr. 40:17-41:2 (Bankr. D. Del. Apr. 25, 2007) (noting that section 503(c)(3) of the Bankruptcy Code "mean[s] something above the business judgment standard but maybe nor much farther above it.").

33. In *Pilgrim's Pride*, the Court concluded that section 503(c)(3) of the Bankruptcy Code contemplates greater involvement by the court and that "even if a good business reason can be articulated for a transaction . . . the court must make its own determination that the transaction will serve the interests of the creditors and the debtor's estate." *Pilgrim's Pride*, 401 B.R. at 237. In assessing whether the proposed transaction is in the best interests of the creditors and the debtor's estate, a court "need only determine that the Debtors have provided a sound business reason for the [transaction] and that, even at [its] projected cost, the benefit to the Debtors'

estates is of commensurate value." *Id.* at 237 n.14. The Debtors respectfully submit that the KEIP meets this standard.

34. First, the Debtors structured the KEIP to directly relate to performance metrics and with the motivation of key employees in mind. The Debtors selected the KEIP Participants because they will have the greatest influence upon these Chapter 11 Cases and each have the ability to maximize revenue, reduce expenses, and generate added value for the Debtors' estates. Moreover, the Debtors determined that the KEIP Participants are best positioned to help them with a timely exit from bankruptcy. The KEIP is appropriately designed to motivate the KEIP Participants to drive the Debtors to meeting or exceeding their goals.

35. Second, the cost of the KEIP is reasonable. As discussed above and further described in the Juniper KEIP Declaration, the Debtors and their advisors analyzed recent KEIPs approved in this District and elsewhere in designing this KEIP. Importantly, except for the amounts payable under achieving the Restructuring Transaction Metric, each of the KEIP Metrics are self-funding. If the KEIP Participants achieve the targets, the amounts obtained and saved for the Debtors' estates exceed the cost of payment under the KEIP. Accordingly, the Debtors believe that the costs are reasonable and well-justified given the size of the Debtors' businesses and the value that achievement of the KEIP metrics would provide to the Debtors' estates.

36. Third, the KEIP has a target scope, limited only to those persons whose performance will most impact the Debtors' financial goals and metrics.

37. Fourth, the Debtors designed the KEIP with the advice and consultation of their financial advisor, CR3, and their counsel, Haynes and Boone. As noted in the Juniper KEIP Declaration, the Debtors and their advisors analyzed numerous approved KEIPs to properly

15

evaluate the KEIP. Additionally, the Debtors' management team carefully reviewed multiple iterations of the KEIP, participated in several meetings with management regarding the parameters of the KEIP, asked extensive questions of the Debtors and their advisors, and requested that certain adjustments be made to the KEIP prior to its approval.

38.     The foregoing demonstrates a sound business purpose and, in addition, demonstrates that the value of the KEIP to the Debtors' estates is more than commensurate with its cost. Accordingly, the Debtors submit that the KEIP satisfies section 503(c)(3) of the Bankruptcy Code and should be approved.

## C.     The KEIP is an Exercise of the Debtors' Sound Business Judgment

39.     The KEIP May also be approved under section 363(b)(1) of the Bankruptcy Code. *See In re Alpha Nat. Res.*, 546 B.R. at 356 ("Incentive payments under a KEIP are governed by the more general provisions of § 363(b)(1). . . ."). Section 363(b)(1) of the Bankruptcy Code provides that a debtor-in-possession may "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Transactions outside the ordinary course of business need to be justified by a sound business purpose in order to obtain bankruptcy court approval. *Inst. Creditors of Cont'l Airlines, Inc. v. Cont'l Airlines, Inc. (In re Cont'l Airlines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("Implicit in § 363(b) is the . . . requirement of justifying the proposed transaction . . . there must be some articulated business justification" for transactions outside the ordinary course of business); *In re Gadzooks, Inc.*, No. 04-31486-HDH-11, 2005 WL 6443639 at *2 (Bankr. N.D. Tex. July 22, 2005) (explaining transactions outside the ordinary course of business may be approved if the debtor establishes sound business purposes and approving the debtor's amended key employee retention plan).

