

FILED
OCT 24 2022
CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF TEXAS

FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| Corsicana Bedding, LLC, et al., | ) | Case No. 22-90016-elm11 |
| Debtors. | ) | Jointly Administered |

## OBJECTION TO DEBTORS' FIFTH OMNIBUS MOTION TO REJECT CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES PURSUANT TO SECTION 365 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 6006 AND MOTION TO APPOINT A TRUSTEE

Michael Loomis, identified as a former employee of Corsicana, does hereby object to the Debtor's Motion to reject his employment agreement. Debtor Corsicana Bedding has mischaracterized the Loomis Agreement as burdensome and lacking sufficient value to the Debtor. Such characterization misstates the value already received, and not yet paid for, by debtor. In addition, Debtor conveniently fails to disclose that Mr. Loomis is under ongoing obligations, described herein, to Corsicana that have not been discharged. To support this Objection, Mr. Loomis, pro se, respectfully and properly characterizes the Agreement and asks the Court to not grant Debtor's motion.

### Background

In 2018, Mr. Loomis was contacted at his home in Pennsylvania by Corsicana and offered a position with the company as Vice President – Product Development and Innovation. The offer, Attached as Exhibit A and herein referred to as the "Employment Agreement" or "Agreement", has several elements to it and was the result of negotiations between Corsicana and Mr. Loomis. The negotiations had the result of inducing Mr. Loomis to leave his family home in Pennsylvania and travel to Texas, where Debtor was, and continues to conduct business. In order to induce Mr. Loomis to travel to Texas, Corsicana provided a comprehensive package of compensation.

As a result of this inducement, Mr. Loomis began employment with Debtor on July 21, 2018 and continued so until he was terminated without cause on April 22, 2022. Nonetheless, Mr. Loomis is under continuing obligations to Corsicana, which they have failed to mention in their Motion to Reject the Agreement.

### The Employment Agreement

The Employment Agreement includes a provision for base salary, Bonus Compensation, Equity, Benefits including Vacation, Reimbursement for Business Expenses, Relocation Expenses, and Other Benefits. It was on the basis of this Agreement that Mr. Loomis was induced to engage with Corsicana as an employee and contributor. It is respectfully submitted that Mr. Loomis' efforts during his time at Corsicana guaranteed that it would have value to its owners even after reorganizing in bankruptcy.

During his tenure, Mr. Loomis was entrusted with Confidential Information that he agreed not to disclose - even after his employment ended. Section 3 of the Agreement specifies that "You agree that this restriction shall continue to apply after your employment terminates, regardless of the reason for such termination." Clearly Mr. Loomis has an ongoing obligation to not disclose any Confidential Information, yet the Debtor states that there is no value to this Agreement. In actuality, at least one of Corsicana's customers contacted Mr. Loomis to entreat him to share the design elements for a mattress that he had personally developed. The customer was concerned about the ongoing viability of Corsicana and wanted to seek alternative manufacturing arrangements, though they wanted to continue using the design that Mr. Loomis came up with. Pursuant to his ongoing obligation to Corsicana as detailed in the Agreement, Mr. Loomis declined to disclose anything to this customer. And now, Corsicana claims that the Agreement is without value. Mr. Loomis objects to this assertion and notes that his employment agreement provided for a salary continuation in order to compensate him for this ongoing obligation not to disclose Corsicana's Confidential Information.

The Agreement restricts Mr. Loomis' ability to seek employment within the mattress industry for a period of 12 months. "you agree not to work as an employee, independent contractor or otherwise whether with or without compensation for any Person that is engaged in any business that is competitive with the business of the Company or its Affiliates." Mr. Loomis disclosed this non-compete obligation to recruiters and potential employers when seeking new opportunities upon his termination, severely hampering his search for new employment. Mr. Loomis continues to abide by the non-compete and has turned down opportunities to work in the industry.

Moreover, pursuant to the Agreement, Mr. Loomis is required to protect any and all "documents, records and files, in any media of whatever kind and description, relating to the business, **present or otherwise** of the Company or any of its Affiliates..."(emphasis added). This means that Mr. Loomis has an ongoing duty, which Debtor now claims has no value or insufficient value. Yet, Debtor has not provided the Court with an explanation of how this, and other ongoing obligations from Mr. Loomis have suddenly become value-less. Mr. Loomis objects to this characterization and reiterates that the ongoing salary obligation of Debtor is intended, in part, to compensate Mr. Loomis for this ongoing duty.