40. Courts in this District have found that a debtor's use of reasonable bonuses and incentives to motivate employees is a valid exercise of a debtor's business judgment. *See, e.g., In re Studio Movie Grill Holdings, LLC*, Case No. 20-32633 (SGJ) (Bankr. N.D. Tex. Dec. 11, 2020) [Doc. No. 331] (approving debtors' key employee incentive program); *In re PHI, Inc.*, Case No. 19-30923 (HDH) (Bankr. N.D. Tex. June 6, 2019) [Doc. No. 620] (same); *In re Emkey Companies, LLC*, Case No. 16-30548 (SGJ) (Bankr. N.D. Tex. July 14, 2016) [Doc. No. 253] (approving debtors' key employee incentive and retention programs); *In re GreenHunter Res., Inc.*, Case No. 16-40956 (RFN) (Bankr. N.D. Tex. Apr. 4, 2016) [Doc. No. 163] (approving debtors' key employee incentive program); *In re Vanderra Res., LLC*, Case No. 12-45137 (DML) (Bankr. N.D. Tex. Nov. 30, 2012) [Doc. No. 210] (same).

41. In sum, the KEIP will serve a sound business purpose. The Debtors have determined, in the exercise of their sound business judgment, that the costs associated with the KEIP are more than justified by the benefits the Debtors will realize if the KEIP Metrics are met. The KEIP Participants' experience, skills, work ethic, and knowledge of the Debtors' operations and infrastructure are vital for the Debtors to operate their business and maximize the value of their estates for the benefit of all stakeholders.

## Notice

42. Notice of this Motion will be provided to the parties listed on the Debtors' complex service list in accordance with the *Order Granting Complex Chapter 11 Bankruptcy Case Treatment* (collectively, the "Notice Parties").

## <u>Conclusion</u>

**WHEREFORE**, based on the foregoing, the Debtors respectfully request that the Court

(i) grant the Motion, and (ii) grant such other and further relief as is just and proper.

RESPECTFULLY SUBMITTED this 15th day of July 2022.

By: */s/ Eli O. Columbus*
Stephen M. Pezanosky
State Bar No. 15881850
Ian Peck
State Bar No. 24013306
Eli O. Columbus
State Bar No. 24028062
Martha Wyrick
State Bar No. 24101606
**HAYNES AND BOONE, LLP**
301 Commerce Street, Suite 2600
Fort Worth, TX 76102
Telephone: 817.347.6600
Facsimile: 817.347.6650
Email: stephen.pezanosky@haynesboone.com
Email: ian.peck@haynesboone.com
Email: eli.columbus@haynesboone.com
Email: martha.wyrick@haynesboone.com

**PROPOSED ATTORNEYS FOR DEBTORS**

**<u>EXHIBIT A</u>**

**PROPOSED ORDER**

4874-7900-3943

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Corsicana Bedding, LLC, *et al.*,[1] | § | Case No. 22-90016-elm11 |
| | § | |
| Debtors. | § | Jointly Administered |

**ORDER GRANTING DEBTORS' MOTION FOR ENTRY OF AN ORDER:**
**(I) APPROVING DEBTORS' KEY EMPLOYEE INCENTIVE PLAN AND**
**(II) GRANTING RELATED RELIEF**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Corsicana Bedding, LLC (3019) ("Corsicana"); Thetford Leasing LLC (7227) ("Thetford"); Olive Branch Building, LLC (7227) ("Olive Branch"); Eastern Sleep Products Company (1185) ("Eastern Sleep"); Englander-Symbol Mattress of Mississippi, LLC (5490) ("Englander Symbol"); Hylton House Furniture, Inc. (5992) ("Hylton House"); Luuf, LLC (3450) ("Luuf"); Symbol Mattress of Florida, Inc. (4172) ("Symbol Florida"); Symbol Mattress of Pennsylvania, Inc. (3160) ("Symbol Pennsylvania"); Symbol Mattress of Wisconsin, Inc. (0871) ("Symbol Wisconsin"); Symbol Mattress Transportation, Inc. (1185) ("Symbol Transportation"); and Master Craft Sleep Products, Inc. (4961) ("Master Craft"). The location of the Debtors' service address is P.O. Box 3233, Fort Worth, Texas 76113.

Upon the *Debtors' Motion for Entry of An Order: (I) Approving Debtors' Key Employee Incentive Plan and (II) Granting Related Relief* (the "Motion")[2] of Corsicana Bedding, LLC, *et al.* (collectively, the "Debtors"); and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. § 1334 and the *Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc*, Miscellaneous Rule No. 33 (N.D. Tex. August 3, 1984); and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and it appearing that venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided, and it appearing that no other or further notice need be provided; and the Court having reviewed the Motion; and the Court having held a hearing on the Motion; and all objections, if any, to the Motion have been withdrawn, resolved, or overruled; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is granted as set forth herein.