The Agreement also requires Mr. Loomis, a designer by education, training and experience, to create Intellectual Property that will be owned, and continue to be owned by Corsicana. Furthermore, the Agreement requires Mr. Loomis to agree to "execute any and all applications for domestic and foreign patents, copyrights or other proprietary rights and to do such other acts ...requested by the Company to assign the Transferred Intellectual Property to the Company... and to permit the Company to enforce any patents, copyrights or other proprietary rights to the Transferred Intellectual Property." And so during the course of his employment with Corsicana, the Company benefited from Mr. Loomis' intellectual property and product designs and continues to do so including a unique design of a mattress Mr. Loomis created which won a substantial piece of business at Mattress Firm and currently makes up a significant portion of the Corsicana's revenue. Nonetheless, Debtor now would like the Court to believe that such endeavors have insufficient value to support the payment of the remainder of Mr. Loomis' salary continuation agreement.

And yet there is more in the Agreement from which Corsicana continues to benefit. Corsicana continues to require, pursuant to the Agreement, that Mr. Loomis refrain from assisting "any other Person" to hire any employee of the Company or any of its Affiliates, to persuade any employee of the Company or any of its Affiliates to quit working there or to even to solicit or encourage any independent contractor providing services to the Company to stop working for Corsicana. And this requirement continues for 12 months following Mr. Loomis' termination without cause. Another obligation that was important enough to thoroughly document in the Agreement, but is now characterized as having insufficient value to support the payment of the remaining 5 months of Mr. Loomis' salary.

**Legal Basis for Rejecting Debtors Motion to Reject Mr. Loomis' Agreement.**

At the time that Corsicana filed for bankruptcy, it owed Mr. Loomis for work that he had performed for the company and for the continuing obligations with which it has saddled Mr. Loomis. In

order to preserve his right to be compensated according to the Agreement to which he continued to abide by, Mr. Loomis properly filed a claim with the Bankruptcy Court.

Wages owed to former employees are considered a priority debt and since Mr. Loomis' wages are ongoing and owed currently and were incurred within the 180 days prior to the bankruptcy filing, they have priority over most other types of debt. *11 U.S.C. §507*. While the priority for wages may be limited in amount, the remainder of Mr. Loomis' claim is supported by his ongoing duties and obligations to the Debtor. Corsicana has benefited from Mr. Loomis living up to his end of the bargain that was struck at the inception of his employment. Corsicana seeks to gain the benefit of that bargain without having to compensate Mr. Loomis for that benefit.

Debtor has not indicated that it has insufficient funds to pay this debt and is still receiving the value of the Agreement with Mr. Loomis. As such, Mr. Loomis respectfully requests that Corsicana's motion to reject Mr. Loomis' agreement be denied.

## Motion to Appoint a Trustee

Mr. Loomis, as an interested party, hereby requests the Court to appoint a trustee to look after the interests of the Creditors in this matter. The Debtor's mischaracterization of the obligations to Mr. Loomis and others as value-less is dishonest and, because it did not disclose the ongoing duties to which it holds Mr. Loomis, the Debtor has not met its obligation of candor to the tribunal in this matter. Instead, Debtor intentionally did not disclose the important and ongoing value that Mr. Loomis is providing to Corsicana. As such, a trustee should be appointed to protect the interests of creditors, including Mr. Loomis.

Respectfully submitted,

*/s/ M J L*

Michael Loomis
2355 East Rock Road
Perkasie, PA 18944
(908) 334 8185

And served via email to:

Stephen Pezanosky at Stephen.pezanosky@haynesboone.com
Eli Columbus at eli.columbus@haynesboone.com
David Staab at David.staab@haynesboone.com
Thomas Zavala at tom.zavala@haynesboone.com

# Exhibit A

July 21, 2018

Michael Loomis

Dear Mike:

This letter (the "Agreement") will confirm our offer to you of employment with Corsicana Bedding, LLC (the "Company"), under the terms and conditions that follow.

1. **Position and Duties.**

(a) Effective as of July 21, 2018, you will be employed by the Company, on a full-time basis, as its Vice President – Product Development and Innovation and as of that date, you will assume the usual and customary duties, responsibilities and authority of the Vice President – Product Development and Innovation.