2.      The KEIP, as described in **Exhibit B** to the Motion, is approved and the Debtors are authorized, but not directed, to implement such plan in their discretion.

3.      The Debtors are authorized to take any and all actions as may be necessary, desirable, or appropriate to effect, implement, and/or consummate the KEIP, including, without limitation, making the payments that may become due thereunder, without further application or order of this Court.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

4.     All amounts earned and payable under the KEIP shall have administrative expense priority under sections 503(b) and 507(a)(2) of the Bankruptcy Code for all purposes in these Chapter 11 Cases and in any other cases under the Bankruptcy Code to which these cases may convert (in each case subject and subordinate to any administrative expense claims of the DIP Lenders and the Prepetition Lenders granted by the DIP Order or otherwise).

5.     Notwithstanding anything in this Order to the contrary, (a) payments authorized by, and any authorizations contained in, this Order are subject to the terms, conditions, limitations, and requirements of any cash collateral or DIP financing orders entered in these Chapter 11 Cases (together with any approved budgets in connection therewith, the "DIP Financing Orders") and (b) to the extent there is any inconsistency between the terms of such DIP Financing Orders and any action taken or proposed to be taken hereunder, the terms of such DIP Financing Orders shall control.

6.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

7.     Notwithstanding Bankruptcy Rule 6004(h), to the extent applicable, this Order shall be effective and enforceable immediately upon entry hereof.

### #  #  #   END OF ORDER   #  #  #

**Submitted by:**

Stephen M. Pezanosky
State Bar No. 15881850
Ian Peck
State Bar No. 24013306
Eli O. Columbus
State Bar No. 24028062
Martha Wyrick
State Bar No. 24101606
**HAYNES AND BOONE, LLP**
301 Commerce Street, Suite 2600
Fort Worth, TX 76102
Telephone: 817.347.6600
Facsimile: 817.347.6650
Email: stephen.pezanosky@haynesboone.com
Email: ian.peck@haynesboone.com
Email: eli.columbus@haynesboone.com
Email: martha.wyrick@haynesboone.com

**PROPOSED ATTORNEYS FOR DEBTORS**

**<u>Exhibit B</u>**

**Key Employee Incentive Plan**

**(redacted)**

**Corsicana Bedding, LLC**
*Key Employee Incentive Plan*

## Overview

Corsicana Bedding, LLC and certain of its affiliated entities (collectively, the "Company") has implemented a Key Employee Incentive Plan (the "KEIP") for certain critical executive and non-executive employees. The implementation of the KEIP is subject to a final order entered by the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division (the "Bankruptcy Court") in the Company's pending bankruptcy cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), which were filed on June 25, 2022 (the "Petition Date"). Any final determination of payments owing under the KEIP shall be made by the Board of Directors, in its sole discretion, with the Bankruptcy Court maintaining jurisdiction in the event there is a dispute regarding the terms of the KEIP, either before, upon, or after any payment under the KEIP.

The following employees will be eligible to receive payments under the KEIP and are designated as either "Key Employees" or "Sales Employees," and shall be collectively referred to as "KEIP Participants":

**Key Employees**



**Sales Employees**



For a KEIP Participant to receive any payments set forth in the KEIP, the KEIP Participant must be an employee of the Company as of the Payment Date (as defined below).  In addition, on or within 21 days of the date the metrics described below are achieved, the KEIP Participant must execute (without revocation within any statutorily-authorized revocation period) a general release of known and unknown claims in favor of the Company and its affiliated persons and entities in a form satisfactory to the Company (the "Release").

Payments under the KEIP are to be paid in all cash within 60 days following the achievement of the Sale or Alternative Transaction, described below (the "Payment Date").

The KEIP does not provide benefits to the KEIP Participants upon termination of their employment, unless the Company terminates the KEIP Participant without Cause or upon the KEIP Participant's death or Total and Permanent Disability.  Subject to the foregoing, in the event that a KEIP Participant is no longer employed by the Company on the date that a payment is due under the KEIP, the amount attributable to that KEIP Participant shall be retained by the Company.  Further, in the event that a KEIP Participant is eligible to receive a payment from the Company due to a termination without Cause or upon the KEIP Participant's death or Total and Permanent Disability, such payment will be made at the same time and subject to the same terms and conditions as payments made to active KEIP Participants (other than the continued

employment requirement) and any subsequent, new employee that replaces such terminated employee will not be entitled to any payment under the KEIP.