(b) You agree to perform the customary duties of your position and such other duties as may reasonably be assigned to you from time to time by the Chief Executive Officer. You also agree that, while employed by the Company, you will devote your full business time and your best efforts, business judgment, skill and knowledge exclusively to the advancement of the business interests of the Company and its Affiliates and to the discharge of your duties and responsibilities for them.

(c) You agree to perform your duties primarily from the Company's facilities in the greater Dallas, Texas area and from your home office. Notwithstanding the foregoing, you may from time to time work from the Company's facilities outside of the greater Dallas, Texas area and agree that you may be required to travel from time to time in order to perform your duties.

(d) You agree that, while employed by the Company, you will comply with all Company policies, practices and procedures and all codes of ethics or business conduct applicable to your position, as in effect from time to time.

2.  **Compensation and Benefits.** During your employment, as compensation for all services performed by you for the Company and its Affiliates and subject to your full performance of your obligations hereunder, the Company will provide you the following pay and benefits:

(a)  Base Salary. The Company will pay you a base salary at the rate of $250,000 per year, pro-rated for any partial years, payable in regular installments in accordance with the general payroll practices of the Company and subject to adjustment from time to time by the Board in its discretion (as adjusted from time to time, the "Base Salary").

(b)  Bonus Compensation. For fiscal year 2018, you will be entitled to receive an annual bonus equal to 50% of your annual Base Salary, prorated by multiplying such annual bonus by a fraction, the numerator of which is the number of days you were employed by the Company during fiscal year 2018 and the denominator of which is 365. Beginning in fiscal year 2019, for each fiscal year completed during your employment under this Agreement, you will be eligible to earn an annual bonus, with a target amount equal to fifty percent (50%) of your annual Base Salary. The actual amount of any such bonus will be determined by the Board in its sole discretion based on achievement of such annual performance targets as it may determine. Any annual bonus, including your annual bonus in respect of fiscal year 2018, will be paid at the time the Company regularly pays bonuses and you must be employed on the date of payment in order to be eligible to receive any annual bonus.

(c)  Equity. Promptly following your execution of this Agreement, you will be granted a profits interest, in the form of units of Corsicana Management Incentive Plan, LLC that will enable you to benefit directly from the long-term value creation of the Company. Your profits interest will be subject to the terms and conditions of the Corsicana Management Incentive Plan, LLC limited liability company agreement and an award letter evidencing your grant.

(d)  Participation in Employee Benefit Plans. You will be entitled to participate in all employee benefit plans from time to time in effect for senior executives of the Company generally (including 401(k) and health insurance plans), except to the extent such plans are duplicative of benefits otherwise provided you under this Agreement (e.g., severance pay plans). Your participation will be subject to the terms of the applicable plan documents and generally applicable Company policies, as the same may be in effect from time to time, and any other restrictions or limitations imposed by law.

(e)  Vacations. You will be entitled to earn up to four (4) weeks' of vacation per calendar year, pro-rated for any partial years, in addition to holidays observed by the Company. Vacation may be taken at such times and intervals as you shall determine, subject to the business needs of the Company, provided that no more than one week of vacation may be taken at any one time without prior approval of the Board. Vacation shall otherwise be subject to the policies of the Company, as in effect from time to time.

(f)  Business Expenses. The Company will pay or reimburse you for all reasonable out-of-pocket normal course business expenses, such as air travel, mileage, meals and entertainment and lodging for work related to the business of the Company, subject to and in

accordance with the Company's policies as may be in effect from time to time and Internal Revenue Service standards.

(g) <u>Relocation Expenses</u>. The Company will pay or reimburse you for your direct relocation, travel and temporary housing expenses (for up to Three (3) months). Should you voluntarily resign your employment on or before July 2019, you will be obligated to reimburse the Company for any and all relocation and travel expenses paid or reimbursed by the Company within thirty (30) days following your resignation.

(h) <u>Expense Reimbursement</u>. Your right to payment or reimbursement for business and relocation expenses under Section 2(f) and Section 2(g) shall be subject to the following additional rules: (i) the amount of expenses eligible for payment or reimbursement during any calendar year shall not affect the expenses eligible for payment or reimbursement in any other calendar year, (ii) payment or reimbursement shall be made not later than December 31 of the calendar year following the calendar year in which the expense or payment was incurred, and (iii) the right to payment or reimbursement is not subject to liquidation or exchange for any other benefit.

(i) <u>Other Benefits</u>. The Company will provide you with a mobile phone and laptop computer for work related to the Company's business.