"Cause" means (i) willful misconduct with respect to or failure to perform the KEIP Participant's duties as an employee of the Company or any Affiliate; (ii) indictment for a felony; (iii) commission of fraud, embezzlement, theft or other act involving dishonesty, or a crime constituting moral turpitude, in any case whether or not involving the Company, or any Affiliate that, in the opinion of the Company, renders the KEIP Participant's continued employment harmful to the Company or any Affiliate; (iv) breach or persistent breaches of any kind of the Company's employment policies (or the employment policies of any successor to the Company), as they may exist from time-to-time, which is not cured after 30 days prior written notice by the Company; and/or (v) violation by the KEIP Participant of the terms of any non-competition, non-disclosure or similar agreement with respect to the Company or any Affiliate to which the KEIP Participant is a party. For purposes of this definition, "Affiliate" means any corporation or other entity that is required to be aggregated with the Company under Sections 414(b), (c), (m) or (o) of the Internal Revenue Code of 1986, as amended.

"Total and Permanent Disability" means, with respect to a KEIP Participant, that the KEIP Participant is considered to have a disability that entitles such KEIP Participant to receive long-term disability benefits under the Company's long-term disability ("LTD") insurance plan or policy; *provided, that* in the event that the KEIP Participant is not being covered as an employee at the time of the KEIP Participant's impairment under such LTD plan or policy, then "Total and Permanent Disability" shall mean that the KEIP Participant is considered to have a disability that entitles the KEIP Participant to receive benefits from the U.S. Social Security Administration.

**KEIP Thresholds**

**A.  Sale or Alternative Transaction**

Upon the occurrence of; (i) a Sale Transaction (as defined below) that is consummated no later than 75 days after the Petition Date, unless otherwise extended as agreed to in writing between the Company and the DIP Secured Parties[1] or (ii) an alternative restructuring transaction or chapter 11 plan, other than a Sale Transaction (the "Alternative Transaction" (as further defined below)) that is consummated no later than 100 days after the Petition Date, unless otherwise extended as agreed to in writing between the Company and the DIP Secured Parties, the Key Employees shall be eligible to receive the below amounts payable on the Payment Date (the "Transaction Fee"), subject to compliance by the Key Employee with the Release requirement. If the Company fails to achieve a Sale or Alternative Transaction by the foregoing deadlines, the Key Employees shall no longer be eligible to receive the Transaction Fee and the Transaction Fee shall be forfeited in its entirety.

---

[1] DIP Secured Parties has the meaning given to such term in the *Debtors' Emergency Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503 and 507 (I) Authorizing the Debtors to Obtain Senior Secured Superpriority Postpetition Financing; (II) Granting (A) Liens and Superpriority Administrative Expense Claims and (B) Adequate Protection to Certain Prepetition Lenders; (III) Authorizing Use Of Cash Collateral; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* [Doc. Nos. 13 & 14] (the "DIP Motion").



A "<u>Sale Transaction</u>" means any transaction or series of related transactions that that close prior to Thursday, September 8, 2022, unless otherwise extended as agreed to in writing between the Company and the DIP Secured Parties and constitute the disposition to one or more third parties (including, without limitation, any person, group of persons, partnership, corporation or other entity, and also including, among others, any of the existing owners or shareholders, employees, or creditors of the Company and/or the affiliates of each) in one or a series of related transactions of (a) substantially all equity interests held and/or (b) all or substantially all of the assets or operations the Company or any joint venture or partnership or other entity formed by it, in either case, including, without limitation, through a sale or exchange of capital stock, options or assets with or without a purchase option, a merger, consolidation or other business combination, an exchange or tender offer, or any similar transaction, including, without limitation, any sale transaction under sections 363, 1129 or any other provision of the Bankruptcy Code; provided that any Sale Transaction is on terms that are reasonably acceptable to the DIP Secured Parties.