**3.    Confidential Information and Restricted Activities.**

(a) <u>Confidential Information</u>. During the course of your employment with the Company, you will learn of Confidential Information (as defined below) and you may develop Confidential Information on behalf of the Company and its Affiliates. You agree that you will not use or disclose to any Person (as defined below), except as required by applicable law or for the proper performance of your regular duties and responsibilities for the Company, any Confidential Information obtained by you incident to your employment or any other association with the Company or any of its Affiliates. You agree that this restriction shall continue to apply after your employment terminates, regardless of the reason for such termination. Notwithstanding the foregoing, nothing in this Agreement shall be construed to limit, restrict or in any other way affect your communicating with any governmental agency or entity, or communicating with any official or staff person of a governmental agency or entity, concerning matters relevant to the governmental agency or entity, including but not limited to: (i) making a good faith report of possible violations of applicable law to the Securities and Exchange Commission ("<u>SEC</u>") or any other governmental agency or entity or (ii) making disclosures to the SEC or any other governmental agency or entity that are protected under the whistleblower provisions of applicable law, in each case, without notice to Company. Nothing in this Agreement limits Executive's right, if any, to receive an award for information provided to the SEC. You understand that you cannot be held criminally or civilly liable under any federal or state trade secret law for disclosing a trade secret (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney, solely for the purpose of reporting or investigating a suspected violation of law, or (ii) in a complaint or other document filed under seal in a lawsuit or other proceeding; provided, that notwithstanding this immunity from liability you may be held liable if you unlawfully access trade secrets by unauthorized means.

(b) <u>Protection of Documents</u>. All documents, records and files, in any media of whatever kind and description, relating to the business, present or otherwise, of the Company or any of its Affiliates, and any copies, in whole or in part, thereof (the "<u>Documents</u>"), whether or not prepared by you, and any computers, mobile phones or other devices owned by or provided to you by the Company or any of its Affiliates (the "<u>Equipment</u>") shall be the sole and exclusive property of the Company. You agree to safeguard all Documents and Equipment and to surrender to the Company, at the time your employment terminates or at such earlier time or times as the Board or its designee may specify, all Documents and Equipment then in your possession or control. You also agree to disclose to the Company, at the time your employment terminates or at such earlier time or times as the Board or its designee may specify, all passwords necessary or desirable to obtain access to, or that would assist in obtaining access to, any information which you have password-protected on any computer equipment, network or system of the Company or any of its Affiliates.

(c) <u>Assignment of Rights to Intellectual Property</u>. You shall promptly and fully disclose in writing all Transferred Intellectual Property (as defined below) to the Company, whether developed prior to or subsequent to the execution of this Agreement. You will hold in trust for the sole right and benefit of the Company, and hereby assign and agree to assign to the Company (or to another Person as otherwise directed by the Company) your full right, title and interest in and to all Transferred Intellectual Property. You agree to execute any and all applications for domestic and foreign patents, copyrights or other proprietary rights and to do such other acts (including without limitation the execution and delivery of instruments of further assurance or confirmation) requested by the Company to assign the Transferred Intellectual Property to the Company (or to another Person as otherwise directed by the Company) and to permit the Company to enforce any patents, copyrights or other proprietary rights to the Transferred Intellectual Property. You will not charge the Company for time spent in complying with these obligations. All copyrightable works that you create during your employment shall be considered "work made for hire" and shall, upon creation, be owned exclusively by the Company.

(d) <u>Restricted Activities</u>. You agree that the following restrictions on your activities during and after your employment are necessary to protect the goodwill, Confidential Information, trade secrets and other legitimate interests of the Company and its Affiliates:

(i) While you are employed by the Company and during the twelve (12)-month period immediately following termination of your employment, regardless of the reason therefor (in the aggregate, the "<u>Restricted Period</u>"), you shall not, directly or indirectly, whether as owner, partner, investor, consultant, agent, employee, co-venturer or otherwise, (x) compete with the Mattress Business (as defined below) for your own account or for the account of any other Person anywhere in the United States (the "<u>Restricted Area</u>"), or (y) engage in other activity conducted or proposed to be conducted by the Company or any of its Affiliates at the time of your termination of employment. Specifically, but without limiting the foregoing, you agree not to work as an employee, independent contractor or otherwise, whether with or without compensation, for any Person that is engaged in any business that is competitive with the business of the Company or its Affiliates, as conducted or in planning during your employment with the Company, in the Restricted Area. You agree that such restrictions are reasonable to protect the

- 4 -

Company from unfair competition by other individuals, corporations, partnerships, joint ventures or other entities that are in the same business as the Company.