An "<u>Alternative Transaction</u>" means other than a Sale Transaction, any transaction or series of transactions that closes prior to Monday, October 3, 2022, unless otherwise extended as agreed to in writing between the Company and the DIP Secured Parties, which constitute a recapitalization of all or substantially all of the Company's debt securities and/or other indebtedness, obligations or liabilities, including accrued and/or accreted interest thereon, which such recapitalization or restructuring is effected pursuant to an exchange transaction, tender offer, a plan of reorganization or liquidation under the Bankruptcy Code, a solicitation of

consents, waivers, acceptances or authorizations, any change of control transaction, any refinancing, exchange, conversion to equity, cancellation, forgiveness, retirement, and/or a modification or amendment to the terms, conditions, or covenants (including, without limitation, the principal balance, accrued or accreted interest, payment term, other debt service requirement and/or financial or operating covenant) of any agreements or instruments governing any of the equity and/or debt securities and/or other indebtedness or any combination of the foregoing transactions; provided that any Alternative Transaction is on terms that are reasonably acceptable to the DIP Secured Parties.

**B.**     **Cash Saving Metric**

Following the occurrence of the Sale or Alternative Transaction described in Section A above, in the event of the successful completion of the Cash Saving Metric, as described below, the Key Employees listed above shall be eligible to each receive ▮▮▮▮▮, payable on the applicable Payment Date, subject to compliance by the Key Employee with the Release requirement.

The Cash Saving Metric is achieved provided there is a savings of 15% of operating cash as compared to the Approved Budget (as defined in the DIP Motion), excluding professional or other-related bankruptcy costs, over the course of the Chapter 11 Cases, beginning on the Petition Date and ending on the closing of the Sale Transaction or the Alternative Transaction; *provided that,* for purposes of determining the Cash Saving Metric, net cash flow can be adjusted to account for the effect of post-petition accounts payable (excluding payroll), if any.

**C.**     **Sales Volume Metric**

Following the occurrence of the Sale or Alternative Transaction described in Section A above, the Sales Employees listed above may be eligible to receive payment based on the two tiers outlined below for achieving the below volume of gross sales of the Company's products as of the end of the third quarter of 2022. For the avoidance of doubt, the maximum payment amount a Sales Employee is eligible to receive under the Sales Volume Metric is ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮. Any amount payable pursuant to this Section C shall be paid on the applicable Payment Date, subject to compliance by the Sales Employee with the Release requirement.

| | Sales Volume Metric | Individual Payments to Sales Employees |
|---|---|---|
| **Tier 1** | $75M | ▮▮▮▮ |
| **Tier 2** | $85M | ▮▮▮▮ |

**General Provisions**

(a) <u>Binding Effect</u>. This KEIP shall be binding upon and inure to the benefit of the Company, its successors and assigns and upon any KEIP Participant, the KEIP Participant's heirs, executors, administrators, and legal representatives.

(b) <u>Not a Contract of Employment</u>. This KEIP does not constitute a contract of employment or impose upon the Company any obligation to retain any KEIP Participant as an employee, to change or not change the status of the KEIP Participant's employment, or to change the Company's policies regarding a termination without Cause (as defined above).

(c) <u>Withholding</u>. All payments made hereunder to a KEIP Participant or the KEIP Participant's beneficiary shall be subject to the withholding of such amounts by the Company as is required pursuant to any applicable Federal, state, local or foreign law or regulation.

(d) <u>Applicable Law</u>. This KEIP shall be construed in accordance with and governed by the laws of the State of Texas, without regard to conflicts of law principles thereof.

(e) <u>Intention to Comply</u>. The Company intends that this KEIP, and any payments made pursuant to this KEIP, to be exempt from the requirements of Section 409A of the Internal Revenue Code of 1986, as amended (the "<u>Code</u>") and shall interpret this KEIP consistently with such intent. Notwithstanding anything to the contrary contained herein, the Company retains the right to amend this KEIP to the extent necessary for purposes of continued exemption from the requirements of Section 409A of the Code (and any regulations or other guidance issued thereunder).

**<u>Exhibit C</u>**
**Juniper KEIP Declaration**

4864-7120-1063 v.3

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| Corsicana Bedding, LLC, *et al.*,[1] | § | Case No. 22-90016-elm11 |
| | § | |
| Debtors. | § | Joint Administration Requested |

**DECLARATION OF MICHAEL JUNIPER IN SUPPORT OF DEBTORS'**
**MOTION FOR ENTRY OF AN ORDER: (I) APPROVING DEBTORS'**
**KEY EMPLOYEE INCENTIVE PLAN AND**
**(II) GRANTING RELATED RELIEF**

I, Michael Juniper, hereby declare under penalty of perjury:

1.       I am a Partner of the firm, CR3 Partners, LLC ("CR3"), which has its principal office at 13355 Noel Road, Suite 2005, Dallas, Texas 75240.  In June 2022, I was appointed as the Debtors' Chief Restructuring Officer ("CRO").