(ii) During the Restricted Period, you will not directly or indirectly (a) solicit or encourage any customer, client, advertiser, distributor or supplier of the Company or any of its Affiliates to terminate or diminish its relationship with them; or (b) seek to persuade any such customer, client, advertiser, distributor or supplier of the Company or any of its Affiliates to conduct with anyone else any business or activity which such customer, client, advertiser, distributor or supplier conducts or could conduct with the Company or any of its Affiliates; provided, however, that these restrictions shall apply (y) only with respect to those Persons who are or have been a customer, client, advertiser, distributor or supplier of the Company or any of its Affiliates at any time within the immediately preceding twelve (12)-month period or whose business has been solicited on behalf of the Company or any of the Affiliates by any of their officers, employees or agents within such period, other than by form letter, blanket mailing or published advertisement, and (z) only if you have performed work for such Person during your employment with the Company or one of its Affiliates or been introduced to, or otherwise had contact with, such Person as a result of your employment or other associations with the Company or one of its Affiliates or have had access to Confidential Information which would assist in your solicitation of such Person.

(iii) During the Restricted Period, you will not, and will not assist any other Person to, (a) solicit for hiring any employee of the Company or any of its Affiliates or seek to persuade any employee of the Company or any of its Affiliates to discontinue employment or (b) solicit or encourage any independent contractor providing services to the Company or any of its Affiliates to terminate or diminish its relationship with them. For the purposes of this Agreement, an "employee" or an "independent contractor" of the Company or any of its Affiliates is any Person who was such at any time within the twelve (12)-month period immediately preceding the activity restricted by this Section.

(e) In signing this Agreement, you give the Company assurance that you have carefully read and considered all the terms and conditions of this Agreement, including the restraints imposed on you under this Section 3. You agree without reservation that these restraints are necessary for the reasonable and proper protection of the Company and its Affiliates, and that each and every one of the restraints is reasonable in respect to subject matter, length of time and geographic area. You further agree that, were you to breach any of the covenants contained in this Section 3, the damage to the Company and its Affiliates would be irreparable. You therefore agree that the Company, in addition and not in the alternative to any other remedies available to it, shall be entitled to preliminary and permanent injunctive relief against any breach or threatened breach by you of any of those covenants, without having to post bond, together with an award of its reasonable attorney's fees incurred in enforcing its rights hereunder. So that the Company may enjoy the full benefit of the covenants contained in this Section 3, you further agree that the Restricted Period shall be tolled, and shall not run, during the period of any breach by you of any of the covenants contained in this Section 3. You and the Company further agree that, in the event that any provision of this Section 3 is determined by any court of competent jurisdiction to be unenforceable by reason of its being extended over too great a time, too large a geographic area or too great a range of activities, that provision shall be deemed to be modified to permit its

enforcement to the maximum extent permitted by law. It is also agreed that each of the Company's Affiliates shall have the right to enforce all of your obligations to that Affiliate under this Agreement, including without limitation pursuant to this Section 3. Finally, no claimed breach of this Agreement or other violation of law attributed to the Company, or change in the nature or scope of your employment or other relationship with the Company or any of its Affiliates, shall operate to excuse you from the performance of your obligations under this Section 3.

4. **Term and Termination of Employment.** Your employment under this Agreement shall continue until it is terminated pursuant to this Section 4.

(a) <u>By the Company For Cause</u>. The Company may terminate your employment for Cause (as defined herein) upon notice to you (in writing or in person). The following, as determined by the Board in its reasonable judgment, shall constitute "<u>Cause</u>" for termination: (i) your misappropriation of funds of the Company or any of its Affiliates; (ii) your commission of, indictment for, conviction of, or pleading of guilty or *nolo contendere* to a felony or crime involving moral turpitude; (iii) your failure to comply with any directive of the Board; (iv) your misconduct or negligence in the performance of your duties; (v) your material breach of this Agreement or any other agreement with the Company or any of its Affiliates (including without limitation any covenant or agreement relating to confidentiality, non-competition or non-solicitation), or violation of the Company's code of conduct or other written policy; or (vi) other conduct by you that is detrimental to the Company or any of its Affiliates or their reputation.