2.       I submit this declaration (the "Juniper DIP Declaration") in support of the *Debtors' Motion for Entry of An Order: (I) Approving Debtors' Key Employee Incentive Plan and (II) Granting Related Relief* (the "Motion").[2]

3.       Except as otherwise indicated, all statements in this Declaration are based on my personal experience and knowledge, my opinions, my discussions with the Debtors' management and professionals, and my review of the relevant documents.  I am authorized to submit this

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Corsicana Bedding, LLC (3019) ("Corsicana"); Thetford Leasing LLC (7227) ("Thetford"); Olive Branch Building, LLC (7227) ("Olive Branch"); Eastern Sleep Products Company (1185) ("Eastern Sleep"); Englander-Symbol Mattress of Mississippi, LLC (5490) ("Englander Symbol"); Hylton House Furniture, Inc. (5992) ("Hylton House"); Luuf, LLC (3450) ("Luuf"); Symbol Mattress of Florida, Inc. (4172) ("Symbol Florida"); Symbol Mattress of Pennsylvania, Inc. (3160) ("Symbol Pennsylvania"); Symbol Mattress of Wisconsin, Inc. (0871) ("Symbol Wisconsin"); Symbol Mattress Transportation, Inc. (1185) ("Symbol Transportation"); and Master Craft Sleep Products, Inc. (4961) ("Master Craft").  The location of the Debtors' service address is P.O. Box 3233, Fort Worth, TX 76113.

[2] Each capitalized term used but not defined herein shall have the meaning ascribed to it in the Motion.

Declaration on behalf of the Debtors. If called to testify, I could and would testify to each of the facts and opinions set forth herein.

**A.** **Qualifications**

4. CR3 is a financial advisory and turnaround firm specializing in underperforming businesses and distressed situations, including financial, balance sheet and operational restructurings, both in and out of bankruptcy. CR3, whose predecessor firm was founded in 2001, provides a range of services to debtors, creditors, shareholders, and other interested parties, including financial advisory, interim management, litigation support, forensic financial review, and independent oversight services. CR3 and its professionals have on numerous occasions advised debtor-in-possession or official and unofficial committees in large and complicated chapter 11 proceedings.

5. I have more than 20 years of experience in financial and operational analysis and improvement, turnaround and restructuring consulting, and interim management. I have advised companies across a diverse range of industries. I have assisted clients both in and outside of chapter 11, and have acted as financial advisor to companies, lenders, and unsecured creditors' committees. More specifically, I have served as a CRO for both private and public companies, including companies that have filed chapter 11 bankruptcy.

6. I attended Washington University in St. Louis, where I earned an MBA. I also attended University of Arkansas at Little Rock, where I earned a BBA in finance. I am a Certified Turnaround Professional by the Turnaround Management Association ("TMA"). I was previously the president of the Dallas/Fort Worth TMA, and I am currently on the Board of the Dallas/Fort Worth TMA. Prior to joining CR3, I served in finance functions for private manufacturing and distribution companies.

7.      I am knowledgeable and familiar with the Debtors' day-to-day operations, business and financial affairs, books and records, and the circumstances leading to the commencement of these Chapter 11 Cases.

8.      I have reviewed the Motion and believe that it accurately reflects the circumstances leading to the development of the KEIP and the justification and need for relief.  I firmly believe that approval of the KEIP is essential to preserve and maximize the value of the Debtors' estates and minimize disruption to the Debtors' business operations.

**B.      Background**

9.      As set forth in further detail in the First Day Declaration, through these Chapter 11 Cases, the Debtors are seeking to sell substantially all of their Assets through the Sale Transaction or to facilitate a restructuring through an Alternative Transaction, other than the Sale Transaction. I believe that the success of the proposed process, which is designed to preserve and maximize the value of the Debtors' businesses, will turn on the performance and productivity of certain of the Debtors' key employees during these Chapter 11 Cases.  During the Debtors' restructuring efforts, I believe that these employees will be key drivers of the Debtors' ability to meet and exceed operational and financial milestones in order to maximize value.