(b) <u>By the Company Without Cause</u>. The Company may terminate your employment at any time without Cause upon notice to you (in writing or in person). Notwithstanding anything from within, the occurrence of any of the following will result in your option to be terminated Without Cause and be provided all the rights expressed in section 5b of this document: i) no longer reporting to CEO , ii) departure of the current CEO, iii) a reduction in compensation or scope of duty.

(c) <u>Resignation by You</u>. You may terminate your employment at any time upon thirty (30) days' written notice to the Company.

(d) <u>Death and Disability</u>. Your employment hereunder shall automatically terminate in the event of your death during employment. In the event you become disabled during employment and, as a result, are unable to continue to perform the essential functions of your position, either with or without reasonable accommodation, for a period of (i) forty-five (45) consecutive days; or (ii) ninety (90) days during any twelve (12)-month period, the Company may terminate your employment, upon notice to you (in writing or in person). If any question shall arise as to whether you are disabled, to the extent that you are unable to perform the essential functions of your position, you shall, at the Company's request, submit to a medical examination by a physician selected by the Company to whom you or your guardian, if any, has no reasonable objection to determine whether you are so disabled, and such determination shall for purposes of this Agreement be conclusive of the issue. If such a question arises and you fail to submit to the requested medical examination, the Company's determination of the issue shall be binding on you.

5. **Other Matters Related to Termination.**

(a) Final Compensation. In the event of termination of your employment with the Company, howsoever occurring, the Company shall pay you (i) the Base Salary for the final payroll period of your employment, through the date your employment terminates; (ii) compensation at the rate of the Base Salary for any vacation time earned but not used as of the date your employment terminates, to the extent required by the Company's policies; and (iii) reimbursement for business expenses incurred by you but not yet paid to you as of the date your employment terminates; provided you timely submit all expenses and supporting documentation required, and provided further that such expenses are reimbursable under Company policies as then in effect (all of the foregoing, the "Final Compensation"). The Final Compensation shall be paid to you on or prior to the time required by law, but in no event more than sixty (60) days after the date your employment terminates.

(b) Severance Payments. In the event that your employment is terminated by the Company without Cause (other than by reason of death or disability) the Company will pay you, in addition to Final Compensation, the Base Salary for six (6) months from the date of termination (the "Severance Payments") and, if you timely elect to continue participation for you and your eligible dependents in the Company's medical plans under the federal law known as COBRA, will pay the costs of such continued participation for six (6) months from the date of your termination; provided, that if such continued participation is not permissible under the terms and conditions of the applicable plan or applicable law, or would result in additional taxes or penalties to the Company, the Company may, in its discretion, pay to you the amount in cash that it would have paid toward your applicable premiums (on an after-tax basis), which amounts shall be paid, if at all, in substantially equal installments on the same schedule or remaining schedule as the Severance Payments (the "Continued Health Benefits").

(c) Conditions To and Timing Of Severance Payments and Continued Health Benefits. Any obligation of the Company to provide you the Severance Payments and Continued Health Benefits is conditioned, however, on your signing and returning to the Company a timely and effective separation agreement containing a release of claims and other customary terms (including without limitation non-competition and non-solicitation covenants) in the form provided to you by the Company at the time your employment is terminated (the "Separation Agreement"). The Separation Agreement must become effective, if at all, by the sixtieth (60th) calendar day following the date your employment is terminated. Any Severance Payments to which you are entitled hereunder will be provided in the form of salary continuation, payable in substantially equal installments in accordance with the normal payroll practices of the Company. The first payment will be made on the Company's next regular payday following the expiration of sixty (60) calendar days from the date of termination; but that first payment shall be retroactive to the day following the date your employment terminates. Notwithstanding anything to the contrary, the Company's obligation to pay the Severance Payments and provide the Continued Health Benefits will immediately cease if you breach the provisions of Section 3, the Separation Agreement, or any other agreement that you have with the Company or any of its Affiliates, or if any provision of those agreements is determined to be unenforceable, to any extent, by a court or arbitration panel, whether by preliminary or final adjudication.

(d) <u>Benefits Termination</u>. Except for the Continued Health Benefits and any right you may have under COBRA to continue participation in the Company's group health and dental plans at your cost, your participation in all employee benefit plans shall terminate in accordance with the terms of the applicable benefit plans based on the date of termination of your employment, without regard to any continuation of base salary or other payment to you following termination and you shall not be eligible to earn vacation or other paid time off following the termination of your employment.