10.      I believe the KEIP is critical to motivate the KEIP Participants, which include executive and non-executive employees involved in management, operations, accounting, and sales.  Ultimately, the KEIP is designed for the purpose of maintaining and enhancing the enterprise value for the benefit of all of the Debtors' stakeholders.  I, along with the Debtors and their legal and financial advisors, designed the KEIP to ensure that it is reasonable and consistent with compensation paid to similarly situated employees at comparable companies.  The Debtors established certain financial performance metrics based upon their weekly cash flow forecast to

ensure that the financial performance metrics are challenging and will require a strong performance by both the company and the KEIP Participants. The Debtors also established certain volume sales metrics to exceed the projected sales revenues contemplated in the DIP Budget for the third quarter of 2022 which will also require a strong performance by the company and the sales team. Importantly, the benefits to the Debtors' estates that are contemplated under the KEIP, either through increased revenue from gross sales or from conserving cash, exceed the cost of funding the KEIP.

11.     I believe the KEIP is designed to promote a sound business purposes. The Debtors' business and operations rely on the KEIP Participants, and those employees who they supervise. Although the KEIP is based on non-retention-based metrics, the KEIP will likely have the additional effect of encouraging retention of the KEIP Participants, which is important because the Debtors' goals of these Chapter 11 Cases cannot be met if key employees depart prematurely. In fact, in the last few months approximately three of the Debtors' key sales representative and various other key employees resigned to pursue other employment opportunities, putting substantial additional demands and pressures on the remaining KEIP Participants. I believe the KEIP will serve to maximize value of the Debtors' estates.

## C.     Key Employee Incentive Plan

12.     Beginning in June 2022, the Board and management began discussing the implementation of a key employee incentive plan for certain executive and non-executive employees that would incentive key employees during the Chapter 11 Cases.

13.     Recognizing that employee performance would play a critical role in the Debtors' objective of preserving and maximizing the value of their assets during the Chapter 11 Cases, the Board, working with the Debtors' restructuring advisors, including myself, undertook a

deliberative and iterative process to design an effective and appropriate compensation program. These efforts ultimately culminated in the KEIP, which was approved by the Board on June 22, 2022. The Debtors determined that implementation of the KEIP is necessary to (i) incentivize the KEIP Participants to maintain and create value for the benefit of all stakeholders; (ii) compensate the KEIP Participants at market level; and (iii) ensure the Debtors' anticipated business needs will be met during the restructuring process.

14. In selecting the KEIP Participants, the Debtors identified 43 key employees who possess institutional knowledge and skills that are essential to the Debtors' sale process and success of these Chapter 11 Cases. In addition to responsibilities related to the Debtors' everyday operations, the KEIP Participants have assumed, and will continue to assume, considerable added responsibilities in connection with the Chapter 11 Cases and the sale process. Such responsibilities may include continuing business operations with all of the challenges attendant to being in bankruptcy, facilitating and conducting management presentations for potential bidders, responding to bidder information and diligence requests, and otherwise taking whatever steps are necessary to obtain the highest and best bid for the Debtors' assets.

15. I believe the KEIP Participants, individual and collectively, have the ability to materially influence the Debtors' financial and operational performance and manage critical relationships during these Chapter 11 Cases. I believe these employees' performance and motivation during the Chapter 11 Cases is essential to avoid disruption, maintain and enhance the Debtors' business operations, and offset any accompanying negative effect of the Chapter 11 Cases on the Debtors' overall enterprise value.

16. In order to verify the reasonableness of the KEIP, the Debtors and the Debtors' legal and financial advisors, reviewed various recent key employee incentive plans approved in recent chapter 11 cases, (the "Comparable KEIPs"), including:

| | |
|---|---|
| *In re Country Fresh Holding Co.*, Case No. 21-30574 (Bankr. S.D. Tex. 2021) (Isgur) | *In re Fred's, Inc.,* Case No. 19-11984 (Bankr. D. Del. 2019) (Sontchi) |
| *In re Studio Movie Grill Holdings, LLC*, Case No. 20-32633 (Bankr. N.D. Tex. 2020) (Jernigan) | *In re Fairway Group Holdings Corp.*, Case No. 20-10161 (Bankr. D. Del. 2020) (Garrity) |
| *In re Trivascular Sales LLC*, Case No. 20-31840 (Bankr. N.D. Tex. 2020) (Jernigan) | *In re Aralez Pharmaceuticals US Inc*, Case No. 18-12425 (Bankr. S.D.N.Y. 2018) (Glenn) |
| *In-Shape Holdings, LLC,* Case No. 20-13130 (Bankr. D. Del. 2020) (Silverstein) | *In re Brookstone Holdings,* Case No. 18-11780 (Bankr. D. Del. 2018) (Shannon). |
| *In re Approach Res. Inc.,* Case No. 19-36444 (Bankr. S.D. Tex. 2019) (Isgur) | *In re GreenHunter Res. Inc.,* Case No. 16-40956 (Bankr. N.D. Tex. 2016) (Nelms) |
| *In re Melinta Therapeutics, Inc.*, Case No. 19-12748 (Bankr D. Del. 2019) (Silverstein) | |