(e) <u>Removal from any Boards and Position</u>. If your employment is terminated for any reason under this Agreement, you shall be deemed (without further action, deed or notice) to resign (a) if a member, from the Board or board of directors (or managers) of any Affiliate of the Company or any other board to which you have been appointed or nominated by or on behalf of the Company and (b) from all other positions with the Company or any Affiliate of the Company, including, but not limited to, as an officer of the Company and any of its Affiliates.

(f) <u>Survival</u>. Provisions of this Agreement shall survive any termination of employment if so provided in this Agreement or if necessary or desirable to accomplish the purposes of other surviving provisions, including without limitation your obligations under Section 3 of this Agreement. Upon termination by either you or the Company, all rights, duties and obligations of you and the Company to each other shall cease, except as otherwise expressly provided in this Agreement.

6. **Timing of Payments and Section 409A.**

(a) Notwithstanding anything to the contrary in this Agreement, if at the time your employment terminates, you are a "specified employee," as defined below, any and all amounts payable under this Agreement on account of such separation from service that would (but for this provision) be payable within six (6) months following the date of termination, shall instead be paid on the next business day following the expiration of such six (6)-month period or, if earlier, upon your death; except (A) to the extent of amounts that do not constitute a deferral of compensation within the meaning of Treasury regulation Section 1.409A-1(b) (including without limitation by reason of the safe harbor set forth in Section 1.409A-1(b)(9)(iii), as determined by the Company in its reasonable good faith discretion); (B) benefits which qualify as excepted welfare benefits pursuant to Treasury regulation Section 1.409A-1(a)(5); or (C) other amounts or benefits that are not subject to the requirements of Section 409A of the Internal Revenue Code of 1986, as amended ("<u>Section 409A</u>").

(b) For purposes of this Agreement, all references to "termination of employment" and correlative phrases shall be construed to require a "separation from service" (as defined in Section 1.409A-1(h) of the Treasury regulations after giving effect to the presumptions contained therein), and the term "specified employee" means an individual determined by the Company to be a specified employee under Treasury regulation Section 1.409A-1(i).

(c) Each payment made under this Agreement shall be treated as a separate payment and the right to a series of installment payments under this Agreement is to be treated as a right to a series of separate payments.

(d) In no event shall the Company have any liability to you for any alleged failure of any payment or benefit under this Agreement to comply with, or be exempt from, the requirements of Section 409A.

7.   **Definitions.** For purposes of this Agreement, the following definitions apply:

"Affiliates" means all persons and entities directly or indirectly controlling, controlled by or under common control with the Company, where control may be by management authority, equity interest or otherwise.

"Confidential Information" means any and all information of the Company and its Affiliates that is not generally available to the public. Confidential Information also includes any information received by the Company or any of its Affiliates from any Person with any understanding, express or implied, that it will not be disclosed. Confidential Information does not include information that enters the public domain, other than through your breach of your obligations under this Agreement.

"Intellectual Property" means all rights, title, and interests in and to all proprietary rights of every kind and nature however denominated, whether protected, created, arising or enforceable under the laws of the United States or any other jurisdiction or any international convention or treaty regime, including without limitation (i) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and patent applications, patents and patent disclosures, together with all reissuances, continuations, continuations-in-part, divisionals, provisionals, revisions, extensions, substitutions, renewals and reexaminations relating thereto and all patents issuing from any of the foregoing, (ii) trademarks, trade names, service names, service marks, brands, logos, designs, trade dress, corporate names and other source or business identifiers, rights of privacy and publicity, and all goodwill and activities associated with any of the foregoing, together with all applications, registrations, renewals and extensions related thereto, (iii) copyrights, and all registrations and applications therefor, copyrightable works, works of authorship and moral rights, including common law rights, statutory rights, contractual rights, and all registrations and applications, renewals, extensions and reversions relating thereto, (iv) Internet domain names, web sites and web pages, (v) trade secrets, (vi) Confidential Information, (vii) computer software programs (including all information systems, data files and databases, libraries, binaries, source and object codes and user interfaces), (viii) all other proprietary rights and intellectual property rights, (ix) all actions and rights to sue at law or in equity for any past or future infringement or other impairment of any of the foregoing, including the right to receive all proceeds and damages therefrom, and all rights to obtain renewals, continuations, divisions, or other extensions of legal protections pertaining thereto, and (x) recordings, copies and tangible embodiments of any of the foregoing (in whatever form or medium).