17. The purpose of this review was to gather data with respect to the design and general construct of various key employee incentive plans in other chapter 11 cases of a comparable size to these Chapter 11 Cases. Based on this analysis of recently approved, key employee incentive plans, the Debtors believe that the KEIP is largely consistent with comparable plans.

18. To determine whether the KEIP is consistent with comparable plans, I assisted the Debtors and their advisors in comparing companies with pre-petition assets between of $500 million or less and companies with target sale proceeds of approximately $550 million or less. By each of these measures, the payments contemplated under the KEIP are well within the range of those provided in the market comparables. The market comparable information for the Comparable KEIPs is attached hereto as **Exhibit 1**. This comparison revealed that the KEIP is well within the overall range of other approved KEIPs.

19. I believe the KEIP is reasonable based on the facts and circumstances of this Chapter 11 Case and as compared to the Comparable KEIPs. I also believe the payments

contemplated to be made under the KEIP are necessary to incentivize key employees to perform these duties in an optimal manner, and reward them for their efforts during these Chapter 11 Cases.

20.     Based upon the foregoing, I respectfully submit that the KEIP, as compared to market comparables, is reasonable and should be approved.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 15, 2022

/s/ Michael Juniper
Michael Juniper
Chief Restructuring Officer
Corsicana Bedding, LLC

**Exhibit 1**

**Comparable KEIPs in Texas Bankruptcy Courts**

| Case Name | Pre-Petition Assets | Target Sales Proceeds from the 363 Sale Process | Number of Participants in the KEIP |
|---|---|---|---|
| *In re Studio Movie Grill Holdings, LLC* (Bankr. N.D. Tex. 2020) (Jernigan) | $50-$100M | $530M (less credit to purchaser of $100M) | 33 (21 GMs ($5700 each) and 4 regional managers ($12,500 each)) |
| *In re Trivascular Sales LLC* (Bankr. N.D. Tex. 2020) (Jernigan) | $0 - $50,000 | N/A | 8 |
| *In re Country Fresh Holding Co.*, (Bankr. S.D. Tex. 2021) (Isgur) | $100M-$500M | $35.5M | 5 |
| *In re Approach Res. Inc.* (Bankr. S.D. Tex. 2019) (Isgur) | $100M-$500M | $115.5M | 4 |
| *In re GreenHunter Res. Inc.*, (Bankr. N.D. Tex. 2016) (Nelms/Mullin) | $10M - $50M | $21M | 9 |

**Comparable KEIPs Outside of Texas Bankruptcy Courts**

| Case Name | Pre-Petition Assets | Target Sales Proceeds from the 363 Sale Process | Number of Participants in the KEIP |
|---|---|---|---|
| *In-Shape Holdings, LLC* (Bankr. D. Del. 2020) (Silverstein) | $50M-$100M | $45M | 6 |
| *In re Melinta Therapeutics, Inc.* (Bankr D. Del. 2019) (Silverstein) | $100M-$500M | $140M | 7 |
| *In re Fred's, Inc.* (Bankr. D. Del. 2019) (Sontchi) | $100M-$500M | $54M | 4 |
| *In re Brookstone Holdings* (Bankr. D. Del. 2018) (Shannon) | $100M-$500M | $56M | 5 |
| *In re Fairway Group Holdings Corp.*, Case No. 20-10161 (Bankr. S.D.N.Y. 2020) (Garrity) | $100M-$500M | $82.5M | 9 |

| Case Name | Pre-Petition Assets | Target Sales Proceeds from the 363 Sale Process | Number of Participants in the KEIP |
|---|---|---|---|
| *In re Aralez Pharmaceuticals US Inc.*, (Bankr. S.D.N.Y. 2018) (Glenn) | $100-$500M | $250M | 9 |