"Mattress Business" means the manufacture and distribution of mattresses, foundations, and other bedding products.

"Person" means an individual, a corporation, a limited liability company, an association, a partnership, an estate, a trust or any other entity or organization, other than the Company or any of its Affiliates.

- 9 -

"Transferred Intellectual Property" means (a) all Intellectual Property conceived, made, created, developed, discovered, acquired or reduced to practice by you in whole or in part (whether alone or with others, whether or not during normal business hours or on or off Company premises) during or pursuant to the course of your employment or engagement as a contractor by the Company or its Affiliates in connection with your performance of assigned duties as an employee or contractor of the Company or its Affiliates and that relate to the Company, its Affiliates, or their respective businesses, or to the Company's or its Affiliates' actual or demonstrably anticipated research or development; (b) any Intellectual Property that you conceived, made, created, developed, discovered, acquired or reduced to practice, either solely or jointly with another or others, during or pursuant to the course of your employment or engagement as a contractor by the Company or its Affiliates and that is or was made through the use of any of the Company's or its Affiliates' equipment, facilities, supplies, trade secrets or time, or that results from any work performed by you for the Company or any of its Affiliates, (c) any part or aspect of any of the foregoing; and (d) all Intellectual Property owned or held by you and that was conceived, made, created, developed, discovered, acquired or reduced to practice by you, either in whole or in part, either solely or jointly with another or others prior to your employment or engagement as a contractor by the Company or its Affiliates that relates (i) to the business of the Company or its Affiliates, (ii) to the actual or demonstrably anticipated research and development of the Company or its Affiliates, or (iii) to the Intellectual Property resulting from any work performed by you for the Company or its Affiliates.

8. **Conflicting Agreements.** You hereby represent and warrant that your signing of this Agreement and the performance of your obligations under it will not breach or be in conflict with any other agreement to which you are a party or are bound, and that you are not now subject to any covenants against competition or similar covenants or any court order that could affect the performance of your obligations under this Agreement. You agree that you will not disclose to or use on behalf of the Company any confidential or proprietary information of a third party without that party's consent.

9. **Withholding.** All payments made by the Company under this Agreement shall be reduced by any tax or other amounts required to be withheld by the Company under applicable law.

10. **Assignment.** Neither you nor the Company may make any assignment of this Agreement or any interest in it, by operation of law or otherwise, without the prior written consent of the other; provided, however, the Company may assign its rights and obligations under this Agreement without your consent to one of its Affiliates or to any Person with whom the Company shall hereafter effect a reorganization, consolidate or merge, or to whom the Company shall hereafter transfer all or substantially all of its properties or assets. This Agreement shall inure to the benefit of and be binding upon you and the Company, and each of our respective successors, executors, administrators, heirs and permitted assigns.

11. **Severability.** If any portion or provision of this Agreement shall to any extent be declared illegal or unenforceable by a court of competent jurisdiction, then the remainder of this Agreement, or the application of such portion or provision in circumstances other than those as to

which it is so declared illegal or unenforceable, shall not be affected thereby, and each portion and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

12. **Miscellaneous.** This Agreement sets forth the entire agreement between you and the Company, and replaces all prior and contemporaneous communications, agreements and understandings, written or oral, with respect to the terms and conditions of your employment. This Agreement may not be modified or amended, and no breach shall be deemed to be waived, unless agreed to in writing by you and an expressly authorized representative of the Board. The headings and captions in this Agreement are for convenience only and in no way define or describe the scope or content of any provision of this Agreement. This Agreement may be executed in two or more counterparts, each of which shall be an original and all of which together shall constitute one and the same instrument. This is a Texas contract and shall be governed and construed in accordance with the laws of the State of Texas, without regard to any conflict of laws principles that would result in the application of the laws of any other jurisdiction. You agree to submit to the exclusive jurisdiction of the courts of or in the State of Texas in connection with any dispute arising out of this Agreement. This Agreement is contingent upon your satisfactory completion of a standard background check and a standard drug screening test.

*[Remainder of page intentionally left blank.]*

If the foregoing is acceptable to you, please sign this letter in the space provided and return it to me at your earliest convenience. At the time you sign and return it, this letter will take effect as a binding agreement between you and the Company on the basis set forth above. The enclosed copy is for your records.

Sincerely,
Corsicana Bedding, LLC

By: _____
Name: Michael Thompson
Title: CEO

Accepted and Agreed:

_____
Michael Loomis

Date: _____